1                    UNITED STATES DISTRICT COURT
2                    EASTERN DISTRICT OF ARKANSAS
                            WESTERN DIVISION
3

4  ------------------------------x
   CHRISTOPHER DOSS            )
5                              )
             PLAINTIFF,        )
6                              )   CASE NO. 4:13CV121SWW
   VS.                         )
7                              )
   THE CITY OF ALEXANDER; CHIEF )
8  HORACE WALTERS, INDIVIDUALLY, )
   AND AS THE POLICE CHIEF FOR )
9  THE ALEXANDER POLICE        )
   DEPARTMENT; JEFFREY WATSON, )
10 IN HIS INDIVIDUAL CAPACITY; )
   SALINE COUNTY; BRUCE        )
11 PENNINGTON, INDIVIDUALLY    )
   AND AS SALINE COUNTY SHERIFF; )
12 PAUL BABBITT, IN HIS        )
   INDIVIDUAL CAPACITY; JERRY  )
13 ODOM, IN HIS INDIVIDUAL     )
   CAPACITY                    )
14                             )
             DEFENDANTS.       )
15 ------------------------------x

16

17

18                      ---o---

19                   DEPOSITION OF

20                 CHRISTOPHER DOSS

21         Taken Tuesday, August 6, 2013

22                      ---o---

23

24

25

```
 1  A P P E A R A N C E:

 2        ON BEHALF OF THE PLAINTIFF:

 3              BRIDGETTE M. FRAZIER, ESQUIRE
                    Attorney at Law
 4                  1723 S. Broadway
                    Little Rock, Arkansas  72115
 5
          ON BEHALF OF THE DEFENDANTS:
 6
                JOHN WILKERSON, ESQUIRE
 7                  ARKANSAS MUNICIPAL LEAGUE
                    301 W. Second Street
 8                  Little Rock, Arkansas  72115

 9              GEORGE ELLIS, ESQUIRE
                    ELLIS LAW FIRM
10                  126 North Main Street
                    Benton, Arkansas  72018

11
                DAVID M. FUQUA, ESQUIRE
12                  FUQUA-CAMPBELL, P.A.
                    425 West Capitol, Suite 400
13                  Little Rock, Arkansas  72201

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

W I T N E S S E S                                    PAGE

CHRISTOPHER DOSS

       Direct Examination by Mr. Fuqua..............    5

       Cross Examination by Mr. Ellis...............   74

       Cross Examination by Mr. Wilkerson...........   87

       Re-Direct Examination by Mr. Fuqua...........  104

---o---


E X H I B I T S

Exhibit Number One................................   25

Exhibit Number Two................................   25

Exhibit Number Three..............................  104

Exhibit Number Four...............................  104

Exhibit Number Five...............................  104


---o----


Reporter's Certificate............................  109


---o----

1       The deposition of CHRISTOPHER DOSS was taken

2   before me, Robin E. Johnson, Certified Court Reporter

3   and notary public within and for the County of Pulaski,

4   State of Arkansas, duly commissioned and acting,

5   beginning at the hour of 9:35 a.m. on Tuesday, August 6,

6   2013, in the office of Bridgette Frazier, 1723 S.

7   Broadway Avenue, Little Rock, Pulaski County, Arkansas.

8       Said deposition being taken in accordance with

9   the Federal Rules of Civil Procedure and pursuant to the

10  provisions of the Arkansas Rules of Civil Procedure at

11  the instance of counsel for the Defendants in the

12  above-styled cause pending in the United States District

13  Court.

14           S T I P U L A T I O N S

15       IT IS HEREBY STIPULATED AND AGREED by and

16  between counsel for the parties that all forms and

17  formalities as to the taking, transcribing, transmitting

18  said deposition in this action are hereby waived;

19  however, the right to object to the testimony of the

20  witness on the grounds of competency, relevancy and

21  materiality is hereby expressly reserved, other than as

22  to the form of questions as propounded to the witness,

23  and may be hereinafter asserted if and when presented at

24  the time of trial of this cause without the necessity of

25  noting same at the time of taking of said deposition.

```
 1                      ---o---
 2            P R O C E E D I N G S
 3  THEREUPON,
 4                 CHRISTOPHER DOSS,
 5  having been called for examination and having first been
 6  duly sworn by the undersigned notary public, was
 7  examined and testified as follows:
 8                  DIRECT EXAMINATION
 9            MR. FUQUA:  Y'all want me to go first?
10            MR.  WILKERSON:  You bet.
11            MR. ELLIS:  You're the big chief, man.
12       The big chief.
13  BY MR. FUQUA:
14  Q    Mr. Doss, my name is David Fuqua.  I am an attorney
15  and I represent in this case Saline County, Sheriff
16  Bruce Pennington, Officer Tim Green or Deputy Tim Green
17  and Reserve Deputy Jerry Odom.
18       To my left, George Ellis, represents former Deputy
19  Paul Babbitt and then Mr. Wilkerson represents the City
20  of Alexander and its police officers.
21       We are here today to find out information about
22  your lawsuit.
23       Have you ever given a deposition before?
24  A    No, sir.
25  Q    Well, there is no trick here.  If I or either of
```

1    these other gentlemen ask you a question you don't

2    understand, please say so.

3    A    Okay.

4    Q    And we will repeat it until we're communicating

5    clearly.  What we need from you is verbal answers that

6    the court reporter can take down.  She won't do a good

7    job of interpreting nods and shakes of the head.

8    A    Okay.

9    Q    So, verbal answers.  And if I might remind you to

10   give a verbal answer, I'm not doing it to be rude.  I'm

11   just doing it to make sure that we have a good record.

12        Are you ready to start?

13   A    Yes, sir.

14   Q    Is there any reason that you can't give your

15   deposition today?

16   A    No.

17   Q    There is no reason that you can't remember the

18   events or anything of that nature?

19   A    No, sir.

20   Q    I would say other than the passage of time.  I

21   assume that erodes all of our memories to some extent.

22        Okay.  Tell us your name please.

23   A    My name is Christopher Doss.

24   Q    All right.  And what is your address?

25   A    13523 Second Street, Alexander, Arkansas.

```
 1                    MR. ELLIS:  13?
 2                    WITNESS:  523, Alexander, Arkansas 72002.
 3  BY MR. FUQUA:
 4  Q    Do you live there alone?
 5  A    Yes.  At the time.
 6  Q    Do you live there alone now?
 7  A    Yes.
 8  Q    And did you live alone at the time of the incident?
 9  A    No, sir.
10  Q    Okay.  Now, the incident that we're concerned with
11  occurred on October 9, 2011, is that correct?
12  A    Yes, sir.
13  Q    All right.  And at the time, who did you live with
14  in this house?
15  A    It was me, my girlfriend Lashanda and four of our
16  kids.
17  Q    All right.  And tell me was Lashanda -- how do you
18  spell Lashanda?
19  A    L A S H A N D A.
20  Q    What is her last name?
21  A    Billiups, B I L L I U P S.
22  Q    All right.  And you said --
23                    MR. ELLIS:  You said you spelled it B R?
24                    WITNESS:  B U L L I U P S.  Bulliups.
25  BY MR. FUQUA:
```

```
 1   Q    Okay.  All right.  And you said you had four
 2   children?
 3   A    Yes.
 4   Q    And these children are between you and Ms.
 5   Bulliups, is that correct?
 6   A    Three of them.
 7   Q    All right.  Let's start with the three that are
 8   between the two of you.  Tell me their names and ages.
 9   A    The youngest is Anauree.
10   Q    Spell that for us.
11   A    A N A U R E E.
12   Q    The last name Doss?
13   A    Yes.
14   Q    And is that a boy or a girl?
15   A    It's a girl.  She's four years old.
16   Q    Okay.  And tell me your next.
17   A    Christopher Doss, Jr.  He's nine years old.
18   Q    Okay.
19   A    And Aliyah.
20   Q    Spell that for us.
21   A    A L I Y A H.
22   Q    All right.
23   A    And she's eleven.
24   Q    Okay.  And then there was another child that was
25   not your child, is that correct?
```

1   A    Yes.  Yes.

2   Q    Who is that child?

3   A    Alondria.

4   Q    Spell that for us.

5   A    A L O N D R I A.

6   Q    What is her last name?  Bulliups?

7   A    Atkins.

8   Q    Okay.  And Lashanda is her mother, is that correct?

9   A    Yes.

10  Q    And how old is Alondria?

11  A    She's twelve.

12  Q    All right.  Now, was Alondria living with you at

13  the time?

14  A    Yes.

15  Q    Okay.  Do you know who Alondria's father is?

16  A    I heard of his name, but I don't know first name.

17  Q    Is he involved in her life at all?

18  A    No.

19  Q    Does he pay child support?

20  A    I don't know.

21  Q    Okay.  Have you and Lashanda ever been married?

22  A    No.

23  Q    Have you ever been married to anybody?

24  A    No.

25  Q    When did you and Lashanda stop living together?

1  A    I would say maybe a year now.  Close to a year.

2  Q    Okay.  Where does she live now?

3  A    She lives in Southwest Little Rock.

4  Q    Do you have an address you can give?

5  A    No, I don't.  She stays on a street called

6  Maryville.

7  Q    Do you still communicate with her?

8  A    Yes.

9  Q    Are you under any restraining order?

10 A    No.

11 Q    Any kind of order of protection with regard to her?

12 A    No.

13 Q    Are you under an order of protection with respect

14 to anybody?

15 A    No.

16 Q    Has there ever been an order of protection between

17 you and Lashanda?

18 A    No.  Not that I recall.

19 Q    All right.  Why did you break up?

20 A    Just we had differences.

21 Q    Are you under any order to pay child support?

22 A    No.  Not for these kids.

23 Q    Do you have other children?

24 A    Yes, I do.

25 Q    How many?

```
 1   A    One.

 2   Q    And tell me that child's name and age.

 3   A    Amaya.

 4   Q    Spell that.

 5   A    A M A Y A.

 6   Q    Okay.  Doss?

 7   A    William -- yes.  Williams.

 8   Q    I'm sorry.  Girl?

 9   A    Yes.

10   Q    And how old is Amaya?

11   A    Thirteen.

12   Q    Who is her mother?

13   A    Connie -- Connie Williams.

14   Q    Okay.  Where does she live?

15   A    I don't know.

16   Q    Do you see Amaya?

17   A    Yeah.  Every once in a while.

18   Q    Like once a month or --

19   A    Maybe -- maybe once, twice a year.  Three times a

20   year.

21   Q    Do you pay child support for her?

22   A    Yes.

23   Q    How much do you pay?

24   A    $55 a week.

25   Q    Do you pay that through the court?
```

1    A    Yes.

2    Q    Which county?

3    A    Pulaski County.

4    Q    Was Amaya at your house on October 11, 2011 when

5    this incident occurred?

6    A    No.

7    Q    Were the other three -- the other four children

8    present when the events occurred?

9    A    Yes.   Three of them casually.

10    Q    Which three was there?

11    A    Anauree, C.J. and Aliyah.

12    Q    Okay.   So, your -- Alondria was not there, is that

13    correct?

14    A    She was not there.

15    Q    Okay.   Do you give any money to Lashanda in support

16    of your children?

17    A    Yes.

18    Q    Okay.   How much do you give her?

19    A    It depends on if I'm -- it depends on the work that

20    I do or when I'm able to give to her.

21    Q    What would you say your average is per month?

22    A    Maybe -- maybe a hundred.

23    Q    Per month?

24    A    Yeah.   Depends on the job that I'm doing.

25    Q    Okay.   And there has never been any court order

1   entered that requires you to pay child support for your

2   children with Lashanda, is that correct?

3   A    That's correct.

4   Q    Does she work?

5   A    Not at this time.

6   Q    When is the last time she worked?

7   A    I don't recall.  I don't remember.

8   Q    How does she support herself?

9   A    I guess family.  Family helps her.

10  Q    Does she live with someone like a family member?

11  A    No.

12  Q    She lives alone?

13  A    Yes.

14  Q    So, as far as you know, any money she would have

15  for rent or food or anything else would come from family

16  members?

17  A    Yes, sir.

18  Q    Okay.  Now tell me -- tell me about your work.

19  What do you do at the present time?

20  A    At the present time I'm working for a new

21  restaurant called Mellow Mushroom.  Just started

22  yesterday.

23  Q    Okay.  What are you doing there?

24  A    I'm a dishwasher.

25  Q    Okay.  And where did you work before that?

1   A    Royal Lawn and Construction Service.

2   Q    Okay.  I heard Royal --

3   A    Lawn.

4   Q    L I O N?

5   A    L A W N.

6   Q    Oh, okay.  Royal Lawn.

7   A    And Construction.

8   Q    Okay.  And I heard someone say before we began that

9   Royal Doss is your father, is that correct?

10  A    Yes.

11  Q    Okay.  And when was the last time you worked for

12  Royal Lawn?

13  A    Maybe two or three months.

14  Q    Okay.  Why did you stop working for Royal?

15  A    Well, the work got slow.

16  Q    Okay.  Is the business of Royal Lawn and

17  Construction to do lawn maintenance and construction?

18  A    Yes.

19  Q    Do they do mostly lawn or mostly construction?

20  A    It's about even.

21  Q    Okay.  Did you quit or were you terminated?

22  A    I kind of just went on and found me -- started

23  looking for another job.

24  Q    Did you and your father talk about you needing to

25  move on?

1  A    No.  I still help him out from time to time when he

2  needs me.

3  Q    So, are you telling me that you didn't have any

4  employment for two or three months before starting at

5  the Mellow Mushroom?

6  A    Yes.

7  Q    Okay.  And for how long did you work continuously

8  for Royal Lawn Construction?

9  A    Well, with the business that we're in it's kind of

10 seasonal.  So, we might have a good -- might have a good

11 month this month and next month might not be so good.

12 Q    Okay.

13 A    It's just --

14 Q    Well, okay.  Let's start with some basics.

15      How old are you?

16 A    Thirty-three.

17 Q    What is your birth date?

18 A    January 12th, 1980.

19 Q    Okay.  And did you grow up in Alexander?

20 A    Yes.

21 Q    Where did you go to high school?

22 A    Joe T. Robinson.

23 Q    That seems like a long way to go.

24 A    Yes, sir.

25              MR. ELLIS:  That's not unusual.

