CERTIFIED COPY

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

CHRISTOPHER DOSS,                               **PLAINTIFF**

      **VS**               **No.**   **4:13-cv-121 SWW**

THE CITY OF ALEXANDER; CHIEF
HORACE WALTERS, INDIVIDUALLY
AND AS POLICE CHIEF FOR THE
ALEXANDER POLICE DEPARTMENT;
JEFFREY WATSON, IN HIS INDIVIDUAL
CAPACITY; BLANKENSHIP, IN HIS
INDIVIDUAL CAPACITY; SALINE COUNTY;
BRUCE PENNINGTON, INDIVIDUALLY AND
AS SALINE COUNTY SHERIFF; TIM GREEN,
IN HIS INDIVIDUAL CAPACITY;
PAUL BABBITT, IN HIS INDIVIDUAL
CAPACITY; JERRY ODOM, IN HIS OFFICIAL
CAPACITY                                  **DEFENDANT**

---

## DEPOSITION OF JEFF WATSON

        DATE:    October 9, 2013
        TIME:    10:40 a.m.
        PLACE:   The Saline County Courthouse
                   200 North Main Street
                   Benton, AR  72015-3767

---

### APPEARANCES

On Behalf of the Plaintiff:      Bridgette M. Frazier, Attorney
                                   The Frazier Law Firm
                                   1723 Broadway
                                   Little Rock, AR 72206-1220

**Cobb Court Reporting**
P. O. Box #4, Sweet Home, AR  72164-0004
Phones:  (501) 490-0066 - Off; (501) 590-0975 - Cell
(501) 490-0926 — Facsimile
e-mail: gloria.cobb@comcast.net

CERTIFIED COPY

On Behalf of the Defendants:

David M. Fuqua, Attorney
Fuqua Campbell, P.A.
425 W. Capitol Ave., Suite #400
Little Rock, AR  72201

John L. Wilkerson, Attorney
Arkansas Municipal League
P. O. Box #38
North Little Rock, AR  72115

George D. Ellis, Attorney
The Ellis Law Firm
P. O. Box #2307
Benton, AR  72018-2307

Jonathan Greer
Saline County Attorney
Saline County Courthouse
200 North Main Street
Benton, AR  72015-3767

CERTIFIED COPY ₃

I N D E X

PAGE

AGREEMENT OF COUNSEL. . . . . . . . . . . . . . . . . . . 3

SWEARING OF THE WITNESS. . . . . . . . . . . . . . . . . .3

EXAMINATION OF JEFF WATSON

    By Mrs. Frazier. . . . . . . . . . . . . . . .4-58 & 61-62

    By Mr. Ellis. . . . . . . . . . . . . . . . . . . .58-60

    By Mr. Wilkerson. . . . . . . . . . . . . . . . . .59-60

COURT REPORTER'S CERTIFICATION. . . . . . . . . . . . . .65

*   *   *   *   *

*   *   *

*

E X H I B I T S

#1 — Shelby Kackley Letter dtd 10/22/11. . . . . . . . . . 63

#2 — Watson details of Information [not dtd]. . . . . . . .64

CERTIFIED COPY

4

STIPULATIONS

The deposition of Jeff Watson, produced, sworn and examined at the Saline County Courthouse, 200 North Main Street, Benton, AR  72015-3767, commencing at 10:40 a.m., on October 9, 2013, in the captioned cause at the instance of counsel for the Plaintiff, and said deposition being taken according to the terms and provisions of the Arkansas Rules of Civil procedure.

It is stipulated and agreed all forms and formalities in the taking, transcribing, forwarding and filing of said deposition, are hereby waived by the parties, the right being expressly reserved to object to the testimony of the witness at the time of trial as to incompetency, irrelevancy and immateriality, other than those with respect to the form of questions as propounded to the witness.

* * * * *

P R O C E E D I N G

THEREUPON,

JEFF WATSON

having been called for examination by counsel for the plaintiff, and having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

Questions by Mrs. Frazier:

Q.  Good morning.

CERTIFIED COPY

5

A.   Good morning.

Q.   My name is Bridgette Frazier, I'm the attorney for
Christopher Doss in this case.   Can you state you name and
address for the record?

A.   Jeff Watson, 15207 Alexander Road, #11, Alexander, Arkansas
72002.

Q.   Okay.   Mr. Watson have you ever given a deposition before?

A.   I've talked with John Wilkerson yesterday and gave a
deposition yesterday.

Q.   Okay.   In which case did you give a deposition in?

A.   Ah, this one; the Christopher Doss case.

Q.   Oh.

                    ELLIS:   I don't think he understood the
question.

