CERTIFIED COPY    33

1    Q.  Okay.  Do you remember classes on de-escalation?

2    A.  Yes, ma'am.

3    Q.  Tell me about them.  How many were there; one, two?

4    A.  Oh, it was one or two on, you know, how to try to de-

5    escalate ah, problem would be, you know, if you've got say for

6    instance two people arguing with each other and you're trying

7    to de-escalate it you separate the two people and deal with

8    them individually.

9    Q.  So that was the extent of the de-escalation training?

10   A.  Uh-huh.

11   Q.  Okay.  Have you ever received any reprimands or punishment

12   or any other discipline?

13   A.  No, ma'am.

14   Q.  Okay.  Are you still married?

15   A.  Yes, ma'am.

16   Q.  Where does your wife work?

17   A.  She's a stay-at-home mother.

18   Q.  Okay.  Was she ever on the Alexander City Board?

19   A.  Yes, ma'am.

20   Q.  When was she on the city board?

21   A.  Ah, 2010-2011 or 2011-2012; she's, she can answer that

22   better; she's outside.

23   Q.  I can't bring her in so--ah, was she on the city board

24   while you were a police officer?

25   A.  Yes, ma'am.

CERTIFIED COPY    34

1    Q.  Did anyone ever accuse you or did you ever hear any

2    rumbling that you received special treatment because your wife

3    was on the city council?

4    A.  No, ma'am.  My wife was not ah--anything that involved me

5    she was not allowed to vote on.

6    Q.  Okay.  But she did have authority to hire and fire the

7    chief of police; right, the city council?  Not her but the city

8    council?

9    A.  The city council; yes, ma'am.

10   Q.  Okay.  Ah, have you ever been involved in any other court

11   proceedings as a defendant or a plaintiff besides anything to,

12   you know, when you had to go testify as a witness?

13   A.  Just the one where I had to testify with DHS ah, had to

14   testify on Joshua Green.

15   Q.  Well, not those but like have you ever been a defendant?

16   A.  No, ma'am.

17   Q.  A plaintiff?

18   A.  No, ma'am.

19   Q.  Have you ever had any charges brought against you?

20   A.  I've had a speeding ticket.

21   Q.  Okay.  Anything else?

22   A.  Then the hot check deal that was---

23   Q.  Okay.  Okay, it says answer #6 says John Garrett made a

24   complaint that you were not a certified officer.  Who is John

25   Garrett?

CERTIFIED COPY 35

1    A.   One of the citizens of Alexander.

2    Q.   Okay.  Tell me about this complaint?

3    A.   I, I, all I know of it is he went to the city council

4    complaining that I was not an officer.

5    Q.   Okay.  Was your wife on the city council at that time?

6    A.   Yes, ma'am.

7    Q.   What happened?

8    A.   She was asked not to have any regards in the discussion of

9    it and they voted for him to meet with the chief and discuss it

10   with the chief but it was the chief's position not the city

11   council's.

12   Q.   Okay.  Are there any other times where you've been the

13   subject of a complaint?

14   A.   Not that I'm aware of.

15   Q.   And on the evening of October 9th ah, Mr. Blankenship was

16   under your command?

17   A.   Yes, ma'am.

18   Q.   Were y'all both part-time officers?

19   A.   No, ma'am, I was listed as a full-time officer.

20   Q.   Okay.  But you were not certified?

21   A.   Correct.

22   Q.   Okay.

23   A.   You have a year to get certified.

24   Q.   Okay.  I asked you to describe the manner in which you

25   determine whether or not you have PC to make an arrest without

CERTIFIED COPY    36

1   a warrant.  Can you please describe in greater detail how you

2   determine, you know when you arrest someone how do you

3   determine you have PC to make an arrest?

4   A.  It all depends on the case on what's going on.  Ah, you

5   have, someone being disorderly that's PC for arrest; ah not,

6   drinking in public that's PC for arrest; domestic batteries,

7   stuff like that.

8   Q.  Okay.  Are you allowed to just give individuals citations

9   or do you need to physically arrest them and bring them down

10  and book them?

11  A.  If it's, if it's, depending on the charge you have to take

12  them down and book'em; (sic) yes, ma'am.

13  Q.  Okay.  Well, tell me about the charges for Christopher

14  Doss?  Have you ever just given someone a physical citation for

15  drinking in public or do you have to arrest them?

16  A.  No, ma'am; it, it is the order of the chief that they do go

17  to jail and spend the night in jail.

18  Q.  For drinking in public?

19  A.  Yes, ma'am.

20  Q.  Where does this order come from?

21  A.  That is--I don't know on that.

22  Q.  So well how do you know about this order?

23  A.  That's what chief was, told us.

24  Q.  So he told you?

25  A.  Yes.

**Cobb Court Reporting**
P. O. Box #4, Sweet Home, AR  72164-0004
Phones:  (501) 490-0066 - Off; (501) 590-0975 - Cell
(501) 490-0926 — Facsimile
e-mail: gloria.cobb@comcast.net

CERTIFIED COPY

37

1   Q.  He said if you see anyone drinking in public you have to

2   arrest them and bring them down to the station?

