CERTIFIED COPY

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

CHRISTOPHER DOSS,                                          PLAINTIFF

      VS                    No.  <u>4:13-cv-121 SWW</u>

THE CITY OF ALEXANDER; CHIEF
HORACE WALTERS, INDIVIDUALLY
AND AS POLICE CHIEF FOR THE
ALEXANDER POLICE DEPARTMENT;
JEFFREY WATSON, IN HIS INDIVIDUAL
CAPACITY; BLANKENSHIP, IN HIS
INDIVIDUAL CAPACITY; SALINE COUNTY;
BRUCE PENNINGTON, INDIVIDUALLY AND
AS SALINE COUNTY SHERIFF; TIM GREEN,
IN HIS INDIVIDUAL CAPACITY;
PAUL BABBITT, IN HIS INDIVIDUAL
CAPACITY; JERRY ODOM, IN HIS OFFICIAL
CAPACITY                                                  DEFENDANT

---

### DEPOSITION OF TIMOTHY SHANNON GREEN

        DATE:   October 9, 2013
        TIME:   9:38 a.m.
        PLACE:  The Saline County Courthouse
              200 North Main Street
              Benton, AR  72015-3767

---

### APPEARANCES

On Behalf of the Plaintiff:        Bridgette M. Frazier, Attorney
                                   The Frazier Law Firm
                                   1723 Broadway
                                   Little Rock, AR 72206-1220

**Cobb Court Reporting**
P. O. Box #4, Sweet Home, AR  72164-0004
Phones:  (501) 490-0066 - Off; (501) 590-0975 - Cell
(501) 490-0926 — Facsimile
e-mail: gloria.cobb@comcast.net

CERTIFIED COPY

On Behalf of the Defendants:

David M. Fuqua, Attorney
Fuqua Campbell, P.A.
425 W. Capitol Ave., Suite #400
Little Rock, AR  72201

John L. Wilkerson, Attorney
Arkansas Municipal League
P. O. Box #38
North Little Rock, AR  72115

George D. Ellis, Attorney
The Ellis Law Firm
P. O. Box #2307
Benton, AR  72018-2307

Jonathan Greer
Saline County Attorney
Saline County Courthouse
200 North Main Street
Benton, AR  72015-3767

CERTIFIED COPY  3

I N D E X

                                                              PAGE

AGREEMENT OF COUNSEL. . . . . . . . . . . . . . . . 3

SWEARING OF THE WITNESS. . . . . . . . . . . . . . .3

EXAMINATION OF TIMOTHY SHANNON GREEN

      By Mrs. Frazier. . . . . . . . . . . . . . . 4-31 & 34

      By Mr. Fuqua. . . . . . . . . . . . . . . . .31-32

      By Mr. Ellis. . . . . . . . . . . . . . . 32-33 & 34

COURT REPORTER'S CERTIFICATION. . . . . . . . . . . .39

                    *  *  *  *  *

                       *  *  *

                          *

E X H I B I T S

#1 — Alexander Arrest Procedures [not dtd]. . . . . . . . 35-36

#2 — Doss Case Narrative by Tim Green dtd 3/21/13. . . . . . 37

#3 — Doss Case Narrative by Tim Green dtd 4/5/13. . . . . . .38

**Cobb Court Reporting**
P. O. Box #4, Sweet Home, AR   72164-0004
Phones:  (501) 490-0066 – Off; (501) 590-0975 – Cell
(501) 490-0926 — Facsimile
e-mail: gloria.cobb@comcast.net

CERTIFIED COPY

4

1          STIPULATIONS

2      The deposition of Timothy Shannon Green, produced, sworn

3  and examined at the Saline County Courthouse, 200 North Main

4  Street, Benton, AR  72015-3767, commencing at 9:38 a.m., on

5  October 9, 2013, in the captioned cause at the instance of

6  counsel for the Plaintiff, and said deposition being taken

7  according to the terms and provisions of the Arkansas Rules of

8  Civil procedure.

9      It is stipulated and agreed all forms and formalities in

10  the taking, transcribing, forwarding and filing of said

11  deposition, are hereby waived by the parties, the right being

12  expressly reserved to object to the testimony of the witness at

13  the time of trial as to incompetency, irrelevancy and

14  immateriality, other than those with respect to the form of

15  questions as propounded to the witness.

16                  *  *  *  *  *

17              P R O C E E D I N G

18  THEREUPON,

19              TIMOTHY SHANNON GREEN

20  having been called for examination by counsel for the

21  plaintiff, and having been first duly sworn, was examined and

22  testified as follows:

23              DIRECT EXAMINATION

24  Questions by Mrs. Frazier:

25  Q.  Okay, thank you, Ms. Cobb.  My name is Bridgette, we met

CERTIFIED COPY

5

1  earlier; I represent Chris Doss ah, Mr. Doss in this case.  Ah,

2  have you ever given a deposition before?

3  A.  I have; yes, ma'am.

4  Q.  Okay.  In which cases?

5  A.  Ah, a case out of North Little Rock.

6  Q.  Do you remember the name of the case?

7  A.  Ah, it was a case that I had personally against North

8  Little Rock.

9  Q.  So you had personally against--was this a civil case?

10  A.  Civil case; yes, ma'am.

11  Q.  Okay.  Which court was that in?

12  A.  Ah, it was a Pulaski County Court, I don't know what

13  division it was in.

14  Q.  Okay.  What year was that case?

15  A.  2008 I believe it was.

16  Q.  Okay.  How was that case resolved?

17  A.  Yes, ma'am.

18  Q.  How was that case resolved?

19  A.  I believe it went to ah, the Supreme Court and it was

20  dismissed.

21  Q.  Okay.  What were the facts surrounding that case?

22  A.  Ah, I was married to another officer and she made some

23  false allegations that were proven to be false and during that

24  time they actually ah, put me in the back of the car and did

25  some things and come to find out they were proven to be false

CERTIFIED COPY

6

1  and then a lawsuit was filed by my attorney.

2  Q.  Was it a wrongful termination lawsuit or---

3  A.  No ma'am, they actually ah, actually put me in the back of

4  a police car and took me down and made me submit to a test and

5  different things like that.

