CERTIFIED COPY

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

**CHRISTOPHER DOSS,**                    **PLAINTIFF**

        **VS**            **No.**    <u>**4:13-cv-121 SWW**</u>

**THE CITY OF ALEXANDER; CHIEF
HORACE WALTERS, INDIVIDUALLY
AND AS POLICE CHIEF FOR THE
ALEXANDER POLICE DEPARTMENT;
JEFFREY WATSON, IN HIS INDIVIDUAL
CAPACITY; BLANKENSHIP, IN HIS
INDIVIDUAL CAPACITY; SALINE COUNTY;
BRUCE PENNINGTON, INDIVIDUALLY AND
AS SALINE COUNTY SHERIFF; TIM GREEN,
IN HIS INDIVIDUAL CAPACITY;
PAUL BABBITT, IN HIS INDIVIDUAL
CAPACITY; JERRY ODOM, IN HIS OFFICIAL
CAPACITY**                         **DEFENDANTS**

---

### DEPOSITION OF HORACE WALTERS

DATE:   October 10, 2013
TIME:   11:05 a.m.
PLACE:  The Saline County Courthouse
        200 North Main Street
        Benton, AR  72015-3767

---

### APPEARANCES

On Behalf of the Plaintiff:        Bridgette M. Frazier, Attorney
                                   The Frazier Law Firm
                                   1723 Broadway
                                   Little Rock, AR 72206-1220

CERTIFIED COPY

On Behalf of the Defendants:

David M. Fuqua, Attorney
Fuqua Campbell, P.A.
425 W. Capitol Ave., Suite #400
Little Rock, AR  72201

John L. Wilkerson, Attorney
Arkansas Municipal League
P. O. Box #38
North Little Rock, AR  72115

George D. Ellis, Attorney
The Ellis Law Firm
P. O. Box #2307
Benton, AR  72018-2307

Jonathan Greer
Saline County Attorney
Saline County Courthouse
200 North Main Street
Benton, AR  72015-3767

CERTIFIED COPY                                      3

I N D E X

                                                            PAGE

AGREEMENT OF COUNSEL. . . . . . . . . . . . . . . . . 4

SWEARING OF THE WITNESS. . . . . . . . . . . . . . .4

EXAMINATION OF HORACE WALTERS

    By Mrs. Frazier. . . . . . . . . . . . . . .4-89 & 93-98

    By Mr. Ellis. . . . . . . . . . . . . . . . .89-93

COURT REPORTER'S CERTIFICATION. . . . . . . . . . . . 115

* * * * *

* * *

*

E X H I B I T S

#1 — Biased Law Enforcement Practices. . . . . . . . . . 99-107

#2 — Letter from Doss to Walters dtd 2/13/10. . . . . . 108-110

#3 — Fox 16 News Article dtd 3/18/12. . . . . . . . . . . 111

#4 — Blankenship & Watson Statements (not dtd) . . . . .112-113

#5 — Aaron FOI request To Review Documents. . . . . . . . 114

**Cobb Court Reporting**
P. O. Box #4, Sweet Home, AR  72164-0004
Phones:  (501) 490-0066 – Off; (501) 590-0975 – Cell
(501) 490-0926 — Facsimile
e-mail: gloria.cobb@comcast.net

4

CERTIFIED COPY

1                           STIPULATIONS

2       The deposition of Horace Walters, produced, sworn and

3   examined at Saline County Courthouse, 200 North Main Street,

4   Benton, Arkansas, 72015-3767, commencing at 11:05 a.m., on

5   October 10, 2013 in the captioned cause at the instance of

6   counsel for the Plaintiff, and said deposition being taken

7   according to the terms and provisions of the Arkansas Rules of

8   Civil procedure.

9       It is stipulated and agreed all forms and formalities in

10  the taking, transcribing, forwarding and filing of said

11  deposition, are hereby waived by the parties, the right being

12  expressly reserved to object to the testimony of the witness at

13  the time of trial as to incompetency, irrelevancy and

14  immateriality, other than those with respect to the form of

15  questions as propounded to the witness.

16                          *  *  *  *  *

17                    P R O C E E D I N G

18      THEREUPON,

19                       HORACE WALTERS

20  having been called for examination by counsel for the

21  plaintiff, and having been first duly sworn, was examined and

22  testified as follows:

23                     DIRECT EXAMINATION

24  Questions by Mrs. Frazier:

25  Q.  Hello, Chief Walters, I'm Bridgette Frazier, we've met.  I

5

CERTIFIED COPY

1   represent Chris Doss in this matter.  Ah, could you state your

2   name and address for the record?

