CERTIFIED COPY                                    32

1  A.  E-N, okay that's the officer that I hired from Little Rock.

2  Now there's a S-T-A-T-O-N ah, we have a Tony Staton and a---

3  Q.  Well, there's an Eric?

4  A.  an Eric Staten, E-N and O-N; now which one are you

5  referring to?

6  Q.  They're both spelled E-N in my response.

7  A.  Oh.  Eric is E-N and Tony is O-N.

8  Q.  Okay.  But Eric is still full time?

9  A.  Yes, ma'am.

10  Q.  Okay, so tell me about Tony?

11  A.  Tony was a reserve officer.

12  Q.  What happened to him?

13  A.  He resigned also.

14  Q.  Why did he resign?

15  A.  Because I was eliminating the auxiliary program.  I didn't

16  have any complaints on him; not a one.

17  Q.  So if he wanted to go full time he still would have been

18  with the force?

19  A.  I didn't hire him so I can't answer that question.  I would

20  have to do another background investigation and do all of that.

21  Q.  But he was reserve at the time?

22  A.  Yes, ma'am.

23  Q.  So could he have said can you move me to full time?

24  A.  I would have to do an investigation even for the, from the

25  reserve officer to become a full-time officer.

CERTIFIED COPY

33

1   Q.   So would you have?

2   A.   I'm sorry?

3   Q.   Would you've considered really hiring him for full time?

4   A.   I would have considered but chances are I wouldn't have

5   hired him.

6   Q.   Why?

7   A.   Well, he didn't have the stamina and he wouldn't follow up

8   on things and his report writing was horrible.

9   Q.   Okay.  And what about George Craig?

10  A.   Now he was a reserve officer for about two months and he

11  left and took a job with the federal people.

12  Q.   Okay.  Well, it says 4/11 to the present; is he no longer

13  presently wor---

14  A.   He hasn't been there--that's what I put in that statement?

15  Q.   Yes; he, George Craig and Sheryl Craig?

16  A.   No, they were only there for about two months.

17  Q.   Okay.

18  A.   That's incorrect.

19  Q.   Okay.  Natosha Sims?

20  A.   I just hired her about three or four weeks ago and she

21  resigned last week--I mean, she resigned this week.

22  Q.   Okay.

23  A.   She moved to Florida.

24  Q.   So and I'm pretty much talking about the officers, you

25  know, that you've hired during the time that the incident took

CERTIFIED COPY

34

1   place.   There were about five officers I guess that came in

2   Brad Williams' class?

3   A.   For the reserve class?

4   Q.   Yes.

5   A.   It may have been six; it could have been five---

6   Q.   Five or six, that's good; I'm not going to hold you to it.

7   A.   That's fine, yes.

8   Q.   And so that would have been Watson and who else?

9   A.   Watson, Blankenship, Staten, Staton, Oscar Deleon, and

10  Calvin Reed--oh, I'm sorry and Patrick Thompson was a part of

11  that.

12  Q.   Yes, because they're on the same role class.

13  A.   Yes.

14  Q.   Ah, and you hired all of these individuals?

15  A.   The ones that came on as police officers---

16  Q.   Uh-huh.

17  A.   Yes, I hired them.

18  Q.   And do you feel you've made good decisions with regards to

19  their hiring?

20  A.   Yes, ma'am.

21  Q.   Okay.   Did you ever have to reprimand Mr. Watson, Officer

22  Watson?

23  A.   No, ma'am.

24  Q.   Okay.   Did he ever receive any verbal reprimands?

25  A.   No ma'am.

1  Q.  Okay.  Did he receive any reprimands for what happened at

2  Pocahontas?

3  A.  Ah, no because it happened in Pocahontas on their campus.

4  Q.  Okay.  And after he left Pocahontas did you allow him to

5  come back and work?

6  A.  He worked about, about three weeks, I conducted the

7  investigation before I made a decision.  I just couldn't fire

8  him, terminate him because of what happened in Pocahontas, I

9  wanted to find out for myself.

10 Q.  Were you concerned about putting him back on the street

11 knowing that he had the altercation with four other law

12 enforcement officers?

