CERTIFIED COPY    58

1    A.  I'm referring to his father Mr. Doss.  He's filed several

2    lawsuits against the City of Alexander and the media didn't

3    present it the way I said it to them.  You can go back and play

4    the recording you'll see that's not exactly what I said.

5    Q.  Okay.  Tell me what you said?

6    A.  I said this family has filed numerous lawsuits against the

7    City of Alexander and the bottom line I don't know these people

8    hardly at all.  I don't have anything to grind with them

9    nothing.

10   Q.  Okay.  How many lawsuits does the family have against the

11   city?

12   A.  The family filed one because a truck was parked in front of

13   their resident.  I, it seems like it's two of them I have to

14   think about it that was the last one if I can remember.  As a

15   matter of fact you represented the family with that one.  Ah---

16   Q.  I did and I won.

17   A.  I, I always like to be honest I can't remember that; I

18   think it's been at least two or three.

19   Q.  Okay.  What were they concerning?

20   A.  They weren't concerning police.

21   Q.  Okay, but the city?

22   A.  Yes.

23   Q.  Okay.  So it said ah, in the news thing their primary

24   complaint is the use of excessive force on one man's own front

25   yard.  And then you remarked this is the same family that has

CERTIFIED COPY

1  made these same allegations time after time after time.    So

2  then which allegations were you referring to in your statement?

3  A.   I guess the ones that I'd heard from the street and I

4  but---

5  Q.   Okay.  Which one did you hear from the street?

6  A.   I don't because I don't pay any attention to that whole

7  bunch of mess.

8  Q.   I know but which ones did you hear?

9  A.   About he was being chased by Bryant PD and wrecked his car

10  and then the Alexander PD was out laughing something to that

11  extent and my guys weren't even around.  These are the kind of

12  allegations that I've heard about.

13  Q.   Anymore allegations?

14  A.   Something happened to him in supposedly in the jail and

15  something that they were high-fiving and Alexander was there

16  with them you know.  If someone has a complaint about one of my

17  officers you can take it to the bank, if someone comes to me

18  with something like this in writing like this I'm going to

19  investigated it with my initials on it showing upon receipt

20  that I got this.

21  Q.   So when you heard these allegations did you investigate at

22  all?

23  A.   No, because I've heard so, Alexander is a small town and

24  you hear everything if I investigated everything I hear I will

25  never get anything done.

CERTIFIED COPY

60

1  Q.  Well do you heard a lot of allegations regarding your

2  officers?

3  A.  Not, not about the police department, no ma'am.

4  Q.  No, I'm talking about the police  department---

5  A.  No, no---

6  Q.  because the---

7  A.  no, no uh-uh Alexander---

8  Q.  one of the Alexander, one of the allegations you just said

9  involved the police department.  So my question is if you hear

10  allegations regarding the police department do you investigate?

11  A.  It depend on the validity of what I think is a true and

12  bonafide complaint.  I've heard that the officers shot somebody

13  in the back out there and you know got away with it.  You think

14  I'm gonna (sic) go and investigate that, no.

15  Q.  That's one that you might want ah, to investigate.

16  A.  When I'm sitting right there and they tell me who was shot

17  and he's walking down the street, ma'am.

18  Q.  Okay.  Well then you don't need to investigate that?

19  A.  That's what I just said, yeah.  I'm investigate everything

20  I hear.

21  Q.  Okay.  Ah, what if you for example on this one and I guess

22  the news report said that the officers came back and tazed him

23  while he was on the ground and then it ah, it says that the

24  city and the police department say they take these allegations

25  with a grain of salt.  So did you take those allegations with a

CERTIFIED COPY

61

1    grain of salt?

2    A.   Okay, now let me, where, where is that because---

3    Q.   I know it doesn't say you specifically but I'm asking you

4    if you took these allegations with a grain of salt?

5    A.   which ones?

6    Q.   Ah, that the officers came back tazed him once and then a

7    couple of times?

8    A.   Yes, because I investigated it because I had the file, you

9    know, I, I sign off on every incident report that comes through

10   Alexander.   I have the information from the officers about what

11   had happened so that was my investigation right there.

