CERTIFIED COPY

86

1    weighed 106 and my current girlfriend weighs 105.  Nancy

2    weighed well over---

3    Q.  I've never seen Nancy so.

4                ELLIS:  Go with it, man.

5                FUQUA:  So you like them small and thin?

6                WALTERS:  And pretty.

7                WREN:  Strike all that from the record.

8                ELLIS:  I feel like this may get read back.

9                FRAZIER:  I just might need a laugh one day,

10   chief but no, we're fine.

11   Q.  So that's no?

12   A.  Absolutely, not.

13   Q.  Okay.  You mentioned depositions, how many depositions have

14   you given in the last two years?

15   A.  Two years it had been very few ah---

16   Q.  Okay, three years?

17   A.  ah, Brad Williams---

18   Q.  Brad Williams.

19   A.  ah, you, was it you with ah, his dad, Doss---

20   Q.  I don't believe we did depositions?

21   A.  I thought we did, okay.  Brad Williams, I guess that's

22   about the only one since I've been at Alexander.

23   Q.  Okay, so just Brad Williams?

24   A.  Yes.

25   Q.  And what is that lawsuit about?

CERTIFIED COPY

1   A.  He got a check, he received a check from the city.  He said

2   he lost it about ten months later he cashed the check that he

3   said he has lost and at that time I was still investigating the

4   theft from the City of Alexander---

5   Q.  Okay.

6   A.  and I got an arrest warrant for him signed by the

7   prosecutor from Pulaski County.  Paul Mitchell went to the

8   judge first of all to get the case dismissed and the judge

9   denied it.  He then went to the prosecutor and said that I had

10  no right and that the city did not want to prosecutor Brad

11  Williams and he even said that the Counsel had stated that they

12  would not prosecute him and that's, that's the opinion and I

13  can't elaborate on it anymore.

14  Q.  Feel free not to that's explained more than I wanted so

15  it's a civil lawsuit about, and you gave a deposition in that?

16  A.  Yes.

17  Q.  Okay.  And you know who the ah, Brad's attorney is, you

18  remember you might not remember?

19  A.  Yes, Reggie Cots ah, Coach, ah, Coke.

20  Q.  Okay.  And is Brad the person who trained ah, Blankenship

21  and Watson?

22  A.  He was an instructor, yes, uh-huh.

23  Q.  Okay.  And do then you said there wasn't lawsuit with

24  Patrick Thomas, Thompson?

25  A. No, no.

CERTIFIED COPY

1   Q.   Okay.   And then I'm pretty sure that I asked this but it

2   was your decision to hire Blankenship and Watson, correct?

3   A.   That's my decision, yes ma'am I made the hiring.

4   Q.   Okay.   You mention for one other officer, Patrick that

5   Chief Mitchell pressured you to hire Patrick?

6   A.   No, Mayor Mitchell.

7   Q.   Mayor Mitchell?

8   A.   Yeah, insisted that I hire Patrick.

9   Q.   Yeah, okay.   Did anyone insist that you hire Watson or

10  Blankenship?

11  A.   No, ma'am.

12  Q.   Did anyone recommend that you hire them?

13  A.   No, ma'am.

14  Q.   Okay.   And then at the time that Watson and, the time of

15  the incident, how many certified law enforcement officers did

16  you have?

17  A.   I think it was four.

18  Q.   And who were they again?

19  A.   Brad Williams, Fenton and Eric Staton and he went to work

20  for the sheriff, Pulaski County sheriff, I gave you the names

21  before.

22  Q.   Okay.   And I will go over them a few at a time you don't

23  have to remember again.   And then one more time Derrick

24  Jackson, weren't we talking about him?   Was there some incident

25  or something that happened with Derrick Jackson?

CERTIFIED COPY

89

1  A.  Not that I'm aware of---

2            ELLIS:  I'm sorry.

3  Q.  Before you hired him?

4  A.  I didn't find anything in his background.

5  Q.  Okay.  And you didn't find anything in Calvin Reeds

6  background?

7  A.  No, ma'am.

8  Q.  Did he resign or was he fired by Saline County?

9  A.  He who?

10  Q.  Calvin Reed?

11  A.  No, he resigned with good recommendation from his shift

12  supervisor.

13            FRAZIER:  I think I'm just about done; give me a

14  few minutes.  Let me look at my stuff; maybe someone else has a

15  question.

16            ELLIS:  You want us to go ahead while you're

17  looking?

18            FRAZIER:  Yes, please.

19            ELLIS:  I've got a couple of real quick, little

20  housekeeping matters.

21                      CROSS-EXAMINATION

22  Questions by Mr. Ellis:

23  Q.  Chief I'm George Ellis, I represent Mr. Babbitt in this

24  case.  You were talking about a stick of wood that you found

25  out there when you went out the next day.

CERTIFIED COPY    90

1  A.  Yes.

2  Q.  And you told us several times it was ten or fifteen feet

3  from the bar-be-que grill---

4  A.  Yes, sir.

5  Q.  Is that correct?

6  A.  Yes, sir.

7  Q.  Okay.  Now did you misspeak the first time you brought it

8  up when you said it was ten to fifteen yards?