```
 1              MR. FUQUA:  Yeah, I guess that's true.
 2   BY MR. FUQUA:
 3   Q    Now, your house at -- let me get the address
 4   straight here.  Your house at 13523 Second Street -- to
 5   your knowledge is that in Pulaski or Saline County?
 6   A    I would have to say Pulaski County.
 7   Q    Okay.  To your knowledge you lived in the Pulaski
 8   County Special School District, is that correct?
 9   A    Yes, sir.
10   Q    Okay.  Did you graduate high school?
11   A    Yes.
12   Q    What year did you graduate?
13   A    1998.
14   Q    Did you pursue any education after high school?
15   A    Yes, sir.
16   Q    Tell me about that.
17   A    I went to Pulaski Technical College for two years.
18   Q    Did you get an Associate's Degree?
19   A    No, sir.
20   Q    What did you study?
21   A    Auto collision repair.
22   Q    And did you have any -- why did you stop before you
23   got a degree?
24   A    I just didn't finish.
25   Q    Okay.  Did you do any work in the field of auto
```

1  collision repair?

2  A    No, sir.

3  Q    Were you working while you were going to school?

4  A    Yes, sir.

5  Q    Were you working for your father?

6  A    Yes, sir.

7  Q    Since getting out of high school, has all of your

8  work been for Royal Lawn and Construction?

9  A    Since high school?  No.  I had another job working

10 for a temporary service and --

11 Q    Which service?

12 A    I think it was -- I don't want to be wrong about

13 it.  I think it was Personnel or Staffmark something.

14 Q    Okay.  Well, when did you do that?

15 A    Maybe 2003.  2004.  I'm not sure.

16 Q    Okay.  But other than that, you worked for Royal

17 Lawn and Construction, is that correct?

18 A    Yes, uh-huh.

19 Q    Okay.  Now, in your life have you had any criminal

20 convictions?

21 A    Yes, sir.

22 Q    All right.  Well, let's talk about those.  How many

23 have you had?

24 A    Maybe two.

25 Q    Okay.  Two that you can remember?

```
 1   A     Yeah.  One or two.
 2   Q     All right.  Well, tell me -- tell me about the
 3   first one you can remember.
 4   A     I remember I had a charge of theft by receiving.
 5   Q     What county was that?
 6   A     It was in Pulaski County.
 7   Q     Okay.  And did you plead guilty to that or did you
 8   have a trial?
 9   A     Yes.  Yes, I pled guilty.
10   Q     What was your sentence?
11   A     I think it was five years in the ADC.
12   Q     Okay.  And how much time did you actually serve?
13   A     About ten months.  Eleven months.
14   Q     Which unit were you in?
15   A     My parent unit was Newport.
16   Q     And what year did you get that conviction?
17   A     2008 maybe.  It's so long ago.  I can't hardly
18   remember.
19   Q     Okay.  What were the facts that brought that
20   charge?
21   A     I don't understand your question.
22   Q     Well, what did you do that caused you to catch that
23   charge?
24   A     Oh, okay.  It was -- I was driving the car --
25   driving the car.
```

1  Q    Driving a stolen car?

2  A    No.  I was driving the car with my brother that I

3  had -- had took some things.

4  Q    Okay.  So, your brother stole some things?

5  A    Yeah.  He stole some money.

6  Q    Okay.  What's your brother's name?

7  A    Patrick Doss.

8  Q    Did he get convicted on the same thing?

9  A    Yes.

10 Q    So you were in possession of some stolen property

11 that your brother had stolen, is that correct?

12 A    Yes.

13 Q    Okay.  And tell me about -- do you remember another

14 conviction you had?

15 A    Yes.  It was possession of a controlled substance.

16 Q    And what was the substance?

17 A    Cocaine.

18 Q    When did you get that conviction?

19 A    I think it was the same year.  2008, if I'm not

20 mistaken.

21 Q    All right.  What was the sentence or what was

22 the --

23 A    It was -- it was probation.

24 Q    Okay.  Was this -- was this -- was that conviction

25 before or after the theft by receiving?

```
 1   A    It was -- I want to say -- I want to say before it.
 2   Q    Okay.  How many brothers and sisters do you have?
 3   A    One brother, one sister.
 4   Q    Well, we know Patrick.  Where does Patrick live
 5   now?
 6   A    He stays -- he stays in Little Rock.
 7   Q    Do you know his address?
 8   A    No, sir.
 9   Q    Okay.  Does he work anywhere?
10   A    Yes.
11   Q    Where does he work?
12   A    He works someplace in Maumelle.  A warehouse.
13   Q    Okay.  Now, he was not present in your home on the
14   night of this incident that we're going to talk about?
15   A    No, sir.
16   Q    All right.  And tell me your sister's name.
17   A    Melissa Doss.
18   Q    Now, is she older or younger than you?
19   A    She's older.
20   Q    Okay.  Is Patrick older or younger?
21   A    Older.
22   Q    All right.  And where does Melissa live?
23   A    She lives in Alexander.
24   Q    What does she do?
25   A    She works at the Highway Department.
```

1  Q    Okay.  Was she present on the night of this event?

2  A    No, sir.

3  Q    Okay.  Was -- was there any other member of your

4  family present other than Lashanda and your children?

5  A    No, sir.

6  Q    All right.  Were there any other witnesses other

7  than -- well, I will get to the witnesses in a minute.

8       All right.  Let's move on to arrests and I'm going

9  to exclude the -- for the moment I'm going to exclude

10 the event that you filed suit on, but I -- can you tell

11 me about any other arrests you have had?

12 A    Yes.  I have been arrested for public intoxication.

13 Mostly from the City of Alexander.

14 Q    Okay.  And how many times have you been arrested

15 for public intoxication?

16 A    About maybe six or seven times.

17 Q    Okay.  Have you ever gotten -- have you ever been

18 arrested for DWI?

19 A    Yes.

20 Q    How many DWI arrests have you had?

21 A    Two.

22 Q    Were those out at Alexander as well?

23 A    I think it was Bryant.

24 Q    Two out of Bryant?

25 A    One out of -- I think one out of Little Rock and

1    one out of Bryant.

2    Q    Okay.  Well, let me go back to the public intox.

3         Were those arrests processed -- does the City of

4    Alexander have a Municipal Court?

5    A    Yes, sir.

6    Q    Okay.  Were those public intox arrests processed

7    through Alexander Municipal Court?

8    A    Yes.

9              MR. ELLIS:  District Court.

10   BY MS. FRAZIER:

11   Q    Or District Court.  I'm sorry.

12             MR. ELLIS:  You're dating yourself.

13             MR. FUQUA:  I am.

14   BY MR. FUQUA:

15   Q    Did you plead guilty or get convicted on all of the

16   public intox arrests?

17   A    Yes.  I think so.  No -- let me see.  Sometimes I

18   think I got like time served or --

19   Q    Well, let me ask it this way.  And I'm -- I mean I

20   can go look at the records.

21   A    Okay.

22   Q    And I don't -- you know, I'm not expecting you can

23   remember everything, but do you remember having a trial

24   where you were found not guilty on a public intox

25   charge?

```
 1   A    Maybe a couple of times.

 2   Q    Okay.  When was the last time you were arrested for

 3   public intox?

 4   A    Last time?  Let me see.  Maybe June sometime.

 5   Q    Of this year?

 6   A    Yes.

 7   Q    Okay.  2013?

 8   A    Hold on.  I'm not still having tickets.  I don't

 9   remember.  I know -- I think it was either June --

10   February, March, April, May.  I think it was May.

11   Q    All right.

12   A    May or June.

13   Q    All right.  Well, that's fair enough.

14        Okay.  Well, let's talk about your DWI arrests.

15   When was the last arrest for a DWI?

16   A    I think it's been over three years.

17   Q    Okay.  And how long has it been since the first

18   one?