Q.   Have you ever given a deposition before like participated
in a deposition?

A.   No, not a, other than this one.

Q.   Okay.   Sir, now you understand that everything you say now
is under oath; correct?

A.   Yes.

Q.   Okay.   I'm going to ask you questions and then you answer
obviously.   If you don't understand what I'm saying, trust me
it's probably me it's not you.   Ah, just ask me to clarify or
repeat the question because it's real important that, you know,
you understand what I'm asking when you give your answer---

CERTIFIED COPY

6

1   A.  Yes, ma'am.

2   Q.  so we can have full answers and we're both on the same

3   page.

4   A.  Yes, ma'am.

5   Q.  And it shouldn't really be long but if you need to get up

6   or take a break just finish answering the question and let me

7   know and we can do that.  It's not a big deal.  Okay, are you--

8   is there any reason why your testimony today wouldn't be

9   completely truthful and accurate?

10  A.  No, ma'am.

11  Q.  Are you under the influence of anything?

12  A.  No, ma'am.

13  Q.  Okay, great.  And then has anyone assisted or prepared you

14  for today's deposition?

15  A.  Yes, ma'am.

16  Q.  Okay, who?

17  A.  John Wilkerson.

18  Q.  Okay.  Did you look at any documents to refresh your

19  memory?

20  A.  No, ma'am.

21  Q.  Okay.  Did you look at any documents for today's

22  deposition?

23  A.  No, ma'am.

24  Q.  Okay.  Did you look at anybody else's interrogatories or

25  answers or any court documents for today?

CERTIFIED COPY

7

1  A.  No, ma'am.

2  Q.  Without revealing what if anything you talked with Mr.

3  Wilkerson, did anyone tell you, orally tell you about anything

4  in any of the other interrogatories or answers?

5  A.  No, ma'am.

6  Q.  Okay.  Do you know the other defendants in this case?

7  A.  Ah, other defendants as in Chief Walters?

8  Q.  Uh-huh.

9  A.  Yes, ma'am.

10  Q.  Okay.  What about William Blankenship?

11  A.  Yes, ma'am.

12  Q.  Bruce Pennington?

13  A.  Ah, sheriff; yes, ma'am.

14  Q.  Okay.  Tim Green?

15  A.  He's a Saline County deputy.

16  Q.  Okay.  Paul Babbitt?

17  A.  Saline County Deputy.

18  Q.  Jerry Odom?

19  A.  Saline County Deputy.

20  Q.  Okay.  When was the last time you spoke with Chief Walters?

21  A.  Ah, I seen him yesterday but ah, that was the last time I

22  talk to him.

23  Q.  Did you discuss this case?

24  A.  No, ma'am.

25  Q.  Did you discuss your upcoming deposition with him?

CERTIFIED COPY                                          8

1   A.  No, ma'am.

2   Q.  Okay.  What about William Blankenship, when is the last

3   time you spoke with him?

4   A.  Ah, it's been probably a year; year and a-half.

5   Q.  Okay.  Did y'all discuss ah, the incident with Mr. Doss

6   after it happened?

7   A.  No, ma'am.

8   Q.  Did you discuss anything with Bruce Pennington?

9   A.  Nope.

10  Q.  What about with Jim Green?

11  A.  Nope.

12  Q.  When is the last time you spoke with Jim Green?

13  A.  Ah, the night of the incident.

14  Q.  Okay.  Ah, when is the last time you spoke with Paul

15  Babbitt?

16  A.  The night of the incident.

17  Q.  When was the last time you spoke with Jerry Odom?

18  A.  The night of the incident.

19  Q.  Okay.  Did I ask about Sheriff Pennington?

20  A.  Yes, ma'am; you did.

21  Q.  Okay.  When, when is the last time you spoke to him?

22  A.  I haven't never spoke to him.

23  Q.  Okay.  So never?

24  A.  Uh-huh.  No.

25  Q.  Okay.  Did you give ah, have you given any statement about

CERTIFIED COPY

9

1    the incident?

2    A.   There is a ah, incident report that was filled out---

3    Q.   Okay.

4    A.   the night of the incident.

5    Q.   Did you give any oral statements or anything to anybody

6    else?

7    A.   No, ma'am.

8    Q.   Did ah, Chief Walters ask you about what happened that

9    night?

10   A.   No, ma'am he went over my ah, report, made a couple of

11   correct errors corrections that I needed to make on spelling

12   and we submitted it to the prosecuting attorney.