3   A.  Yes.

4   Q.  Do you know if this was written anywhere?

5   A.  No, ma'am.

6   Q.  Were there a lot of orders that the chief told you that

7   were not written someplace but that he just told you about that

8   you had to follow?

9   A.  Ah, there's orders that's state laws that we had to follow.

10  Q.  Uh-huh, okay; let me rephrase my question.  Did Chief

11  Walters have a lot of written orders?

12  A.  No, ma'am.

13  Q.  Did he have a lot of oral orders like orders that he told

14  you like this drinking in public that weren't written down

15  anywhere he just told you?

16  A.  No, ma'am; it pretty much, he told us to go by the statue

17  and there was also orders that, you know, the County Judge said

18  like drinking and driving is automatic jail time, you know,

19  driving with no drivers license is automatic jail time and

20  stuff like that.

21  Q.  Okay.  Disorderly conduct?

22  A.  It's automatic jail time by the statute to neutralize the

23  subject.

24  Q.  But which statute?

25  A.  I would have to look it up.

CERTIFIED COPY   38

1   Q.  So are you saying that I guess that 5-71-207 says that you

2   have to automatically take them to jail?  That's what you

3   charged Mr. Doss with.

4   A.  Yes, yes.  That would have been the statute for the arrest.

5   Q.  So you didn't have any discretion; you had to take him to

6   jail?

7   A.  Yes, ma'am.

8   Q.  Is that your understanding?

9   A.  Yes, ma'am.

10  Q.  Okay.  What about terroristic threatening is that something

11  you could just give them a citation for?

12  A.  It depends on how bad the terroristic threatening is.

13  Q.  All right.  I mean pretty much any terroristic threatening

14  if it's misdemeanor or felony you got to go let the judge

15  decide whether it was ah, grounds for them to spend more time

16  in jail or which way to charge'em (sic).

17  Q.  Okay.  What ah, criminal violation didn't require a jail

18  visit?

19  A.  Ah, pertaining to this there was---

20  Q.  No, no, no, just in general?

21  A.  ah, you'd have you jaywalking or arguing over a dog being

22  in somebody else's yard, just stuff like that.

23  Q.  Is it your normal practice if you find someone committing a

24  crime to just take them to jail?

25  A.  No, ma'am.

CERTIFIED COPY

39

1   Q.  You had discretion?

2   A.  No, ma'am ah, it just depend on what law they was breaking.

3   Q.  But you had no discretion when you drinking in public?

4   A.  That's automatic go to--you, you take'em (sic) to jail.

5   Q.  Per Chief Walters?

6   A.  Per I believe this statute is written now it is automatic

7   jail time too.

8   Q.  No, no, how the statute was written then at the time of the

9   arrest?

10           WILKERSON:  Objection to form; that's been asked

11   and answered; go ahead and answer again, please.

12           ELLIS:  Many times.

13           FRAZIER:  I'm just trying to make sure I

14   understand what he's saying.

15           WILKERSON:  No, I, I, I understand what you're

16   attempting to do.

17           FRAZIER:  I'm not trying to trap him I'm just

18   trying to understand.

19           WILKERSON:  I'm just---

20           FRAZIER:  I get a little confused at times.

21   Sometimes it's hard to speak and listen.  I'm trying to get

22   better at listening.  So it's automatic jail time drinking in

23   public if he's high?

24   A.  Yes, ma'am.

25   Q.  Okay, all right.  But tell me a little more about use of

CERTIFIED COPY    40

1    force.  Does the City of Alexander have the use of force

2    policy?

3    A.  Yes, ma'am.

4    Q.  Does the City of Alexander have a written use of force

5    policy?

6    A.  Yes, ma'am.

7    Q.  Okay.  And that was the one pepper spray to---

8    A.  Yes, ma'am.

9    Q.  Okay, let's talk specifically about this night of October

10   9, 2011.

11   A.  Yes, ma'am.

12   Q.  Tell me what happened.

13   A.  I received a dispatch from Saline County dispatch to assist

14   a female from getting her stuff out of a house.  I then told

15   central I would be in route, I met with the female on the

16   corner of Vine and 2nd Street where she advised me that it was

17   her kids that she was trying to get out of the house of the

18   address.

19   Q.  Okay.  Do you have the female's name?

20   A.  Not right off the top of my hand (sic).

21   Q.  Okay.  You met her on 2nd and Vine?

22   A.  Yes, ma'am; right on the corner.

23   Q.  Okay.  Then what happened?

24   A. She followed me from 2nd and Vine just two trailers down to

25   where I met with Mr. Doss.