6  Q.  Okay.  So you're familiar with how depositions work?

7  A.  Yes, ma'am.

8  Q.  You're familiar with the whole process?

9  A.  Yes, ma'am.

10  Q.  So you understand that you're under oath?

11  A.  Yes, ma'am.

12  Q.  Is there any reason that your testimony--is there anything

13  going on that would affect your testimony today?  For example,

14  are you under the influence of anything today?

15  A.  Absolutely, I am not.

16  Q.  Okay, I just wanted to get that out of the way.  Ah, did

17  anyone assist to prepare you for this deposition today?

18  A.  Ah, no, ma'am.

19  Q.  Okay.  Did you look at any documents to refresh your memory

20  before your deposition?

21  A.  No, ma'am.

22  Q.  Did you look at any interrogatories or any other court

23  documents to prepare you for today?

24  A.  Actually today?

25  Q.  For today.

CERTIFIED COPY                    7

1    A.   For today.   I had to go to the attorney's and answer

2    interrogatories.

3    Q.   Okay.  But did you look at any other interrogatories or any

4    other documents?

5    A.   No, ma'am.

6    Q.   Okay.  Did anyone tell you about the information contained

7    in any of the other interrogatories?

8                      FUQUA:  I object to the extent that might be

9    attorney/client privileged.

10   Q.   You don't have to tell me what anyone said but did you

11   look, did anyone tell you anything that might be in the other

12   interrogatories?

13   A.   Ah, no ma'am.

14   Q.   Okay.  Do you know the defendant in this case?

15   A.   Do I know what, ma'am?

16   Q.   Do you know the defendant in this case, the other

17   defendants?

18   A.   Ah, I don't know who all is in involved; no, ma'am.

19   Q.   Okay.  It's Bruce Pennington, Paul Babbitt, Jerry Odom,

20   Horace Walters, Jeffrey Watson, and William Blankenship?

21   A.   Ah, I'm familiar, I don't know Blankenship and I don't know

22   Watson and I think I've only met Mr. Walters one time.

23   Q.   Okay.

24   A.   The other one's I'm familiar with.

25   Q.   When was the last time you've communicated with the

CERTIFIED COPY    8

1  defendant, let's just start when was the last time you

2  communicated with Paul Babbitt?

3  A.  Ah, it's probably been two weeks ago.

4  Q.  Okay.  Did you discuss this case?

5  A.  No, ma'am.

6  Q.  Okay.  What about Jerry Odom, when was the last time you

7  communicated with him?

8  A.  It's been probably months; I have seen him in months.

9  Q.  Did you discuss this case with Mr. Odom?

10 A.  Ah, not that I remember.

11 Q.  Okay.  What about ah, Bruce Pennington?

12 A.  Ah, I talked to the sheriff his last day which that was on

13 the 30th of last month.

14 Q.  Okay.  Did you ever discuss this case---

15 A.  No, ma'am.

16 Q.  with Sheriff Pennington?  What about William Blankenship?

17 A.  I don't know William Blankenship.

18 Q.  Okay.  Does he go by William or just Stan; do you know?

19 A.  I don't know.

20 Q.  Okay.  What about Jeffery Watson?

21 A.  I don't know Mr. Watson.

22 Q.  Okay.  So you did not discuss this case with Jeffery

23 Watson?

24 A.  No, ma'am; I don't know him.

25 Q.  Okay.  Did you make or write any statements regarding the

CERTIFIED COPY

9

1  facts surrounding this case?

2  A.  Ah, I made an incident report and I made an incident report

3  and a use of force report; yes, ma'am.

4  Q.  Okay, all right.  Let's get a little bit about your

5  background.  Can you state your full name and address for the

6  record?

7  A.  It's ah, Timothy Shannon Green---

8  Q.  Uh-huh.

9  A.  It's 121 Grant 55, Hensley, Arkansas  72065.

10  Q.  Okay.  Where are you from Mr. Green?

11  A.  Ah, Sheridan.

12  Q.  Sheridan?

13  A.  Yes, ma'am.

14  Q.  Born and raised?

15  A.  Ah, yes, ma'am.

16  Q.  Okay.  And then how long have you been a police officer?

17  A.  Ah, almost ah, a little over seventeen years.

18  Q.  Ooh, okay.  Tell me ah, your background here; tell me your

19  law enforcement background, please?

20  A.  Ah, I started in law enforcement back in 91 before I

21  graduated from high school---

22  Q.  Uh-huh.

23  A.  I was a cadet for the Sheriff's Office down in Grant County

24  ah, and once I turned eighteen I went to the cadet program in

25  North Little Rock and served in North Little Rock from 94 ah,

CERTIFIED COPY

10

1  until 2008; I was a ah, youngest field training officer in the

2  history of North Little Rock and ah, stayed there until 2008

3  and then ah, left there and came down to the Sheriff's Office

4  and ah, was at Saline County and they offered me a school

5  resource position in Bryant ah, working with kids and things

6  and ah, went to Bryant, revamped their school resource program

7  and then ah, they offered me a sheriff's with the canine

8  program, to take over the canine program and that's where I'm

9  at now.

10  Q.   Okay.  So why did you leave North Little Rock to go to was

11  it Saline County?

12  A.   Yes, ma'am.

13  Q.   Okay.

14  A.   Ah, like I told you I was married to another police officer

15  up there ah, and she stepped out on the marriage and put some

16  different things and made accusations and stuff and I wind up

17  just ah, it became too much affair and I just went ahead and

18  resigned.

19  Q.   Okay.  You had to take a pay cut didn't you?

20  A.   I did; yes, ma'am.

21  Q.   Okay.  And in your interrogatories you state you haven't

22  had any reprimands, punishment or disciplines; is that correct?

23  A.   That's correct.

24  Q.   While you were with--at all?

25  A.   Ah, in North Little Rock I think I got ah, in North Little

CERTIFIED COPY

1    Rock ah, I received like a verbal counseling---

2    Q.  Uh-huh.

3    A.  ah, and then they turned around I got a ah, a letter of

4    recognition for saving the people in a car that I was pursuing,

5    and then I actually save them out of the car; it was a burning

6    car and that's the only form of discipline that I've received,

7    I've had; I haven't had anything other than that.

8    Q.  Uh-huh, okay.  I'd asked you had you ever been named a

9    defendant in a civil or administrative proceeding and you have

10   never been a defendant; is that correct?