3   A.  My name is Horace Walters, H-O-R-A-C-E Walters, W-A-L-T-E-

4   R-S.  My address is P. O. Box 2797, Alexander, Arkansas.

5   Q.  Okay, great.  Ah, what is your current occupation?

6   A.  I am the Chief of Police in Alexander, Arkansas.

7   Q.  How long have you been the chief of police?

8   A.  Three years and four months.

9   Q.  Okay.  Ah, so approximately what date did you start so I

10  won't have to do the math?

11  A.  Okay.  I started May 28, 2010.

12  Q.  2010?

13  A.  Yes.

14  Q.  Okay.  Ah, and have you every given a deposition before?

15  A.  Countless.

16  Q.  Okay.  So you know the drill just, if you need a break just

17  let me know.  You understand you're under oath ah, you

18  understand, if you don't understand my question just ask me and

19  I'll repeat it or rephrase it or try to make it, so we're on,

20  you know, the same communication level?

21  A.  Yes, ma'am I understand.

22  Q.  Got it awesome.  Is there any reason why ah, your testimony

23  will be affected today for example you're under the influence?

24  A.  I don't smoke nor drink no, ma'am.

25  Q.  You're not under the influence, okay.  You've been the

CERTIFIED COPY

6

1  Alexander Police Chief since May 28, 2010.  Let's see do you

2  know about the facts giving rise to this lawsuit?

3  A.  Yes, ma'am, I read the file.

4  Q.  Okay, great.  And did you look at any documents ah, before

5  you testimony today?

6  A.  No, ma'am.

7  Q.  Refresh you memory.  Did you look at any documents ah, to

8  prepare you today?

9  A.  I looked at some ah, Tuesday just briefly looked over my

10  file.

11  Q.  And which file would you be talking about?

12  A.  Ah, the one where my officers were involved in the arrest.

13  Q.  Okay.  So your file at the station?

14  A.  Yes.

15  Q.  Okay.  Did you happen to look at any interrogatories or

16  answers from any of the other defendants in the lawsuit?

17  A.  No I didn't, just my only?

18  Q.  Just yours?

19  A.  Yes.

20  Q.  Okay.  Did anyone tell you about any of the information

21  contained in any of the other interrogatories?

22  A.  No, ma'am, I wouldn't listen to it anyway.

23  Q.  Okay.  But no one told you?

24  A.  No.

25  Q.  Okay.  And let's go quickly through the other defendants in

CERTIFIED COPY

7

1  this case.  Have you ah, spoken to Officer Watson about the

2  incident on November 9th, giving rise to this case?

3  A.  November 9?

4  Q.  Ah, excuse me October 9th?

5  A.  Okay, we had a, a like a deposition ah, two days ago and

6  that was the only conversation I had with him was then.

7  Q.  Okay, with Watson?

8  A.  Yes.

9  Q.  Okay, and you spoke with Watson?

10        ELLIS:  I want to object to the form of the

11  question.  He said deposition.  Did he not perhaps mean a kind

12  of an office conference?

13        WALTERS:  That's exactly what it was, rephrase

14  that please?

15        ELLIS:  Thank you.

16  Q.  Okay.  And did you speak with Officer Watson about the

17  facts?

18  A.  Oh, no ma'am, I can definitely say that, no.

19  Q.  Okay.  So you didn't speak to Officer Watson?

20  A.  We talked but not specifically about the case.  We were

21  just talking in general.

22  Q.  Okay.  Ah, what about Officer Blankenship?

23  A.  I did not talk to him at all.

24  Q.  Okay.  When is the last time you talked with Officer Watson

25  before last Tuesday?

CERTIFIED COPY    8

1    A.  I couldn't tell you it's been months.

2    Q.  Okay.  Did you by any chance speak with Officer Watson ah,

3    right after the incident, right after?

4    A.  Ah, yes ma'am I have to.

5    Q.  Okay.  What about Officer Blankenship?

6    A.  Yes, ma'am I have to.

7    Q.  Did they both tell you what happened?

8    A.  Yes, ma'am.

9    Q.  Okay.  Have you had an occasion to speak with ah, Sheriff

10   Pennington?

11   A.  No, ma'am not about this case, no.

12   Q.  Okay.  What about ah, Reserve Officer Odom?

13   A.  I have not talked to any of the Saline County Sheriff

14   Officers about any of this case.

15   Q.  Okay.  Have you discussed the facts of the October 9th

16   incident with anyone other then I think we just, you just said

17   Blankenship and Watson?

18   A.  And ah, Municipal League.

19   Q.  Okay.  Is that it?

20   A.  That's it.

21   Q.  Okay.  By any chance did you have to write or make any

22   statements to anyone about the incident of October 9th?