13 A.  Three other.

14 Q.  Three other; thank you.  Did that give you any concerns?

15 A.  No, ma'am, because I read what happened up there---

16 Q.  What happened?

17 A.  It's not a typical but young police recruits they like to

18 talk about what they have done in their city and what goes on

19 in their city, someone made a joke about Alexander being a

20 small hick town and he took offense to it.  His roommate was

21 from Smackover and it escalated from that and then it got to

22 yelling and you just don't do that at the training academy.

23 Q.  So was yelling the extent of the altercation?

24 A.  Yes.

25 Q.  Was there any physical or use of force?

CERTIFIED COPY

36

1    A.   None.

2    Q.   Not use of force but no physical action?

3    A.   None.

4    Q.   Okay.  Have you ever suspended any of your officers?

5    A.   Yes, ma'am.

6    Q.   You've only been there since 2010 as I remember---

7    A.   Yes.

8    Q.   Which ones have been suspended?

9    A.   I suspended Staton---

10   Q.   Which Staton?

11   A.   Eric Staton---

12   Q.   Eric Staton, okay.

13   A.   Ah, he drove his car to a firing range without permission.

14   Q.   Okay.  So what sort of suspension did he receive?

15   A.   Three days.

16   Q.   Is that three days without pay?

17   A.   That's correct but I did allow him to use vacation in lieu

18   of the suspension days.

19   Q.   So he still got paid?

20   A.   Yes, but he loss three days of vacation.

21   Q.   Any other officers?

22   A.   I don't think so.

23   Q.   Okay.  I'll just go through them real quick because I want

24   to make sure that I'm getting all of the officers that might

25   have had any reprimands, suspensions, et cetera, et cetera.

CERTIFIED COPY

37

1    A.    Okay.

2    Q.    Real quick.  Tim Blankenship?

3    A.    No, disciplinary actions.

4    Q.    Oscar Deleon?

5    A.    None.

6    Q.    John Fenton?

7    A.    None.

8    Q.    Jonathan Calma?

9    A.    I think I may have given him a verbal warning.

10    Q.    Okay.  Willie Jordan?

11    A.    No disciplinary action.

12    Q.    Robert Hawkins?

13    A.    None.

14    Q.    Brent Lawrence?

15    A.    None.

16    Q.    Michael Murray?

17    A.    None.

18    Q.    Mark Ridgeway?

19    A.    None.

20    Q.    Jeff Watson?

21    A.    None.

22    Q.    Christy Dillavou?

23    A.    None.

24    Q.    So ah, Officer Alvarado.  Oh, I can't pronounce his name,

25    how do you pronounce his first name?

CERTIFIED COPY

38

1    A.   Alvarado, that's his last name.   Ah, Joaquin

2    Q.   Joaquin?

3    A.   Yes.

4    Q.   Ah, Derrick Jackson?

5    A.   None.

6    Q.   Jose Padilla?

7    A.   None.

8    Q.   Eric Staton?

9    A.   I just told you, yes.

10   Q.   Calvin Reed?

11   A.   None.

12   Q.   Winberry?

13   A.   None.

14   Q.   Ah, let's see; we don't know about Mr. Shell.   Brad

15   Williams?

16   A.   None.

17   Q.   Cummings?

18   A.   None.

19   Q.   Thompson before he was terminated?   That's okay we'll move

20   on.

21   A.   None.

22   Q.   we'll move on.   I mean he didn't have any before he was

23   terminated; correct?

24   A.   No, ma'am but it--no.

25   Q.   Chris?

CERTIFIED COPY

39

1  A.  None.

2  Q.  ah, he predated you--well, he almost predated you; interim

3  chief so--we'll go on.  Dennis Eckmann?

4  A.  None.

5  Q.  Cain Maxheimer?

6  A.  I don't even know him.

7  Q.  Okay.  Allen Spears, chief before you; Tony Staton?

8  A.  None.

9  Q.  And then George and Cheryl Craig?

10  A.  None.

11  Q.  And Natosha?

12  A.  None.

13  Q.  Okay.  And then I want to ask you about Michael Murray.

14  Did Michael have any problems before you hired him?  Anything

15  that would have given you concern?