12   Q.   Okay.   But the officers might not always be truthfully, is

13   that correct?

14   A.   That's correct also the victims, the allege victims cannot

15   always be true.

16   Q.   Correct, absolutely---

17   A.   Uh-huh.

18   Q.   but if you hear there might be another side of the story.

19   do you investigate?

20   A.   I, I investigate the information that's brought before me.

21   Q.   So you're telling me your investigation consisted of

22   reading the officers' report?

23   A.   I---

24   Q.   In this, in this, in this particular incident?

25   A.   I went out to the scene that, that following morning.

CERTIFIED COPY

62

1  Q.  Okay and then what happened?

2  A.  That was it I didn't see any signs where that was a real

3  physical alteration, you know, and I was looking for anything

4  that would have been in the report about what had happened.

5  Q.  Oh, well Chief what would you have seen?

6  A.  That's why you go out there to see.  You can see scuff

7  mark, you can see torn clothing, things of this nature.  You

8  can't sit in your office and make those decisions.

9  Q.  Did you see any scuff marks in the grass?

10  A.  No, ma'am.

11  Q.  Did you see any ah, weapons in the grass?

12  A.  No, ma'am.

13  Q.  Did you see any piece of wood in the grass?

14  A.  That's what I was looking for, no ma'am I didn't.  I did

15  see one quite a distance from there.

16  Q.  Okay, but no piece of wood?

17  A.  It was a piece of wood but ah---

18  Q.  It was a distance from there?

19  A.  Yeah, it was about 10 or 15 yards, yeah.

20  Q.  Okay, but not where the scuffle happened?

21  A.  It was close to it yes, ma'am.

22  Q.  Okay.  How close?

23  A.  I would say bear in mind it was say the next morning---

24  Q.  Uh-huh.

25  A.  I say, it was about, about that long and it was about 10 or

CERTIFIED COPY

63

1   15 feet from where the alleged incident happened.

2   Q.  Okay.

3   A.  So I could not conclusively say that that was the weapon

4   that was involved and I'm not going to make that lie or make

5   that determination.

6   Q.  You were told that there was a weapon involved?

7   A.  Yes, that's why I went out there.

8   Q.  Okay.  Did you see any weapons?

9   A.  I saw that piece of wood.

10  Q.  Okay.

11  A.  It was like a stick.

12  Q.  It was like a bar-be-que stick for a grill?

13  A.  No, there was not, I don't know what a bar-be-que stick is

14  believe or not.

15  Q.  Me either, I'm asking.

16  A.  It was just a stick of wood not too far from a fire

17  extinguisher, not a fire extinguisher but a grill of some type.

18  Q.  Okay.  Was it like a tree branch?

19  A.  Umm---

20  Q.  Was it a four-by-four; that's what I'm asking?

21  A.  I don't remember it being a four-by-four, I would have

22  remembered lumber; this was a stick of some type.

23  Q.  Like a stick that fell off a tree or a piece of wood?

24  A.  Yes, indeed.

25  Q.  Okay.

CERTIFIED COPY [64]

1   A.   Yeah.

2   Q.   A tree branch kind of stick.  How big is this?

3   A.   Fourteen inches.

4   Q.   Thank you.  I'm not very good at guessing stuff like that.

5   A.   That's okay.

6               FRAZIER:  Okay.  I'm going to give you these

7   statements, I think y'all have those already.

8               REPORTER:  Are any of these going to be exhibits

9   ma'am?

10              FRAZIER: All of them.

11              REPORTER:  All of them; okay, thank you.

12  Q.   I show you the statements from Officer Blankenship and

13  Watson.

14  A.   I just have one from Blankenship.

15  Q.   Well,  I guess the next one was the incident report that

16  officer Watson prepared?

17  A.   Again, I state anything that comes before me---

18  Q.   Yes, that's the next page.

19  A.   you will see my initials on it.  And on the front page of

20  this document here you will see my initials on it.

21  Q.   Okay.

22  A.   Let me read what the first one says though.

23  Q.   Okay.

24  A.   Yes, ma'am; I read it.

25  Q.   Okay.  Do you know why Officer Blankenship submitted a

CERTIFIED COPY

65

1    statement regarding this arrest?