9  A.  Okay, I did not intend to say yards.

10  Q.  I didn't think you did.

11  A.  Okay.

12  Q.  Because after that you kept saying ten to fifteen feet.

13  A.  Yes, no I shouldn't have, I'm sorry if I said yards.

14  Q.  Okay, good we've cleared that up.  Now just so we can kind

15  of complete record regarding your background here, the record

16  that Ms. Cobb is going to prepare for us, let me ask you about

17  your employment background.  Ah, prior to becoming the chief at

18  Alexander what did you do in law enforcement?

19  A.  I started out with the Little Rock Police Department May

20  22, 1972 and I rose through the rank to captain.

21  Q.  Uh-huh.

22  A.  And I was the acting assistant chief of police when I left.

23  Q.  Little Rock?

24  A.  Little Rock, I'm sorry.

25  Q.  And did you come to Alexander directly from Little Rock?

CERTIFIED COPY

91

1    A.  No, sir, I went to work for Arkansas Tobacco Control Board

2    for four years.

3    Q.  How long?

4    A.  Four years.

5    Q.  Okay.  And then to Alexander?

6    A.  Yes, sir.

7    Q.  All right.  Now what divisions or departments did you work

8    in at Little Rock?

9    A.  After I graduated from the FBI academy I was put in charge

10   of the administrative part of the police department.

11   Q.  Uh-huh.

12   A.  I started out as an investi--I was a speed officer first

13   then I was promoted to---

14   Q.  Would that be what we would call the patrol division?

15   A.  Patrol division yes, sir.  I was promoted to detective ah,

16   I was a burglary detective then I was transferred to the

17   homicide detective then I transferred from there to

18   intelligence---

19   Q.  Okay.

20   A.  and then I was promoted to sergeant.

21   Q.  All right.

22   A.  And then I became field sergeant patrol sergeant, patrol

23   sergeant; I was a patrol sergeant for three years then I was

24   promoted to lieutenant within the next--I was a patrol sergeant

25   for two years then I made lieutenant.  I was a lieutenant for

CERTIFIED COPY

92

1   four years and then I made captain.

2   Q.  And during your tenure at Little Rock were you ever in

3   charge of or did you participate in internal investigations of

4   officers who were alleged of wrongdoing?

5   A.  Yes, sir, that's part of the lieutenant and the captain's

6   job duties.

7   Q.  Okay.  How many, how many internal investigations would you

8   say you either led or were involved in?  Would you guess?

9   A.  I'd say thirty maybe.

10  Q.  Thirty maybe?

11  A.  Yes.

12  Q.  Just as a lieutenant or captain?

13  A.  Yes, sir

14  Q.  And how long were you a lieutenant and captain?

15  A.  I was a lieutenant for four years and I was a captain for

16  ten.

17  Q.  For ten years?

18  A.  Yes, sir.

19  Q.  Now let me ask you and I'll quit about your educational

20  background.  What is your educational background?

21  A.  Ah, Business Administration and then of course I'm a

22  graduate at the F.B.I. National Academy---

23  Q.  Back up Business Administration, where is that?

24  A.  Ah, at the uni--ah, a Philander Smith College.

25  Q.  Okay.  Did you graduate from Philander?

CERTIFIED COPY

93

1    A.    Yes, sir.

2    Q.    Okay, in Business Administration?

3    A.    Business Administration.

4    Q.    Keep going.

5    A.    Ah, then ah, I attended the F.B.I. National Academy and ah,

6    I attended ah, numerous ah, at the University of Kansas, I'm

7    sorry the University of, right outside of Washington D.C.,

8    Virginia---

9    Q.    Uh-huh.

10    A.    I have an Associates Degree even from then at the time I

11    was at the academy and then I took more courses after I left.

12    Q.    Uh-huh.  What are some of the courses you studied, you

13    took?

14    A.    Criminal Law, DNA, ah, Police Pursuits, Police Lawsuits,

15    ah, I was up there for four months so it entails every facet of

16    law enforcement.

17    Q.    Are you talking about the F.B.I. Academy?

18    A.    Yes, sir.

19    Q.    Okay, and what year did you attend and graduate?

20    A.    Ah, 1988 I graduated number eight out of a class of 700.

21              ELLIS:  Thank you.  Pass the witness.

22              FRAZIER:  I just have one or two.

23                   REDIRECT EXAMINATION

24    Questions by Mrs. Frazier:

25    Q.    For the Alexander City Police Department ah, who was in

CERTIFIED COPY

94

1   charge of investigating any allegations of officer misconduct?

2   A.   That's me.

3   Q.   Who would be in charge of disciplining any officers?

4   A.   That's me.

5   Q.   Then I, ah, yesterday in Jeffrey Watson's file there was a

6   request from Marcie Manley who is a reporter from KARK and she

7   was asking for all of the ah, police employment records from

8   about May the ah, I don't know December, 2011.  Do you know why

9   this reporter was asking for all these records?