19   A    Over five or six years.

20   Q    Do you have a driver's license?

21   A    No.  No, sir.

22   Q    Why do you not have a driver's license?

23   A    I'm still paying off fines so I can get them back.

24   Q    Okay.  What would these fines be for?

25   A    The DWI.
```

```
 1  Q    Okay.  Which courts do you owe the money to?
 2  A    Bryant.
 3  Q    And how much do you pay a month?
 4  A    I pay -- I think it's $50 a month.
 5  Q    Do you know how much more you owe?
 6  A    It's like 1700.
 7  Q    Okay.  How do you get to work?
 8  A    My parents, friends, family.
 9  Q    This is a bit of a personal question, but -- I
10  mean, the evidence so far suggests that you have got a
11  drinking problem.  Do you think that's true?
12  A    No, sir.
13  Q    Have you ever been in any alcohol programs?
14  A    A while back.
15  Q    Okay.  How long ago?
16  A    Maybe three years.  Three or four years.
17  Q    Was that a part of a DWI conviction?
18  A    Yes.
19  Q    Have you stopped drinking?
20  A    No, sir.
21  Q    Have you told me about all of your arrests and
22  convictions that you can recall?
23  A    Yes.
24  Q    Okay.  Your attorney gave us some -- some papers
25  this morning and I'm going to start with some
```

1  photographs.  Let's start with the one that's -- well,

2  they're all dated 12-10-2011.  I'm going to show you the

3  one that just has a single photograph on there.

4          MS. FRAZIER:  If I can just make a

5          correction.  I did inquire as to the date and

6          they're backwards.  They're supposed to be

7          10-12-2011.

8          MR. FUQUA:  Okay.

9          MS. FRAZIER:  It's not December, but they

10         were taken October 12, 2011.

11         MR. FUQUA:  The day, month and year.

12         MR. ELLIS:  That would make more sense

13         because the allegation is as of October 9

14         2011.

15         MR. FUQUA:  Okay.  Well, I think I'm

16         going to go ahead and mark this as Exhibit One

17         to your deposition.

18         (THEREUPON, Exhibit Number One and Two

19         were marked and identified for the record.)

20  BY MR. JONES:

21  Q    Okay.  Let me put this on here.

22       Tell me what Exhibit One is.

23  A    It shows prongs.  It shows where they tased me.

24  Q    Okay.  Whose -- and it looks like a woman's hand

25  there.  Whose hand is that?

1    A    That would be my sister Melissa.

2    Q    Who took the photograph?

3    A    She did.

4    Q    Okay.  Let me look at this.  Could I borrow yours

5    for a minute, Bucky?  And that way we can look together.

6         It looks like her hand is next to a dark spot on

7    your skin, is that correct?

8    A    Yes, sir.

9    Q    And that's where one of the taser darts struck you?

10   A    Yes, sir.

11   Q    And further to the right there looks like

12   another -- I will call it a dot or a scar.  Do you see

13   what I'm talking about?

14   A    Yeah.  At the top?

15   Q    Yeah.  It's more to the top and to the right?

16   A    Uh-huh.

17   Q    Is that another taser scar or was that from

18   something else?

19   A    No.  I think that was from something else.

20   Q    All right.  Let me draw a circle around that one

21   and -- how many darts hit you?

22   A    I think it was one.

23   Q    One dart?

24   A    One or two.

25   Q    Okay.  All right.  Have you got a pen I can use?

1    Mine doesn't work too well.  That doesn't work too well

2    either.

3                   MR. ELLIS:  This one works.

4                   MS. FRAZIER:  Do you have one that works?

5                   MR. FUQUA:  Yeah.  This one works.

6    BY MR. FUQUA:

7    Q    I drew a circle around the blemish that you say is

8    not related, is that correct?

9    A    Yes.

10   Q    And then -- and between the laser scar and this

11   other scar, there is kind of a what I will call a longer

12   scar.  Is that correct?

13   A    Yes, sir.

14   Q    Does that one have anything to do with --

15   A    No, sir.

16   Q    -- this arrest incident?

17   A    It's a childhood scar.

18   Q    Okay.  And your attorney said that these

19   photographs were taken on October 12, 2011.  Is that

20   true to the best of your recollection?

21   A    Yes, sir.

22   Q    That would have been the day after the incident, is

23   that correct?

24   A    It would have been two days after.

25   Q    Okay.  All right.  Okay.  Then I'm going to mark --

 1  A      Three days.

 2                  MR. ELLIS:  Can I see the exhibit?

 3  BY MR. FUQUA:

 4  Q      All right.  I have marked -- why don't you trade

 5  with me and I will let you look at this one?

 6                  MR. ELLIS:  Look at this one.

 7                  MR. FUQUA:  No.  This one is fine.

 8  BY MR. FUQUA:

 9  Q      Let's look at the picture at the top.  It looks

10  like you have got two bandages, is that correct?

11  A      Yes, sir.

12  Q      Where did you get the bandages?

13  A      Those bandages my sister put on.

14  Q      Were they -- okay.  And then let's look at the

15  photograph below that.  Again, it looks like there are

16  two scars, is that correct?

17  A      Yes.  Two holes, yeah.  Yes, sir.

18  Q      And is it your testimony that each one of those

19  holes as you have described it was where a taser dart

20  struck you, is that correct?

21  A      Yes, sir.

22  Q      And, again, that's your sister's hand?

23  A      Yes.

24  Q      And your sister is taking the photograph, is that

25  correct?

1   A    Yes.

2   Q    These were taken after you got out of jail, is that

3   correct?

4   A    Yes.

5   Q    Okay.  All right.  I'm going to talk about -- I'm

6   going to ask you about the -- I'm going to ask you in

7   detail about the whole event, but I want to focus first

8   on the actual tasering part of it.  Okay?

9   A    Yes.

10  Q    Now, how far -- well, let me try to get in basic --

11  do you know which officer actually used the taser?

12  A    No, sir, I don't.

13  Q    Was this the first time that you had been involved

14  with or arrested by Saline County deputy sheriffs?

15  A    Can you ask that question again?

16  Q    Yeah.  Saline County deputy sheriffs.  Was this the

17  first time that you were arrested by Saline County

18  deputies?

19  A    I think -- yes, I think so.

20  Q    All right.  But maybe I can -- maybe this is a

21  little simpler way.

22       Can you recall any history with Saline County

23  deputies before this event?

24  A    I can't recall.  I can't recall.

25  Q    Okay.  You didn't -- on the night that this event

1 occurred, you did not recognize any of the Saline County

2 officers that were there.  Is that --

3 A    No.  That's true.

4 Q    Okay.  All right.  Did you see the Saline County

5 deputy pull his laser from his holster?

6                MS. FRAZIER:  Taser?

7                MR. FUQUA:  Taser.  I'm sorry.  What did

8       I call it?

9                MS. FRAZIER:  Laser.

10               WITNESS:  No, I didn't see which one shot

11       me with the taser.

12 BY MR. FUQUA:

13 Q    Okay.  Did anyone give you any kind of a warning

14 before firing the taser?

15 A    No.

16 Q    And by "warning," I mean anything like, you know,

17 "stop fighting," or --

18 A    No.

19 Q    -- "lay down," or --

20 A    Okay.  They did say -- I heard a voice that said,

21 "Get your hands up and turn around -- and get on the

22 ground."

23 Q    Okay.

24 A    That was the terms they used.

25 Q    And do you know who said that?

1    A    No.

2    Q    Can you distinguish that as being somebody that was

3    with Saline County or with the City of Alexander?

4    A    I wouldn't know which one said it.  I just did what

5    they told me to do.

6    Q    So, someone said, "Raise your hands and lay down on

7    the ground?"

8    A    Yes.  They said, "Turn around."

9    Q    Okay.

10    A    "Turn around and get on the ground."  As I turned

11    around, that's when I was tased.

12    Q    At the point you were tased, did you have -- did

13    any police officer out there have hands on you?

14    A    Before I was tased?  Is that what you're asking?

15    Q    Well, at the time -- at the time that you were

16    actually tased, did any officer have his hands on you?

17    A    No.  No.

18    Q    At the time you were tased, were you laying down?

19    A    No.

20    Q    At the time you were tased, had you raised your

21    hand?  Hands.  I'm sorry.

22    A    Yeah.  Hands was up, turned around, tased, hit the

23    ground.

24    Q    All right.  Before you were tased, did you ever see

25    an officer with a taser in his hand?

1  A    No.

2  Q    Before this event, did you know what a taser looked

3  like?

4  A    Yes.

5  Q    Had you ever -- before this incident had you ever

6  been tased?

7  A    No.

8  Q    This was the first?

9  A    First time.

10  Q    Okay.  Since this event, have you been tased by

11  another officer in another arrest?

12  A    No.

13  Q    Okay.  But at the time this happened, you were able

14  to identify what a taser looks like, is that correct?

15  A    Yes.

16  Q    Okay.  So, what I'm hearing you say is, you never

17  saw an officer with a laser in his hand -- a taser.  I'm

18  sorry.  If I say laser, I mean taser.

19       You never saw an officer with a taser in his hand

20  before you felt the --

21  A    No, I didn't.

22  Q    Okay.  And based on the photographs that you have

23  shown us, it appears that you were tased in the back, is

24  that correct?

25  A    Yes, sir.

1  Q    What I'm hearing you say is that you were tased --

2  so, before you were tased you had turned around,

3  correct?

4  A    Yes.

5  Q    Do you remember if there were -- when you were

6  turned around, were there officers standing in front of

7  you?

8  A    Yes.

9  Q    Do you remember who they were?

10  A    No.  I knew one.  One was Officer Watson.  That's

11  the only one that I remember.

12  Q    All right, sir.  And Officer Watson was with

13  Alexander, is that correct?

14  A    Yes.

15  Q    At the time you were tased, was he in front of you?

16  A    Yes.

17  Q    Yes?

18  A    Yes, he was.

19  Q    At the time you were tased, were you -- were you

20  physically resisting any officer?

21  A    No, sir.

22  Q    Okay.  And were you verbally resisting any officer?

23  A    No, sir.

24  Q    I mean, were you talking back at all or arguing?

25  A    No, sir.

1  Q    So, from your point of view there was nothing about

2  your behavior that would have been threatening, is that

3  correct?

4  A    That's correct.

5  Q    Now, you said you had been ordered to lay down or

6  get on the ground, but you hadn't done that yet, is that

7  correct?

8  A    That's correct.  I didn't have a chance.

9  Q    Okay.  So, before you even had a chance to get on

10 the ground you were tased, is that correct?

11 A    Yes.

12 Q    Do you know who gave you the order to raise your

13 hands and lay down?

14 A    No, I don't.  I had flashlights in my face.  I

15 couldn't even see past it.  So, I didn't see anything

16 but people walking towards me.

17 Q    All right.  Now, my understanding of the way these

18 tasers work is that when an officer fires it, it shoots

19 these barbs that are connected to the taser by wires.

20 Is that what you understand?

21 A    Yes.

22 Q    And when you were hit by these barbs, do you recall

23 two barbs hitting you basically at the same time?

24 A    Pretty much.  I couldn't even feel the barbs until

25 after the fact.

1  Q    Okay.  Well --

2  A    And the tase -- I mean, the tasers were -- I felt.

3  Q    So, you felt the shock?

4  A    The shock.

5  Q    Okay.  And how long did the shock last?  What would

6  your estimate of that be?

7  A    About ten seconds.

8  Q    Okay.  Was it one continuous shock?

9  A    Yeah.  The first one.  The first one was.

10 Q    All right.  And did the first one knock you down?

11 A    Yes.

12 Q    And how many times were you tased all together?

13 A    Four times.

14 Q    Four times?  What was the interval between each

15 one?

16 A    I don't know.  From my yard to the police car I got

17 tased four times.  While I was at home, because --

18 Q    Okay.  Well, all right.  So, let me go back and

19 kind of break that down.

20     The first shock knocked you down.  That's what I

21 hear you saying, is that correct?

22 A    And they cuffed me.

23 Q    All right.  And do you know who cuffed you?

24 A    No.

25 Q    Do you know if it was a Saline County deputy or a

1  Alexander policeman?

2  A    I don't know which one.

3  Q    Okay.  Did anyone help you to your feet?

4  A    Yes.

5  Q    Do you know who that was?

6  A    No.  I was out of it.

7  Q    Okay.  Do you recall anybody saying anything to you

8  during this process of being cuffed and picked up?

9  A    No.

10  Q    And how far were you from the car that you were

11  placed in?

12  A    About 110 feet.

13  Q    Okay.  And this happened in your front yard, is

14  that correct?

15  A    In my backyard.

16  Q    In your backyard.  So, you had to be escorted from

17  your backyard out to the front of the house, is that

18  correct?

19  A    Yes.

20  Q    Was the car parked in the front or in the driveway?

21  A    Beside the street.

22  Q    Okay.  And was this -- were you placed in a Saline

23  County car or in an Alexander car?

24  A    I think it was an Alexander.

25  Q    Okay.  Now, you mentioned you knew an officer named

1  Watson.  Do you remember anything specific that happened

2  with Watson out there?

3  A    During this time?

4  Q    Yeah.

5  A    Yes, I remember them high fiving each other after

6  they got me in the police car.

7  Q    Okay.  All right.  Now, let's get back to the

8  taser.

9        You say you were tased a total of four times.  So,

10  what I thought I heard you saying is that you got three

11  additional shocks between the backyard and being placed

12  in the car, is that correct?

13  A    Yes.

14  Q    Were you doing anything that would have provoked

15  that response from the officer?

16  A    No.  No.

17  Q    Did this just seem like random shocks that --

18  A    Yeah.  Yes, it did.  It was -- the wires were still

19  in my back and when I was walking -- I'm in handcuffs

20  and I'm walking from the backyard to the police car.

21  Every time they tased me, I would fall down to my knees.

22  And it happened three times before I got in the police

23  car.

24  Q    Did anybody say anything at the time that you were

25  shocked?

1  A    I don't know.  It was -- I was -- I was just

2  overwhelmed by the shock.  I couldn't heard nothing

3  or -- I mean, I don't know if there were or what.  I

4  don't know if they was saying anything.

5  Q    You don't recall anything?

6  A    I don't recall.

7  Q    All right.  And your testimony is that there was

8  nothing you were doing that would have caused or

9  required that you be tased any time, is that right?

10  A    Correct.

11  Q    Because -- is that because you were compliant with

12  the orders the policemen gave you?

13  A    Yes, sir.

14  Q    Okay.  And when were you -- as I understand it you

15  were taken to the Saline County jail, is that right?

16  A    Yes.

17  Q    Did someone remove the barbs from your back?

18  A    Yes, sir.

19  Q    Do you know who did that?

20  A    One of the deputies that was there at the jail.

21  Q    Do you remember if the -- and how did the deputy do

22  that?

23  A    Maybe with some wire pliers, needle nose or

24  something like that.

25  Q    Does that basically just mean that the deputy

```
 1  grabbed it with the pliers and pulled it out?  Like
 2  pulling out a fish hook or something?  Is that right?
 3  A    Yes, sir.
 4  Q    Okay.
 5              MS. FRAZIER:  You have to say yes or no
 6         so she can --
 7              WITNESS:  Yes, sir.
 8  BY MR. FUQUA:
 9  Q    Do you remember if the wires were still connected
10  to the taser at the time the barbs were pulled out?
11  A    No, it wasn't.
12  Q    Do you know when the barbs were disconnected?
13  A    Yes.  I did it.  I broke the wire.
14  Q    When did you do that?
15  A    When they put me in the police car they still had
16  the gun in their hand.  I was in the police car and I
17  grabbed the wire and I broke it.  Just like that.
18  Q    Okay.  Was it a single wire or was it two?
19  A    Two.
20  Q    Okay.  So you broke the two wires?
21  A    Yes.
22  Q    Is that right?
23  A    Yes, sir.
24  Q    Did anybody say anything about that?
25  A    No, sir.
```

1  Q    All right.  Let's move on to the issue of how this

2  all got started.  Okay?

3                  MR. ELLIS:  Is this a place to take a

4        break?

5                  MR. FUQUA:  Okay.  This is good.

6                  (THEREUPON, there was a brief period off

7        the record.)

8  BY MR. FUQUA:

9  Q    Okay.  This incident that we're to talk about -- it

10 looks like it occurred at the address you gave me

11 beginning 13523 West Second Street.  Is that where the

12 incident occurred?

13 A    Yes.

14 Q    And I believe you told me earlier at the time you

15 were living there with Lashanda and your children, is

16 that right?

17 A    Yes.

18 Q    And did you own that home?

19 A    Yes.  Yes.  I own it.  Well, I'm still making

20 payments on it.

21 Q    Who do you make your payments to?

22 A    Green Tree Mortgage Company.

23 Q    Okay.  How much is your mortgage payment?

24 A    Four thirty-seven ten.

25 Q    Okay.  As a result of that incident, it appears

1  that you were charged -- and I'm just reading this off

2  the arrest disposition report.  It appears you were

3  charged with drinking in public, disorderly conduct,

4  resisting arrest, terroristic threatening of a law

5  officer.

6       Do you remember those charges?

7  A    Yes, sir.

8  Q    Were you -- did you go to trial on any of those

9  charges?

10  A    No, sir.

11  Q    What happened to the charges?

12  A    The case was dismissed.

13  Q    Why was the case dismissed?

14  A    I think Officer Watson had quit or something and

15  ended up having -- the case was dismissed.

16  Q    Okay.  Was the case called in court?

17  A    Yes.

18  Q    Were you in court one day for trial?

19  A    No.

20  Q    Well, sometimes cases are dismissed because lawyers

21  don't show up.

22  A    Uh-huh.

23  Q    Is that what happened?

24            MS. FRAZIER:  I was his attorney then.

25       His attorney showed up.

1           MR. FUQUA:  I'm sorry.  I meant the

2     prosecuting attorney.  Well, I don't know.  I

3     mean, if you want to tell us why --

4           MS. FRAZIER:  The attorney just decided

5     to non-pros it because the public intox -- he

6     wasn't in public.  I can't speak for the

7     prosecuting attorney.  He just non-prosed all

8     the charges, because there wasn't really a

9     case he could prosecute successfully.  At

10    least that's what he told me.

11          MR. FUQUA:  Who was the prosecutor?

12          MS. FRAZIER:  You know -- I forget his

13    name.  I have it -- he worked sometimes out of

14    Saline County.  I believe there was some kind

15    of an arrangement in Saline County where he

16    came in Alexander.

17          MR. FUQUA:  This was in Alexander

18    District Court?

19          MS. FRAZIER:  Yes.  So we showed up for

20    trial and he non-prosed it.

21          MR. WILKERSON:  Was his name Vince?

22          MS. FRAZIER:  Shoptaw.

23          MR. WILKERSON:  Yes.

24          MS. FRAZIER:  Yes.

25          MR. WILKERSON:  It was Ed Shoptaw?