13   Q.   Okay.  So the only suggestions he made was just spelling?

14   A.   Yes, ma'am.

15   Q.   Okay.

16   A.   Spelling and punctuation.

17   Q.   Okay.  So that is the only statement you've done in

18   connection with this is this incident report?

19   A.   Yes, ma'am.

20   Q.   Okay, that's great.  All right, I am looking at the

21   interrogatories that you prepared in this case.

22   A.   Uh-huh.

23   Q.   And interrogatory number 1 states that you were the person

24   that prepared the interrogatories; is that correct?

25   A.   Yes, ma'am.

CERTIFIED COPY    10

1    Q.   Did anyone assist you in preparing them?

2    A.   No, ma'am.

3    Q.   Okay.  These interrogatories are not certified so if you

4    need to read them over I can give you a moment.

5    A.   No, ma'am.

6    Q.   But are the answers to these interrogatories true and

7    correct to the best of your knowledge and belief?

8    A.   Yes, ma'am.

9    Q.   And so you're assure by the answers?

10   A.   Yes, ma'am.

11   Q.   Okay.  I guess we'll go through them.  So tell me about

12   your education?

13   A.   What part of my education?

14   Q.   Ah, where did you go to high school?

15   A.   Perry-Casa.

16   Q.   I'm sorry?

17   A.   Perry-Casa.

18   Q.   Oh, okay.  Is that in Perryville?

19   A.   Well, it's actually in Casa.

20   Q.   Okay.  In Casa, okay.  Perry County?

21   A.   Perry County.

22   Q.   Okay.  And is that where you graduated from?

23   A.   No, I graduated from Addison High School.

24   Q.   Okay, where is Addison?

25   A.   It's an online high school that you take online.

CERTIFIED COPY    11

1  Q.  Why did you choose to take an online course?

2  A.  Because I had to drop out of school when I was 16 to go to

3  work to help support my mother, my brother and my sister.

4  Q.  Okay.  Okay, you finally got your diploma in 2000?

5  A.  Yes, ma'am.

6  Q.  What year were you slated to graduate had you stayed at

7  Perry-Casa?

8  A.  2000.

9  Q.  2000?

10  A.  Yes, ma'am.

11  Q.  That was the same year.  Do you have any other degrees

12  other than the one from Addison?

13  A.   I have a ah, full certification from Arkansas Fire Academy

14  ah, First Responder, Hazmat, Hazmat Attack, Awareness and Ops,

15  other than that I've had the 40-hour Part-time II class ah---

16  Q.  Where did you have that class?

17  A.  It was given at the Alexander Fire Department by John

18  Fenton.

19  Q.  John Fenton?

20  A.  Yes, ma'am.

21  Q.  And it was forty hours you say?

22  A.  Yes, ma'am.

23  Q.  And when did you take that?

24  A.  Ah, it's been--I ain't quite sure on the date on that.

25  Q.  Okay.  And the year?

CERTIFIED COPY    12

1    A.    It was ah, about two and a-half years ago; two years ago.

2    Q.    So in 2010?

3    A.    Yeah.

4    Q.    Okay.  Do you have any other advanced training or degrees

5    past high school?

6    A.    No, ma'am.

7    Q.    Okay.

8    A.    Just my weapons certification and stuff like that.

9    Q.    All right.  Well, tell me about your weapons certification?

10   A.    I qualified as an expert marksman.

11   Q.    With who?

12   A.    With Alexander, with the Part-Time II Class.

13   Q.    How did you qualify for that?

14   A.    Ah, the range master, I can't think of his name, we

15   qualified at Bauxite PD, he was a court bailiff that certified

16   us all and I shot ninety-eight out of a hundred.

17   Q.    Okay.  And tell me a little more about your part-time

18   training.  You said John Fenton?

19   A.    John Fenton.

20   Q.    And who is John Fenton?

21   A.    He was a ah, Alexander officer.

22   Q.    Was he a certified officer?

23   A.    Yes.  A certified officer and also a certified instructor.

24   Q.    Okay.

25   A.    We also had adjutant instructors in to teach other parts of

CERTIFIED COPY 13

1  it.

2  Q.  Okay.  And I guess before I get into it before I forget,

3  I'm just going to ask about some documents real quick.  I was

4  ah, looking through your personnel file and I noticed there was

5  another officer who had a ah, I guess a psyche profile; did you

6  ever do a psyche profile?

7  A.  Yes, ma'am.

8           FRAZIER:  Okay.  I didn't see a psyche profile

9  for this.

10          WILKERSON:  If you don't have it, I don't have

11  it.