CERTIFIED COPY

41

1   Q.  Okay.  What happened?  So just tell me what happened?

2   A.  Ah, when I got out of the car Mr. Doss proceeded to be very

3   verbally toward me, cussing, hollering and screaming, cussing

4   at her ah, yelling a screaming I was not an officer, I was not

5   allowed on his property ah, that she wasn't getting the kids

6   and all that.

7   Q.  Okay.

8   A.  That Mr. Doss finally calmed down after I had the female

9   sit back in the car because they was both arguing back and

10  forth, I got Mr. Doss to release the children from his house to

11  their mother after she was, after the kids were given to them,

12  to the mother Mr. Doss was still getting verbally aggressive

13  toward us, started toward me, I then call for my backup units

14  to kind of help me de-neutralize (sic) the system because I had

15  her arguing in the car and him arguing outside the car ah, at

16  which time until Officer Blankenship showed up ah, Mr. Doss had

17  kind of calmed back down a little bit so I cancelled my county

18  unit which was a-half block up the road when I cancelled'em ah,

19  we told Mr. Doss, we let the female go, told Mr. Doss that if

20  he'd go in the house, calm down and stay in for the night, that

21  he wouldn't go to jail for drinking in public.  He---

22  Q.  And he was in his yard this whole time?

23  A.  No, he was on the street.  He was out in the street because

24  he was in between--I had my police unit in between me and him.

25  Q.  Okay.  I mean did you ask him to come to the car?

CERTIFIED COPY

42

1    A.   No, ma'am.

2    Q.   Uh-huh.   I had actually ordered him several times to stay

3    in his yard where I was not getting him any closer to her.

4    Q.   Okay.   Go on.

5    Q.   Ah, Mr. Doss agreed to go in the house and kind of calm

6    down a little bit and told him that he could get a hold to her

7    tomorrow to figure out on the kids; I didn't want to get into

8    that.   He agreed, he went into the house, me and Officer

9    Blankenship left.   We me up with the county a-half a block up

10   the road.   At which time we were sitting there talking to the

11   county unit Mr. Doss had come back out into the street and was

12   yelling, cussing, and hollering and screaming toward us at

13   which time I made the decision to go ahead and take him to jail

14   for disorderly conduct and drinking in public.

15   Q.   So where is this parking lot that you said you met up with

16   the officers?

17   A.   A-half a block up the street from his house.

18   Q.   Could you see his house?

19   A.   Yes, ma'am.

20   Q.   And you could see the street?

21   A.   Yes, ma'am.

22   Q.   And then what happened?

23   A.   We, when we started toward Mr. Doss' house he run down the

24   front of his trailer to the bar-b-que pit which was at the very

25   back corner of it ah, when we got out of the car he was given

CERTIFIED COPY

43

1  the verbal command three different times to get on the ground

2  ah, that he would be, that he was being placed under arrest, he

3  refused and then I heard the taser go off.  And after he was

4  hit with the taser I placed him in handcuffs, after getting him

5  in the handcuffs he still wanted to fight and resist ah, kicked

6  the side of my police unit which the officer that had the

7  taser, the actively pulled the trigger again to give him

8  another zap to get him under control.

9  Q.  And then what happened?

10 A.  I transported him to Saline County Jail where he was booked

11 on the charges.

12 Q.  Okay.  And you said he was tazed a second time because he

13 was still fighting?

14 A.  Yes.

15 Q.  And that was why?

16 A.  Yes, ma'am.

17 Q.  Okay.  And then you mentioned that he was tazed a third

18 time.  Why was he tazed that third time?

19 A.  Because when we got to the jail he was refusing ah,

20 resisting what the bailiff's of Saline County Jail.

21 Q.  Okay.  Was he tazed again after that?

22 A.  Not that I'm aware of I mean once we get'em (sic) inside of

23 Saline County's responsibility.

24 Q.  Okay.  We don't do pat down on'em (sic) or anything once

25 they're inside the jail.

CERTIFIED COPY

44

1    Q.   Okay.   And tell me about this piece of wood he picked up?

2    Who was around when he picked up the piece of wood?

3    A.   He was by hisself (sic), he had the piece of wood when we

4    was approaching him.

5    Q.   And so when you were approaching he already had wood in his

6    hand?

7    A.   Yes.   He already had the piece of wood; it was about three

8    or four inches in diameter, a foot, foot and a-half long.

9    Q.   Okay.   What did he do with that piece of wood?

10   A.   He was just holding the piece of wood and standing by the

11   bar-b-que grill.

12   Q.   Okay.   But I'm saying after you came did he swing it at

13   you?

14   A.   He never swung it at me, he just proceeded to stand there

15   like he was standing his ground with the piece of wood; would

16   not comply to my verbal commands to drop the wood and get on

17   the ground.