11   A.  Not that I remember; no, ma'am.

12   Q.  Okay.  Ah, have you ever been involved in any civil or

13   administrative proceeding; been a defendant or a plaintiff?

14   A.  Ah, no, ma'am; not that I remember.

15   Q.  Okay.  I've asked you had you ever been involved with a

16   police or law enforcement officer ah, an incident which is the

17   subject of a civilian complaint and you said not to my

18   knowledge.  Generally would you be made aware if someone made a

19   civilian complaint against you?

20   A.  A civilian complaint?

21   Q.  Uh-huh.

22   A.  Ah, sometimes, sometimes they do; it depends on what the

23   circumstance are.

24   Q.  What circumstance would they not make an officer aware

25   that's there a complaint?

CERTIFIED COPY

12

1   A.   It depends on the supervisor.  If somebody calls in and

2   say, you know, I saw this unit speeding down the street or

3   whatever you might be contacted or you might not.  So it just

4   depends on the supervisor.  I don't know what a superv--you

5   know, all supervisors do.

6   Q.   Have you ever been told that you were the subject of a

7   complaint?

8   A.   Ah, are you talking about here in Saline County---

9   Q.   At all.

10  A.   as far as a complaint?

11  Q.   During your Sal---

12  A.   I have no ah---

13  Q.   We'll start with Saline County.

14  A.   ma'am, I don't have anything in my file as far as

15  complaints or anything like that.

16  Q.   But have you ever been told that someone called and made a

17  complaint against you or about you?

18  A.   You'll have someone call and say hey, this lady wasn't

19  happy with you or whatever and they'll say hey, what happened

20  with this incident or whatever and you'll say this is what

21  happened and then that will be about the end of it.

22  Q.   But has that ever happened to you?

23  A.   It has; yes, ma'am.

24  Q.   Okay.  Do you remember approximately how many times that

25  has happened?

CERTIFIED COPY

1   A.  No, ma'am.

2   Q.  Okay.  Do you remember the last time someone made a

3 complaint?

4   A.  Ma'am, I haven't had a complaint in years.

5   Q.  Okay.  What is the use of force policy for Saline County?

6   A.  Ah, the use of force policy is sort of like a use of force

7 continuum basically you make your physical presence known and

8 then you lead up to verbal and you lead up to ah, ah, like your

9 taser or chemical agents and things like that and it moves on

10 in to impact weapons which is like your batons and then it goes

11 up to lethal force.

12   Q.  Okay.  And can you describe in detail the continuum for me?

13   A.  That's what I just did---

14   Q.  Okay.

15   A.  It is your physical presence, verbal commands telling

16 people hey stop, you're under arrest or get on the ground ah,

17 then it leads up to taser or chemical agents and then your

18 baton, you impact weapon and then deadly force or lethal force.

19   Q.  So is there any step between verbal command and the use of

20 taser for Saline County?

21   A.  Ah, that's all, right now it says physical presence, verbal

22 and then your taser.

23   Q.  And what are the arrest procedures for Saline County?

24   A.  What do you mean arrest procedures?

25   Q.  Does Saline County have arrest procedures?

CERTIFIED COPY

14

1   A.  Ah, once you advise someone that they're under arrest, you

2   have to subdue them with handcuffs and place them in the back

3   seat of your car, transport'em, (sic) do your documentation.

4   Q.  Are you familiar with any arrest procedures?

5   A.  Ah, that's what our arrest procedures are.

6   Q.  That's okay.  Ah, what about procedures when effectuating

7   an arrest or deciding to arrest someone?  Does Saline County

8   have any procedures for that?

9   A.  You mean if they commit a crime?

10  Q.  Uh-huh.

11  A.  If they commit a crime you advise them that they're under

12  arrest, you subdue'em, (sic) transport'em, (sic) and fill out

13  your paperwork.

14  Q.  Okay.  Tell me about your training that you've received for

15  the use of force policy?

16  A.  Ah, as far as use of force policy I've spent three month at

17  the Academy, ALETA, and then when you come back at ah, at North

18  Little Rock you spend six well, I think they've changed it now

19  but when I was there you'd spend six months with a training

20  officer going over the policies and procedures and things like

21  that ah, as far as ah, training at Saline County---

22  Q.  Uh-huh.

23  A.  as far as the use of force policy ah, they just basically

24  follow their policy directive---

25  Q.  Okay.

CERTIFIED COPY

1   A.   which is very similar to North Little Rock's.

2   Q.   Okay.  But I'm trying to see specifically, tell me were you

3   trained in Saline County's use of force policy or did they say

4   here's the manual, follow it?

5   A.   Well, as far as policy the use of force---

6   Q.   Uh-huh.

7   A.   I was trained with the taser.

8   Q.   Uh-huh.

9   A.   I spent a one-day class on a taser and ah, as far as ah---

10  Q.   I'm sorry, I haven't had--I've only had one cup of tea so

11  it's not you it's me.

12  A.   No, that's fine.

13  Q.   So have you been trained in Saline County's use of force

14  policy?

15  A.   Yes, ma'am.

16  Q.   When were you trained in Saline County's use of force

17  policy?

18  A.   Ah, 2008 I believe it was.

19  Q.   Okay.  Describe to me the training?

20  A.   Ah, that's what I was going into.  The training that we had

21  as far as the use of force policy that was different than what

22  I've been trained on and everything else---

23  Q.   Uh huh.

24  A.   because I wasn't trained on the taser until I came to

25  Saline County and I went through the use of force school

CERTIFIED COPY

16

1  regarding the taser ah, as a one-day class.

2  Q.  And who conducted the class?

3  A.  Ah, Sheriff Pennington.

4  Q.  Or was this---

5  A.  Or Bruce Pennington.

6  Q.  Okay.  Sheriff Pennington and this was in 2008?

7  A.  2008 or it might have been around 2009; like that yes,

8  ma'am.

9  Q.  Okay.  Were you trained specifically on the use of force

10 policy not just the taser but the policy?

11 A.  It was actually on the taser that went in with the use of

12 force policy.

13 Q.  Okay.  You know I'm not trying to split hairs I know you

14 were trained on the taser but were you trained on the policy?

15 A.  I've never went to a class on that.

16 Q.  Did they say here's the policy, here's what you need to do

17 which one happened?