23   A.  I had to fill out some interrogatories.

24   Q.  Anything else beside the interrogatories?

25   A.  That's it.

CERTIFIED COPY

9

1    Q.   Okay, thank you.  Let's start with the Alexander PD.   How

2    many reserve, full-time and part-time officers do you currently

3    have?

4    A.   I have six certified officers and zero reserve officersas

5    of now.

6    Q.   I see.  Any part time I or II officers?

7    A.   They're all certified, full-time officers.

8    Q.   And when you say certified what do you mean?

9    A.   They've all been to the academy, the Arkansas Law

10   Enforcement Training Academy.

11   Q.   Okay.

12   A.   In Pocahontas.

13   Q.   In Pocahontas.  At the time of the incident how many

14   certified law enforcement officers did you have?

15   A.   At that time I think I had four.

16   Q.   Who would those have been?

17   A.   They would have been Brad William, Alex Staten,

18   S-T-A-T-E-N, I would have to look at my roster to see.

19   Q.   You know what, I'm looking for my where did my

20   interrogatory go?  I think I provided these in the

21   interrogatories.  Ah, we can go through it and that will make

22   it easier for both of us.  Give me a second if you would?

23   A.   Sure.

24   Q.   Thank you; here we go.  At that time what type of officers

25   did you have?

CERTIFIED COPY 10

1   A.  What type as in---

2   Q.  Full time, part time, part time I, part time II?

3   A.  I had all full-time officers and one reserve officer.

4   Q.  Okay.  Let's just go through it.  Tim Blankenship, who is

5   he?

6   A.  He is a, he was a reserve officer.

7   Q.  Okay.

8   A.  He had been through all of the training to be qualified as

9   a reserve officer.

10  Q.  Is he still with the Alexander PD?

11  A.  I do--no, I do not have any reserve officers.

12  Q.  Okay.  Well, he could have been a different officer now

13  so---

14  A.  No, he is not an officer at Alexander.

15  Q.  Okay.  Oscar Deleon.

16  A.  He was a translator a Hispanic translator and was a reserve

17  officer.

18  Q.  Okay.  Is he with Alexander PD?

19  A.  No, ma'am.

20  Q.  Why did he leave?

21  A.  He just resigned.

22  Q.  Do you know why he resigned?

23  A.  I was phasing out the reserve officer program.

24  Q.  Okay.  Tell me about John Fenton.

25  A.  That's another one, John Fenton.  He was a fairly descent

CERTIFIED COPY

1 officer, he hadn't been certified through ah--no, he had gone

2 to the academy in Camden.

3 Q.  So does that count for certification?

4 A.  Yes, ma'am.

5 Q.  So you would say he was a certified officer?

6 A.  Working part time, yes.

7 Q.  Do you know when he was certified?

8 A.  No, he had gone through the academy when I came on as

9 chief.

10 Q.  Okay.  So he had already been through the academy?

11 A.  Yes, ma'am.

12 Q.  Okay.  And what type of officer was he; he was a reserve?

13 A.  No, no, he was a certified officer.   John Fenton?

14 Q.  Yes.

15 A.  He was a certified police officer.

16 Q.  On your staff was he full time?

17 A.  Full time.

18 Q.  Full time okay.  Is he with your ah, Alexander PD anymore?

19 A.  No, he took a job up near his parents in Paron, Arkansas.

20 Q.  Okay.  Johnathan Calma.

21 A.  He was an officer that was getting ready to go to the

22 academy.

23 Q.  Okay,  you have your full-time patrolman so was he full

24 time?

25 A.  Yes, he was.

CERTIFIED COPY

12

1   Q.   Was he a certified law enforcement officer?

2   A.   No, he hadn't gone to the academy.

3   Q.   Is he with Alexander PD anymore?

4   A.   No, he's with some place in Oklahoma City with his parents

5   also.

6   Q.   Why did he resign?

7   A.   He wanted to go be near his mother, his mother was ill and

8   he wanted to go live near them.

9   Q.   Willie Jordan.

10   A.   He was an officer that I hired from Saline County.

11   Q.   Okay.  Tell me about Willie?

12   A.   He had not been to the academy.

13   Q.   Why did he resign?

14   A.   He resigned because he had been involved with an

15   altercation with his ex-wife in England, Arkansas.

16   Q.   Okay.  So was he discharged or did he resign?

17   A.   He resigned but I was investigating it and it did not look

18   well for him.