16  A.  Yes, he had an altercation with a girlfriend.

17  Q.  I'm sorry, was that the one that had the altercation?

18  A.  No, no, this is Michael Murray; yeah this, this was before

19  I came on and I had difficulty finding the report; all I had to

20  go on was word of mouth and I called him in and ask him about

21  it prior to his hire.

22  Q.  Okay.  And what did you find out?

23  A.  That he was desponded because his girlfriend had left him.

24  Q.  But nothing else gave you cause for concern?

25  A.  No.

CERTIFIED COPY

40

1   Q.  Ah, I believe at one of the city council meetings or

2   something one of the city council people raised some issue

3   about him being suicidal; do you remember that?  Michael

4   Murray?

5   A.  I heard something about it but I don't think it was at,

6   that was not brought up in council meeting I don't think.

7   Q.  Well, I'm getting information third and fourth-hand.

8   A.  Yeah.

9   Q.  Was it ever brought up?

10  A.  To me?

11  Q.  Uh-huh.

12  A.  No.

13  Q.  Did you ever hear those rumors?

14  A.  Yes, I did the night of his introduction to the council

15  some citizen came up and told me that but then that was his or

16  her opinion though and I find out there was some problem

17  between the two families.

18  Q.  Okay.  So you investigated it?

19  A.  No, I did not.  I found that out afterwards.

20  Q.  No, I mean when you found that out did you investigate it?

21  A.  No, because he was already on and I didn't find anything in

22  his background that would allude to him being suicidal.  If he

23  were I would not have hired him.

24  Q.  But once you did hire him you found out that something,

25  there might be some sort of flag that's suicide, being

CERTIFIED COPY

41

1   suicidal?

2   A.   That's when I called him in again and asked him about it

3   and he told me the exact same thing again.

4   Q.   I'm not going to characterize that as an investigation

5   hearing about that---

6   A.   I didn't say that it was an investigation, I said I called

7   him in and asked him about it.

8   Q.   So you inquired further after you found out?

9   A.   After I was told; I didn't find it out.

10  Q.   Okay.  And you kept him on the force?

11  A.   Yes, I did.

12  Q.   And let's see, Odom has never been reprimanded; correct?

13  A.   Who?

14  Q.   I'm sorry, I was looking at the wrong one; Blankenship?

15  A.   No, he has not.

16  Q.   And he's with the fire department right now; right?

17  A.   Yes, ma'am.

18  Q.   Okay, all right.  Tell me more about the training.  I

19  believe Officer Watson at the time of the incident was part II?

20  A.   Part II, yes.

21  Q.   Okay.  So exactly what training does a part II officer?

22  A.   He had the reserve training plus he rode with Officers Eric

23  Staton for two weeks.

24  Q.   Okay.  And ah, after that you thought that he was qualified

25  to go on the street by himself?

CERTIFIED COPY

42

1  A.  Yes, ma'am; I sent all of this information out to Arkansas

2  Minimum Standards that he was on the street and I felt that he

3  could operate as a single unit.

4  Q.  Okay.  At one time was there a policy that ah, your

5  officers had to do a five-week training with another officer?

6  A.  With Alexander?

7  Q.  Uh-huh.

8  A.  Sometime I would if I, if I felt it necessary that an

9  officer needed some additional training and I have ongoing

10  training at all times so it's just not necessarily a standard

11  five weeks, that's something I instituted upon myself.

12  Q.  Okay.  So Officer Watson had two weeks in the patrol car?

13  A.  Yes, with a senior field training officer, Officer Eric

14  Staton.

15  Q.  Okay.  And then what other training did they receive?

16  There's the two weeks in the car; and how many hours of---

17  A.  A hundred and ten.

18  Q.  A hundred and ten of classroom training?

19  A.  Yes.

20  Q.  Do you need some water?

21  A.  No, I'm fine.  Classroom training plus firearms training.

22  Q.  Okay.  And then how long is the classroom training?

23  A.  It's usually about---

24  Q.  Is there like a minimum amount of time?

25  A.  No, they just have to make sure they complete those one

CERTIFIED COPY        43

1  hundred and ten hours.