2    A.  He has to.

3    Q.  Why?

4    A.  Because he was on the scene of an incident and I have my

5    officers to write a report on any and everything they do.  Not

6    just this one---

7    Q.  Did you tell them to?

8    A.  Ma'am, that's part of my instructions to my officers to

9    generate a report on any and everything they do no matter how

10   inconsequential it is, I want a report made.

11   Q.  Okay.  The answer is no, you didn't have to ask him to do

12   it he just did it?

13   A.  A part of his job.

14   Q.  It is a part of his duties.

15   A.  Yes, ma'am.

16   Q.  And so the reason I'm asking you did you read both of

17   these?

18   A.  I just read the second page of that.

19   Q.  I mean at the time you said you did your investigation by

20   reading these two reports, correct?

21   A.  Yes, ma'am.

22   Q.  Is that correct?

23   A.  Yes, ma'am.

24   Q.  Okay.  And what is your policy regarding arrest?

25   A.  Okay, what kind of arrest?

CERTIFIED COPY                         66

1   Q.  You have different policies regarding different types of

2   arrest?

3   A.  Well like yes, ma'am, if he arrest someone for DWI that's

4   totally different.  You have to advise them of their rights,

5   take them to get a breathalyzer, if they refuse what you have

6   to sign and do.

7   Q.  Okay.  What about an arrest for disorderly conduct?

8   A.  Disorderly conduct they would take them to jail and fill

9   out the report, The Arkansas Disposition Report, which is

10  called an arrest report, come back and generate a file and give

11  it to me for my review.

12  Q.  Uh-huh.  So under Alexander City Policy and this is

13  honestly something I didn't understand when I first saw this

14  ah, I'm unfamiliar with it.  Like take for example an officer

15  sees someone committing a crime, do they generally stay on

16  scene and arrest them?

17  A.  It depends on the circumstances if---

18  Q.  Uh-huh.

19  A.  and I teach my officers to be safe number one.  If they get

20  to an environment and it's hostile I tell them to call for a

21  backup immediately.

22  Q.  Okay.  What, when you read these two reports what was your

23  take on what had happened with Mr. Doss?

24  A.  My take on it is that's what happened.

25  Q.  Well, they don't necessarily say the same thing.

CERTIFIED COPY

1  A.  Well, the ones that I'm reading basically did.  Where is

2  there a discrepancy in the two?

3  Q.  Do you think the two basically say the same thing?

4  A.  Yes, from what I can understand; yes, ma'am.  That's my

5  interpretation.

6  Q.  Okay.  So you had no questions about what had happened; you

7  were satisfied?

8  A.  Oh, I talked to the officers the next day.

9  Q.  What did Officer Blankenship tell you?

10  A.  The same thing he said here.

11  Q.  Which is what?

12  A.  That he came as a backup to Watson because Watson had

13  called for a backup because everybody knew that Mr. Doss will

14  fight you and again I would reiterate don't escalate a problem

15  if you don't have to.

16  Q.  Okay.  What else did Officer Blankenship say?

17  A.  Just basically what was in here.  He got there and Mr.

18  Doss, you know, it was something about some children, I

19  remember that much and ah, and it escalated from there.

20  Q.  Did Blankenship ever say that it deescalated?

21  A.  I didn't read that in here.

22  Q.  No, no, no, I'm not asking you what you read I'm asking

23  what he told you?

24  A.  Oh no, he didn't tell me it deescalated.

25  Q.  Did he tell you that he calmed Chris down and then everyone

CERTIFIED COPY

68

1   left?

2   A.  He said he was trying to calm Chris down; I think he said

3   that in here.  By the way this is what, two years ago here.

4   Q.  I understand.

5   A.  Watson did not say anything to Mr. Doss once I started

6   trying to calm him down.  This is the way I teach my officers

7   to react to an incident like this; try talking to the person---

8   Q.  Okay and then---

9   A.  and when that doesn't work then you go to the OC sprays.

10  Q.  Okay.  And it says when Officer Watson got in his vehicle

11  and left, I was thanked by Mr. Doss.  Does that seem like the

12  situation had deescalated?