10  A.   I can tell you why she asked me.

11  Q.   Okay.

12  A.   She said Paul Mitchell and two other people from Alexander

13  had made the comment that ah, these officers weren't certified.

14  I brought Channel 4 to my office and took the files out and let

15  them read everything that in the file from Arkansas Minimum

16  Standards to show that they were incorrect but that was not put

17  back on the news.

18  Q.   Okay.  So at which point were all the officers, let me make

19  sure I'm using the right word, not certified but met standards,

20  is that right?

21  A.   Yes.

22  Q.   Was there every a time when the officers hadn't met

23  standards?

24  A.   No, ma'am.  Our officers have always got extraordinary,

25  good reviews, from, from Arkansas Minimum Standards.  I have

CERTIFIED COPY

95

1  never had an officer that did not get certified once they went

2  through the academy.

3  Q.  Well I'm talking about before they went through the

4  academy?  For like part-time just because there's a year,

5  right?

6  A.  A year---

7  Q.  They have to meet minimum standards with hire?

8  A.  Within a year yes, yes, ma'am.

9  Q.  I thought they could be certified within a year?

10  A.  That is correct yes, ma'am.  They have to go to the academy

11  within one year of their employment or if there's an existing

12  circumstance where these officers cannot get to the academy you

13  can apply to the Director of Standards to Arkansas Minimum

14  Standards to get an extension.  They can only extend it for six

15  months I did have to do that for one police officer.

16  Q.  Who's that?

17  A.  That was ah, Calvin Reed because they didn't have a vacancy

18  but we were able to get him in under the deadline anyway

19  without the six months.

20  Q.  Okay.  So I guess what was she accusing, well not accusing,

21  what was she investigating that y'all hadn't met standards?

22  A.  No, she was saying that they hadn't even met, didn't even

23  have a file on them and that they wanted officers.

24  Q.  Okay.  So what do you need to have to be an officer?

25  A.  You have to go through the Arkansas Standards again, you

CERTIFIED COPY

96

1  have to, it takes---

2  Q.  What do you have to go through, I'm sorry, when in between

3  the time I guess there's a minimum of something to be hired?

4  What is that called?

5  A.  Ah, no felony convictions ah, no moral interperude, things

6  of this nature and must be able to pass a physical and a

7  psychological evaluation, that has to be done before they are

8  hired.

9  Q.  So that's not called minimum standards?

10  A.  Minimum standards has to have that in, in their office

11  before they are hired.

12  Q.  Okay.  Just for example theirs some standards that an

13  officer has to meet like if you wanted to be a part-time two

14  officer while you're waiting for your one year service,

15  correct?

16  A.  Could you rephrase you question that's confusing?

17  Q.  Why not, why don't you help me and just save us ten minutes

18  you can be out ten minutes earlier?

19  A.  Okay.  Let me try, okay I think, any officer whether he's

20  part-time one or part-time two, they have to have a complete

21  file with everything in order to go to standards before they

22  can be officers part-time, full time officers.

23  Q.  Okay.  Did you have any people serving in the law

24  enforcement capacity that had not had a complete file?

25  A.  Oh, no, no ma'am that's a no, I wouldn't even allow that.

CERTIFIED COPY

97

1             ELLIS:  The thing that makes it--off the

2  record--the thing that makes it confusing is that standards is

3  an agency---

4             FRAZIER:  Okay.

5             ELLIS:  It's like justice for state.

6             FRAZIER:  Okay.

7             ELLIS:  It's, it's shorthand and all law

8  enforcement officers talk that way.

9  Q.  Is there a phrase for minimums standards just for hiring?

10            ELLIS:  You have to answer.

11  A.  Yes, it is; yes.

12  Q.  What's that called?

13  A.  Minimum standards.

14  Q.  All right, I'm just making sure we're talking the same

15  thing.

16            ELLIS:  We're all talking the same thing and you

17  just don't realize it.

18  Q.  Okay.  And so in order to be hired you have to have an

19  complete file?

20  A.  Yes, ma'am.

21  Q.  And that was always done?

22  A.  Under my administration, yes.

23  Q.  And no one had ever been on the streets or served without

24  having that done?

25  A.  That is correct.

CERTIFIED COPY

1    Q.   Okay.

2    A.   And if they didn't Arkansas Standards for Minimum Policing

3    would not allow me to let them go on to the streets.

4    Q.   Okay.   That maybe all I have---

5                ELLIS:  We need Robert Newcomb.

6                FRAZIER:  Only if he wears a Santa Claus suit.

7                ELLIS:  That was off record.

8                REPORTER:  Did you say you pass?

9                FRAZIER:  Ah, I think I'm done.

10               FUQUA:  I don't have any questions.

11               WREN:  No, questions.

12               [The deposition ended at 1:33 p.m., on October

13   10, 2013.]