```
 1                    MS. FRAZIER:  Yes.
 2   BY MR. FUQUA:
 3   Q    Okay.  Thank you.  All right.  I want to -- have
 4   you looked at any documents before starting your
 5   deposition to help refresh your memory about what
 6   happened?
 7   A    No.
 8   Q    All right.  Tell me what happened that caused the
 9   police to come to your house in the first place.
10   A    Okay.  It started off -- it started off that
11   morning.  Me and my parents -- we was working on a
12   mobile home underpinning and we had been grilling and --
13   you know, all day long that day.  And then around 12:25
14   my kids came home.
15   Q    Are we talking about 12:25 p.m.?
16   A    A.m.  We had been working on this mobile home all
17   day long and I had the -- I had the three kids with me
18   and she had the oldest girl, Alondria, with her.  And so
19   when she came home that night or twelve a.m. -- 12:25
20   a.m. I asked her why she would leave me with the three
21   kids and -- knowing I was trying to help my parents fix
22   this mobile home.  And so she said she didn't want to
23   talk about it.  So, I said, "Well, if you don't want to
24   talk about it you can get your stuff and leave."
25        And so I asked the kids -- I asked the kids did
```

```
 1  they want -- did they want to go with their mom or did
 2  they want to stay with me.  So, the kids said, "We want
 3  to stay with you."  And so she said, "Well, I'm
 4  calling" -- Lashanda said, "I'm going to call the police
 5  to help me get my stuff."  I was like, "Go ahead.  Call
 6  the police."
 7       So Officer Watson arrived around 12:40 -- around
 8  12:47 and --
 9  Q    Now, are you looking at something to remind you?
10  A    No.  No.
11  Q    There is some paper in front of you.  Are you
12  referring to the paper?
13                  MS. FRAZIER:  Are you looking at this?
14                  WITNESS:  No.
15                  MS. FRAZIER:  I will set it here.
16                  WITNESS:  Around 12:47 he talked to
17           Lashanda in my driveway.  So, she got her
18           things and I asked the kids again -- I said,
19           "Are you going to stay with me or are you
20           going with your mom?"  Aliyah said, "Since the
21           police is here, we're going to go with mom."
22           I said, "Okay.  Fine."  They got in the car
23           with Lashanda and they left.
24                  Officer Watson was still standing there
25           in my driveway up to about ten minutes and I
```

1        asked him -- I said, "Why are you still here?"

2        I said, "You can leave now."  And so, he got

3        in his car and he left.

4            I went back to my grill and restarted my

5        fire, because it had went out.  And so I was

6        at my grill and I heard some cars pulling

7        up -- out there by the road.  So, I see the

8        Alexander car and I see three of the Saline

9        County cars.  And so they got out and I'm

10        still there by my grill.  I'm facing them.

11        They start walking down between the two mobile

12        homes that I had been working on and I stay

13        next door to the mobile home.  And then

14        between the mobile home they got to walking

15        and -- like shoulder to shoulder.  You know,

16        side by side with flashlights and they had

17        them in my face and I couldn't see nothing

18        behind me.  But I did know it was a police

19        officer.  So, at that time they said, "Get

20        your hands up and turn around and get on the

21        ground."  I got my hands up, turned around to

22        get on the ground and before I could get on

23        the ground they tased me in my back.  That's

24        when I hit the ground and they -- they put the

25        handcuffs on me and I was still -- I mean, my

```
 1              arms were still stiff from the tase.  Like --
 2              I guess, that's what it does.  It locks your
 3              muscles up.  And so, they put me in handcuffs,
 4              picked me up and on the way to the car is when
 5              I was tased three more times before they put
 6              me in the police car.
 7  BY MR. FUQUA:
 8  Q    Okay.  Thank you.  I'm going to go back over some
 9  of this.
10      First of all, it sounds like Lashanda and the
11  children did not actually witness your arrest.
12  A    Yes.  True.  Exactly.
13  Q    All right.  To your knowledge, was there any
14  witness to the arrest and the tase other than yourself
15  and the police officers who were there?
16  A    No witness.  I was all alone.
17  Q    All right.  So, Lashanda took -- this happened on a
18  Saturday, is that right?
19  A    It was -- well, we had been -- I think it was a
20  Saturday.  It was a Saturday and -- after midnight, so
21  it was Sunday.
22  Q    Right.  Okay.
23  A    So, it was kind of like Sunday morning when I got
24  tased.
25  Q    All right.  And -- so, what I heard you say is
```

1   Lashanda left sometime on Saturday without the children,

2   correct?

3   A     Yes.   She took the -- correct.   She took the

4   oldest -- the oldest child, Alondria, with her and left

5   me with the three younger ones and I had been working

6   and trying to watch them and -- all day long and putting

7   food on the grill so we can have something to eat.

8   Q     And the -- you said that you were helping your

9   parents underpin a mobile home?

10   A     Yes, sir.

11   Q     How close was that mobile home to where you live?

12   A     It's right next door.

13   Q     Okay.

14   A     Right next door.

15   Q     And I'm sorry if I asked this, but I don't remember

16   the answer.   What time did Lashanda leave?

17   A     She left around -- maybe 11:30, 11:45, somewhere in

18   between there.

19   Q     A.m. or p.m.?

20   A     P.m.

21   Q     So, she -- when did you start to work with your

22   parents?

23   A     We started about ten or eleven that a.m.

24   Q     All right.   Saturday morning?

25   A     Saturday -- yeah, morning.

```
 1   Q     Okay.

 2   A     Yes.

 3   Q     And had you -- by the time Lashanda left, had you

 4   completed the work on the mobile home?

 5   A     When -- at the end of the night?

 6   Q     Yeah.

 7   A     Yes.  At the end of the night we was done working

 8   on the mobile home.  We was just kind of sitting there

 9   grilling and --

10   Q     And were you drinking alcohol?

11   A     Yes.  Yes, I had some beer.

12   Q     What time did you start drinking?

13   A     Maybe about -- maybe about one.

14   Q     One in the afternoon?

15   A     In the afternoon, yes.

16   Q     Was Lashanda drinking?

17   A     Lashanda wasn't there.  She had left with the older

18   child and had been gone all day.

19   Q     All right.

20   A     So when she got home I asked her where she had been

21   and why would she leave me here working with my parents

22   and trying to watch the kids.

23   Q     Okay.

24   A     And she didn't want to talk about it.

25   Q     I really did misunderstand what you told me.  So,
```

1   let me ask it again.

2       I thought you said that Lashanda left with the

3   oldest child about 11:30 p.m.

4   A   No.  No, sir.

5   Q   She left about 11:30 a.m.?

6   A   Yes.

7   Q   Okay.  All right.

8   A   On a Saturday.

9   Q   Okay.  Do you know where she went?

10   A   No, I don't.  I still don't know.

11   Q   Had she and you been arguing before she left?

12   A   No.  No.

13   Q   Okay.  And you told me you started drinking beer

14   about 1:00 o'clock p.m., is that correct?

15   A   Yes, sir.

16   Q   How many beers do you think you had before the

17   police showed up?

18   A   Maybe -- maybe six.

19   Q   Do you think you were intoxicated?

20   A   No, sir.

21   Q   All right.  And what you told me was -- maybe this

22   is where I misunderstood you.  Lashanda came back to the

23   house at night.

24   A   Yes.

25   Q   About what time did she come back?

1  A    About eleven -- about 11:30, somewhere in there.

2  P.m.

3  Q    Okay.  And you asked her where she had been and why

4  she had left you alone with the kids, is that correct?

5  A    Yes.

6  Q    And she said, "I don't want to talk about it."

7  A    Yes.

8  Q    And so that's when you said --

9  A    That's when we started to argue.

10  Q    All right.  And your response to her was, "Well, if

11  you're not going to talk about it, you can leave."

12  A    Yes.  "You can get your stuff and you can leave."

13  Q    All right.  And was she arguing about whether she

14  should leave or was she okay with leaving?

15  A    I guess she was okay to leave.  She was okay with

16  leaving.  I guess she just wanted to make a scene or --

17  I don't know, but she wanted the police to be there

18  while she get her stuff.

19  Q    All right.  As between the two of you, were y'all

20  yelling at each other?

21  A    Yeah.  We had a couple of words to each other.

22  Q    Was it loud enough that somebody might consider it

23  a disturbance?

24  A    No, I don't think -- it wasn't loud like that.

25  Q    Okay.

1   A    Because I don't have neighbors on either side of me

2   at that time.

3   Q    Okay.  What I'm hearing is that she -- well, let me

4   back up.

5        And I'm just going to call it an argument, but this

6   argument you had with her -- was this inside or outside?

7   A    It was outside when she pulled in.

8   Q    Okay.  Was she still outside when she called the

9   police?

10  A    Yes.

11  Q    Did she go inside your house before the police

12  arrived?

13  A    No.  No.

14  Q    Officer Watson was the officer that responded, is

15  that correct?

16  A    Yes.

17  Q    And how long did it take for him to get there?

18  A    Maybe fifteen minutes.

19  Q    Did you and Lashanda stay outside while --

20  A    Yes.

21  Q    -- waiting on the policeman?

22  A    Yes, and my kids were inside watching TV.

23  Q    Okay.  Did you and Lashanda continue to argue with

24  each other while you were waiting on the policeman?

25  A    Yeah, we had some words.  Yes, we were arguing.

1  Q    When Officer Watson arrived, did he talk to you at

2  all?

3  A    No.  No.  He was in the driveway talking to her.

4  Q    Did -- did he go in to the house with her so she

5  could get her things?

6  A    No.

7  Q    Did -- he stayed outside with you, is that correct?

8  A    Yes, sir.

9  Q    While -- and she went in alone to get her things?

10  A    Yes, sir.

11  Q    Did he talk to you at all?

12  A    No.

13  Q    So y'all didn't exchange any words?

14  A    We didn't exchange any words.

15  Q    Okay.  Now, you told me that originally -- first,

16  you asked the kids if they wanted to go with her or stay

17  with you and they said stay with you.

18  A    Yes.  That was -- yes.

19  Q    And that was before the police arrived, is that

20  correct?

21  A    Yes.  Yes.

22  Q    And then I thought you said they ultimately ended

23  up going with Lashanda.

24  A    Yes.

25  Q    Do you know what changed their mind?

1  A    I think there was -- I think they was afraid of the

2  police and -- I guess when she went in the house -- I

3  guess she persuaded them to go ahead and leave with

4  her -- which I didn't have a problem with.

5  Q    Okay.  The only officer there at that time was

6  Officer Watson.  Is that true?

7  A    Yes, sir.

8  Q    Was there any -- was there anything that happened

9  in front of Officer Watson between you and Lashanda like

10 an argument or an exchange of words or --

11 A    Well, yes.  We were still kind of arguing back and

12 forth, but I was standing in the yard and she was, you

13 know, getting her stuff and getting the kids.  Getting

14 in the car and they left.

15 Q    Did Officer Watson have to intervene to either

16 separated the two of you or --

17 A    No, sir.

18 Q    -- have you be quiet or anything like that?

19 A    No, sir.

20 Q    So, he's just standing there watching?

21 A    Just standing there watching.

22 Q    All right.  And you said that once she got her

23 things she drove away, is that correct?

24 A    She drove away, yes, sir.

25 Q    All right.  And you said Officer Watson -- I think

1  you said stayed in the --

2  A    He stayed in my driveway up to like ten minutes and

3  that's when I started to ask him -- I was like, "Why are

4  you still here?  I mean, the problem is over.  You know,

5  she got her stuff and she's gone and you're still here."

6  I said, "You can leave now."  And I just stood there and

7  waited for him to drive off.

8  Q    Well, did he say anything like, "I'm here because X

9  or Y or Z?"

10 A    I can't recall, because she had already left.  I

11 just didn't understand why he'd still be sitting here in

12 my driveway.

13 Q    So, what I'm trying to understand is, did he say

14 any -- did he give any explanation as to why he was

15 continuing to be there?

16 A    No.  I can't recall.  I don't remember.

17 Q    All right.  So, then I believe you told me that

18 after he left you went -- you returned to the backyard?

19 A    Yes.  Yes.

20 Q    And you said you fired your grill up again?

21 A    Yes.

22 Q    Were you using a gas grill or charcoal?

23 A    Charcoal.  Charcoal grill.

24 Q    Why were you going to fire your grill up after

25 midnight?

1  A    Because I still had some food I had took out and I

2  was going to cook it for the next day.

3  Q    Okay.  Were you -- were you drinking?  Did you get

4  a new beer and start drinking a beer?

5  A    I don't know.  I don't remember.

6  Q    Okay.  How long were you in the backyard before the

7  police showed up again?

8  A    Maybe ten minutes.  He had left and I went back --

9  maybe ten minutes.  Just enough time to get my grill

10  back going and stuff.

11  Q    All right.

12  A    And I went in the house to bring the meat out.

13  Q    Okay.  Did the -- were you able to see the police

14  cars pull up in front of the house?

15  A    Yes, I was.  Because I seen the headlights and

16  everything coming down.

17  Q    Okay.  How many cars were there?

18  A    I want to say four.  I want to say about three to

19  four cars.

20  Q    Were they running with their emergency lights and

21  sirens on?

22  A    No, sir.  No, sir, they wasn't.

23  Q    Is your backyard fenced in?

24  A    No, sir.

25  Q    So, you have some view of the street from the

```
 1  backyard?