12          FRAZIER:  Okay.

13  Q.  But you did complete one for the City of Alexander?

14  A.  Yes, ma'am.  It was myself, Chief Mark Ridgeway with the

15  fire department ah, Robert Hawkins and ah, I can't think of

16  that other boy's name but it was four or five of us that went

17  and took it altogether.

18  Q.  Okay.  And then did you ever do kind of an evaluation with

19  a psychologist?

20  A.  Just the one that gave us the psyche test.

21  Q.  Okay.  That was it?

22  A.  That was it.

23  Q.  Okay.

24          WILKERSON:  Let me ask, are you talking about a

25  fire department psyche test?

CERTIFIED COPY    14

1    WATSON:  No, this was for us to become--me,

2    myself--myself, Chief Ridgeway and Robert Hawkins was all

3    becoming Part-Time II for the Fire Marshall so we had to go

4    through the police department psyche test.

5    WILKERSON:  I mean I don't have it; I can look

6    for it again.

7    WATSON:  It should have been in my personnel

8    file.

9    Q.  Have you seen your personnel file before?

10   A.  No, I've never seen my personnel file before.

11   Q.  Okay.  And so you know the purpose, my purpose for a

12   deposition is just for, at least my purpose is just information

13   gathering.

14   A.  Uh-huh.

15   Q.  So I'm going to be asking a lot of questions not to trick

16   or trap you but just to help me investigate this case.  So I'm

17   handing you a letter from Black River Technical College, did

18   you attend Black River Technical College?

19   A.  Yes, ma'am; I did.

20   Q.  When did you go?

21   A.  I went in the--well, January class of 2012.

22   Q.  And this was, it says Basic Police training.

23   A.  This would have been to be a certified police officer.

24   Q.  Okay.  So the only other training you had before---

25   A.  Was the Part-Time II.

CERTIFIED COPY 15

1    Q.   Was the Part-Time II, okay.  And did you complete this?

2    A.   No, ma'am, I had to drop out for personal reasons; I blew

3    my kneecap out.

4    Q.   Okay.

5    A.   Doing the like PT part of it.

6    Q.   Now would that be considered like police academy?

7    A.   Yes, that is the police academy.

8    Q.   Okay.  And you said the reason you had to leave was because

9    of a kneecap?

10   A.   I was not able to complete the physical requirements to

11   finish the course.

12   Q.   Okay.  Did you voluntarily drop out or were you asked to

13   leave?

14   A.   I voluntarily dropped out.

15   Q.   Were you ever asked to leave any police academy?

16   A.   No, ma'am.

17   Q.   Were you ever asked to leave any police academy because of

18   an altercation with another ah, attendee?

19   A.   Well, I mean there was a little incident with Black River

20   but they suggested me leave or drop out and I did voluntarily.

21   Q.   Well, tell me about that incident?

22   A.   Ah, it was just an altercation with the, one of the other

23   classmates that he didn't like the way that I was operating and

24   he was trying to control me.

25   Q.   How was he trying to control you?

CERTIFIED COPY  16

1  A.  He was our squad leader telling me when we had curfews,

2  when and whether we could smoke, stuff like that and I just

3  told him I wasn't, you know, I wasn't to be babysitted (sic)

4  that once we left the academy grounds we was on our own.

5  Q.  Okay.  What type of altercation was this?

6  A.  Just a verbal.

7  Q.  And did they ask you to leave or did---

8  A.  They, the, all the classmates passed a petition around for

9  people to sign ah, to try to get me thrown out, I talked to the

10  instructor ah, he was a little upset about it, I told him what

11  happened and told him that I would voluntarily drop out where I

12  would be able to attend further courses later on down the line.

13  Q.  Okay.  So is this the same training academy that your knee

14  blew out?

15  A.  Yes.

16  Q.  Okay.  So which happened first your knee or you agree to go

17  voluntarily because of the petition?

18  A.  The knee.  I actually was left on, I left there on a Friday

19  to come see the doctor about my knee, he put me on light

20  workout and was able to try to make it through the course.

21  Q.  Okay.  And then after you left were you able to return to

22  back to the Alexander Police Department?

23  A.  Yes, ma'am.

24  Q.  What did Chief Walters tell you about you having to leave

25  the training academy?

CERTIFIED COPY

17

A.   He just basically told me that ah, with me not being able

to complete the academy my year would be up before I could go

back, that I would have to drop out the police department.

Q.   Why?

A.   Because you have a year to become certified or you cannot

be a police officer and we do not have Part-Time II positions

any more.