18   Q.   So you gave him a verbal command to drop the wood?

19   A.   Yes, ma'am.

20   Q.   Okay.

21   A.   As a matter of fact I gave him three verbal commands.

22   Q.   So you gave him three verbal commands to drop the wood?

23   A.   Yes, ma'am.

24   Q.   Okay.   Did you just talk or did you yell drop the wood?

25   A.   I was in a aggressive manner of that way he would

CERTIFIED COPY    45

1    understand where that I meant drop the wood and get on the

2    ground.

3    Q.  Okay.  How loud did you say?

4    A.  Pretty loud because it was five officers all and the

5    commotion going on.

6    Q.  So the five officers were there when you y'all out to drop

7    the weapon?

8    A.  Yes.

9    Q.  Okay.  And ah, what else did you tell Mr. Doss?

10   A.  Tell him that he was under arrest, which is public

11   intoxication, which is drinking in public and disorderly

12   conduct.

13   Q.  And did this take place in Mr. Doss' yard?

14   A.  Yes, ma'am.

15   Q.  Okay.  Ah, so you told Mr. Doss he was under arrest?

16   A.  Yes, ma'am.

17   Q.  And then what happened again?

18   A.  I told him he was under arrest, to get on the ground the

19   three times and then he did not comply so he was tazed.

20   Q.  After you told him three times he didn't comply and he was

21   tazed?

22   A.  Yes, ma'am.

23   Q.  Okay.

24   A.  And I was not the tazing officer so I have no clue of why

25   or how that come about.

CERTIFIED COPY

46

1  Q.  Okay.  But in your use of force policy you're allowed to
2  use pepper spray?
3  A.  Yes, ma'am.
4  Q.  So why didn't you use pepper spray?
5  A.  Because the county was also there and their use of force is
6  different than ours.
7  Q.  Okay.
8  A.  I mean I can't speak for the county on what their use of
9  force is.
10  Q.  But you were the arresting officer; correct?
11  A.  Yes, ma'am.
12  Q.  Okay.  So was there a reason you didn't use pepper spray to
13  subdue Mr. Doss?
14  A.  I had my pepper spray out, he was tazed before I could ever
15  get a chance to pepper spray him.
16  Q.  Okay.  And then who were the officers that were with you;
17  you said there were five officers?
18  A.  It would have been me, Officer Blankenship ah, Officer
19  Green, Babbitt and I don't know the other officer's name by
20  heart.
21  Q.  Okay.  And were they all present ah, did you see them all?
22  A.  Yes, all five of us was in the yard.
23  Q.  Were they all in the yard when Mr. Doss was being tazed?
24  A.  Yes, ma'am.
25  Q.  Okay.  And do you remember how many officers or which

CERTIFIED COPY

1  officers were there when you were yelling, when you were

2  telling him--not yelling,  when you were telling him that he

3  was under arrest?

4  A.  All five of them.

5  Q.  Okay.  And then how did you put Mr. Doss in handcuffs?

6  A.  The, I placed his right hand in the handcuff first, made

7  sure my spacing was correct, made sure my spacing was correct,

8  double wrapped my cuffs where they wouldn't get any tighter

9  like I was trained to.

10  Q.  Okay.  And who helped you handcuff him?

11  A.  Ah, there was five officers, I couldn't tell you exactly

12  who helped.

13  Q.  I'm sorry, I need some water.  If you need any water I'll

14  give you a bottle.

15  A.  No, I'm fine.

16  Q.  Okay.  Were there any officers that helped you try to

17  subdue Mr. Doss before he was tazed?

18  A.  There was just the ones that was there when we was all

19  approaching'em and giving him commands he didn't comply so he

20  was tazed.

21  Q.  Okay.  But specifically Officer Blankenship was present;

22  correct?

23  A.  Yes, ma'am.

24  Q.  Did Officer Blankenship help you or try to assist you in

25  cuffing Mr. Doss?

CERTIFIED COPY    48

1   A.   Ah, no, ma'am; not that I'm aware of, I mean there was--

2   when he got tazed there was two or three others that went down

3   to handcuff him so---

4   Q.   Okay.  So who was there?

5   A.   Me, Babbitt, Green, Blankenship and the other officer, I

6   don't know his name.

7   Q.   Mr. Odom?

8   A.   Ah, I would have to defer on that.

9   Q.   If you don't know that's fine; I don't want you to tell me

10  something that you don't know.  And then would you recognize

11  Paul Babbitt?

12  A.   Ah, no, ma'am that's the first time I had met any of the

13  county officers.

14  Q.   Okay.  Ah, but Officer Green is the one who tazed Mr. Doss;

15  correct?

16  A.   Yes, ma'am.

17  Q.   Okay.  Did he try to help you get Mr. Doss in handcuffs?

18  A.   No, ma'am because he was standing above us with the taser.

19  Q.   Okay.  So he was standing above you at that point?

20  A.   Yes, ma'am.

21  Q.   But before Mr. Doss was tased was there anyone that tried

22  to help you put him in handcuffs?