18 A.  Yes, ma'am, they just give you a book as far as a class;

19 no, ma'am.

20 Q.  Okay.  And when was the last time Sheriff Pennington kind

21 of talked to you or that you've received an instructions or

22 directives regarding the use of force policy?

23 A.  Not since that class, no.

24 Q.  Okay.  What type of taser were you trained on?

25 A.  Ah, the ah, M-26 and I believe it's the X-26.

CERTIFIED COPY

17

Q.   Okay.  How many times have you used the taser on a suspect?
Approximately, I'm not trying to hold you to a specific number.

A.   Probably six or eight times.

Q.   Six or eight?

A.   Yes, ma'am.

Q.   Okay.  And tell those instances since there's not that many
that you had to use the taser on a suspect?

A.   Ah, one that sticks out in my mind I was chasing a guy that
had a gun and he tried to shoot at me and I deployed my canine
and ah, he grabbed my dog and was beating my dog and ah, I had
ah, you know, told him that he was going to be tased, you know,
taser, taser, taser and I had to tase him in that instance.

Q.   Okay.

A.   And ah, I was on a disturbance call and the guy had a ah,
threatened his wife, to kill his wife, hurt his wife and ah, he
come out of the bedroom and swung at me and ah, I was able to
get back and deploy my taser on him.

Q.   Okay.

A.   And then of course I remember Mr. Doss.

Q.   Okay.  Any other times you remember?

A.   No, ma'am.

Q.   Each time did you have to fill out a use of force report?

A.   I did; yes, ma'am.

Q.   And who reviewed those reports?

A.   Ah, we fill out those reports and then it goes to my

CERTIFIED COPY 18

1  sergeant and he turns it in to my lieutenant.

2  Q.  Okay.  Did you have to do any follow-ups and explain or

3  what's the procedure?

4  A.  Ah, once you're involved in use of force you ah, contact

5  your sergeant and tell him the facts of what happened and then

6  you fill out the report and give it to them who reviews it and

7  then turns it in.

8  Q.  Okay.  Do you ever remember any feedback or any comment or

9  criticism or any communication whatsoever regarding any use of

10  force reports?

11  A.  No, ma'am.

12  Q.  So your supervisor never came to you and said you could

13  have done this differently or---

14  A.  I've never had that happen; no.

15  Q.  Okay.  I'm showing you what was given to me it's section

16  11, I guess; it's arrest procedures for Saline County.

17       REPORTER:  Is that going to be an exhibit ma'am?

18       FRAZIER:  Ah, it may be.

19       REPORTER:  Okay, I'll just wait.

20       FRAZIER:  I don't think I brought enough copies.

21       REPORTER:  I'll just wait.

22       FRAZIER:  I think I have one more copy.  I know

23  what, I'm showing his this---

24       FUQUA:  Okay.

25       FRAZIER:  And I'll have a copy for ah--I'm

CERTIFIED COPY

19

1    sorry, I was in trial all yesterday.

2              FUQUA:  That's fine; go ahead; no problem.  You

3    probably need to look at that yourself.

4              ELLIS:  Yes, I think copy I think I have like

5    this.  Is this Lisa?

6    Q.  Have you ever seen that document before?

7    A.  Yes ma'am.

8    Q.  When have you seen it?

9    A.  Ah, whenever they, whenever I got hired and they gave us a

10   book.

11   Q.  Okay.  Are you familiar with these?

12   A.  Ah, pretty much; yes, ma'am.

13   Q.  Okay.  So these will be the arrest procedures that I asked

14   about earlier?

15   A.  Yes, ma'am.

16   Q.  Okay  So did you ever receive any training on these

17   procedures or again was it like the taser; here is the policy?

18   A.  Yes, ma'am.

19   Q.  And you were expected to just read it and follow it?

20   A.  Yes, ma'am.

21   Q.  Okay.  And did you follow all of the procedures during--all

22   of the procedures commemorated herein or listed herein when you

23   arrested Mr. Doss?

24             FUQUA:  I object to the form of the question.  I

25   think we haven't established that he arrested Mr. Doss so---

CERTIFIED COPY 20

1          FRAZIER:  Correct, so I withdraw that question.

2     Q.  During the---

3          WILKERSON:  What section are we looking at; I'm

4     trying to find it on my computer.

5          FUQUA:  It's section---

6          FRAZIER:  Eleven.

7          FUQUA:  eleven.

8          WILKERSON:  Eleven; thank you.

9     Q.  Were you present during the arrest of Mr. Doss?

10    A.  I was; yes, ma'am.

11    Q.  Okay.  Did you arrest Mr. Doss?

12    A.  I did not.

13    Q.  What was your role?

14    A.  Ah, Mr. Doss was advised that he was under arrest by one of

15    the, I guess, Alexander officers.  Ah, he began jerking away

16    from the officers and fighting trying to walk away cursing'em

17    (sic) using profanity and to prevent him from getting hurt or

18    one of the deputies from getting hurt because he was struggling

19    with them I told him taser, he was going to be tazed, taser,

20    taser and he was tased.

21    Q.  Okay.  How did you hook up with those officers?

22    A.  Ah, dispatch---

23          FUQUA:  I object to the form of the question.

24    Q.  How did you come to be with those officers?

25          FUQUA:  Thank you.

1   A.   Ah, our central dispatch gave us a call that the, Alexander

2   had requested assistance on a disturbance call, they needed

3   some help and I responded.

4   Q.   Okay.  How many times did Alexander--how many times have

5   you had to go assist Alexander PD?

6   A.   Times, me personally, I don't know, a half a dozen times

7   probably.

8   Q.   Okay.  So is it usual or unusual for you to go assist

9   Alexander Police?

10  A.   It was ah, pretty usual, it depends on which area you

11  worked because it's broke down in district and stuff ah,

12  Alexander calls for assistance from the county quite often.

13  Q.   Okay.  And then the address that you were dispatched to was

14  that in Pulaski or Saline County?

15  A.   Ah, ma'am, I don't know; I don't know if it's Pulaski or

16  Saline.

17  Q.   If's it's in Pulaski County would you still be able to

18  assist Alexander City PD?

19  A.   Yes, ma'am, if they're requesting assistance or whatever

20  and something is going on we're authorized to go up there to

21  help them.