19   Q.   Okay.  When did you find out about this altercation?

20   A.   The same day it happened.

21   Q.   And then how long after that did he resign?

22   A.   About three weeks.

23   Q.   Okay.

24   A.   Long enough for me to conduct an investigation.

25   Q.   Robert Hawkins.

CERTIFIED COPY

13

1   A.   He was a reserve officer.

2   Q.   Okay.  Before we go any further tell me the difference

3   between reserve, part time and full time?

4   A.   A reserve officer is not a certified officer; they can only

5   conduct just routine police services; they have not gone

6   through the law enforcement training academy.

7   Q.   What are routine police services?

8   A.   Ah, they can back up other officers.

9   Q.   Are they allowed to carry weapons?

10  A.   Yes, ma'am; they have to qualify through standards.

11  Q.   Okay.  And then carry a weapon?

12  A.   Yes.

13  Q.   Can they arrest people on their own?

14  A.   Yes, they can.

15  Q.   Can they ride around on their own?

16  A.   Ah, they can but I always like for mine, at that time I

17  always had my reserve officers working with a certified

18  officer.  They did not have to be in the car and I checked with

19  standards and they said long as they're under the supervision

20  of a certified officer.  I made sure that was done.

21  Q.   Okay.  And then what sort of training did reserve officers

22  receive?

23  A.   They'd get, I think it was a hundred and ten hours of

24  training that has to be certified through minimum standards.

25  Q.   And who conducted those training?

CERTIFIED COPY

14

1   A.  Different, different agencies.  One instructor was from the

2   Arkansas Standards, another one was a qualified range officer

3   from the University of Arkansas at Little Rock and I even

4   taught some of the classes and I had another instructor from

5   ah, I think it was Saline County.

6   Q.  Okay.  Were any of these, did you ever have any of these

7   officers instruct the other officers?  For example any of the

8   full-time patrolmen, were they instructors for the other

9   officers?

10   A.  Ah, yes, Brad Williams was because he was an assistant

11   chief of police---

12   Q.  Okay.

13   A.  and John Fenton was a ah, instructor.  He instructed

14   accidents, accident investigations.

15   Q.  Okay.  Couldn't he instruct in anything else?

16   A.  I think he taught several classes.

17   Q.  Which classes could he have taught?

18   A.  One was ah, policy and procedure and the other one was, I

19   think it was not self defense, I don't recall but that

20   information is available at minimum standards.

21   Q.  Where was that---

22         ELLIS:  Let me interject just to add I'll object

23   to the form of the question.  You might want to ask the witness

24   what he's referring to when he says standards; do you know?

25         FRAZIER:  No, I'll just have to follow that up.

Cobb Court Reporting
P. O. Box #4, Sweet Home, AR  72164-0004
Phones:  (501) 490-0066 - Off; (501) 590-0975 - Cell
(501) 490-0926 — Facsimile
e-mail: gloria.cobb@comcast.net

CERTIFIED COPY

1    ELLIS:  Okay, because that's a commission ah,

2    Arkansas Commission on---

3    WATSON:  Arkansas Law Enforcement Standards

4    Commission.

5    ELLIS:  Thank you.

6    WATSON:  I'm sorry, I---

7    FRAZIER:  I was just about to follow up like

8    where.

9    Q.  So I would be able to check if I went to the Arkansas Law

10   Enforcement Commission?

11   A.  Of minimum standards, yes.

12   Q.  Okay.  Would I be able to check for example which classes

13   John Fenton taught?

14   A.  Yes, you can.

15   Q.  Okay, so where are we up to?  You were telling me the

16   training for reserve officer was a hundred and five hours?

17   A.  I think it was a hundred and ten.

18   Q.  A hundred and ten; sorry.  What about Part-time I?

19   A.  I, I don't think we even hired any Part-Time I, I just

20   hired full-time officers.

21   Q.  What about Part-Time II?

22   A.  I think I hired maybe two Part-Time II officers.

23   Q.  Okay.  What ah, what were their qualifications; like what

24   needed to happen for them to be a part-time policeman?

25   A.  Everything would be the same before I would hire them.

CERTIFIED COPY

16

1   Q.   The same as what?

2   A.   As certified officers and the Part-Time I and II officers,

3   Part-Time I can work nineteen, a minimum of nineteen hours up

4   to I think it's twenty-five hours a week but they all got the

5   same training whether they were Part-Time I or Part-Time II.

6   Q.   What training would that be?

7   A.   They had to go through a field training officer; I had an

8   officer that came from Little Rock, he was an officer over at

9   Little Rock for ten years, he was my certified field training

10  officer; it's commonly referred to as FTO.