2  Q.  Okay.  So a hundred and ten hours of classroom training---

3  A.  Yes.

4  Q.  and two weeks in the car?

5  A.  Yes.

6  Q.  Okay.

7  A.  And continuously ongoing training.  I have them to go on

8  line and do training.

9  Q.  Okay.  And then during that classroom training ah, are

10  they, do they have a class in Arkansas Criminal Code?

11  A.  Yes, ma'am; that's taught by, that was taught by Officer

12  Fenton.

13  Q.  Okay.  Tell me about that class; what do they learn?

14  A.  They learn the Arkansas Criminal Codes, excuse me, what the

15  appropriate charge would be, when to charge someone and even

16  how to conduct an investigation leading up to charges.

17  Q.  Okay.  And does Alexander city, do y'all have a training

18  manual?

19  A.  Ah, I have a policy manual that covers everything.

20  Q.  Okay. I believe I received copies of your policy manual.

21  Ah, was that policy manual in effect in 2011?

22  A.  No, that one was not but another one was.

23  Q.  Which one was?

24  A.  The one that was ah, it was done by Allen Spears.

25              FUQUA:  Which one was done by Allen Spears?

CERTIFIED COPY

44

1          WALTERS:   The one that was there when I came

2   onboard in 2010.

3   Q.   So the one that in existence in 2010 that was in effect

4   2011?

5   A.   Yes, ma'am.

6   Q.   And the reason I'm asking because I remember we had a

7   conversation a long time ago where I asked you about a policy

8   manual and you said well, Alexander has one but it hasn't been

9   adopted by the city council?

10  A.   That's the one that's in place now---

11  Q.   Okay.

12  A.   because I was on a staff with twenty seven other chiefs of

13  police, this policy manual was adopted and approved by the

14  Arkansas State Police ah, the Attorney General's Office and

15  then it's three other agencies---

16  Q.   But that's the one you have now?

17  A.   Yes, uh-huh.

18  Q.   The one you have now wasn't in effect in 2011?

19  A.   That is correct.

20  Q.   Okay.   I just want to make sure that when I go back and

21  look I'm looking at the right one.

22  A.   Yes.

23  Q.   Is there anyway I'd be able to tell that I'm looking at the

24  right one?

25  A.   Oh, yeah.

CERTIFIED COPY

45

1    Q.   Does it have it on the coversheet?

2    A.   Yes, mine is totally different from the one from 2010.

3    Q.   Okay, so I'll be able to tell the difference; all right.

4    What about any oral policies; did you have any not written but

5    oral policies that you kind of gave to your deputies--what do

6    you call them your law enforcement officers?

7    A.   Law enforcement officers.

8    Q.   I'm just going to call them officers.

9    A.   That's okay.

10   Q.   Okay, thank you.  Do you have any oral policies that you

11   issued to your officers?

12   A.   Yes, ma'am.  I expect their cars to be clean at all times;

13   I expect their uniforms to be clean and pressed at all times; I

14   expect them to try to buy fuel in the City of Alexander; and I

15   also tell them about gossiping and talking really, things of

16   that nature.

17   Q.   Okay, all right.

18   A.   Those or oral.

19   Q.   The last of this question---

20   A.   It's okay.

21   Q.   All right.  Are the oral policies memorialized or written

22   anywhere?

23   A.   Some are in the new policy manual about the conduct of

24   officers; yes.

25   Q.   Okay.  I know those are oral but you might have written

CERTIFIED COPY    46

1  them down and placed them some were.  Do you know if that ever

2  happened?

3  A.  Because the next chief might come along and he might care

4  if they didn't wear long sleeve shirts in the summer time.

5  Q.  Did you have an oral policy regarding the ah, disposition

6  of offenders in certain offenses.  For example, ah, if you were

7  arrested for having ah, not having ah, car tags would you have

8  a policy stating that those individuals had to be detained in

9  jail?

10  A.  No, but I think it was a ah, not, not having automobile

11  license no that's, that's, I haven't seen that in anyplace.