13  A.  And I was thanked by Mr. Doss?

14  Q.  Uh-huh.

15  A.  Where is that?

16  Q.  Two paragraphs down.  You read this, correct?

17  A.  I did and yes, my initials are on it.  I, I, I don't see

18  the words that he thanked him.  You say it's in the second

19  paragraph--read it.

20  Q.  When Officer Watson got in his vehicle and left, I was

21  thanked by Mr. Doss--

22  A.  Oh okay, that's not the second paragraph; okay.

23  Q.  No, no, after the paragraphs we just read two paragraphs

24  down.

25  A.  Yeah, and he said I didn't have any problem with me, just

69

CERTIFIED COPY

1    Officer Watson.

2    Q.  Yeah, yeah.  So my question was when it said Officer Watson

3    got in his vehicle and left; I was thanked by Mr. Doss.  Does

4    that sound like the situation had deescalated?

5    A.  Ah, it had calmed down, yes; uh-huh.

6    Q.  And Officer Watson had left?

7    A.  Yes, uh-huh.

8    Q.  Okay.  And then if we look at Watson's thing it said Saline

9    County Deputy arrived on scene and the suspect was still

10   threatening me and the county deputy so the deputy order the

11   suspect to get on the ground.

12   A.  Okay.

13   Q.  Do those seem like they're talking about the same incident?

14   A.  Ah, yes, ma'am ah, it's in one of the reports that I don't

15   have before me after they were leaving Mr. Doss ran out into

16   the street and was yelling and cursing and threatening to that

17   effect that's why---

18   Q.  I haven't seen that report, which report would that be?  I

19   haven't seen any report that says that.

20   A.  This is just two, this is just two, it would be more

21   reports than this.

22   Q.  That's all the reports I've seen.

23   A.  Okay.  That would be---

24   Q.  Is there another report that says that?

25   A.  There should be a summary of facts report.

CERTIFIED COPY

70

1   Q.   What report would this be?

2   A.   Summary of facts.

3   Q.   And where would that report be?

4   A.   It should have been in, it would be in the file, you know.

5   Q.   Well, I guess John's not here to ask but could you go back

6   and find that report?

7   A.   Yes, ma'am.

8   Q.   And what did that report say?

9   A.   Summary of facts.

10  Q.   No, no, what does the report say?

11  A.   That ah, when they were leaving Mr. Doss was out in the

12  streets screaming and cursing and yelling.

13  Q.   And who wrote that report?

14  A.   I'm sorry?

15  Q.   Who wrote that report?

16  A    It would have had to have been Officer Watson.

17  Q.   Okay. Because Officer Blankenship in his report doesn't

18  mention anything about Mr. Doss going back in the street.

19  A.   I don't see it on this initial report.

20  Q.   In facts it says that they talked with Officer Watson and

21  at the end of the conversation, we all went back to his

22  residence.

23  A.   I was the last one to get there, before I got around the

24  trailer to see everything, I heard some shouting and then I

25  heard the sound of the taser being fired.

CERTIFIED COPY

71

1   Q.  Correct but there's nothing indicating that Mr. Doss was

2   back into the street.

3   A.  Ah, that's the only way they could have tazed him when he

4   was in the street.

5   Q.  So it's your information that they tazed Mr. Doss in the

6   street?

7   A.  Or in the yard--ah, he was not in his home is what I'm

8   saying; he was in the purviews of what had happened.

9   Q.  So when you investigated the crime--not the crime, excuse

10  me, when you investigated the next day which area did you

11  investigate?

12  A.  The one right in front of his mobile home.

13  Q.  Would that be his front yard?

14  A.  It's, his home sit like this at the street.

15  Q.  Uh-huh.

16  A.  and this is the street out here and I drove right around

17  here.

18  Q.  Okay.  And you say you got out and looked?

19  A.  I did not go onto the property because I didn't want

20  anything to escalate.

21  Q.  So you just investigated--define curvilinear for me?

22  A.  The area around the house, yeah; the home right in front of

23  it.  I would not go on his property.