14                            * * * * *

15

16

17

18

19

20

21

22

23

24

25

CERTIFIED COPY

Alexander Police Department

*William Blankenship*
*5-8-12*

Policy: 001
Effective: 06-01-10
Date of Origin: 06-01-10

## BIASED LAW ENFORCEMENT PRACTICES

<u>PURPOSE</u>    A.  Members of the Alexander Police Department shall not violate an individual's constitutional rights, regardless of race, color, creed, ethnicity, gender, age, sexual orientation, disability, religion, or any other belief system.  This policy serves to:

1.  Reaffirm the Alexander Police Departments' commitment to unbiased law enforcement practices.

2.  Further clarify the circumstances in which officers may consider race or ethnicity when making enforcement decisions.

3.  Reinforce procedures that assure the public that this agency is providing service and enforcing laws in an equitable and lawful fashion.

## POLICY:

Employees of the Alexander Police Department shall not violate citizens' equal protection rights.  Toward this end, employees are prohibited from engaging in racial/bias profiling in any aspect of law-enforcement activity as defined by this policy.  It shall be the policy of the Alexander Police Department that officer's base pedestrian or motor vehicle stops, detentions, investigative activities, searches, property seizures, or arrests of a person upon a standard of reasonable suspicion or probable cause in compliance with the U.S. Constitution and Arkansas Constitution.  Law enforcement officers of this agency shall be prohibited from utilizing race, color, creed, ethnicity, gender, age, sexual orientation, disability, religion, or any other belief system as the sole factors in making law enforcement decisions, except to determine whether a person matches the description of a particular suspect. Members of the Alexander Police Department, whether



PLAINTIFF'S DEPOSITION EXHIBIT
#1
PENGAD 800-631-6989

sworn, civilian, or volunteer, shall treat every person with courtesy and respect when interacting with the public and will conduct all law enforcement duties and civilian responsibilities in a professional manner.

## DEFINITIONS:

A. **"Probable Cause"** means that a set of facts or circumstances based on reliable information or personal knowledge or observation by an officer, which reasonable shows and would warrant an ordinary prudent person in believing that a particular person has committed, is threatening, or is about to commit some criminal violation of the law. This definition is subject to applications and precisions made by the federal and state courts interpreting applicable law.

B. **"Reasonable suspicion"** means suspicion based on facts or circumstances which of themselves do not give rise to the probable cause requisite to justify a lawful arrest, but which give rise to more than a bare suspicion; that is, a suspicion that is reasonable as opposed to an imaginary or purely conjectural suspicion. This definition is subject to applications and precisions made by the federal and state courts interpreting applicable law.

C. **"Reasonable cause to believe"** means a basis for belief in the existence of the facts that, in view of the circumstances under and purposed for which the standard is applied, is substantial, objective, and sufficient to satisfy applicable constitutional requirements. This definition is subject to applications and precisions made by the federal and state courts interpreting applicable law.

D. **"Reasonable belief"** means a belief based on reasonable cause to believe. This definition is subject to applications and precisions made by the federal and state courts interpreting applicable law.

E. **"Racial profiling"** means the practice of a law enforcement officer relying, to any degree, on race, ethnicity, national origin or religion in selecting which individuals to subject to routine investigatory activities, or in deciding upon the scope and substance of law enforcement activity following the initial routine investigatory activity, except that racial profiling does not include reliance on the criteria in combination with other identifying factors when the law enforcement officer is seeking to apprehend a specific suspect whose race, ethnicity, or national origin is part of the description of the suspect, and the description is thought to be reliable and locally relevant. This definition is subject to applications and precisions made by the federal and state courts interpreting applicable law.

## PROCEDURES:

A. **Training:**  All training shall be in compliance with Ark. Code Ann. 12-12-1404 and this policy and shall include:

1. Training of all current and future agency employees as to this policy and the prohibition against racial/biased profiling.

2. Annual in-service training stressing the understanding and respect for racial, ethnic, national, religious and cultural differences and development of effective and appropriate methods of carrying out law enforcement duties;

3. A review of the agencies, operating procedures that implement the prohibition against racial profiling and the affirmation by agency employees that they have copies of, understand, and are following the policy, and

4. If necessary and possible, foreign language instruction to endure adequate communication with residents of a community.

CERTIFIED COPY

## B. Field Officer Responsibilities

1. Officers shall base all pedestrian and motor vehicle stops, detentions, investigative activities, or arrest on a standard of reasonable suspicion or probable cause and in doing so shall not violate this policy.

2. Upon initial contact, and when feasible and reasonable to do so, each law enforcement officer shall provide his or her full name, written identification, jurisdiction, and the reason for the pedestrian or motor vehicle stop to the accused. If asked for a serial or badge number by the pedestrian or driver of a motor vehicle, officers shall oblige by providing their identification number when feasible and reasonable to do so.