 2  A    Yes.

 3  Q    Do you know how many of the cars were City of

 4  Alexander and how many were Saline County?

 5  A    I think there was one Alexander and three Saline

 6  County.  If I'm not mistaken, it was three.

 7  Q    Was Officer Watson in the Alexander car?

 8  A    Yes, sir.

 9  Q    To your knowledge was he the only Alexander

10  officer?

11  A    I think it was one other guy that was there, but he

12  was in -- I think it was another Alexander officer

13  there, but he wasn't even on the Alexander force.  He

14  was like -- more like a Fire Department guy.

15  Q    Okay.  Did he arrive in his own vehicle or --

16  A    I don't know.  I don't know, because I just seen

17  them walking up.  Like I told you before, they had

18  lights in my face.  So, I couldn't hardly see behind the

19  lights.

20  Q    Okay.  Did you -- I think you told me that the

21  actual arrest occurred in the backyard.

22  A    It's not like -- the mobile home is kind of slim,

23  you know.

24  Q    Right.

25  A    It's kind of in the back on the side, you know.
```

1   Q    Okay.

2   A    Of the mobile home.

3   Q    All right.  But -- okay.

4   A    Like this is the mobile home.  I was like right

5   here.

6   Q    Yeah, okay.

7   A    The street goes out here.

8   Q    All right.  Which side is the driveway on?

9   A    Right here.

10  Q    Okay.  So, you're sort of at the back end of the

11  driveway?

12  A    Yeah.

13  Q    At the back corner of your --

14  A    Yes, sir.

15  Q    Okay.  I'm understanding.  And the mobile home

16  would line up against the street like a T, is that

17  correct?

18  A    Yes.  Yes, sir.

19  Q    Okay.  All right.  So, the cars pull up.  Did all

20  the officers get out and come to you?

21  A    Yes, sir.

22  Q    You did not walk up to the front to meet them?

23  A    No, sir.

24  Q    Do you remember any officer saying anything about

25  why they were there?

1  A    No, sir.

2  Q    Do you recall what any officer said when you had

3  the first contact with them?

4  A    No.

5  Q    You don't remember anything they said?

6  A    I don't remember anything they said.  They

7  really -- all I remember is them telling me to get my

8  hands up and turn around and get on the ground.  That's

9  all I remember them saying.

10 Q    Okay.  So -- and you don't remember who said that?

11 A    No, sir, I don't.

12 Q    Okay.  Well, what it sounds to me like what you're

13 describing to me is that these officers approached you

14 and -- with the intention of placing you under arrest.

15 Is that --

16 A    Yes, sir.

17 Q    You think that's what they were doing?

18 A    I think that's what -- they were coming to do

19 something.  I really don't know what the intentions was

20 because the problem beforehand was already handled.

21 Q    Okay.

22 A    I don't understand why would they leave and come

23 back and walk in my yard and do what they done to me.  I

24 don't understand that.

25 Q    All right.  Well, were you -- did anybody say,

1  "You're under arrest," or, "We're here to arrest you,"

2  or anything of that nature?

3  A    Not that I recall.

4  Q    All right.  All you recall is them saying, "Put

5  your hands up and" --

6  A    Turn around and get on the ground.

7  Q    Turn around and get on the ground.  Okay.

8       So, when they walked up, were you facing them?

9  A    Yes.

10  Q    Okay.

11  A    I was.

12  Q    And did you say anything to them like, "Why are you

13  here," or "What's going on," or just anything?

14  A    No.  I was just -- I was just doing what they told

15  me to do.  I mean, I was outnumbered.  I couldn't -- I

16  mean, I was just in shock.  I mean, I was in shock.  I

17  didn't know -- I was just doing what they told me to do.

18  Q    So, you didn't talk back at all, is that correct?

19  A    No, sir.

20  Q    All right.  And so as I understand what you're

21  telling me, the police are walking as a group up the

22  driveway and you're facing them.  Had you moved away

23  from your grill?  I mean, had you moved forward or

24  backwards or anything?

25  A    No.  I was right there in front of my grill and I

1  hit the ground.

2  Q    Okay.  So, the officers walk up and someone -- you

3  don't know who, but someone gives you the order, "Raise

4  your hands, turn around, get on the ground?"

5  A    Yes.

6  Q    Is that right?

7  A    Yes, sir.

8  Q    And you don't know who told you that?

9  A    No, sir.

10 Q    All right.  So what I understand your testimony to

11 be is that you raised your hands, turned around and

12 that's the point at which you were --

13 A    Tased.

14 Q    -- tased, is that right?

15 A    Yes, sir.

16 Q    And you did nothing that you think an officer could

17 interpret as resisting or --

18 A    No.

19 Q    -- anything else?

20 A    No, sir, I didn't.

21 Q    Okay.  And then you have already described -- and

22 I'm not going to go over in again, but you have already

23 described that they cuffed you, picked you up and then

24 escorted you back to one of the cars and tased you three

25 more times in that process.

1  A    Yes, sir.

2  Q    And I think you told me this was one hundred -- did

3  you say 110 feet?

4  A    Yes, sir.

5  Q    From where the grill was to the street, is that

6  right?

7  A    Yes, sir.

8  Q    How do you know it was 110 feet?

9  A    Because I measured.

10 Q    Okay.  You measured it after the events?

11 A    Yes, sir.

12 Q    Did you take any photographs of the scene where

13 this happened?

14 A    Yes, sir.  I think my parents did.

15 Q    Okay.  Have you provided those photographs to your

16 attorney?

17 A    Did you ever get these?

18            MS. FRAZIER:  No.  If I had them, you

19       would have had them.

20            MR. FUQUA:  Well, I'm sure that's the

21       case.

22 BY MR. FUQUA:

23 Q    Would you provide those photographs to your

24 attorney so that we can have a look at them?

25 A    Okay.  I'll see if she still got them.

1  Q    Do your parents live next to your house or in the

2  same neighborhood or anything?

3  A    Yes.  We're in the same neighborhood, yes, sir.

4  Q    Okay.  But they didn't witness any of those events?

5  A    No, sir, they didn't.

6  Q    Okay.  Have you told me everything that you can

7  remember about the actual arrest or -- in this

8  altercation with the police officers?

9  A    Yes, sir.

10  Q    Let me ask you about the experience in the jail.

11       You were arrested -- the arrest report says time of

12  arrest 12:23, which would be a.m.  That would be twenty

13  three minutes after midnight on October 9, 2011.

14       When were you released from the jail?

15  A    I stayed in there all Sunday -- all day Sunday

16  since I went so early in the morning.  I didn't get

17  released until like Monday evening.

18  Q    Okay.  And were you released -- did you have to

19  post a bond or were you released --

20  A    I was released on my own recognizance or --

21  Q    They gave you a citation that had a court date on

22  it?

23  A    Yes, sir.

24  Q    And -- okay.  Was that the first time you had ever

25  been in the Saline County jail?

1    A    No, sir.

2    Q    When had you been there previously?

3    A    For the -- I think it was another incident -- a

4    public intoxication with the Alexander police.

5    Q    Okay.  All right.

6         When you got the DWI arrest in Bryant, did you go

7    to jail then?

8    A    Yes.  Yes, sir, I did.

9    Q    Okay.  On either of those occasions, did you stay

10   in the jail longer than you did on this occasion?

11   A    Yes, sir.

12   Q    Okay.  And you said that the jailer -- a jailer

13   pulled the darts out with a pair of pliers, is that

14   correct?

15   A    Yes, sir.

16   Q    Did somebody apply any antiseptic or alcohol or put

17   a bandage on there or anything?

18   A    Yes.  It was a female deputy put Band Aids on it.

19   Q    Okay.  Did you develop an infection in these

20   wounds?

21   A    No, sir.

22   Q    Other than just the general indignity of being in

23   jail, do you have any complaints about your treatment in

24   the jail on this occasion?

25   A    Yes, I do.  At the time I was telling them that I

1  wanted to go to the Saline Memorial Hospital for chest

2  pain, because it was kind of bad.  And then they offered

3  me a Tylenol or something like that.  And so at that

4  time that's the only thing they offered me.

5  Q    Do you have any history of heart disease?

6  A    No, sir.

7  Q    Were your chest symptoms just pain?

8  A    Yes.  There was pain.  It hurts.  It was kind of

9  like a ache in my chest.

10  Q    Was it like muscle ache and pain or --

11  A    I don't know.  It's hard to describe, but I knew my

12  chest was hurting.

13  Q    Okay.  Well, when you complained, did anybody take

14  your blood pressure?

15  A    No.  No one did anything.

16  Q    Did anybody ask you any questions --

17  A    No.

18  Q    -- about your condition?

19  A    No.

20  Q    Well, who -- who gave you a Tylenol?

21  A    I don't know the lady's name, but it was a lady.

22  They did give me a Tylenol.

23  Q    Okay.  And did she ask you any questions about your

24  symptoms?

25  A    No.  She just gave them to me and just walked off.

1  Q    And how -- how long had you been there when this --

2  A    I had just got there.

3  Q    Okay.  So, you hadn't even gone to a cell yet?

4  A    No.  I didn't even go to a cell.

5  Q    Okay.  Did you ever go to a cell?

6  A    Yes, I finally went.  I finally went later -- a

7  long time after.  I stayed in the holding cell for a

8  good 12 hours or longer.

9  Q    Okay.  Then you were put in the general population

10 cell?

11 A    Uh-huh.

12 Q    Is that right?

13 A    Yes, sir.

14 Q    Did your chest pains go away?

15 A    Yeah.  For the most part.  For the most part it

16 went away.

17 Q    How long did it take for those chest pains to go

18 away?

19 A    About maybe -- maybe about six hours.  Seven hours.

20 Something like that.  I can't be exact about how long,

21 but it was in that -- in that range.

22 Q    Other than the pain you have described, did you

23 have any medical problems related to your heart?

24 A    No, sir.

25 Q    Did you go to a -- well, before I get to the

1  doctors, other than wanting more medical attention than

2  you got, did you have any other problems while you were

3  in the jail?

4  A    No, sir.

5  Q    Other than not being taken to the hospital, do you

6  think you were mistreated while you were in the jail?

7  A    No, sir.  No, sir.

8  Q    Okay.

9  A    Well, let me rephrase that.  I was kind of

10  mistreated when I first got there for the simple fact

11  the way they pulled the prongs out of my back and -- I

12  was upset.  So, I -- that's pretty much all I can say

13  about that.

14  Q    Okay.  I think you said that a female jailer pulled

15  them out?

16  A    No.  It was a male deputy pulled it out and the

17  female deputy gave me a Band-Aid.

18  Q    Okay.  Well, did the deputy say anything like,

19  "This is going to hurt," or anything --

20  A    Huh-uh.

21  Q    Just reached in with some pliers and pulled it out?

22  A    Leaned me over the counter.  I still had the

23  handcuffs on me when they did it.

24  Q    All right.  At the time of your arrest, what were

25  you wearing?

```
 1   A    I can't recall.  Shorts maybe.  T-shirt.
 2   Q    Okay.  You didn't have on a heavy coat or anything
 3   like that?
 4   A    Oh, no.  No, sir.
 5   Q    Okay.  All right.  Now, did you seek any medical
 6   attention while -- after you got out of jail did you go
 7   to a doctor or a hospital or somewhere for some medical
 8   attention?
 9   A    Oh, no, sir.
10   Q    And did your -- did the taser wounds heal?
11   A    Yes, sir.
12   Q    I'm assuming -- do you still have a scar on your
13   back?
14   A    I think so.  I really don't look at my back at all.
15   Q    Okay.  Does -- do you have any -- is there anything
16   about your taser wound that continues to cause you
17   problems?
18   A    Well, I did kind of end up going to the hospital
19   like -- I don't know.  After that for a muscle spasm.
20   Q    Uh-huh.
21   A    It just came to me all of a sudden.  Just one
22   morning I just couldn't get up.  I couldn't get up.  I
23   was sore and spasming.  So, I did go to the hospital and
24   they said that I had muscle spasms.
25   Q    How long was that after you were tased?
```

1   A    Maybe a month.  A month or two.

2   Q    Had there been anything else that happened to you

3   after the taser event?

4   A    No, sir.

5   Q    Didn't have like a car wreck or --

6   A    No.

7   Q    No unusual strenuous work or anything?

8   A    No, sir.

9   Q    What treatment did you get when you went to the --

10  A    Well, they gave me a shot of steroids.  They gave

11  he some other muscle relaxers and -- pills or --

12  somebody at the hospital give me four different kinds of

13  medicine for muscle spasm.

14  Q    And you went to Saline Memorial at that time?

15  A    Yes, sir.

16  Q    And you were just seen there in the emergency room?

17  A    Yes, sir.

18  Q    Is that the only time you went to the -- went to

19  the doctor?

20  A    Yes, sir.

21  Q    And did the medicine they gave you resolve your

22  problems?

23  A    It helped.  It helped.  I wouldn't say resolved,

24  because sometimes I still get real stiff and I still

25  hurt sometimes.

1    Q    When you say you get real stiff, are you talking

2    about in your back?

3    A    Like cramps.

4    Q    Cramps?

5    A    Yeah.  I get charlie horses or what they call like

6    cramps in different parts of my body.

7    Q    Okay.  But like maybe in your legs?

8    A    Yeah.  On my back, right up the side of my buttocks

9    or whatever.  I get pains all the way down -- just like

10   it just tightens up, and -- but after a while it goes

11   away sometimes.

12   Q    Are these symptoms that you had before you were

13   tased?

14   A    No, sir.

15   Q    These are things you believe the taser caused, is

16   that correct?

17   A    Yes, sir.

18   Q    But just so I'm clear, you have only gone for

19   medical treatment one time?

20   A    Yes.

21   Q    To Saline Memorial, correct?

22   A    Yes, sir.

23   Q    And let me ask you just generally about your

24   medical condition.

25        Before this incident were you being treated for