Q.   Okay.  Did he tell you that you did not have to tell anyone

about the incident at Black River?

A.   No, ma'am.

Q.   Did he ever tell you to keep quiet about the incident at

Black River?

A.   No, ma'am.

          REPORTER:  This letter from Black River is that

going to be an exhibit?

          FRAZIER:  No, now a lot of these I'm just trying

to figure out what's going on.

Q.   And I'm getting permission, I'm going to ask about this

that I found in your police file.  What exactly is that?  I'm

handing you a letter from a Shelly or something; it was in your

personnel file.  What is that about?

A.   Umm, I have no idea; I have no clue.

Q.   Have you ever seen that before?

A.   Nope.

Q.   Okay.

CERTIFIED COPY                    18

1          WILKERSON:  I want to make this one an exhibit

2    at least; if that's all right?

3          FRAZIER:  That's fine.

4    A.  I've never seen this, I mean I know Robert Hawkins but I

5    don't know that the rest of the people in it.

6    Q.  So you don't know Shelby Hackley?

7    A.  Not that I'm aware of.

8    Q.  Okay; that's a weird thing to have in your file.  Now I'm

9    handing you your initial employment report.  On it, it has two

10   dates at the bottom ah, May 11th and then that circled and then

11   it says 9/22/11.

12   A.  Uh-huh.

13   Q.  And then under date employed it's 9/22/11 and then

14   5/17/2011.  Okay, so what's the significance of the two dates?

15   A.  One of them I was as a reserve officer and the other one

16   would have been when he put me as a full time officer.

17   Q.  So you got put as a full-time officer on 9/22/11?

18   A.  Yes, ma'am.

19   Q.  Okay.

20   A.  That's, that's the only thing that I can think of with them

21   dates and you'd have to ask chief exactly on'em.

22   Q.  Okay.  I want to ask you this also.  I think this is from

23   your---

24          ELLIS:  Is this Page 2 of the document we just

25   saw?

CERTIFIED COPY      19

1      WILKERSON:  I don't think so.

2      ELLIS:  It would be part---

3      WILKERSON:  No, it's the same document I

4  believe---

5      FRAZIER:  Yeah---

6      WILKERSON:  it's a twenty, page 3.

7      FRAZIER:  it's the initial employment report.

8      WILKERSON:  Okay, it is the same document.

9      ELLIS:  Good.

10  Q.  On the bottom of page 129 under attitude it says what do

11  you consider the current attitude of the problem of greatest

12  concern and your first answer is government.  Can you explain

13  that to me?  How do you consider the government to be a current

14  social problem of great concern?

15  A.  The government is always a concern of everybody; like right

16  now they're shut down.  You never know what's going to happen

17  with the government.

18  Q.  How are you concerned with the government 2011?

19  A.  I wasn't thinking about the government, I mean---

20  Q.  But you wrote it down though as your first answer?

21  A.  Right.

22  Q.  And so it said that you considered it to be a great

23  concern.  So how do you consider the government to be a great

24  concern?

25  A.  That's pretty much what we represent around is the

CERTIFIED COPY

20

1    government; they control everything so---

2    Q.   You think the government controls you?

3    A.   No, to an extent I mean they do.

4    Q.   Who do the government control?

5    A.   Your police chiefs, your organizations and things like

6    that.

7    Q.   Have you ever had problems with the government?

8    A.   No, ma'am.

9    Q.   Tell me how corporate America concerns you?

10   A.   I don't know.  Corporate America, everybody you run into is

11   a different type of people, different places.

12   Q.   How would they concern you though?

13   A.   You always are concerns about different people, different

14   personalities.  There's always a concern.

15   Q.   What about people that have no clue thinking that they know

16   it all?  How is that a social problem of great concern?

17   A.   Ah, I mean that right there would be a lot of your ah,

18   starting arguments for a lot of your, you know, if one person

19   says he know it all and you think you know it all and get into

20   an argument.

21   Q.   Has that been a problem for you?

22   A.   No.

23   Q.   Kind of interacting with know it alls?

24   A.   No; I pretty much interact with everybody.

25   Q.   But for example you had a problem with your, who is it your

CERTIFIED COPY

21

1  sergeant, your squad leader?