23  A.   No, he---

24  Q.   Okay.

25  A.   he was standing--the way he was positioning hisself (sic)

Cobb Court Reporting
P. O. Box #4, Sweet Home, AR  72164-0004
Phones:  (501) 490-0066 - Off; (501) 590-0975 - Cell
(501) 490-0926 — Facsimile
e-mail: gloria.cobb@comcast.net

CERTIFIED COPY 49

1  it was going to be, it looked to be it was going to be a

2  struggle to try to put him in handcuffs.

3  Q.  So you didn't even try?

4  A.  No.

5  Q.  Okay.  Ah, and then--so he's tased, you get him in

6  handcuffs---

7  A.  Yes, ma'am.

8  Q.  you tased him a couple of more--how many more times?  I

9  don't want to put words in your mouth.

10  A.  Ah, I can't tell you because I wasn't the one tazing him.

11  Q.  But you could visually tell when he was tazed; correct?

12  A.  No, ma'am; I mean it's electrical current is---

13  Q.  He didn't behave any differently after a shot?

14  A.  Not that I could tell I mean everything was in a cluster

15  trying to get him under arrest.

16  Q.  Okay.  Were you the one who transported him?

17  A.  Yes, ma'am.

18  Q.  Okay.  And then when you met up with the sheriffs who were

19  from Saline County in the parking lot?

20  A.  Yes, ma'am.

21  Q.  Okay.  You had said before that you had cancelled back up?

22  A.  Yes, ma'am.

23  Q.  Okay.  When you met with them did you tell them that you

24  had cancelled back up?

25  A.  Yes, they, they knew that I had cancelled'em, (sic) they

CERTIFIED COPY

50

1    had called Saline County and ask to, for me to 49 with them.

2    Q.   What, I don't know, what does 49 mean?

3    A.   To meet up with them.

4    Q.   How did you know that they knew the backup request was

5    cancelled?

6    A.   Through Saline County dispatch.

7    Q.   Okay.  So you radioed to Saline County to cancel backup?

8    A.   Yes, ma'am.

9    Q.   Okay.  So you meet with these officers in the parking lot;

10   who did you meet up with?

11   A.   Ah, Green, Babbitt--the county officers that were there

12   Green, Babbitt and whoever else ah, myself and Blankenship.

13   Q.   Okay.  Did you tell them that you didn't need backup at

14   that point?

15   A.   Ah, they, they was posted up because I'd done checked 98

16   off the scene and they just wanted to see if we--they was

17   asking to see if we had a better map of the city where they

18   could assist us with backup quicker.

19   Q.   What does 98 mean?  I don't know police language and that's

20   why---

21   A.   Oh, I was clear of the scene.

22   Q.   Okay, clear of the scene; okay.  So at what point did you

23   ask them to come and assist you?

24   A.   When Mr. Doss stepped back out in the road and was

25   hollering, screaming and cussing, I told the county units I had

CERTIFIED COPY 51

1  done told him if he'd stay in the house that he wouldn't go to

2  jail, that I was going to go ahead and make the arrest and they

3  said they would assist me with the arrest.

4  Q.  Okay.  So that's when you decided to arrest him?

5  A.  Yes, ma'am.

6  Q.  Okay.  And did you write all this down in your, I guess

7  report that you submitted to the chief?

8  A.  Yes, ma'am.

9  Q.  Okay.  And ah, I really had another question I was about to

10 ask you but give me a second.  When you went back, when y'all

11 decided to go back and arrest Mr. Doss did y'all walk over

12 there?

13 A.  No, we---

14 Q.  Was it close enough to walk?

15 A.  We could have but we had to cross a lane of traffic so we

16 took our cars because you don't walk to a scene, you have to

17 have your unit for, one for protection and one for transport.

18 Q.  Okay.  Did you put your lights on?

19 A.  No, ma'am.

20 Q.  Okay.  Why not?

21 A.  Because it does not call for, to run lights.

22 Q.  Well, how do you decide when you're going to run lights?

23 A.  That just depends on the call, on the severity of the call

24 and---

25 Q.  So your lights depend on the severity?

CERTIFIED COPY                    52

1   A.  Yelp.

2   Q.  Okay.  Is there not a policy to have your lights on

3   whenever you do an arrest?

4   A.  No, ma'am.

5   Q.  Okay.  Well let me just ask ah, do you all have cameras in

6   the Alexander City Police Cars?

7   A.  Yes, ma'am.

8   Q.  When are the cameras triggered?

9   A.  When the lights are triggered.

10  Q.  So if you don't trigger the lights then the camera is not

11  triggered?

12  A.  Exactly.  Unless we can turn the cameras on manually once

13  we, when we're transporting we can turn the camera on to the

14  inside of the car.

15  Q.  Yeah, yeah.  And did you make the decision not to turn the

16  lights on?