22  Q.   Okay.  I guess specifically even if the incident is in

23  Pulaski County?

24  A.   Yes, ma'am, if an officer is asking for assistance we have

25  to go.

CERTIFIED COPY

1  Q.  Okay.  So the officer, there's a call for assistance,

2  you're dispatched; correct?

3  A.  Yes, ma'am.

4  Q.  Okay.  Who are you with?

5  A.  Ah, just by myself.

6  Q.  By yourself, okay.  Who else showed up to assist?

7  A.  Ah, at that time I believe Deputy Babbitt was there and I

8  believe later on another Alexander officer showed up and like I

9  said I don't know their names, I don't know the guys up there.

10 Q.  Okay.  Why don't we just start from the beginning.  You

11 received a dispatch, correct?

12 A.  Yes, ma'am.

13 Q.  Okay; tell me the story.

14 A.  Okay.  So dispatched to assist Alexander officers ah, while

15 in route there ah, to the call ah, there was an Alexander unit

16 sitting in like a gravel lot.  Ah, I pulled over there to the

17 empty lot ah, I believe Deputy Babbitt was already there and I

18 pulled up to find out what was going on.  Ah, the Alexander

19 officer said that he had been on a disturbance call or whatever

20 or while he was telling his story you could hear someone

21 shouting and then later on it was identified as Mr. Doss

22 shouting, screaming, you know, you could hear him screaming

23 fuck this, fuck that and everything he was saying was just

24 profaned language.  Ah, he had went down there in his car or

25 whatever and that Mr. Doss had told him, you know, basically

CERTIFIED COPY

23

get off his property he wasn't taking him to jail so I guess

this guy was a new officer or something so he backed out and

that's when I guess he called for assistance.  Ah, the other

Alexander officer got there and you could still hear Mr. Doss

screaming and hollering, he said that was him ah, so we just

followed him down there.  Ah, they all exited their unit before

I did ah, Deputy Babbitt---

Q.  I'm sorry; I'm sorry.  Tell me again what happened; y'all

were in a gravel lot?

A.  It's like a gravel parking lot of something kind of close

to his residence.

Q.  Okay, close to his residence.

A.  Right.

Q.  And could you see him or just hear him?

A.  I couldn't see him we could just hear someone screaming and

hollering profanity and ah, they said that was Mr. Doss

outside.

Q.  Okay.  And then what did Officer Watson tell you?

A.  Ah, I don't remember if it was Mr. Watson or the other guy

but ah, they said that they were waiting for some assistance to

go down there and arrest him.

Q.  Did they tell you what they were arresting him for?

A.  Ah, well, he used profanity and things like that standing

outside his residence and ah, I was under the assumption it was

probably going to be disorderly conduct and ah, they---

CERTIFIED COPY    24

1    Q.   Go ahead.

2    A.   I was about to say when we got there to the scene the other

3    officers had already exited their cars, they were walking up

4    and ah---

5    Q.   Now which other officers, how many officers were there?

6    A.   It was the two Alexander guys and Deputy Babbitt.

7    Q.   Okay.

8    A.   And ah, they were walking to him and he was facing them as

9    they was walking to him they were facing him and he was

10   shouting and he was cussing'em (sic) and things like that and I

11   remember one of the Alexander officers said Chris you're under

12   arrest and he was like fuck you, I'm not going to jail, turned

13   around, I remember there was a grill, he was grilling some food

14   saw smoke or whatever, he was going to the grill and they said

15   Chris you're under arrest.  Deputy Babbitt grabbed one arm and

16   then let the other guy grab the other arm and he went to

17   jerking around, screaming and hollering and cussing and

18   everything else.  I told them you guys are going to get hurt,

19   y'all back off taser, taser and, you know I told him you're

20   going to get tazed and ah, he just kept on, kept on and ah,

21   they was trying to take him to the ground and I told'em I said

22   you're going to get hurt and ah, told'em to get out of the way

23   and I administered the taser.

24   Q.   Okay.  And ah, but how long approximately did this whole,

25   until you said taser, taser, about how long did it take?

A.   About fifteen seconds probably.

Q.   So there was ten or fifteen seconds from the time that they encountered Mr. Doss until the time that you tazed him?

A.   No, the struggle, like when he turned around and started walking off and stuff they started struggling with him for about ten or fifteen seconds.

Q.   Okay.   And do you know who the other officer was that spoke to Mr. Doss from Alexander?

A.   No, ma'am.

Q.   Okay.   Ah, but Officer Babbitt also?

A.   Officer Babbitt was on his left side.

Q.   Okay.   And the other officer was on his right side?

A.   Right.

Q.   And about how big is Officer Babbitt?

A.   Ah, he's probably a little over six foot, maybe 190.

Q.   Okay.   And what about the other officer that was on his right side?

A.   I don't know, I don't know him; I don't know which one it was.

Q.   Okay.   Could the officer that have, without giving me the name, can you describe this---

A.   About the same size as Babbitt, a little taller, it guess; I remember there being a tall guy there.

Q.   Okay.   But how much did he weigh?

A.   Ma'am, I don't know.   I don't see those guys that often; I

CERTIFIED COPY

1 didn't know'em.

2 Q.  Okay.  But generally you can estimate a suspects weight or

3 height; you done that before, correct?

4 A.  Correct; yes, ma'am.

5 Q.  Okay.  So generally if you don't know the guy but how much

6 did the guy weigh that was on the other side on his arm?

7 A.  Ma'am I believe just guessing maybe 200; I don't know.

8 Q.  Okay.  So you yelled taser, taser and then what happened?

9 A.  Mr. Doss went to the ground, he still was struggling with

10 officers and he had his hands up underneath his waistband and

11 they didn't know if he had a weapon or what he had and they

12 were sitting there saying, I guess one of the guys knew him and

13 they was saying Chris get your hands out, get your hands out

14 and he wouldn't get his hands out and stuff and I said if you

15 don't get your hands out you're going to get tased again and

16 ah, he administered another cycle and I remember Deputy Babbitt

17 was able to get one hand out and they was able to handcuff him.