11  Q.   Okay.  And then what's the difference between a reserve

12  officer and the Part-Time II; their duties whether

13  responsibility?

14  A.   Part-Time I and Part-Time II are basically the same; they

15  conduct the same type police procedures.  Reserve officers

16  don't have that capability and do not have the capability to go

17  out and do things by themselves where Part-Time I and II can go

18  do things by themselves.

19  Q.   Okay.  Can you give me an example of the things they can do

20  by themselves and the things like Part-Time II could do that a

21  reserve officer couldn't do?

22  A.   Okay.  A Part-Time I and II officer they can conduct

23  basically any type of police services, write citations,

24  investigate accidents ah, just batteries on children, they can

25  do basically the police services.  The reserve officer, he or

CERTIFIED COPY

17

1   she has to be with a certified officer to do that.

2   Q.  Okay.  So could a reserve officer write citations?

3   A.  Yes, they can.

4   Q.  Okay.  I'm sorry; help me chief.  What can reserve or Part-

5   Time II officer do that a reserve officer can't?

6   A.  They can, Part-Time I and II officers can conduct regular

7   police services where a reserve officer cannot.  A reserve

8   officer has to be in the presence of a certified officer before

9   they can do such police activities.

10  Q.  Okay.  And what would those police services include?

11  A.  Ah, traffic--not traffic ah, investigation involving

12  injuries ah, where someone has been shot, things of that

13  nature.  They can only assist, they can take reports ah, but

14  they cannot conduct any type of investigations.

15  Q.  Okay.

16  A.  That's a reserve officer.

17  Q.  Okay.

18  A.  A Part-Time I and II can conduct such operations.

19  Q.  Okay.  And then what's the difference between a Part-Time

20  II and a full-time officer?

21  A.  Part-time I get those confused because I know a Part-time

22  II officer he or she can only work a certain amount of hours; I

23  think it's up to nineteen; a part-time II, they can work up to

24  thirty-nine hours.

25  Q.  Okay  And does the part-time II officer do they need to be

CERTIFIED COPY 18

1   certified?

2   A.   That's, that's up to you; you will send them to the

3   academy; they will eventually be certified.

4   Q.   Because it's my recollection that full-time officers have a

5   year to be certified.

6   A.   That is correct.

7   Q.   Do part-time II officers have the same requirement?

8   A.   Yes, they do.

9   Q.   So they have to be certified within a year as well?

10  A.   Yes.   The normal steps are they start out as a part-time II

11  then they are promoted to, you know, a certified, full-time

12  officer.   Then you have state law says you have one year to get

13  them to the academy and if there is a problem where you cannot

14  get them to the academy in time and that's simply because if

15  the academy is full you can ask for an extension.

16  Q.   Okay.   Then when does the clock start ticking like for

17  example if you hire someone as a part-time II officer?   Do they

18  have a year as a part-time II officer but then eight months you

19  can move them to a full-time officer and then they have a year

20  after they're a full-time officer or is it they have to be

21  certified from the time they become a part II officer?

22  A.   Part-time I and Part-time II and full-time officers it

23  doesn't matter it's as you say the clock start ticking the date

24  of hire.

25  Q.   Okay.   The date of hire part-time II you have one year?

CERTIFIED COPY

19

1   A.   Correct.

2   Q.   And the clock doesn't restart once you've been promoted to

3   full-time?

4   A.   No, it does not.

5   Q.   Okay; thank you.  All right, Robert Hawkins; did we talk

6   about him?

7   A.   Yes, I told you he was a reserve officer.

8   Q.   And he resigned why?

9   A.   To become a firefighter.

10  Q.   Okay.  Brent Lawrence?

11  A.   He was a certified officer--I'm sorry, he was a full-time

12  officer.

13  Q.   Okay.  Why did he resign?

14  A.   His wife had a baby and he wanted to stay at home with the

15  baby.  She had multiple problems with the childbirth.

16  Q.   I'm sorry to hear that.  Okay, Michael Murray?

17  A.   Michael Murray he, he is no longer with me.  Ah, I hired

18  him from Saline County; I never had any problem out of him.

19  Q.   Why is he no longer with you?

20  A.   He got married and his spouse, previous spouse to be which

21  didn't turn out, didn't want him to be a police officer; that

22  what he put in his letter of resignation.

23  Q.   Okay.  So when you say transferred to the street department

24  do you mean like another---

25  A.   No, he was hired after he resigned from the police

CERTIFIED COPY

20

1  department the mayor hired him as a street employee.