12  Q.  No, no I'm just asking if you had any policy like that?

13  A.  No, no, no I did not and do not.

14  Q.  What about certain offenses for example ah, I'm trying to

15  think of offenses were you can write a citation or ah, drinking

16  in public.  Did you have an oral policy that if an officer

17  suspected someone drinking in public that they had to be

18  brought to jail?

19  A.  The would have to follow state law and that's what I have

20  instructed them to do.

21  Q.  Okay.  What is the state law regarding that?

22  A.  If a person is intoxicated in the public view and not on

23  his or her, I think it's domain and causing alarm I can't quote

24  it verbatim but that's basically it.

25  Q.  Okay.  Do they have to be, because I know sometimes and I'm

CERTIFIED COPY

47

1  thinking college days you know like in Fayetteville if someone

2  drinking in public or something, you know, they would just get

3  written citation as opposed to being hauled off to the

4  Fayetteville slammer?

5  A.  Okay.  I let them use their on discretion if it's like the

6  first time a person is not, you know, causing a problem

7  resisting and, you know they can but if a person is being

8  beleaguerant and causing public alarm, take them to jail, yes.

9  Q.  Yeah, but I'm just saying do you have a policy like ah,

10  drinking in public had to be carded down to jail?

11  A.  No, I don't have that, no ma'am.

12  Q.  Okay.  Do you have any policy regarding ah, officers

13  turning on their blue flashing lights?

14  A.  Okay, in activating yes---

15  Q.  Yes---

16  A.  there is a policy for that, yes.

17  Q.  okay.  What's that policy?

18  A.  Ah, if it's ah, creating a hazard if you stop at someone

19  and you stop them on a courtesy policeman blue lights must be

20  on, if you stop anybody basically for anything your blue lights

21  have to be turned on so people can visually see that you are

22  the police.

23  Q.  Okay.  And is these a written policy or an oral policy?

24  A.  It's written, it's in the policy manual.

25  Q.  The old one?

CERTIFIED COPY

48

1    A.  It's in the old one too, yes but it's definitely in the new

2    one.

3    Q.  Have you ever received any complaints about officers not

4    turning on there blue lights?

5    A.  Yes, ma'am but it was prior my administration.

6    Q.  Okay.  So how did you receive the complaints?

7    A.  They came in a told me about it after.

8    Q.  Okay.  So what did you do after people complained?

9    A.  I told them I would look into it---

10   Q.  Okay.

11   A.  but and I also explained to them, you know that happened

12   prior to my administration and I couldn't go back and

13   investigate something I didn't have the information on.

14   Q.  Correct, but did you do anything like say, look I received

15   to your current officers such as I received complaints this

16   make sure this happens.

17   A.  Oh, I talk to my officers about the procedures almost

18   weekly it's just it's ongoing you have to do that in a small

19   town with a small amount of officers.  Where I came from at

20   Little Rock I had a 164 out here I have six and we would have

21   in service training in Little Rock and I conduct informal in

22   service training with my officers in Alexander.

23   Q.  So you officers would have known that you expect the blue

24   lights to be on?

25   A.  Yes, ma'am.

CERTIFIED COPY

1   Q.   All right.   Did you have oral or written use of force

2   policy?

3   A.   I have a written policy yes, ma'am.

4   Q.   That was in affect, when I ask you these things I mean all

5   the policy or whatever that would in affect 2011?

6   A.   Yes, ma'am that's in the old policy manual because I read

7   it I know it's there.

8   Q.   Okay, tell me what is the use of force?

9   A.   Ah, I can't quote it to you verbatim it's my job---

10  Q.   I'm not going to ding you if it's not verbatim but just

11  generally?

12  A.   Use of force if, if the officer feel threaten with himself

13  or someone else and they have to control him or her and you see

14  a need to prevent an escalating, you know, go ahead an use

15  force if your life is going to be in danger or someone else.