24  Q.  Okay.  So where did they tell you that they tazed Mr. Doss?

25  A.  Well, my officer didn't taze him Ms.---

CERTIFIED COPY

72

1  Q.  Where did they tell you that he was tazed?

2  A.  On his person or at the scene?

3  Q.  At the scene.

4  A.  I think they said it was near the street; bear in mind

5  that's the Sheriff's Department report there.

6  Q.  I didn't see that Sheriff's Department report.

7  A.  Because my officers don't even carry tasers.

8  Q.  Correct.

9  A.  And I don't really, I let the Sheriff's Department handle

10  that investigation; I don't want mine contaminated with their

11  and theirs contaminated with mine.

12  Q.  Then how far back from the street was the bar-be-que pit?

13  A.  I'd say about thirty feet maybe.

14  Q.  What's his first name; can you fill that in?

15  A.  Lieutenant Walls.

16  Q.  And then you could see the bar-be-que pit?

17  A.  Yes, ma'am.

18  Q.  Okay.

19  A.  And it was not a pit it was like a grill.

20  Q.  Yes, grill, I'm sorry; okay.  And did it say in this report

21  that I haven't seen that he was arrested in the street?

22  A.  I don't recall what it said when he was arrested for

23  because once a taser has been deployed the person deploying the

24  taser has to do the report.

25  Q.  But you've seen this report?

CERTIFIED COPY

73

1    A.  No, that was with the sheriff department.

2    Q.  Okay.  And I'm sorry help me again why do you think he was

3    arrested and detained in the street?

4    A.  Because he was screaming and yelling and cursing in the

5    street.

6    Q.  And this was based on the testimony Officer Watson told

7    you?

8    A.  Watson, yes.

9    Q.  Did you ask Blankenship about it?

10   A.  No, I did not because Watson was the primary officer

11   assigned to the call.

12   Q.  Did you talk with Blankenship about it?

13   A.  I asked him what happened and he told me basically this

14   right here.

15   Q.  And you say this you mean his report?

16   A.  His report yes, ma'am.

17   Q.  Did Blankenship every ah, corroborate Watson's story about

18   Mr. Doss being in the street?

19   A.  I didn't ask him so I don't know but I can ask him and get

20   that information to you.

21   Q.  No, don't ask him now.

22   A.  Hind-sight is 20/20.

23   Q.  Okay.  So what was the investigation that you did?  You

24   just read your reports and talked to Watson?

25   A.  Yeah, and I talked to ah, ah, Blankenship.

CERTIFIED COPY

74

1   Q.  But you didn't ask Blankenship about anything in Watson

2   report?

3   A.  No, you don't let two officers get together and tell you

4   the same thing you separate them and the both sides of the

5   story.

6   Q.  I'm just asking because Blankenship never mentioned

7   anything about the street?

8   A.  Maybe he wasn't there to see that I don't know I can't

9   answer that.

10  Q.  And so I'm thinking one of my officer was like he's in the

11  street and the other officer doesn't mention the street.  You

12  just don't ask?

13          ELLIS:  Object to the form---

14  A.  The other officer didn't say---

15          ELLIS:  ask and, object to the form ask and

16  answered to many times.

17  Q.  And then what, you just don't ask?

18  A.  If the officer hadn't gave to me a detail report of what he

19  saw.  I cannot tell you what he had seen because he also have

20  to get me reports that, at the end of the shift.  So I can't

21  tell you what, what Watson, what Blankenship saw.

22  Q.  Okay, thank you.  I'm going to ask you about this memo---

23  A.  Again you will see my initials on anything that comes to me

24  or from them.

25  Q.  I'm just curious it said all officers are required to make

CERTIFIED COPY    75

1    twelve contacts per shift.  Do you not know what I'm talking

2    about you've seen it ASAP but I know that from Derrick Jackson-

3    --

4    A.   Yeah, that's from him.

5    Q.   but what does that mean I'm just curious?

6    A.   To at least go out and talk to people make twelve contacts

7    per shift because Alexander had suffered from such a horrible

8    reputation.  I want my officers to get out and talk to, it's

9    called citizen, C-O-P, Citizen Or Any Policeman.