3. In an effort to minimize conflict during interactions with accused violators when stopping and or detaining persons, it is recommended that officers attempt, where feasible and reasonable to:

   a) Extend a customary greeting to each person such as: *Good morning, afternoon, or evening.*

   b) Identify themselves by name. For instance: *I am Officer Jim White of the Alexander Police Department.*

   c) Explain the reason for the stop or detention: *I stopped you because............*

   d) Listen politely and give the accused ample opportunity to tell their story and explain their behavior.

   e) Politely ask for identification and any required documents. *May I please see your driver's license, registration, and proof of motor vehicle insurance?*

f)  Complete paperwork and advise the driver or pedestrian as to what action is being taken and what, if anything, the person must do as a result; such as appear in court, etc.

g)  Extend a departing pleasantry such as: *Please drive safely or thank you for your cooperation.*

h)  If necessary, assist the driver in safely merging back into traffic.

i)  Remain courteous and project a professional demeanor during the interview, questioning or contact.

j)  Officers shall refrain from participating in or encouraging any actions or statements that could be reasonable perceived as racial/bias-related profiling, including but not limited to racial slurs or derogatory references about a minority group.

k)  Officers shall report any acts of racial/bias-related profiling to their immediate supervisor as is specifically defined herein.

4.  When stopping a pedestrian or a driver of a vehicle for an alleged violation, officers shall take into account circumstances associated with each individual and shall use discretion in determining whether to issue a verbal warning, a misdemeanor summons or a traffic citation.

## C. Citizen Complaints of Biased Law Enforcement Practices

1.  When accused of biased law enforcement practices, the officer shall immediately contact the Shift Supervisor. When practical to do so, the supervisor shall report to the scene to mediate the situation.

2. The officer shall provide complainant(s) with the full name and telephone number of his or her immediate supervisor, and the contact name and telephone number of the Office of the Chief of Police.

3. The officer shall complete a written report detailing the incident, the allegation(s) made, the purpose for the pedestrian or motor vehicle stop, detention, investigative activity or arrest, and submit the report to the Shift Supervisor by the end of shift.

4. Along with the written report, the officer shall submit the Mobile Video/Audio Recording (MVR) tape containing the encounter in question, if applicable, to the Shift Supervisor.

5. All allegations of biased law enforcement practices shall be investigated by the department in a like and consistent manner.

## D. Supervisor Responsibilities

1. Each Supervisor is responsible for ensuring that all personnel under their command fully understand the content of this policy and are operating in compliance with the procedures therein.

2. The Shift Supervisor shall be responsible for making contact with any known complainant alleging biased law enforcement practices by his or her officers either on scene or by telephone and document using departmentally approved forms. It is preferred that the Supervisor meet face to face with a complainant.

   a) If the complaint is not resolved, the Shift Supervisor shall provide the complainant a Citizen Complaint Form and collect the MVR tape if applicable

   b) The Shift Supervisor shall further provide guidance to the complainant, as needed, in completing and filing the complaint as well as explain the department's policy and in particular the investigative process.

3.  The Shift Supervisor is responsible to see that all department reports and MVR tape(s) associated with a complaint alleging biased law enforcement practices is forwarded to the Office of the Chief of Police through the supervisor's Chain of Command by the end of the shift.

E.  **The Use of Mobile Video/Audio Recording (MVR) Equipment**

1.  The use of Mobile Video/Audio Recording (MVR) equipment will be in accordance with Policy of the Alexander Police Department Policy and Procedure Manual.

F.  **Review and Reporting Requirements**

1.  The Office of the Chief of Police shall implement a systematic review process to generate quarterly analysis of the statistical information collected form the Citizen Complaint Form.

2.  These analyses shall identify allegations specific to biased law enforcement practices.

3.  If a pattern is identified, the Chief of Police or his or her designee shall be responsible for conducting an investigation to determine whether officers have violated the provisions of this policy and/or other department policies.

4.  Officers found to have engaged in biased law enforcement practices shall receive counseling, remediation, corrective training, and/or discipline up to and including termination in a timely manner.

G.  **Retaliation**

1.  No member of the Alexander Police Department, regardless of rank or stature, shall retaliate against officers, civilians, or volunteer employees for reporting incidents of biased law enforcement practices.

2.  Actions or behaviors found to constitute retaliation shall be immediately disciplined up to and including termination.



## Documentation and Record Keeping

(A)    Any officer who stops a motor vehicle for an alleged violation of a law or Ordinance regulating traffic or who stops a pedestrian for any suspected offense shall document the stop with the following information, which shall be included in addition to any other information documented by the officer:

1.    A physical description of each person detained as a result of the including:

(a)    the person's gender; and
(b)    the person's race or ethnicity.

2.    The traffic law or ordinance alleged to have been violated or the suspected offense;

3.    Whether the officer conducted a search as a result of the stop, and if so, the basis for that search:  consent of the person detained, existence of probable cause, frisk for weapons, or other;

4.    Whether any contraband was discovered in the course of the search and the type of contraband discovered.

5.    Whether the officer made an arrest as a result of the stop or the search, including a statement of the offense charged;

6.    The street address or approximate location of the stop;

7.    The date and time of the stop; and

8.    Whether the officer issued a warning or a citation as a result of the stop.

(B)    Every year, no later than April 1, this law enforcement agency will compile the above information relating to the race/ethnicity of individuals stopped.