```
 1  any -- any medical conditions?
 2  A    No, sir.  Not at all.
 3  Q    Were you taking any -- before this incident were
 4  you taking any prescription medication?
 5  A    No, sir.  No, sir.
 6  Q    Are you presently taking any prescription
 7  medication?
 8  A    No, sir.
 9  Q    Other than the medication prescribed at the
10  hospital, have you taken any prescription medication
11  after this taser incident?
12  A    Can you rephrase?
13  Q    Well, what I understand is that -- I'm trying to
14  just get a sense of your general medical condition.
15  A    Okay.
16  Q    Do you have a primary care doctor that you go to?
17  A    No, sir, I don't.
18  Q    In the past five years, have you been to a doctor
19  for any reason other than this taser?
20  A    No, sir, I haven't.
21  Q    To your knowledge, do you have any medical
22  conditions that either you are being treated for or you
23  need to be treated for?
24  A    No.  No, sir.
25  Q    Okay.  And I'm excluding these cramping and other
```

1  sensation symptoms that you have described to me.

2  A    Okay.

3  Q    So, my question was, I understand from your

4  testimony that you went to the emergency room and you

5  were given four prescription medications.

6  A    Yes.

7  Q    Other than those, have you taken any other

8  prescription medications since the taser incident?

9  A    No prescription medication, but I have -- like

10 every now and then I take Tylenol -- over the counter --

11 Q    Okay.

12 A    -- medicine.  But as far as prescription, once I

13 ran out, that was it.

14 Q    Okay.  So, you take over the counter for aches and

15 pains?

16 A    Yes, sir.

17 Q    Is that correct?  Okay.

18       Now, did you lose any work as a result of this

19 incident?

20 A    Yes.  Yes, I did.

21 Q    Who were you working for at the time?

22 A    I was working for my dad, but after -- after the

23 incident, I couldn't work for a little while.

24 Q    How long was a little while?

25 A    I mean after the -- after I went to the doctor, I

1  couldn't work for at least a week, week and a half.  I

2  had the muscle spasm for about that long.

3  Q    Okay.  So, you're telling me that you lost a total

4  of a week or a week and a half of employment, is that

5  correct?

6  A    Yes, sir.

7  Q    And the time you lost that work, how much were you

8  being paid?

9  A    It varies from different jobs to job.  Like I'm not

10 set on no hourly pay or anything.  It's like -- the job

11 might be worth this much or this much.  You know, I

12 wouldn't have no idea of how much I lost.

13 Q    Would your father -- does he keep a record of how

14 much he pays you?

15 A    Yes.

16 Q    Does he pay you in cash?

17 A    Sometimes.

18 Q    Does he withhold taxes when he pays you?

19 A    Yes.

20          MS. FRAZIER:  Just to be clear, we

21       weren't claiming lost wages.  If something

22       comes up and it turns out that it's now a

23       possibility, I will revisit all of the

24       interrogatory answers.

25          MR.  WILKERSON:  He's claiming lost wages

```
 1              now pretty clearly, right?  Isn't it obvious?
 2                   MR. ELLIS:  He's not.
 3                   MR.  WILKERSON:  He's not?
 4                   MS. FRAZIER:  I'm not claiming lost
 5          wages.
 6                   MR.  WILKERSON:  He is right now.
 7                   MR. ELLIS:  No, he's not.
 8                   MR.  WILKERSON:  Oh, he's not claiming
 9          lost wages?  Okay.
10                   MS. FRAZIER:  He asked him if he missed
11          work.
12                   WITNESS:  Excuse me.  Can I have a break?
13          I need to use the restroom?
14                   MR. FUQUA:  Yeah, sure.  That would be
15          fine.
16                   (THEREUPON, there was a brief period off
17          the record.)
18  BY MR. FUQUA:
19  Q    All right.  Are you as you sit here today -- you
20  can certainly change your mind as the case develops, but
21  as you sit here today, are you asking to be compensated
22  for lost wages as a result of this incident?
23  A    Well, I really haven't considered that yet.  I
24  don't know.
25  Q    Okay.  Well, if -- what I understand your testimony
```

1  to be is that you're able to say that you lost a week to

2  a week and a half of work as a result of being tased.

3  Is that -- did I understand you correctly?

4  A    Yes.

5  Q    Okay.

6  A    Yes.  Yes.  I guess -- I guess I could take that

7  into consideration.

8  Q    Well, I'm not asking you to make your mind up.  I'm

9  just trying to narrow it down how much work time it

10  would be if you made the claim.  That's all I'm asking

11  you.  And what I'm hearing you say is that you think you

12  lost a week to a week and a half.

13  A    Yes.  Yes, sir.

14  Q    As a result of being tased.

15  A    Yes, sir.

16  Q    Okay.  That answers my question.

17       Okay.  I'm going to pass you on to these other

18  lawyers who will probably have some questions.

19                     CROSS EXAMINATION

20  BY MR. ELLIS:

21  Q    Mr. Doss, a couple of housekeeping matters.

22       You worked for Royal Lawn and Construction?

23  A    Yes.

24  Q    And your daddy's name is Royal.

25  A    Yes.

1   Q    So, we can assume that that's the same Royal as

2   Royal Lawn and Construction.

3   A    Yes, sir.

4   Q    You were working for your daddy.

5   A    Yes, sir.

6   Q    Okay.  Now, I tried to make list of the things

7   that -- your run-ins with the law.  You have got a

8   control substance conviction and -- for which you were

9   put on probation.  Is that correct, sir?

10  A    Yes.

11  Q    Who was your lawyer in that?

12  A    I think I just used the public defender at that

13  time.

14  Q    That wasn't Ms. Frazier?

15  A    No.

16  Q    And after that -- I think it was after that you got

17  a five year conviction and you did about ten months at

18  ADC for theft by receiving.  Is that correct, sir?

19  A    Yes, sir.

20  Q    Both those were in you think around 2008?

21  A    Yes, sir.

22  Q    And who was your lawyer for that case?

23  A    I don't recall.  It was a lady out in Bryant that

24  has a law firm.  I can't recall her name.  It's been a

25  while back.

1  Q    Who referred you to her?

2  A    I just picked up the phone book and it was -- kind

3  of went from there.

4  Q    I will think of her name in a minute.  I know who

5  you mean.

6       And then you had six or seven times you were

7  arrested for public intoxication.  Is that correct, sir?

8  A    Yes, sir.

9  Q    But then you also told us that a couple of those

10 times you were found not guilty.  Are those -- those not

11 guilty findings -- one of these -- a couple of these six

12 or seven?

13 A    Yeah, maybe.  Yeah -- yes.

14 Q    Okay.  And who represented you in the findings of

15 not guilty?

16 A    The public defender.

17 Q    Okay.  And then you had two DWIs, one in Little

18 Rock and then the second one in Bryant, is that correct,

19 sir?

20 A    Yes, sir.

21 Q    Was that DWI in Bryant -- was that a DWI second

22 conviction?

23 A    Yes, sir.  I think so.

24 Q    Okay.  Who represented you in Little Rock?  If you

25 remember.

1    A    I don't know.

2    Q    You may not.

3    A    I don't remember.

4    Q    Sure.  And how about Bryant?  Who represented you

5    in Bryant?

6    A    I don't remember.  Maybe the public defender.

7    Q    Okay.  Has Ms. Frazier ever represented you in

8    anything except this case?

9    A    No.

10   Q    Okay.  Who referred you to Ms. Frazier?

11                MS. FRAZIER:  I'm sorry.  Can you clear

12           that question up?

13                MR. ELLIS:  Who referred you --

14                MS. FRAZIER:  No.  The question before.

15           There is kind of a companion.  There was this

16           case and a companion criminal case.

17                MR. ELLIS:  Oh, okay.  Good.  Good.

18           Thank you.  Good point.

19   BY MR. ELLIS:

20   Q    The case that was filed growing out of this

21   litigation -- who represented you in that?

22   A    Ms --

23   Q    You can consult here if you need to.

24   A    Ms. Frazier.

25   Q    Okay.  And she's also representing you in this

1  civil litigation, correct?

2  A    Yes, sir.

3  Q    Now, who referred you to Ms. Frazier?

4  A    I think my dad -- my dad told me about Ms. Frazier.

5  Q    All right.  Now, going back to -- you had mentioned

6  a lawyer in Bryant on that DWI.  Was that person's name

7  Gina Frazier?  Maybe I -- Gina Reynolds?

8  A    Yes, sir.  I think it was.

9  Q    Gina Reynolds?

10 A    Yes, sir.

11 Q    Okay.  Do you know a man named Paul Babbitt?

12 A    No, I haven't -- I heard of his name before, but I

13 don't know him personally or if I seen him I wouldn't

14 know who he --

15 Q    How have you heard of him?

16 A    I think I heard my father talk about his name

17 before.

18 Q    Okay.  In what way or context?

19 A    I don't remember.  I just -- I just -- his name

20 sounds familiar.

21 Q    Do you know a man named William Blankenship?

22 A    No, sir, I don't.

23 Q    Never heard --

24 A    I heard of his name.

25 Q    How have you heard of his name?

1  A    I just heard of his name coming up before. I can't

2  remember, but I have heard of his name.

3  Q    Okay.  Do you know what Mr. Blankenship does for a

4  living?

5  A    No, sir, I don't.

6  Q    Now, in preparation for your deposition today or at

7  any other time, did you have an opportunity to review

8  this lawsuit that Ms. Frazier prepared for you before it

9  was filed?

10  A    Yes.  We went over it.

11  Q    Did you read it?

12  A    Yes.

13  Q    And understand it?

14  A    Yes.

15  Q    Have you had an opportunity prior to your

16  deposition and in preparation for it or any other time

17  to look at any police documents?  Any narrative -- what

18  we call narratives or any descriptions of what went on

19  out there that night?

20  A    Yes.

21  Q    Okay.  What have you reviewed?

22  A    I mean, I'm really not understanding your question.

23  Q    Well, policemen often prepare descriptions of what

24  went on during the course of an arrest.

25  A    Uh-huh.

```
 1   Q    Did you -- did you review anything like that in
 2   preparation for your deposition or at any other time?
 3   A    I mean, I still don't really understand.
 4        Me and my lawyer -- yeah, we talked about certain
 5   things, but --
 6   Q    I'm not going to ask you about anything you
 7   discussed with her, because that's your and her personal
 8   business.
 9   A    Uh-huh.
10   Q    You understand?
11   A    Yes.
12   Q    Okay.  Keep going.
13   A    Okay.  Yes, we went over a couple of things.
14   Q    Did you go over William -- because this is why I
15   ask you about William Blankenship.  There was an Officer
16   William Blankenship who appears to be an officer in
17   Alexander.  Do you know -- did you know that?  He talks
18   about Officer Watson here.
19   A    Blankenship?  Do I recall -- no, I don't really
20   hardly know him.
21                MS. FRAZIER:  Does he go by a different
22          name by any chance?  Does Officer Blankenship
23          go by a different name?
24                MR. ELLIS:  I have no idea.
25                MS. FRAZIER:  Is that his brother?
```