2  A.  Squad leader.

3  Q.  Yes.

4  A.  Yes.

5  Q.  Did your squad leader think that he knew it all?

6  A.  No, he was just trying to be controlling.

7  Q.  Controlling?

8  A.  And he was a lot younger, he was just barely, just turned

9  21 so---

10  Q.  Do you think that's a problem with ah, when the younger

11  people thinking they know it all or---

12  A.  Not so much anymore.

13  Q.  Why not anymore?

14  A.  Because I work under people now that's younger than me that

15  have more degrees then I do so---

16  Q.  Okay, let's see.  This is from the Arkansas State Police

17  that came out of your employment file it's from the ah, about

18  you application it says that the results of this comparison

19  shows a match with fingerprints in our criminal file.  Can you

20  explain why you had a match in the criminal files of the

21  Arkansas State Police?

22  A.  Oh, I mean I've been fingerprinted several times so---

23  Q.  I mean which time?

24  A.  Well, I've been fingerprinted with consent to carry permits

25  ah, just fingerprinted when I went to work for the PD.

CERTIFIED COPY

22

1  Q.  Which PD?

2  A.  Ah, Alexander.

3  Q.  Okay.

4  A.  I was fingerprinted when I went to work for the fire

5  department so---

6  Q.  Did Chief Walters ever ask you about the match?

7  A.  Not that I recall.

8  Q.  Okay.  Have you ever been arrested?

9  A.  Yes, ma'am.

10  Q.  When?

11  A.  Ah, back in my youth days under 18.

12  Q.  Under 18?

13  A.  Yes, ma'am.

14  Q.  Okay.  You ever been arrested since you were over 18?

15  A.  Yes, ma'am; over a hot check that my first wife wrote.

16  Q.  Okay.  Have there been any other times?

17  A.  No, ma'am.

18  Q.  Okay.  Did Chief Walters ask you about if you'd ever been

19  arrested?

20  A.  I notified Chief Walters of it just as soon as I found out

21  because when I went to have my fingerprints run at the state

22  police for the police department, I was notified by the state

23  police that I had a warrant for my arrest out of Sherwood over

24  a hot check.  I went right then and took care of it, paid it

25  off, and was done with it.

CERTIFIED COPY

23

Q.  Okay.  And you let Chief Walters know?

A.  Yes, ma'am.

Q.  Okay.

A.  Took him the paperwork and showed everything had been paid off.

Q.  Okay.  And then on April 16, 2012 you sent Chief Walters a formal request to be removed as a full-time officer and be replaced as a Part-Time II Officer?

A.  Yes, ma'am.

Q.  Why did you do that?

A.  That was after the incident with the academy.

Q.  You wrote this is due to a schedule conflict.

A.  And I was also trying to hold two jobs; yes, ma'am.

Q.  So was it due to a schedule conflict or was it due to you not being able to be certified?

A.  Well, I was certified as a Part-Time officer but it was due to my scheduling at work because I was having to work two or three nights as a PD officer and then work all day; I wasn't getting no sleep.

Q.  Okay.  So when you were working as a full-time officer you still had two other jobs?

A.  No, I was just a full-time officer.  It wasn't until after the academy that I picked up this job that paid a lot more that's why I went down to a, wanted to drop down to a part time.  I tried it for two and a-half months and it wasn't

CERTIFIED COPY

24

1   working.

2   Q.   Okay.

3   A.   I got this job in April of last year.

4   Q.   What job is that?

5   A.   Tyson's Foods in North Little Rock.

6   Q.   Okay.  I'm just handing you a subpoena from Nancy Cummins

7   that was delivered to you April 17th, why were you subpoenaed?

8   A.   Ah, I'm not sure.  Where is the rest of the paperwork

9   that---

10  Q.   I don't know, this is all that was in the file.

11  A.   I'm not for sure why I was subpoenaed?

12  Q.   You don't remember being subpoenaed on April 17th?

13  A.   Unless it was to do with one of my cases.  April 17th--

14  Q.   Well, 2012.  So when did you drop down?

15  A.   This was after I dropped down because I'd done started with

16  Tyson's--this was the subpoena for me to testify in the case of

17  ah, Joshua Green and his girlfriend that I had to arrest; it

18  was upstairs.

19  Q.   Okay.

20  A.   It was actually a DHS case.

21  Q.   Okay.  This is a request that was in your file from Marcie

22  Manley for KARK 4.  A team between July 20, 2011 and September

23  27th ah, she wanted any application material associated with

24  your employment.  Did you talk with the chief about this

25  request?

CERTIFIED COPY    25

1    A.  I didn't know nothing about it.

2    Q.  The chief didn't tell you that somebody requested your

3    application material?

4    A.  No, ma'am, I mean they was requesting, there was several

5    people in the city that went down and requested my ah,

6    personnel file from the state police and everything it was due

7    to a ah, officer on the department having them go down there

8    and do it.