17  A.  Yes, ma'am because there was no reason to have our lights

18  on.

19  Q.  Okay.  So tell me, I asked you about your physical

20  observations of Mr. Doss---

21  A.  Uh-huh.

22  Q.  at the time.  So you said you're a trained first responder,

23  correct?

24  A.  Yes, ma'am.

25  Q.  Okay.  But you didn't notice any discernible difference in

CERTIFIED COPY    53

1    Mr. Doss' physical appearance after he was tazed?

2    A.  No, ma'am; he was still, he was still combative, he was

3    still breathing and fighting with us.

4    Q.  He was still breathing, that's good.

5    A.  I mean there was no need to call the medical.

6    Q.  No, no, I'm just asking if you saw a difference after he

7    was tazed like---

8    A.  Yeah, he was madder.

9    Q.  Madder?

10   A.  Oh, yeah.

11   Q.  I mean could you see a difference on his--and I don't know,

12   I've never seen anyone being tazed except in ah, what's that

13   movie, the Hangover and, you know, when they were tazed I this

14   is Hollywood but when they were tazed they were like, seemed a

15   little dazed and fell to the ground.

16   A.  No, ma'am, when you get hit with a taser I mean you're

17   going to fall to the ground because it stiffens your muscles up

18   and it's only and eight second, once you're, once the shock is

19   done you're back to normal.  I mean there's no reoccurring

20   affects off of it because if there was they wouldn't let us

21   carry'em.

22   Q.  Oh, okay.  So did you ask Mr. Doss if he needed any medical

23   attention?

24   A.  Yes, I did.

25   Q.  When did you ask Mr. Doss that?

CERTIFIED COPY 54

1  A.  Ah, upon putting him in the car.

2  Q.  Okay.  What did he tell you?

3  A.  He said that he didn't want medical attention, he just

4  wanted to go to jail.

5  Q.  Okay.

6  A.  That he wanted the prongs pulled out of'em (sic) which I

7  told him would be pulled out of him at the jail by the jailors

8  because they are trained to pull'em out.

9  Q.  Okay.  And then did you discuss this incident with anyone

10  else on the police force?

11  A.  No, ma'am.

12  Q.  With any of your fellow officers did you discuss this?

13  A.  No, ma'am.

14  Q.  Did you discuss this with anyone on the city council?

15  A.  No, ma'am.

16  Q.  Did you discuss this with Chief Walters?

17  A.  No, ma'am; I mean like I said I turned my report in, he

18  told me to do a felony case file on it, I did a felony case

19  file on it, turned it in---

20  Q.  What's a felony case file?

21  A.  It's, it's different than misdemeanors.  Felony case files

22  come through the prosecuting attorney going to---

23  Q.  Oh.

24  A.  going to the prosecuting attorney for them to do the

25  charges.

CERTIFIED COPY <sup>55</sup>

1   Q.  Oh, okay.  But you didn't charge him with a felony?

2                    WILKERSON:   Object to the form.

3   A.  The only felony was the terroristic threatening.

4   Q.  Okay.  So that was a felony?

5   A.  Yes, ma'am, so I had to do a felony case file.

6   Q.  Okay.  And that was your only interaction with Chief

7   Walters regarding---

8   A.  Yes, ma'am.

9   Q.  Okay.  And did you write the use of force report yourself?

10  A.  I didn't have to write a use of report form; I didn't use

11  force.

12  Q.  Okay, my, my, I apologize.  Did you write--what, what

13  report did you write again?

14  A.  I wrote my arrest deposition (sic) and our incident

15  reports.

16  Q.  Okay.  Did you write the incident report yourself?

17  A.  Yes, ma'am.

18  Q.  Did you type it or did you handwrite it?

19  A.  It all gets typed and saved to the computer and printed

20  off.

21  Q.  Okay.  And did you type it yourself?

22  A.  Yes, ma'am.

23  Q.  Okay.  At any time during encounter with Mr. Doss did you

24  have your audio on?

25  A.  Just---

CERTIFIED COPY 56

1   Q.  Y'all have body mikes?

2   A.  Ah, I did, we do have body mikes, mine was not on it was

3   dead from the current calls I had had that night and had not

4   had time to charge it.

5   Q.  Okay.  Well, what time of day did you initially go and help

6   with the assist?

7   A.  Assist, this with Mr. Doss---

8   Q.  Uh-huh.

9   A.  would have been around midnight.

10  Q.  Okay.

11  A.  Which was halfway through my shift.

12  Q.  Okay.  So half of your shift your radio, your body mike was

13  dead?

14  A.  Yes, ma'am.

15  Q.  Okay.  And you may not know this, do you know if Officer

16  Blankenship if his body mike was on?

17  A.  No, ma'am.

18  Q.  You don't know?

19  A.  I don't know.

20  Q.  Okay.  Do you know of any audio video recordings that were

21  made?