18 Q.  And then what happened?

19 A.  Ah, he was walked back to the car ah, ah, I disconnected

20 the taser, asked them if they needed anything, any medical

21 assistance---

22 Q.  I'm sorry, could you repeat that?

23 A.  What?

24 Q.  What happened.

25 A.  Disconnected the taser wires.

CERTIFIED COPY

27

1  Q.  Who disconnected the taser?

2  A.  I did.

3  Q.  You did, okay.

4  A.  Because you'd have to keep your cartridge.  You disconnect

5  the wires and then---

6  Q.  Okay.  And then what happened?

7  A.  Ah, I guess Alexander transported him and then I left.

8  Q.  You left, okay.  And then did you write a use of force

9  report?

10  A.  I did; yes, ma'am.

11  Q.  Okay.  Do you know where that use of force report is?

12  A.  No, ma'am, I do not.

13  Q.  Okay.  Were any of the cars, police cars on scene near Mr.

14  Doss' property?

15  A.  Were they on scene?

16  Q.  Did you, when you met in the gravel lot did y'all walk to

17  Mr. Doss'?

18  A.  No, we all drove.

19  Q.  Okay.  Do you if any of the, if your car or any of the

20  other cars had an audio or visual on?

21  A.  Oh no, ma'am; I don't know.

22  Q.  Did your car?

23  A.  No, ma'am.

24  Q.  Did you have any body mikes or any audio?

25  A.  No, ma'am.

CERTIFIED COPY    28

1    Q.   Recording devices?

2    A.   No, ma'am.

3    Q.   I'm going to show you---

4              FUQUA:  By the way, are you making this arrest

5    procedures an exhibit; you never said.

6              FRAZIER:  We can; that's cool.

7    Q.   Okay.  Officer Green I'm handing you a case narrative, two

8    case narratives actually that I received in discovery.  Did you

9    write that?

10   A.   Yes, ma'am.

11   Q.   Actually there are two of them because they have different

12   dates on the bottom.  One is stuck behind Ms. Cobb.

13             FUQUA:  If you don't mind let's mark the first

14   as Exhibit 2 he's looking at.

15             WILKERSON:  What is the first one he's looking

16   at so I can---

17             REPORTER:  Wait just a minute.  Are you speaking

18   of that one or this one?

19             FUQUA:  The policy---

20             REPORTER:  This is Exhibit 1.

21             FUQUA:  is Exhibit 1.

22             REPORTER:  Yes, sir and it's two pages.

23             FUQUA:  And it's two pages.

24             REPORTER:  Yes, sir.

25             FUQUA:  And then Exhibit 2 is going to be the

1  first document placed in front of Officer Green and I'll let

2  these other lawyers---

3              ELLIS:  Yes, thank you.

4              FUQUA:  look at it.  Do you want to mark that

5  one?

6              REPORTER:  Yes, sir.

7  Q.  Did you prepare that statement?

8  A.  Yes, ma'am.

9  Q.  What circumstances caused you to prepare that statement?

10 A.  Ah, upon the night that the incident occurred I actually

11 completed a use of force---

12 Q.  Uh-huh.

13 A.  and that use of force was turned in to my sergeant and my

14 sergeant turned it in to my lieutenant and the next day that we

15 were off, I received a call from my sergeant stating that the

16 lieutenant only received a copy of the use of force and that

17 night my sergeant said since it was an assist to Alexander on

18 the use of force just type this narrative on the use of force.

19 So I did what my sergeant told me to do and then I received a

20 call the next day from my sergeant that the lieutenant had the

21 use of force that he also wanted an incident report.  So I left

22 on my day off and went to the substation and completed this

23 incident report and turned it in; actually submitted it on the

24 computer.

25 Q.  Okay.  And I'm handing you a second narrative; it's in

CERTIFIED COPY

30

1    front of Ms. Cobb.

2               REPORTER:  I'm sorry; I didn't see it.

3               GREEN:  That's fine.

4               FUQUA:  Is this 3?

5               REPORTER:  It will be 3, sir.

6               FRAZIER:  I'm only going to include one; I don't

7    need to include the other one.  I was just curious why they had

8    different dates.  They don't need to be both admitted.

9               FUQUA:  Well, is it the same narrative?

10              FRAZIER:  Uh-huh.

11   A.  The only thing I can tell you is when anybody goes into a

12   computer like if anybody goes in to review it, it will show up

13   whenever somebody else printed it out it will show that they

14   printed it out.

15   Q.  Okay.

16   A.  On that day that they printed it out.

17             FUQUA:  I'd like to have this as Exhibit 3 just

18   so we'd know what he looked at.

19             FRAZIER:  Okay.

20             WILKERSON:  Yeah, I got it on here too.

21   Q.  I mean that one is the format is slightly different and I

22   was wondering if you had to do---

23   A.  No.

24   Q.  one for someone and then turn in something for someone else

25   and---

CERTIFIED COPY

31

1  A.  No, once I hit the submit button I have nothing else to do

2  with that so---

3  Q.  Okay.  And is that a true and accurate account of--how soon

4  after the incident with Mr. Doss happened did you write that

5  narrative?

6  A.  Once I did the use of force first and this was on my day

7  off so this happened, this was either on the first day off or

8  the second day off so it was one or two days after.

9  Q.  So is that an accurate narrative of what happened as well?

10 A.  Ah, pretty much; yes, ma'am.

11 Q.  Is there anything that you would change?

12 A.  Ah, except the other stuff about the deploying of the taser

13 or the number of cartridge or the number of tase that actually

14 come on the use of force and a lot of times we don't put it on

15 here.

16 Q.  Okay.  Is everything else true and accurate?

17 A.  Yes, ma'am.

18                 FRAZIER:  Okay.  Let me look at my stuff but I

19 think I'm done for right now.  Does anyone have any questions?

20                 FUQUA:  Ah, I did want to ask a question.

21                 CROSS-EXAMINATION

22 Questions by Mr. Fuqua:

23 Q.  You said you were the youngest field-training officer at

24 North Little Rock?

25 A.  Yes, sir.

CERTIFIED COPY

1  Q.  Okay.  Did you ever train in use of force?

2  A.  Ah, yes, sir.

3  Q.  I mean you trained people in the use of force is that

4  correct?