2  Q.  You mean like sanitation?

3  A.  No, ma'am; street.

4  Q.  What does that mean?

5  A.  They work all on the streets and roadways; in Alexander

6  street department.

7  Q.  Okay.  Who is the street department in charge of?

8  A.  I'm sorry.

9  Q.  What are they in charge of?

10  A.  Their jobs they're allowed to cover the streets of

11  Alexander.

12  Q.  I mean as a law enforcement officer?

13  A.  No, no, no, no.

14  Q.  Okay.

15  A.  Just straight worker.  Help keep up the streets and cut

16  grass and things of that nature.

17  Q.  Okay, okay.  Like a public works in a kind of way.

18  A.  Yes.

19  Q.  Mark Ridgeway?

20  A.  He was a reserve officer also.

21  Q.  Okay.  What happened to him?

22  A.  He became the fire chief.

23  Q.  Okay.  And then we have Mr. Watson?

24  A.  Oh, Jeff Watson.

25  Q.  Uh-huh.  Tell me about him?

CERTIFIED COPY

1   A.  He was hired, he was a reserve officer also and I hired him

2   from some of that same class and promoted him to full-time

3   officer.  Ah, he had gone to the academy and he was up there

4   for about four months and there was an altercation with four

5   cadets---

6   Q.  Uh-huh.

7   A.  from different agencies and I took him out of the academy

8   and brought him back.

9   Q.  Okay.  And then what happened?

10  A.  He resigned.

11  Q.  Why did he resign?

12  A.  Because I was investigating the incident and I do not tell

13  employees or ask them to resign, I conduct my investigation and

14  I do let them see what I have concluded too.

15  Q.  Okay.  So he didn't leave the academy because of a blown

16  knee cap?

17  A.  He had a problem with his knees while he was there.

18  Q.  Is that why he left the academy?

19  A.  No.

20  Q.  Okay.  And then what kind of employee was he?

21  A.  I did not have a single complaint on him.

22  Q.  Okay.  When you hired him he had a warrant out for his

23  arrest; is that correct?

24  A.  No, he did not?

25  Q.  He didn't have a warrant out for failure to appear?

CERTIFIED COPY

1  A.  No.  Standard wouldn't have--the Arkansas Bureau of

2  Standards would not have accepted him and signed off on his

3  papers if he would have had a warrant outstanding for him.  He

4  did have a misdemeanor hot check warrant before I hired him and

5  I checked and it had been dismissed because he paid the check

6  off.

7  Q.  Okay.

8  A.  But there is no way I would hire someone with a warrant.  I

9  do an extensive background on employees before I hire them.

10  Q.  Tell me about the extensive background check you do?

11  A.  I, I get, I have them to write down at least four ah,

12  references and then I go and talk to the last place they had

13  worked---

14  Q.  Okay.

15  A.  and then of course I have to run a NCIC, it's a form we

16  have to, we check, it's called an NCIC and an ACIC form to see

17  if they have any kind of criminal activity.

18  Q.  Okay.  And what other things do you check in your extensive

19  background check?

20  A.  That's about it.  I like to check and see if they go to

21  church and things of this nature but I don't, I don't determine

22  a person for hire by going to church or not but I do consider

23  that.

24  Q.  That was your attorney just breathing a sigh of relief with

25  you saying that.

CERTIFIED COPY    23

1  A.  You have to say the truth.

2  Q.  Please, please; speak the truth.  Ah, at one point weren't

3  you conducting polygraph test?

4  A.  Yes, ma'am.

5  Q.  How long did that last?

6  A.  About three months.

7  Q.  Okay.  Were you doing that during the time that Mr. Watson

8  was hired?

9  A.  No, because Paul Mitchell had told me to stop doing it;

10  that was the former mayor.

11  Q.  Okay.  Ah, what other sort of investigation did you do?

12  A.  Pertaining to what?

13  Q.  The applicants.

14  A.  That's basically it I do it myself I don't, I don't have

15  the luxury to have someone else to do it.

16  Q.  Okay.  So were you concerned at all when Mr. Watson had a

17  warrant out for his arrest; did that concern you?

18  A.  Okay again, he did not have a warrant for his arrest when I

19  went into his background.

20  Q.  Correct.  But before you hired him he said, hey chief I

21  have this warrant out; correct?

22  A.  No, that never happened; he didn't tell me he had a warrant

23  for his arrest.

24  Q.  You didn't know?

25  A.  No, because the record didn't show that; NCIC and ACIC

CERTIFIED COPY

1  didn't show that he had an outstanding warrant; it showed that

2  it had been taken care of.