16  Q.   Okay.   Well tell me about the permissible force because

17  there's ah, what's the word continuum force---

18  A.   Yeah, continuing force, yeah.

19  Q.   so tell me about the continuum?

20  A.   I have trained my officers to try to use the minimum force

21  necessary to affect and arrest.   And they know that's what I

22  expect and if a person, you know goes beyond that use of

23  continuum force and if an officer is struck or is striking

24  someone, I'll give you an example, a lady was being attacked by

25  her boyfriend an officer got called and he continued to fight

50

**CERTIFIED COPY**

1  his girlfriend and when the officer tried to get him off her he

2  turned around and struck the officer and that's, that's if

3  they, you know, he had to use force to keep him from getting

4  hurt as well as the victim.

5  Q.  So what, so what is the, well put it like A, B, C, D or 1,

6  2, 3 on the continuum.  What's number one?

7  A.  Number one is verbal.

8  Q.  So number one is not pepper spray?

9  A.  No, no I always teach them to try to talk to them first

10  then pepper spray is second---

11  Q.  And then what's third?

12  A.  Third is whatever is necessary to affect the arrest.

13  Q.  And then what's fourth?

14  A.  Ah, fourth is the ultimate is deadly force.

15  Q.  Okay.  And then ah, are the officers, are all your officers

16  trained in this policy?

17  A.  Yes, ma'am.

18  Q.  You think they're all aware of the policy?

19  A.  Oh, yes ma'am.

20  Q.  How do you know you seem so sure?

21  A.  Because I asked them about it, if they have questions about

22  it when I have routine meetings with my officers I ask them

23  about things like this.

24  Q.  Did you ever ask Jeff Watson?

25  A.  No, I did not.

CERTIFIED COPY

51

1  Q.  Why not?

2  A.  I just didn't have an occasion to because he was working

3  nights most of the time and I would be in my office between

4  five and six, six-thirty.

5  Q.  So you never found out if Mr. Watson was aware or knew the

6  Use Force Policy?

7  A.  Yes, because that was taught to them as a Reserve Officer

8  and plus my FTO my Field Training Officer instructed them and

9  they signed off that they've been schooled on Use of Force.

10 Q.  So you feel certain that he did know the use of force

11 policy?

12 A.  Yes, she did.

13 Q.  But you never asked?

14 A.  I did not ask him.

15 Q.  But you've asked other officers?

16 A.  Yes.

17 Q.  Okay.

18 A.  I haven't all of my officers but I recently asked some of

19 them, especially my new officers.

20 Q.  Is Jeff Watson a new officer?

21 A.  Fairly new; yes.

22 Q.  Did you ever ask Mr. Blankenship?

23 A.  No, I didn't because he was a reserve officer.

24 Q.  Okay.  I'm going to hand you this, I guess, Biased Law

25 Enforcement Practices.  Thank you Ms. Cobb.  Tell me what is

CERTIFIED COPY

52

1    this policy?

2    A.   Biased Law Enforcement Practices.

3    Q.   Where did it come from?

4    A.   This was on board when I came on and this is part of the

5    old policy manual.

6    Q.   Okay.  So this would be the policy manual in effect?

7    A.   Yes, it is.

8    Q.   In 2011?

9    A.   Yes.

10   Q.   Okay.  So they're not numbered but I guess the third page

11   maybe.

12   A.   Okay.  On the back or on the front?

13   Q.   Ah.

14   A.   Just tell me the first line on that.

15   Q.   E, Racial profiling.

16   A.   Okay.

17   Q.   It says training ah, it says number 2, it says there in an

18   annual in-service training.  Do you know if that in-service

19   training was done in 2011?

20   A.   2011; yes, ma'am because by state law all officers have to

21   attend a racial profiling seminar--

22   Q.   And how would that---

23   A.   and if they don't then I have to answer why.

24   Q.   How do you document that the officers has attended this

25   seminar?

1   A.   It's in their personnel files each officer has that in

2   their personnel file that is conducted each year.

3   Q.   Okay.  And I'm asking you because I didn't see anything

4   reflected in Jeffery Watson's personnel's file?

5   A.   Yes, he has racial profiling classroom training as well and

6   I even have them to go on line after they have it there in the

7   office.

8   Q.   Okay.  So where in the personnel file would that be

9   reflected?

10  A.   Just inside the personnel file.

11  Q.   Is there a certificate?

12  A.   Yes, ma'am.

13  Q.   Okay.  If there's no certificate or other indication in Mr.

14  Watson's personnel file what would that mean?

15  A.   That means it's been misplaced but you can rest assured I

16  can find it.