10   Q.   Okay.  What kind of reputation did Alexander have?

11   A.   That they were corrupted.

12   Q.   You mean the City of Alexander or the police department?

13   A.   The police department that's all I deal with I don't deal

14   with nothing else with the ah, city.

15   Q.   Why did they have that reputation, do you know?

16   A.   Corrupt police officers that was proven in federal court

17   I'm just not speaking that.

18   Q.   Okay.  Are any of those officers still on the force?

19   A.   None, none zero.

20                FRAZIER:   Okay.  And that one doesn't need to

21   be.

22                REPORTER:   This one doesn't?

23                FRAZIER:   Correct.

24                REPORTER:   Thank you.

25                FRAZIER:   Just asking, trying to get

CERTIFIED COPY

76

1   information.

2   Q.  Ah, Jeffrey Watson underwent a psych evaluation, is that

3   correct?

4   A.  Yes, ma'am.

5   Q.  Do you know where that psych-eval (sic) is?

6   A.  It's in his personal file.

7   Q.  I didn't see it in his personal file.

8   A.  Okay.  I can get it for you.

9   Q.  Okay.  Thank you.

10  A.  Or if you feel comfortable you can get it from Dr. Brad

11  Williams.

12  Q.  I don't know if I'm authorized to do that.

13  A.  Yes ma'am, it's public record they may redact a lot of his

14  personal information date of birth and social security number.

15  Q.  Or if you can just give it to ah, John Wilkerson---

16  A.  Okay.

17  Q.  that and that other report that I haven't seen.

18  A.  A statement of facts report?

19  Q.  Yes, yes.  And then I'm going to ask you about this FOI

20  request that I say ah, that I saw ah, I received in the

21  discovery from Mr. Wilkerson.  I guess from Mr. Aaron submitted

22  it to the Record Clerk.

23  A.  He submitted our files on the day it occurred.

24  Q.  Okay.  I'm sure he did.  Ah, and in it there are notes next

25  to it?

1    A.  That's mine, those are mine---

2    Q.  Your notes---

3    A.  print, yes---

4    Q.  awesome---

5    A.  I, I wrote these here.

6    Q.  good so we'll know.  Ah, right does, is the check marks

7    things that you found and turned over?

8    A.  Yes.

9    Q.  Okay.  On it, it has a check mark next to the audio from

10   the body microphones?

11   A.  Okay.  Which one then, okay number four?

12   Q.  Number five?

13   A.  Number five?

14   Q.  Yes.

15   A.  That, that was sub, submitted too.

16   Q.  Okay, the audio from the body mikes?

17   A.  That was, no from the in-car camera.

18   Q.  Okay, that was number four?

19   A.  Okay, that's it, okay.

20   Q.  Do you know where that audio might be?

21   A.  Okay, I was thinking that this was the same thing though

22   that's my mistake.  I thought you wanted the, see it doesn't

23   have audio at the very top it says video, because you can have

24   in-car cameras with just, just the, the focus and not audio.

25   Q.  Okay.  So you never had any audio from body mikes?

CERTIFIED COPY

78

1    A.  Now my officers do wear body mikes yes, but I don't have

2    one for this.

3    Q.  How are they activated?

4    A.  By pushing a button.

5    Q.  Okay.  Have you ever heard any audio?

6    A.  Oh, yes ma'am.

7    Q.  From this incident?

8    A.  Oh, no.

9    Q.  Have you ever seen any video from this incident?

10   A.  Yes, ma'am.

11   Q.  What did the video show?

12   A.  Showed ah, Mr. Doss in the backseat of the patrol car.

13   Q.  Have you seen anymore video?

14   A.  That's the only one I've seen.

15   Q.  Okay.  I'm asking because I heard that there was ah, video

16   from the actual stop and seizure?

17   A.  I don't have it---

18   Q.  You've never seen it?

19   A.  never, and never, and never saw one.

20   Q.  Okay.  And don't have, do you have any ah---

21            FUQUA:  Can I make a request while, while we're

22   on this subject ah, in that ah, video in the car of Mr., Mr.

23   Doss said it repeatedly that he had it all on video ah, at his

24   house he had video.  Ah, so I'm making a request that he

25   provide his video too.