(C)    The information will be reported in a format that may include, but is not limited to, the reporting of the data in numerical and/or percentage categories of ethnicity, stops, reasons for the stops, searches resulting from the stops, disposition of the stops, and the duration of the stops.

(D)    This law enforcement agency shall also compile data on individual officers to be used in evaluation and as an early warning system for possible racial/bias profiling.



(E)    The data and documentation collected pursuant to this general order shall not constitute prima facie evidence of racial profiling or any other violation of civil rights or of state or federal law.

### Communication to the Community of the Policy

(A)    This law enforcement agency shall be responsible for providing public information relating to the agency's efforts to comply with government mandates on racial profiling. This will include public education relating to the agency's complaint process. Avenues for this information may be, but not limited to, any of the following:

1.    Pamphlets developed by the agency;

2.    Public service announcements concerning this policy and additional outreach efforts on local radio stations, television stations and local newspapers;

3.    Community meetings and public forums in which bias/racial profiling is discussed, and

4.    News/press releases.

(B)    Where appropriate to meet the goals of this policy, communications of this policy with the community shall be available in English and in Spanish.

### Public Inspection

(A)    A copy of this policy shall be kept at the City of Alexander Police Department, office of Chief of Police for public inspection.

### Legislative Audit Requirements

(A)    To the extent that state law mandates local law enforcement agencies to file reports with Legislative Audit, this order/policy shall be included in the annual report that the department submits to the Division of Legislative Audit.

### Application

(A)    This order constitutes agency policy and is not intended to enlarge the employee's existing civil or criminal liability in any way. It shall not be construed as the creation of an additional cause of action by either employee or any third party.

Chief of Police

CERTIFIED COPY

**ALEXANDER POLICE DEPARTMENT**                          PAGE 1of3

**Horace Walters** – Police Chief

15605 Alexander Rd

P.O. Box 610 Alexander, AR 72002

DEC. 13, 2010

On, Saturday, December 11, 2010, around 6:30 am, I was walking a white female friend half way home. On my way back, I noticed one of Alexander police car parked on Sharon Baptist Church parking lot talking to a person, who is now or used to be with Alexander Fire Department.  He drove a bluish gray Chevy truck. The officer said, in a loud voice, "Come here son," then the truck pulled away.  I felt that the officer could have addressed me in a more professional way.  I went to see what he wanted and he then told me he smelled alcohol on my breath and how he can arrest me for public intoxication.   I said, "If you smell anything on me, it was from last night."It was like his mind was already made up about me. I again and again trying to explain to him that I am ok, just walking with a friend. The more I try to explain to him the more Officer Eckmam's conduct was unbecoming as offices. He was irate, unprofessional, and a lack of respect. He put handcuffs on me and took me to jail. While down at the jail, Officer Reed was using excessive and unnecessary force; pushing, pulling, shoving and using unnecessary body weight on me, while in hand cuffs.  He was treating me like I had done what the officer Eckman said I did. I ask, "What was my charge?"  The officers or jailers told me I had a terroristic threatening charge, public intoxication, and disorderly conduct. While in jail, I notice that my friend I was walking with was arrested too. I ask her what she's doing here, she said "for public intoxication". And she was released that same day. While there in jail, I requested my free phone call around 7:00 am and was denied until 11:30 pm.  I was even denied breakfast and didn't eat lunch until around 2:30 pm Saturday. I feel that who I talk to regardless of race or sex is not Office Dennis Eckman's business.

PLAINTIFF'S DEPOSITION EXHIBIT
#2
PENGAD 800-631-6989



Page 2of2

Officer Eckman claimed I was under the influence of some intoxicating substance, but that's not why I was arrested. I was arrested because I was with a white girl. Because while at Saline county jail, I receive no **breathalyzer, urine test, blood test or any other test to support his charges against me.** Now it's very clear to me the reason he called me to his car. I felt that it was unlawful to discriminate based on race or color. Officer Dennis Eckman action based on my conduct with him is un called for, he has no people skills and don't know how to talk to people. I was ill treated by Officer Reed because of unsupported charges brought against me By Officer Denis Eckman from the City of Alexander. I felt threaten, and felt that Dennis was going to cause me harm due to his uncontrolled demeanor. I am sure that your Officers are not trained to talk down to people. I felt that I was placed in harms way with unsupported reasons.

In closing, I'm a 30 year old citizen of Alexander. I was born here and my parents moved here 38 years ago. They are strong pillars in this community, with very high work ethics. My father has owned Royal Lawn & Construction Services over 27 years. I, myself started with him since the age of 10 years old until now. I help my family with rental properties. I support them in their restaurant business. When my mom & dad had plenty enough help, I took a job at the Hess Gas Station in Alexander for 2 years, here in the community. All of the Officers of Alexander knows me, including Officer Eckman.