```
 1              MR. ELLIS:  It says Officer William
 2         Blankenship.
 3                 MR.  WILKERSON:  What is his last name?
 4              MR. ELLIS:  206.
 5              MS. FRAZIER:  It's Tim.
 6                 MR.  WILKERSON:  It's Bill Blankenship.
 7         It may be Bill.
 8              WITNESS:  It's Tim.
 9              MR. ELLIS:  It's Tim or should be Tim.
10              MS. FRAZIER:  Okay.
11              WITNESS:  I know a Tim.
12              MS. FRAZIER:  I'm asking.  There is a Tim
13         Blankenship that I know.
14              MR. ELLIS:  All I know is what they gave
15         me.  Officer William Blankenship.  206.
16  BY MR. ELLIS:
17  Q    Did you have an opportunity to review his statement
18  of what went on the night you were arrested?
19  A    No.
20  Q    October 9, 2011?
21  A    No.  No, I haven't.
22  Q    You haven't seen that statement?
23  A    No.
24  Q    And there is another what we like to call a
25  narrative statement.  I think -- first of all -- give me
```

1    a minute.  Now, that I have shot my mouth off.

2        Officer Watson.  We have already talked about

3    Officer Watson today, haven't we?

4    A    Yes, sir.

5    Q    And it is an explanation by him in the file

6    provided to us from several sources, including your

7    attorney, about what went on out there the night you

8    were arrested on October 9.

9        Have you seen that document?

10   A    Yes, sir.

11   Q    Details of information is what its called.  Did you

12   review it prior to today?

13   A    Yes, I have seen it before.

14   Q    All right.  Well, let's look at it very closely,

15   because I have got it in front of me.

16       It says he received a call to the above address --

17   and that would be your address -- for an escort of a

18   female to get her kids from the above suspect.  That

19   would be you.

20       Is that a true statement?

21   A    No, sir.

22   Q    That's not true?  What's not true about that?

23   A    He didn't -- Officer Watson never came to my house

24   to get my kids or anything.

25   Q    Okay.  Once on the scene the suspect -- that would

1   be you -- started yelling at me.

2        Is that true or not true?

3   A    No, that's not true.

4   Q    Not true.  You never yelled at him?

5   A    No, sir.

6   Q    Never raised your voice?

7   A    Not at him, no.

8   Q    All right.  And calling the girlfriend names and

9   started threatening her.

10       Is that true?

11  A    No.  That's not true.

12  Q    Did he make that up?

13  A    Yes, sir.

14  Q    Okay.  And I -- Officer Watson -- and threatening

15  her and I, Officer Watson, with bodily harm.

16       Did you threaten either your girlfriend or him --

17  A    No, sir.

18  Q    -- with bodily harm?

19  A    No, sir.

20  Q    You didn't do that?

21  A    No, sir.

22  Q    Okay.  So, this officer called for backup units to

23  respond for backup because the suspect, you, stated that

24  he had something for me -- for him.  A -- it says A.  It

25  probably means and.  Ran back in the house.

1    Did any of that happen?

2  A    No, sir.  Nothing -- none of that happened.

3  Q    Do you think he made that up?

4  A    Made it all up.

5  Q    All right, sir.

6    The suspect, you, had been drinking.

7    That is true, isn't it?

8  A    Yes, sir.  That's true.

9  Q    And was very disorderly.  Were you very disorderly?

10  A    No, sir.

11  Q    Were you a little disorderly?

12  A    No, sir.  I wasn't disorderly.  I might have been

13  upset.  Me and my girlfriend had argued, but as far

14  as --

15  Q    Did you ever raise your voice at her?

16  A    Yeah.  We was arguing.

17  Q    Saline County deputies -- deputy.  Probably should

18  be deputies.  Arrived on the scene and the suspect was

19  still threatening me.

20    Is that true?

21  A    No, sir.

22  Q    Okay.  And the county deputies -- threatening me

23  and the county deputies.  So the deputy ordered the

24  suspect to get on the ground.

25    Now that part is true, isn't it?

1    A    No, sir, because when Officer Watson came to my

2    house, there was no other deputies around but Officer

3    Watson.  So, that's not true either.  They came ten

4    minutes later.

5    Q    Okay.

6    A    At the most.

7    Q    All right, sir.  But when they did come, somebody

8    did order you to get on the ground.

9    A    The officers when they came?

10    Q    Uh-huh.

11    A    After he left and came back?

12    Q    Uh-huh.

13    A    Yeah.  Yes, he did.

14    Q    So, that part is true.

15        And the suspect refused -- did you refuse to get on

16    the ground?

17    A    No, sir.

18    Q    At which time the deputy -- just singular deputy.

19    We don't know who -- tased the suspect.  Is that true?

20    We know it's true.  You were tased.

21    A    Yes, sir.  It's true.

22    Q    In order to take him in to custody.

23        Now were you tased in order to be taken in to

24    custody?

25    A    No.  I mean, they tased me for no reason.  I don't

1    understand the question.

2    Q    Well, I'm really not sure what he means here

3    either.  I'm just reading what he says.  He says you

4    were tased in order to be taken in to custody.

5    A    He didn't have to tase me for me to be taken in to

6    custody.

7    Q    Okay.  Once -- it says here once you were in

8    custody you were transported to the Saline County jail.

9         That's true, isn't it?

10   A    Yes, sir.

11   Q    And on the way to the jail you continued to make

12   threatening statements, which were all recorded on the

13   inside camera.

14   A    Okay.

15   Q    Is that true?

16   A    I might have said -- I don't remember.

17   Q    You don't remember?

18   A    I don't remember.

19   Q    Okay.  Now, finally let me ask you real quickly and

20   then I will pass you on.

21        They took two barbs out of you according to these

22   photographs, is that right?

23   A    Yes, sir.

24   Q    Okay.  And when you tase a person, that puts two

25   barbs in them, doesn't it?

```
1   A    Yes, sir.

2   Q    You have already told us that?

3   A    Yes, sir.

4   Q    That's the case.  But Mr. Doss, you told us you

5   were tased four times.

6   A    Yes.

7   Q    That would be eight barbs.

8   A    No -- no, sir.  One barb.  One barb tased me.  They

9   kept pulling the trigger.  Pulling the trigger.  Every

10  time I hit the ground.  They didn't just keep shooting

11  me with the taser.  Once the barbs are in your skin,

12  every time they pulled the trigger it -- you fall down.

13  Q    I got you.

14  A    It shocks.  It don't have to be eight barbs.

15  Q    I got you.  So, the two barbs were in you and then

16  they could --

17  A    Play with it.

18  Q    -- continue to pull the trigger.

19  A    Yes, sir.

20  Q    Like I'm doing?

21  A    Yeah.

22  Q    At will.

23  A    At will.

24  Q    And every time it would be a shock?

25  A    Yes, sir.
```

1    Q    All right, sir.  I think I'm through here.  Let me

2    take a quick look.

3                    MR. ELLIS:  Pass the witness.

4                    CROSS EXAMINATION

5    BY MR.  WILKERSON:

6    Q    Have you had any encounters with the Alexander

7    Police Department?

8    A    Since this happened?

9    Q    Before.

10   A    Yes, sir.

11   Q    Have you had any encounters afterwards?

12   A    Yes, sir.

13   Q    Have your actions been different in any of those

14   encounters?  I mean before the -- let me rephrase that.

15        When the officers show up at any of these

16   encounters you have, is your reaction to any of the

17   officers showing up any different?

18   A    Yes.  I'm very nervous.  Afraid.  I don't know what

19   they're going to go.

20   Q    No, I mean -- I'm sorry.  You had this incident

21   where you said the officers just showed up and asked you

22   to turn around and tased you, correct?

23   A    Yes, sir.

24   Q    Okay.  And in your other encounters with the City

25   of Alexander prior to you being tased, do officers just

1  show up and you stand there and do nothing?

2  A    I don't -- I mean --

3  Q    Do you mouth off to the officers?  Have you ever

4  mouthed off to the officers before this?

5  A    No.

6  Q    Have you ever mouthed off to the officers after

7  this?

8  A    I don't recall.  I don't remember if I have or

9  haven't.

10 Q    You never said to an officer, "Get off my mother

11 fucking property?"

12 A    I don't recall it.

13 Q    You don't recall that?

14 A    No.

15 Q    You don't remember using the F word -- using the F

16 word toward officers after this incident?

17 A    I don't remember.

18 Q    All right.  Now, when you say that you're nervous

19 around officers, can you describe that to me?

20 A    It's very scary.  I never know what they're going

21 to do next.

22 Q    Do you stay quiet then?

23 A    Majority of the time.  I stay to myself and try to

24 mind my own business.

25 Q    Well, the majority of the time you stay quiet when

1  the officers approach you, but the rest of the time what
2  do you do?
3  A    I don't know.
4  Q    So, when an officer approached you after this
5  incident you stay quiet, right?
6  A    I don't know what they're going to do.  I mean, I
7  don't even know why they keep harassing me.
8  Q    How do they harass you?
9  A    Every time they see me they say, "Have you been
10 drinking," or, "Are you under the influence?  You're
11 going to jail."  A lot of incidents where I can be just
12 walking minding my own business and they can just drive
13 up on me, take me to jail.  Public intoxication.  They
14 have never been able to prove any -- not even one time
15 that I was under the influence.  No breathalyzer.  No
16 blood test.  Nothing.
17 Q    But you have been convicted of public intoxication
18 before in the City of Alexander?
19 A    Yes, sir.
20 Q    So, they can prove that you have been drinking in
21 those instances.
22 A    I guess so.
23 Q    Because you pled guilty to public --
24 A    Yes, sir.
25 Q    So, you admitted to the court that you were --

1   A    Yes, sir.

2   Q    You admitted to the court that you were drunk in

3   public.

4   A    Yes, sir.

5   Q    So what do you mean they couldn't prove it?

6   A    Just -- there was just the way -- I don't

7   understand.

8   Q    Okay.  So, can you name the officers -- the

9   Alexander police officers you had encounters with before

10  this incident in which you were tased?

11  A    I don't keep up with their names.  I don't even

12  know, but the ones who have ever caused me any problems.

13  Them are the only ones I do know.

14  Q    Who?

15  A    They changed officers so, so much.

16  Q    Who are the ones that caused you problems?

17  A    I remember Acheman.  Dennis Acheman was a police

18  officer that caused me problems.  I know Watson.  There

19  is a couple of other guys, but I don't -- I don't know

20  their names.

21  Q    Tell me about when Jeff Watson messed with you --

22  harassed you as you say.  Prior to this incident.

23  A    Prior?  I don't know if it was prior.  I don't

24  think I ever had an incident before -- before this time

25  with Watson.

1    Q    Okay.  What about Bill Blankenship or William

2    Blankenship?

3    A    I don't know him -- I know him if I see him.

4    Q    Now, in your complaint you mentioned the City of

5    Alexander has a history of racial profiling.  Can you

6    tell me about that?

7    A    Yes.  They don't see -- the City of Alexander has

8    continually been harassing -- not only me, but other --

9    other people, also.

10    Q    Like who?

11    A    Like the Mexican guys.  That was one incident.  And

12    they harass a lot of guys from the neighborhood.

13    Q    Like who?

14    A    Like Michael -- a guy named Michael.

15    Q    Do you have the last name?

16    A    Peters.

17    Q    Peters?  Okay.  Who else?

18    A    I can't think of anybody else, but I know they're

19    known for harassing.

20    Q    How are they known for harassing?  I mean what

21    entails harassing?

22    A    I only know about what they do to me when they see

23    me.  I really can't speak for everybody else, but I know

24    every time they see me they harass me.  They stop me and

25    take me to jail.

1   Q    Okay.  Harassing though -- you're talking about the

2   times that you have been arrested, but not convicted.

3   Do you remember any times that you were arrested by the

4   City of Alexander and not convicted?  Other than this

5   one, of course?

6   A    I can't remember.

7   Q    Okay.  Can you remember how many times you have

8   been harassed, but not arrested?

9   A    Yes.

10  Q    Okay.  Describe to me those instances.

11  A    Okay.  One night walking to the store.  Walking to

12  the Superstop.

13  Q    Superstop.

14  A    Walking to the Superstop and this incident happened

15  more than once.  Every time they see me they pull up

16  behind me.  They ask me if I have been drinking.  I'm

17  like, "Yeah, I drunk a couple of beers," and they take

18  me to jail.

19  Q    Okay.  I'm sorry.  I thought I asked the question

20  better.  I guess I didn't.

21       Tell me about the times that they harassed you, but

22  not arrested you.

23  A    Oh.  That is exactly what I'm saying.  They stop me

24  all the time to ask me if I have been drinking.  How I'm

25  doing and all this and that, yeah.

1  Q    All right.  Have you ever been tased before?

2  Obviously you said that.  Have you ever -- has any force

3  been used against you by the City of Alexander before

4  this incident?

5  A    No, sir.

6  Q    Okay.  Now, you said in your complaint that there

7  is a wide spread custom of excessive force being used by

8  the City of Alexander.  Can you tell me about that?

9  A    I said what?

10 Q    There is a widespread custom of permitting the use

11 of excessive force in the City of Alexander.

12 A    Yes.  An officer shot my friend Reginald Madison.

13 Q    That's about seven or eight years ago, wasn't it?

14 A    Something like that.

15 Q    Okay.  What else?

16 A    Officer pushed a guy through the door in my

17 neighborhood and he fell and bumped his head and they

18 got in trouble for that.

19 Q    Who was the guy they pushed?

20 A    Chucky.

21 Q    Chucky what?

22 A    I want to say Lewis.

23 Q    How long ago did that happen?

24 A    It's been a while back.

25 Q    Okay.  What else?

1  A    What else?  They killed my friend, Carlton.  Police

2  officer killed my friend Carlton and not even -- not too

3  long ago.

4  Q    Last year, right?

5  A    Yes, sir.

6  Q    Maybe earlier this year.

7  A    Yes, sir.

8  Q    Okay.

9  A    Let me keep thinking.  It's similar incidents, but

10  I can't think of it right now.  But let me think.  I

11  can't think of any more right now, but --

12  Q    Okay.  You said they have -- there is a wide spread

13  custom of permitting false arrest in Alexander.  Can you

14  tell me about that?  Give me an example of someone being

15  falsely arrested.  Other than yourself, of course.

16  A    Well, I don't know of anybody else.

17  Q    Okay.  Now, as far as you being falsely arrested,

18  any other instances other than this one that you have

19  ever been -- I'm sorry.  I think you asked this

20  question, and at the risk of being redundant, has there

21  ever been a time you were arrested by the City of

22  Alexander and not convicted of the crime?

23  A    Other than this one?

24  Q    Other than this one.

25  A    I think it's been times where I have been -- I had

1  a public intox and I go to court and they ask me if I'm

2  all right today and then they -- time served, deals like

3  that.

4  Q    Okay.  And the last one is, you said there is a

5  wide spread custom of permitting -- covering up of these

6  civil rights -- of these certain violations by the City

7  of Alexander.  Can you tell me about that?

8  A    Covering up things?

9  Q    Yeah.

10  A    I can't think of anything right now.

11  Q    Okay.  Do you have any knowledge of the hiring

12  practices of Chief Walters or anybody with the City of

13  Alexander?

14  A    Do I know anything about the way they hired?

15  Q    The way they hire people.

16  A    No, I don't know anything about that.

17  Q    Okay.  Do you know anything about the training that

18  the City of Alexander police officers go through?

19  A    No, but I have heard that they haven't had any.

20  Q    Okay.  Do you know anything about the way Chief

21  Walters supervises his officers?

22  A    No, I don't know that either.

23  Q    Okay.  Now you said that your girlfriend Lashanda

24  showed up at 11:30 that night?

25  A    Around that time, yes.

1   Q    And the police showed up at 12:30 or so.  Does that

2   sound about right?

3   A    About 11:45.  Somewhere in there.

4   Q    Okay.  All right.

5                    (THEREUPON, Exhibit Number Four was

6             marked and identified for the record.)

7   BY MR.  WILKERSON:

8   Q    And just for the -- this is Exhibit Two.  This is a

9   document I'm assuming that you typed it out.  Do you

10  know what that is?

11  A    This says statement.

12  Q    And you typed it out?

13  A    Yes.

14  Q    And did you give it to the City of Alexander?

15  A    I don't know if my lawyer did or not.  Did we give

16  this to --

17                MS.  FRAZIER:  I think he's talking about

18             before.  You're talking about before this,

19             correct?

20                MR.  WILKERSON:  Yes.  Did you give it to

21             the City and to me?

22                MS.  FRAZIER:  This is the official

23             complaint.

24                WITNESS:  I don't know.

25                MS.  FRAZIER:  I'm sorry, but that's a