9    Q.  Who, which officer?

10   A.  It was ah, Assistant Chief Officer Brad Williams.

11   Q.  Why did Brad have them do it?

12   A.  Because Brad did not want me as a police officer.  He would

13   go down and pull my files from the state police and then have

14   these people go and submit the files.

15   Q.  Why didn't Brad want you as a police officer?

16               WILKERSON:  Object to the form of the question;

17   you can go ahead an answer.  You can answer the question; it's

18   just a formality.

19   A.  I mean ah, I don't know; he never stated.

20   Q.  Did you ever talk to Brad about this?

21   A.  Nope.

22   Q.  Do you know why Ms. Manley wanted the arrest records

23   between July 20, 2011 and September 27th?

24   A.  No, ma'am.

25   Q.  Is there any incident that you can think of?

CERTIFIED COPY

26

1    A.   No, ma'am.

2    Q.   Do you remember any news reports or stories that happened?

3    A.   There was all kind of news reports on, about me on the news

4    so---

5    Q.   All right.  What were they reporting?

6    A.   That I wasn't an officer, that there wasn't no paperwork

7    showing I was an officer and all that stuff.

8    Q.   Were all these stories before the incident with Mr. Doss?

9    A.   Yes.

10   Q.   How did they affect you?

11   A.   They didn't bother me.  I knew all my personnel file was

12   correct and everything was like it was supposed to be, chief

13   insured that I was qualified and I passed the course and was an

14   officer.

15   Q.   Okay.

16   A.   I signed the oath and was given the badge and the car and

17   everything.

18   Q.   When did you sign this oath?

19   A.   Ah, I'm not for sure.

20   Q.   When were you given the badge and the car?

21   A.   The day I signed the oath.

22   Q.   About when did you sign the oath?

23   A.   It would have been right after reserve school sometime in

24   May of 2010.

25   Q.   Okay.  What were the other news reports about?

CERTIFIED COPY    27

1   A.  I don't recall; it's been two years.

2   Q.  Did you have an interview with anyone in the press?

3   A.  No, ma'am.

4   Q.  What did Chief Walters tell you?

5   A.  Chief Walters was the spokesman for the police department

6   that he wouldn't do any interviews.

7   Q.  Okay.  Now I'm just showing you the arrest and disposition

8   report from this case.  This is when you arrested Mr. Doss.

9   A.  Yes, ma'am.

10  Q.  And let me ask first do you know who filled this out?

11  A.  Me.

12  Q.  You, okay.  All right so you charged him with drinking in

13  public?

14  A.  Yes, ma'am.

15  Q.  What ah, can you tell me the law for drinking in public?

16  What is the code citation for drinking in public?

17  A.  The code citation for drinking in public?

18  Q.  Uh-huh, 571212?

19  A.  Yes, ma'am, it is anyone under the influence that is a

20  danger to hisself (sic) of the society.

21  Q.  That's your understanding of drinking in public?

22  A.  Yes, ma'am.

23  Q.  What is your understanding of giving him a citation for

24  disorderly conduct?

25  A.  That would be anybody that was not compliant, going against

CERTIFIED COPY

28

1   orders that was given to'em, yelling, screaming, carrying on

2   would be disord--anything that disorders the public.

3   Q.   Okay.  Terroristic threatening first of law enforce, the

4   law officer.

5   A.   Yes, ma'am.

6   Q.   What is the element of that crime?

7   A.   That was comments that was made toward me from Mr. Doss.

8   Q.   The elements of, in order to charge someone with

9   terroristic threatening of a law officer.

10  A.   It's---

11  Q.   What do they have to do for you to be able to charge them

12  with it?

13  A.   To threaten bodily harm.

14  Q.   Okay.  And then resisting arrest; what are the elements of

15  resisting arrest?

16  A.   Resisting arrest, just like it says you're trying to

17  place'em under arrest and they're not compliant, they're not

18  combative (sic) to what you're wanting'em to do.

19  Q.   Okay.  And then what kind of training did you receive?

20  Like everything you just told me---

21  A.   Uh-huh.

22  Q.   how did you find out about it?

23  A.   Through the Part-Time II class.

24  Q.   Okay.  So were you trained on these specific statutes?

25  A.   The statutes, you can read the statute at any time.

CERTIFIED COPY

29

1  There's a book that tells you, it tells you how to charge

2  people.

3  Q.  Okay.  Which book is this?

4  A.  It is the law book that is kept at the Saline County Jail.

5  And there is also one at the police department and it can be

6  looked at, at any time.