22  A.  Just the in-car camera that was recorded on the way to the

23  jail.

24  Q.  Okay.  And the dash cam footage?

25  A.  Yes, ma'am.

CERTIFIED COPY 57

1    Q.  Who recorded the dash cam footage?

2    A.  It would have been my patrol unit.

3    Q.  You mean your car?

4    A.  Yes.

5    Q.  Okay.  Where are you employed now?

6    A.  Tyson Food in North Little Rock.

7    Q.  Full time?

8    A.  Yes, ma'am.

9    Q.  And was Alexander City Police was that your first and only

10   job as a law enforcement officer?

11   A.  Yes, ma'am.

12   Q.  Where were you employed before?

13   A.  Alexander Fire Department.

14   Q.  Okay.  How long were you with the Alexander Fire

15   Department?

16   A.  Twelve years.

17   Q.  Twelve years; okay.  And why did you leave the Alexander

18   Fire Department?

19   A.  I'm still with'em as a volunteer, I switched over to the PD

20   side.

21   Q.  Why?

22   A.  To help the city out and the chief needed the officers.

23   Q.  The chief asked you to leave the fire department and go to

24   the city?

25   A.  No, ma'am.  I had always wanted to get into law enforcement

CERTIFIED COPY 58

1   and I asked chief if he needed officers.

2   Q.   So why didn't you go back to the fire department?

3   A.   Because the pay difference.

4   Q.   What about the pay difference?

5   A.   Well, nine dollars versus seventeen dollars.

6   Q.   Okay.

7   A.   Plus full benefits and insurance where I didn't have that

8   with the city.

9   Q.   Yeah.

10  A.   And I have three kids and a wife to support so---

11             FRAZIER:   I understand.   Okay, I'm going to look

12  through my papers so if anyone have any questions.

13             ELLIS:   I've got one.

14             FUQUA:   I don't have any questions.

15                      CROSS-EXAMINATION

16  Questions by Mr. Ellis:

17  Q.   Ah, you've said sir that ah, I represent Paul Babbitt by

18  the way ah, the in-car camera was activated on the way to the

19  jail.

20  A.   Yes, sir.

21  Q.   Now is that the camera that shows ah, the person in the

22  back seat?

23  A.   Yes, it will show me driving and it records any audio and

24  visual inside the car.

25  Q.   Okay.   So where is it located physically in the car?

CERTIFIED COPY

59

1    A.    It is the rearview mirror.

2    Q.    Do you know if you still have that footage?

3    A.    That footage is actually--yes, we still have the footage.

4    Q.    Okay.  And it would show Mr. Doss on his way then to jail

5    wouldn't it?

6    A.    Yes, sir.

7                    ELLIS:  Okay, all right; thank you.

8                         CROSS-EXAMINATION

9    Questions by Mr. Wilkerson:

10   Q.    After the first time Mr. Doss was tazed what did he do?

11   A.    He laid on the ground with one hand under his stomach in

12   his waistband which is when I believe Officer Green, I asked

13   him to remove his hand, he kept fighting and is when Officer

14   Green tazed him again for me to get his hands to finish him

15   handcuffing him.

16   Q.    So that was the second time he was tazed?

17   A.    The second time; yes.

18   Q.    And the third time he was tazed when?

19   A.    At the car when I went to open the door of the car he

20   shoved the door shut and was shoving backwards so that zapped

21   him again.

22   Q.    And then there's a fourth taze that didn't happen at the

23   scene that happened at the jail?

24   A.    From what I hear---

25   Q.    Okay, so you wasn't there?

CERTIFIED COPY 60

1  A.  I wasn't there.

2  Q.  So you only saw three taze?

3  A.  I only saw three times.

4  Q.  Okay.

5  A.  One taser deployment and three shocks.

6  Q.  Okay.  Thank you.

7          ELLIS:  Was he ah--may I go ahead?

8          FRAZIER:  Yeah, go ahead.

9              RECROSS-EXAMINATION

10  Questions by Mr. Ellis:

11  Q.  Was the same officer, county officer doing all three

12  tasing?

13  A.  Yes.  The leads was (sic) attached to his taser.

14  Q.  Green?

15  A.  Green, yes.  They are left attached to the taser until the

16  subject is fully contained where he is being transported and

17  then he disconnected the taser leads and left them in the car

18  with the, Mr. Doss.

19  Q.  Oh, I thought you said the leads were removed at the jail?

20  A.  The leads was removed out of Mr. Doss but it's a cartridge

21  that is on the end of the gun that discharges when you get'em

22  (sic) in the car they can remove the cartage where he can put a

23  new cartridge onto his taser but the leads stay with the

24  subject until they are removed by a medical personnel.