5  A.  Correct.

6            FUQUA:  Ah, okay, that's all I've got.

7                    CROSS-EXAMINATION

8  Questions by Mr. Ellis:

9  Q.  Officer Green I represent Paul Babbitt.  I wrote down what

10  you said; I think I wrote it down right.  Babbitt was there

11  already.  Now your testimony I think was in the context and I

12  may have misunderstood is why I'm asking.  In the context of

13  the gravel lot---

14  A.  Yes, sir.

15  Q.  was he already at the gravel lot?

16  A.  Right yes, sir; he was parked next to an Alexander car.

17  Q.  All right.  Who all was at the gravel lot?

18  A.  It was ah, the Alexander car, Babbitt, I pulled up and then

19  another Alexander car showed up.

20  Q.  Okay.  And I think you indicated then you all pulled out

21  together---

22  A.  Right, they pulled out and went to---

23  Q.  But you were hearing Mr. Doss there?

24  A.  Correct; yes, sir.

25  Q.  And you went to where Doss was did you indicate that in

CERTIFIED COPY

33

1  your testimony when you arrived there Babbitt was ahead of you

2  and had already gotten there?

3  A.  That is right; yes, sir.

4  Q.  Okay.  Now did he have any involvement other that holding

5  Mr. Doss on the left side; on his left side?

6  A.  Right.  He held him on his arm and they was trying to take

7  him to the ground and then he helped subdue him with handcuffs.

8  Q.  Okay.  So if they had been successful getting him to the

9  ground and cuffing him you wouldn't have had to taser him?

10  A.  Correct.

11  Q.  But he was not cooperative?

12  A.  No, sir; not at all.

13  Q.  And so you had to taze him?

14  A.  Correct.

15  Q.  And you've trained other officers in this area have you

16  not?

17  A.  Ah, as far as actually training on the taser I'm not a

18  certified taser instructor---

19  Q.  Okay.  But in other areas of use of force?

20  A.  Right, correct; yes, sir.

21                ELLIS:  I think that's all.

22                WILKERSON:  I have nothing.

23                FRAZIER:  I have some followup.

24                REDIRECT EXAMINATION

25  Questions by Mrs. Frazier:

CERTIFIED COPY

1    Q.   Where is that gravel parking lot you said?

2    A.   Ma'am it's probably ah, a few hundred, maybe a hundred and

3    fifty yards away from his residence maybe or something like

4    that; a hundred yards maybe.  It was ah, I guess is that a

5    trailer park back where he lives on I don't know if that's

6    considered a trailer park but ah, his house is right here, we

7    were right here, over in this area.  So I don't know that area

8    very well but I remember it was some kind of little lot right

9    there.

10                   FRAZIER:  Okay.

11                        RECROSS EXAMINATION

12   Questions by Mr. Ellis:

13   Q.   Greater than the distance of a football field?

14   A.   Yes, sir.  It's probably just a little bit further than a

15   football field; maybe about a hundred yards.

16   Q.   And you all were hearing him?

17   A.   Yes, sir.

18                   ELLIS:  Nothing further; thank you.

19                   FRAZIER:  nothing further.

20                   FUQUA:  I'm done.  We'll waive signature on this

21   Ms. Cobb.  Okay, you're done; you're free to go.

22                   ELLIS:  Thank you, sir.

23                   REPORTER:  Thanks, Officer Green.

24                   [The deposition ended at 10:22 a.m., October 9,

25   2013.]

CERTIFIED COPY

# SECTION 011

## ARREST PROCEDURES

I.    **POLICY**

Laws of arrest and search and seizure are defined by the United States Constitution, Arkansas statutes, and judicial interpretation to protect individual rights of all persons.  It is the policy of the Saline County Sheriff's Office to always use legal justification and means for any arrest, search or seizure.

A.    Only sworn deputies shall make arrests or serve arrest warrants.  Non-sworn employees shall direct persons surrendering at the Sheriff's Office to a deputy for arrest or to serve an arrest warrant.  Use caution, planning, and correct approach to help reduce dangers of making arrests.

B.    You may arrest when you have an arrest warrant, reasonable belief there is an outstanding arrest warrant, or probable cause to believe a crime has been committed.

1.    Most arrests can be made simply by communicating verbally with the person to be arrested that he/she is under arrest. It is unnecessary to apply any physical force or to touch the body in this type of arrest situation unless the person arrested needs to be handcuffed.

2.    It is the policy of the Saline County Sheriff's Office that deputies making an arrest verbally advise the arrestee, "you are under arrest," or a similar phrase to ensure arrestee clearly understands he/she is under arrest.

3.    Fortunately most citizens who are arrested will comply to a deputy's commands and submit to arrest without incident. However, occasionally a citizen will become argumentative or violent in their refusal to submit to an arrest. In this type of arrest situation the following guidelines will be followed:

a.    Only the force necessary to effectively make the arrest will be used.

Example

If an individual is only argumentative and is hesitant in complying with an deputy's orders, he/she will be led to the preferred destination, (generally a patrol vehicle), by the deputy holding the individual's arm as a method of guidance (minimum force necessary is used to effect the arrest). **NOTE:** Verbal assault is not considered as a legitimate excuse to apply any type of physical force as long as the individual voluntarily submits to the arrest.

Example

If an individual becomes violent, (fighting or struggling with deputies), at any time during an arrest, deputies are justified to use whatever reasonable force is necessary to effectively make the arrest.  Force will be escalated in the following order:

- Verbal commands.
- Use of hands to apply restraining holds.
- Taser (if training is documented and certification issued).
- O.C. Spray (if training is documented and certification issued).
- Use of Baton or similar device for which training documentation is available.
- Deadly Force (deputies will be justified in using deadly force to protect themselves or others from what is reasonably perceived to be an immediate threat of death or serious bodily harm).



PLAINTIFF'S DEPOSITION EXHIBIT #1


CERTIFIED COPY

C.    In any type of arrest situation officers will exercise caution and call for back-up at any point during the arrest procedure that there is the slightest possibility that any type of force will become necessary.