3  Q.  Did he tell you about it?

4  A.  Yes, he did.

5  Q.  When did he tell you?

6  A.  Ah, before I hired him.

7  Q.  Okay.  So you did know?

8  A.  Yes, uh-huh.

9  Q.  Were you concerned at all to hire an officer that had had a

10  warrant out for his arrest?

11  A.  No, it was all depending on the investigation of my

12  background and it was a misdemeanor warrant; you cannot hire a

13  police officer if they have a felony conviction.  I wouldn't

14  even consider so no, that wouldn't have any difference made

15  here.

16  Q.  Okay, okay.  And ah, Christy Dillavou?

17  A.  Yes.

18  Q.  Tell me about, Christy.

19  A.  She came from Shannon Hills and she left on her own.

20  Q.  Okay.  Why did she leave?

21  A.  I was not satisfied with her work performance and she felt

22  like she was doing what she could and she resigned.

23  Q.  Okay.  Officer Alvarado is still on the force, correct?

24  A.  Yes.  One of the best officers I've had to work for me in

25  my thirty-eight years of law enforcement.

CERTIFIED COPY

25

1   Q.   Okay.   Derrick Jackson?

2   A.   He's now the assistant chief; he's a good officer.

3   Q.   Where did he come from?

4   A.   Shannon Hills.

5   Q.   Did he ever have any ah, did he have any sort of adverse

6   record before he came?

7   A.   He had some problem with Shannon Hills.

8   Q.   What sort of problems?

9   A.   Ah, I checked with the chief and the chief said that he

10  wanted to excel too fast and there was a time when, I hate to

11  bring up another agency but they had some serious problem with

12  the Arkansas Minimum Standards and he was the only officer over

13  there that was certified and he was working a shift by himself

14  and the former chief over there didn't particularly care for

15  him.

16  Q.   But did he have any problems with complaining?

17  A.   He who?

18  Q.   Mr. Jackson.

19  A.   Complaints by who?

20  Q.   About anything that he had done?

21  A.   No, I didn't find anything.   I even, the chief let me

22  review his personnel file; let me see Jackson's personnel file.

23  Q.   Okay.   Eric Staten?

24  A.   Staten was a ten-year veteran with the Little Rock Police

25  Department; he worked for me, I was his sergeant and his

CERTIFIED COPY

1  lieutenant and ah, he got married and his ah, at that time his

2  wife died and left him with three kids so he had to find

3  another job.

4  Q.  Did he have any blemishes on his record before you hired

5  him?

6  A.  No, I checked with the chief and they said that they would

7  hire him back.

8  Q.  What about Calvin Reed?

9  A.  Calvin Reed came from Saline County also.  He was a good

10  dedicated officer.  No disciplinary actions at all.

11  Q.  Did you ever hear of any rumors or problems concerning

12  Calvin Reed during his tenure at Saline County?

13  A.  No, I did not.

14  Q.  So, Mr. Reed gave you no concerns?

15  A.  No.

16  Q.  And he's a full-time patrolman?

17  A.  He is.

18  Q.  And you reviewed Mr. Reed file fully before you hired him?

19  A.  I did.

20  Q.  Do you know what he did at Saline County?

21  A.  He was a deputy in the deten--in the jail.

22  Q.  Okay.  Christopher Winberry?

23  A.  He's at the academy right now; he came from Saline County.

24  Q.  What did Mr. Winberry do at Saline County?

25  A.  He was a detention officer.

CERTIFIED COPY

1  Q.  Did you ever hear any rumors or stories about Mr. Winberry?

2  A.  I didn't hear any--I didn't find anything in his background

3  and to answer your question no, I hadn't heard about any rumors

4  or anything.

5  Q.  Okay.  Is he going to the academy now you said?

6  A.  He's at the academy in Pocahontas.

7  Q.  Okay.  Taylar Shell.

8  A.  He was a, before I came on he worked for me for about two

9  months; he was ah, the two mayors prior to the one we have now

10  appointed him like as a police supervisor or something and he

11  had gone through the reserve program before I came on and

12  again, I decided I was going to eliminate all reserve officers

13  and he resigned.

14  Q.  Okay.  Brad Williams?

15  A.  Brad Williams he was there when I came on board and he

16  resigned.

17  Q.  You put terminated.

18  A.  No, no, that was before my time; I can't answer nothing

19  about that; I don't know nothing about that.

20  Q.  Okay.  So he left in 2010?

21  A.  No, he left in 2012.

22  Q.  Okay.  I asking because it says full-time assistant chief

23  07/06 to 05/10, terminated due to budget cuts.  So did he come

24  back?