17  Q.   Is there any independent way to check or verify it?

18  A.   Through stand--Arkansas Minimum Standards.

19  Q.   Do you send their names in after they attend this session?

20  A.   Yes, ma'am, you have to.

21  Q.   Okay.  So again if I check with standards I'll see when Mr.

22  Watson---

23  A.   Yes, ma'am.

24  Q.   took this class?

25  A.   Yes, ma'am.

CERTIFIED COPY

54

1  Q.   Okay.  Do you know who conducted that class?

2  A.   Oh, it's different ones ma'am.  Sometimes I send them to

3  Saline County and sometimes I use CJI, Arkansas Criminal

4  Justice Institute commonly called CJI, they have instructors

5  and I send them to them and they also have an on-line training

6  I send them to because Alexander had a racial profile lawsuit

7  successfully filed against them and me being a minority, I make

8  sure that this does not happen.

9  Q.   Okay.  Would you flip one more page to a big C, Citizen

10 Complaints of Biased Law Enforcement Practices?

11 A.   Okay.

12 Q.   Have you ever received any complaints of biased law

13 enforcement practices?

14 A.   No, ma'am; not since I've been chief.

15 Q.   Did Mr. Doss ever complain of biased law enforcement

16 practices?

17 A.   Not to me; no, ma'am.

18 Q.   Do you know if he ever submitted any complaints?

19 A.   This young man?

20 Q.   Yes.

21 A.   And by the way I never knew him until just now.

22 Q.   I forgot, I'm sorry; this is Christopher Doss.

23 A.   I didn't know what he looked like, I've only seen him off

24 distance.  Not from him; no, ma'am.

25 Q.   Okay.  I'm going to talk---

CERTIFIED COPY 55

1          WALTERS:  Do you want this back or do we also

2    keep it?

3          FRAZIER:  No, if we can do that as an exhibit

4    Ms. Cobb.

5          REPORTER:  Thank you.

6    Q.  I'm going to hand you a citizen's Complaint from

7    Christopher Doss to your attention.

8    A.  Okay.

9    Q.  And it's dated December 13, 2010.

10   A.  Yes ma'am.

11   Q.  Are of aware of this complaint?

12   A.  No, ma'am because you can check anyplace in any file that I

13   have anyplace you will always see my initials and a date

14   acknowledging it.

15   Q.  So you never received this?

16   A.  I've never seen this before; no, ma'am.

17   Q.  Okay.

18   A.  Question; you said that this young man gave me this form?

19   Q.  Well, I don't know if I can really answer questions.  I'd

20   have to ask Mr. Doss how you received that.

21   A.  There, he's sitting there.

22   Q.  It was delivered to the police department.

23   A.  Anything that is brought to the police department you will

24   find my initials and a date on it.  Not some but all that comes

25   to me.

CERTIFIED COPY

56

1  Q.  Okay.  Well, that just could have just been the copy that

2  they retained; that could have been the copy that was in their

3  files.

4  A.  Oh, okay.

5  Q.  So do you understand what I'm saying?

6  A.  I understand what you're saying.

7  Q.  So it might be somewhere floating around.

8  A.  Okay, no problem.

9  Q.  Okay.  But you say you've never seen it; we will move on.

10  I did not see any use of force reports ah, filed in the last

11  three years; have there been any use of force reports?

12  A.  Yes, Brad Williams had one at his station and that's when

13  he pepper sprayed someone.

14  Q.  Okay.  Is that it you can recall?

15  A.  Yes, ma'am.

16  Q.  Okay.  So just Brad Williams?

17  A.  That's the only one I can recall.

18  A.  Because I instruct my officers to use the, the minimum

19  force to make an arrest to, to avoid a ton of paper work but I

20  also insist that they be careful and not get themselves hurt.

21  But I, I strongly believe in not using force unless you just

22  have to affect an arrest.

23  Q.  And then what happened after ah, Brad use the pepper stray?

24  A.  He, the, the suspect was arrested.

25  Q.  Okay.  I mean did you investigate?