CERTIFIED COPY    79

1              FRAIZER:  I think we covered this in his

2    deposition were he said he was just mad and told the officer

3    that there was a video remember that?  Remember someone asked

4    about that?

5              ELLIS:  I don't have to answer question?

6              FRAZIER:  Well I don't specifically remember

7    that.  You don't have answer the question.

8              ELLIS:  I'm teasing I don't remember it.

9              DOSS:  It's, it's ah, I remember answering that

10   question in my deposition about the video.

11             FRAZIER:  And was there any, did you have any

12   video?

13             DOSS:  It, it was no video.  It was just ah, for

14   my safety just were they wouldn't, wouldn't go any farther from

15   what they had already done that's why I told them that.

16             FRAZIER:  I think I remember on the question.

17             ELLIS:  Okay.  All right, there are none is

18   that's what I heard.

19             FRAZIER:  Yeah, that's what I'm hearing too.

20             ELLIS:  Yes, there are none.

21             FRAZIER:  Correct.

22             ELLIS:  I guess we had no bananas, okay.

23             FRAZIER:  Correct, if I had bananas I would have

24   given you said bananas.  I wish we all wouldn't be here if I

25   had said bananas but at last that would be a lot easier.

CERTIFIED COPY

80

1    Q.   Okay.   Agreements in reference to Judicial Transport

2    Request for Assistance, are there any written agreements in

3    reference to Judicial Transport Request for Assistance in this

4    matter?

5    A.   I don't have any of them but it was always relayed to me.

6    I have seen one at one of the chief's meetings.

7    Q.   Where have you seen?

8    A.   It was right after I first came on as chief.

9    Q.   Okay.   Was this a written document or did they tell you

10   about it?

11   A.   It was like ah, it was from the sheriff department I

12   remember that much but I don't have one to answer your question

13   I don't have one in writing.

14   Q.   Okay.

15   A.   I do know one exist.

16   Q.   And what's your understanding to this agreement?

17   A.   Whenever we need assistance, I have a small agency---

18   Q.   Uh-huh.

19   A.   and when we need assistance we call for Saline County to

20   come and assist us.   If, if Saline County is having a problem

21   they will call us for assistance.

22   Q.   Okay.

23   A.   That's the agreement that I have with the sheriff the same

24   thing is applicable with the Pulaski County sheriff.

25   Q.   Okay.   And do you have ah, I know that we kind of touched

CERTIFIED COPY

1  on this before, a relationship with the Doss'?

2  A.  No, ma'am because I don't know anything about these people

3  but for some reason they have, it stems back from before I even

4  came on as chief.  The Doss family is always had from what I

5  can hear like you say you hear they've always had problems with

6  City Hall and it just blend over and when I became chief they

7  just put me right into it.

8  Q.  So you don't think it's personal?

9  A.  I think so, yes.

10  Q.  You think it's personal with the Doss'?

11  A.  With me, yes uh-huh?

12  Q.  Did you ever get the impression that they were out to get

13  you terminated?

14  A.  Ah, it has cross my mind, yes.

15  Q.  Did you ever hear anything to that effect?

16  A.  No, no.

17  Q.  So what lead you to kind of think that?

18  A.  Just by like, like the lawsuit about ah, that you

19  represented them on.  I didn't have an ax to grind with anybody

20  by the way both parties were angry with me because I would not

21  take sides.  I don't do that I don't, I don't jeopardize my

22  integrity for no one.  And I don't have anything negative about

23  this family.

24  Q.  So is it solely based on that lawsuit that you thought it

25  was personal against you?

CERTIFIED COPY

82

A.  Well that and yes.

Q.  That and what else?

A.  Just ah, things that come up in the counsel meeting, you know.

Q.  Like what?

A.  Why I won't, you know, why I was siding with the former mayor who hired me ah, ah, Johnson.  I didn't know, I didn't know anybody in Alexander when I became chief of, it, nobody.