On Saturday, the morning of Dec.11 when I was asked by my friend to walk with her, it was a normal day as always until I was ordered to come to Officer Eckman's car. I'm still trying to figure out how I broke the law. Maybe some think that I was out of place by walking with a "white" friend of mine and if that's the case, I'm guilty. But I am innocent of Officer's Eckman's claims of me. The citizens of Alexander and myself, thought with the old system of serving and protecting certain people within the city had vanished. There are records that will confirm the history of racial profiling amongst the Alexander Police Department.

CERTIFIED COPY

110

Past lawsuits and negative publicity to the city and the citizens should have hindered any future injustices, only to find out there's still remaining practices of some harassment and discriminating of black citizen's lurking behind the shadows of our public services.

Thanks,

Christopher Dewayne Doss

CERTIFIED COPY

# Another Lawsuit Filed Against City of Alexander, Saline County Sheriff, Alexander Police

Story Comments          Share



Family Files Lawsuit Against City of Alexander

Tags:

alexander, lawsuit

Updated: 3/18 10:49 pm  Published: 3/18 10:23 pm

Alexander, AR - The city of Alexander's troubles didn't end with a Treasurer resigning Monday. A lawsuit filed against the City of Alexander and several law enforcement agencies cites an incident happening in 2011.

Their primary complaint is the use of excessive force on one man in his own front yard.

The family's spokesperson, Rizelle Aaron, says they claim the actions taken by a few law enforcement officers in the Saline County Sheriff's Office and Alexander Police Department were unnecessary and excessive. Ultimately he says, the family just wants their day in court and justice to be served.

"So that the city and the people of Alexander understand that what was done to him should not have been done and that it shouldn't happen to other people," said Aaron.

Aaron is the spokesperson for Christopher Doss and says this lawsuit stems from an incident when Doss was arrested in Alexander in his own yard.

After police responded to a domestic dispute at his home they say the officers came back, tazed him once and then again a couple of times after he was on the ground.

Doss was charged with resisting arrest, public intoxication and terroristic threatening but the prosecutor has not moved forward with the charges.

The city and police department say they take these allegations with a grain of salt. In fact, Chief Horace Walters goes as far to say he will fight this lawsuit and deny the accusations to the end.

"We will meet with our attorney's to combat everything that they've said to prove that it's not true and factual," Chief Walters remarked. "Again, this is the same family that has made these same allegations time after time after time."

The city had plans to address another lawsuit from this family at Monday's council meeting however they did not meet quorum.

Mayor Hobbs wouldn't directly comment on the lawsuit but did say they plan on consulting with the Municipal League on moving forward and will address this in a future city council meeting.

Copyright 2013 Nexstar Broadcasting, Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

*The links below are paid advertisements. FOX16 is not responsible for their content.*



PLAINTIFF'S DEPOSITION EXHIBIT
#3

CERTIFIED COPY

**Alexander Police Department**

I, Ofc. Blankenship, backed up Ofc. Watson on an escort on 2nd st.  Ofc. Watson was escorting a female to the residence to pick up her children from there.

Upon arrival of myself, Ofc. Watson was being verbally hollered at by Mr. Chris Doss.  Mr. Doss was standing very close to Ofc. Watson, within 24 inches.  Ofc. Watson was not hollering back at Mr. Doss, but was trying to explain that he was there at the request of the female subject.

I tried to get Mr. Doss to talk to me by calling him by name, adking different questions as to who mowed his yard, how often he did it, and tried to get him to talk in a more normal manner.  Mr. Doss continued to shout at and holler at Ofc. Watson all the way to Ofc. Watsons patrol vehicle. Ofc. Watson did not say anything to Mr. Doss once I started trying to calm him down.

The comments that Mr. Doss were making to Ofc. Watson were, "He wasn't a real Police Officer, that he knew where he lived, and for him to get off his property and to get off his street."

When Ofc. Watson got in his vehicle and left, I was thanked by Mr. Doss, who said he didn't have any problem with me, just with Ofc. Watson.

When we had cleared from the scene, we met with two Saline Co. Deputy's at Third & AC Wallace.  They talked with Ofc. Watson, and at the end of the conversation, we all went back to Mr. Doss's residence.

I was the last on to get there, before I got around the trailer to see everything, I heard some shouting, and then I heard the sound of the taser being fired.

When I got close enough to see, Ofc. Watson had Mr. Doss on the ground. While one of the Deputy's had his taser deployed on Mr. Doss.

Mr. Doss continued to put up some resistance and tried to delay being put in the back of Ofc. Watsons vehicle.

Ofc. Watson then transported Mr. Doss to the Saline County Detention Center.