```
 1          different one I gave you.
 2  BY MR.  WILKERSON:
 3  Q    This is -- instead of 11, you used 12.  But the
 4  time gap is the same.  I was just curious.  You think
 5  it's 11:30 or 12:30 that Lashanda showed up?
 6  A    I'm thinking it was -- I'm thinking it was 11:30.
 7  Q    Okay.  Like I said, the gap between events is the
 8  same.  I just wanted to make sure we're dealing with
 9  11:30 instead of 12:30 -- or 12:25 I think is the time
10  on it.
11  A    No.  This is the time that -- this is the time that
12  she -- she came home around 12 -- 12 -- no, about eleven
13  something.
14  Q    I guess what I'm asking you is, did the police show
15  up 17 minutes after she arrived or did the police show
16  up an hour and 17 minutes after she arrived?
17  A    Oh, like 17 minutes after.
18  Q    That's what I was getting at.  Okay.
19       When the officers showed up and approached you with
20  the flashlight out, you were facing the officers,
21  correct?
22  A    Yes, sir.
23  Q    All right.  And at what -- when they told you to
24  turn around, you said you had started to turn around,
25  correct?
```

1   A    Yes.

2   Q    How far did you get turned around?

3   A    All the way around.

4   Q    Did you turn to your left or your right?

5   A    Turned -- I'm facing them.  Sorry.  I turned

6   like this.

7   Q    Which is -- can we agree it's clockwise?

8   A    To the right.

9   Q    To the right?

10  A    Turn to the right.

11  Q    Okay.  Now on your ride back with Officer Watson to

12  the Saline County jail, you mentioned about eight or

13  nine times that you had cameras at your house recording

14  this incident.  Do you remember that?

15  A    Yes, I do.

16  Q    Where are the recordings?

17  A    There wasn't any.

18  Q    Did you have cameras at your house?

19  A    No, sir, I didn't.

20  Q    Okay.  Why did you tell the police officer that?

21  A    Because I was afraid of what he could do once I got

22  in the car.  I didn't know if he was going to take me to

23  jail or do anything.  I didn't know what -- I didn't

24  know what he was going to do.  I didn't know if he was

25  going to take me up the street and beat me down or take

1   me to jail.  That's why I told them I had cameras at my

2   house.

3   Q    Okay.  Now, we kind of glossed over a little bit

4   the argument you had with Lashanda that night.  You said

5   a couple of times, "I had some words for her," or, you

6   know, a couple of words for each other.

7        What do you mean by "words?"

8   A    We was just arguing back and forth.

9   Q    Tell me the words you were using.

10  A    I don't remember.  I mean, we were arguing about

11  she didn't want to talk about it.  I wanted to talk

12  about it.  So, I mean, I told her she could get her

13  stuff and leave.  I had some -- I was cursing and, you

14  know, she'd tell me I ain't no good.  I'd tell her

15  she's, you know, a bitch or whatever, you know.  You

16  know, we were just arguing.

17  Q    But did you raise your voice?

18  A    I'm pretty sure I did.

19  Q    Did you -- other than calling her a bitch, did you

20  call her any other names?

21  A    I might have, but I never threatened her or the

22  police.

23  Q    And by threatened --

24  A    I never told her I was going to hurt her in any

25  kind of way.

```
 1  Q    Okay.  What kind of beer do you drink?  Or what
 2  kind of beer were you drinking that night?
 3  A    Budweiser.
 4  Q    Budweiser?  How much?  Was it a thirty pack or
 5  twelve pack?
 6  A    Probably about a twelve pack.
 7  Q    Okay.
 8  A    I had help drinking.
 9  Q    Help with who?
10  A    No.  We had been working on the mobile home all
11  day.  So, me and my dad -- we had a couple of beers.
12  That's why I could say I drunk about six.
13  Q    After you got tased -- actually a little
14  housekeeping.  Mr. Ellis, would you mind putting one o
15  those stickers on the bottom of there?  What are we on
16  Exhibit Three?
17       Now, were you suffering from the effects of the
18  Tase while you were in the police car?
19  A    I was just in shock.  I was in -- yes, I was in
20  pain.
21  Q    Tell me what you mean by you were in shock.
22  A    I couldn't believe that they would just come in my
23  yard and just do that to me for no reason at all.  I
24  couldn't believe what had just happened.
25  Q    How do you act when you're in shock?
```

```
 1  A    It was just -- I don't know.  It was just the way
 2  that I never felt before.  I was scared, nervous.
 3  Just -- I was still -- I'm still dealing with it.  When
 4  I see them I still deal with it.
 5  Q    Do you stay quiet when you get in shock?
 6  A    I try to make myself as small as possible.
 7  Q    Did you make yourself as small as possible on the
 8  way to the Saline County jail?
 9  A    No, not -- not that time.  I was angry.  You know,
10  I was angry.
11  Q    Okay.  You said it's 110 feet away from where you
12  were to -- what was it?  It was 110 feet we talked
13  about.  What was that distance?  From where to where?
14  A    From the sidewalk -- from the sidewalk to my -- to
15  the back of the side of my yard.
16  Q    Where you were?
17  A    Where I was.
18  Q    Okay.  And the cops parked on the sidewalk or near
19  the sidewalk?
20  A    Yes.  Because the driveway -- the sidewalk runs
21  across my driveway like this.
22  Q    The officers had to walk 110 feet to get to you?
23  A    Yes.
24  Q    And then they had to walk 110 feet back to put you
25  in the car?
```

1   A      Yes, sir.

2   Q      And you're tased once initially.

3   A      Once.

4   Q      And after you're handcuffed, three more times?

5   A      Yes.

6   Q      Can you estimate for me how -- what the distance

7   was between each tase?

8   A      Every four steps.

9   Q      Okay.

10  A      Every four to five steps.  I can't be exact.

11  Q      Okay.

12  A      But, yeah.

13  Q      So you're walking along doing nothing and you got

14  tased three more times.

15  A      Yeah.  They had on my arms and every time they

16  tased me, I would fall.  They'd still pick me back up,

17  one guy on each side.

18  Q      Who were the -- do you know the two guys on each

19  side?

20  A      I don't know.  I was in a daze.  I couldn't even

21  hardly think.

22  Q      All right.

23                MR.  WILKERSON:  I think that's all I

24         have got.

25                (THEREUPON, Exhibit Number Four was

```
 1            marked and identified for the record.)
 2            MR.  WILKERSON:  I'm done.
 3            MR. FUQUA:  Did you want to ask questions
 4       about that?
 5            MR. ELLIS:  That's what I was waiting
 6       for.  I wanted it on the record.
 7            MR. FUQUA:  I do have just a brief
 8       followup.
 9              RE-DIRECT EXAMINATION
10  BY MR. FUQUA:
11  Q    When we got here this morning -- I will just make
12  exhibit -- your attorney gave us a stack of documents
13  that includes some of your personal narratives.  This
14  is -- I marked this as Exhibit Five.
15            (THEREUPON, Exhibit Number Five was
16       marked and identified for the record.)
17            MR. FUQUA:  Could I look at somebody
18       else's so I can go through --
19            MR. ELLIS:  This?
20            MR. FUQUA:  No.  It's the document we got
21       this morning.
22            MR.  WILKERSON:  Here.  This is it right
23       here.
24  BY MR. FUQUA:
25  Q    The first two -- well, actually the first four
```

1    pages looks like a complaint that you made to the

2    Alexander Police Department regarding an incident on

3    December 11, 2010.  Am I interpreting this correctly?

4    A    Yes, sir.

5    Q    Did you ever get a response from the Police

6    Department about your complaint?

7    A    No, sir.  I don't think so.

8    Q    You don't remember getting a letter or anything

9    from the chief?

10   A    No, sir.

11   Q    I skimmed through this quickly.  It sounds like a

12   girl or lady or woman called the police and said

13   somebody was following her?

14   A    No, sir.

15   Q    Okay.  What was the complaint?

16   A    I don't know.  I don't know.  I was just walking a

17   friend home one morning from my house and I had one of

18   the Alexander police officers tell me that -- to, "Come

19   here, son."  And I went over there to him and he asked

20   me have I been drinking and I said, "Well, I have been

21   drinking -- if I have been drinking it was like the

22   night before."  And he took me -- that's another time I

23   had went to jail for public intoxication.

24   Q    What was the girl's name?

25   A    If I'm not mistaken I think her name was Stephanie.

1  Q    You don't know her last name?

2  A    No, sir.  She was just a friend that walks through

3  my neighborhood.

4  Q    Had she spent the night at your house?

5  A    Yes, she did.

6  Q    Was that the time you and Lashanda were broken up?

7  A    Yes.  Yes, it was.

8  Q    Okay.  So, you were just walking her home?

9  A    Yeah.

10  Q    Would this be an instance of what you described as

11  harassment?

12  A    Yes, sir, I would.

13  Q    Okay.  All right.  And then there is -- it looks

14  like you wrote a statement regarding an incident on

15  March 12, 2012, by the Alexander police officer Jeff

16  Watson came to your door, is that correct?

17  A    Yes, sir, that's correct, but my dad is the one who

18  took notes of this incident.

19  Q    Okay.  All right.  I see now that's his signature.

20      It looks like they were -- someone was saying that

21  your son was chasing a little girl around the

22  neighborhood?

23  A    Yes.  It was someone -- a younger teenaged girls,

24  yes.  That was just --

25  Q    It turned out to be another boy that was doing it.

1   A    Not with me, but another -- the girls -- the girl's

2   stepdad at that time was trying to -- they was bickering

3   about something and he was trying to get them to come

4   back to the house or something.  So, they ran off from

5   them and they come to my house an asked me if I knew

6   anything about it and they put me in the car and

7   everything.  Come to find out they had the wrong guy.

8   Like -- anything that happens around there they come to

9   my house first.

10  Q    Okay.  Well, were you arrested as a result of

11  this --

12  A    No, sir.

13  Q    -- March 12, 2012 incident?

14  A    No, sir, I wasn't.

15  Q    All right.  And then at the end -- let me look --

16  never mind.  Let me look at your copy here.

17                MR.  WILKERSON:  It's Exhibit Three now.

18  BY MR. FUQUA:

19  Q    And then the last document -- and Mr. Wilkerson

20  asked you about this -- is just a statement you wrote

21  regarding the incident that we're in litigation over, is

22  that correct?

23  A    Yes, sir, it is.

24  Q    Okay.  Now, did you ever make a complaint to the

25  Saline County Sheriff about the treatment you received

1  in the incident?

2  A    I never did.  I never did contact Saline County

3  jail for anything.

4  Q    All right.  So you didn't make a complaint of the

5  behavior of the Saline County deputies?

6  A    No.  No, I didn't.

7  Q    Okay.  All right.  That's all my questions.

8        You do have a right to read the transcript of your

9  deposition to make sure it's accurate.  I'm not asking

10 you to do that.  I'm just -- and that's something your

11 attorney may have to weigh in on, but I just -- we need

12 to know whether you want to read or not want to read.

13 A    Yes, I would like to.

14 Q    The court reporter will arrange to have that done.

15              MR. FUQUA:  Okay.  Are we done?

16              MS. FRAZIER:  I don't have any followup.

17              (WHEREUPON, the deposition concluded at

18        12:36 p.m.)

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E
 2  STATE OF ARKANSAS   )
                        )   SS.
 3  COUNTY OF PULASKI   )
 4          I, Robin E. Johnson, Certified Court Reporter
 5  and notary public in and for the County of Pulaski,
 6  State of Arkansas, duly commissioned and acting, do
 7  hereby certify that the witness herein was by me first
 8  duly sworn to testify to the whole truth and nothing but
 9  the truth prior to taking down in Stenotype the
10  questions, answers and proceedings during said
11  deposition, and from such recordation was thereafter
12  reduced to print by means of computer-assisted
13  transcription, and the same fully, truly, and correctly
14  reflects the proceedings had.
15          I FURTHER CERTIFY that all formalities with
16  regard to notice, issuance of commission, taking,
17  signing, and returning are hereby waived; said
18  deposition being taken with the same force and effect as
19  though all the requirements of the rules and statutes
20  have been complied with.
21          I FURTHER CERTIFY that the above deposition
22  was given by the witness and taken at the times and in
23  the place hereinabove set forth.
24          I FURTHER CERTIFY that I am not attorney or
25  counsel of any of the parties, nor am I a relative or
```

1  employee of any attorney or counsel or party connected

2  with the action, and have no interest in the outcome or

3  results of this litigation.

4          WHEREFORE, I have subscribed my signature and

5  affixed my notarial seal as such notary public at the

6  City of Little Rock, County of Pulaski, State of

7  Arkansas, this 17th day of August, 2013.

8

9          _____

           ROBIN E. JOHNSON, C.C.R.
10         NOTARY PUBLIC IN AND FOR
           PULASKI COUNTY, ARKANSAS
11         LS CERTIFICATE NO. 319

12

13

14

15

16

17

18

19

20

21

22

23

24

25