7  Q.  Okay.  Do you remember what this law book is called?

8  A.  No, it's just a big thick book.

9  Q.  Is it a book of criminal statutes or is it a---

10  A.  Criminal and ah, it would be criminal statutes and ah, I

11  don't know what the word would be for other statutes ah,

12  basically it breaks it down between felony, misdemeanors and

13  stuff like that.

14  Q.  Okay.  And then specifically how did you get trained on

15  this stuff?  Was it just there for you to read it?

16  A.  Yes, ma'am.

17  Q.  Were you required to--were there any requirements with

18  regard to that book?

19  A.  No, ma'am; it was just a reference on charging people and

20  the drinking in public is also falls back into by field

21  sobriety certification that I hold in my BLC.

22  Q.  When did you receive those?

23  A.  Ah, it would have been 2011 in Morrilton.

24  Q.  Do you remember when in 2011?

25  A.  No, ma'am, it does not say.

CERTIFIED COPY    30

1    Q.   Okay.  Were you given classes on kind of the criminal code?

2    A.   Yes, ma'am.

3    Q.   Who conducted those classes?

4    A.   It would have been John Fenton.

5    Q.   Is his name Ben John Fenton or John Fenton?

6    A.   John Fenton.

7    Q.   Okay.  And tell me about the class; describe it?

8    A.   It was just class that we had to, we went over the most

9    common statutes ah, we acted a bunch of'em (sic) out on which

10   way you'd charge this person, how you'd charge this one and had

11   to complete a test on it.

12   Q.   Did you complete a test?

13   A.   Yes, ma'am.

14   Q.   Would that test be in your file?

15   A.   That, it should be in John Fenton files; I don't know who

16   gets it.

17   Q.   And when did you have this training?

18   A.   Which training?

19   Q.   How many trainings do you have?

20   A.   There was talking about the BAC and then---

21   Q.   The part time.

22   A.   The part time II would have been in 2010.

23   Q.   Where was Mr. Doss when you arrested him?

24   A.   He was standing in his front yard by the bar-b-que grill

25   holding a stick.

CERTIFIED COPY

31

1    Q.   You said he was holding a stick?

2    A.   Yes, ma'am.

3    Q.   Okay, all right.  Let me go through your answers, okay.

4    Tell me about, tell me--strike that.  What is the use of force

5    policy for the City of Alexander?

6    A.   The use of force policy is you start with the least and go

7    to the more.

8    Q.   All right.  Tell me what least is, tell me what more is,

9    and tell me everything in between?

10   A.   The least for me would have been pepper spray or baton, the

11   worse would have been my side arm.

12   Q.   What's in between those two?

13   A.   There's taser but I'm not taser certified so I don't carry

14   a taser.

15   Q.   So we're going from pepper spray---

16   A.   To baton to the fire arm.

17   Q.   And is that the policy for the city of Alexander?

18   A.   I'm not for sure exactly; it's been rewrote since I've been

19   there.

20   Q.   Okay.  I'm saying the policy when you were there?

21   A.   Yes, that force it took to get the job done.

22   Q.   Okay.  And then when did you receive your use of force

23   training?

24   A.   During the ah, Part-Time II class.

25   Q.   Okay.  How many days was this training?  The use of force

CERTIFIED COPY   32

1  training not the Part-Time II but how many days were you

2  trained on---

3  A.  Ah, a little over a week.

4  Q.  So you spent a week?

5  A.  Yes, because we had our self-defense part of it in there

6  with it.

7  Q.  Okay.

8  A.  On striking, on how to strike with a baton and everything.

9  Q.  Did you have a class on how to use pepper spray?

10 A.  Yes, ma'am.

11 Q.  What about conflict de-escalation; how long was that class?

12 A.  Ah, it was three nights, the fourth night we got pepper

13 sprayed.

14 Q.  You're allergic to pepper spray aren't you?

15 A.  Yes, ma'am.

16 Q.  How did that affect you?

17 A.  It kind of burns worse that it does most people.

18 Q.  Okay.  But tell me specifically on kind of de-escalation

19 where you cannot use the baton or pepper spray, how long did

20 those classes?

21                 WILKERSON:  Object to the form; you can go ahead

22 and answer.

23 A.  I mean there's no determine length I, I couldn't tell you

24 how long we spent on a certain subject.  I mean we covered a

25 lot of material in forty hours.

Cobb Court Reporting
P. O. Box #4, Sweet Home, AR  72164-0004
Phones:  (501) 490-0066 - Off; (501) 590-0975 - Cell
(501) 490-0926 — Facsimile
e-mail: gloria.cobb@comcast.net