25  Q.  I understand.  And you didn't see'em (sic) get removed?

CERTIFIED COPY   61

1   A.   No, ma'am--I mean no, sir.

2                    REDIRECT EXAMINATION:

3   Questions by Mrs. Frazier:

4   Q.   Okay, I got this one.  Is this the only incidence report

5   that you've written?

6   A.   This is the yes, this is the incidence report I wrote.

7   Q.   Did you write any other reports or statements regarding

8   this?

9   A.   No, ma'am.

10  Q.   Okay.

11  A.   Just what was wrote on the arrest details.

12  Q.   And when did you write that?

13  A.   This would have been at the end of my shift soon as I got

14  back to the city from the jail.

15  Q.   Okay.  The same day?

16  A.   Ah, it would have been six o'clock the next morning after

17  shift.

18  Q.   Okay.  And that is an accurate reflection of what happened?

19  A.   Yes, ma'am in short detail.

20  Q.   But it's accurate; correct?

21  A.   Yes.

22  Q.   Okay.  And just so I can clarify for the Alexander Police

23  Department the only training you have receive is the part-time

24  officer training; is that correct?

25  A.   Yes, ma'am.

CERTIFIED COPY    62

1   Q.   Okay.   I don't have anything further.

2                WILKERSON:   I have nothing.

3                FUQUA:   I'm done.

4                [The deposition ended at 12:03 p.m., October 9,

5   2013.]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFIED COPY

Oct. 22nd 2011

I Shelby Hackley got told by Ray Hackley that Robert Hawkins told him that me and Officer Jeff slept together and stuff. And its not true! We have not done nothing.

Thanks

Shelby Hackley

PLAINTIFF'S DEPOSITION EXHIBIT #1

PENGAD 800-631-6989

64

CERTIFIED COPY

Exceptionally Cleared    Unfounded

### DETAILS OF INFORMATION
Include points of entry, tools used, objects of attack where applicable

I Officer Watson received a call to the above address for an escort of a female to get her kids from the above suspect. Once on scene the suspect started yelling at me and calling the girlfriend name and started threatening her and I Officer Watson with bodily harm. So I Officer Watson called for back up units to respond for back up because the suspect stated that he had something for me a ran back in the house. The suspect had been drinking and was very disorderly. Saline county deputy Arrived on scene and the suspect was still threatening me and the county deputy so the deputy order the suspect to get on the ground the suspect refused at which time the deputy tazed  the suspect in order to take him into custody. Once the suspect was in custody he was transported to the saline county jail. On the way to the jail the suspect continued to make threatening statements which was all recorded on the inside camera.

| Itemized List of Property Involved | | | | |
|---|---|---|---|---|
| Quantity | Brand, Model & Description of Item | Serial or ID # | Value | Property Tag # |
| | | | $ | |
| | | | $ | |
| | | | $ | |
| | | | $ | |
| | | | $ | |
| | | | $ | |
| | | | $ | |
| | | | $ | |
| | | Total Value Property | Stolen | Recovered |
| | | | $ | $ |

ADDITIONAL ORIGINAL INFORMATION INCLUDED ON SUPPLEMENT FORM
LIST TRAFFIC SUMMONS & TICKET NUMBERS ____ / ____ / ____ / ____ / ____ _____



PLAINTIFF'S DEPOSITION EXHIBIT

#2

CERTIFIED COPY    65

# R E P O R T E R ' S   C E R T I F I C A T E

STATE OF ARKANSAS   )
                    )                SS. 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
COUNTY OF PULASKI   )


        I, Gloria Y. Cobb, A Certified Court Reporter
and Notary Public in and for the aforesaid County and state, do
hereby certify that the witness, <u>JEFF WATSON</u>, was duly sworn by
me prior to the taking of testimony as to the truth of the
matters attested to and contained therein; that the testimony
of said witness was taken by me, a <u>voice writer</u>, and was
thereafter reduced to typewritten form by me or under my
direction and supervision; that the foregoing transcript is a
true and accurate record of the testimony given to the best of
my understanding and ability.

        I FURTHER CERTIFY that I am neither counsel for,
related to, nor employed by any of the parties to the action in
which this proceeding was taken; and, further, that I am not a
relative or employee of any attorney or counsel employed by the
parties hereto, nor financially interested, or otherwise, in
the outcome of this action; and that I have no contact with the
parties, attorneys, or persons with an interest in the action
that affects or has a substantial tendency to affect
impartiality, that requires me to relinquish control of an
original deposition transcript or copies of the transcript
before it is certified and delivered to the custodial attorney,
or that requires me to provide any service not available to all
parties to the act.


                                    Gloria Y. Cobb, CCR LS#0336
                                    Notary Public

My Commission Expires:
January 16, 2017
My Commission #12358451


Cobb Court Reporting
P. O. Box #4, Sweet Home, AR  72164-0004
Phones:  (501) 490-0066 - Off; (501) 590-0975 - Cell
(501) 490-0926 — Facsimile
e-mail: gloria.cobb@comcast.net