D.    Sworn law enforcement personnel shall be allowed to make a non-warrant arrest when:

1.    A criminal offense has been committed in his/her presence, either felony or misdemeanor;

2.    When the deputy has "reasonable grounds" for believing the person arrested has committed a felony offense;

3.    When acting in accordance with authority specified within Arkansas Rules of Criminal Procedure 4.1 through 4.6;

4.    Pursuant to ACA 16-81-106, when the deputy has "probable cause" to believe that the person arrested has committed the criminal offense of misdemeanor battery and the deputy finds evidence of bodily harm and the deputy reasonably believes that there is danger of violence unless the person alleged to have committed the battery is arrested without delay, it is not necessary that the alleged offense has been committed in the deputy's presence.  **NOTE:  This is an exception to the general rule that a misdemeanor offense must be committed within the deputy's presence.**

E.    <u>Arrests Outside Jurisdiction of the Saline County Sheriff's Office</u>.  A law enforcement officer of the Saline County Sheriff's Office operating outside the jurisdiction of Saline County may make non-warrant arrests for felony or misdemeanor offenses if the offense is committed within the deputy's view, subject to the following provisions:

1.    This section is applicable only within the State of Arkansas;

2.    That as soon as possible after the arrest the deputy shall notify the Law Enforcement Agency, where the arrest was made, of the arrest and that Law Enforcement Agency shall take custody of the detainee and shall take the detainee before a magistrate; and

3.    That the deputy operating outside this jurisdiction must be doing so at the request of or with the permission of the Municipal or County Law Enforcement Agency having jurisdiction in the locale of the arrest.

F.    <u>Other Arrests</u>.  When a deputy is orally ordered by a Judge to effect an arrest upon anyone for the commission of a public offense committed in the Judge's presence, such order shall justify such arrest.

MAR/21/2013/THU 01:23 PM          FAX No.                    P. 003

<span style="color:red">CERTIFIED COPY</span>

### CASE NARRATIVE

OFFICER WAS DISPATCHED TO 13523 2ND STREET IN ALEXANDER TO ASSIST ALEXANDER POLICE DEPARTMENT ON A DISTURBANCE. UPON ARRIVAL OFFICER OBSERVED A BLACK MALE (LATER IDENTIFIED AS CHRIS DOSS) STANDING IN THE FRONT YARD OF THE RESIDENCE SHOUTING PROFANE LANGUAGE TOWARD OFFICER'S. UPON APPROACH ALEXANDER POLICE UNITS ADVISED SUSPECT THAT HE WAS UNDER ARREST, AT WHICH TIME SUSEPCT BEGAN SHOUTING, "FUCK YOU I'M NOT GOING TO JAIL!" OFFICER'S ATTEMPTED TO PLACE THE SUSPECT'S HANDS BEHIND HIS BACK, AT WHICH TIME THE SUSPECT BEGAN TO JERK AWAY FROM OFFICERS. OFFICER'S ADVISED SUSPECT NUMEROUS TIMES TO STOP RESISTING, HOWEVER SUSPECT REFUSED. DEPUTY GREEN THEN DEPLOYED TASER STRIKING THE SUSPECT IN THE BACK AREA. SUSPECT WAS SUBDUED WITH HANDCUFFS WITHOUT FURTHER INCIDENT BY ALEXANDER POLICE UNITS.

SUSPECT WAS TRANSPORTED TO THE SALINE COUNTY DETENTION CENTER BY ALEXANDER POLICE.

DEPUTY TIM GREEN



3/21/2013                                              Page 3 of 3

CERTIFIED COPY

## CASE NARRATIVE

OFFICER WAS DISPATCHED TO 13523 2ND STREET IN ALEXANDER TO ASSIST ALEXANDER POLICE DEPARTMENT ON A DISTURBANCE. UPON ARRIVAL OFFICER OBSERVED A BLACK MALE (LATER IDENTIFIED AS CHRIS DOSS) STANDING IN THE FRONT YARD OF THE RESIDENCE SHOUTING PROFANE LANGUAGE TOWARD OFFICER'S. UPON APPROACH ALEXANDER POLICE UNITS ADVISED SUSPECT THAT HE WAS UNDER ARREST, AT WHICH TIME SUSEPCT BEGAN SHOUTING, "FUCK YOU I'M NOT GOING TO JAIL!" OFFICER'S ATTEMPTED TO PLACE THE SUSPECT'S HANDS BEHIND HIS BACK, AT WHICH TIME THE SUSPECT BEGAN TO JERK AWAY FROM OFFICERS. OFFICER'S ADVISED SUSPECT NUMEROUS TIMES TO STOP RESISTING, HOWEVER SUSPECT REFUSED. DEPUTY GREEN THEN DEPLOYED TASER STRIKING THE SUSPECT IN THE BACK AREA. SUSPECT WAS SUBDUED WITH HANDCUFFS WITHOUT FURTHER INCIDENT BY ALEXANDER POLICE UNITS. SUSPECT WAS TRANSPORTED TO THE SALINE COUNTY DETENTION CENTER BY ALEXANDER POLICE. _____ DEPUTY TIM GREEN



**CERTIFIED COPY**                              39

R E P O R T E R ' S   C E R T I F I C A T E

STATE OF ARKANSAS    )
                     )                SS. 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
COUNTY OF PULASKI    )


        I, Gloria Y. Cobb, A Certified Court Reporter
and Notary Public in and for the aforesaid County and state, do
hereby certify that the witness, TIMOTHY SHANNON GREEN, was
duly sworn by me prior to the taking of testimony as to the
truth of the matters attested to and contained therein; that
the testimony of said witness was taken by me, a voice writer,
and was thereafter reduced to typewritten form by me or under
my direction and supervision; that the foregoing transcript is
a true and accurate record of the testimony given to the best
of my understanding and ability.

        I FURTHER CERTIFY that I am neither counsel for,
related to, nor employed by any of the parties to the action in
which this proceeding was taken; and, further, that I am not a
relative or employee of any attorney or counsel employed by the
parties hereto, nor financially interested, or otherwise, in
the outcome of this action; and that I have no contact with the
parties, attorneys, or persons with an interest in the action
that affects or has a substantial tendency to affect
impartiality, that requires me to relinquish control of an
original deposition transcript or copies of the transcript
before it is certified and delivered to the custodial attorney,
or that requires me to provide any service not available to all
parties to the act.

                              _____
                              Gloria Y. Cobb, CCR LS#0336
                              Notary Public

My Commission Expires:
January 16, 2017_____
My Commission #12358451




**Cobb Court Reporting**
P. O. Box #4, Sweet Home, AR  72164-0004
Phones:  (501) 490-0066 - Off; (501) 590-0975 - Cell
(501) 490-0926 — Facsimile
e-mail: gloria.cobb@comcast.net