25  A.  Yes, he did.

CERTIFIED COPY    28

1    Q.   Okay.   So how long was he on the force when he came back?

2    A.   I came on in May of 10 and he resigned in maybe August of

3    2012.

4    Q.   Okay.   Why did he resign?

5    A.   I was investigating him and I had him arrested.

6    Q.   What did you have him arrested for?

7    A.   Ah, felony theft of property.

8    Q.   Okay.   So was it one of these situations where he resigned

9    in lieu of termination like the rest of them it seems?

10   A.   Again, when I investigate an officer I let them review my

11   entire investigation.

12   Q.   Have you ever had to terminate an officer?

13   A.   Yes, ma'am.

14   Q.   Which one?

15   A.   Patrick Thompson.

16   Q.   We haven't gotten to him; all right.   Was he the only one

17   you ever terminated?

18   A.   Yes, ma'am.

19   Q.   So the rest of'em (sic)kind of resigned first?

20   A.   Yes.

21   Q.   Okay.   Do you encourage them to resign---

22   A.   No, ma'am.

23   Q.   before termination?

24   A.   No, ma'am.

25   Q.   Or they just see the train coming?

CERTIFIED COPY

29

1  A.  I let them review the file with my investigative findings.

2  Q.  Okay.  Officer Cummings?

3  A.  She was involved in a shooting in Alexander; she just got

4  exonerated from that incident.  I had zero problems out of her

5  when I hired her.

6  Q.  Okay.  Do you know if she's going to come back since she

7  was exonerated?

8  A.  I'd have to make that, she will have to go through the

9  process to be hired again; I just can't say yeah, I'll hire her

10  back.

11  Q.  Okay.  Did she resign or is she on leave?

12  A.  She resigned on her own.

13  Q.  Okay.  And then Patrick Thomas, where did he come from?

14  A.  From the reserve program---

15  Q.  Okay.  What did he do---

16  A.  a, Alexander reserve officer.

17  Q.  And where did he come from before that?

18  A.  When I looked at his file he had come from I think it was--

19  he was a ah, security guard some place.

20  Q.  Okay.  Did you hire him?

21  A.  Yes, I did; yes, I hired him.

22  Q.  Okay.  Did he have anything in his record or background

23  which would give you hard times?

24  A.  No, he had filed several lawsuits but none had come to a

25  conclusion and I was strongly advised to hire him by Paul

CERTIFIED COPY

30

1   Mitchell, the former mayor.

2   Q.   Okay.

3   A.   But the bottom line I hired him; the buck stops here.

4   Q.   Okay.  And then you said he was the only one you

5   terminated?

6   A.   Yes, ma'am.

7   Q.   What did you terminate him for?

8   A.   For twenty-two violations of police policies and

9   procedures.

10  Q.   Okay.  Well, is he suing the city, right now?

11  A.   Not, not that I know of.  I haven't rece---

12  Q.   Well, you'd probably know.

13  A.   Yeah.

14  Q.   Is that a no, right?

15  A.   No.

16  Q.   And then Chris Maher?

17  A.   He was the acting chief when I was hired.

18  Q.   Okay.  Who is he?

19  A.   He is with ah, Saline County right now.

20  Q.   But he predates you, right?

21  A.   Yes.

22  Q.   Okay.  And then Jeff Garcia looks like predates you?

23  A.   Right.

24  Q.   Dennis Eckmann, what about him?

25  A.   Dennis was hired, he was on when I came on board, when I

CERTIFIED COPY

1  became chief.

2  Q.   Who is he?

3  A.   He is now working for Pulaski County and he was a good

4  officer too but he had difficulty with ah, his girlfriends.

5  Q.   What sort of difficulty?

6  A.   Ah, two would come to the office and I didn't allow that,

7  you know, while they were on duty and it was more than three

8  times ah, and I caught him the third time and again, I let him

9  review the file, the investigative file.

10  Q.   And he resigned?

11  A.   Yes.

12  Q.   Did he ever have any other problem like in performance of

13  his official duty was there any problems or anything?

14  A.   None.

15  Q.   In his record?

16  A.   No.

17  Q.   Or just personal issues?

18  A.   Yes.

19  Q.   Tommy Leath?

20  A.   Before my time.

21  Q.   Okay.   Allen Spears in before your time?

22  A.   Yes, ma'am.

23  Q.   Tony Staten.

24  A.   He was a reserve off--is that S-T-A-T-O-N?

25  Q.   E-N.