Q.  Do you feel that the Doss' have an ax to grind against you?

A.  With the city and I'm part of the city.  You can't find a Doss anywhere to say that I was mistreated, ah I mistreated them, I was rude to them you won't find anyone can say that and be honest and truthful.  I even have gone out of my way just not to go on his property to look at the crime scene I stayed out on the street.  That's why I can't give you exact measurements.

Q.  Yeah, yeah, that's fine.  But do you think they have an ax to grind against you?

A.  I don't know just my personal option---

Q.  What do you think?

A.  yes.

Q.  Okay.

A.  I think that it's more directed toward the city and since I'm part of the city, so be it.

Q.  You ah, kind of had a rough time since you've been with the

CERTIFIED COPY

83

1  City of Alexander, would that be fair?

2  A.  Yes because, yes because I don't go along with what's wrong

3  and I'm not going to jeopardize my career, my professionalism

4  and my integrity and above all my honesty.

5  Q.  Okay.  Ah, were you forced to resign at one point?  Wasn't

6  there a break in your tenure?

7  A.  No, that was the former mayor ah, relieved me of duty.

8  Q.  Which mayor?

9  A.  Paul Mitchell.

10  Q.  Y'all had a couple of former mayors?

11  A.  Yes.

12  Q.  So Paul Mitchell relieved you of duty?

13  A.  Yes.

14  Q.  When was that?

15  A.  It was in 2011 and I was reinstated eight to zero by the

16  counsel and the citizens, apparently I had filled up the

17  courtroom even outside of the courtroom because I treat---

18                FRAZIER:  You can we take a minute and get some

19  water?

20                WALTERS:  That's fine, that's fine.

21                REPORTER:  Thank you, we may go off the record?

22                FRAZIER:  Sure, sure.

23                [A recess was taken at 1:00 p.m., proceedings

24  resumed at 1:13 p.m., to-wit:]

25                REPORTER:  We are on the record ma'am and you

CERTIFIED COPY

1    may continue.

2                    DIRECT EXAMINATION CON'T

3    Questions by Ms. Frazier Con't:

4    Q.  Thank you.  We were talking about your tenure at ah---

5    A.  Alexander.

6    Q.  thank you.  Ah, let's see you resigned no, no, no, asked to

7    resign?

8    A.  No, I was---

9    Q.  Relieved of duty---

10   A.  relieved of duty, yes.

11   Q.  relieved of duty and then city counsel meeting eight to

12   zero, got asked back?

13   A.  Yes.

14   Q.  Okay.  Since then have you received any complaints about

15   the police department or you management of the Alexander Police

16   Department?

17   A.  None whatsoever.

18   Q.  Okay.  What about ah, weren't there rumors regarding you

19   and Stacey Sykes?

20                    FUQUA:  And what?

21                    FRAZIER:  Stacey.

22                    WALTERS:  Syds

23                    FRAZIER:  Syds, thanks you.

24                    FUQUA:  Say it again?

25                    FRAZIER:  Rumors?

CERTIFIED COPY

1              FUQUA:  Oh, rumors.

2  Q.  Regarding you having a personal relationship?

3  A.  Yes.

4  Q.  Tell me about that?

5  A.  This young lady is, I'm a single man I will not date anyone

6  that's younger than my oldest baby, my oldest child.  That was

7  a Paul Mitchell and Brad Williams rumor and after that rumor

8  failed they said I had an affair with an 87 year old ah, ah,

9  court re--she was the treasurer.

10  Q.  So did you?

11  A.  Absolutely not.  I don't date employees and will not.

12  Q.  Okay.  What about ah, the rumors of I guess personal

13  relationship and/or ah, sexual harassment of Nancy Cummings?

14  A.  From me?

15  Q.  Uh-huh, yes.

16  A.  I've never heard that---

17  Q.  You never heard---

18  A.  other then, yes I did at, during the deposition at ah,

19  with, with Municipal League, no I'm sorry with the, with the

20  Saline County Prosecutor.  She asked me about that, that she

21  say is there a rumor.  I said hell I've never heard it before.

22  Q.  Okay.  So you've only heard it, that place?

23  A.  That was the only place I heard about Nancy.  And my answer

24  to that my deceased wife she weighed ah, 108, my second

25  girlfriend that, that, I'm sorry the wife that I divorced she