Ofc. William Blankenship, 206

PLAINTIFF'S DEPOSITION
EXHIBIT
#4

CERTIFIED COPY

113

Exceptionally Cleared          Unfounded

## DETAILS OF INFORMATION
Include points of entry, tools used, objects of attack where applicable

I Officer Watson received a call to the above address for an escort of a female to get her kids from the above suspec
Once on scene the suspect started yelling at me and calling the girlfriend name and started threatening her and I Office
Watson with bodily harm. So I Officer Watson called for back up units to respond for back up because the suspect statec
that he had something for me a ran back in the house. The suspect had been drinking and was very disorderly. Saline
county deputy Arrived on scene and the suspect was still threatening me and the county deputy so the deputy order the
suspect to get on the ground the suspect refused at which time the deputy tazed  the suspect in order to take him into
custody. Once the suspect was in custody he was transported to the saline county jail. On the way to the jail the suspect
continued to make threatening statements which was all recorded on the inside camera.

| | Itemized List of Property Involved | | | |
|---|---|---|---|---|
| Quantity | Brand, Model & Description of Item | Serial or ID # | Value | Property Tag # |
| | | | $ | |
| | | | $ | |
| | | | $ | |
| | | | $ | |
| | | | $ | |
| | | | $ | |
| | | | $ | |
| | | | $ | |
| | | Total Value Property | Stolen | Recovered |
| | | | $ | $ |

**ADDITIONAL ORIGINAL INFORMATION INCLUDED ON SUPPLEMENT FORM**
LIST TRAFFIC SUMMONS & TICKET NUMBERS          /          /          /          /          /

2

CERTIFIED COPY

City of Alexander Police Department
15605 Alexander, Rd.
Alexander, AR 72002
(501) 455-2585

Records Clerk,

IN RE: FOI Defendant Christopher Doss, Arrest on October 9, 2011
       Reference: Alexander ticket # 394751 and Saline County Booking # 5219-11

       I Rizelle Aaron, respectfully request to review the following materials for the
purposes of duplication.

1.    A copy/printout of the complete dispatch logs for October 9, 2011 and — *COUNTY RADIO SYSTEM*
      October 10, 2011.
2.    The audio of all 911 and emergency calls or other numbers received on    *" "     " "*
      Sunday, October 9, 2011 from 12:00 am to 1:00 am.
3.    The incident reports in reference to this incident by Saline County Deputies
      and City of Alexander Police Officers. *( only ATTACHed*
4.    The video of all dashboard camera recordings in reference to this incident. ✓
5.    The audio from body microphones. ✓
6.    The "Use of Force Policy". ✓
7.    The officer's use of force report in reference to this incident. ✓
8.    The audio and video from the taser camera used during this incident. *SALINE COUNTY*
9.    All jailhouse audio and video pertaining to the booking, detention and holding *SALINE COUNTY JAIL*
      of Mr. Doss in reference to this incident.
10.   All records pertaining to the arrest of Mr. Doss on October 9, 2011. ✓
11.   All agreements in reference to jurisdictional, transport and request for *don'T have*
      assistance matters between the City of Alexander, Alexander Police
      Department and the Pulaski County Sheriff's Office.
12.   All agreements in reference to jurisdictional, transport and request for *don'T have*
      assistance matters between the City of Alexander, Alexander Police
      Department and the Saline County Sheriff's Office.
13.   All agreements in reference to jurisdictional, transport and request for . *don'T have*
      ~~tween~~ the Saline County Sheriff's Office and the Pulaski
      ~~ice.~~

*4-18-13*

*LT —*
*Mr. Aaron said "Did you*
*look at his request?" He was*
*to VIEW records - He is not*
*paying anything - only if*
*after viewing them.*
*WS*

*WED, call*
*AND let Mr. Aaron*
*know that his*
*FOI request are*
*Ready the FEE*
*is $15.60.*


PLAINTIFF'S DEPOSITION EXHIBIT
#5
PENGAD 800-631-6989

# R E P O R T E R ' S   C E R T I F I C A T E

STATE OF ARKANSAS      )
                       )                    SS. 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
COUNTY OF PULASKI      )

        I, Gloria Y. Cobb, A Certified Court Reporter
and Notary Public in and for the aforesaid County and state, do
hereby certify that the witness, <u>HORACE WALTERS</u>, was duly sworn
by me prior to the taking of testimony as to the truth of the
matters attested to and contained therein; that the testimony
of said witness was taken by me, a <u>voice writer</u>, and was
thereafter reduced to typewritten form by me or under my
direction and supervision; that the foregoing transcript is a
true and accurate record of the testimony given to the best of
my understanding and ability.

        I FURTHER CERTIFY that I am neither counsel for,
related to, nor employed by any of the parties to the action in
which this proceeding was taken; and, further, that I am not a
relative or employee of any attorney or counsel employed by the
parties hereto, nor financially interested, or otherwise, in
the outcome of this action; and that I have no contact with the
parties, attorneys, or persons with an interest in the action
that affects or has a substantial tendency to affect
impartiality, that requires me to relinquish control of an
original deposition transcript or copies of the transcript
before it is certified and delivered to the custodial attorney,
or that requires me to provide any service not available to all
parties to the act.


                              _____
                              Gloria Y. Cobb, CCR LS#0336
                              Notary Public

My Commission Expires:
<u>January 16, 2017     </u>
My Commission #12358451



**Cobb Court Reporting**
P. O. Box #4, Sweet Home, AR  72164-0004
Phones:  (501) 490-0066 – Off; (501) 590-0975 – Cell
(501) 490-0926 – Facsimile
e-mail: gloria.cobb@comcast.net