# Policy & Procedures Manual

## Police Department



**Allen Spears**
**Chief of Police**

15605 Alexander Rd • Alexander AR •72002
501•455•2585

# DISCLAIMER

"This manual is designed only to be a general guide to some key policies. The City of Alexander hopes this manual is and will continue to be helpful to you and assist you in having a better understanding of the operations of Alexander. Please refer to this manual on a regular basis. Our policies and operating procedures will change from time to time to meet the needs of our employees and the public. This manual is not intended to create any contractual or other legal rights. It is designed solely as a guide and does not alter your at-will employment status. Periodically, this manual may be revised and updated. Additionally, no supervisor has the authority to make verbal changes in this manual. The Chief of Police or his designate must approve any changes."

*"These policies and procedures are for internal use only, and do not enlarge an officers civil or criminal liability in any way. They should not be construed as the creation of a higher standard of safety or care in an evidentiary sense, with respect to third party claims. Violations of these policies and procedures, if proven, can only form the basis of a complaint by this agency, and then only in a non-judicial administrative setting."*

# WELCOME

I am pleased to welcome you as a city employee and as a member of the Police Department.

This manual is specifically designed to assist you in understanding many of the issues that you may experience.  Rules, regulations, policies and procedures are a means of assisting you in your job performance.

Since it is impossible to provide all answers here, and you will have other questions from time to time, your supervisor will be happy to answer your questions when they arise.  I ask that you take special care in the performance of your duties and are as proud of yourself as we are proud of you.

May your association with the City be long and satisfying for you as well as for the citizens.

Sincerely,

*Shirley S. Johnson*
Mayor

31.1

## MEMORANDUM FROM THE CHIEF OF POLICE

TO:          ALL MEMBERS OF Alexander Police Department

FROM:      Chief Allen Spears

SUBJECT:   POLICY AND PROCEDURES MANUAL

DATE:      January 1, 2010

1.      The Policy and Procedures Manual will be in full force and effect from January 1, 2010.

2.      The contents of this manual are applicable to all law enforcement officers, and where specified, to all non-certified employees of the department. (The term "employee" shall apply to all law enforcement officers and non-sworn employees of the department).

3.      All published general orders, special orders, and administrative instructions not in conflict with this manual shall have the same effect for administrative purposes. All other documents in conflict with this manual are hereby canceled.

4.      The contents of this manual, any general or special orders shall not be canceled, amended, or new orders issued without the approval of, and over the signature of the Chief of Police.

5.      Failure of an employee to perform the duties of his or her position or assignment, or violation by an employee of any departmental rule, regulation, policy, procedure, order or instruction having the effect of a regulation or order, may be considered sufficient cause for termination, demotion, suspension, or other penalty as determined by the Chief of Police.

# POLICY & PROCEDURES MANUAL

## TABLE OF CONTENTS

| SECTION | TOPIC | PAGE |
|---|---|---|
| 6 | ADDRESS AND TELEPHONE NUMBERS | 6.1 |
| 7 | AMERICANS WITH DISABILITIES ACT | 7.1-6 |
| 8 | APPLICANTS/EMPLOYEES WITH DISABILITIES | 8.1-3 |
| 9 | ARREST PROCEDURES | 9.1 |
| 10 | AUXILIARY OFFICER FORCE | 10.1-4 |
| 11 | BAIL BONDS | 11.1 |
| 12 | BOMB THREATS/ DISASTER PLANNING | 12.1-3 |
| 13 | CANINE (K-9) OPERATIONS | 13.1-6 |
| 14 | CARDS: OFFICIAL - PERSONAL | 14.1 |
| 15 | CHAIN OF COMMAND | 15.1 |
| 16 | CHEMICAL IRRITANT PROJECTOR | 16.1 |
| 17 | BLOODBORNE PATHOGENS | 17.1-5 |
| 18 | COMMUNICABLE DISEASES POLICY | 18.1-4 |
| 19 | COMMUNITY RELATIONS | 19.1-2 |
| 20 | CONDUCT: ABUSE OF POSITION | 20.1 |
| 21 | CALL PRIORITIZATION, DISPATCH, TELEPHONIC REPORTS | 21.1-4 |
| 22 | CONDUCT: UNBECOMING AN EMPLOYEE | 22.1-2 |
| 23 | COURT PROCEDURES | 23.1 |
| 24 | CRIME PREVENTION | 24.1-2 |
| 25 | DEBTS | 25.1 |
| 26 | DOMESTIC ABUSE INCIDENTS | 26.1-3 |
| 27 | ELECTRONIC RESTRAINT DEVICE | 27.1 |
| 28 | EMERGENCY CALL OUT PROCEDURE | 28.1 |
| 29 | 911 COMMUNICATIONS CENTER | 29.1-4 |
| 30 | USE OF ELECTRONIC RECORDING DEVICES | 30.1-6 |

| SECTION | TOPIC | PAGE |
|---|---|---|

| | | |
|---|---|---|
| 32 | ENFORCEMENT: MUTUAL ASSISTANCE | 32.1-2 |
| 33 | ENFORCEMENT: TRAFFIC | 33.1-6 |
| 34 | ETHICS | 34.1-2 |
| 35 | EVIDENCE | 35.1-3 |
| 36 | FIREARMS: AUTHORIZATION | 36.1 |
| 37 | FIREARMS: TRAINING AND QUALIFICATIONS | 37.1-3 |
| 38 | FOLDER, FELONY CASE | 38.1-3 |
| 39 | COMPUTER ISSUES | 39.1 |
| 41 | GRATUITIES, REWARDS AND WITNESS FEES | 41.1 |
| 42 | GRIEVANCE & DISCIPLINARY PROCEDURES | 42.2 |
| 43 | ROADWAY DRUG INTERDICTION | 43.1 |
| 44 | HARASSMENT - WORKPLACE | 44.1 |
| 45 | HOLIDAYS | 45.1 |
| 46 | IMPARTIALITY | 46.1 |
| 47 | INFORMATION: DIVULGING | 47.1 |
| 49 | INJURED/SICK PERSONS | 49.1 |
| 50 | INVENTORY - MOTOR VEHICLE | 50.1-2 |
| 51 | INSUBORDINATION | 51.1 |
| 52 | INTOXICANTS AND NON-PRESCRIBED DRUGS | 52.1-2 |
| 53 | INVESTIGATION: CRIMINAL | 53.1-8 |
| 54 | INVESTIGATION: INTERNAL AFFAIRS | 54.1-3 |
| 55 | INVESTIGATION: MISSING PERSONS | 55.1-3 |
| 56 | INVESTIGATION: MOTOR VEHICLE ACCIDENTS | 56.1-3 |
| 59 | JAIL AND BOOKING PROCEDURES | 59.1 |
| 60 | JUVENILE CURFEW VIOLATIONS | 60.1-2 |
| 61 | JUVENILE PROCEDURES | 61.1-2 |
| 62 | LEAVE | 62.1-2 |
| 63 | MEDIA RELATIONS | 63.1-3 |
| 64 | MEMBERSHIP IN ORGANIZATIONS | 64.1 |
| 65 | MOBILE VIDEO/AUDIO RECORDING EQUIPMENT | 65.1 |

**SECTION**                     **TOPIC**                                              **PAGE**

66          OFF-DUTY EMPLOYMENT ........................................66.1

67          OFF-DUTY: POLICE ACTIVITY, NEIGHBORHOOD DISPUTES . ...........67.1

68          OUT-OF-TOWN HOME CHECKS ....................................... 68.1-2

69          PATROL FUNCTIONS ...................................... 69.1-3

70          PERFORMANCE EVALUATION .........................................70.1-4

71          PERSONAL PROPERTY AND EQUIPMENT ............................ 71.1

72          POLICE OFFENSES: DISCIPLINARY .................................. 72.1

75          POLICE VEHICLE: MAINTENANCE ...................................75.1-3

76          POLICE VEHICLE: OCCUPANTS .....................................76.1-3

77          POLICE VEHICLE: EMERGENCY OPERATION..........................77.1-4

78          POLICE VEHICLE: PURSUIT DRIVING ............................... 78.1-4

79          POLICE VICTIM ASSISTANCE . . . . . . . . . . . . . . . . . . . . . . . . . . 79.1

80          POLITICAL ACTIVITY ................................................ 80.1

81          PROBATION PERIOD ................................................ 81.1

82          PROMOTIONAL PROCEDURES ...................................... 82.1-2

83          PROPERTY: DEPARTMENTAL........................................83.1-4

84          PROPERTY: DISPOSITION ......................................... 84.1-5

85          PSYCHOLOGICAL AND PHYSICAL EXAMINATION ...................... 85.1

88          RADIO PROCEDURES ............................................. 88.1-2

89          RECOMMENDATION OF SERVICES. . ................................ 89.1

92          REPORT: OFFENSE/INCIDENT ......................................92.1-2

93          REPORT WRITING PROCEDURE ...................................... 93.1-2

95          RESPONSE OUTSIDE OF JURISDICTION ............................. 95.1

96          ROBBERY: BANK/SAVINGS AND LOAN,
            HOLDUP, ALARM PROCEDURES ....................................96.1-2

97          SEARCH: MOTOR VEHICLES ...................................... 97.1-4

98          SEARCH: EXECUTION OF WARRANT ................................. 98.1

99          SEARCH: PERSON .............................................. 99.1-2

100         VEHICLE SAFETY CHECKPOINT......................................100.1-2

101         SOBRIETY CHECKPOINT (ROADBLOCK) . ........................... 101.1

| SECTION | TOPIC | PAGE |
|---|---|---|

| 102 | SMOKING AND USE OF TOBACCO | 102.1 |
| 103 | EMPLOYEE - DRUG TESTING | 103.1-4 |
| 104 | TRAINING | 104.1 |
| 105 | TRAINING REQUIREMENTS | 105.1-2 |
| 106 | TRANSPORTING ARRESTED PERSONS | 106.1-2 |
| 107 | UNIFORMS/GROOMING | 107.1-2 |
| 108 | USE OF FORCE | 108.1-3 |
| 109 | HOSTAGE/BARRICADED SUBJECT SITUATIONS | 109.1-2 |
| 110 | TOWING/WRECKER SERVICE | 110.1-4 |
| 112 | EQUAL EMPLOYMENT OPPORTUNITY | 112.14 |
| 113 | SPIKED BARRIER SYSTEM | 113.1-3 |
| 114 | TASSER HANDLING AND DEPLOYMENT | 114.1.4 |
| 115 | DEATH/SERIOUS INJURY NOTIFICATION | 115.1-2 |
| 116 | LINE OF DUTY DEATHS | 116.1-2 |

# SECTION 6
## ADDRESS AND TELEPHONE NUMBERS

**POLICY:**   In the event of a major emergency, it will become necessary to notify off duty personnel who will be required to report for duty at that time. For the purpose of emergency notification all department employees shall, upon employment, submit their residence address and telephone number's to their immediate supervisor who will forward this information to the Chief of Police. Telephone numbers will include the following:

1.   Home phone

2.   Cellular phone
     a.   Any change in residence location or telephone number's will be submitted to an immediate supervisor who will forward this information to the Chief of Police within twenty-four (24) hours of the change.
     b.   There are no exceptions to this policy.

6.1

# SECTION 7
# AMERICANS WITH DISABILITIES ACT

**INTRODUCTION:**
For many years, police and public safety agencies have expressed a commitment to providing quality response and service to all people in a fair, impartial manner. Traditionally, agencies have addressed fairness and impartiality on the basis of race, color, sex, sexual preference, national origin, religion, and, more recently, age.

People with disabilities represent the largest minority group in the nation. With the passage of the Americans with Disabilities Act in 1990, it has become imperative that departments restate their commitment, ensuring accessibility to services and employment opportunities by people with disabilities.

Every department should recognize the needs of people with disabilities in their mission statement and agency values. Departments must develop policies and procedures that address specific accommodations to be afforded to people with disabilities. Through enforcement of these policies, agencies must ensure equal provision of law enforcement services.

Beyond adopting policies and procedures, it will be necessary for agencies to train law enforcement and public safety employees and physically modify facilities to make them accessible to and usable by people with disabilities. Agencies must eliminate physical and communication barriers that interfere with equality of employment. Agencies must ensure that workers with a disability are provided with the same benefits and privileges of employment as those enjoyed by employees without disabilities.

**PURPOSE:**
The purpose of the following policy is to provide guidance to the agency in committing itself and its employees to providing quality services to people with disabilities and complying with provisions of the Americans With Disabilities Act.

It has been estimated that there are approximately 43 million people with disabilities in the United States. The Americans With Disabilities Act of 1990 (Title II) provides that departments of any state or local government may not exclude qualified individuals with disabilities from participation in any program, service, or activity or deny qualified individuals with disabilities the benefits of programs, services, or activities, or otherwise subject them to discrimination on the basis of disability.

**POLICY:**
It shall be the policy of this agency to ensure that a consistently high level of law enforcement services are provided to all members of the community including people who may require special consideration in order to access these services. It is the policy of this agency to afford people with disabilities the same access to programs, services, and employment provided to all citizens. This includes, but is not limited to, services such as first responder recognition of the nature and characteristics of various disabilities and appropriate physical and emotional support to people with disabilities who seek to access law enforcement services or who come into contact with law enforcement officers. Examples include, but are not limited to:

a.  recognition of symptoms and appropriate medical and emotional support for people experiencing seizures;
b.  sensitivity to and appropriate physical support in aiding people who are mobility challenged;
c.  rapid access to interpreters for people with hearing and/or speech disabilities who have a need to communicate with law enforcement personnel;
d.  24-hour access to professional support systems for people with mental disabilities;
e.  access to law enforcement information, programs, and publications for people who have impaired vision or hearing;
f.  recognition of the difference between characteristics common to certain disabilities (such as epilepsy, diabetes, and deafness) and those associated with antisocial or criminal behavior or reaction to alcohol and drug abuse; and,

7.1

g. other accommodations to ensure service and access to all people with visual, mental, emotional and medical disabilities including "invisible' disabilities such as diabetes, epilepsy, multiple sclerosis, loss of hearing and others.

## DEFINITIONS:

a. The term "qualified individual with a disability" means an individual who, with or without reasonable modifications to rules; policies or practices; the removal of architectural, communication, or transportation barriers; or, the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

b. The term "disability" means, with respect to an individual, a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such impairment; or being regarded as having such an impairment.

c. The term "reasonable accommodation" includes the modification of existing facilities to facilities that are readily accessible to and usable by individuals with disabilities; job restructuring, part-time, or modified work schedules; reassignment of an employee with a disability to a vacant position; acquisition or modification of equipment; and appropriate alteration of examinations, training materials, or policies.

## PROCEDURAL OVERVIEW:

a. No single policy or procedure can address law enforcement responses to all people with disabilities. It is the intent of this policy and procedure to guide employees in responding to and assisting those people with disabilities with whom they will have the most contact in the performance of their duties and responsibilities. This policy and procedure addresses common law enforcement interaction with people with disabilities including those who are complainants, victims, witnesses, arrestees, members of the community who desire to participate in department-sponsored programs, people seeking information, and uninvolved bystanders.

b. In all cases, employees must take all steps necessary to assist people with disabilities in accessing the full range of immediate and follow-up services provided by this agency. Consideration must be given to those steps that will lead to a positive outcome while, at all times, maintaining employee safety.

## OVERVIEW OF SPECIFIC DISABILITIES:

a. *Introduction*
   1. It is not the intent of this policy to provide detailed information on all disabilities.
   2. It is incumbent on this agency to make information available to employees, through training and other sources, on various disabilities.
   3. It is incumbent on all employees to become aware of the characteristics of various disabilities and the needs of people who have them.
   4. Employees should be aware that many people have multiple disabilities.
   5. The following section provides a brief overview of several disabilities and how this agency and its employees should respond to the needs of people with these disabilities.

b. *Visual Disabilities*
   1. One of the most difficult issues facing people in need who are blind or vision impaired is identifying law enforcement officials. Employees should offer detailed information in identifying themselves as members of this agency. Whenever possible, if the presence of a visual disability is known, officers may have dispatch contact the victim or complainant to verify to him or her that a member of the Department has arrived. If needed, badges may be offered to the individual to verify the officer's identity.
   2. Knowing what not to do is as important as knowing what to do to assist a person who is vision impaired.
   3. Employees do not need to raise their voice when speaking. Employees should not grab the person's arm to lead him or her in a particular direction. If needed, the individual will take the officer's arm for guidance.
   4. Signs and printed information at law enforcement facilities should be in large print in order to assist people with vision impairments. Room identification signs and elevator information in those facilities where people may proceed unaccompanied should be in Braille for blind people.

c. *Mental, Emotional and Psychological Disabilities*
   1. The terms "mental illness," "emotional illness," and "psychological illness," describe varying levels of a group of disabilities causing disturbances in thinking, feeling, and relating. It has been estimated that ten percent of the population of the United States has some type of mental illness.
   2. Providing accessibility to law enforcement services for people with mental, emotional, and psychological

disabilities usually involves providing only general assistance. At times, exceptional law enforcement services and safe custodial care may be required.

3. Employees must ensure that people with mental, emotional, and psychological disabilities are assisted in accessing agency services, which may require time and patience beyond that usually provided. For example, time spent on a call for service may have to be extended in order to reassure the individual, sort facts, interact with family members and others, and bring the call to successful resolution.

4. If an individual with a mental, emotional, or psychological disability is taken into custody, employees must make reasonable efforts, while taking precautions, to use the least restraint possible and protect the arrestee from self-injury.

5. Frequently, a family member or friend is of great value in calming an individual exhibiting unusual behavior
as a result of mental or emotional impairment. If needed, steps should be taken to gain placement for the individual in an appropriate emergency medical, health care, or shelter facility.

6. Officers must become familiar with appropriate government agencies, nonprofit agencies, volunteer organizations, and emergency medical services available to provide assistance to people with mental, emotional, and psychological disabilities.

7. Officers must remain familiar with appropriate emergency commitment/detention procedures to be used when providing shelter care and related support to people with mental, emotional or psychological disabilities.

d. *Mental Retardation*

1. Mental retardation encompasses a broad range of developmental disabilities from mild to profound. Mental retardation and mental illness are distinct conditions, with no similarity. The largest percentage of people with mental retardation are in the ranges termed "mild" or "moderate."

2. Employees should recognize that people who have mental retardation have varied degrees of limited intellectual functioning. In all situations, employees should ask short questions, be patient when waiting for answers, repeat questions and answers if necessary, have individuals repeat the question in their own words, and provide reassurance. in many situations, and particularly when dealing with someone who is lost or has run away, the employee may gain improved response by accompanying the person through a building or neighborhood to seek visual clues.

3. In responding to the needs of people with severe or profound mental retardation, the aid of family, friends, and neighbors is invaluable.

e. *Mobility Impairments*

1. Among the disabilities that are the most visibly identifiable are mobility impairments. People with mobility-related impairments include those who have difficulty walking, those who use a wheelchair or other mobility aid, and those who are immobile.

2. In a critical or emergency situation, employees should be aware of the safest and most rapid methods for assisting people with mobility impairments to avoid causing them unnecessary strain or injury.

3. In an arrest encounter, once an arrestee with a mobility impairment is secure in a cell and safety concerns are resolved, an effort should be made to return use of any mobility aids (wheel chair, cane, etc.).

4. Department facilities should be accessible to people with mobility impairments. Entrances, interior routes, stairs, drinking fountains, rest rooms, and telephones should accommodate people with mobility impairments including those who use wheelchairs.

f. *Invisible Disabilities*

1. Many disabilities are difficult to notice. A law enforcement officer's failure to recognize characteristics associated with certain invisible disabilities could have serious consequences for the person with the disability. For example, outward signs of a disability such as epilepsy generally do not exist unless the person with the disability experiences a seizure. People with diabetes may have reactions from either too little insulin or too much insulin. Low blood sugar reactions are common and are usually treated by ingesting sugar. Detaining someone and preventing them from getting sugar could have serious health implications for the individual and liability consequences for the officer and department.

2. Officers should realize that involuntary behavior associated with some invisible disabilities may resemble behavior characteristically exhibited by intoxicated or, less frequently, combative individuals. For example, a person experiencing a mild seizure may appear incoherent and physically imbalanced. The response is temporary .

3. An officer's patience and understanding of the characteristics commonly associated with invisible

disabilities will lead to a successful outcome. An inaccurate assessment may lead to unnecessary confrontation, injury, and denial of needed medication and/or medical treatment.

4. As with all types of disabilities, an employee's first obligation is to protect the individual from unnecessary harm. When aiding a person experiencing a seizure, protection from obstacles, a calm reassuring manner, and patience are important responses. Family members and friends should be sought to provide information and assistance. Their presence may prove invaluable in understanding the needs of the person with the disability and guiding the officer's actions.

g. *Speech and Hearing Disabilities*

1. Like other invisible disabilities, officers may confuse the behavior of individuals with hearing and speech disabilities with those of people who intentionally refuse to cooperate or those who abuse illegal substances. Officers should be aware that an individual's failure to comply with or respond to verbal orders does not always constitute defiance, but may be the result of that individual's inability to hear the officer or respond verbally. Before committing themselves to a course of action, officers should attempt to identify whether or not they are dealing with a person who has a communication-related disability.

2. It is essential that officers take extra measures to protect the rights of suspects who are deaf and hard of hearing, as well as others who may not have educational or communications comprehension levels sufficient to fully understand the basic Miranda rights. Simply reading the rights to someone with a hearing disability and having the individual acknowledge that they are understood is insufficient.

3. All law enforcement facilities should be appropriately posted with clearly visible signs that provide essential information to people with hearing impairments.

4. Each facility should be equipped with a variable volume public telephone and a TDD in order to provide telephone access to people who are deaf or hard of hearing who desire to call the law enforcement facility from an external location and those at the facility who desire to make a call to another.

## RESPONSIBILITY OF OFFICERS:

a. In the performance of their duties, law enforcement officers and civilian staff will encounter people with disabilities in every possible situation. In providing law enforcement services to the public, it is incumbent on every employee to ensure that people with disabilities are afforded all rights, privileges, and access to the Department provided to those without disabilities.

b. People with disabilities may also be suspects or arrestees and require detention, transport, and processing. Employees must familiarize themselves with the proper methods of transport, arrest, and detention to ensure officer safety while providing all reasonable support to an arrestee with a disability.

c. Employees must develop the ability to recognize the characteristics of various disabilities, including symptoms, and physical reactions.

d. Employees must recognize that responses of people with certain disabilities may resemble those of people who have abused substances such as alcohol or drugs. At times, such traits may be exhibited by people with diabetes, epilepsy, multiple sclerosis, hearing impairments, and other disabilities.

e. Employees should be able to identify and apply appropriate responses, such as emergency medical aid, protecting and/or calming the individual, using basic sign language, securing professional medical attention, locating and enlisting support of family and friends, and rendering proper physical support.

f. Officers should be able to identify and apply appropriate restraint to a person with a disability, if needed to facilitate an arrest. When affecting an arrest of a person with a disability, officers should be able to access the support systems necessary to secure the rights of the individual. This may include use of interpreters, attorneys, and legal guardians.

g. In all cases, officer safety must prevail. No employee should jeopardize his or her safety or that of others in an attempt to accommodate a person with a disability.

## DEPARTMENT RESPONSIBILITIES:

a. The Department will provide training and information to all employees on recognition of various disabilities and the provision of appropriate law enforcement services to people with disabilities. The Department will provide training to all officers on appropriate response to both nonarrest and arrest situations involving people with disabilities.

b. In order for employees to provide the highest level of service or safe custodial care to people with disabilities, the Department will develop and regularly update a list of agencies available to provide guidance, support, and direct assistance.

c.   The Department will maintain a roster of support agencies and individuals who may be contacted on a 24-hour-per-day basis to provide support in situations involving people with disabilities. The Department will provide reasonable accommodation to all qualified individuals who have disabilities.

d.   Routine and Emergency Interaction. In providing routine and emergency services, equality in response, support and protection will be provided to all people including those with disabilities. Officers will make every effort to access appropriate support organizations when needed. (Successful liaison between law enforcement and support services agencies has led to improved service to people with disabilities in major cities and counties throughout the United States.) All Department services will be made available to people with disabilities. This includes:

1.   Communications accessibility for both emergency and routine situations. All dispatchers will be trained to recognize characteristics of people whose disabilities may require special communications techniques and methods for providing service. The Department will maintain TDD services for deaf and hard of hearing people and provide direct access to telephone emergency systems for individuals who use TDD'S.

2.   Access to Department programs. Crime prevention programs such as target hardening and neighborhood watch, youth programs, in-school programs, and other programs will be made available to people with disabilities through outreach, modified program schedules, use of interpreters or other a aids and services, and other efforts to accommodate special needs.

3.   Response to routine calls for service.
   (a)   Department employees should be aware that people with disabilities have special needs that may have to be met in order to provide the best possible law enforcement response to calls for service. Officers should be able to identify specific needs of people with disabilities.
   (b)   Employees should be sensitive to the fact that some people with disabilities may be targeted as crime victims as a direct result of their disability.
   (c)   Employees should be familiar with techniques they may employ at a scene (during the initial call for service and follow-up) to provide support to people with disabilities. All reasonable steps should be taken to aid people with disabilities in bringing calls for law enforcement service to successful completion.

4.   Response to emergency calls for service
   (a)   Employees should be able to identify characteristics common to specific disabilities in a crisis or emergency so that appropriate action may be taken to render aid and assistance. If the person with the disability is unable to communicate, employees should seek a medical alert bracelet or similar form of ID and input from family, witnesses, and others to aid in identifying the nature of the disability.
   (b)   As first responders, all employees should be aware of emergency medical techniques applicable to various disabilities.
   (c)   All employees should be able to apply emergency signs to people who are deaf to obtain basic information on matters such as nature of the incident, location and extent of injury, name and address, and family member or other person to be contacted.

5.   Response to criminal and disruptive behavior
   (a)   Some people with disabilities commit crimes. Some people with disabilities also exhibit disruptive behavior.
   (b)   Generally, people with disabilities who commit crimes or engage in disorderly conduct should receive no preferential treatment. However, disorderly conduct should not be treated as a criminal activity when it is the manifestation of a disability. For example, when such conduct is the result of a seizure or mental disability, the call for service should be handled as a medical call rather than an arrest situation.
   (c)   Officers should be aware that, in such situations, it is common for people with disabilities to seek sympathy as a way to lessen the outcome of the law enforcement response.
   (d)   In all such situations, officers should take reasonable precaution to protect themselves and others.
   (e)   Arrest and Incarceration

6.   Employees should employ appropriate precautions and safety techniques in arresting and incarcerating all people, whether or not they have a disability. Officers should follow all policies and standard techniques for arrest and incarceration when taking a person with disabilities into custody.

7.   Consideration should be given to the special needs of some people with disabilities in an arrest situation. Response in these situations requires discretion and will be based, in great part, on the officer's knowledge of characteristics and severity of the disability, the level of resistance exhibited by the suspect, and immediacy of the situation. In arrest and incarceration situations, employees may encounter the following:

(a)   A person whose disability affects the muscular and/or skeletal system may not be able to be restrained using handcuffs or other standard techniques.  Alternative methods (transport vans, seat belts) should be sought.

(b)   Some people with disabilities require physical aids (canes, wheel chairs, leg braces) to maintain their mobility.  Once the immediate presence of danger has diminished and the suspect is safely incarcerated, every effort should be made to return the device.  If mobility aids must be withheld, the prisoner must be closely monitored to ensure that his or her needs are met.

(c)   Prescribed medication may be required at regular intervals by people with disabilities (diabetes, epilepsy).  Medical personnel (the suspect's physician, on-call medical staff, emergency room medical staff) should be contacted immediately to determine the importance of administering the medication, potential for overdose, etc.

(d)   Some people with disabilities may not have achieved communications comprehension levels sufficient to understand their individual rights in an arrest situation. (For people who are deaf, there is no sign language for the term "waive" in regard to the Miranda rights.  Yet, in an effort to be cooperative, a suspect who is deaf may acknowledge that he or she is willing to give up his or her rights.)  Officers must take extra care to ensure that the rights of the accused are protected.

(e)   Lack of speech or other speech impairment may make it difficult for a suspect to notify the arresting officer or jailer of an urgent need.  Frequent cell checks should be conducted.

# SECTION 8
# APPLICANTS/EMPLOYEES WITH DISABILITIES

**POLICY:**   To provide applicants and employees with disabilities the opportunity to compete on an equal basis with others, and to provide clear, strong, consistent and enforceable procedures addressing discrimination against individuals with disabilities. Public Law 101-336 (42 USC 12101), dated July 26, 1990 cited as the "Americans With Disabilities Act of 1990" shall be used to resolve any questions or issues relating to this subject.
**NOTE: 42 USC references following each section identify location of the data in the Public Law.**

a.   *DEFINITIONS:*
    (1)   "Disability" means, with respect to an individual;
        (a)   A physical or mental impairment that substantially limits one or more of the major life activities of such individual;
        (b)   A record of such impairment; or
        (c)   Being regarded as having such impairment. (42 USC 12102 - Section 3.2)
    (2)   "Direct Threat" means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodations. (42 USC 12111 - Section 101.3)
    (3)   "Qualified Individual With A Disability" means an individual with a disability who, with or without reasonable accommodations, can perform the essential functions of the employment position that such individual holds or desires. (42 USC 12111 Section 101.8)
    (4)   "Qualification Standards" may include a requirement that an individual shall not pose a threat to the health or safety of other individuals in the department. (42 USC 12113 Section 103.b)
    (5)   "Reasonable Accommodation" may include -
        (a)   Making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and,
        (b)   job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities. (42 USC 12111 - Section 101.9)

b.   *QUALIFIED INDIVIDUAL WITH A DISABILITY:*
    The Chief of Police shall determine what functions of a job are essential, and prepare a written description of the job to be performed before advertising or interviewing applicants for the job; this description shall be considered evidence of the essential functions of the job. (42 USC 12111 - Section 101.8)

c.   *DISCRIMINATION:*
    This agency shall not discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment. (42 USC 12112 - Section 102.a)

d.   *PRE EMPLOYMENT INQUIRIES:*
    The department may make pre employment inquiries into the ability of an applicant to perform job related functions. (42 USC 2112 - Section 102.c-2-b)

e.   *AUTHORIZED MEDICAL EXAMINATIONS:*
    The department may require a medical examination **AFTER** an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination if:
    (1)   all entering employees are subjected to such an examination regardless of disability;
    (2)   information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated  as confidential medical records, except that:

(a) supervisors may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

(b) first aid and safety personnel may be informed when appropriate, if the disability might require emergency treatment; and

(c) government officials investigating compliance with the "Americans With Disabilities Act of 1990", shall be provided relevant information on request; and

(3) the results of such examination are used only in accordance with the Act. 42 USC 12112 - Section 102 - c-3 a, b and c)

f. *PROHIBITED MEDICAL EXAMINATIONS:*

The department shall not require a medical examination, nor make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation as required under this act. (42 USC 12112 - Section 102 - 4a)

g. *ACCEPTABLE EXAMINATIONS AND INQUIRIES:*

The department may conduct voluntary medical examinations, including voluntary histories, which are a part of an employee health program available to employees at the work site. The department may make inquiries into the ability of an employee to perform job related functions. (42 USC 12112 - Section 102 - 4b)

h. *REQUIREMENT:*

Information obtained under paragraph (G) regarding the medical condition or history of any employee is subject to the requirements of paragraph (E) of this policy. (42 USC 12112 - Section 102 - 4c)

i. *INFECTIOUS AND COMMUNICABLE DISEASES:*

(1) In any case an individual has an infectious or communicable disease that is transmitted to others through the handling of food, that is included on the list developed by the Secretary of Health and Human Services, and which cannot be eliminated by reasonable accommodation, the department may refuse to assign or continue to assign such individual to a job involving food handling. (42 USC 12113 - Section 103 - d2)

(2) Nothing in this policy shall be construed to preempt, modify, or amend any State, county or local law, ordinance or regulation applicable to food handling which is designed to protect the public health from individuals who pose a significant to the health or safety to others, which cannot be eliminated by reasonable accommodation. (42 USC 12113 - Section 103 - d3)

j. *ILLEGAL USE OF DRUGS AND ALCOHOL:*

(1) For the purposes of this section the term "Qualified Individual With A Disability" shall not include any employee or applicant who is currently engaged in the use of drugs, when the department acts on the basis of such use. (42 USC 12114 - Section 104 - a)

(2) Nothing in subsection (1) shall be construed to exclude as a qualified individual with a disability an individual who:

(a) has successfully completed a supervised drug rehabilitation program and is no longer engaged in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use;

(b) is participating in a supervised rehabilitation program and is no longer engaged in such use; or

(c) is erroneously regarded as engaged in such use, but is not engaged in such use;

(d) except that it shall not be a violation of the Act or this Policy for the department to adopt or administer reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual described in paragraph (a) or (b) is no longer engaging in the illegal use of drugs. (42 USC 12114 - Section 104 - b 1, 2 and 3)

(3) Authority:

(a) The department may prohibit the illegal use of drugs and the use of alcohol at the work place by all employees. (42 USC 12114 - Section 104 c1)

(b) The department may require that employees shall not be under the influence of alcohol or be engaging in the illegal use of drugs at the work place. (42 USC 12114 - Section 104 c2)

employees to the same qualification standards and requirements established under the Drug-Free Work Place Act of 1988. (41 USC 701 et seq.) (42 USC 12114 - Section 104 c3)

    (d)    The department may hold an employee who engages in the illegal use of drugs or who is an alcoholic to the same qualification standards for employment or job performance and behavior that the department holds other employees, even if any unsatisfactory performance or behavior is related to the drug abuse or alcoholism of such employee. (42 USC 12114 - Section 104 c4)

k.    *DRUG TESTING:*

    (1)    For the purposes of the Act and this Policy, a test to determine the illegal use of drugs shall not be considered a medical examination. (42 USC 12114 - Section 104 d1)

    (2)    Nothing in this policy shall be construed to encourage, prohibit, or authorize the conducting of drug testing for the illegal use of drugs by job applicants or employees or making employment decisions based on such test results. (42 USC 12114 - Section 104 d2)

l.    *ACTION:*

The Chief of Police shall have the authority to remove employees who test positive for the illegal use of drugs, and on duty impairment by alcohol.

# SECTION 9
# ARREST PROCEDURES

**POLICY:**  Laws of arrest, search and seizure are defined by the United States Constitution, Arkansas Statutes, and judicial interpretation to protect individual rights of all persons.  It is the policy of this agency to always use legal justification and means for any arrest, search or seizure.

I.  Only sworn officers shall make arrests or serve arrest warrants.  Non-sworn employees shall direct persons surrendering at the department to an officer for arrest or to serve an arrest warrant.  Use caution, planning, and correct approach to help reduce dangers of making arrests.

II.  You may arrest when you have an arrest warrant, reasonable belief there is an outstanding arrest warrant, or probable cause to believe a crime has been committed.

1.  Most arrests can be made simply by communicating verbally with the person to be arrested that he/she is under arrest. It is unnecessary to apply any physical force or to touch the body in this type of arrest situation unless the person arrested needs to be handcuffed.

2.  It is the policy of this agency that officers making an arrest verbally advise the arrestee, "you are under arrest or a similar phrase to ensure arrestee clearly understands he/she is under arrest.

3.  Fortunately most citizens who are arrested will comply with a police officers command and submit to arrest without incident. However, occasionally a citizen will become argumentative or violent in their refusal to submit to an arrest. In this type of arrest situation the following guidelines will be followed:
    a.  Only the force necessary to effectively make the arrest will be used.

### Example
If an individual is only argumentative and is hesitant in complying with an officers orders, he/she will be led to the preferred destination, (generally a police vehicle), by the officer(s) holding the individuals arm as a method of guidance, (minimum force necessary is used to effect the arrest). **NOTE:** Verbal assault is not considered as a legitimate excuse to apply any type of physical force as long as the individual voluntarily submits to the arrest.

### Example
If an individual becomes violent, (fighting or struggling with officers), at any time during an arrest, officers are justified to use whatever non deadly force is necessary to effectively make the arrest.
Force will be escalated in the following order:
a.  Verbal commands
b.  O.C. Spray (if training is documented and certification issued).
c.  Use of Baton or similar device for which training documentation is available.
d.  Use of hands to apply restraining holds.
e.  Use of Taser or similar device for which training documentation is available.

### Example
If an individual produces a deadly weapon at any time during an arrest, officers will be justified in using deadly force to protect themselves or others from what is reasonably perceived to be an immediate threat of death or serious bodily harm.

a.  In any type of arrest situation officers will exercise caution and call for back-up at any point during the arrest procedure that there is the slightest possibility that any type of force will become necessary.
b.  Sworn law enforcement personnel shall be allowed to make a non-Warrant Arrest when:
    (1)  A criminal offense has been committed in his presence, either felony or misdemeanor;
    (2)  When the law enforcement officer has "reasonable grounds" for believing the person arrested has committed a felony offense;
    (3)  When acting in accordance with authority specified within Arkansas Rules of Criminal Procedure 4.1 through 4.6;
    (4)  Pursuant to ACA 16-81-106, when the law enforcement officer has "probable cause" to believe that the person arrested has committed the criminal offense of misdemeanor battery and the law

9.1

# SECTION 10
# AUXILIARY OFFICER FORCE

**POLICY:**   The Auxiliary Officer Force is authorized to supplement the staffing of the regular officers and employees, and will be governed by this and all Policies and Procedures adopted for this agency.

PROCEDURES:

A.   General

    (1)  Members of the Auxiliary Officer Force will be sworn in upon their acceptance to membership and completion of training.  The taking of this oath does not give the newly sworn Auxiliary member full powers and authority of a sworn law enforcement officer.

    (2)  The uniform prescribed for the Auxiliary Officer Force is as specified in **SECTION 107, UNIFORMS/GROOMING,** this Policy Manual.

    (3)  The Chief of Police, or his/her designee,  will serve as liaison between the department and Auxiliary Officer Force.

    (4)  In accordance with **ACA 12-9-306**, this agency will appoint no more auxiliary law enforcement officers than the  larger number of:

        (a)  One (1) auxiliary law enforcement officer for each full-time certified law enforcement officer employed by this agency; *or*

        (b)  One (1) auxiliary law enforcement officer for each one thousand (1,000) persons residing in the county, as  determined by the last official census.

        (c)  Any greater number than that allowed in paragraphs (a) and (b) above must be approved by the Arkansas Commission on Law Enforcement Standards and Training.

B.   Recruitment/Selection/Staffing

    (1)  Applications from persons desiring to become an Auxiliary Officer will be accepted on a continuous basis throughout the year and retained by the Chief of Police.

    (2)  Once annually, the Commander, Auxiliary Officer Force will process those applications on file and appropriate recommendations to the Chief of Police pertaining to the selection of new auxiliary officers for any open positions.

    (3)  Based on those recommendations appropriate basic training will be scheduled for new recruits.

    (4)  Newly selected auxiliary officers waiting for basic training will be encouraged to ride with officers, keeping in mind that they can take no law enforcement action.

C.   Membership

    (1)  Members of the Auxiliary Officer Force will be classified as Patrol Auxiliary Officers or Administrative Auxiliary Officers and will perform those duties as defined in paragraph I.

    (2)  It is recognized that some citizens may be interested in assisting the department in areas other than patrol operations.  Examples of these areas would include communications, records and special "in-house" projects.  Those persons selected for these administrative duties will receive the same classroom training as other auxiliary officers but will not be furnished a firearm to carry or be sworn.

    (3)  Membership will be open to all individuals who meet the following requirements, which are the same as for regular law enforcement officers:

        (a)  Age - applicants must be 21 years of age.

        (b)  Education - high school diploma, GED or equivalent.

        (c)  Residency (revised)

        (d)  Drivers' license - must hold valid Arkansas license and be able to operate a vehicle with no mechanical  adjustments to standard equipment.

        (e)  Be free of a felony record and this will be evidenced by not having entered a plea of guilty or having been convicted, pardoned or otherwise relieved by a state or the Federal Government of a crime, the punishment for which could have been imprisonment in a federal or a state prison.

(f)  US citizen.

(g)  Undergo a background investigation.

(h)  Complete and submit law enforcement officer application, personal history statement, and medical history questionnaire.

(i)  Be fingerprinted and a search initiated of state and national fingerprint files to disclose any criminal record.

(j)  Be examined by a licensed physician and meet the physical requirements prescribed in Specification S-5, Executive Commission on Law Enforcement Standards and Training Rules and Regulation Manual.

(k)  Be examined by an individual licensed to practice psychiatry or psychology and qualified to perform such evaluations in the State of Arkansas.

(l)  Be interviewed by the Chief of Police or his representative(s) to determine such things as motivation, appearance, demeanor, attitude and ability to communicate.

(4)  Applications, personal history statements and medical history questionnaires must be obtained from and returned to the Chief of Police who will insure prompt processing and investigation of applicants.

(5)  An interview of all applicants will be conducted by the Chief of Police or his representative(s).  Applicants will be notified of the date, time and location of the interviews.

(6)  Applicants tentatively selected will be required to provide a copy of a recent (within the last year) medical examination showing satisfactory physical capability to perform duties as a law enforcement officer.

(7)  Completed files, with the comments of the Auxiliary Officer Force Commander will be sent to the Chief of Police for membership determination.

(8)  All candidates will be notified in writing of acceptance or rejection of their application by the Chief of Police.

D.   Training

(1)  New members selected for Auxiliary Officer status will be required to complete a basic training course of at least 100 hours prior to being sworn.

(2)  Auxiliary recruits will be required to fire a score of 80 or above on the Police Qualification Course -- Handgun before being sworn.  Each recruit will be given 2 opportunities to qualify.

(3)  Those recruits who are unable to qualify will be invited to remain active as an Administrative Auxiliary Officer.  If that is not agreeable they will be removed from membership.

(4)  Following successful completion of the basic training course, officers will be issued a weapon, uniforms, an ID card will be sworn and allowed to participate in field training and limited duty assignments.  Officers serving in an administrative capacity will not be issued a weapon nor sworn but will be issued uniforms and an ID card.

(5)  All training is based on the Basic Police Officer training program, as defined by the Executive Commission on Law Enforcement Standards and Training.

(6)  Detailed training records will be kept on each member showing satisfactory accomplishment of performance objectives.

(7)  To remain active as an Auxiliary Officer, members will be required to qualify semi-annually at the firearms range by firing a score of 80 or above on the current qualification course.  If at the end of 6 months, an officer has not qualified, or after two unsuccessful attempts to fire a qualifying score of 80, the member will not be allowed to continue as an Auxiliary Officer.  At that point the member can either change to an Administrative Auxiliary position or they will be removed from the membership.  Normally it will be the responsibility of the individual to furnish weapons.

(8)  Those officers who have completed the 100 hour basic training course will be scheduled for a 40 hour program biannually which provides such members with in-service training to correspond with their duties.  In addition, specialized training may be provided as requested by the members of the Auxiliary Officer Force, and as available.

(9)  On-the-job training will be accomplished by working with regular officers on vehicle patrol.

E.   Probationary Status: All Auxiliary officers will serve a minimum one year probationary period.  Following this one year period, a review board consisting of the Auxiliary Commander and Chief of Police will review the probationary officer's record and will either 1) approve the officer for permanent status, 2) extend the probation period or 3) terminate the officer.

F.   The Chief of Police, in conjunction with the Commander of the Auxiliary Officer Force will conduct an annual

review of the performance of the Auxiliary Officer Force and determine if changes are needed in the organizational structure or personnel assignments.

G.   Service Requirement: A minimum of 120 hours of in-service time (e.g. training sessions, monthly meetings, patrol duties) is required each year. This will be accomplished by working at least 8 hours of patrol or administrative duty per month. Members failing to meet this requirement without valid reason will be considered for inactive status.

H.   Meeting requirement: The Auxiliary Officer Force organization holds bi-monthly meetings and each member is expected to attend these meetings. Three (3) unexcused absences, during the calendar year, by an Auxiliary Officer will be grounds for the dismissal of their membership. Illness, job related or formal education conflicts will not be considered unexcused absences, but Auxiliary Officers shall notify their respective Commander of such absence.

I.   Duty Assignments

(1)   Auxiliary Officer powers and authority are restricted by this department in that they are not authorized to work alone in order to perform neither routine patrol nor are they authorized to exercise full powers of arrest unless under direct supervision of a full-time certified law enforcement officer.

(2)   Auxiliary Officers may be assigned to a variety of types of law enforcement duties. Such duties include, but are not limited to, the following:

(3)   Patrol:
   (a)   Accompanying and assisting a regular officer on vehicle patrol.
   (b)   Performing traffic control at designated locations for parades and special events.
   (c)   Assisting at special events in the parks, downtown areas, sports events, events which draw large crowds in crowd and pedestrian control, providing information, etc.
   (d)   Assist in performing stake-outs, undercover assignments, surveillance, security at crime scenes, etc.
   (e)   Available as resources in case of emergency, natural disaster, civil disturbances, etc.

(4)   Administration
   (a)   Assist dispatcher in Communications Center.
   (b)   Assist jailers in Detention Facility.
   (c)   Assist staff members with special administrative projects.

J.   Duty Procedures:
   (1)   Auxiliary officers reporting for duty will report to the shift supervisor, who will assign the officer to duty based on current need.
   (2)   Auxiliary officers will not report for duty unless they are physically and mentally prepared and capable to perform any duty assignment.
   (3)   Auxiliary officers will personally log in with the dispatchers on sign-in sheets. The following information will be included on sign-in sheets: Name, date, time-in; time-out, unit and officer assigned with.
   (4)   Auxiliary officers will normally be notified 48 hours prior to any event where their services are needed, except in emergency situations.
   (5)   Auxiliary officers will be expected to fulfill assignment commitments unless an emergency arises, in which case the department should be notified.
   (6)   Auxiliary officers will not work a time combination of normal job and auxiliary duty, the combined time of which exceeds their physical and mental capacity to properly perform their law enforcement responsibilities.
   (7)   Supervisors and regular officers working with Auxiliary officers are encouraged to submit to their supervisor any positive or negative comments pertaining to auxiliary duty performance. These comments will in turn be referred to the Auxiliary Commander and Chief of Police.

K.   Inactive Roster:
   (1)   Auxiliary officers may be placed involuntarily or may voluntarily request in writing to be placed on an inactive status for:
      (a)   Reasons of health.

      (b)   Pursue education.
      (c)   Employment conflicts.
      (d)   Age.
      (e)   Failure to satisfy service requirements.

(2) Auxiliary officers will be allowed to remain in an inactive status for a period of six (6) months. At the end of that time the officer must return to active duty or resign, unless placed on the permanent inactive roster. Inactive officers will be required to turn in uniforms, equipment, weapon, badges, and ID cards.

(3) Auxiliary officers will be placed on the permanent inactive roster at age 60 and may be allowed to perform limited non-street duty. Officers may request, in writing, a waiver of this requirement in which case the request will be reviewed by the Chief of Police and a decision made.

L.   Uniforms and Appearance:
    (1)   Uniforms for Auxiliary officers are prescribed by **SECTION 107, UNIFORMS/GROOMING**.
    (2)   Auxiliary officers will not carry an off-duty gun unless they have a valid and current concealed weapons permit obtained under current state law.

M.   Injury on Duty:
    (1)   Auxiliary officers are covered by the worker's compensation system.
    (2)   Auxiliary officers injured on duty will report same to supervisor, and if medical treatment is necessary will report to the hospital for examination.
    (3)   Auxiliary officers will be required to complete any and all paperwork related to injuries in a timely manner, including a "Claimant's Notice of Accident" form.

N.   Termination:  Auxiliary officer appointments may be terminated by the Chief of Police for cause.

O.   Responsibilities:
    (1)   Auxiliary officers who assist an officer at an incident or arrest must be aware that their testimony may be required in court and that they are subject to subpoena in any case.
    (2)   In the eyes of the public, Auxiliary officers on-duty are viewed as law enforcement officers and their conduct must at all times be totally professional.
    (3)   Just as regular law enforcement officers are held by the community to a higher standard of off-duty conduct, so will be Auxiliary officers.

# SECTION 11
# BAIL BONDS

**POLICY:**   No employee shall become involved directly or indirectly in recommending or arranging for a bondsman or posting bond for any person charged with a criminal or traffic offense. The only exception to this rule is if the arrested person is a member of the employee's family.

a.    No employee shall suggest the name of, or recommend, a Bail bond company to any person who is involved in a criminal, traffic, or civil action.

b.    Bail bond procedures will be established by the Judges of the Circuit and Municipal Courts. Should any question arise concerning bond procedures, including recognizance bonds, law enforcement officers shall contact their immediate supervisor for guidance.

c.    A complete list of all licensed/practicing Bail bond companies will be updated as needed by the Jail Administrator and kept in the booking/processing area for easy reference.

d.    The list of Bail bond companies will be made available to incoming arrestee's or incarcerated individuals who are eligible to post a bond. The list is not to be removed from the booking/processing area.

e.    Under no circumstances will a Bail bond person be allowed to remain on departmental property for any reason other than official business. Official business includes speaking to an individual concerning a bond or actually writing a bond.

## SECTION 12
## BOMB THREATS/DISASTER PLANNING

**POLICY:**    When planning a response to a bomb threat or disaster, there are a number of factors which must be considered. The preservation of life and property is certainly the most important consideration. There is no single course of action that will always be suitable. Each situation must be evaluated individually. Immediate and total evacuation of an area may appear to be the obvious solution; however, if handled incorrectly this can be both ineffective and dangerous. Some planning is necessary so that the response will be orderly and efficient.

a.    PRIOR PLANNING:
- (1)    The Police Chief or Fire Chief or their designee, shall be responsible for coordinating Emergency Services for the City, and shall direct City department heads and allocate municipal resources. The location of the Control Center will be determined by the Police or Fire Chiefs.
- (2)    The staff in the Control Center should be limited to those employees who have a specific function to provide. The number of persons should be as small as possible.
- (3)    The Chief of Police shall be designed as the "Field Commander", however, in the absence of the Chief, the Assistant Chief or other command level officer as assigned will assume incident command until being relieved of that responsibility.

b.    CONTROL CENTER:
- (1)    Duties:
    Initiate planned procedure.
    Notify and coordinate activities of other personnel.
    Release necessary information to the press.
    In accordance with the Public Information policy.
- (2)    Decision Making Process:
    - •    Who will make decisions for the City?
    - •    Deciding factors for evacuation, search, and continuation of business.
    - •    Situation (bomb threat, civil unrest, etc.)
    - •    Vulnerability and accessibility of target area.
    - •    Probable risks involved.
    - •    Practicality of evacuation.
    - •    Type of search to be implemented.
    - •    Who will conduct the search?
- (3)    Course of Action:
    - •    Total evacuation of facility.
    - •    Selective evacuation.
    - •    No evacuation.
    - •

c.    RECEIVING A BOMB THREAT:
- (1)    Telephone: The majority of bomb threats are made by telephone. All personnel who handle incoming calls should be supplied with a bomb threat checklist.
- (2)    The checklist should provide the following information:
    - ▪    When is bomb going to explode?
    - ▪    Where is it now?

    - ▪    What does it look like?
    - ▪    What kind of bomb is it?
    - ▪    What will cause it to explode?
    - ▪    Did you place the bomb?
    - ▪    Why?
    - ▪    What is your address?
    - ▪    What is your name?
    - ▪    Exact wording of the threat
    - ▪    Sex of caller
    - ▪    Race (sound of voice)
    - ▪    Age, approximate (sound of voice)

- Length of call
- Name of person receiving the call
- Number at which call is received
- Time the call was received
- Date the call was received

CALLER'S VOICE

| | | |
|---|---|---|
| Calm | Crying | Deep |
| Angry | Normal | Ragged |
| Excited | Distinct | Clearing Throat |
| Slow | Slurred | Deep Breathing |
| Rapid | Nasal | Cracking Voice |
| Soft | Stutter | Disguised |
| Loud | Lisp | Accent |
| Laughter | Raspy | Whispered |

If voice is familiar, who did it sound like?

BACKGROUND SOUNDS

| | |
|---|---|
| Street Noises | Office Machines |
| Crockery | Factory Machines |
| Voices | Animal Noises |
| P A System | Clear |
| Music | Static |
| House Noises | Local |
| Motor | Booth |

THREAT LANGUAGE

| | |
|---|---|
| Well-spoken | Incoherent |
| Profane | Taped |
| Irrational | Message (Read by person making threat) |

**REPORT CALL IMMEDIATELY TO CHIEF OF POLICE.**

d.    EVALUATION:
   (1)   Having evaluated the credibility of the threat, it is necessary to decide whether to:
         (a) Take no action; or
         (b) Search without evacuation; or
         (c) Initiate a partial evacuation; or
         (d) Conduct a complete evacuation and search.
   (2)   The final decision to evacuate is made by the person in charge of the premises after receiving a recommendation from the incident commander.
   (3)   If the decision to evacuate is made, all persons should be evacuated to a location a safe distance from the area.

e.    SEARCH:
   (1)   Regardless of the extent of evacuation, a search is almost always advisable.  Questions to be answered before conducting a search include:
         (a)    Will it be an OVERT search? or
         (b)    Will it be a COVERT search?
         (c)    Will it be conducted without evacuation? or
         (d)    Will it be conducted after evacuation?
   (2)   Circumstances of a partial or no evacuation will often necessitate a COVERT search

         (a)    A Covert search is conducted to avoid both panic and the interruption of business operations, and is normally executed by a few supervisory or management personnel, without arousing employee suspicions.
         (b)    An Overt search increases the efficiency of the operation, when a specially-selected and trained team is used.

    (c)    If, during the process of a search a suspect device, box, sack, or other container is located, <u>DO NOT TOUCH IT</u>, and do not assume it to be the <u>ONLY</u> device.

        (1)    Clear and secure the immediate area and notify the control center.

        (2)    The finding of one suspected device does not end the search.  More devices may be present and search efforts must continue until the entire facility has been checked.

        (3)    If a prolonged search is unavoidable, the search team should be given a break period every three (3) hours.  Six (6) hours is about the maximum time a search team can function effectively.

        (4)    In the event no explosive device is found, the decision to reenter will be influenced mostly by the confidence in the search procedure.

f.    <u>EMERGENCY ASSISTANCE:</u>

Should an emergency situation arise, involving a bomb threat or removal of a suspected explosive device, emergency assistance may be requested by contacting:

    *(1)*    *(If other than military or federal facility)*
           State Police

    (2)    *(If Military Ordnance)*
           52nd Ordnance Detachment - Pine Bluff Arsenal
           (501) 534-1850

    (3)    *(All Federal Facilities except U. S. Postal Facilities)*
           FBI - Little Rock
           (501) 221-9100

    (4)    U. S. Postal Facilities
           U. S. Postal Inspectors-Little Rock
           (501) 945-6720

# SECTION 13
# CANINE (K-9) OPERATIONS

**POLICY:**  Because of a superior sense of smell and hearing and potential aggressiveness, the trained law enforcement canine is a valuable supplement to law enforcement manpower. However, utilization of canines requires adherence to procedures that properly control their use of force potential and that channel their specialized capabilities into legally acceptable crime prevention and control activities. The legal advisor to the Chief of Police shall review all rules, regulations, policies, and procedures relating to K-9 operations and make changes necessary for compliance with existing criminal and civil liability law.

## ADMINISTRATION AND MANAGEMENT

a.  The K-9 unit will be supervised by an officer who will be responsible for maintaining and assuring the accuracy and completeness of procurement, health, operational reports and training records relating to the K-9 operation.

b.  Operational reports will be prepared by the handler in all situations where K-9 intervention is necessary. Copies of all incident, offense and supplemental reports will be submitted to the supervisor for creation of a file for statistical analysis.

c.  The supervisor will research state of the art training procedures for the K-9 and handler, prepare a scheduled re-training program to be provided at regular intervals, select an approved training site and submit recommendations to the Chief of Police for approval.

d.  The K-9 shall be obtained from a kennel or other supplier who has a verifiable record of satisfactory performance in providing dogs and training to other law enforcement agencies.

e.  Any K-9 that is approved for purchase by the department shall, prior to acceptance, have a certificate or letter of good health issued by a licensed veterinarian authorized to conduct examinations and certify the physical and emotional (temperamental) condition of an animal that is to be utilized in public service as a police working dog.

    (1)  Each K-9 owned or controlled by the department shall annually receive an examination by a qualified Veterinarian to determine the K-9's suitability for retention by the department.
         A K-9 may have a fitness for duty examination at anytime as determined necessary.

    (2)  The type, quantity of food and feeding schedule shall be provided, and the K-9 handler shall be responsible for complying with recommendations of the licensed Veterinarian who is contracted to provide care.

    (3)  Housing/Sanitary requirements, for the K-9 when off duty, will be in compliance with recommendations made by a licensed veterinarian who is contracted to provide care.

    (4)  At any time the K-9 is kept in a kennel the supervisor shall randomly inspect, or arrange for a veterinarian to routinely inspect its conditions. The kennel will be maintained in a manner which is in compliance with established standards for temperature, food, watering and sanitary conditions. This will insure a clean & healthy off duty environment for the K-9.

f.  No dog that has been trained as a "guard dog" (one that will attack on detection of intrusion, or will attack a human being without command) will be acceptable for utilization by this agency.

g.  Any dog owned or controlled by the department that exhibits any tendency of loss of control, or when unprovoked, attacks or bites another person, or in the opinion of the legal counsel or the Chief of Police creates a public or individual liability, or poses a threat to an individual or public safety shall be removed from law enforcement service and disposed of in a manner acceptable to the county.

## OPERATIONAL PROCEDURES

a.  Should any question arise from this portion of this document it shall be resolved in a manner that complies with the department policy relating to the K-9 Unit. The operational procedures are designed as instructions or directions for the establishment and operation of the K-9 Unit and may be subject to change by the Chief of Police.

b.  Any changes of these instructions or directions will be recommended by the supervisor of the K-9 Unit and submitted to the Chief of Police for approval. Upon approval, the Chief of Police will direct that the changes be made in this section of the Department Policy Manual.

c.  Any act performed by a trained handler using a Department K-9 in the performance of duty may, depending upon the circumstances, be considered as the use of physical or deadly force.

d.  Under no circumstances shall a K-9 handler command the dog to use more force than is necessary to enforce the law, or to protect himself, the dog or other person from the loss of life or the threat of serious physical injury.

e.    The use of deadly force may be justified accordingly. Situations where force necessary to prevent the loss of life is normally not required in other circumstances.

## REQUEST FOR K-9 SERVICES

a.    A K-9 team shall consist of one (1) handler and one (1) dog that have met the minimum training requirements as established by the Chief of Police.

b.    When <u>on duty</u> any certified law enforcement officer may request the assistance of a K-9 team. Approval or disapproval of the request shall be determined by the <u>on duty</u> supervisor.

c.    When the K-9 team is <u>off duty and on call</u>, their services may be requested by any certified law enforcement officer. Approval or disapproval of the request shall be determined by the Chief of Police or the highest ranking officer on duty at the time of the request.

d.    When <u>on duty or off duty and on call</u> should assistance be requested by another law enforcement agency, approval shall be given to other jurisdictions who have entered into a mutual aid agreement with the City. The only exception is, approval may be authorized for other jurisdictions who have written approval from the Chief of Police to provide this service without a mutual aid agreement.

## TYPES OF APPLICATIONS:

a.    Each police dog handler shall be trained in the tactical application of his dog prior to being placed in an operational status. A dog handler will assist in formulating plans of action for effective K-9 use. K-9 use will be based upon the immediate circumstances of a situation. Examples of situations in which K-9 teams might properly be used are:
      (1)    building searches
      (2)    tracking of suspects
      (3)    clearing open areas
      (4)    evidence searches
      (5)    chase and subdue suspects fleeing the scene
      (6)    crowd control
      (7)    lost persons

## OPERATIONAL PROCEDURES

a.    <u>Building Search</u> - When an incident occurs where a K-9 may be used for searching a building, responding officers must be aware that, generally, when a building has been closed for the night, the odors in the building tend to dissipate. When a person enters the building or opens a door or window, this allows a draft or wind to enter and disturbs the suspect odor trail and spoiling the scene. When the responding officer believes an unauthorized person is in a building, his responsibility is to secure the building, permitting no one to enter, and to call a K-9 team, which will enter and search the building. Prior to the building search, the K-9 handler will verbally announce a warning to anyone inside the building that a K-9 will be released to conduct a search. The K-9 handler will urge anyone inside the building to surrender at that time. If there is no response the K-9 will then be released by the handler to conduct the initial search.

b.    <u>Tracking</u> - When an incident occurs where a K-9 team may be used for tracking a suspect, the responding officer shall make certain that no person enters the area used by the suspect to make his departure. Since the subject's odor will be predominant, the entire scene must be free of other contamination. If material has been dropped be the fleeing suspect, such material and the area surrounding it must not be disturbed because the dog may detect the suspect's odor from the material. In tracking situations, the responding officer should immediately contact the complainant. The contact should be made in a manner that least disturbs or contaminates the scene. Back up units should not respond to the scene, but position themselves around the perimeter of the incident so the suspect cannot leave the area.

The purpose of the back up unit is to observe the general area to see anyone leaving. Generally speaking, dogs are capable of picking up a scent several hours after the suspect has left the area if the scene has not been contaminated by another person.

Weather has a definite effect on tracking ability. Humid early morning hours, with no wind offer ideal tracking conditions. Tracking on paved streets is difficult because of the odor of the pavement itself. Dogs are capable of picking up a scent of a suspect from a personal item the suspect dropped as long as 24 hours after the incident if the dropped article has not been contaminated or picked up by another person. Wind of twenty miles per hour or more makes tracking difficult as does a heavy rain. A light rainfall

congregate where K-9 units are to be used. Responding officers should make every effort to:

(1)     keep noise and confusion to a minimum at any scene, for it is not desirable to have activity which excites or distracts the dog.

(2)     When the resident has a pet at the scene, tactfully request the owner to get the pet completely away from the area.

(3)     Do not follow or get close to a dog that is working, unless specifically requested by the handler.

## K-9 TEAM RELATIONSHIP TO THE GENERAL LAW ENFORCEMENT FUNCTION

a.     The K-9 Unit's objective is, when requested, to assist and support all divisions within the department.

(1)     Arrests made or evidence located as the result of a request for a K-9 team assistance will be considered to have been accomplished by the requesting officer.

(2)     In those instances when a K-9 team responds as a back up unit, the handler will be responsible for completing a supplemental report, documenting actions taken by the K-9 team.

b.     K-9 team self-initiated patrol activity:

(1)     The K-9 Unit will be responsible for taking appropriate law enforcement action when offenses are committed in the presence of the officer, and the K-9 Officer will be responsible for completion of the necessary reports.

c.     RULES FOR UTILIZATION OF A K-9 TEAM

RULE 1.     To control a crowd only when necessary to prevent death or injury to innocent persons, or to prevent assaults on law enforcement officers.

RULE 2.     To apprehend persons under the influence of intoxicating liquor or drugs only when another offense is involved.

RULE 3.     To apprehend mentally disturbed persons only when a crime is involved.

RULE 4.     May be used in response to any approved request for protective, crime prevention or law enforcement services.

RULE 5.     To search for lost children (persons) only when, in the judgment of the supervisor, there are extenuating circumstances surrounding the disappearance; example:

(a)     evidence of foul play,

(b)     reason to believe that harm will be suffered by the child (person) if he/she is not located.

d.     GENERAL RULES FOR DEPARTMENT PERSONNEL

RULE 1.     Personnel shall pet a K-9 only in the presence and with the permission of its handler.

RULE 2.     Personnel shall not hug a police work dog, or lean closely to the dog's head when petting the dog.

RULE 3.     Under no circumstances will department personnel tease or act aggressively toward a   K-9.

RULE 4.     Officers will comply with the directions of the dog handler when the K-9 team is involved in a specific problem and it is necessary for a handler to direct officers in a K-9 related tactical situation.

RULE 5.     Except in emergency circumstances, or with prior approval of an assigned dog handler, personnel other than dog handler shall not give commands to a K-9.

## POLICE K-9 TEAM SPECIFICATIONS

a.     Obedience
The K-9 should respond to the obedience commands of its handler as a control feature rather than as a competitive exercise.

b.     Agility
The K-9 shall be trained to overcome operational obstacles that may be occurring on the job.

c.     Scent Work
This is one of the K-9's function. He is used as an investigative tool and should be trained to locate people by scent.

(1) The dog should search the inside of a building and detect the presence of any person or persons hiding inside.

(2) The dog should track in reasonable environments a track of 400 yards that is 20 to 60 minutes old.

d.     Protection
The K-9 should be trained to protect its handler and to stop a fleeing suspect by biting. The police dog should release its hold on the suspect on a spoken command from its handler.

e.     Certification
Before a department's K-9 Unit (dog and handler) can be placed on an "operational status" certain requirements must be met in order to insure that the dog is certified to be competent and properly handled. The K-9 and

13.3

handler shall not participate in the annual documents 25-12 a qualified and certified K-9. Should a K-9 team not be certified as suitable for "operational status", the Unit shall cease operation until certification is approved by the Chief of Police. The primary reason for such a decision would be behavior on the part of the K-9 that places himself, his handler, or the public in jeopardy.

f.    The K-9 team shall be required to train at least sixteen (16) hours, and no more than twenty four (24) hours per month in addition to the annual re-certification.

## PROCEDURES FOR K-9 TEAMS

a.    A K-9 Unit shall be capable of accomplishing the following:
   (1)    Tracking:  Location of missing persons (civilian or criminal) in either rural or in-city environments.
   (2)    Crime prevention patrol of high crime areas.
   (3)    Building searches and apprehension of criminals.
   (4)    Crowd control when authorized by department policy.
   (5)    Pursuit, apprehension, and guarding fleeing criminals or felony suspects.
   (6)    Support officers in combative situations.
   (7)    Protection of the public and law enforcement officers from threat of physical injury.
   (8)    Detection of lost or hidden articles or evidence, illegal narcotics and explosives.
   (9)    Crime prevention programs for civic, social and school groups.

## K-9 OFFICER'S DUTIES

a.    Crime preventive patrolling.
b.    Field and building searches.
c.    Assist in the apprehension or prevent the escape of persons who officers believe has committed a crime.
d.    Assist in the apprehension of persons suspected of a crime when all other efforts to apprehend or prevent escape have failed.
e.    Assist other officers of the department as necessary.
f.    Assist outside agencies and officers when authorized.
g.    Decide on tactical employment of the dog and the team's ability to accomplish a given assignment.
h.    Determine the need for additional officers at the scene of a K-9 operation.

## OFFICERS AT THE SCENE (OTHER THAN K-9)

a.    When a K-9 Unit is requested, officers on the scene will comply with the following procedure:
   (1)    Secure the scene until K-9 Unit arrives.
   (2)    Prevent contamination of the crime scene (physical presence or chemical) that will adversely affect the scent necessary for tracking, building search or narcotics detection.
   (3)    Upon arrival at a "burglary in progress" scene do not enter the building until directed by the on site supervisor.
   (4)    Assist the K-9 Unit only as requested the K-9 officer or directed by a supervisor.
   (5)    Keep distracting noise to a minimum.
   (6)    Do not permit excessive talking while K-9 team is working.
   (7)    During the hours of darkness reduce all illumination when the K-9 team is operational.
   (8)    Officers will not permit ANYONE within a K-9 operating area without the consent and approval of the officer.

## THE FOLLOWING PROCEDURES WILL BE EXERCISED WHEN K-9 TEAMS ARE FUNCTIONAL

a.    Building Searches:
   (1)    When a suspected burglary has been determined, the officer at the scene may request the use of the K-9 team.
   (2)    The first officer on the scene will secure the area as quickly as possible, and if necessary, request additional units to assist in securing the area. The purpose of securing the area is to prevent anyone from entering or leaving the scene, and to observe all points of possible escape in an attempt to apprehend a suspect  fleeing from the scene.
   (3)    When the K-9 team arrives, the officer in charge will brief the team on the situation, paying particular attention to the location of exits, concealed areas and movement. If the K-9 supervisor is not on the scene, the K-9 officer will make the final decision on the use of the dog.

under operational procedures concerning building searches. The K-9 will be allowed to search the building at that time.

(5)     Officers on the outside of a building will not enter the scene of operation while the K-9 team is working unless specifically requested by the K-9 handler. Officers will secure all possible avenues of escape and eliminate as much noise as possible in order not to distract the K-9

(6)     If the suspect is apprehended by the K-9 team, the handler will request assistance from other officers if needed. All apprehended suspects will be turned over to the first responding officer for prosecution unless otherwise directed by the on site supervisor.

(7)     Upon completion of the search and apprehension (if made) the K-9 team will return to normal patrol duty.

## TRACKING

a.     When the need for a K-9 team is established, officers will request assistance.

b.     When waiting for the K-9 team to arrive, officers will protect the area, permitting no one to touch, pick up or move any materials which may be used by the K-9 team. Once touched, the material becomes contaminated with the scent of the person touching the material, and may confuse the dog and cause the tracking effort to be ineffective. The dog will pick up the freshest scent available.

c.     When the K-9 team arrives, the officer in charge will brief the team on the situation, paying particular attention to the location of exits, concealed areas and movement. If the K-9 supervisor is not on the scene, the K-9 officer will make the final decision on the use of the dog.

d.     If a stolen or abandoned vehicle is involved, the responding officers will not permit anyone, including other officers to get closer than ten (10) feet to the vehicle. This will prevent contamination of the area.

## NARCOTICS SEARCHES

a.     The K-9 team, if available, will be utilized in all drug and narcotic searches.

b.     All outside areas and buildings that are to be searched for drugs should be cleared of all persons and animals prior to the arrival of the K-9 team. Efforts shall be made to leave the scene exactly as it was left by the perpetrators. Officers should not attempt to do a physical or visual search prior to the arrival of the K-9 team. Narcotics that are in plain view, or substances that may be harmful to the K-9 shall be shown to the K-9 officer upon his arrival. Under no circumstances should the area be physically searched and contaminated prior to the dog's search.

c.     When the K-9 team arrives, the on site supervisor will brief the K-9 team on the situation, identifying the location of exits, concealed areas and movement. The K-9 officer will make the final decision on the use of the dog.

## DOG BITES:

In the unlikely event a person should be bitten by the K-9, the K-9 officer will file all required reports. A copy of the report(s) shall be submitted to the supervisor for approval. The supervisor will assure the accuracy of the report(s) and submit the same to the Chief of Police.

## INJURY TO K-9:

Should a K-9 be injured as a result of job performance, the assigned officer (handler) shall take the K-9 to the departmental approved Veterinarian for examination and a determination of fitness for duty. The assigned officer (handler) is responsible for the health and safety, whether on or off duty, of the K-9.

## INJURY TO HANDLER:

In the unlikely event that the K-9 officer is injured, the following procedure will be followed:

a.     DO NOT, UNDER ANY CIRCUMSTANCES, approach the K-9 that is protecting the K-9 officer or attempt to assist the officer unless it is apparent that the failure to respond to the officer would result in death or be detrimental to his/her health or safety.

b.     Officers will request medical assistance for the injured K-9 officer immediately.

c.     Make contact with another handler to remove the dog or control its actions.

d.     If all other efforts to respond to the emergency needs of the officer fail, contact the Department Veterinarian and attempt to tranquilize the dog. If those efforts are unsuccessful, and the officer is in imminent danger of loosing his life or compounding an existing injury, the K-9 should be neutralized. If shot, one correctly placed round shall be used in order to reduce the possibility of the K-9 being made to suffer for doing what he is trained to do...protecting his handler. This may seem to be a bit cold and heartless, but always remember this:

### *"A K-9 CAN BE REPLACED ... a K-9 OFFICER CANNOT"*

13.5

a.  A K-9 supervisor will be assigned to control the K-9 unit within the organization. His responsibility is to provide:

    (1)  Liaison with command elements.
    (2)  Make decisions on the deployment of K-9 team.
    (3)  Supervise the K-9 team.
    (4)  Establish and maintain a good working relationship between the K-9 team and other law enforcement personnel and other law enforcement agencies.
    (5)  Assist Chief of Police in implementing K-9 policies and directives.
    (6)  The K-9 supervisor should provide support and direct assistance to K-9 training, provide for man-power and training aids for the K-9 team to maintain proficiency.

## REQUIREMENTS FOR A DEPARTMENT K-9 OFFICER:

a.  Have a minimum of two years of full time law enforcement experience.
b.  Comply with the physical requirements for the position of K-9 Officer, as defined in the Performance Standards for the Patrol Officer.
c.  Have an enthusiastic and positive attitude, high energy and excellent physical coordination.
d.  Have the ability to provide the proper motivation for the K-9 both verbally and physically.
e.  Be self-motivated and be able to work with minimum supervision.
f.  Be willing to devote personal time to maintenance training, care and socialization of the K-9.
g.  Be willing to report for duty after normal working hours when a canine team is needed.
h.  Have the officers family support the decision to have a police working dog in the home to care for, have as a companion and member of the family.
i.  Demonstrate a willingness to assist, support and cooperate with other departments and personnel.
j.  Make a commitment to remain the handler of the K-9 for the remainder of the dogs working life.
k.  Have a strong desire to utilize the K-9 at every opportunity available regardless of inconvenience, weather conditions, time of day, difficult circumstances and personal problems.
l.  Have a sincere love for and understanding of the K-9 as the reason for application for and the position of K-9 handler as well as a sincere desire to utilize the K-9's abilities to enhance investigations and increase apprehensions.
m.  Have the discretion to put the K-9 first when credit is given for his accomplishments; and to put the K-9 second to officer survival in life-threatening situations.
n.  Use only the degree of the dog's protection abilities necessary to assure officer and suspect safety during an apprehension.
o.  Be able to put the K-9's well being and physical comfort above his own.

## K-9 RULES AND REGULATIONS:

a.  Living area shall be cleaned every day.
b.  K-9's are not to be taken into private clubs, or public places except for duty related assignments.
c.  The K-9 handler shall groom the K-9 each day prior to reporting for duty.
d.  Unauthorized demonstrations of K-9's skills and ability are prohibited.
e.  The handler will not permit the K-9 to be petted or fed by anyone.
f.  The dog will not be disciplined by striking, kicking or other means of physical abusive treatment.
g.  The K-9 handler shall provide Veterinary care for any illness or injury to the dog, and submit a report to the supervisor.
h.  The handler will, before the end of a tour of duty, prepare for submission to the supervisor a report of any dog bite.
i.  Unsupervised K-9s will not be permitted to run at large at home or in a public area.
j.  All collars, choke chains and other equipment will be examined daily to assure operational readiness. Any control item that is determined to be unserviceable will be replaced before working the dog.
k.  Uniforms and patrol vehicle interior will be kept clean and free of excessive hair and odors.
l.  No agitation or aggressive response training shall be provided except as a part of an authorized training session.
m.  Dogs are to be fed according to feeding instructions and fresh water will be available at all times.
n.  Frequent rest and exercise stops shall be made in an effort to prevent the K-9 from urinating or defecating inside buildings or around the outside of property when responding to calls for service.
o.  The K-9 is never to be left unattended in the patrol vehicle. If it is necessary for the officer to be away from the vehicle the K-9 should be with the handler.
p.  The K-9 shall not be permitted to run loose or be unattended at any time when inside the department.
q.  Smoking by the K-9 officer or any other person is expressly prohibited inside the unit that transports the K-9. Smoking is prohibited whether the dog is in or out of the vehicle.

## SECTION 14
## CARDS:  OFFICIAL – PERSONAL

**POLICY:**  Business or personal cards which refer to this agency shall be used by employees and officers only in connection with the performance of official duties.

a.  All cards used must conform to the approved departmental format, and may be obtained only by permission of the Chief of Police.

14.1

## SECTION 15
## CHAIN OF COMMAND

**POLICY:**   In addition to the Department Policies in this manual, the following shall be the "descending" chain of command for the department: The chain of command represents the level of authority associated with each rank, beginning with the Chief of Police at the highest level and descending downward to levels of first line supervision.

**CHIEF OF POLICE**

**ASSISTANT CHIEF**

**PATROL LUTENTANT**

**PATROL SERGENT**

**PATROL OFFICER (certified)**

**PATROL OFFICER (reserve)**

## CHEMICAL AGENT - OLEORESIN CAPSICUM (OC)

**POLICY:**   Following approval by the Chief of Police and the satisfactory completion of qualification training, law enforcement officers may be armed with the Chemical Agent OLEORESIN CAPSICUM (OC) and projector.  OC (Pepper Spray) used in compliance with these procedures is nondeadly force.  OC used in compliance with these procedures is authorized to effect a lawful arrest, to prevent escape from lawful custody, to defend the officer or another from what the officer reasonably believes is the imminent use of physical force, or to restore institutional integrity in a detention facility.

PROCEDURES:

a.   The OC device is designed to be worn externally and in a holster.  An OC device shall not be pocketed or otherwise concealed by a certified user since one of the purposes of OC is to create a visible deterrent to potential offenders.

B   The OC will not be drawn and used against an individual holding a deadly weapon.  OC is not intended to be an alternative to the use of deadly force when such is clearly authorized and is necessary.

c.   When all reasonable efforts have failed to calm a person who is acting violently and presenting a definite danger to himself or others, a minimum stream may be fired at the person in accordance with manufacturers' recommendations and departmental training received.

d.   The OC weapon will be used only to terminate violent behavior, or the threat of violent behavior, which could result in injury to the officer, other persons, or the violent individual.

e.   The OC weapon will not be discharged in the immediate vicinity of an infant, unless the infant's life is endangered, since their respiratory system is small and especially sensitive to irritating vapors.

f.   The OC device weapon will normally be discharged from a distance of at least six (6) feet.

g.   The aiming point is the eyes.

h.   Firing will be limited to one successful hit, not exceeding one (1) full second on target and the termination of the violent or threatening behavior.

i.   Following use, the disabled victim will:
  (1)   Be hand-cuffed:
      (a)   When an arrested person resists voluntary detention,
      (b)   Or is acting in a belligerent or combative manner,
      (c)   Or is considered to be threatening resistance or violent behavior.
  (2)   Be assisted to wash-up area.
  (3)   Flush contaminated area with water.
      (a)   The time between OC exposure and wash-up should, if possible, not exceed fifteen (15) minutes.
  (4)   Only under conditions which represent an extreme hazard (immediate threat of serious injury or death to the officer or others) will the OC be used in the following manner:
      (a)   Prolonged discharge at any effective distance into the face of a person already incapacitated or not responding to normal application of the chemical agent formulation who is continuing an assault which will result in serious injury.
      (b)   Discharge of large quantities of the chemical irritant in a confined space such as a small room or closed automobile.
      (c)   Discharge in the close proximity of an infant.
  (5)   No officer shall apply, nor permit another person to apply oil or grease medications such as butter, cold cream, lanolin, Vaseline, lotion, or salves which could trap the irritant to the skin and thereby cause blistering unless authorized by a physician
  (6)   Exposed areas should not be bandaged; the areas should be exposed to fresh air for evaporation.
  (7)   If a person exposed to OC requests to be taken to a doctor, the person will be transported for examination by a doctor as soon as possible.
  (8)   Officers utilizing the OC device shall prepare a use of force incident report and the "USE OF CHEMICAL IRRITANT REPORT" citing specifically:
      (a)   The clear justification for use.
      (b)   Date and time of exposure.
      (c)   Time lapse before wash-up.
      (d)   Any injuries observed during wash-up procedure.

k.   Failure to provide appropriate care after exposing a person to chemical agents is considered excessive force by this agency.

l.   Violation of this section may result in individual loss of authority to use OC and may result in disciplinary action.

# SECTION 17
# BLOODBORNE PATHOGENS

I. **PURPOSE**

The purpose of this policy is to provide officers with guidelines for preventing the contraction of the AIDS virus, hepatitis B and other bloodborne pathogens.

II. **POLICY**

It is the responsibility of this agency to take all reasonable measures to allow its members to perform their duties in a safe and effective manner. The safe performance of daily operations is threatened by the AIDS and hepatitis B viruses that can be contracted through exposure to infected blood and several types of bodily secretions. Therefore, it is the policy of this agency to continuously provide employees with information and education on prevention of these diseases provide up-to-date safety equipment and procedures that will minimize their risks of exposure and to institute post-exposure reporting evaluation and treatment for all members exposed to these diseases.

III. **DEFINITIONS**

A. *Bodily Fluids*: Blood, semen and vaginal fluids or other secretions that might contain these fluids such as saliva, vomit, urine or feces.

B. *Exposure Control Plan*: A written plan developed by this agency and available to all employees that details the steps taken to eliminate or minimize exposure and evaluate the circumstances surrounding exposure incidents.

C. *Personal Protective Equipment*: Specialized clothing or equipment worn or used by members for protection against the hazards of infection. This does not include standard issue uniforms and work clothes without special protective qualities.

D. *Universal Precautions*: Procedures promulgated by the Centers for Disease Control (CDC) that emphasizes precautions based on the assumption that all blood and bodily fluids are potentially infectious of the AIDS (HIV) and hepatitis B (HBV) viruses.

IV. **PROCEDURES**

A. General Disease Prevention Guidelines
1. This agency's exposure control plan shall provide the overall strategy for limiting exposure to HIV and HBV and responding to potential exposure incidents. The plan is available for review by all members through request of their immediate supervisor.
2. This agency subscribes to the principles and practices for prevention of HIV and HBV exposure as detailed in the "universal precautions" prescribed by the CDC and the federal regulations of the Occupational Safety and Health Administration. Where otherwise not detailed in this policy, officers shall be guided by these practices and procedures.

B. Workplace Controls and Personal Protective Equipment
1. In order to minimize potential exposure, officers should assume that all persons are potential carriers of HIV or HBV.
2. When appropriate protective equipment is available, no member shall refuse to arrest or otherwise physically handle any person who may carry the HIV or HBV virus.
3. Members shall use protective gear under all appropriate circumstances unless the member can demonstrate that in a specific instance, its use would have prevented the effective delivery of health care or public safety services or would have imposed an increased hazard to his safety or the safety of another co-worker.
   a. All such instances shall be reported by the member and shall be investigated and appropriately documented to determine if changes could be instituted to prevent similar occurrences in the future.
4. Disposable gloves shall be worn when handling any persons, clothing or equipment with bodily fluids on them.

5.    Masks in combination with eye protection devices, such as goggles or glasses with solid side shields or chin-length face shields, shall be worn whenever splashes, spray, spatter or droplets of potentially infectious materials may be generated and eye, nose or mouth contamination can be reasonably anticipated.

6.    Gowns, aprons, lab coats, clinic jackets or other outer garments shall be worn as determined by the degree of exposure anticipated.

7.    Plastic mouthpieces or other authorized barrier/ resuscitation devices shall be used whenever an officer performs CPR or mouth-to-mouth resuscitation.

8.    All sharp instruments such as knives, scalpels and needles shall be handled with extraordinary care and should be considered contaminated items.

    a.    Leather gloves or their protective equivalent shall be worn when searching persons or places, or when working in environments, such as accident scenes, where sharp objects and bodily fluids may reasonably be encountered.

    b.    Searches of automobiles or other places should be conducted using a flashlight, mirror or other devices where appropriate. Subsequent to a cautious frisk of outer garments, suspects should be required to empty their pockets or purses and to remove all sharp objects from their person.

    c.    Needles shall not be recapped, bent, broken, removed from a disposable syringe or otherwise manipulated by hand.

    d.    Needles shall be placed in departmentally provided, puncture-resistant, leak proof containers that are marked as biohazardous when being collected for evidence, disposal or transportation purposes.

9.    Officers shall not smoke, eat, drink or apply makeup around bodily fluid spills.

10.    Any evidence contaminated with bodily fluids shall be completely dried, double bagged and marked to identify potential or known communicable disease contamination.

C.    Custody and Transportation of Prisoners

1.    Officers shall not put their fingers in or near any person's mouth.

2.    Individuals with bodily fluids on their persons shall be transported in separate vehicles from other persons. The individual may be required to wear a suitable protective covering if he is bleeding or otherwise emitting bodily fluids.

3.    Officers have an obligation to notify relevant support personnel during a transfer of custody when the suspect has bodily fluids present on his person, or has stated that he has a communicable disease.

4.    Suspects taken into custody with bodily fluids on their persons shall be directly placed in the designated holding area for processing. The holding area shall be posted with an "Isolation Area-Do Not Enter" sign.

5.    Officers shall document on the appropriate arrest or incident form when a suspect taken into custody has bodily fluids on his person, or has stated that he has a communicable disease.

D.    Housekeeping

1.    Supervisors and their employees are responsible for the maintenance of a clean and sanitary workplace and shall conduct periodic inspections to ensure that these conditions are maintained.

2.    All supervisory personnel shall determine and implement written schedules as appropriate for cleaning and decontamination based on the location within the facility or work environment, the type of surface or equipment to be cleaned, the type of soil present and the tasks and procedures to be performed in the area.

3.    All equipment and environmental and work surfaces must be cleaned and decontaminated after contact with blood and other potentially infectious materials as provided in this policy.

4.    Any protective coverings used in laboratory, evidence custody or enforcement operations for covering surfaces or equipment shall be removed or replaced as soon as possible following actual or possible contamination.

5.    Bins, pails and similar receptacles used to hold actual or potentially contaminated items shall be labeled as biohazardous. These receptacles shall be decontaminated as soon as

feasible following contamination and then inspected and decontaminated on a regularly scheduled basis.

6.  Broken and potentially contaminated glassware, needles or other sharp instruments shall not be retrieved by hand but by other mechanical means and shall not be stored in a manner that requires that they be retrieved manually.

7.  Officers shall remove clothing that has been contaminated with bodily fluids as soon as practical and with as little handling as possible. Any contacted skin area shall be cleansed in the prescribed fashion.

8.  Contaminated laundry and personal protective equipment shall be bagged or containerized at the location where it is used in departmentally approved leak proof containers but shall not be sorted, rinsed or cleaned at that location.

9.  Departmental personnel working within this agency's criminalistics laboratory shall adhere to policy and procedures contained herein but shall refer to and also adhere to special safety procedures established for the laboratory workplace.

10. Only employees specifically designated by the chief executive shall discard actual or potentially contaminated waste materials. All such disposal shall conform with established federal, state and local regulations.

E.  Disinfection

1.  Any unprotected skin surfaces that come into contact with bodily fluids shall be thoroughly washed as soon as possible with hot running water and soap for at least 15 seconds before rinsing and drying.

   a.  Alcohol or antiseptic towelettes may be used where soap and water are unavailable.

   b.  Disposable gloves should be rinsed before removal and hands and forearms should then be washed.

   c.  Skin surfaces shall be washed and mucous membranes flushed as soon as feasible following the removal of any personal protective equipment.

   d.  Hand lotion should be applied after disinfection to prevent chapping and to seal cracks and cuts on the skin.

   e.  All open cuts and abrasions shall be covered with waterproof bandages before reporting to duty.

2.  Disinfection procedures shall be initiated whenever bodily fluids are spilled or an individual with bodily fluids on his person is transported in a departmental vehicle.

   a.  A supervisor shall be notified and the vehicle taken to the service center as soon as possible.

   b.  Affected vehicles shall be immediately designated with the posting of an "Infectious Disease Contamination" sign upon arrival at the service center and while awaiting disinfection.

   c.  Service personnel shall remove any excess bodily fluids from the vehicle with an absorbent cloth, paying special attention to any cracks, crevices or seams that may be holding fluids.

   d.  The affected areas should be disinfected using hot water and detergent or alcohol and allowed to air dry.

   e.  All police vehicles taken to a service center for scheduled washing and routine maintenance shall, as part of that routine be cleaned in the interior with an approved disinfectant.

3.  Nondisposable equipment and areas upon which bodily fluids have been spilled shall be disinfected as follows:

   a.  Any excess bodily fluids should first be wiped up with approved disposable absorbent materials.

   b.  A freshly prepared solution of one part bleach to 10 parts water or a fungicidal/ mycobactericidal disinfectant shall be used to clean the area or equipment.

F.  Supplies

1. Supervisors are responsible for continuously maintaining an adequate supply of disease control supplies in a convenient location for all affected personnel in their unit. This includes, but is not limited to, ensuring that
   a. personal protective equipment in appropriate sizes, quantities and locations are available,
   b. hypoallergenic gloves and other materials are available for those who are allergic to materials normally provided, and cleaning laundering and disposal, as well as repair or replacement of these and other items is provided; and
   c. first aid supplies and disinfecting materials are readily available at all times.

2. All departmental vehicles shall be continuously stocked with the following communicable disease control supplies:
   a. Personal protective equipment in appropriate size and quantity for affected personnel to include face and eye protective devices, coveralls, disposable gloves and booties, leather gloves, puncture-resistant and leak proof containers for needles and other sharp objects, barrier resuscitation equipment and leak proof plastic bags.
   b. Liquid germicidal cleaner.
   c. Disposable towelettes (70 percent isopropyl alcohol).
   d. Waterproof bandages.
   e. Absorbent cleaning materials.

   f. "Isolation Area-Do Not Enter" signs.

3. Officers using supplies stored in their vehicles are responsible for ensuring that they are replaced as soon as possible.

4. Officers are required to keep disposable gloves in their possession while on either motor or foot patrol.

G. Vaccination, Exposure, Evaluation and Treatment

1. All members of this agency who have been determined to be at risk for occupational exposure to the hepatitis B virus shall be provided with the opportunity to take the HBV vaccination series at no cost within 10 working days of assignment to an occupationally exposed duty. The vaccination shall be provided if desired only after the member has received required departmental training, has not previously received the vaccination series, and only if not contraindicated for medical reasons.

2. Any person who has unprotected physical contact with blood or other bodily fluids of another person while in the line of duty shall be considered to have been potentially exposed to HBV and/or HIV.

3. In cases of exposure, a supervisor shall be contacted who shall complete appropriate duty injury and medical forms and shall take appropriate steps to document the means and circumstances under which the exposure occurred.

4. Immediately after exposure, the officer shall proceed to the designated health care facility for tests of evidence of infection and treatment of any injuries.
   a. This agency shall ensure continued testing of the member for evidence of infection and provide psychological counseling as determined necessary by the health care official.
   b. The members shall receive a copy of the health care provider's written opinion within 15 days of the evaluation and information on any conditions resulting from the exposure that require further evaluation or treatment.
   c. Unless disclosure to an appropriate departmental official is authorized by the officer or by state law, the officer's medical evaluation, test results and any follow-up procedures shall remain confidential.

5. Any person responsible for potentially exposing a member of this agency to a communicable disease shall be encouraged to undergo testing to determine if the person has a communicable disease.
   a. The person shall be provided with a copy of the test results and a copy shall be provided to the exposed agency member. The member shall be informed of applicable state laws and regulations concerning the disclosure of the identity and infectious status of the source individual.

17.4

      b.     Criminal charges may be sought against any person who intentionally exposes a member of this agency to a communicable disease.

6.     Officers who test positive for HIV or HBV may continue working as long as they maintain acceptable performance and do not pose a safety and health threat to themselves, the public or other members of this agency.

      a.     This agency shall make all decisions concerning the employee's work status solely on the medical opinions and advice of the agency's health care officials.

      b.     The agency may require an employee to be examined by the department health care officials to determine if he is able to perform his duties without hazard to himself or others.

7.     All members of this agency shall treat employees who have contracted a communicable disease fairly, courteously and with dignity.

H.    Record Keeping

1.     This agency's personnel function shall maintain an accurate record for each employee with occupational exposure that includes information on vaccination status; the results of all examinations, tests and follow-up procedures; the health care professional's written opinion; and any other germane information provided by the health care professional.

2.     These health care records shall be retained in a secured area with limited access for the duration of the member's employment plus 30 years and may not be disclosed or reported without the express written consent of the member.

I.    Training

1.     This agency's training coordinator shall ensure that all members of this agency with occupational exposure are provided with a complete course of instruction on prevention of bloodborne diseases prior to their initial assignment.

2.     All affected employees shall receive annual refresher training and additional training whenever job tasks or procedures are modified in a manner that may alter their risk of exposure.

3.     All trainees shall have access to applicable federal and state regulations pertaining to the regulation of bloodborne pathogens.

4.     The training coordinator shall ensure that complete records are maintained on member training to include information on the dates and content of training sessions, names and qualifications of persons conducting the training and the names and job titles of all persons attending the training sessions. These records shall be maintained for a period of three years from the date of training.

# SECTION 18
## COMMUNICABLE DISEASES POLICY
## FOR
## LAW ENFORCEMENT AND EMERGENCY SERVICE OFFICERS

**POLICY:**   To provide agency personnel with communicable disease information and current safety procedures which will assist in minimizing potential exposure, while increasing knowledge of the nature and potential risks of communicable diseases.  It shall also be the policy of this agency that every person receives appropriate service and emergency care regardless of their physical condition.

a.      PURPOSE
        To establish procedures for the proper investigation of incidents that involve persons who have, or are suspected of having a communicable disease.  The procedures shall establish:
        (1)     guidelines to reduce the risk of law enforcement or Emergency Service Officers of contracting a communicable disease during the performance of official duties, and
        (2)     procedures to be followed when an officer has a line of duty exposure to a communicable disease.
        (3)     the ability to assure the confidentiality and the prevention of discrimination against of victims of communicable diseases.

b.      DEFINITIONS
        (1)     **Body fluids:**  Liquid secretion including, but not limited to, blood, semen and vaginal or other secretions that might contain these fluids, such as saliva, vomit, urine or feces.
        (2)     **Communicable Disease:**  Those infectious illnesses that are transmitted through direct or indirect (including airborne) contact with an infected individual, including but not limited to the body fluids of the infected individual.

c.      PROCEDURES
        (1)     Communicable Disease Prevention
                (a)     In order to minimize potential exposure to communicable diseases, officers must assume that all persons are potential carriers of a communicable disease.
                (b)     Officers must cover all open cuts and abrasions with waterproof bandages prior to reporting for duty.
                (c)     Disposable double latex gloves shall be worn when handling any person, clothing or equipment with body fluids on them, or when the officer anticipates becoming involved in assaultive behavior through which the officer may potentially become exposed to blood or body fluids containing blood.
                        (1)     Gloves should not be reused, and a new pair should be put on before handling a different person or touching uncontaminated items.
                        (2)     When leather or cotton gloves are worn for crime scene work, latex gloves can be worn underneath for added protection.
                        (3)     In appropriate circumstances, more than one pair of latex gloves shall be worn to protect against exposure.
                (d)     Mask, protective eye goggles and protective disposable coveralls shall be worn where body fluids may be splashed on the officer, or where airborne contamination of a communicable disease is anticipated.
**NOTE:  TO DATE, THERE HAVE BEEN NO DOCUMENTED CASES OF TRANSMISSION OF HEPATITIS B VIRUS (HBV) OR HIV VIRUS THROUGH AIRBORNE CONTAMINATION.**
                (e)     Plastic mouthpieces or other authorized barrier resuscitation devices shall be used whenever an officer performs CPR or mouth-to-mouth resuscitation
                (f)     All sharp instruments such as knives, scalpels and needles shall be handled with extraordinary care and should be considered to be contaminated items.
                        (1)     Leather gloves shall be worn when searching for or handling sharp instruments.

18.1

    (2)    Officers shall not place their hands in areas where sharp instruments might be hidden. An initial visual search of the area should be conducted, using a flashlight and/or portable metal mirror where necessary.

        (a)    When searching a suspect's pockets officers should exercise extreme caution and when appropriate, have the suspect empty the pockets and pull the pockets inside-out from the top.

    (3)    A search of a purse can be accomplished by carefully dumping the contents onto a flat surface.

    (4)    Needles shall not be recapped, bent, broken, removed from a disposable syringe, or otherwise handled.

    (5)    Needles or similar sharp-edged instruments shall be place in puncture-resistant, non-porous container when being collected for evidence or disposal purposes. The container shall be marked accordingly to show contents.

(g)    Officers shall not smoke, eat, drink, or apply makeup around body fluid spills or when wearing protective gloves.

(h)    Any evidence contaminated with body fluids shall first be air dried, then double bagged in plastic bags and marked to identify suspected or known communicable disease contamination.

    (1)    department issued sealable evidence bags shall be utilized. Stapling of evidence bags should be avoided.

    (2)    department-issued prongs shall be utilized to assist in gathering contaminated evidence.

(2)    <u>Transporting and Custody</u>

    (a)    When appropriate protective equipment is available, no officer shall refuse to interview, assist, arrest or otherwise physically handle any person who may have a communicable disease. Should an officer be involved in an incident where proper safety materials are not available, the officer shall immediately contact the supervisor and request assistance.

    (b)    Officers shall not put their fingers in or near the mouth of any conscious person. Officers utilizing protective gloves can, in life threatening situations, insert their finger into the mouth of an unconscious person to attempt to clear a blocked airway. This action should be performed in accordance with prescribed foreign body airway obstruction procedures.

    (c)    When possible, persons with body fluids on their body or clothing shall be transported in separate vehicles from other individuals.

    (d)    During a transfer of custody, officers shall discreetly notify support personnel that the suspect/victim has body fluids on the person or that the suspect/victim has said that he/she has a communicable disease. Care must be taken to insure that the information is given only to those who have a need to know.

    (e)    When possible, suspects taken into custody with body fluids on their body or clothing, and not in need of medical attention shall be isolated from other persons until clean-up has been completed and a change of clothes has been provided.

        (1)    The Supervisory Officer on duty at the detention facility shall be immediately advised of the suspect's status.

        (2)    Officers shall document that a suspect taken into custody has body fluids on their person and has stated that he or she has a communicable disease.

        (3)    All officers dealing with persons who have blood or other body fluids on their body or clothing will be personally responsible for following precautionary procedures and using the protective materials provided.

(3)    <u>Decontamination</u>

    (a)    Any skin surfaces that have had the slightest contact with body fluids shall be immediately and thoroughly washed with hot running water and soap for one (1) minute before rinsing with an antiseptic solution before drying.

        (1)    Alcohol, antiseptic solutions or towelettes may be used when soap and water are not available.

(2)     Disposable gloves should be removed inside out with the contaminated side not exposed. The hands and forearms should then be washed.

(b)     Officers should remove clothing that has been contaminated with body fluids as soon as practical.

     (1)     Officers should cleanse any contacted skin area in the prescribed fashion (showering if necessary) prior to putting on clean clothing.

(c)     Disinfection procedures shall be initiated whenever body fluids are spilled in or when an individual with body fluids on his or her person is transported in a municipal vehicle.

     (1)     The supervisor shall be notified and the vehicle shall be taken out of service.

     (2)     A "Do Not Use-Possible Communicable Disease Contamination" sign shall be posted on the steering wheel of the vehicle.

     (3)     The affected vehicle shall remain out of service until it has been disinfected by washing the contaminated areas with a commercial disinfectant approved by the Chief of Police.

(d)     Non-disposable items such as handcuffs, etc., should be disinfected with either a bleach solution (1 part bleach to 9 parts water), rubbing alcohol or commercial disinfectant. Contaminated shoes and boots, including soles, should also be disinfected with an approved disinfectant.

     (1)     Extreme care should be taken to assure that footwear that is contaminated is not worn home and contamination taken into officers or other persons home or work area.

(4)     <u>Supplies</u>

(a)     The Chief of Police is responsible for purchasing, storing and issuing communicable disease prevention supplies to all personnel within the police department.

(b)     All department and emergency service vehicles shall be continuously stocked with the following communicable disease prevention supplies:

     (1)     Disposable coveralls, aprons and shoe covering in appropriate sizes.

     (2)     Disposable latex gloves and leather gloves.

     (3)     Puncture resistant containers and sealable plastic bags.

     (4)     Barrier resuscitation equipment, protective eye goggles, and surgical face masks.

     (5)     Disposable towelettes (70% isopropyl alcohol).

     (6)     Waterproof bandages.

     (7)     Absorbent cleaning materials.

     (8)     "Do Not Use - Possible Communicable Disease Contamination" signs.

     (9)     Biohazard disposal bags.

     (10)     Portable metal mirrors.

     (11)     Non-porous tongs.

(c)     Officers using supplies stored in police or emergency service vehicles are responsible for their immediate replacement.

(d)     Officers are required to keep disposable gloves in their possession at all times.

(5)     <u>Line of Duty Exposures to Communicable Disease</u>

(a)     Any officer who has been bitten by a person, or who has had physical contact with body fluids of another person, while in the line of duty shall be considered to have been exposed to a communicable disease.

     (1)     Reports of direct air contact of communicable diseases shall be evaluated on the merits of the particular incident by the departmental health care officials.

(b)     The officers' immediate Supervisor shall be contacted and all appropriate injury forms shall be completed.

(c)     Immediately after exposure, the officer shall be transported to the appropriate health care facility for clinical and serological testing for evidence of infection. The health care professionals shall evaluate the test results, along with the circumstances surrounding the incident, and make a determination as to the extent, if any, of exposure to a communicable disease.

(d)     Any person responsible for potentially exposing the officer to a communicable disease shall be encouraged to undergo testing to determine whether the person has a communicable disease.

(e)     Officers who test positive for a communicable disease may continue working as long as they maintain acceptable performance and do not pose a health threat to themselves, the public or the department.

      (1)     Decisions on an affected officers work status will be will be based on the recommendations of the health care professionals.

      (2)     The department may require any employee to be physically examined to determine the employees' fitness for duty and to determine if he is able to perform assigned duties without hazard to himself or others.

(f)     All personnel shall treat employees who have contracted a communicable disease fairly, courteously, and with dignity.

d.     <u>LEGAL RIGHTS OF VICTIMS OF COMMUNICABLE DISEASE</u>

Victims of communicable diseases have the right to expect, and Law Enforcement and Emergency Service Officers shall provide, the same level of service and enforcement as any other individual would receive.

(1)     Officers assume that a certain degree of risk exists in law enforcement and emergency services work and accept those risks with their individual appointments. This holds true with any potential risks of contraction a communicable disease as surely as it does with the risks of confronting an armed criminal.

(2)     Any officer who refuses to take proper action in regard to a victim of a communicable disease, when appropriate protective equipment is available, shall be subject to disciplinary action.

(3)     When an officer mentions in a report that an individual has or may have a communicable disease, he shall write "CLASSIFIED - CONTAINS MEDICAL INFORMATION - NOT SUBJECT TO FOI" across the top margin of the first page of the report.

(4)     The officer's Supervisor shall ensure that the above statement is on all reports requiring that statement at the time the report is reviewed and initialed by the Supervisor.

(5)     The Supervisor making press releases shall make certain the medical information is not given to the news media. Under the Arkansas Freedom of Information Act (FOI) medical records are exempt from disclosure.

(6)     All requests (including subpoenas) for copies of reports marked "CLASSIFIED - CONTAINS MEDICAL INFORMATION - NOT SUBJECT TO FOI" shall be referred to the County Attorney for authorization to release the document.

(7)     Prior approval shall be obtained from the County Attorney before advising a victim of sexual assault that the suspect has, or is suspected of having, a communicable disease.

(8)     All circumstances, not covered in this Policy that may arise concerning releasing confidential or medical information regarding a victim or suspected victim, or a communicable disease shall be referred directly to the Chief of Police.

(9)     Any employee who divulges confidential or medical information in regard to a victim, or suspected victim, of a communicable disease shall be punished in a manner authorized by law.

# SECTION 19
# COMMUNITY RELATIONS

**POLICY:**   It is the policy of this agency to involve all department personnel in a county-wide community relations effort. Each employee shall establish an attitude that the law enforcement personnel are an integral part of the community and that citizen participation and interaction with law enforcement personnel are necessary.  This agency, through established programs, will identify law enforcement policies and procedures to its citizens and the media for the enrichment of the entire community.  This department is committed to correcting actions, practices, and attitudes which may contribute to community tensions and grievances.  It is also the policy of this department that community relations are the shared responsibility of each and every member of the department.

PROCEDURES:

a.   Responsibility - It is the responsibility of all department personnel to promote good community relations, recognizing that the actions and demeanor of department personnel in dealing with the general public have a significant impact on the image of the department and ultimately its overall effectiveness and level of acceptance within the community.  In serving the public, each employee shall make his/her contact one which inspires respect, not only for himself/herself as an individual and professional, but one which generates the cooperation and approval of the public.

b.   Community Relations Objectives
   (1)  To create and maintain liaison with community groups and organizations.  This includes exchanging information, identifying law enforcement service needs of the community, promoting law enforcement/citizen contacts, acquainting each other with mutual problems and encouraging action aimed at solving these problems.
   (2)  To develop community relations policies for this agency.
   (3)  To publicize department objectives, problems, and successes.
   (4)  To obtain input from community groups to ensure that department policies reflect the needs of the community.
   (5)  To identify sources of conflict between law enforcement and the community and encourage efforts to resolve them.
   (6)  To establish neighborhood watch groups where such groups do not now exist.
   (7)  To identify training needs relating to community relations through input from citizens, groups, supervisors and complaint reports.
   (8)  To provide the Chief of Police any information regarding concerns of the community, potential law enforcement/citizen problems and recommended actions.
   (9)  To evaluate all department community relations programs on a semi-annual basis and to participate in an annual survey of citizens' attitudes and opinions with respect to law enforcement service.
   (10) To conduct an annual survey of citizen attitudes and opinions with respect to:
       (a)  Overall department performance.
       (b)  Overall competence of department employees.
       (c)  Officer attitude and behavior toward citizens.
       (d)  Concern over safety and security in the community.
       (e)  Recommendations and suggestions for improvements.

c.   Programs - Program content includes, but is not limited to the following:
   (1)  Public Information Programs
        Publicize department objectives, problems and successes through the media, brochures, guest speakers, news releases, press conferences and newsletters.
   (2)  Community Relations Programs
        Meet with civic groups, minority groups, neighborhood councils, crime watch groups and individuals to exchange information and convey information back to the department.

Present programs such as DARE, GREAT, McGRUFF, or other similar programs of interest to all area schools within the corporate limit.

Present programs of interest to area schools outside the corporate limit on an invitation basis.

(3)  Crime Awareness Programs

Provide citizen groups information on making their families, homes, and business more secure and work to establish crime watch neighborhoods where none exist.  Programs include, but are not limited to:

* Neighborhood Crime Watch
* Burglary Prevention
* Rape Prevention
* Fraud Prevention
* Emergency Reporting Procedure
* Home Security Survey
* Operation ID
* Robbery Prevention
* Commercial Burglary Prevention

19.2

# SECTION 20
## CONDUCT: ABUSE OF POSITION

**POLICY:** No officer shall use his/her official position or relationship with this department to secure special privileges or exemptions for themselves or for **any** other person. Other persons include but are not limited to:

a.  spouse
b.  child
c.  parent
d.  other family member/relative
e.  friend
f.  acquaintance
g.  non-acquaintance

**PURPOSE:**
The purpose of this policy is to provide guidelines for officers confronted with situations which, if not managed properly, would result in abuse of an authoritative position.

**DEFINITIONS:**
**Authoritative position:** All police officers have a position of authority which is afforded to him/her by society. This authority allows police officers to perform many functions including making arrest or even to the extent of using deadly force in the performance of their duty. Because of this authority, police officers are in a position to influence the citizens within a community.

**Conflict of interest:** An individual involving oneself in a situation for which the individual will have a specific self interest in the outcome.

**PROCEDURE:**
No policy could address all situations that might occur which could possibly influence an officers decision to abuse their authority. However, abuse of authority does include, but is not limited to:

1.  Becoming involved in a situation which is a conflict of interest.
2.  Use of authority for the purpose of financial gain.

    a. Conflict of interest:

    (1)    It shall be the responsibility of each individual officer to always conduct himself/herself in a professional manner and to use their authority specifically for the benefit of the citizens they are sworn to serve and protect. All officers will avoid becoming involved in any situation, either on or off duty, for which a conflict of interest is present.

    (2)    If an officer responds to a call for which a conflict of interest presents itself, the officer will control the situation, request a supervisor to respond, and cease any further involvement in the situation after being properly relieved.

***Example:*** An officer is dispatched and responds to a traffic accident. Upon arrival it is noted that a member of the officers' family is involved in the accident. The officer will evaluate the scene and take any action necessary such as requesting emergency assistance, assisting injured citizens, facilitating traffic flow, etc. The officer, however, will not investigate the accident since it could be considered as a conflict of interest.

    b. Use of authority for the purpose of financial gain:

    (1)  Police officers of this agency will not use their position of authority in any manner for the purpose of financial gain.

    (2)  Officers, under no circumstances, will accept payment of cash or property for services delivered in their capacity as a police officer nor will he/she attempt to influence another person/institution, because of his/her position, when negotiating any type of financial transaction .

Any abuse of this authority will be subject to disciplinary action.

20.1

# SECTION 21
# CALL PRIORITIZATION, DISPATCH, TELEPHONIC REPORTS

**POLICY:** It shall be the policy of this agency to render citizen assistance in the most timely, efficient and effective manner possible. When our citizens call for assistance many times all they are seeking is advice, directions, information, or a remedy for a minor problem. The assistance provided by the Department traditionally has been to dispatch a patrol unit to the citizen's location and from there provides whatever aid was required. The time lost through the dispatching procedure, the level of assistance required and the service rendered would many times be no more than what either a dispatcher or an officer could provide over the telephone. Techniques of deferring or prioritizing calls for service will still provide the citizens with a proper level of law enforcement service. The availability of patrol units to answer more serious situations will be enhanced through deferred dispatching techniques. Patrol officers will be able to direct more attention towards directed patrol activities and investigations.

PROCEDURES:

a.  Unit Dispatch Criteria: There are seven criteria which will govern the prompt dispatch of a patrol officer to a citizen's location. All other situations will be considered eligible for deferred dispatched techniques or telephonic report. These criteria include:
    (1)  Life threatening situations.
    (2)  Crimes in progress.
    (3)  Crime scenes needing immediate attention.
    (4)  A suspect is at the scene or reasonably close.
    (5)  In any case of extensive property loss or damage.
    (6)  The caller insists that an officer respond as quickly as possible.
    (7)  Unusual situations, depending on circumstances.

b.  Call Prioritization: Calls for service to which a law enforcement officer must be dispatched will be given one of three priority levels which establish the timing of dispatch and officer arrival.
    (1) The three levels of call prioritization are as follows:
        (a)  EMERGENCY:  Dispatch immediately
        (b)  PRIORITY:  Dispatch so as to anticipate officer arrival within 10-20 minutes.
        (c)  ROUTINE:  Dispatch so as to anticipate officer arrival within 20-60 minutes.

    (2)  EMERGENCY:  **URGENT:** Includes calls of the following types:
        (a)  Threat to life or great danger of serious injury or major property damage.
        (b)  Active felony, violent misdemeanor, or situations which may result in either.
        (c)  Where a felony or violent misdemeanor has occurred and it is probable that the suspects are near the scene or in the area.
        (d)  Accident or illness that may result in substantial personal harm.
        (e)  Any unusual incident that demands an immediate response, such as, accident blocking major traffic arteries, robbery/burglary alarms, fire or any other serious incident.

    (3)  PRIORITY:  **NORMAL:** Includes any calls which are not of an urgent nature, however, should be dispatched due to the nature of the request for service. Calls in this category shall be handled through standard operating procedures.

    (4)  ROUTINE:  **LOW PRIORITY:** Call in which a sustained delay in response would not have an adverse impact on the incident or reduce the quality of service to the citizen and the community. Such calls may be delayed for a period not to exceed 60 minutes. The caller must both agree to the delayed response and be advised of the approximate delay time. Calls may include:
        (a)  Non-active felony, misdemeanor, or other incident that was not committed recently and does not require an immediate investigation.
        (b)  Non-criminal activities, such as parking violations, traffic services, etc.
        (c)  Any incident that involves a minor violation or offense (i.e., noise complaints, loitering, etc.
        (d)  Non-law enforcement services:
            *   Request for transportation

21.1

        \*   Deliver messages
    (e)  In-house and telephone reports
    (f)  Officer initiated calls
        \*    Appointment
        \*    Personal
    (g)  It is not intended that all ROUTINE calls be delayed for the maximum period of time specified.

c.   Dispatcher Authority and Responsibility:
    (1)    Dispatchers shall have the authority and responsibility to determine the type of call and priority code to be assigned, determine unit available, and dispatch the appropriate field unit.
    (2)   All calls for service requiring the presence of an officer will be dispatched as soon as a field unit is available. The dispatcher should remember that circumstances may change the priority level and act accordingly.
    (3)   Officers dispatched on a call for service shall be obligated to handle the call and take appropriate reports. If supervisory intervention becomes necessary and call assignments are changed, the supervisor is responsible to ensure that all calls are appropriately reassigned and handled.
    (4)   Dispatchers, in talking with persons calling for law enforcement service, often represent the first contact the individual has with the department. Courtesy and helpfulness are vital. Dispatchers also create expectations in the minds of callers as to when an officer will arrive at the scene of a reported incident. It is preferable that officers arrive prior to the time expected, particularly if a delayed response is necessary. Accordingly dispatchers should try to give expected arrival times that officers will be realistically able to make. When such a time is given, the dispatcher should advise the officer.
    (5)   All emergency lines, such as 911 phone lines, are of top priority and will be answered promptly. If the call is in fact an emergency, it will be handled as an urgent call with immediate dispatch. However, if the call is determined to be non emergency, the call taker will very politely advise the caller that the call was received on an emergency line and that it will be necessary to hang up, and call back on a non-emergency phone line. The non emergency phone number will be given to the caller after which the call will be terminated.

d.   Calls for Service:
    (1)  Dispatchers determine through questioning the citizen calling for service whether criteria for dispatch of a law enforcement unit are met, the priority to be given the call, and whether a telephonic report might be appropriate. Typical areas for dispatcher questioning include:
        (a) Whether life or property is in immediate danger.
        (b) If the act is in-progress or about to be committed.
        (c) The probability of apprehension (time element involved).
        (d) If prompt response will prevent reoccurrence.
        (e) If the scene or evidence is hazardous or in jeopardy.
        (f) Circumstances other than those listed above which might cause the dispatcher to believe an immediate response is necessary (i.e., fear, excitement, confusion, etc.).
        (g) Dispatchers shall take control and lead the conversation in order to quickly evaluate and prioritize the call for service. Priorities will be established at the dispatcher's discretion, exercising common sense. These decisions will involve "grey areas", where the priority choice has to be made on the basis of the caller's voice, background noise, etc. An act or incident which normally is classified as ROUTINE may, through professional interview, be changed to EMERGENCY. Also, subsequent calls may change the priority code. Dispatchers shall not unduly persuade a complainant to alter their request for immediate law enforcement response.

e.   Telephonic Report/Delayed Response:
    All calls for police service do not require a patrol response. In some instances complainants can be interviewed and reports taken over the telephone. In this type of situation, the following guidelines should be used.

    (1) Dispatcher gets all available information from the complainant and determines if the report can be taken over the telephone.
    (2) Typical crimes and incidents which might be appropriate for telephonic report are listed in Appendix A.
    (3) If the report can be taken by phone, tell the complainant the following: "We can take the report by

telephone for your convenience." If the complainant agrees, assign ROUTINE priority to the call. If time is available, the dispatcher may take the complaint over phone, otherwise, make clear the time an officer will be assigned to return the citizen call and take the report over the phone.

(4) If the complainant answers "No" to handling the report over the telephone, or if the dispatcher feels that a patrol unit should be dispatched, the dispatcher determines the priority code to be assigned. If the call is ROUTINE priority in the dispatcher's opinion, the dispatcher should state the following: "The officer patrolling your area is helping another citizen now and should be available to assist you within 40 minutes, will that be convenient?"

(5) If the complainant states that the delay is not convenient, assign PRIORITY level to the call and dispatch call accordingly. If the complainant is unsure about the delay, again ask the question about taking the report over the telephone.

(6) All PRIORITY and ROUTINE level calls received should be dispatched quickly. If under emergency circumstances the dispatcher sees that a unit will not be able to respond within the time given the citizen caller, the citizen should be called back and advised of the delay and new response time.

(7) During emergency operations due to weather or other conditions, it may be necessary for dispatchers to advise callers of delay in response or to suggest alternate methods of handling problems.

f.  Taking Telephone Reports:

(1) Many times an incident which requires a report need not be taken in person by a law enforcement officer but could be taken over the phone by either a dispatcher or a law enforcement officer. Typical crimes and incidents which might be appropriate for telephonic report are listed in Appendix A.

(2) If the caller agrees to the taking of a report by telephone, the dispatcher may, if time permits, take the report then. Frequently, however, this time will not be available. In this situation the dispatcher will schedule a time for an officer to call and take the report. Dispatchers will ensure that the officer is advised of the call back requirement and time. Officer will contact the citizen, get the information needed for the report, thank the citizen and advise that the report will be on file at the police agency within a reasonable amount of time. If, while taking the telephone report, the officer decides that there is good reason to actually go to the scene, the citizen shall be so advised and a time set for the officer to be there.

21.3

*APPENDIX A*
**POSSIBLE TELEPHONIC REPORT CRIMES/INCIDENTS**

Examples of crimes, complaints or incidents which may be taken telephonically if the citizen consents might include:

1. Non violent felony offenses which occurred prior to the date that the call was received, are not a threat to the citizen at the present time, and do not require a police response for any other reason such as crime scene processing.

2. Bicycle thefts

3. All misdemeanor thefts except purse-snatching, larceny after trust, and shoplifting (if the actor is being detained at that time).

4. Unauthorized use of a motor vehicle.

5. Telephone Violations:  Incidents of harassing or annoying phone calls directed at the complainant - this does not include bomb threats or threats to do bodily harm.

6. Property Damaged:  Damage to agency owned property will require dispatch.  State reportable motor vehicle accidents would require a dispatch unless the caller did not comply with reporting mandates, i.e., to remain at the scene and notify a law enforcement agency immediately.

7. Tampering With a Vehicle:  All cases unless the incident is in progress.

8. Lost Property:  All cases unless some unusual circumstance dictates the need to dispatch an officer.

9. Criminal Mischief

10. Traffic Complaints: Speeding, drag racing, etc., unless the incident requires immediate attention by a field unit.

11. Return of Missing Persons/Runaway Juveniles

12. Follow-up Reports

13. Reports for Insurance Purpose: When a caller indicates that the only purpose for reporting is to be able to make an insurance claim.

# SECTION 22
# CONDUCT:  UNBECOMING AN EMPLOYEE

**POLICY:**  Honesty, efficiency, and integrity are the fundamental guidelines for an employees conduct.  All employees must remember that they are employed to serve the citizens of this jurisdiction.  The public is entitled to courteous, efficient response to requests for law enforcement service.

PURPOSE: To provide guidance for all departmental personnel concerning proper behavior, either on or off duty, while communicating with, making contact with, or in the eye of, the public.

PROCEDURES:

a.  All departmental personnel shall be courteous at all times when interacting with the general public.

b.  All departmental personnel shall be constantly reminded that as a representative of this department it is imperative that he/she maintain a respectable lifestyle whether on or off duty.

c.  Non sworn personnel, (dispatchers, secretaries, clerks, etc...), often interact with the public and do so in the performance of their official duties. It is therefore imperative that all contacts, regardless of the citizen attitude, be courteous and professional at all times.

d.  All police officers when off duty, but in uniform, shall conduct themselves as though they were on duty. Officers will interact with the general public, regardless of citizen attitude, in a courteous and professional manner.

e.  Officers shall not make known to any person any order or information which they have knowledge of or have received, unless it is in the performance of official duty and given to a person entitled to have the information.

f.  Law enforcement officers, whether on or off duty, shall be governed by ordinary and reasonable rules of good conduct and behavior. Officers will always display good morals and values and will not commit any act which could adversely affect the department.

g.  Police officers shall always remember that he/she has sworn to uphold the law, abide by the law, and protect the rights of all people as afforded by the constitution of the United States of America and the constitution of the state of Arkansas.

h.  The Law Enforcement Code of Ethics has been formulated as a professional code of ethics for law enforcement personnel. The Arkansas Law Enforcement Training Academy requires personnel to take an oath to uphold and abide by the Law Enforcement Code of Ethics prior to graduation from the Police Academy. Members of this department are expected to fulfill this oath, and abide by the Code of Ethics. The Code of Ethics is reproduced as part of this policy manual in order to stress the importance of strict compliance.

22.1

## The Law Enforcement Code of Ethics

As a law enforcement officer, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the constitutional rights of all men to liberty, equality and justice.

I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my department. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I will never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession-----Law Enforcement.

22.2

# SECTION 23
# COURT PROCEDURES

**POLICY:** It shall be the policy of this agency that all department personnel appearing in court in any capacity be well groomed, prepared and professional.

PROCEDURES:

a.  Court Appearance
    (1)  Attendance at a court or quasi-judicial hearing, as required by subpoena, is an official duty assignment. Permission to omit this duty must be obtained from the prosecuting attorney handling the case or other competent court official.  All members are to be punctual in appearance.
    (2)  When appearing in Circuit Court, the complete official uniform shall be worn.  Whether or not to wear the side arm should be left to the discretion of the prosecuting attorney or presiding judge.  If an officer chooses to wear civilian clothes, dress shall consist of suit or coat and tie.  Members shall present a neat and clean appearance avoiding any mannerisms which might imply disrespect to the court.
    (3)  Appearances in Municipal Court on days-off can be made in casual dress when approved by the Municipal Court Judge.

b.  Subpoena Precedence
    If an employee should receive more than one subpoena to appear at any court or quasi-judicial hearing on the same date and the same time, subpoena precedence shall be as follows:  Circuit Court, Municipal Court, City Court and then civil cases. In the event that this should happen, every effort will be made to notify the other courts of the situation.

c.  Preparation for Court
    All employees shall have their case files properly prepared, and all evidence suitably arranged for presentation in court.

d.  Respect and Testimony
    (1)  Employees are required to be truthful when testifying, making reports, or conducting any police business.
    (2)  Employees shall observe the utmost attention and respect toward magistrates and judges at all times.  When giving testimony, they shall speak calmly and explicitly in a clear, distinct, and audible tone so as to be heard by the court and jury.  They shall testify with the strictest accuracy, confining themselves to the case before the court, and neither suppress nor overstate the slightest circumstances with a view for favoring or discrediting any person.  When cross-examined, they shall answer with the same readiness and civility as when testifying in support of the charge, remembering that the ends of justice will be served by showing a desire to tell the whole truth, whether it is in favor of or against the defendant.

e.  Testifying for the Defendant
    Any employee subpoenaed to testify for the defense in any criminal trial or hearing shall notify the office of the prosecuting attorney upon receipt of the subpoena.

f.  Civil Action, Court Appearances -- Subpoenas
    An employee shall not volunteer to testify in civil actions and shall not testify unless legally subpoenaed. Employees shall accept all subpoenas legally served.  If the subpoena arises out of departmental employment or if the employee is informed that he is a party to civil action arising out of departmental employment, he shall immediately notify the Chief of Police, and the governmental attorney of the service of notification, and of the testimony he is prepared to give.

g.  Civil Depositions and Affidavits
    Employees shall confer with the Chief of Police before giving a deposition or affidavit on a civil matter.

h.  Employees shall not institute any civil action arising out of their official duties without first notifying the Chief of Police. Employees shall not use their position with the department as a means of forcing or intimidating persons with whom they are engaged in civil matters to settle the case in favor of the departmental employee.

# SECTION 24
# CRIME PREVENTION

**POLICY:** This agency shall continue to pursue Community Crime Prevention Programs and commit itself to the perpetuation of all such programs. Most law enforcement activities consist of reactive policing. No less legitimate; however, is a more proactive approach, which focuses on community involvement and crime prevention efforts. In order to ensure appropriate community interaction, this agency will utilize the language skills of any employee in pursuing crime prevention activities. It shall be the policy of this agency to establish and maintain a crime prevention officer. This officer shall be responsible for presentation of crime prevention techniques to the public and to officers of the agency. Although the department will have a designated crime prevention officer, all officers will be mindful that crime prevention as a departmental function is every officers responsibility, and will be practiced on a daily basis during the performance of regular and customary policing duties.

PROCEDURES:

A.  In order to accomplish the goal of establishing a viable Community Crime Prevention Program, the following steps should be taken:
   1.  The Crime Prevention Program shall receive the support of the Chief of Police and all command level officers.
   2.  All uniformed and non-uniformed personnel shall be aware of the purpose and goals of the Crime Prevention Program and participate in the program during the performance of regular assigned duties.
   3.  The Crime Prevention Officer shall identify those areas where programs can be developed for the general good of the community.
   4.  The Crime Prevention Officer shall arrange for, organize, and present programs to the community on a timely basis, or as requested.
   5.  Programs will be developed for children, young adults (teenagers), and adults depending on the needs of each group, school, business, neighborhood, etc.
   6.  Each officer and civilian employee shall remember that they are a part of the Community Crime Prevention Program of this agency by virtue of employment, and will assist the crime prevention officer in the implementation of various programs.

B.  The Crime Prevention Officer must draw from a cross section of the different divisions of the agency. This officer will be selected by the Chief of Police. The officer shall be responsible for, but not limited to, the following:
   1.  Crime Prevention Officers will train other officers in crime prevention techniques. Training will be accomplished in the following manners:
      a.  During shift briefings
      b.  Classroom
      c.  By taking officers to assist in presenting scheduled presentations/programs.
   2.  Provide lectures on crime prevention to various civic groups and citizens, upon request.
   3.  Conduct residential/business security surveys, upon request.
   4.  Conduct fingerprinting of children, on request and with parent's consent.
   5.  Conduct programs within the school system, upon request or in conjunction with school officials.
   6.  Conduct community wide neighborhood watch programs.
   7.  Perform duties as liaison officer with all school systems in this jurisdiction.
   8.  Perform duties as liaison officer with Crime Stoppers, Inc. or any similar program.
     Interact with citizens in the various neighborhoods to determine crime problems and promote community involvement in solving the problems.

C.  This agency has established a crime prevention priority program that provides for the targeting of programs by crime type and geographic areas, based on empirical analysis of local crime data, and an annual evaluation of all crime prevention programs. Crime Prevention priorities should be established, but not limited to, the following guidelines:
   1.  Crime types and greatest problems.
      a.  Crime analysis spot map
      b.  Monthly in-house statistical report
      c.  Agency annual report

    2.  Which crime prevention activities can be most productive.
       a.  Select programs based on crime trends and locations
       b.  Select programs based on age groups
       c.  Select programs based on citizen requests
       d.  Select programs based on locations desired
    3.  Review and evaluation of programs used will be conducted on an annual basis.
       a.  Compare crime prevention program log with crime trends to determine relevant programs
          (1)  Programs to be continued
          (2)  New programs to be developed
          (3)  Programs to be amended
       b.  Response from citizen survey
       c.  Crime Prevention Officer will review and evaluate programs and forward copy of report to the Chief of Police for review

D.  The Crime Prevention Officer shall be responsible for organization and administration of neighborhood crime prevention groups.

E.  The Crime Prevention Officer shall organize interested citizens in various residential areas to form a crime-watch group. These groups are citizens who are concerned about mutual neighborhood protection. When attending these meetings, the Crime Prevention Officer shall disseminate information concerning the organization of such crime-watch groups, and show interested citizens ways to perform the neighborhood protection format.

F.  High crime areas may be targeted for additional crime prevention activity by Patrol. All law enforcement services are available upon requests by the public.

G.  The Crime Prevention Officer will act as liaison with the citizen groups to address the concerns of the neighborhood watch groups.

H.  It is the responsibility of each law enforcement officer to promote crime prevention within the community. In the protection of the citizens and their property, each officer should strive to assist the public in obtaining the services of the Crime Prevention Officer, who will present timely programs to citizen groups on crime prevention measures.

I.  Crime prevention is not only the responsibility of patrol officers, but concerned citizens and business owners as well. Through the use of Crime Prevention programs, citizens and business owners should have access to information regarding security surveys, marking property, and local crime statistics.

J.  Making citizens aware of how they may help in the prevention of crime can have a positive effect on the reduction of crime in their community. The Crime Prevention Officer shall be available for request from the community on how they may participate in local crime prevention.

K.  Establishing and maintaining liaison between the Crime Prevention Officer and the community is of utmost importance. The officer(s) assigned this task, shall make close, continual community contact a priority.

L.  The Crime Prevention Officer shall set up a schedule to meet with interested community members to incorporate crime prevention programs. Since the community is made up of diverse interests, meeting times and locations may vary in order to meet the communities needs. The Crime Prevention Officer shall encourage active participation from all citizens who make meetings and shall utilize opportunities to promote the Crime Prevention Program through the use of literature, slide/film presentations, as well as, demonstrating various techniques available for the protection of private homes, businesses, etc. All persons should be encouraged to contact the Crime Prevention Officer any time, to maintain a liaison between the officer and the community.

# SECTION 25
# DEBTS

**POLICY:** Employees are cautioned about personal debts of any kind, which could influence their decision in the performance of their duty. Creditors who contact the Chief of Police for assistance in collecting past due accounts will be requested to notify the Chief of Police in writing. A copy of the correspondence shall be placed in the employees personnel file.

PROCEDURES:

    a.  Each individual employee of this agency will be responsible for his/her legal obligations, which includes payment of legitimate debts on a timely basis.

    b.  Employees shall arrange their personal financial affairs so that creditors and collection agencies will not be required to use the office of the Chief of Police for the purpose of making collections.

    c.  Law enforcement officers will remember the Code of Ethics and how failure to pay legitimate debts will be considered as a violation of this code.

    d.  Failure to pay legitimate debts in a timely manner shall be sufficient grounds for termination.

25.1

# SECTION 26
# DOMESTIC ABUSE INCIDENTS

**POLICY:**   It is the policy of this agency to reduce the incidence and severity of domestic abuse; protect victims of domestic abuse and provide them with support through a combination of law enforcement and community services; and, promote officer safety by ensuring that officers are fully prepared to respond to and effectively deal with domestic abuse calls for service.

## DEFINITIONS:

    a. Domestic abuse means:
        (1)  physical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily harm, bodily injury or assault between family or household members; or
        (2)  any sexual conduct between family or household members, whether minors or adults, which constitutes a crime under the laws of this state.
    b. "family or household members" means spouses, former spouses, parents, children, persons related by blood within the fourth (4th) degree of consanguinity or persons who are presently or in the past have resided or cohabited together.

## DISPATCHER'S PROCEDURES:

The dispatcher who receives a domestic abuse call can provide the responding officers with vital information that could save the victim's and the officer's life.  The dispatcher will give a domestic abuse call the same priority as any other life-threatening call and will, whenever possible, dispatch at least two officers to every incident.

    a. In addition to information normally gathered, an effort should be made to determine and relay the following to responding officers:
        (1)  Whether the suspect is present and, if not, the suspect's description and possible whereabouts;
        (2)  Whether weapons are involved;
        (3)  Whether the offender is under the influence of drugs or alcohol;
        (4)  Whether there are children present;
        (5)  Whether a current protective or restraining order is in effect; or
        (6)  Complaint history at that location
    b. Dispatchers shall **not** cancel law enforcement response to a domestic abuse complaint based solely on a follow-up call from the residence requesting such cancellation.  However, the dispatcher shall advise the officers of the complainant's request.

## RESPONDING OFFICER PROCEDURES:

    a. On-Scene Investigation
    When responding to a domestic abuse call, the officers shall:
        (1)  Restore order by gaining control of the situation.
        (2)  Take control of all weapons used or threatened to be used in the crime.
        (3)  Assess the need for medical attention and call for medical assistance if indicated.
        (4)  Interview all parties.
        (5)  After each party has been interviewed, responding officers should confer to determine if an arrest should be made or whether other actions should be taken.  Pursuant to **ACA 16-81-113**, when a law enforcement officer has probable cause to believe a person has committed acts which constitute a crime under the laws of this state and which constitute domestic abuse, the officer may arrest the person without a warrant if the law enforcement officer has probable cause to believe the person, within the preceding four (4) hours, has committed such acts even if the incident did not take place in the presence of the law enforcement officer.

(6) The arrest of the person shall be considered the preferred action by a law enforcement officer of this agency when evidence indicates that domestic abuse has occurred in addition to a violation of the Arkansas Criminal Code.

(7) Collect and record evidence and, where appropriate, take color photographs of injuries and property damage.

(8) Complete appropriate offense or incident reports necessary to fully document the officer's response, whether or not a crime was committed or an arrest made.

(9) Give the victim a copy of the incident report.

(10) Advise the victim that a petition for relief may be filed in the Chancery Court of the county where the petitioner resides, where the alleged incident of abuse occurred, or where the respondent may be served.

(11) Advise all parties about the criminal nature of family violence, its potential for escalation, and that help is available.

(12) Remain on the scene until satisfied that there is no threat to the victim.

(13) Provide the victim with referral information for legal or social assistance and support.

(14) If the offender has left the scene and a crime has been committed, the officers will:
   (a) Conduct a search of the immediate area;
   (b) Obtain information from victims and witnesses as to where the offender might be; and
   (c) Refer the matter to the Prosecuting Attorney.

## ORDER OF PROTECTION:

a. A petition for relief, accompanied by an affidavit made under oath stating the specific facts and circumstances of the domestic abuse incident and the specific relief sought, may be submitted to the Chancery Court by the victim. (The Clerk of the Chancery Court shall provide the forms and clerical assistance to help the petitioner with the writing and filing of a petition under Act 266 of 1991, if the petitioner is not represented by counsel).

b. Acting upon the petition for relief, the Chancery Court may issue a temporary or permanent Order of Protection pursuant to the Domestic Abuse Act of 1991.

c. The court clerk shall immediately, upon receipt of an authorized order of protection, temporary order of protection, and any modification or cancellation of such orders, forward a copy to the sheriff of the county for service.

d. Upon receipt of the order of protection, temporary order of protection, and any modification or cancellation of such orders by the sheriff's office, the person responsible for service of civil process will immediately:

   (a) Ensure that the order of protection, temporary order of protection, or any modification or cancellation of such orders, are immediately entered into the ACIC system pursuant to Act 995 of 1995. As a minimum, the following information describing the subject of the order will be entered:
      (1) Full name and date of birth.
      (2) Race and sex.
      (3) Driver's license number (and social security number if available).
      (4) Last known address.
      (5) Whether the order of protection, temporary order of protection, or any modification "has" or "has not" been served.

   (b) Place a high priority on service of the protection order, temporary order of protection, or any modification of such order. The order must be served on the subject of the order by delivering a copy to him personally, or if he refuses to receive it, by offering a copy thereof to him, or by leaving a copy thereof at his dwelling house or usual place of abode with some person residing therein who is at least 14 years of age, or by delivering a copy thereof to an agent authorized by appointment or by law to receive service of summons. **Because proper service of the protection order is time-critical, no officer of this agency will attempt to serve this process by registered mail.**

   (c) Information contained in and obtained from the ACIC protection order registry shall be deemed confidential and shall be available at all times <u>only</u> to courts, law enforcement and prosecuting attorneys.

26 . 2

**VIOLATION OF AN ORDER OF PROTECTION:**

    a. A person commits the offense of "violation of an order of protection" if:
        (1) a chancery court has issued an order of protection, temporary order of protection, or any modification of such order against him pursuant to the Domestic Abuse Act of 1991, Arkansas Code Annotated 9-15-101, et seq.; and
        (2) he has received actual notice or notice pursuant to Rule 4, Arkansas Rules of Civil Procedure of an order of protection, temporary order of protection, or any modification thereof against him pursuant to the Domestic Abuse Act of 1991, Arkansas Code Annotated 9-15-101 et seq.; and
        (3) he knowingly violates a condition of an order of protection issued pursuant to the Domestic Abuse Act of 1991, Arkansas Code Annotated 9-15-101 et seq.

**ENFORCEMENT OF A VIOLATION OF AN ORDER OF PROTECTION:**

    a. The preferred course of action for law enforcement officers of this agency is to arrest and take into custody without a warrant, pursuant to Arkansas Code Annotated 5-53-134, any person who the law enforcement officer has probable cause to believe is subject to an order of protection issued pursuant to the laws of this state and who the officer has probable cause to believe has violated the terms of the order, even if the violation did not take place in the presence of the law enforcement officer.
    b. Any law enforcement officer of this agency acting in good faith and exercising due care in making an arrest for domestic abuse shall have immunity from civil liability.

**NO CONTACT' ORDERS:**

Although Act 1302 of 1995 does not require entry of 'No Contact' orders into the ACIC system, it is the policy of this agency to enter each 'No Contact' order issued within this jurisdiction into the ACIC system. The procedure for entering a "No Contact' order will be identical to the procedure for entering an order of protection, temporary order of protection, or any modification or cancellation of such orders as outlined in paragraph d, ORDER OF PROTECTION section of this policy.

# SECTION 27
# ELECTRONIC RESTRAINT DEVICE

**POLICY:** Following qualification training by a Nova Technologies authorized instructor, law enforcement officers may be armed with the "NOVA SPIRIT - POLICE SPECIAL" and/or the "NOVA SHIELD" which are electronic restraint devices authorized by the Chief of Police.

PROCEDURES:

a.  The primary purpose of the Electronic Restraint Device (ERD) is to create a visible deterrent to potential violators. The NOVA SPIRIT and the NOVA SHIELD are non-lethal weapons.

b.  The following levels of coercion will normally be used to obtain a person's voluntary compliance with a lawful order:
    (1)    Officer's presence.
    (2)    Verbal command.
    (3)    Chemical irritants (CIP)
    (4)    Physical control and restraint.
    (5)    Temporary non-lethal incapacitation by use of the ERD if necessary.

c.  Aggressive or combative behavior by a person who continues to be threatening will justify the use of the ERD at any level of contact.

d.  The ERD will be most effective when applied directly to the following areas:
    (1)    The muscles that join the sides of the neck to the shoulder.
    (2)    The muscles on either side of the upper chest close to the shoulder.
    (3)    The abdominal muscles beneath the rib cage on either side.
    (4)    The upper thigh or hip muscles near the center of either leg.

e.  Normally the Nova Spirit should not be used in the following areas of the body:
    (1)    Eyes.
    (2)    Testicle, scrotum or penis.
    (3)    Face.
    (4)    Breast of a woman.
    (5)    Stomach of a pregnant woman.
    (6)    Throat.
    (7)    Spine.
    (8)    Open wounds.
    ***EXCEPTIONS:  Should you be threatened with serious bodily harm or with death and you believe that you are in imminent danger, the application of the ERD on the human body areas is unlimited.***

f.  Should it become necessary to use the ERD on a person, a photograph of the area of contact should be taken to show any friction marks and the photographs made a part of the case file.

g.  The NOVA SPIRIT or the NOVA SHIELD will not generally be used in areas that are known to be sensitive to electronic sparks such as:
    (1)    Open fuel tanks.
    (2)    Flammable vapors.
    (3)    Grain silos/tanks.
    (4)    Sawmills or similar areas.
    (5)    Pharmaceutical storage areas or hospitals.
    (6)    Aircraft refueling areas.
    (7)    Mining and other underground locations.

h.  The ERD should not be used if there is even a remote possibility that a flammable vapor or similar gas exists.

i.  An officer using the NOVA CONCAVE and CONVEX ELECTRONIC SHIELD will exercise the same degree of restraint as in the use of the NOVA SPIRIT.

j.  Misuse of the NOVA SPIRIT-POLICE SPECIAL, the NOVA CONCAVE, or CONVEX SHIELD will be sufficient grounds for recalling the authorization for use of the ERD and may result in disciplinary action.

# SECTION 28
# EMERGENCY CALL-OUT PROCEDURE

**POLICY:** The highest-ranking supervisor or senior officer on duty when a homicide or major incident occurs will determine who should be notified for response purposes.

**PROCEDURES:**

A.   The Chief of Police and Division commanders will be notified concerning any major incident. A major incident includes, but is not limited to, the following:

       (1) A police officer involved shooting.
       (2) Any serious physical injury to any officer or public employee.
       (3) Any homicide within the department's jurisdiction.
       (4) Any crime or incident involving a "gang" or other groups of people who have the potential for violating the law.
       (5) Any serious crime against a federal, state, or municipal government and/or employee.
       (6) Any crime involving an employee as a suspect.
       (7) Any incident or disturbance requiring a call-out of departmental officers. Incidents include, but are not limited to the following:
          a.   Civil unrest
          b.   Natural disaster
          c.   Major accident
       (8) Any crime so unusual that it would shock the conscience of the public.
       (9) Any time that the supervisor/senior officer on duty determines that it is necessary to have the Chief of Police or division commanders present.

B.   The Chief of Police shall have the responsibility to call the mayor/city manager on matters of potential interest to that official.

C.   The highest ranking supervisor/officer on duty will have the authority to call personnel in to work as needed, depending on the circumstances involved. Discretion and common sense will have to be utilized in any given situation. Some circumstances in which personnel will need to be contacted include, but are not limited to the following:

a.   Criminal Investigation Division/officer assigned to investigate major criminal offenses: On occasion, major criminal offenses will occur which will require the immediate attention of the personnel who are properly trained and assigned to perform follow up investigations. Examples of offenses include:

| **CRIME:** | **CALL OUT:** |
|---|---|
| Homicide | (all cases) |
| Felony Battery offenses | (exercise discretion) |
| Major Thefts or Burglaries | (exercise discretion) |
| Robbery | (exercise discretion) |
| Rape/sexual offenses | (exercise discretion) |

b.   Patrol personnel: It may become necessary, on occasion, to call extra patrol personnel in to work. Call outs will become necessary in situations including, but not limited to, the following:
    1.   Civil unrest
    2.   Natural disaster
    3.   Major accident
    4.   Search for incompetent persons, (children, elderly, mentally incompetent), who are lost/missing.
Tactical units such as "SWAT", or personnel assigned to respond to any tactical situation: It may become necessary to activate a tactical unit or call out an individual responsible for handling situations including, but not limited to, the following:
    1.   Hostage situation
    2.   Civil unrest
    3.   Natural disasters (where search efforts are vital)
    4.   Major accidents (where search efforts are vital)
    5.   Service of high risk felony warrants

d.   K-9 personnel: It may become necessary to call out a K-9 officer to assist in situations including, but not limited to, the following:
    1.   Tracking suspects who have fled from major crime scenes.
    2.   Tracking suspects who have escaped from custody.
    3.   Drug searches
Call out in all situations involving off duty personnel will require the use of discretion by the supervisor/senior officer and will depend on the circumstances associated with each incident.

# SECTION 29
## 911 Communications Center

**POLICY:**  Receiving emergency information and dispatching appropriate personnel is vital to the preservation of life and property within a community. Response is often the key to life or death in an emergency situation. It shall be the policy of this department to utilize a standard operating procedure in response to all 911 emergency telephone calls received. All 911 emergency telephone calls received will be answered promptly and on a priority basis. Necessary information will be taken and appropriate response coordinated as quickly and efficiently as possible.

**PURPOSE:**  To establish guidelines for all departmental employees to follow in receiving, managing, and dispatching all 911 emergency telephone calls.

**DEFINITIONS:**

a.   **Call Taker:**  For the purposes of this policy call taker refers to the employee(s), either civilian telecommunications personnel, police officers or other individual(s), who are qualified, by virtue of training or experience, to answer the 911 emergency telephone calls and further manage the calls based on circumstances surrounding each emergency situation.

b.   **Computer aided dispatch, (CAD):** All enhanced 911 emergency telephone calls received are aided by computer. The computer automatically displays an address from where the call originated and the telephone number from which the call is being made onto the computer monitor. The automatic display of the address is referred to as the "ALI" (automatic location indicator). The automatic display of the telephone number is referred to as the "ANI" (automatic number indicator).

**PROCEDURES:**

A.  When receiving a 911 emergency telephone call the call taker will answer the telephone, preferably on the first ring, always aware of the fact that time is a crucial element in response to emergency situations. The following procedures will then be applied:
1.  Call taker responds:  911, WHAT IS YOUR EMERGENCY?
2.  If the call is of an emergency nature, the call taker will at first receive only the information necessary for completing an initial dispatch, but will not terminate the call.
3.  The call taker will advise the caller to stay on the line (DO NOT HANG UP!).
4.  The call taker will then dispatch appropriate police, fire, or emergency medical personnel.
5.  The call taker will then resume a conversation with the caller obtaining detailed information depending on the type of call received.
6.  It will at times be necessary for the call taker to remain on the telephone with the caller until the police or fire personnel arrive at the dispatched location. Calls for which the call taker will need to remain on the telephone include, but are not limited to, the following:
   a.   Burglary in progress or has just occurred and the actor is still in the area.
   b.   Disturbance or domestic situation in which an individual has a weapon, is believed to have a weapon, or is threatening to use violence.
   c.   Robbery in progress or has just occurred and the actor is still in the area.
   d.   Individuals threatening to commit suicide.
   e.   Structure fire; unless the caller is inside the burning structure and is capable of making exit safely. In this situation the call taker will advise the caller to exit the building and stand by in the area, away from the fire, for emergency personnel to arrive, or go to a nearby phone and call the emergency 911 phone number to re-establish communication. Should the caller be trapped inside the burning structure the call taker will establish the location of the caller inside the house, notify responding personnel, and maintain communications with the caller if possible.
7.  In any situation for which additional information is needed, however, the caller terminates the call by hanging up the telephone, the call taker will attempt to re-establish communications by either utilizing the information visible on the "ANI", automatic telephone number indicator, or by the information already obtained prior to the hang up.

29.1

B.  If the call received is a request for ambulance response the call taker will:

    1.  Advise the caller to remain on the line, (DO NOT HANG UP!).
    2.  Transfer the call to the appropriate agency.
  3.  Dispatch police or fire personnel if necessary.
    4.  If the caller terminates the call by hanging up the telephone prior to the transfer being made, the call taker will establish contact with the appropriate agency, (ambulance service), dispatch police or fire personnel if necessary, then re-establish communications, (ANI), with the caller if possible and if necessary.

C.  Emergency callers are often very emotionally distraught. It will therefore become necessary for a call taker to take charge of a conversation as quickly as possible after dispatch has taken place. In order to take charge of the conversation, the call taker will need to make every attempt to calm the caller. This can often be accomplished simply by interrupting the caller, telling them to "CALM DOWN!", and then begin to ask questions.

D.  Questions that need to be asked obviously will differ in each emergency situation. However, as a general rule the call taker will need to obtain as much information as possible to aid the responding emergency personnel. The following call guides will be useful in assisting the call taker in obtaining information, however, should not be totally relied upon in all situations. Remember also that detailed information is to be obtained after the initial information has been received and the dispatch accomplished.

E.  When a call is received on the 911 emergency telephone for which there is only background noise, and communications cannot be established, the call taker will dispatch police personnel to the location of the call. This location will be established by the "ALI", automatic location indicator, displayed on the computer aided dispatch monitor. The call taker will continue trying to establish communications. However, depending on the availability of emergency telephone lines, will not keep the line open if all other emergency lines are busy.

F.  Should a 911 call be received which is determined not to be an actual emergency, the following procedures will apply:
    1.  Be courteous and professional in any contact with the general public.
    2.  Advise the caller that he/she has made contact with the police department on an emergency telephone line and that it will be necessary for them to hang up their telephone and call back on a non-emergency line.
    3.  Provide the caller with the non-emergency phone number and assure them that a member of the police department will speak with them on the non-emergency telephone line.
    4.  Terminate the call.

G.  911 emergency calls received from a cellular telephone will often be made from outside this jurisdiction. In this type of situation, take the information then notify the appropriate authorities within the jurisdiction from which the call is being made.

H.  Call takers will not provide any emergency medical advice to any caller other than what the call taker is qualified to provide. In order to be qualified, the call taker must have credentials which would allow him/her to perform the emergency procedure themselves. Any training/educational certificates will be provided to the chief of police or his/her designee and maintained in the employee's personnel file.

I.  All employees will be responsible for compliance with the procedures as stated within this policy. Deviation from these procedures will subject an employee to disciplinary action.

# POLICE CALL GUIDE

Name of caller:

Location of caller:

Name of suspect(s):

Location of suspect(s)

Description of suspect(s):

M_____F_____        Race_____

Ht._____        Build_____

hair color_____        length of hair_____

eyes_____        complexion_____

facial hair_____        scars/marks/tattoos_____

clothing description_____

Vehicle description_____

29.3

# FIRE CALL GUIDE

Name of caller _____

Location of caller _____

Is there anyone inside the structure, vehicle, etc.? _____

If so, what are their locations? _____

Are there any accelerants or hazardous chemicals in the area? _____, if so, where? _____

Do you know how the fire started? _____, if so, how? _____

Name of suspect(s) (if any) _____

Location of suspect(s) _____

Description of suspect(s) _____

Clothing description_____

Vehicle description_____

Additional information:

# SECTION 30
## USE OF ELECTRONIC RECORDING DEVICES FOR CONSENSUAL MONITORING

**POLICY:**  The use of electronic recording devices for the purpose of consensual monitoring and/or recording private conversations is authorized in the State of Arkansas.  There are issues associated with the use of this investigative technique which members of this agency must be aware of before employing consensual monitoring.  The investigative technique of consensual monitoring can be authorized for the use of body recorders or transmitters, consensually monitored telephone conversations, and the use of close circuit television (CCTV) or other video recording equipment.  Non-consensual electronic interception of communications is not legal in the State of Arkansas.

It shall be the policy of this agency to restrict the use of consensual monitoring and/or recording private conversations to those investigations where there is a reasonable suspicion of criminal activity and the use of this investigative technique is essential in the determination of criminal wrongdoing.  Official use of the consensual monitoring technique by any member of this agency is subject to approval by the Chief of Police or the Assistant Chief of Police and with the concurrence of the Prosecuting Attorney and under the guidelines set forth below.

**PURPOSE:**  To provide law enforcement officers of this agency with guidelines to follow when investigating a criminal offense or suspected criminal activity for which the technique of consensual monitoring and/or recording of a private conversation are being considered.

**DEFINITIONS:**

A.  As pertaining to this law enforcement agency, **consensual monitoring and/or recording of private conversations** shall be defined as:  The monitoring and/or recording of private conversations of any individual or group of individuals whom investigating officers reasonably suspect are involved in, or are planning to commit a criminal offense and; that the consenting party is present during the monitoring and/or recording of such conversations.  Such consensually monitored conversations are obtained by telephone recorders, body recorders and/or transmitters that are recorded on magnetic tape or digital media or through CCTV or other video recording equipment.

**LIMITATIONS:**

A.  Law Enforcement officers of this agency, after receiving approval from the proper authority, may utilize an electronic recording device by a consenting party, such as a cooperating witness or an informant, in accordance with state and federal laws, to monitor and/or record what officers reasonably suspect to be conversations or actions which are criminal in nature.
B.  Law Enforcement officers of this agency must be aware that the interception of any form of communication which is not consensual and in which the consenting party is not present is not legal in the State of Arkansas.

**PROCEDURES:**

A.  The Chief of Police has the primary responsibility for the approval and direction of investigations which utilize the consensual monitoring technique.  This authority has also been delegated to the Assistant Chief of Police.
   1.  Departmental approval shall be obtained by the following procedure:
      a.  Any employee of this agency receiving information about criminal activity, for which an electronic recording device is an investigative consideration, shall document the information on a Consensual Monitoring request form, (Appendix A). The form will be forwarded to an investigating officer who will either create an investigative file or add the information to an existing investigative file.
      b.  The investigator will forward the investigative file through the chain of command to the Chief of Police or the Assistant Chief of Police for review. After review, the Chief or Assistant Chief will decide to either approve or disapprove the consensual monitoring request.
      c.  After making a decision, the reviewing authority shall indicate **approved** or **disapproved** in writing by completing a designated portion of the Consensual Monitoring form. The form must be dated and signed by the reviewing authority. If disapproved the form will be filed in the investigative file folder. If approved, the reviewing authority will return the investigative file to the investigator requesting the consensual monitoring. The investigating officer will then make telephone contact with

30. 1

the Prosecuting Attorney or a Deputy prosecutor and follow proper procedures as outlined below for final approval. Whether approved or disapproved, the file folder will be filed in accordance with departmental policy pertaining to investigative files.

B. Once Departmental approval is obtained for consensual monitoring, approval of the Prosecuting Attorney must be obtained as follows:
  1. The investigating officer will make telephone contact with the prosecuting Attorney or a deputy prosecutor and present the facts of the case. The Prosecuting Attorney or Deputy Prosecutor must concur with use of the consensual monitoring technique stating that:
    a. The use of this technique, under the circumstances of this case, is legal.
    b. The use of the consensual monitoring technique does not constitute entrapment.
  2. Whether approved or disapproved, the investigating officer will finalize the Consensual Monitoring Request Form by completing the designated portion of the form (Prosecuting Attorney review). If approved, a copy of the completed form will be forwarded to the office of the Prosecuting Attorney within 5 days.
  3. Approval for use of consensual monitoring shall be for a period of thirty (30) days. At the end of the 30 day period, written updates of the case shall be submitted to the Prosecuting Attorney with a request to continue the use of consensual monitoring.

C. Prior to the use of a body wire (consensual recording and/or monitoring) the consenting party shall sign a Consensual Monitoring Consent form, (Appendix B):

D. Prior to consensually recording a telephone conversation, the consenting party shall sign a Consensual Monitoring Consent form, (Appendix C).

E. Prior to the utilization of a closed circuit television (CCTV) or other video recording device being used, the consenting party shall sign a Consensual Monitoring Consent form, (Appendix D)

F. Maintenance of Original Evidence Tapes:
  1. All original recording tapes shall be duplicated as needed for work copies.
  2. All original recording tapes shall be sealed in accordance with procedures for evidence handling and maintained, as all other evidence items, in a secure evidence storage area.
  3. All original recording tapes shall be maintained as evidence in accordance with the Statute of Limitations, (Arkansas code Annotated 5-1-109), or, pursuant to arrest and prosecution, until the appeal process has been exhausted.

G. The use of electronic recording devices for surveillance or undercover purposes, once approved for use, will often require that law enforcement officers balance the need for information gathering with the rights of any individual(s) being investigated. With this premise in mind, officers of this agency shall adhere to the following:
  1. Investigative techniques used shall be lawful and only so intrusive as to collect the information necessary to prevent a criminal act from occurring, to identify suspects, and to aid in prosecution.
  2. Once the electronic recording device technique has been utilized, a thorough investigative report shall be completed by the officer in charge of the investigation or as assigned by the Chief of Police or the Assistant Chief of Police. This report shall be added to the investigative file. The investigative file will be maintained for prosecution purposes in accordance with the Statute of Limitations, (Arkansas Code Annotated 5-1-109).

H. All information that is gathered by this agency as a result of an investigation for which an electronic recording device is used shall only be disseminated in accordance with Departmental policy.

I. The use of consensual monitoring for surveillance or undercover operations should not be confused with other lawful investigative practices, such as:
  1. Recording, either by video or voice, one's own telephone conversation.
  2. Recording, either by video or voice, of information at a crime scene.
  3. Recording, either by video or voice, of voluntary statements made by victims, witnesses, or suspects.
  4. Recording, either by video or voice, statements made by individuals at the site of an official law enforcement "sting" operation.
  5. Use of body microphones or similar recording devices worn by undercover law enforcement officers in official undercover operations, such as drug buys or engaging in conversations with individuals suspected of being involved in criminal activity.

APPENDIX A
## CONSENSUAL MONITORING REQUEST FORM

On_____, at _____ I_____ received the following
     **Date**       **Time**           **Employee Name**

information from_____.
              Either Identify the Source of Information or Identify as a Confidential Informant

Summary of facts, (Attach additional sheets if necessary): _____

_____

_____

_____

Signature of Employee receiving information: _____

Based on the facts of this case I, _____, hereby
                        Name of Officer Requesting the Consensual Monitoring

request approval to further this investigation through the use of _____
                                        Monitoring Technique

_____Consensual Monitoring. Date _____ Time_____

Signature of Requesting Officer: _____

Request Reviewed By: _____ Date_____ Time _____
               Chief or Assistant Chief of Police
Request Approved: _____   _____   _____
             Yes       No                     Signature of Reviewing Authority

Facts Presented to: _____   _____   _____
                 Name of Prosecutor or Deputy        Date        Time

After reviewing the facts of this case as stated above, and, or on attached sheets, I concur that the use of the consensual monitoring technique as requested above is legal and does not constitute entrapment. Based on the facts as presented, this request is approved for a period of thirty (30) days. Any further monitoring after the 30 day period will require further review of the investigation.

Request Approved: _____   _____
             Yes       No

               _____
Signature of Investigating Officer presenting facts of the case to the prosecuting Attorney's office.

Submitted to Prosecuting Attorney's Office: Date_____ Time _____

30. 3

APPENDIX B
## CONSENSUAL MONITORING CONSENT FORM

Date_____

Location_____    _____
             City                         State

    I, _____    _____,
          Full Name of Consenting Party                 Address

Hereby authorize _____ and _____,
                      Name of Officer                        Name of Officer

Officers of the _____, to place a
                              Agency Name

Transmitter_____ body recorder _____ on my person for the purpose of recording any conversations with

_____, which I may have on or about _____
          Name of Subject(s)                             *Date

    I have given this written permission to the above named officers knowingly, voluntarily and without threats or promises of any kind.  I understand that I must be a party to any conversation in order to record that conversation.

    I, therefore, agree not to leave the recording equipment unattended or take any other action which is likely to result in the recording of conversations to which I am not a party.

                                     _____
                                     Signature of Consenting Party

Witness: _____

Witness: _____

*Date may be shown to be inclusive of the 30 day approval period.

30. 4

# APPENDIX C
## CONSENSUAL MONITORING CONSENT FORM

Date_____

Location_____,
                    City                                    State

I, _____    _____,
        Full Name of Consenting Party              Address

Hereby authorize _____ and _____,
                        Name of Officer                    Name of Officer

Officers of the _____, to install a recording device in a
                        Agency Name

telephone located at _____ for the purpose of recording any conversations that I may

have on that telephone with _____, on or about _____.
                            Name of Subject(s)                              *Date

    I have given this written permission to the above named officers knowingly, voluntarily and without threats or promises of any kind.

                            _____
                               Signature of Consenting Party

Witness: _____

          _____

30. 5

APPENDIX D
## CONSENSUAL MONITORING CONSENT FORM

Date_____

Location_____,
                    City                              State

I, _____,  _____,
           Full Name of Consenting Party                    Address

Hereby authorize _____ and _____,
                      Name of Officer                       Name of Officer

Officers of the _____, to install a closed circuit television
                           Agency Name

(CCTV) or other video recording devise in premises located at _____,
                                                    Address

to view _____
                       Describe Location or Area to be Viewed

for the purpose of viewing and or video recording any activity that I may have with_____

_____ and others as yet unknown on or about _____.
               Name of Subject(s)                                       *Date

    I have given this written permission to the above named officers knowingly, voluntarily, and without threats or promises of any kind.

_____
                  Signature of Consenting Party

Witness: _____

           _____

               *Date may be shown to be inclusive of the 30 days approval period.

30. 6

# SECTION 32
## ENFORCEMENT: MUTUAL ASSISTANCE

**POLICY:**   The goal of this agency is to provide efficient, high quality law enforcement services to the community during both emergency and non-emergency situations.  The purpose of the regional mutual assistance agreement is to enable each agency to more effectively handle emergency situations through the pooling of law enforcement resources.  In recognition of the fact that this agency has a finite amount of resources with which to meet all incidents, it shall be the policy of this agency to participate in the mutual assistance agreement in order to strengthen our response to emergency situations.

**PROCEDURES:**

a.   Requests for Assistance
   (1)   In non-emergency situations, requests for mutual assistance shall be forwarded to the Chief of Police.
   (2)   In the event that this agency requires assistance in handling an emergency, the officer in charge at the scene of the emergency will contact the dispatcher and request that the Chief of Police, or his/her designee, be advised of the situation. The following information should be available prior to contact:
      (a)   Nature of the emergency;
      (b)   Measures taken to bring the situation under control, and why they have proven insufficient; and
      (c)   Estimated amount of equipment, personnel, or special units that will be necessary to bring the situation under control.
   (3)   The Chief of Police, or his/her designee, will be the only official(s) permitted to request or authorize emergency assistance. This authority, however, can and will be delegated in situations where the Chief or his /her designees are out of town or otherwise unavailable for contact.
b.   Emergency Scene Responsibilities
   (1)   The designated supervisor of this agency shall be in charge at the emergency site.  All loaned personnel shall follow his lawful orders.  However, where the provided mutual assistance involves the loan of a specialized SWAT, hostage negotiation, bomb disposal, or canine unit, the commander of that specialized unit shall be responsible for the implementation of the mission to be accomplished, as determined and directed by the designated supervisor of this agency.
   (2)   When taking law enforcement actions at the emergency site, including uses of force, officers from this agency shall at all times adhere to agency policies and procedures, and utilize only those weapons and tactics with which they have qualified.
   (3)   Officers on loan from this agency to an emergency site shall regularly apprise our dispatcher concerning the continued status of the emergency, line of duty injuries, or need for relief.
   (4)   Officers may take only those law enforcement actions permitted under state law for emergency allocation outside this jurisdiction.
   (5)   Officers on loan from this agency to an emergency site shall follow the lawful orders of the commanding officer at the location of the emergency.
c.   Non-Emergency assistance:
   (1)   This department will participate in a mutual assistance agreement with other agencies in conducting various types of investigations which are not of an emergency nature.  Investigations include, but are not limited to, the following categories of criminal activity:
      (a)   Narcotics related investigations-----purchasing narcotics.
      (b)   Recovery of stolen property by use of undercover operations.
      (c)   Acquiring Intelligence information.
d.   Arrests' outside jurisdictional limits will be in accordance with applicable laws as stated below:
   (1)   A local Law Enforcement officer acting without a warrant outside the territorial limits of the jurisdiction under which he holds office is without official power to apprehend an offender, unless he is authorized to do so by state statute. Instances for which the General Assembly has delegated the authority for Law Enforcement officers to arrest outside of their jurisdiction includes the following:
      a.   "Fresh Pursuit"---Arkansas code Ann. 16-81-301.
      b.   When a local Law Enforcement agency requests an outside officer to come into the local jurisdiction  and the outside officer is from an agency that has a written policy regulating its officers  when they act outside their jurisdiction,---Arkansas code Ann. 16-81-106 (3) - (4).
      c.   When a county sheriff requests that a Law Enforcement officer from a contiguous county come into that sheriff's county and investigate and make arrests for violations of drug laws pursuant to Arkansas code Ann. 5-64-705.
      d.   When the Law Enforcement officer has a warrant for arrest, --- Arkansas Code Ann. 16-81-105.

# SECTIO 33
# ENFORCEMENT:  TRAFFIC

**POLICY:**  Traffic law enforcement involves all law enforcement activities or operations which relate to observing, detecting, and preventing traffic law violations and taking appropriate action under the circumstances. Enforcement not only involves arrests and citations, it includes effective warnings to drivers and pedestrians which help prevent them from committing minor and unthinking violations.  Traffic law compliance is promoted through the judicious use of verbal and written warnings in place of traffic arrest.  Traffic enforcement can be reactive to observed violations, at accidents, or in response to community concerns, or may be proactive, to effectively prevent traffic violations.  Enforcement should be in proportion to traffic accidents with respect to time, place, and type of violation.  However, overzealous enforcement without considering whether the violator is familiar with the legal requirement or without regard for the circumstances surrounding the violation causes disrespect for the law and poor relations between the department and the community it serves. Therefore, it shall be the policy of this department to aggressively enforce traffic laws in an effort to reduce the incidence of traffic violations and ultimately reduce the occurrence of traffic accidents. This aggressive approach to enforcement, however, does not preclude that officers shouldn't use discretion in evaluating each offense.

**PROCEDURES:**
a.  *Types of Enforcement Actions:  Enforcement action may consist of a warning, citation, or physical arrest:*
   (1)  Warnings:  A warning may be issued to a violator whenever there is a minor traffic violation committed, and the officer making the stop observed the violation occur, evaluates all the circumstances, and uses officer discretion in making a decision. A warning may also be issued when the violation is committed due to ignorance of a local ordinance which may be a unique violation or a violation of which the driver may not be aware.  A warning, properly given by an officer, can be more effective, while building positive rapport with citizens, than any other type of enforcement action.
   This procedure does not suggest that a warning be issued for each minor offense. It does indicate that officers are allowed to issue warning tickets in these situations after careful consideration and use of discretion.
   (2)  Arkansas Uniform Traffic Ticket and Complaint (UTT).  A UTT should be issued to a violator who jeopardizes the safe and efficient flow of vehicular and pedestrian traffic, including hazardous moving violations or operating unsafe and improperly equipped vehicles. The uniform traffic ticket is also issued for non moving violations; however, officers will evaluate the circumstances of each offense and use discretion in deciding whether to issue a warning or a UTT.
   (3)  Physical Arrest:  Officers will make a physical arrest:
      (a)  When pertaining to Driving Under the Influence of Alcohol or other Intoxicants.
      (b)  Whenever a felony has been committed, involving a vehicle.
      (c)  When the operator refuses to sign the promise to appear on the traffic summons.
      (d)  When the officer has reason to believe that the person will not comply with the summons if issued.
b.  *Handling:  Special Categories of Violators:*
   (1)  Non-residents: Officers should consider use of warnings for non-residents, from outside the area, simply passing through this jurisdiction, who commit a minor, non-hazardous violation.
   (2)  Juveniles: Officers should consider use of warnings for juveniles who commit a minor,  no-hazardous violation.  Warnings, if given, may include notice to parents.
   (3)  The members of the Senate and House of Representatives and the clerks, sergeants-at-arms, and door-keepers of each branch of the General Assembly shall be privileged from arrest during the session of the General Assembly and for fifteen (15) days before the commencement and after the termination of each session.  Nothing contained in this section shall be so construed as to extend to cases of treason, felony, or breach of peace or to privilege any person named from being served at any time or place with a summons or notice to appear (**ACA 16-81-102**). The issuance of a traffic summons for a moving traffic offense is allowed, as is a physical arrest in the case of an offense involving DWI.
   (4)  The organized militia shall be privileged from arrest during their attendance at muster and attendance at drills and in going to and returning from attendance at muster and drills in all cases except treason, felony, and breach of peace (**ACA 12-62-401**). The issuance of a traffic ticket for a moving traffic offense is allowed, as is the physical arrest in the case of an offense involving DWI.
   (5)  Other Law Enforcement Personnel:  Warnings (as listed in paragraph a, (1) may be extended to other law enforcement personnel except when violations indicate a flagrant disregard for traffic laws.  Flagrant violators may be issued a UTT or information provided to the Chief of Police, who will take appropriate administrative action.

c. *Information Re Traffic Summons:* The Arkansas Uniform Traffic Ticket and Complaint will be completed whenever a motorist is to be charged with a motor vehicle violation and the motorist will be told the following:
   (1) Court appearance schedule.
   (2) Whether court appearance by the motorist is mandatory.
   (3) Whether the motorist may be allowed to prepay the fine prior to court and enter a guilty plea.
   (4) Any other information necessary prior to release of the motorist.

d. *Uniform Enforcement Policies for Traffic Law Violations:* The following guidelines for uniform traffic law enforcement actions in routine situations are provided to assist officers in making decisions as to whether or not a traffic summons is warranted.
   (1) Speeding violations: Should be above the posted speed limit. Document the circumstances of the violation on a field note or by writing on the ticket. May depend on location of violation (congested area, downtown, school zone, etc.).
   (2) Other hazardous violations: Consider degree of hazard, place, previous accident history of location, current directed patrol emphasis, etc.
   (3) Equipment violations: With annual inspections required of vehicles, consider issuance of summons for any essential equipment defects.
   (4) Other non-hazardous violations. Consider warning unless repetitive or flagrant.
   (5) Multiple violations. A uniform traffic ticket can be issued for each violation, however, the more flagrant violation is generally cited and a warning issued for the remainder.
   (6) Newly enacted laws and/or regulations: A grace period is generally established during which only a warning will be given. Thereafter, officers will use discretion.
   (7) DWI. See paragraph m following.

e. *Traffic Law Enforcement Practices*
   (1) Normal traffic enforcement involves visible traffic patrol by officers who observe and handle traffic violations during the performance of their normal duties.
      (a) Area patrol involves traffic enforcement within the officer's assigned area of responsibility.
      (b) Directed patrol instructions can specify enforcement efforts in an area or at a hazard/violation being concentrated on.
   (2) Stationary overt observation may be used as a technique to make observations about the flow of traffic at a particular location. Officers are encouraged, when completing reports or doing other activities which will keep them out of service for a short while, to park their patrol vehicles in a conspicuous location, where just the presence of the vehicle will serve to remind the other drivers of the need for compliance with traffic laws.

f. *Objectives of Traffic Stops:* There are two major objectives of a traffic stop. The attainment of these two objectives depends upon the officer's ability to evaluate the violator's mental outlook, physical condition, and facts concerning the violation. This requires a thorough understanding of human relations and demands flexibility on the part of the officer. Enforcement procedures should minimize conflict which may develop between the officer and violator and assist in achieving the two major objectives, which are:
   (1) Immediate objective: To take proper and appropriate enforcement action.
   (2) Ultimate objectives: Favorably alter the violator's future driving pattern.

g. *Approaching the Traffic Violator/Officer Violator Relations:* Once the officer has stopped the violator and approaches to a point where communications can begin, the following guidelines should be followed in terms of officer-violator relationships:
   (1) Be alert at all times for the unexpected, but do not be obviously apprehensive.
   (2) Be absolutely certain the observations of the traffic violation were accurate, without reservation.
   (3) Present a professional image in dress, grooming, language, bearing, and emotional stability.
   (4) Be prepared for the contact by having necessary equipment and forms, if they are to be used, immediately available.
   (5) Decide on the appropriate enforcement action based upon the violator's driving behavior, not attitude. In most cases, it is advisable to have the form of enforcement action decided prior to the initial contact with the violator. An exception to this would be, when the officer, through conversation, finds an out-of-state driver performing a violation that would not be a violation in the visitors' jurisdiction, such as right turn on red light, and the officer then decides to issue a warning rather than a citation as initially intended.
   (6) Greet the violator with an appropriate title and in a courteous manner.
   (7) Inform the violator what traffic law he has violated and the intended enforcement action; the violator should not be kept in suspense.
   (8) Ask for the violators' driver's license, vehicle registration, and proof of vehicle insurance. Only these forms will be requested or accepted.
   (9) If the driver has no driver's license, obtain another document of identification.

33.2

(10) Allow the driver to discuss the violation. Do not argue, berate, belittle, or otherwise verbally abuse the violator.

(11) Complete the forms required for the enforcement action taken or exercise a verbal warning, if this is the decision.

(12) Explain to the violator exactly what he is supposed to do in response to the action you are taking and how this action will affect him.

(13) If the enforcement action requires a court appearance, make sure the violator knows where and when to appear. Explain any alternatives to the violator, but do not predict the actions of the court.

(14) Be alert to any emotional stress exhibited by the driver. If stress is present, the instructions may have to be repeated or the violator may need to calm down before driving is resumed.

(15) Return the violator's driver's license, registration, insurance information and a copy of the traffic/warning ticket issued.

(16) Assist the violator in safely re-entering the traffic flow.

(17) Do not follow the violator.

h. *Stopping the Traffic Violator:* The following steps in stopping and approaching a traffic violator are intended to provide maximum safety for the officer, the violator, and to other users of the roadway. Varying conditions regarding the engineering of the particular traffic artery, the urgency to stop the violator (drinking driver), and the existing volume of traffic may require adjusting or altering the recommended procedure. These procedures are to be followed when possible, and are presented from the perspective that ideal conditions exist.

(1) The pursuit of a traffic violator has ended when the officer has positioned himself behind the violator to begin the stopping procedure.

(2) At this point, the officer should notify the Communication Center of the intended location of the traffic stop, the license number, vehicle description, and number of occupants within the vehicle.

(3) The officer should note the license number of the vehicle on a note pad, to be left inside the patrol vehicle.

(4) The officer should be thoroughly familiar with the area, and anticipate the appropriate location to stop the violator. Consideration should be given to a location with ample space, appropriate lighting, and should avoid stops on hills, curves, intersections, private driveways, and business locations which have limited parking.

(5) The officer should signal the violator to stop. This signal should be with the blue emergency lights, hand signals, sounding the horn, and if necessary, the siren. These signals also alert other drivers of the intent of the officer and will usually facilitate securing the right of way for the stopping maneuver.

(6) The violator should be signaled and directed to the right side of the roadway close to the curb, or onto the shoulder if engineering design of the roadway permits this.

(7) On multi-lane roadways, the officer should insure the safety of the violator during lane changes by gradually changing from lane to lane with the violator until the right side of the roadway is reached.

(8) Should the violator stop abruptly in the wrong lane or in another undesirable location, he should be promptly directed to move to a safer location. Officers should use the public address system to instruct violators to move to a safer location. If the officer's verbal directions and gestures are insufficient to bring understanding, the officer should quickly dismount from the patrol vehicle and give verbal instructions to the violator.

(9) The violator should not be permitted to move his vehicle once it has stopped, if it is suspected the driver is under the influence of intoxicants to the extent that his driving is impaired.

(10) Once the violator has stopped in an appropriate location, the officer should position the police vehicle approximately one-half to one car length behind the violator's vehicle. The police vehicle should be positioned so that it will offer the officer some protection from oncoming traffic. This position should be two feet outside and to the left of the violator's vehicle. This position provides maximum safety to the violator, the officer, and all other traffic.

(11) The officer should dismount from the patrol vehicle and be continuously alert for any suspicious movement or actions on the part of the violator or other occupants in the violator's vehicle.

(12) The officer should approach from the rear of the violator's car, looking into the rear seat area, and stop at a point to the rear of the trailing edge of the left front door. This position should be maintained if there are only occupants in the front seat of the vehicle. From this position, the officer can communicate with the violator, keeping him in a slightly awkward position, and at the same time keep all occupants of the vehicle in view.

(13) In those cases where the violator's car has occupants in both the front and rear seats, the officers should approach to a point near the leading edge of the left front door, being especially alert for any unusual actions on the part of the occupants and choosing a path so the door cannot be used as a weapon against the officer. From this position, the officer can communicate with the violator and keep all occupants in view.

33. 3

(14)  In those traffic stops made by two man patrol vehicles, the passenger officer should be responsible for all radio communications, writing all notes and messages relayed from the communications center, and during the traffic stop should dismount from the vehicle and act as an observer and cover for his fellow officer. At no time should the two officers approach the violator together.

(15)  At night, the procedure is basically the same with the additional necessity of exercising caution in selecting an appropriate place for the traffic stop, signaling the violator (the spot light should not be used except in extreme situations), and positioning the police vehicle. After the stop, the head lights should be on low beam for the safety of oncoming traffic, and emergency lights in use on the patrol vehicle as well as emergency flasher lights.

i.  *Stopping a Known or Suspected Felon:*  Special procedures should be used in vehicle stops when the occupants of a vehicle are known to be armed and dangerous. When a vehicle driven by a known or suspected felon is located by a law enforcement officer, he will notify the dispatcher immediately of his location, and give a thorough description of the vehicle, and of occupants. The officer will keep the suspect vehicle in view and request sufficient assistance in making the stop. The officer will keep support units informed of the location and direction of travel to facilitate their approach with minimal use of emergency equipment. The suspect vehicle will not be stopped, unless absolutely necessary, until adequate support is available and in position. The following procedures will be used in effecting the stop:

(1)  The officer will plan to stop the suspect vehicle in a location which presents minimal danger to other citizens.

(2)  When conditions are appropriate and support units available, the officer will move into position to the rear of the suspect vehicle.

(3)  The officer will signal the violator to stop, utilizing all emergency equipment to warn other traffic.

(4)  The violator will be stopped on the extreme right side of the road.

(5)  If the violator is known to be armed and dangerous, the officer will have his weapon easily accessible and ready for immediate use.

(6)  When the suspect vehicle begins to stop, the officer will turn off the siren and actuate the public address system.

(7)  The officer will park the police vehicle so that it provides maximum protection and cover for him.

(8)  At night, all lights will be focused on the interior of the suspect vehicle, including spot lights, to the disadvantage of the violator.

(9)  The officer will dismount the police vehicle quickly, but remain behind the door and accessible to the public address system microphone.

(10)  The officer making the stop is in command and will direct each occupant, utilizing the public address system, to get out of the vehicle individually according to specific directions and into the appropriate search position, after which the approach may be made.

(11)  If a public address system is not available, the officer will give voice commands if they can be heard; if this fails, the officer will cautiously approach the vehicle, keeping all occupants in view, to a point where he can be heard.

(12)  The officer will also give instructions to the support officers, even if not needed, to assure the suspects that additional support is available.

(13)  The support officers will cover the arresting officer and remain on the curb side of the vehicle until all occupants have dismounted and are in the search position.

(14)  The support officers will not give additional commands as this would tend to confuse the suspects, but will make their presence known by responding to the commands given by the arresting officer.

(15)  Extreme caution will be exercised by officers not to get within each other's line of fire.

(16)  When all occupants have been removed from the vehicle, the support officers should move to a position to cover the arresting officer while the persons are searched.

(17)  Arrestees will be searched and handcuffed prior to being transported.

j.  *Persons Charged with Revoked/Suspended Operator's License:*

(1)  The Arkansas Uniform Traffic Ticket and Complaint (UTT) may be issued when an officer has stopped a vehicle and identified the driver as driving with a revoked or suspended operator's license.

(2)  An officer who identifies an individual driving a vehicle who is known to be under suspension or revocation, if not able to stop the individual in a timely manner, may swear out a warrant for the violator.

k.  *Speed Enforcement:*  Excessive speed is the second greatest cause of death and injury on the American highways. Uniform methods of enforcement of speed laws within this jurisdiction should be applied to all officers. Procedures for the enforcement of law applying to speed will vary in accordance with the type of equipment used.

(1)  The officer should follow the vehicle being paced at a constant interval for a distance adequate, normally two or more city blocks, to obtain a reading on the speedometer indicating a speed exceeding that posted.

33. 4

(2)  Radar: Radar is not to be utilized for "filler" or "slack" officer time, but should be planned and utilized where vehicle speed is excessive or of hazard to other motorists or pedestrians. The following guidelines are established for use of the radar, which will always be operated in compliance with manufacturer's instructions. All departmental radar units meet current NHTSA standards. Generally, the following procedures are applicable to operation of radar units:

    (a)  The radar unit must be properly installed in the vehicle and connected to the appropriate power supply.

    (b)  The effective range of the particular radar unit must be thoroughly understood by the operator so visual observations can support the speed meter reading.

    (c)  The operator must choose an appropriate location relative to traffic accident experience in which speed has been identified as a factor. The location must also be conducive to the effective and safe operation of radar.

    (d)  The radar unit must be properly calibrated to insure accuracy in checking speed. The operator must follow the manufacturer's recommended specific methods of checking calibration without exception. Any problems with the operation of radar units or apparent malfunction should be promptly reported.

    (e)  The following elements must be established in court, by the officer, when radar speed charges are placed:

        (1)  The time, place, and location of the vehicle that was checked, the identity of the operator, the speed of the vehicle, and the visual and radar speed check.

        (2)  Officer qualifications and training in use of radar.

        (3)  The radar unit was operated properly.

        (4)  The unit was tested for accuracy prior to use and after use by an approved method.

        (5)  Identify the vehicle and explain any visual observation of its apparent speed.

        (6)  Speed limit in the zone in which officer was operating and where such signs were posted.

    (f)  Radar training is given to officers at the Arkansas Law Enforcement Training Academy. Officers, in court testimony, should be able to cite/display training received or certificates issued.

    (g)  The Officer is responsible to ensure that radar units receive proper care and upkeep, all required maintenance and calibration of radar units is performed, records kept, and that appropriate certificates are on file with the Municipal Court.

l.  *Alcohol Counter Measures Program:*

    (1)  The arrest of an individual for driving under the influence differs significantly from other traffic law violations. Any person who operates a motor vehicle while under the influence of alcohol or other self-administered intoxicants or drugs poses an unpredictable hazard to law abiding motorists; therefore, each officer of this agency will make an intensified effort to remove this type of driver from the highway. The department has established a proactive alcohol enforcement program that has as its goal the reduction of accidents involving alcohol. The program components are listed below.

    (2)  The Chief of Police will publish a monthly review of accident data to determine the areas with the highest concentrations of alcohol related accidents, and times and days of week most appropriate for enforcement counter measures. He will also provide enforcement guidance, location recommendation, and guidance as to patrol techniques:

        (a)  Assignment of regular patrols to cover the high accident locations times/days within this jurisdiction, with emphasis on the violations that have caused the accidents.

        (b)  Assignment of targeted DWI patrols to concentrate on violation areas, times, and days that relate to alcohol infractions.

        (c)  Establishment of roadside check points to deter drinking and driving.

        (d)  Make speakers and demonstrations on the subject of drinking and driving available to schools and other community groups.

m.  *DWI Enforcement Procedures:*

    (1)  General: Driving under the influence has been interpreted by various courts to mean that the ability to operate a motor vehicle is reduced or impaired by the consumption of alcoholic beverages or other drugs. It does not imply that the operator of a motor vehicle be in a state of alcoholic or drug-induced stupor or be entirely incapable of exercising physical control of his vehicle. Driving under the influence of intoxicants is an offense generally associated with leisure-time activity. Consequently, most arrests are made during the evening hours or in the early morning hours after taverns close or social gatherings end. Although the intoxicated driver may be observed any time of the day or any day of the week, weekends and holidays reflect an increase of offenses and arrests.

    (2)  Laws: Each officer will be familiar with all laws and ordinances that relate to driving while intoxicated.

    (3)  Locating and Stopping:

(a) As soon as an officer suspects a driver of being under the influence, observations should be noted for future reference.

(b) In most cases, the officer will observe deviations from normal driving behavior. The following deviations are some of the indicators that a driver might be suffering some form of impairment:
   (!) Sitting through a green light
   (2) Weaving
   (3) Crossing the center line and driving on road shoulder
   (4) Very slow speed
   (5) Excessive speed
   (6) Disregard for stop signs or signals

(c) When you have observed a driver whose actions are similar to the above or are not consistent with sound driving practices, an immediate stop should be made.

(d) Be alert and use extreme caution when stopping a suspected intoxicated driver. Keep in mind that alcohol or drugs affect judgment and may result in erratic and abnormal behavior.

(4) Officer-Driver Contact:

(a) Officers will be polite and business-like, remaining aware that the driver's judgment, self-restraint, and self-confidence are the first faculties to be distorted by alcohol, creating the setting for lack of cooperation, belligerency, and even physical contact. Do not allow yourself to be drawn into an argument.

(b) Get the violator out of the vehicle and to a safe location, carefully observing all actions and statements.

(c) Obtain the person's operator's license or other identification, if you have not previously done so.

(d) Suspected drivers will be requested to perform the following preliminary tests.
   (1) Dexterity test (e.g. standing on one foot, walking a straight line, picking up a coin, etc.)
   (2) Alcosensor/alcolyser test-indicates amount/degree of alcohol present in the blood.

(e) The test results and driving behavior should be collectively weighed in the decision to make an arrest, however; the suspect driver may refuse these tests. If so, the officer may arrest on the basis of observation of driving behavior. The suspect driver, whose dexterity performance is unacceptable yet chemical test reveals no alcohol consumption, should be carefully observed for signs indicating drug usage or abuse. Officers may also arrest in this case on the basis of observations of driving behavior and dexterity alone.

(5) Transporting DWI Suspects:  See **SECTION 106 - TRANSPORTING ARRESTED PERSONS**

(6) Processing DWI:

(a) Provision and procedures outlined in the Arkansas Code should be applied without regard to age of any suspected intoxicated driver.

(b) Every driver arrested for driving under the influence will be advised of the law requiring a blood or breath test to be taken and the penalty for refusal. (Implied Consent Law)
   (1) If a person chooses to submit to a breath test, that person may also be required to submit to tests to determine the drug content of his blood if the law enforcement officer has reasonable cause to believe the person was driving under the influence of any drug or any combination of drugs or the combined influence/alcohol and drugs.

(c) If the violator submits to a chemical test for intoxication, it will be administered by a qualified breathalyzer operator.

(d) If the DWI arrest is a result of a traffic accident investigation and the vehicle operator has been transported to a hospital, the officer will proceed to the hospital and request the violator submit to a blood test to be administered by the hospital staff. This blood test must be accomplished within two hours of the time of the accident.

(e) If a person under arrest refuses upon the request of a law enforcement officer to submit to a chemical test designated by the law enforcement agency, as provided in **ACA 5-65-202**, none shall be given, and the person's motor vehicle operator's license shall be seized by the law enforcement officer, and the officer shall immediately deliver to the person from whom the license was seized a temporary driving permit which shall expire on the court date (**ACA 5-65-205**).

(e) Departmental forms will be completed accounting for the incident and indicating the results of any tests that have been administered, to include a detailed D.W.I. Offense Report.

# SECTION 34
## ETHICS

**POLICY:** Ethical behavior by employees of this department is imperative in maintaining the trust and respect of the citizens within this community. Should this trust or respect ever be compromised for allegations of unethical conduct, a full scale internal investigation will be initiated and vigorously pursued. An internal investigation will serve to uncover any alleged police practices/behavior which is considered to be undesirable or dispel any citizen speculation of its existence.

## PROCEDURES:

A. Employees of this department will provide courteous and professional law enforcement services to citizens within this community, being ever mindful that our primary mission is to serve mankind, and to be civil and respectful in our contacts with all persons.

B. Employees of this department will remember that he/she are public servants. Our conduct, therefore, in the presence of the public shall always be in accordance with the highest degree of morality which is required of the law enforcement profession.

C. Law enforcement officers will remember that he/she are sworn to protect and serve all citizens of this community equally. Race, color, religion, age, sex, political beliefs or other personal opinions shall not interfere with the equal administration of justice to all citizens within this jurisdiction.

D. Law enforcement officers will always remember that he/she has sworn to uphold the law, abide by the law, and protect the rights of all people as afforded by the constitution of the United States and the constitution of the State of Arkansas.

E. Employees will be truthful in his/her conduct toward all persons.

F. Each employee will assume the responsibility for his/her act or omission to act.

G. Employees will not indulge in obscenity or profanity of speech or action during the performance of official duties, and will conduct his/her private life in a manner which will not bring discredit to this agency.

H. Employees will not intimidate, use or direct unjustifiable violence, force, or threats against any person.

I. Employees will not accept anything of apparent or prospective value from any person which may influence him/her in the performance of official duties.

J. Employees will not knowingly associate with any person(s) notoriously suspected of illegal activities, except in the performance of official duties.

K. Employees will always be neat and clean in person and dress, and while on duty shall be attired and equipped according to the nature of his/her duties and environmental conditions.

L. Employees will not use tobacco while on duty, except with discretion when not in view of the general public.

M. Employees will not consume alcoholic beverages while on duty, except during the performance of official duties.

N. Employees will not consume alcoholic beverages prior to their scheduled work time which will render him/her unfit for duty.

O. Employees will not use drugs other than over the counter medications or those prescribed by a reputable physician.

P. Employees will report to their immediate supervisor, who will document and keep a record of, any permanent or long term prescription medications he/she is taking.

Q. Employees will be respectful when addressing an officer with superior rank. The proper method of addressing a superior officer is to verbalize the officers rank prior to the officers last name, such as: Sergeant Jones or Lieutenant Smith as examples.

R. Employees will promptly obey orders received from a superior officer.

    1. An exception to this rule will apply if the order given is in violation of a policy or procedure of this agency or in violation of any law.

        a. If this situation should occur the subordinate officer will respectfully decline the order, bringing the violation to the attention of the superior officer.

        b. Should the superior officer insist on the subordinate carrying out the order, the subordinate will respectfully decline and immediately contact a higher ranking officer to report the incident.

S. Insubordination from any employee will not be tolerated and will be grounds for disciplinary action.

T. The Law Enforcement Code of Ethics is reproduced as a part of this policy in order to stress the importance of ethical conduct and to provide further guidance for law enforcement officers of this department to follow:

### The Law Enforcement Code of Ethics

- As a law enforcement officer, my fundamental duty is to serve mankind; to safeguard lives and property; to violence or disorder; and to respect the constitutional rights of all men to liberty, equality and justice.

- I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my department. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

- I will never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

- I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before god to my chosen profession-----Law Enforcement.

U. **Any violation of this policy is subject to disciplinary action, up to and including dismissal.**

# SECTION 35
# EVIDENCE

**POLICY:**   It is the policy of this law enforcement agency to ensure that evidence in its custody can be properly secured and stored, readily retrieved, and that any changes in custody have been properly and fully documented.

**PROCEDURES:**

a.      The officer's first responsibility upon arrival at a crime scene is to locate and assist any person who is injured, ill, or needs personal assistance.

b.      After completing part (a), the first officer on the scene shall initiate security measures to protect the crime scene to prevent destruction or contamination of evidence.

   (1)      Officers must prevent unauthorized persons from entering the crime scene or the immediate area.

   (2)      An officer must not touch, move, or pick up objects or disturb in any manner any article, mark, or impression that may have been made by the person or persons committing the crime.

   (3)      Assigned officers will maintain rigid security until the follow-up investigation has collected all the evidence available.

c.      Collection of Evidence:  A common error is overlooking or disregarding the importance of physical evidence left by the criminal.

   (1)      After locating an item considered pertinent to the case under investigation, it should not be disturbed until it has been photographed, measurements taken, its position recorded on the crime scene sketch and entered in the officer's notebook and processed for fingerprints.

d.      Identification of Evidence:  All recovered evidence must be immediately and properly marked or labeled in order to assure its proper identification at some later date.

   (1)      Each piece of evidence must be marked when it is removed from the original position.

   (2)      Evidence will be marked by use of badge number or serial number when practical, rather than using your printed initials.  Evidence should not be marked with an "x."

   (3)      The date of recovery, case number, and item number such as: EV. Item # 1 shall be fixed to the exhibit whenever possible.

   (4)      The identification mark shall not be placed where evidence traces may exist, such as on the sides of a recovered bullet.

e.      Preservation of Evidence:  The integrity of evidence may be further protected by selecting a container that will guard the specimen against damage or contamination.

   (1)      Place each item in its own container or paper wrapping.

   (2)      After the article has been marked, placed in a container and sealed, a label or tag will be affixed. The label or tag shall answer the following questions:

      (a)  What?

      (b)  Where?

      (c)  When?

      (d)  Who?

      (e)  In what condition?

f.      Chain of Possession:  The correct methods used in collecting, identifying, and packaging evidence may be nullified if an officer cannot account for all persons who have handled, examined, or stored the evidence. The chain of possession begins when the evidence is discovered, and continues until it is presented in court.

   (1)      Each officer is responsible for maintaining the chain of possession and protecting the integrity of his/her evidence.  To accomplish this task a form is provided by the department which will document each link in the chain.  To further protect the integrity of the evidence the officer will:

      (a)      Limit the number of persons who handle the evidence from the time it is discovered until it is presented in court.

      (b)      If the evidence leaves the officer's possession, he/she should:

         (1)      Record on the chain of possession form to whom it was given.

         (2)      The time and date.

         (3)      The reason for being given to another person.

         (4)      When and by whom it was returned.

      (c)      Make sure the persons handling the evidence affix their name, identification, and assignment to the package.

      (d)      Obtain a signed receipt for the evidence containing the date and time of the transaction.

# Evidence
## Chain of Possession Form

Evidence item_____

Evidence #_____

Case # _____

Date and Time_____

Out to_____

Reason_____

Returned date/time_____

Returned by whom_____

Evidence

# SECTION 36
# FIREARMS: AUTHORIZATION

**POLICY:**    All officers of this department, when on duty, will carry a departmental issued handgun or one which has been authorized for use by the Chief of Police.

**PROCDURES:**
a.  Routine maintenance and care of the handgun is the responsibility of each officer.
b.  Weapons must at all times be functional, and free from any mechanical defect.
c.  When repair work is required on any departmental issued weapon, the work shall be done by a gunsmith designated or approved by the Chief of Police.
d.  Firearms will be inspected periodically for cleanliness and proper functioning. Inspections will be made by qualified officers, (officers who are properly trained in the functioning of departmental issued firearms), as directed by the Chief of Police.
e.  No officer, when dressed in civilian clothes, whether on or off duty, shall wear a handgun in such a manner as to attract attention, or to be open to the view of the public.  It must be worn in such a manner that will be inconspicuous.
f.  No officer will be armed while under suspension, unless possession of a firearm is in compliance with existing state statutes regarding the use and possession of firearms by the general public.
g.  Service revolvers shall not be worn on the gun belt holster or other device which places the handle of the weapon more than three (3) inches from the body.  When the handle of the weapon is tilted forward and away from the officer's body, the weapon can hang on doors, windows, belts, etc. This also increases the risk of a firearm being taken from an officer's possession while engaged in a physical altercation.
h.  All sworn personnel are required to qualify on the firing range with the handgun he/she carry in their capacity as a police officer, either on or off duty. Personnel must qualify at least twice a year, for each weapon carried, with a minimum score of 75 %.
I.  Qualification documentation must be kept in each employees training or personnel file.
J.  Officers of this department shall not use firearms unless it is necessary to protect themselves or other persons from death or serious bodily injury. For further information, refer to the Department Policy on the use of force, which is contained in Sections on Deadly and Non-Deadly Force of this manual.

# SECTION 37
# FIREARMS: TRAINING AND QUALIFICATIONS

**POLICY:**   It is recognized by this agency that firearms training is an important phase in the development of Law Enforcement officers.  Particularly, with those weapons that are most accessible to the officer, i.e., revolver, pistol and shotgun.  It is the policy of this agency that every full-time, part-time and reserve law enforcement officer will be required semi-annually to qualify with his/her issued revolver or pistol. The highest score from each qualification will be recorded in an officers training or personnel file.  That score, and any scores used by the department for records purposes must be fired on an approved firing range, under the supervision of a certified firearms instructor.

**PURPOSE:**  All sworn personnel of this department are <u>required</u> to be competent in the proper and safe use of various types of firearms. The purpose of this policy is to provide training guidelines established to assist employees in fulfilling this requirement. It is mandatory that all officers be familiar with the provisions of this policy and adheres to the procedures stated herein.

**PROCEDURES:**

a.      The minimum firearms qualification score for law enforcement officers of this agency is 75 percent on at least two (2) qualification relays.  Officers unable to meet this minimum qualification will be scheduled for a conference with the Chief of Police.

b.      Firearms Training will be conducted by a certified firearms instructor as appointed by the Chief of Police or a designee.

c.      Familiarization and qualification courses will be provided on handgun, shotgun, or other weapons, including night firing qualification as directed by the Chief of Police or a designee.

d.      Each officer must qualify semi-annually, or as directed, with authorized weapons.  The Chief of Police may require additional departmental firearms training as necessary.

e.      <u>Qualification Course - Handgun Policy</u>.
        1 - 2 - 3 rounds on each command, shooter starts loaded and holstered, on command (whistle) the shooter will fire the number of rounds the Range Officer indicates.
        1   Yard 12 Rounds    1-1/2 Sec.  (Per Command 1, 2, 3, Rounds)
        3   Yards  6 Rounds    1-1/2 Sec.  (Per Command 1, 2, 3, Rounds)
        9   Yards  6 Rounds    2-1/2 Sec.  (Per Command 1, 2, 3, Rounds)
        7   Yards:
        This will be 12 rounds, 25 Sec., 6 rounds weak hand no support, 6 rounds strong hand no support, all double action.

        15  Yards:
        This will be 6 rounds in 12 Sec. 2 hands, point shoulder, double action.

        25  Yards:
        This will be 18 rounds in 90 Sec., 6 rounds kneeling, no support, 6 rounds standing, weak hand barricade, 6 rounds standing, strong hand, and barricade.

        60 rounds, fired, Possible score 300.
        Have to shoot 230 to qualify.
        230 to 253   MARKSMAN        (76.6% to 84.3%)
        254 to 277   SHARPSHOOTER    (84.6% to 92.3%)
        278 to 300   EXPERT          (92.6% to 100%)

f.      <u>Qualification Course - Shotgun Policy</u>
        5 Rounds Rifled Slugs
        5 Rounds 00 Buckshot (9 Pellets)
        B-27 or an equivalent target is required

RIFLED SLUGS
50 Yards - 1 Round standing from the shoulder.
 Time limit - 10 seconds
40 Yards - 2 Rounds, one standing from the shoulder, 1 round kneeling.
 Time limit - 15 seconds.
25 Yards - 2 Rounds, one kneeling, one standing from the shoulder.
 Time limit - 15 Seconds.

00 BUCKSHOT (9 PELLETS)
25 Yards - 3 Rounds standing from the shoulder, two kneeling.
15 Yards - 2 Rounds, one standing from the shoulder, one kneeling.
 Time limit - 10 seconds.

*NOTE*:  All loading should be "Combat Reloading" method.
 All stages will start with the shotgun loaded, safety on, gun held under the arms, pointed downrange.
 After firing: action open, safety on, barrel up above head level.

 25-yard buckshot stage will start with the shotgun in "Cruiser Safe" condition.  (Magazine tube loaded,
 safety on, chamber empty.)  After firing: action open, safety on, barrel up above head level.

SCORING:    Rifled slugs - B-27 Target - each hit from the "X" to the 7 ring equals 2 points, each hit outside the
 7 ring, but in the black equals 1 point.
 00 Buckshot (9 Pellets) - No other load is allowed.
 B-27 Target - each hit in the black equals 2.223 points.

| | |
|---|---|
| MARKSMAN | 75% - 84% |
| SHARPSHOOTER | 85% - 94% |
| EXPERT | 95% - 100% |

g.  Qualification Course - Automatic Weapon
 1 - 2 - 3 rounds on each command, shooter starts loaded and holstered, on command (whistle) the shooter
 will fire the number of rounds the Range Officer indicates.

| | | | |
|---|---|---|---|
| 1 Yard | 12 Rounds | 1-1/2 Sec. | (Per Command 1, 2, 3, Rounds) |
| 3 Yards | 6 Rounds | 1-1/2 Sec. | (Per Command 1, 2, 3, Rounds) |
| 9 Yards | 6 Rounds | 2-1/2 Sec. | (Per Command 1, 2, 3, Rounds) |

7 Yards:
This will be 6 rounds in 12 seconds, 3 rounds weak hand no support, 3 rounds strong hand no support, all
double action.

25 Yards:
This will be 18 rounds in 90 seconds, 6 rounds kneeling, no support, 6 rounds standing, weak hand
barricade, 6 rounds standing, strong hand, and barricade.
60 rounds, fired, possible score 300.
Have to shoot 230 to qualify.

| | | |
|---|---|---|
| 230 to 253 | MARKSMAN | (76.6% to 84.3%) |
| 254 to 277 | SHARPSHOOTER | (84.6% to 92.3%) |
| 278 to 300 | EXPERT | (92.6% to 100%) |

h.    In order to insure individual officer's firearm proficiency and reduce incidents involving misuse of firearms,
 deliberate or accidental, the following procedure is established:

 **PROCEDURE:**  Any officer who does not meet the minimum requirements for demonstrated proficiency
 in the use of firearms, may be assigned to intensive full-time training duty, until it is determined that an
 officer can or cannot meet the minimum proficiency required for their retention as a law enforcement
 officer in this state.  Any officer of this department who is unable to meet the minimum firearms
 qualification requirements shall not be permitted to carry a firearm in the performance of their duties.

i.    Range Safety Rules and Regulations

    (1)    All Firearms Training must be conducted by a certified Police Firearms Instructor.

    (2)    A record of all approved Firearms Training will be maintained at the department level.

    (3)    No loaded weapons will be on the range except when on firing line.

    (4)    Strict discipline must be maintained by the Range Officer and by the officers receiving the training.

    (5)    When picking up a firearm, open the cylinder or action and check to see that it is loaded.  Check the weapon the second time to assure that it is safe.

    (6)    Do not give a firearm to anyone unless the cylinder or action is open and no rounds in the weapon.

    (7)    Do not anticipate a command on the range.

    (8)    Always check the barrel of a firearm for obstructions before loading.

    (9)    Load your weapon only after you are on the firing line and given the command to "load your weapon."

    (10)    Unload when and as instructed.

    (11)    Keep the barrel of your firearm down range in the target area at all times when in your hands.

    (12)    Do not remove a weapon from its holster with your finger on the trigger.  The finger may be placed on the frame of the weapon until it is clear of the holster and your body, and down range.

    (13)    When on the firing line, smoking, chewing, or dipping tobacco products are absolutely prohibited.

    (14)    There will be no talking on the firing line by any shooter.  Full attention will be given to instructions and commands of the Range Officer.

    (15)    If a firearm is dropped or the muzzle touches the ground, notify the Range Officer immediately, unload the weapon, check the barrel for obstructions and follow the commands of Range Officers to resume fire.

    (16)    Do not let the hammer down on a live round in the firing chamber without placing your thumb in front of the hammer and releasing the pressure on the trigger.

    (17)    In the event of a misfire, keep the muzzle down range and on target for at least ten (10) seconds. Raise your free hand and advise the Range Officer of the misfire.  You will be instructed on how to safely remove the misfire from your weapon.

    (18)    Do not go in front of the firing line until the Range Officer has given the command to "Cease Fire," and the line has been cleared and the order to "Go Forward" has been given.

    (19)    Dry firing is prohibited except when under the supervision of the Range Officer.

    (20)    If you are taking any type of medication or have consumed alcoholic beverages within eight (8) hours of firing a weapon, the Range Officer must be notified.

    (21)    Any officer has the right to challenge the scoring of his or her target.  The challenge must be made to the Range Officer at the time of the original scoring.

    (22)    Repeated violations of any Safety Rule or Regulation, whether intentional or unintentional, may result in loss of score or removal from the range.

    (23)    Ear protection is required to be worn while firing a weapon during range training. Equipment will be provided, however, employees will also be allowed to purchase their own. Privately owned equipment will be subject to approval by the firearms instructor.

    (24)    The firearms instructor, regardless or rank, will be in charge of the firearms training. All officers, including superior officers, will follow the firearms instructors' commands concerning range operations and procedures. The firearms instructor will report to the Chief of Police any problems he/she might encounter as a result of this policy provision.

    (25)    Employees attending firearms training will be attentive and cooperative in class and on the firing range. Class misconduct, horseplay, or negligence of any kind will not be tolerated.

j.    Any officer who is unable to meet the minimum Firearms Qualification Score established by the department shall not be eligible to perform the duties of an armed law enforcement officer. The personal risk is high, and liability is indicated when an officer knows he or she cannot qualify with a firearm and the department continues to permit the officer to work on the streets.  Failure to qualify may result in termination.

# SECTION 38
# FOLDER, FELONY CASE

**POLICY:** The Felony Case Folder is designed both to insure that a complete case file is prepared and to assist the Prosecuting Attorney's office in preparing for a trial. It is essential that the Prosecuting Attorney's Office have this folder as soon as possible after a felony arrest has been made.

**PROCEDURE:**

a.  General: It has been the complaint of many law enforcement officer's that when the time comes for a preliminary trial, the Prosecuting Attorney's Office is totally unfamiliar with the case. Likewise, the Prosecuting Attorney's Office has complained that they are not receiving complete information required for a good prosecution. The Felony Case Folder is designed to abate both complaints. As soon as possible after a felony complaint has been filed, the case will be assigned for follow up investigation and a case file folder prepared. If an arrest is made in the case, the file folder will be sent to the Prosecuting Attorney's office as soon as possible. If no arrest is made the case file folder will be retained in accordance with departmental policy and applicable state law, (Statute of Limitations).

b.  The Felony Case Folder: A Felony Case folder will contain:
    (1)  A Case File Check List: All paperwork should be placed in this folder according to the Check List. (See Appendix A) The check list will be stapled inside the folder on the left hand side. This form serves two purposes:
         (a) It aids the law enforcement officer in preparing his case by accounting for pertinent items.
         (b) It informs the Prosecuting Attorney's office of the items available for trial.
    (2)  The Check List is marked with several items that usually play a role in a felony trial. Besides these items are three columns marked, "available", "not available", and "none":
         (a)  Available - means the item is on hand at the department. A Xerox copy can be made of a report and placed in the folder and a check mark ( ) placed in that column. Evidence and crime scene Photographs are not to be sent initially, but a check mark will confirm that the department does have these items. Xerox copies of crime scene photographs and Xerox copies of photographed evidence items can be sent.
         (b)  Not available - means we will have these items, but they are not currently in our possession; example - photographs have not come back from the Lab.
         (c)  None - means we will not have this item for trial.
    (3)  Executed Arrest Warrants: The Prosecuting Attorney's copy of the felony warrant will be placed in this folder. (original)
    (4)  Offense Report: (copy) (See **SECTION 92, REPORT: OFFENSE/INCIDENT**)
    (5)  All Supplementary Reports (copy) (See **SECTION 92, REPORT: OFFENSE/INCIDENT**)
    (6)  Laboratory Report: (copy)
    (7)  Evidence List: (copy), also include the completed chain of custody form if necessary.
    (8)  Hospital Report: (copy)
    (9)  Photographs: Of the defendant, the victim, people used in a line-up, and the crime scene if pertinent to the case. These photographs should be duplicates or extras, not the only copy.
    (10) Search Warrant and Affidavit; (copy)
    (11) Statements: of the defendants and or witnesses if not already in the Supplementary report. (copy)
    (12) Witness List: Must be complete with full names, addresses, phone numbers, employment, etc. (Original)
    (13) Legal Rights Form: Miranda Warning, signed and witnessed (copy)
    (14) Line-Up Information: Names, addresses, phone numbers, employment information of subjects used.

c.  When criminal records are released to any other Criminal Justice Agency, Prosecuting Attorney or other law enforcement agency, a dissemination card is to be filled out for our records and placed in the subject file.

d.  All Felony Case folders will be reviewed by the officer's Supervisor for accuracy and completeness. The supervisor will either approve the folder by initialing and dating the check list sheet, or will not approve the folder and return it to the investigating officer assigned to the case.  The supervisor will explain to the assigned officer why the file folder is being returned, (incomplete, etc...), and establish a deadline for the folder to be completed and resubmitted for approval.

e.  The Chief of Police or designee will forward the completed Felony Case Folder to the Prosecuting Attorney's Office and have the receipt signed, by an employee of that office, that the case file was received.  The signed receipt will be returned to the original case folder.

*APPENDIX A,*
## CASE FILE CHECK LIST


**COMPLAINANT OR VICTIM (Please Print)**

(1) _____          DATE _____

    IF PLACE OF BUSINESS LIST ON (1)

(2) _____          OFFENSE NUMBER _____

**TYPE OF OFFENSE** _____          **ARK. CODE** _____


| AVAILABLE | NOT AVAILABLE | NONE | NAME OF REPORT | REMARKS |
|---|---|---|---|---|
| | | | Executed Warrants | |
| | | | Offense Report | |
| | | | Supplementary Report | |
| | | | Arrest Report | |
| | | | Records:  Local | |
| | | | State | |
| | | | Federal | |
| | | | Laboratory Reports | |
| | | | Evidence List | |
| | | | Hospital Report | |
| | | | Photographs, ID, Line-up, and Crime Scene | |
| | | | Search Warrant and Affidavit | |
| | | | Statements:  Defendants | |
| | | | Witnesses | |
| | | | Witness List & Records (Arrest) | |
| | | | Legal Rights Forms | |
| | | | Line-Up Information | |
| | | | Other | |


_____

**INVESTIGATING OFFICER**


**(THIS FORM MUST BE STAPLED TO INSIDE FRONT COVER OF FELONY CASE FOLDER)**

38. 3

# SECTION 39
# COMPUTER ISSUES

**POLICY:**   It shall be the policy of this agency to comply with applicable federal laws regarding electronic communications and software copyright regulations, to safeguard the Department from computer virus infections, and to limit Internet use for business purposes only. In compliance with these issues, the following guidelines will be adhered to:

**PURPOSE:** This policy serves to state the position of this agency relative to computer software, usage of agency computers by unauthorized personnel, proper Internet/e-mail usage, and safe-guarding of laptop computers.

**PROCEDURES:**

1.    In compliance with software piracy laws, no software from this agency may be removed from the premises or copied for personal use. No software may be brought into this department and installed into agency computers without the express written permission of the Chief or his or her designee. When such permission is obtained, the software will be installed by a qualified individual in accordance with licensing agreements only.

2.    Requests for new software beneficial to the mission of this agency may be made through the office of the Chief or his or her designee. If approved, the software will be purchased and registered to the Police Department.

3.    Software loaded on individual computers is subject to review at any time, and unauthorized software will be removed.

4.    No unauthorized personnel are to be allowed to access or use Police Department computers either in the agency office space or in the homes of employees.

5.    The e-mail system is the property of the Police Department and is intended for the furtherance of official business for this agency. Messages transmitted or received by the e-mail system are messages and property of this agency.

6.    All messages sent on the e-mail system are viewed as Police Department messages and **not** personal, confidential messages of the employee.

7.    The supervisory staff of the Police Department has the right to enter the agency e-mail system and review, copy, delete, or disclose any message.

8.    Passwords will be used to gain access to the e-mail system for the purpose of protecting the integrity of the Police Department.

9.    E-Mail messages are the intellectual property of the Police Department, not of the employees, and must pertain only to agency business.

10.   E-Mail messages should not be left on the computer screen when the employee is away from his/her desk or work station, in order to protect agency proprietary information.

11.   Passwords will be changed frequently to avoid unauthorized access.

12.   No information protected by copyright laws, including software, will be sent or copied via e-mail.

13.   All messages on the e-mail system are to be businesslike. There will be no tolerance for using the system for personal messages or for those which contain profanity, vulgarity, and/or harassing or defamatory language.

14.   All personnel who use the agency Internet service shall use the service for official business only.

15.   Items which are subject to theft such as laptop computers require extra diligence in safeguarding them when they are removed from the confines of the Police Department area. Following are guidelines to be followed when a laptop is carried outside of the Police Department.

16.   Always carry the laptop in its specially padded carrying case.

17.   When traveling by air, always carry the laptop on the airplane. Never check the laptop as baggage and never put the laptop inside another case checked as baggage. The only exception to this is that a laptop can be shipped in a special shipping container with padded foam for shipping sensitive items. That case is specially constructed and designed to house sensitive electronic equipment.

18.   Always hand carry the laptop when traveling to and from the airport. Don't put it in the trunk of a cab or on the rack of an airport shuttle.

19.   Always make sure that there is not a disk in the floppy drive or a CD in the CD ROM drive while traveling. This could cause damage to the laptop.

20.   If you have the need to carry one of the computers home to work on agency projects, the computer must be carried to and from the office on a daily basis during the work week. Under no circumstances will Police Department property be left at your residence while you are at work.

21.   Laptop computers are assigned individually or obtained from Central Inventory by sign out.

# SECTION 41
# GRATUITIES, REWARDS, AND WITNESS FEES

**POLICY:**  Employees shall not solicit or accept rewards, presents, gratuities, or compensation other than that paid by the City, or as provided for by City Ordinance or Department Policy, for services performed in the line of duty.

a.    Any reward, gratuity, present or unauthorized compensation received by any officer, shall immediately be submitted to the Chief of Police, accompanied by an incident report describing all circumstances related to the incident.

b.    No employee shall use his or her badge, uniform, identification card, or official position to solicit special privileges for him or herself or others such as:

    (1)    Admission to places of amusement.

    (2)    Sporting events.

    (3)    Discount on purchases.

    (4)    Other favors, except as expressly permitted by department orders.

c.    Employees shall not solicit witness fees for responding to a legally constituted subpoena and testimony in criminal or civil courts.  If unsolicited witness fees are paid to an officer, an incident report will be made identifying the case, case number, the court of jurisdiction, the amount of the fee, and the identification of the person paying the fee.

41.1

# SECTION 42
# GRIEVANCE & DISCIPLINARY PROCEDURES

**POLICY:**   It is the policy of this agency to avoid terminating an otherwise productive member when conduct, behavior or performance problems occur, if possible.  This agency will use progressive disciplinary action to bring about change once it is shown that a member knew, or should have known, that such conduct, behavior or performance failed to comply with established directives, provided that:

a.   the conduct, behavior or performance was not caused by a lack of skills or ability that the typical  member would not be expected to possess; and

b.   prior to taking such disciplinary action, lesser forms of actions, such as supervisory consulting or formal counseling, were appropriate to use and were followed.

**PROCEDURES:**

a.   When discipline is deemed appropriate, this agency will use a progressive system, when practicable.  Furthermore, discipline shall be for cause and shall follow the basic concepts of due process.

b.   This agency does not intend to illegally discriminate against current members, potential members or member groups on the basis of sex, ethnic background, race, religion, color, age or physical disability in any disciplinary or termination proceedings.

c.   Supervisors must ensure that fair enforcement decisions are made in the use of disciplinary or termination action.  Fair enforcement incorporates the concepts of equality and equity, supervisors will not illegally discriminate against members and will treat them equally when making decisions about the appropriate type of intervention to use in correcting a performance deficiency.  Solutions include training, counseling, discipline, remedial training, reassignment, demotion or termination.  Whatever  the administrative action, its amount and degree must be based on equity.

(1)   Equity defined.  Equity means that supervisors review each member's performance deficiency and considers the following circumstances to help determine the amount and degree of administrative action:

(a)   the seriousness of the offense;

(b)   management's expectation that the type and level of administrative action will facilitate or deter the conduct, work proficiencies or behaviors of others;

(c)   the member's overall conduct, work productivity, time between other violations (if other offenses occurred) and behavior record;

(d)   management's expectation, based on the member's overt behavior, that the type and level of administrative action will improve the member's future performance.  In other words, does the member respond positively to discipline; and

(e)   the member's seniority.

d.   It is the policy of the this agency to terminate members when situations beyond the control of the agency, or when the member's actions or inaction's, or when the results of the member's actions or inaction's, are such a nature that:

(1)   economic necessity requires reductions in the workforce;

(2)   a member fails to demonstrate a willingness or ability to improve his or her conduct, behavior or performance deficiencies without intense supervision; or

(3)   failing to terminate the member would create an unreasonable risk of negligently retaining a member who has failed to display the necessary competencies to remain in his or her job position.

e.   When discipline is deemed appropriate, it is policy to use a progressive system, when practicable.  Furthermore, discipline shall be for cause and shall follow the basic concepts of due process.

f.   Not every supervisory interaction or intervention with a member is to be construed as discipline.  Except in cases of culpability, correcting undesirable conduct, behavior or work performance is at times best handled by the immediate supervisor in an informal atmosphere.  This means taking the member aside and discussing the problem, candidly and openly.  These actions may or may not be formally documented, depending on the supervisor's discretion.  In addition to supervisory consulting, the following situations are not considered to be disciplinary:

(1)   Counseling.  At times, personal problems may interfere with the member's ability to perform normally.  When the results are not serious enough for discipline but call for a more formal type of supervision than consulting with the member, counseling is the proper tool to help the member.  Counseling is not a form of discipline but is the last tool available to correct a problem if the member is not capable of doing so.

(2)   Administrative Leave.  Administrative leave occurs any time the member must be removed from duty until a proper investigation or other administrative proceeding can be held.  Usually the situation involves a case of suspected misconduct, such as alleged criminal activity, fighting, or being mentally or physically unfit for duty.  In such cases leaving the member in position would create an unreasonable liability or safety issue for this agency.  The immediate supervisor can order a relief from duty and then immediately report the action to the Chief

of Police. The Chief of Police then initiates an investigation and makes a decision within 24 hours about whether the relief will continue, and for how long.

(3) Administrative Furloughs. Following a deadly use of force. These types of furloughs are not discipline and should not be viewed as such. They are to help the member adjust and handle any personal or emotional needs resulting from traumatic events. Administrative furloughs are mandatory, initiated by the supervisor/senior officer on duty. Furloughs should continue until the officer involved has received professional counseling from a licensed psychologist who will notify the Chief of Police when the officer is capable of returning to work.

(4) Incompetence or Inability to Serve. Anytime a member's performance is consistently poor or the member is not able to perform all the assigned responsibilities, duties or tasks of the job in a competent manner, causes exist to terminate the member's position.

g.  Steps of Progressive Discipline

(1) Written Warning. Written warnings are written records and the first step in the progressive discipline system. They are intended to be the least intrusive form of discipline. Written warnings are provided to members of this agency within 48 hours of the infraction.

(2) Written Reprimand. A written reprimand is the second step in discipline, unless circumstances of the case justifies a higher level of discipline, in which case this can be bypassed.

(3) Suspensions. Suspensions are serious interventions and occur when a member fails to respond positively to lesser forms of discipline. Suspensions can also be the first step in progressive discipline if the act, and/or the result of the act, is serious enough that a written warning or reprimand would not promote the intent or spirit of the purpose and need for disciplinary action. Members should have a hearing, if they desire, when suspensions occur.

(4) Demotions as a Form of Discipline. Demotion *as a form of discipline* is intended to be punitive and can occur concurrently with a suspension when a supervisor is involved.

(5) Termination. All members are subject to termination for the following general conditions:

    (a)  reductions in work force brought about by economic conditions;

    (b)  consistent performance failure(s) or a single performance failure that results in serious consequences to the office's public credibility or ability to do business in an effective and efficient manner, with or without fault;

    (1)  Termination for performance failure (through acts of omission or commission while on or off duty) can occur with or without fault on the member's part.

      (a)  Termination with fault: Examples include, but are not limited to, insubordination, threatening a supervisor, fighting and assaults or provoking a fight or assault, forbidden harassment, endangering another, drug or alcohol abuse, theft, and false reporting or witnessing. *In cases of termination with fault, members normally have culpability, that is, the member acted purposefully, knowingly, recklessly or negligently.*

      (b)  Termination without fault: Examples include, but are not limited to chronic problems, substantial impairment of the employee relationship and situations where performance is not reasonably expected to improve or where problems are not expected to be resolved in a reasonable time.

      *  Chronic problems include excessive excused and non-excused absences, failure to consistently accomplish expected levels of performance results on assigned tasks, and chronic complaining about operations to the extent that supervisors must spend excessive time dealing with the problems caused by the complaints.

      *  Examples of substantial impairment of the employment relationship include unreasonable disruption to normal operations of this agency, endangering the organization's mission purpose, actions or inaction's that contribute to an unnecessary risk to the public image and creating conflicts of interest.

      (c)  decisions of the Chief of Police as permitted and retained by law.

h.  Whenever disciplinary action is used, inform the member in writing of the following specific elements:

    (1)  the exact offense violated;

    (2)  how the violation affects this agency's ability to be an effective, efficient or safe employer;

    (3)  what the member must do to avoid future disciplinary action;

    (4)  how much time the member has to correct the problem; and

    (5)  what further disciplinary action-possibly including termination-will occur if performance does not improve.

i.  Notice of Termination: If a member's performance requires an investigation, the member may be placed on administrative leave pending outcome of the investigation. Depending on the findings, the member may then be terminated. If this occurs, the terminated member will be provided with information that includes:

    (1)  the reasons for the termination;

    (2)  the effective date of the termination;

    (3)  whom to contact regarding status of fringe and retirement benefits; and

    (4)  a statement that the content of the member's record relating to the termination will be made available to the member according to state public law.

# SECTION 43
# ROADWAY DRUG INTERDICTION

**POLICY:** This agency has a primary mission of creating a safer environment for the citizens within this community. Although the total elimination of drug law violations within the city is unlikely, this agency shall be committed to the suppression of illegal drugs and narcotics. In furtherance of this commitment this agency shall conduct a roadway drug interdiction effort as directed by the Chief, the Assistant Chief, or a designee.

**PURPOSE:** To increase the effectiveness of this agency in disrupting the transport, distribution and sale of narcotics and illegal drugs, thereby increasing the safety of the citizens within the community.

PROCEDURES:

a. All roadway drug interdiction efforts shall be conducted by utilizing legally executed probable cause vehicle traffic stops.

b. Roadblocks, checkpoints or random vehicle traffic stops shall not be utilized for drug interdiction purposes.

c. The Chief, Assistant Chief, or a designee may periodically identify an area of roadway (major highway, county road or etc.) as being a route that is likely being used for transporting of illegal drugs. In this situation, specific officers (properly trained canine officers if available) shall be assigned to patrol the identified area primarily for the purpose of enforcing traffic laws with the additional responsibility of seizing illegal contraband that is being transported over the roadways.

d. A vehicle, in any traffic stop situation, should only be searched for contraband when an officer in good faith, has good reason to believe that the driver or any passenger is engaged in illegal activity. If an officer has no basis to believe that criminal activity is present, the vehicle stop should be considered only a traffic stop. Any search conducted by the officer should be lawfully justified, such as a search based upon consent, probable cause, inventory, or other search approved by applicable judicial decisions.

e. To conduct a thorough search for narcotics and illegal contraband an officer should call for a properly trained canine team whenever a reasonable suspicion exists to believe a vehicle is transporting a controlled substance and to confirm the presence of suspected contraband articles, including currency and its container. The canine shall be utilized and a vehicle search conducted only in situations where probable cause is established in accordance with applicable law, (see item (g) below).

f. The Arkansas Rules of Criminal Procedure stipulate that an officer having reasonable suspicion to believe an individual is engaged in criminal activity may detain the individual for approximately 15 minutes or a reasonable length of time. This rule shall apply in all vehicle stops initiated by an officer of this agency. Therefore, should a canine team be unable to respond to a vehicle stop within this established time limit, and if there is no probable cause for search or arrest, the vehicle stop shall be terminated and the detained individual(s) allowed to leave.

g. Any motor vehicle, containers therein, and other personal property including cash which has been used to facilitate the commission of a felony or to transport any contraband article shall be seized, thoroughly inventoried, and forfeiture proceedings enacted according to applicable law and departmental policy.

h. In an effort to avoid storage costs, any motor vehicle that has been seized shall be stored at the agency storage location if there is storage space available. Otherwise a vehicle shall be stored at a storage facility that is commonly used by this agency. However, the vehicle shall be moved to the agency storage as soon as space is available.

i. All items of contraband and seized property, other than a motor vehicle, shall be logged into evidence storage according to departmental policy pertaining to evidence procedures.

j. Agency personnel shall be required to attend a mandatory two hour block of instruction concerning roadway drug interdiction. This instruction will further familiarize personnel with agency operational procedures, discuss current modus operandi of drug traffickers, and emphasize officer safety.

k. Information about any drug interdiction operation, or subsequent arrests or seizures as a result of the operation shall be released to the news media in accordance with departmental policy.

l.  Intelligence information received as a result of an interdiction operation shall be documented as an investigative file and further investigation conducted by the criminal investigation division of this agency. Intelligence information which has an impact on another jurisdiction shall be forwarded to the respective jurisdiction by the Criminal Investigation Division.

m.  When information is received through arrests, seizures, or intelligence sources of large scale trafficking operations, the Chief, Assistant Chief, or a designee shall contact other appropriate agencies such as the State Police, Drug Enforcement Administration, or U.S. Customs and provide them with this information.

n.  All arrests or property seizures made as a result of an interdiction operation shall be documented on an offense/incident report completed by the arresting/investigating officer(s). The report shall include the date, time, and location of the arrest or seizure, personnel involved including a canine, factual basis for the search, items seized, and any other information specific to the particular event.

o.  A completed report shall be forwarded to the immediate supervisor of the officer completing the report. The supervising officer shall approve the report and forward a copy to the Criminal Investigation Division for investigative purposes if necessary. A copy shall also be forwarded to the Chief and the Assistant Chief. The original report shall be filed in accordance with departmental filing procedures.

43.2

**SECTION 44**

**HARASSMENT - WORKPLACE**

**POLICY:** It is the policy of this law enforcement agency that all employees have the right to work in an environment free of all forms of harassment. This agency does not condone, and will not tolerate, any harassment. Therefore, this agency shall take direct and immediate action to prevent such behavior and to remedy all reported instances of harassment, sexual or otherwise.

**PROCEDURES:**

a. Prohibited Activity

    (1) No employee shall either explicitly or implicitly ridicule, mock, deride or belittle any person.

    (2) Employees shall not make offensive or derogatory comments based on race, color, sex, religion or national origin either directly or indirectly to another person. Such harassment is a prohibited form of discrimination under state and federal employment law and is also considered misconduct subject to disciplinary action by this agency.

    (3) Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

        (a) Submission to such conduct is made either explicitly or implicitly a term or condition of employment; or

        (b) Submission to or rejection of such conduct by an employee is used as the basis for employment decisions affecting the employee; or

        (c) Such conduct has the purpose or effect of unreasonably interfering with an employee's work performance or creating an intimidating, hostile, or offensive working environment.

b. Employee's Responsibilities

    (1) Each supervisor shall be responsible for preventing acts of harassment. This responsibility includes:

        (a) Monitoring the work environment on a daily basis for signs that harassment may be occurring;

        (b) Counseling all employees on the types of behavior prohibited, and the agency procedures for reporting and resolving complaints of harassment;

        (c) Stopping any observed acts that may be considered harassment, and taking appropriate steps to intervene, whether or not the involved employees are within his line of supervision; and

        (d) Taking immediate action to limit the work contact between two employees where there has been a complaint of harassment, pending investigation.

    (2) Each supervisor has the responsibility to assist any employee of this agency, who comes to that supervisor with a complaint of harassment, in documenting and filing a complaint with the internal investigations authority.

    (3) Each employee of this agency is responsible for assisting in the prevention of harassment through the following acts:

        (a) Refraining from participation in, or encouragement of, actions that could be perceived as harassment;

        (b) Reporting acts of harassment to a supervisor; and

        (c) Encouraging any employee, who confides that he is being harassed, to report these acts to a supervisor.

    (4) Failure to take action to stop known harassment shall be grounds for discipline.

c. Complaint Procedures

    (1) Employees encountering harassment shall tell the person that their actions are unwelcome and offensive. The employee shall document all incidents of harassment in order to provide the fullest basis for investigation.

    (2) Any employee who believes that he is being harassed shall report the incident(s) to his supervisor as soon as possible so that steps may be taken to protect the employee from further harassment, and appropriate investigative and disciplinary measures may be initiated. Where this is not practical, the employee may instead file a complaint with another supervisor or the agency head.

        (a) The supervisor or other person to whom a complaint is given shall meet with the employee and document the incidents complained of, the person(s) performing or participating in the harassment, and the dates on which it occurred.

        (b) The agency employee taking the complaint shall expeditiously deliver the complaint to the agency head.

    (3) The agency head shall be responsible for the investigation of any complaint alleging harassment.

        (a) The agency head will immediately notify the prosecutor's office if the complaint contains evidence of criminal activity, such as battery, rape or attempted rape.

        (b) The investigation will include a determination whether other employees are being harassed by the person, and whether other agency members participated in, or encouraged the harassment.

        (c) The agency head shall inform the parties involved of the outcome of the investigation.

        (d) A file of harassment complaints will be maintained in a secure location by the agency head.

    (4) There shall be no retaliation against any employee for filing a harassment complaint, or assisting, testifying, or participating in the investigation of such a complaint.

    (5) Complainants or employees accused of harassment may file a grievance/appeal when they disagree with the investigation or disposition of a harassment claim.

    (6) This policy does not preclude any employee from filing a complaint or grievance with an appropriate outside agency.

# SECTION 45
# HOLIDAYS

**POLICY:** An eligible employee is authorized eleven (11) paid holidays each calendar year.

a.    The State of Arkansas has adopted the following holiday schedule:

    (1)    New Years Day. . . . . . . . . . . . . . . . . . . . January 1
    (2)    Robert E. Lee's/Martin L. King . . . . . . . 3rd Monday in January
    (3)    George Washington's Birthday . . . . . . . 3rd Monday in February
    (4)    Memorial Day. . . . . . . . . . . . . . . . . . . Last Monday in May
    (5)    Independence Day. . . . . . . . . . . . . . . . July 4th
    (6)    Labor Day . . . . . . . . . . . . . . . . . . . . 1st Monday in September
    (7)    Veterans Day. . . . . . . . . . . . . . . . . . . . November 1st
    (8)    Thanksgiving Day . . . . . . . . . . . . . . . . 4th Thursday in November
    (9)    Christmas Eve. . . . . . . . . . . . . . . . . . . December 24th
    (10)    Christmas Day. . . . . . . . . . . . . . . . . . . December 25th
    (11)    Employee's Birthday. . . . . . . . . . . . . . . _____

b.    Arkansas Code Annotated 14-52-105 provides that all law enforcement officers, regardless of their titles, employed by cities of the first or second class or incorporated towns, shall be compensated for all legal holidays established by the governing body of the municipality, based on the law enforcement officers' daily rate of pay and in addition to their regular pay schedule.  Recent case law prescribes that this payment be made even if the officer did not work on the holiday.

c.    Employees of the department will be required to schedule their holidays in such a manner that the department will always be prepared to efficiently respond to emergencies.

d.    The Chief of Police may require any employee of the department to work on any of the scheduled holidays when necessary for public safety.

# SECTION 46
# IMPARTIALITY

**POLICY:**   Officers shall in all cases enforce laws and ordinances in a fair and impartial manner.  All employees shall be treated fairly and equally in all duty assignments, training, promotional opportunities and in administrative and disciplinary actions.

a.   No employee will be given or denied any assignment based only upon age, sex, race, religion, politics, or physical handicap, unless such action would create a hazardous condition for the individual or others.

b.   Employees are prohibited from soliciting or encouraging influence from anyone in the form of personal requests, letters, or petitions to be sent to the Chief of Police or any elected or appointed Government Official.

c.   Any attempt by an employee to influence the Chief of Police or any other elected or appointed official for purposes of promotion, assignments, or other administrative or disciplinary considerations, or to avoid the penalties for improper actions or conduct shall be considered a violation of this policy.

# SECTION 47
# INFORMATION: DIVULGING

**POLICY:**   Contents of records, files, reports, or other information relating to an incident of interest to the department, or from records required to be kept or maintained by the department, shall not be discussed or transmitted to any person not authorized by the Chief of Police to receive the information.

**PURPOSE:**  The purpose of this policy is to provide guidance to employees of this agency concerning the transfer of information, by any means, to the public.

**PROCEDURES:**

a.   Employees shall not disclose any information in their possession, however obtained, which may enable anyone to escape detection, arrest, or prosecution, or enable anyone to destroy evidence, or to dispose of or destroy stolen property.

b.   Employees shall not divulge to any person not connected with the department information acquired by his or her employment if the information might adversely affect the efficiency of the department.

c.   Employees are prohibited from disclosing any information to unauthorized persons that is declared by law, rule, regulation, policy, or procedure to be confidential, nor shall any employee use officially obtained information for personal gain or benefit.

d.   Employees who receive telephone, verbal, or written requests regarding a person's criminal or traffic record will refer such requests to the Chief of Police or his/her designee for response.

e.   Employees are prohibited from revealing to any person or persons:
   (1)    The name and other information concerning a complaint.
   (2)    The name and other information concerning a victim.
   (3)    Sources of information.
   (4)    Information concerning witnesses.
   (5)    Progress of cases of another law enforcement agency.
   (6)    Information contained in any personnel file or form

f.   As an exception to this policy, employees of this department will release information in accordance with the Arkansas Freedom of Information Act, (Arkansas Code 25-19-101 through 25-19-107).

g.   This department shall not deny any news media, groups, organizations, or individuals any information to which they are legally entitled.

h.   Employees of this department shall be cooperative and courteous when dealing with the news media, groups, organizations, or individuals requesting information.

i.   Employees who have questions concerning the release of information shall contact their immediate supervisor for guidance prior to any release being made.

j.   Violation of this section will be considered a violation of the public's trust and will result in disciplinary action up to and including termination of employment.

# SECTION 49
# INJURED/SICK PERSONS

**POLICY:** Emergency comfort care provided by a law enforcement officer to any injured or sick person shall be done where the person is found. Medical professionals warn against unnecessarily handling or moving the injured due to the risk of aggravating after-effects or extended hospitalization of the injured person. Officers will attempt to provide whatever comfort they can until professional medical care can be obtained. There may be emergency situations requiring the immediate removal of seriously injured or critically ill persons from a position of imminent danger. The decision must, in all instances, be based on the safety and protection of the victim.

**PROCEDURES:**

a.    Arrest of injured Persons: Persons who are taken into custody with visible injuries or convincing complaints of an injury shall be provided with professional medical care prior to incarceration.

      (1)    If hospitalization is required, a misdemeanor suspect will be released to the examining physician. The arresting officer shall issue a Uniform Violations Notice to the suspect setting a location, time and date for court appearance.

      (2)    If hospitalization is required for an arrested felony suspect the Chief of Police or his/her designee shall be notified, and should a clear danger of escape be present, a law enforcement guard may be assigned to the suspect until released and processed according to the law.

      (3)    In any situation, other than an emergency, the arresting officer will contact an immediate supervisor for instructions concerning the medical care.

b.    Should an officer respond to a call involving a person who is seriously injured, however, no arrest is made, the following procedures shall apply:

      (1)    All situations will be somewhat different in circumstance and will therefore require the use of officer discretion to some extent.

      (2)    The primary responsibility of the first responder is to care for the injured. However, unless dangerous circumstances exist, which require a seriously injured person to be moved, officers will not attempt to move any injured person. Situations in which an injured person would have to be moved include, but are not limited to, the following:

          1.    Motor vehicle accident for which the injured person(s) is in imminent danger of further injury due to a possible vehicle explosion.

          2.    Any type of explosion for which the injured are in danger of further injury due to fire, chemical exposure, or other environmental factors.

          3.    Any type of natural disaster such as tornado, flood, earthquake, etc. for which environmental factors exist that create a substantial risk of further injury to the injured in question.

c.    Officers who are not properly trained, certified, and have the proper equipment to render first aid, such as CPR, will not attempt any such procedures.

d.    Officers who are properly trained, certified, and have the proper equipment to render first aid may do so, however, will limit the aid not to exceed their level of training/certification.

e.    In all cases a complete written report shall be prepared giving all information available and action taken by the officer.

f.    Sick Persons: An officer responding to a call to assist a person who is ill, shall provide immediate assistance and comfort and shall make necessary arrangements for the transportation of the ill person to a health care professional of their choice.

      (1)    Any person who is unconscious or unable to give any information or make a decision concerning their physician of choice shall be transported to the closest health care facility for treatment.

      (2)    A complete written report will be prepared by the officer providing this assistance, citing the circumstances and action taken by the officer.

# SECTION 50
# INVENTORY - VEHICLE

**POLICY:** Whenever any vehicle is taken into custody or control by a law enforcement officer of this agency, it shall be the policy of this agency that said officer shall inventory the vehicle. The inventory must be conducted to protect the owner's property while it remains in the custody of the law enforcement agency, to protect the agency against claims or disputes over Vehicle damage, lost or stolen property, and to protect law enforcement personnel and the public from dangerous items which could pose a threat to the community.

**PURPOSE:** The purpose of this policy is to provide guidance to officers concerning the towing and inventory of vehicles whenever the tow is the result of this agency having taken custody or control of the property.

**DEFINITIONS:**
a.  Abandoned vehicle: For the purposes of this policy a vehicle is considered abandoned at anytime it is left unattended on public property without the consent of an authority in charge of such property. A vehicle is also considered as abandoned if it is left unattended on or near a public way for a period of (72) seventy two hours or more, or left unattended in a traffic lane blocking traffic.
b.  Public way: Any road, highway, or street over which the public may travel which includes the traveled surface and the shoulder.

**PROCEDURES:**
a.  An inventory of a vehicle will be conducted by any officer of this agency who takes control of a vehicle under the following circumstances, and requests' a wrecker for towing purposes:
    1.  Whenever the owner/operator of a vehicle is arrested.
    2.  Vehicles which have been Abandoned.
    3.  Vehicles which are illegally parked and are creating a traffic hazard.
b.  In accordance with Arkansas Motor Vehicle and Traffic Law, (27-50-1205), the following procedures will apply concerning abandoned vehicles:
    1.  Any officer of this agency observing a vehicle on or near a public way which appears to be unattended or abandoned shall:
        a.  Immediately remove the said vehicle if it is located within three (3) feet of the traveled surface of a public way, or which vehicle appears to create a hazard to the public.
        b.  Affix a parking ticket to any abandoned or inoperative vehicle which is not a traffic hazard and is located within three feet of the public way. The parking ticket will be affixed to the vehicle in a location where it can be observed and will show:
            1.  The date and time of the parking ticket.
            2.  That the vehicle will be towed pursuant to Arkansas law, ( 27-50-1205 ), if not removed from the present location within seventy-two (72) hours.
            3.  The location and telephone number where more information may be obtained.
            4.  The identification of the officer issuing the parking ticket.
c.  Anytime this agency takes control of a vehicle and as a result a wrecker is summoned for towing purposes, a vehicle inventory tow-in report will be completed by the officer requesting the tow.
    The inventory tow-in report will be completed fully and will also include the following information:
    1.  Any damage to the vehicle, regardless of how minor, either interior or exterior.
    2.  Condition of the vehicle, (good/bad). If the condition is bad, explain further in the report narrative.
    3.  Any known liens against the vehicle.
d.  The inventory search shall include all spaces within the vehicle and the trunk or bed of the vehicle and shall include an inventory of all containers therein, including those that are closed or locked.
e.  A thorough inventory of a vehicle will generally result in locating property items including the following:
    1.  Evidence items: On occasion Items located will include property which will need to be seized and properly labeled as evidence. In this situation the proper procedures will be followed concerning seizure/storage of evidence and details will be documented on the inventory tow-in report. Information which will be documented in this situation include:
        a.  Description of item(s) located.
        b.  Where in the vehicle the item(s) were located.
        c.  Date and time the item(s) were located.
        d.  Officer(s) locating the item(s).
        e.  Officer(s) recording the item(s)

        f.  Chain of custody from the time the item(s) are located until the item(s) are properly stored in the evidence locker.

   2.  Valuables: Some items located will often include property which, because of its value, and because of the departments responsibility to safeguard the property, will need to be removed from the vehicle, properly labeled, and stored in the departments property storage area.

       a.  If valuables are located inside the vehicle or a container therein which should be stored separately from the vehicle, it is the duty of the law enforcement officer conducting the inventory to record the following:

      1.  Description of the item(s) found.
      2.  The condition of the item(s) found.
      3.  Where in the vehicle the item(s) were located.
      4.  Date and time item(s) were located
      5.  Officer(s) locating the item(s)
     6.  The location where this item is stored.

f.  The inventory details shall be attached to the inventory tow-in report and a copy of the inventory shall be made available to the owner or driver of the vehicle.

g.  All officers have the responsibility of safeguarding the vehicles which become the subject of an inventory. Misuse of or intentionally damaging a vehicle during the inventory will not be tolerated. Behavior of this type will subject an employee to disciplinary action up to and including dismissal.

# SECTION 51
# INSUBORDINATION

**POLICY:**   The organizational/rank structure of this department lists the Chief of Police as the leading authority within the chain of command. This authority is delegated downward to the next level of authority and continues throughout the entire chain to the lowest level. It is mandatory that employees of this department understand the rank structure and carry out their duties and responsibilities as directed by their supervisors. Any form of insubordination, unless otherwise justified, will not be tolerated and will be subject to disciplinary action up to and including dismissal.

**PURPOSE:**   To provide guidelines for employees of this agency to follow concerning alleged acts of insubordination.

**Definition:** For the purposes of this manual, insubordination is any act of defiance, disobedience, dissension or resistance to authority.

**PROCEDURES:**
a.   All employees shall follow the instructions and orders issued by supervisory personnel.
b.   Should an order or directive be issued and an officer has information that may adversely affect the intent of the order, the officer shall discuss the information with the supervisor, so that further evaluation can be considered.
c.   Any employee who uses profane or obscene language toward his/her supervisor or any public official, or threatens physical violence or attempts to carry out any threat shall immediately be relieved of duty and dealt with according to department policy or law.
d.   Policy requires officers to obey instructions; however, when compliance is not feasible, officers are not required to carry out orders that would jeopardize their health and safety, violate any federal, state, county, or municipal laws or involve the breach of any of the rules, regulations, policies, or procedures of this department.
e.   Should a situation occur as stated in PROCEDURES paragraph (d) of this policy, the employee receiving the order will respectfully request an opportunity to discuss the situation, in private, with the supervisor issuing the order. The employee will explain to the supervisor the reason for concern-----violation of the law, health or safety concern, etc.
f.   In the event the discussion between the supervisor and the employee fails to resolve the conflict, the employee issued the order will be allowed to make contact with a higher ranking supervisor, (next level of authority within the chain of command), for clarification purposes.
g.   This procedure does not propose nor does it suggest that subordinate officers have the authority to challenge all orders issued by a superior officer. Any abuse of this procedural provision will subject an employee to disciplinary action.
h.   Conflict between a subordinate employee and a supervisor does not relinquish the responsibility the subordinate has to be respectful of the supervisor. The subordinate will always be reminded of PROCEDURES paragraph (c) of this policy and refrain from any of the listed behaviors which would be considered as insubordinate.
i.   Any instance of insubordination will be fully documented by the supervisor involved. Documentation will consist of an incident report which will be submitted to the Chief of Police at the earliest opportunity.
j.   Any supervisor will relieve an insubordinate employee of duty. The employee will be advised to contact the Chief of Police on the work day following the alleged insubordination.
k.   Any employee accused of insubordination will follow the supervisors' instructions for contacting the Chief of Police or subject themselves to disciplinary action up to and including dismissal.

# SECTION 52
# INTOXICANTS AND OTHER DRUGS

**POLICY:**   The citizens of this community have a right to expect that those who are sworn to protect them are at all times both physically and mentally prepared to assume these responsibilities. There is sufficient evidence to conclude that the use of intoxicants or the abuse of certain other drugs will seriously impair an employee's physical and mental health which will adversely affect his/her job performance. The integrity of the law enforcement profession as well as the public trust will not be compromised due to employee abuse of these substances. It shall be the policy of this department that all employees will provide quality law enforcement services to the community by maintaining a drug/alcohol free working environment. Alcohol or drugs will not be consumed by any employee during a time that the substance would adversely affect the employee's performance, or at any time that the substance is considered to be illegal according to applicable laws.

**PURPOSE:**   The purpose of this policy is to provide guidelines to all employees concerning the use of alcohol and other drugs.

**PROCEDURES:**
a.   No employee shall report for duty who has consumed any alcoholic beverage or used any mind altering drug or medication, if at the time for duty the employee is under the influence of the substance. An exception to this provision will be made under the following circumstances:
   1.   An employee first gives the information to a superior officer and is then ordered to report.
   2.   An employee is directed by a licensed physician or dentist to use prescription medication, on a temporary basis, and was advised that the medication in question could impair job performance. In this type of situation the following procedures will apply:
      A.   The employee will promptly inform his/her supervisor of the known side effects of the medication, the prescribed period of usage, and the prescribing physician.
      B.   The supervisor will evaluate each situation and make a decision as to employee work status based on all the circumstances.
      C.   It may be necessary, in some situations, to temporarily assign an employee to perform other duties where appropriate.
      D.   If this is not appropriate, depending on the employee and whether or not the medication has resulted in adverse side effects, it may be necessary to place the employee on sick leave until he/she has completed taking the medication.
      E.   It shall be the responsibility of the employee to ask the prescribing physician or dentist if the medication prescribed will possibly impair their ability to perform their duties. If so, a letter from the medical professional will need to be obtained and presented to an immediate supervisor.
      F.   The supervisor will document this information in the form of a memo which will be directed to the Chief of Police or his/her designee. A copy of this memo will be maintained by the supervisor in the employee personnel file.
   3.   An employee consumes a proper dosage of over the counter medication which has an adverse affect on the employees' ability to function properly in the performance of duties. In this situation the same procedures will apply as stated in "PROCEDURES paragraph (a) sub-paragraph (2) of this policy.
b.   No employee shall use any controlled substance except as prescribed by a licensed medical practitioner.
c.   No employee shall ingest prescribed, or over the counter medication in amounts beyond the recommended dosage.
d.   When on duty or in uniform, no employee shall consume or possess alcoholic beverages, except while engaging in the specific performance of a duty assignment.
e.   No employee shall bring any personal alcoholic beverages or non-prescribed drug into the department while on duty, transport alcoholic beverages or non-prescribed drugs in a departmental vehicle unless it is evidence, property of a suspect or prisoner, or found property.
f.   Any employee who unintentionally ingests, or is made to ingest, a controlled substance shall immediately report the incident to the employee's supervisor so that appropriate medical steps may be taken to ensure the employee's health and safety.

g.  Any employee having a reasonable basis to believe that another employee is illegally using, or is illegally in possession of any controlled substance shall immediately report the facts and circumstances to the Chief of Police or his/her designee.

h.  Any employee who is under the care of a physician or dentist and taking prescribed medication, <u>on a permanent basis or for an unknown extended period of time shall</u>:

    (1)  Obtain a statement from the physician or dentist describing the type of medication prescribed, and whether or not the medication will affect the employee's judgment, ability to use a firearm, or to operate an emergency vehicle.

    (2)  Should prescribed medication affect the employee's ability to function, the physician or dentist should recommend that the employee be placed on sick leave.

    (3)  It shall be the responsibility of the employee to ask the physician or dentist if the medication will affect the employee's performance and if so, to present a letter to the Chief of Police.

    (4)  Should an employee be placed on sick leave pursuant to this procedure, appropriate laws or other established guidelines, (Civil Service Regulations, etc.), concerning this type of situation will be applicable.

i.  Where law enforcement officers and police department employees participate in illegal drug use and drug activities, the integrity of the law enforcement profession and public confidence in that integrity are destroyed. This confidence is further eroded by the potential for corruption.

j.  Therefore, in order to ensure the integrity of the department and to preserve the public trust and confidence in a fit and  drug free law enforcement profession, this department will utilize employee drug testing as outlined in the **POLICY AND PROCEDURES MANUAL, SECTION 103, EMPLOYEE DRUG TESTING.**

# SECTION 53
# INVESTIGATION: CRIMINAL

**POLICY:**   All members of this department must clearly understand their responsibilities for the conduct of preliminary and follow-up criminal investigations and of complaints of major infractions of the law.

**PROCEDURES:**

a.   Preliminary Investigation:
   (1)   The preliminary investigation begins when the first law enforcement unit arrives at the scene of a crime, or telephonic information is taken by an officer concerning a crime, and continues until postponement of the investigation or the transfer of responsibility will not jeopardize the successful completion of the investigation.
   (2)   The following officer responsibilities are part of the preliminary investigation and will vary according to the type of crime being investigated and the circumstances associated with the crime scene:
      (a)   Provide aid to the injured
      (b)   Protect the crime scene to insure evidence is not lost or contaminated
      (c)   Determine if an offense has actually been committed, and if so, the exact nature of the offense.
      (d)   Determine the identity of the suspect or suspects, and effect an arrest if it can be accomplished either at the scene or through immediate pursuit
      (e)   Furnish other field units descriptions, method and direction of flight of suspects, and other relevant information concerning wanted suspect or suspects or vehicles
      (f)   Obtain complete identification of all witnesses
      (g)   Determine what information is known by the victim and each witness
      (h)   Determine in detail the exact circumstances of the offense
      (i)   Arrange for the collection of evidence
      (j)   Obtain written and signed statements from victim(s), witnesses, and from the suspect(s)
      (k)   Determine the necessity of some degree of follow up investigation of the crime scene
      (l)   Accurately and completely record all pertinent information on the report forms as prescribed in **SECTION 092, REPORT; OFFENSE/INCIDENT**
   (3)   The initial stages of all preliminary investigations, including crime scene processing, will be conducted by Patrol Officers.  In certain serious crimes as defined in Paragraph b (1), a criminal investigator will be called, will respond, and will assume responsibility for completion of the investigation.
   (4)   As soon as the preliminary investigation is concluded by a Patrol Officer, the initial field report should be completed including all information obtained at the scene of the offense.
   (5)   It shall be the responsibility of the supervisor to ensure that an adequate and complete preliminary investigation has been made and to review, screen, and approve the officer's report.  Screening should include: review of facts stated to ensure all essential information indicating a criminal act are included, legibility, clarity, and completeness.  The signature of the supervisor approving the report shall be on each report in the proper space.  In the case of those offenses reported directly to and handled completely by a criminal investigator, the Chief of Police, or his/her designee, will review the report.
b.   Serious Crimes - Criminal Investigator Response:
   (1)   The following offenses are of a nature requiring the immediate assignment of a criminal investigator to assume responsibility for the completion of the preliminary investigation and to begin a follow-up investigation:
      (a)   Death of a violent or suspicious nature
      (b)   Rapes or suspected rapes
      (c)   Assaults, serious injury or death to the victim
      (d)   Armed robberies of commercial institutions
      (e)   Burglaries where there is excessive or unusual loss (high dollar value, negotiable, cash, jewelry, silver, etc.)
      (f)   Any major disaster (where investigators can assist in identification of victims)
      (g)   Hostage situations
      (h)   Kidnappings, extortion
      (i)   Officer involved shooting
      (j)   Bombings
      (k)   Any criminal offense or situation for which the on duty ranking officer/supervisor believes a criminal investigator should be immediately assigned.

    (2)  A criminal investigator assigned to this agency and/or a state police criminal investigator will be available 24 hours a day and will be contacted and will conduct the investigation of offenses listed above.

    (3)  In the event the criminal investigator on call is unavailable, the Chief of Police or his/her designee will be contacted immediately for further guidance.

    (4)  If requested by the assigned criminal investigator, the dispatcher will direct available patrol personnel to assist with protection of crime scene, traffic, crowd control, witness canvass, etc.

c.    Follow-up Investigation:

    (1)  The follow-up investigation is an extension of the preliminary investigation. The purpose of the follow-up is to provide additional investigation in order to effect the arrest of an offender and/or recover stolen property.

    (2)  Officer or criminal investigator responsibilities of the follow-up investigation include:

        (a)  Identification and apprehension of the offender

        (b)  Collection/preservation of additional evidence and arrangements for the analysis and evaluation of the evidence. If evidence was sent to lab; on its return review lab results.

        (c)  Recovery of stolen property

        (d)  Conduct any additional interviews of victims and witnesses as required

        (e)  Conduct any additional interrogation of suspects as required

        (f)  Seek other information from law enforcement officers and informants

        (g)  Review department records and coordinate with adjoining agencies pertaining to other similar offenses to determine if other crimes may have been committed by the suspects. Review all information contained in case file (preliminary investigation and earlier follow-up reports) concerning this offense.

        (h)  Recording of information obtained and preparing supplementary reports as required.

        (i)  Disseminate information as appropriate

        (j)  If necessary, plan, organize, and conduct searches

        (k)  Arrange for polygraph examinations through the Arkansas State Police.

        (l)  Prepare case file folder on suspect for court

        (m)  Check suspect's local police record and criminal histories

        (n)  Prepare case and assist in prosecution

    (3)  In assigning investigators for follow-up, the Chief of Police, or his/her designee, will normally consider the following guidelines:

        (a)  Patrol officers will conduct and complete the investigation of all non-criminal calls for police service and for misdemeanor or felony crimes not appropriate for referral to the criminal investigator.

        (b)  A criminal investigator will conduct the follow-up investigations when one or more of the following conditions exist:

            *  The offense appears to be part of a pattern of such offenses.

            *  When the follow-up is required in widely separated locations outside this jurisdiction.

d.    Relationships with Prosecuting Attorney.

    (1)  The Prosecuting Attorney's office prosecutes criminal cases, both felony and misdemeanor, in each court and for each law enforcement agency within the jurisdiction. Because of a tremendous case load, All personnel are required to coordinate appointments in advance, be on time, have subject for discussion planned in advance and keep conversations brief.

    (2)  In every known contested case, misdemeanor or felony, the officer involved will make an appointment with the Prosecuting Attorney or his/her deputy to discuss the case prior to trial.

    (3)  During any law enforcement investigation (or during prior planning for arrest or pretrial stages), any questions of law or criminal procedure will be addressed to the Prosecuting Attorney or deputy. Questions on law enforcement procedure will be addressed to the Chief of Police, or his/her designee.

    (4)  Any criminal cases referred to the Prosecuting Attorney which result either in a decision of declined to prosecute or dismissed, due to law enforcement mishandling, must be carefully reviewed and appropriate corrective action taken. The Prosecuting Attorney has been asked to call such cases to the attention of the Chief of Police.

e.    Dissemination of Information to the news media: See **SECTION 63, MEDIA RELATIONS**.

f.    Investigative Check Lists: Appendix A, Crime Check Lists, contains questions which should be addressed during the conduct of any criminal investigation as well as specific questions relating to different types of crimes. These lists are not intended to be all-inclusive, but will serve as guides in doing actual investigations, preparing reports related thereto, and in supervisory review of such reports.

*Appendix A: Crime Check Lists*
(Extracted from William Dienstein, How To Write A Narrative Report, Charles C. Thomas, 1964)

1. General Investigative Questions
   a. Who is involved?
      (1) Who is the victim?
      (2) Who is the suspect?
      (3) Who is a witness?
      (4) Who reported the case?

   b. What happened?
      (1) What took place?
      (2) What offense was committed?
      (3) What are the elements of the offense?
      (4) What was the object of the attack?

   c. When did it happen?
      (1) When in time did the occurrence take place?
         (a)   At what hour?
         (b)   On what day?
         (c)   In what month?
         (d)   In what year?

      (2) Was it day or night?

      (3) Was it clear or cloudy?

      (4) Was it foggy, misty, raining, smoggy, snowing, hailing, sleeting, etc.?

   d. Where did it happen?
      (1) Where did the offense occur?
      (2) Where was the object of the offense?
      (3) Where is the object of the offense now?
      (4) Where was the object of the offense found?
      (5) Where was the perpetrator of the offense?
      (6) Where is the suspect now?
      (7) Where was the suspect when apprehended?
      (8) Over what area did the offense extend?
      (9) Where were the witnesses in relation to the crime scene?
      (10) Where are the witnesses now?

   e. How did it happen?

      (1) How was the offense committed?
         (a)   What preparation was made to commit the offense?
         (b)   What was done to avoid detection?

      (2) How was the property or person attacked?
         What method was used to induce the victim to give up his property?
         What means were used to overcome resistance of the victim?
         What means or instruments were used in the perpetration of the offense?

      (3) How did the offender act?

         What did the victim do in response to the actions of the perpetrator?

      (4) How did the victim act?

What did the victim do in response to the actions of the perpetrator?

(5) How did the situation assist in the commission of the offense?

(6) How did the offender enter the crime scene?  What means were used?

(7) How did the offender leave the crime scene?
What means were used?

2.   Offenses Against Persons. Robbery, assault, battery, murder, kidnapping, abduction, mayhem, sex offenses, extortion.
  a.   How did the perpetrator approach the victim?

What device, trick, ruse, method did the perpetrator use to gain access to the victim?

  b.   What did the perpetrator say?

What exact expressions were used?

  c.   What in detail did the perpetrator do?

How did he act?

  d.   What means did he use?

| gun | seduction | razor | intoxication |
|-----|-----------|-------|--------------|
| knife | promise | chemical | scissors |
| bodily force | blackmail | missile | request |
| club | poison | badge | other |

  e.   What preceded the offense?

| quarrel | breaking and entering |
|---------|------------------------|
| attack | robbery |
| accusation | burglary |
| self-defense | |

impersonation (officer, repairman, inspector, salesman, prospective renter or buyer, canvasser, etc.)

  f.   What was the victim doing immediately preceding and at the time of the offense?

| opening or closing premises | preparing to leave residence |
|------------------------------|------------------------------|
| going to the bank | arriving at residence |
| walking | at residence |
| riding in vehicle | parking automobile |
| other | |

  g.   Were there accomplices?
Complete personal descriptions -
What did the accomplices do?
How did they participate in the crime?
What was said?
How many were there?
Did they arrive with the perpetrator?
Did they leave with the perpetrator?

  h.   How did the perpetrator arrive and depart?

| taxi | on foot |
|------|---------|
| automobile | other |

  i.   What other facts surrounding the occurrence could be used to identify the perpetrator and accomplices?

3.   Offenses Against Property. Burglary, theft, larceny, worthless checks, embezzlement, arson.
  a.   Burglary
Precisely what type of premises was entered?

Where was the point of entry?

53. 4

Where was the point of departure?

What instruments were used to gain entry?

What was done by the investigator to preserve evidence of entry and exit?

What acts were committed by the perpetrator at the scene?
    eating
    drinking
    defecating, urinating
    malicious damage
    defacing
    smoking
    use of matches
    disturbance of materials
    other
Where were occupants of the premises?
    exact location

How did perpetrator arrive and depart?

Any facts or acts that can be used to identify the perpetrator?

b.    Theft, Larceny
From what place was property stolen?

| | |
|---|---|
| automobile | room, specific type |
| basement | showcase |
| closet | slot machine |
| counter | store |
| display stand | telephone box |
| kitchen | toilet |
| locker | tool box |
| lobby | trunk |
| mail box | vehicle |
| meter | window |
| porch: front, back | yard other |

Were there occupants on the premises?
Where were they?
What means were used to take the property?
    carrying away
    shoplifting
    trick and device
    bodily force
    other

How did the victim discover the loss?

What means were used to distract attention of victims or persons in the vicinity?

How did perpetrator arrive and depart?

c.    Worthless Checks
How were checks written or otherwise prepared?
    pen
    pencil
    typewriter
    check writer
    raised
    rubber stamp

amount

What type of paper was used?
    printed check form
    printed pay check
    counter check
    money order
    personal check form

How were checks returned?
    not sufficient funds (NFS)
    improper endorsement
    no such account
    forged
    fictitious

What purpose was to be served by check?
    cash, money
    jewelry
    clothing
    merchandise: type
    vehicle
    other

What claim was made by passer to establish authenticity of check?
    making purchase as customer
    impersonating another
    exhibits check book, bank deposit book, driver's license, other
    refers to well known person or persons
    pretends to live in neighborhood
    uses bogus letter of credit other

Was victim able to note description of check passer?

What caused particular notice?

What did passer say when presenting check to victim?

What time of day was check passed?

How did the check passer arrive and depart?

Other pertinent facts?

d.    Embezzlement

What was the subject of the embezzlement?

What was the value of the property?

Who had ownership?

Who had possession at the time of the conversion?
Under what circumstances was the property received or held?
How was the loss discovered?
Where was the property recovered?

Who had possession at the time of recovery?

(Questions under Worthless Checks, Theft or Larceny may be applicable to Embezzlement)

e.    Arson

How was the fire reported?

means used: telephone, fire alarm box, other

Who reported the fire?

name, address, telephone number, occupation, description of person, circumstances causing person to note fire,

When was the fire discovered?

exact time or inclusive period if exact time not determinable
Specify a.m. or p.m.

Who discovered the fire?

name, address, telephone number, occupation, description, etc.

Under what circumstances was the fire discovered?

Where was the person who discovered the f ire?

How did he happen to be there?

What type of structure or property was set on fire?
number of stories approximate dimensions approximate number of rooms
construction of building: brick, frame, iron, stucco, fireproof, other
factory, warehouse, mill, dwelling, garage, other

Was the building vacant?

length of time
source of information
name and present address of last occupant

Was the building inhabited?

Was a human being in the structure at the time of the fire?

Would an ordinary person have reason to know or suspect the building was inhabited?

Who occupies the building?

What type of business is carried on in the building?

names, addresses, telephone numbers, descriptions of owners of building.

How long has this business been at this location?

names, addresses, telephone numbers, business or occupation, descriptions of all occupants of the building.

Who owns the building?

53. 7

name, address, age, description, when acquired building

How was the fire started?

What materials, accelerants, and devices were used?

What was the value of the property destroyed?

What were the findings of the arson investigator, of the fire department, and other agencies?

(Such reports are attached as exhibits.)

Was there a burning or charring as distinguished from mere scorching?

What evidence (traces on clothing of suspect or clue materials at the scene) associated the suspect with the scene?

What actions of the suspect offered evidence of criminal intent?
    removal of valuable articles
    substitutions
    ill-feeling, animosity, hostility, hatred
    toward owner or occupants
    unfriendly relations between suspect and occupants
    absence of any effort to extinguish fire or turn in alarm

# SECTION 54
# INVESTIGATIONS: INTERNAL AFFAIRS

**POLICY:**  This agency makes consistent and expeditious investigations of complaints from citizens against agency employees.  The department protects the rights of each employee during an investigation, and makes the investigation without prejudice.

**PURPOSE:**  This department must maintain an open channel of communications with the citizens of our community to process complaints of substandard service or alleged misconduct by police department employees. It is the purpose of this policy to provide a citizen complaint processing procedure which is fair, objective, impartial, and aimed at determining the facts which substantiate or refute the allegation(s). The department must vigorously investigate all complaints so there is no doubt as to the integrity of the agency. This policy will also provide employees with information concerning their rights and obligations if confronted with allegations of misconduct or substandard service.

**PROCEDURES:**
   a.  Internal Affairs Function
       The Internal Affairs process is administered to ensure the integrity of this department and its employees. All investigations shall be fair and impartial.  Internal Affairs investigations shall be conducted by the Chief of Police or assigned by the Chief to a Board Of Internal Affairs who investigates the complaint and makes recommendations to the Chief based on their findings.  The Chief then reviews these findings and recommendations and makes the final decision.  The Board Of Internal Affairs will consist of 3 to 5 officers of various ranks.
   b.  Internal Affairs Activities.  Internal Affairs activities include:
       (1)  External complaints - Recording and investigating complaints against agency employees made by persons outside the agency.
       (2)  Internal complaints - Recording and investigating alleged or suspected misconduct by agency employees from within the department; and
       (3)  Confidentiality - Maintaining confidential investigations and records.
   c.  Classification of Complaints
       (1)  **Class One** - Serious or criminal misconduct complaints that allege needless or excessive force, brutality, violations of criminal law, corruption, breach of civil rights, abuse of authority, intentional discrimination, and others so classified by the Chief of Police.
       (2)  **Class Two** - Complaints that allege inadequate public service, discourtesy, improper procedure, and other less serious and non-criminal conduct as directed by the Chief of Police.
       (3)  **Class Three** - **Use of Deadly Force;** A use of deadly force by any officer of this agency will be investigated regardless of whether or not a formal complaint is filed.
   d.  Due Process:
       (1)  This department shall investigate both formal and informal complaints.  Investigators shall follow proper procedures when interviewing an accused employee and shall uphold and defend the legal rights of employees as afforded by due process of law.  NOTE:  If it is determined that accusations may be malicious and false, the Chief of Police may limit the investigation to substantiating a false report.
       (2)  The Chief Of Police will issue a written statement of allegations and employee rights and responsibilities to each employee that becomes the subject of an internal affairs investigation.
**NOTE: The Chief of Police will withhold this notice in cases of alleged corruption or felony law violations.**
       (3)  Employees will be notified in writing of the final disposition of a complaint for which he/she is the accused.
   e.  Taking a Complaint:
       (1)  Any employee of this department who receives a complaint of substandard service or misconduct shall provide the complainant with information regarding what procedures the complainant will need to follow in processing the complaint.
       (2)  No employee will attempt to discourage a citizen from filing a complaint. An employee should actually encourage the filing of the complaint, so there will be no perception from within the community that any "cover up" of inappropriate behavior has taken place.
       (3)  employees receiving a complaint will follow the procedures as outlined below:
           1.  If the employee receiving the complaint is a supervisor, the employee will proceed with taking the information necessary for compiling a report. (Report form is in the appendix).
           2.  If the employee receiving a complaint is not a supervisor, the employee will immediately refer the citizen to the police department to file the complaint with a supervisor on duty at the time. The employee will then telephone the police department and inform a supervisor of the situation.

(Do not use the police radio equipment to contact the police department).

3.   The complainant will never be told to return and make the complaint at a later time.

4.   Should the complainant specifically ask to talk to the Chief of Police or a higher ranking officer, and the specific individual is available, those arrangements will be made.

5.   Should the Chief or higher ranking officer be unavailable, the supervisor will inform the complainant to contact the appropriate office during the time that the requested individual will be available. The supervisor will also request identification and phone number information from the complainant which    will be forwarded to the office of the requested individual who can make contact with the complainant    upon returning to work.

6.   Regardless of who takes the complaint, the complainant will be advised that the report will be forwarded to the Chief of Police, (designee during absence of the chief), who will either investigate the complaint or assign other personnel the responsibility. The complainant will also be informed that he/she will be contacted within (5) days concerning further procedures.

7.   During an interview of a citizen who is alleging misconduct of an officer or employee of this department, it shall be established if the complainant is a suspect or defendant in the event from which the complaint originated. This can be established by questioning the complainant or, in some situations, reading the report concerning the event.

8.   If it is determined that the complainant is in fact, or possibly could be, a suspect or defendant in the event, the supervisor will immediately read the complainant a Miranda rights warning, utilizing a standard rights form and attach the form to the complainants report. This information will be included in the narrative of the complaint report.

9.   Complaints shall be taken on a standard citizen complaint form. A sample of this form is included in the appendix of this policy.

10.  Once the complaint is directed to the Chief of Police and assigned for investigation, the complainant    will be contacted as soon as possible, (within 5 days from the date of the complaint), and advised    reference the steps involved in completing the investigation.

11.  All complaints shall be finalized within 30 days from the date filed unless circumstances exist which    create a difficulty in achieving this time limit.

12.  If an investigation is not completed within the 30 day time limit, the ranking officer in charge of the investigation will notify the complainant in writing and explain the reason for the delay.

13.  Employees will cooperate fully with any investigation of a complaint made concerning their actions or conduct. This includes: truthfully answering all questions asked, appearing in line-ups, consenting to and submitting to test such as polygraph examinations, medical tests such as providing urine for drug screening, or a breath sample for blood/alcohol testing.

14.  Employees who do not cooperate fully with an investigation of this type will subject themselves to dismissal from the department.

e. Relief From Duty:

(1) It is sometimes in the best interest of the community and all parties concerned if an employee, who is the subject of an internal affairs complaint, is immediately relieved from duty.

(2) The highest ranking supervisor on duty at the time a complaint is received shall have the authority to relieve an employee of duty, with pay, pending further investigation of the complaint or incident.

(3) If the incident, for which the employee is being relieved, involves an intoxicated or impaired employee, an on duty police officer (preferably a supervisor) will provide transport for the employee.

f.  Information on the Complaint Report:

(1) The Chief of Police will record all complaints in a permanent record and assign internal affairs report number.  Reports will include the following information:

(a) Name of complainant;

(b) Name of accused;

(c) Date received;

(d) Type of complaint;

(e) Internal affairs number; and

(f) Final disposition.

NOTE:  See Complaint Report in Policy Appendix.

g.  Disposition of Complaints:

(1) Types of dispositions include:

(a) Unfounded - Allegation is false or not factual;

(b) Sustained - Enough evidence to prove allegation;

(c) Not Sustained - Not enough evidence to prove or disprove allegation; and

(d) Exonerated - Incident happened, but employee's actions were lawful and proper.

(e) Sustained /Other - The investigation revealed that there was misconduct by the employee other than that which was alleged.

54 . 2

## APPENDIX

<u>Report of employee misconduct/substandard service</u>

A.  Type of complaint: (indicate misconduct or service)_____

B.  Name of Complainant: _____

C.  Address of complainant:_____
D.  Phone # of Complainant: (home)_____(work)_____

E.  Place of Employment: _____

F.  Name of employee: _____

G.  Internal Affairs #_____

H.  Date and Time of alleged occurrence: _____

I.  Date and Time of Report:_____

## N A R R A T I V E:   Attach additional sheet(s) if necessary

------------------------------------------------------------------------

------------------------------------------------------------------------

------------------------------------------------------------------------

------------------------------------------------------------------------

------------------------------------------------------------------------

------------------------------------------------------------------------

------------------------------------------------------------------------

------------------------------------------------------------------------

------------------------------------------------------------------------

------------------------------------------------------------------------

------------------------------------------------------------------------

Signature of Officer taking the complaint: _____

Signature of Complainant: _____

# SECTION 55
# INVESTIGATION: MISSING PERSONS

**POLICY:**  The effectiveness of the ACIC and NCIC communication networks as well as departmental liability issues depend on accurate and prompt entry of missing persons information, and immediate cancellation of entries when no longer required.  It is the responsibility of each officer dealing with reports of missing persons to conduct a proper investigation, prepare necessary reports, and request appropriate ACIC/NCIC entries.  Each telecommunications operator making an actual entry must insure that the entry contains accurate and complete information and that unnecessary delays in making the entry are avoided.

**PURPOSE:**  To provide all employees with guidelines concerning the standard investigative procedures associated with a missing persons complaint.

**PROCEDURES:**
a.   Officer(s) receiving a missing persons report shall collect and evaluate information (pictures, descriptions, etc.) and investigate possible leads provided by the reporting person without delay.
b.   In situations involving missing juveniles, the investigating officer should take immediate action to establish the fact that the youth is missing (i.e. search of the residence, check schools, friend's homes, local stores, parks, etc.).
c.   To ensure that all missing persons are entered into NCIC/ACIC and then deleted once located, an NCIC/ACIC entry/deletion form will be completed by each officer submitting a report for entry purposes. The NCIC/ACIC entry/deletion form is located in the appendix of this policy.
d.   The majority of missing person complaints will be received over the telephone and patrol officers dispatched accordingly. Officers receiving a missing persons call will utilize the following procedures:
   1.   Interview the reporting person.
   2.   Evaluate the information received. Does the information fit the criteria for a missing person?
   3.   If the answer to # 2 above is yes, complete an initial missing persons report.
   4.   If the answer to # 2 above is no, explain the situation and, if appropriate, offer referrals to the person reporting the incident.  NOTE:  If in doubt, always make a report!
   5.   Should a report be made, get detailed information concerning associates, habits, locations frequented, physical and clothing descriptions, etc. Also obtain a recent photograph of the missing person if available.
   6.   Submit the initial report and the completed ACIC/NCIC entry/deletion form to an on duty senior officer/supervisor for review.
   7.   After review and approval, the reviewing authority will forward the report and the ACIC/NCIC entry/deletion form to a certified ACIC/NCIC operator.
   8.   The ACIC/NCIC operator receiving these documents will enter the information into the system. A copy of the ACIC/NCIC entry print-out will be attached to the other documents submitted.
   9.   The operator making the entry will then submit all the stated documents to the proper investigative authority, (Criminal Investigator or other officer assigned to investigate the case), for further follow up investigation.
e.   All department personnel must be aware that there is no formal waiting period required before this agency will accept a missing persons report.
f.   The senior officer/supervisor reviewing the initial missing persons report will consider criteria necessary for ACIC/NCIC entry. If any one of the five criteria listed in paragraph g is met, the missing person will be entered.
g.   A missing person record may be entered into ACIC/NCIC for the following:
   (1)   A person of any age who is missing and under proven physical/mental disability or is senile, thereby possibly subjecting self or others to personal and immediate danger.
   (2)   A person of any age who is missing and in the company of another person under circumstances indicating that their physical safety is in danger.
   (3)   A person of any age who is missing under circumstances indicating that the disappearance was not voluntary, i.e., abduction and kidnapping.
   (4)   A person who is missing and declared unemancipated and does not meet any of the entry criteria listed above (i.e. juvenile).
   (5)   A person of any age who is missing after a disaster.
h.   Documentation must be on file at the time entry is made supporting the stated conditions under which the person is declared missing. Examples of acceptable documentation are:
   (1)   A missing persons report, prepared as a result of investigation by a law enforcement officer.
   (2)   A written statement from a physician or other authoritative source corroborates the missing person's physical/mental disability.

    (3)   A written statement from a parent, guardian, next of kin or other authoritative source advises that the person is in danger or that their disappearance was not voluntary.

i.    When a missing person is located or information received requiring an ACIC/NCIC deletion, the following procedures will apply:

    1.   It is very important to first make contact with the reporting person, or the family of the missing person, and communicate the information obtained.

    2.   The officer locating the missing person or developing information which requires a deletion will be responsible for completing the deletion process.

    3.   The officer will locate the initial report and complete the deletion portion of the ACIC/NCIC deletion form attached to the report. NOTE: Should the initial report be unavailable, the officer will prepare a separate ACIC/NCIC deletion form.

    4.   The officer will submit the ACIC/NCIC deletion form to a certified ACIC/NCIC operator for deletion from the system.

j.   The telecommunications operator receiving notification that the missing person has been located, or that the investigating officer wants to clear or cancel the person, will follow ACIC/NCIC guidelines and clear the entry from the system. Once the entry has been deleted, the operator will attach an ACIC/NCIC deletion print out to the submitted documents which will then be returned to the officer assigned to the investigation. The assigned investigative officer will sign the deletion form after reviewing the case circumstances and submit the form to a reviewing supervisor/senior officer who will also sign the deletion form.

k.   Once the missing person report is cleared, it will be filed, along with all other documents, in accordance with departmental policy for records purposes.

**APPENDIX**

**ACIC/NCIC Entry/Deletion Form: Missing Person**

Name: _____, D.O.B._____

Sex: _____, Race: _____, Hair: _____, Build_____

Eyes: _____, Height: _____, Weight: _____

Clothing Description: _____

Vehicle Description: _____

Brief Summary of Disappearance:



Signature of Officer
   Preparing Report: _____

ACIC/NCIC Entry
   Made By: _____

Date of Entry: _____ Time of Entry_____

Investigating Officer assigned: _____

Signature of
Supervisor/Senior Officer: _____

===================================================================

**DELETION**

Reason for Deletion: _____

Signature of
Officer Requesting Deletion: _____

Signature of
Employee Making Deletion: _____

Date of Deletion: _____ Time of Deletion: _____

Signature of
Supervisor/Senior Officer: _____

# SECTION 56
## INVESTIGATION: MOTOR VEHICLE ACCIDENTS

**POLICY:**   This agency has as one of its goals and objectives the reduction of motor vehicle accidents.  To accomplish this, the agency performs a variety of traffic accident investigation functions including providing emergency service to the injured, protecting the accident scene, conducting accident investigations and follow-ups, preparing reports and taking proper enforcement action relative to incidents.  The purpose of accident investigation is to properly determine the causative factors involved in an automobile crash and utilize these factors to develop enforcement that will reduce the incidence of accidents.  Accident reports taken are utilized by the Arkansas State Police and Arkansas State Highway & Transportation Department at the state level and by this agency at the local level to study the frequency of crashes at a given location and time, the causes, the conditions that exist at the time, etc.  The reports are also used by this agency to develop selective enforcement programs and to promote street and highway safety.

**PROCEDURES:**
a.   *Accident Report and Investigation General:*
    The following rules shall apply to all probationary and sworn employees, while on and off duty:
    (1) Arkansas Code requirements concerning the reporting of traffic accidents include:
        (a) ACA 27-53-202(a): The driver of a vehicle involved in an accident resulting in injury to or death of any person or total property damage to an apparent extent of five hundred dollars ($500) or more shall notify the nearest law enforcement agency immediately. All persons involved in the accident shall make themselves readily available to the investigating agency's officer or officers.
        (b) ACA 27-53-303(c): The responsible investigating office shall make the investigation with all possible promptness, and the investigating officer shall file the report with the Department of Arkansas State Police within five (5) days subsequent to the actual investigation.
    (2) The terminology used in the above laws requires "reports of accidents". For our purposes, a report is made by a law enforcement officer who has investigated an accident at the scene or elsewhere, the length, duration and depth of investigative effort being proportioned to the seriousness or harm done as a result of the accident.
    (3) A law enforcement officer will be assigned and respond to, and prepare a report of accidents involving any of the following:
        (a) Death or injury
        (b) Property damage in excess of the reportable amount established by the Legislature.
        (c) Hit and run
        (d) Impairment due to alcohol and drugs
        (e) Hazardous materials
        (f) Any accident involving property, vehicles, equipment, or facilities of this agency
    (4) Law enforcement officers should also be assigned to respond to any accident involving disturbances between principals, or which create major traffic congestion as a result of the accident or where vehicles are damaged to the extent that towing is required. Law enforcement officers may be assigned to any other accident, not listed above, to assist persons involved with information exchange, etc. Time permitting, officers may investigate and report such accidents for departmental use.
    (5) Accident scene responsibilities of the first officer at the scene include:
        (a) Administering emergency medical care (basic life support measures) pending arrival of rescue squad. NOTE: Accident victims should not be moved unless their location at the scene places them in further danger of injury.
        (b) Summoning additional help as required (officers, rescue, tow truck, etc.)
        (c) Protecting accident scene
        (d) Preserving short-lived evidence (broken parts, skid marks, etc.).
        (e) Establishing a safe traffic pattern around scene
        (f) Locating witnesses and recording accident information
        (g) Expediting removal from roadway of vehicles, persons, and debris (In property damage only) accidents, where possible, get vehicles off roadway immediately to get traffic moving.
    (6) The officer initially dispatched to an accident shall normally be responsible for the investigation of the accident. He shall have the responsibility and authority to request assistance from any other officers as needed. He is then also the primary investigating officer and in charge at the scene. In the case of a serious accident involving multiple vehicles with personal injury, the dispatcher may assign several law enforcement units to respond. Under such circumstances, the senior officer on duty will designate one of the officers as the primary investigator.

      (7) In case of accidents that occur on private property, accident reports need not be filled out if it is a property damage only accident and the property damage does not exceed the reportable amount established by the Legislature.

      (8) In case of extremely inclement weather, and an accident involved only property damage, the dispatcher or officer may, with the Chief of Police's approval:

          (a) Request that the involved parties come to the department and file a report in person within 48 hours of the incident. The employee taking the telephonic report shall record the name, address, operator license number, and telephone number of all involved drivers.

b. *Accident Scene Information Collection:*

At the scene of the accident, the investigating police officer must gather information concerning the accident for subsequent use in completing necessary report forms. Information to be collected at the scene may include, but is not limited to:

      (1) Interviewing principals and witnesses and securing necessary identity/address information.

      (2) Examining/recording vehicle damage.

      (3) Examining/recording effects of the accident on the roadway or off the roadway on other property/structures, etc.

      (4) Taking measurements as appropriate.

      (5) Taking photographs as appropriate.

      (6) Collection/processing evidence.

      (7) Exchanging information among principals.

c. *Accident Investigation Follow-up Activities:*

      (1) Follow-up activities which may be necessary include:

          (a) Collecting of scene data

          (b) Obtaining/recording formal statements from witnesses

          (c) Reconstructing accidents

          (d) Submitting evidentiary materials for laboratory examination

          (e) Preparing accident and/or offense reports to support criminal charges arising from the accident.

      (2) In a particularly serious accident involving severe injuries, fatalities, multiple vehicles, etc., it may be necessary to summon expert or technical assistance from photographers, surveyors, mechanics, physician, accident crash team specialists, or other specialists. Such expert assistance should be requested through the Chief of Police.

      (3) Enforcement action should be taken whenever believed appropriate by the investigating officer, when that officer has detected a violation of a traffic law or ordinance and when evidence exists to satisfy all the elements of that particular violation

          (a) At the scene of the accident, the officer may take immediate enforcement action and issue a Uniform Traffic Ticket.

          (b) If officer at the scene concludes DWI and defendant is still there, DWI arrest should be made prior to transport.

          (c) If driver transported to hospital prior to arrival of officer, and officer later at hospital concludes DWI as a result of following proper procedures, a hold will be placed on the driver.

          (d) On other traffic related investigations, when the officer leaves the scene of the offense and follow up investigation later identifies an offender or offense, an arrest warrant should be obtained.

d. *Accident Scene Procedures*

      (1) Upon the receipt of a report of a motor vehicle accident that requires the services of a law enforcement officer, the officer assigned shall proceed as expeditiously as possible to the scene. The police vehicle should not be parked at the scene in a manner that will endanger other pedestrians, motorists, or citizens. The officer should consider using the police vehicle as a shield to protect the scene as well as himself.

      (2) If during periods of reduced visibility or darkness, the officer should put on reflectorized safety vest prior to leaving the vehicle. Flares are available in each police vehicle for use in creating an illuminated warning pattern to alert other motorists. The objective is to protect the scene and participants and to temporarily detour traffic safely around the scene.

      (3) In case of injuries, persons trapped in vehicles, etc., the appropriate rescue unit should be called out.

      (4) In case of danger of fire from leaking ruptured gas tanks or where there is any major crash entanglement of two or more vehicles, or where there is any sign of hazardous materials having been transported, the Fire Department should be called out.

      (5) All police vehicles are equipped with a copy of the current Emergency Response Guidebook, which permits both rapid identification of DOT vehicles and contained placards for hazardous materials and gives information concerning the nature of the hazard, emergency procedures, evacuation disasters, etc. Any law enforcement officer arriving at the scene of such an accident and seeing hazardous materials placards should immediately request the Fire Department. The Fire Chief will assume control of any scene involving

hazardous materials and all law enforcement officers will provide support as required. Any investigation of the accident will only occur after such has been approved by the Fire Chief.

    (6)    Any property belonging to accident victims will be protected from theft or pilferage and if victims are not present, should be brought to the Department, properly tagged and held for the victims.

e.   *Accident Report*

    (1)    ACA 27-53-303(c) of the Motor Vehicle Laws of Arkansas states "The responsible investigating office shall make the investigation with all possible promptness, and the investigating officer shall file the report with the Department of Arkansas State Police within five (5) days subsequent to the actual investigation".

    (2)    An accident report will be filed on all accidents that occur on public property within this jurisdiction. Public property is defined, for the purpose of accident reports, as any highway, roadway, street or public parking lot maintained by the State, County, or City.

    (3)    In the event of an accident that occurs on private property, an accident report will be filed if it meets any of the normal reporting criteria (death, personal injury, property damage, in excess of the reportable amount established by the Legislature, or involves government operated vehicles). The reports filed on any other type of an accident on private property shall be used for departmental use only and not forwarded to the Arkansas State Police.

f.   *REPORT FORMS:*

    (1)    ACA 27-53-304 (a) of the Motor Vehicle Laws of Arkansas states: All traffic accident investigation reports shall be made upon forms prescribed, approved, and supplied by the Department of Arkansas State Police, with the concurrence of the Arkansas State Highway and Transportation Department.

    (2)    All motor vehicle accidents which occur within this jurisdiction and that meet the standard criteria established as a result of this legislation will be completed using the accident report forms which are supplied by the Department of the Arkansas State Police.

g.   *REPORTS TO BE PUBLIC RECORDS:*

    (1)    ACA 27-53-305 (a) of the Motor Vehicle Laws of Arkansas states: All traffic accident investigating officer's reports shall be public records and be open to public inspection at all reasonable times.

    (2)    All motor vehicle traffic accident reports completed within this jurisdiction are subject to the Arkansas Freedom of Information act and will therefore be made available for public dissemination or review within five (5) days of the date of occurrence.

# SECTION 59
# JAIL AND BOOKING PROCEDURES

**POLICY:** The loss of freedom that follows a physical arrest places a tremendous responsibility on this Department and its employees to provide for the safety and welfare of persons committed to custody. The first impression of the department is also gained during the admissions process and the department is judged on its handling of the detainee. For these reasons, the entire process must be accomplished in an efficient manner that combines firmness with respect for the rights and needs of the person to be detained.

**PURPOSE:** To provide guidelines for all departmental employees in the processing of arrested persons from the time of arrest until transported to the detention facility.

**PROCEDURES:**
a.  Each officer is responsible for processing his/her own detainee.
b.  Any detainee arrested by an officer of this agency will be transported to and processed at this agency. An exception to this provision will be made under circumstances that would make this procedure dangerous to the arresting officer or offender, (such as a very violent individual), or due to the offenders obvious state of intoxication, processing would need to be delayed. In this situation it shall be the responsibility of the arresting officer to make sure the processing of the intoxicated individual is completed as soon as processing is possible.
c.  A complete Arkansas Arrest Disposition Report (A. D. R.) shall be completed on each person arrested, a copy of which shall be furnished the _____ County Detention Center at the time of incarceration.
d.  Fingerprint cards will be completed for detainees who have committed the following offenses
    **(Ref ACA 12-12-101 & ACA 9-27-320):**
    (1)  Adults
        (a)  All felony offenses.
        (b)  All Class A misdemeanor offenses wherein violence or the use of a weapon was involved.
        (c)  All offenses involving the manufacture, delivery, possession of a controlled substance, or possession with intent to manufacture or deliver a controlled substance.
    (2)  Juveniles
        (a)  When a **juvenile** is arrested for any offense which, if committed by an adult, would constitute a felony, or a Class A misdemeanor wherein violence or the use of a weapon was involved, the **juvenile** shall be fingerprinted and photographed.
        (b)  A **juvenile** shall not be fingerprinted or photographed under any circumstances except as outlined in paragraph d (2) (a) above.
    (3)  The following fingerprint cards will be completed:
        (a)  One (1) state card (gray).
        (b)  Three (3) F.B.I. cards (red), one (1) of which will have to be furnished to the _____ County Detention Facility at the time of incarceration.
    (4)  Disposition of fingerprint cards
        (a)  The state card (gray) and one (1) F.B.I. card (red) shall be mailed to the Arkansas State Police Identification Bureau within 48 hours after making the arrest.
        (b)  One (1) F.B.I. card (red) will be maintained in the detainee's personal folder at this agency.
        (c)  Copies of a **juvenile** fingerprint cards and photographs will be made available only to other law enforcement agencies, the Arkansas Crime Information Center, prosecuting attorneys and the juvenile court.
        (d)  This agency shall maintain a separate file of photographs and fingerprints, ensuring that juvenile photographs and fingerprints are not maintained in the same file as adult fingerprints.
e.  Three (3) mug-shot photographs will be taken of each detainee. Two (2) are to remain at this agency, and one (1) will have to be furnished to the _____ County Detention Center at the time of incarceration.
f.  When any officer is delivering a detainee to the _____ County Detention Center he/she will remain with the detainee until the detainee is locked up or when the officer is dismissed by the booking jailer.
g.  All detainees shall make bond at the _____ County Detention Facility.
h.  All detainee property (excluding evidence) will be turned over to the booking officer at the _____ County Detention Center.
I.  All other forms, such as Bail Determination forms, ID Forms, etc., needed by the detention center, will be copied and supplied to the center at the time the prisoner is transported.

# SECTION 60
# JUVENILE CURFEW VIOLATIONS

**POLICY:**   If curfew laws are to be effective, they must be enforced in a consistent, fair and uniform manner.  In addition, to be properly evaluated, enforcement actions must be fully documented.  To these and related ends, law enforcement officers shall follow the procedures outlined below when enforcing curfew violations.

**PURPOSE:**  To provide guidelines for all departmental employees to follow in processing a juvenile for a curfew violation.

**PROCEDURES:**

a.  Confronting Potential Violators.  Upon observation of a juvenile who is in possible violation of the curfew ordinance, an officer should take the following steps:
   (1) Request the juvenile's name, age, date of birth and address and, if necessary, provide the dispatcher with the location of the potential violation, the number of persons involved and their identity or physical description.
   (2) Should the individual be in violation of curfew restrictions, ascertain why the youth is out, where he/she has been and where he/she is going.
   (3) Inform the individual that he/she is in violation of the curfew ordinance.
   (4) Determine from communications whether the individual has outstanding warrants and, if possible, whether he/she has been previously cited for curfew violations.
   (5) If the individual has two prior curfew violations, particular consideration should be given to arrest as an alternative within the guidelines of this policy.
   (6) In all cases where a curfew violation has been identified, the officer shall complete the appropriate departmental record of the violation.

b.  Enforcement Options.  When a curfew violation has been identified, an officer may use reasonable discretion in determining an appropriate course of action.  These options include directing the juvenile to proceed directly home, transporting the juvenile home, or arrest and detention of the juvenile until his parents or guardian can be reached for pickup.

   (1) Directing a violator to proceed directly home is normally warranted for
      (a) first offenses;
      (b) when the circumstances of the violation suggest a reasonable attempt on the part of the juvenile to conform with the law; or
      (c) when the officer feels that the individual will proceed home as directed.

   (2) If directed to proceed directly home, the officer shall present a copy of the violation to the youth and provide counseling on the purpose and intent of the curfew ordinance and the potential law enforcement response to future violations.

   (3) Transporting the juvenile home is normally warranted when
      (a) the juvenile has more than one curfew violation;
      (b) when there are indications that the juvenile has purposely ignored the law;
      (c) when the officer has suspicion that the juvenile will not proceed home;
      (d) when the officer feels that he needs to make personal contact with the youth's parents or guardian; or
      (e) when there is a question concerning the whereabouts of the parents or their ability to provide proper supervision for or control of their child. (*Note:*  In this case, arrest and referral to juvenile authorities may be a reasonable and prudent option.)

   (4) When the juvenile is transported home, the parent or responsible adult should be contacted, informed of the specific circumstances of the violation, the nature and purpose of the law and potential consequences of future violations.  A copy of the violation should be served the parent or guardian, who should sign the original.  Unwillingness of the parent or guardian to sign shall be noted on the violation or warning notice.

    (5)  Arrest and detention of a curfew law violator should normally be made when the youth has two or more prior curfew violations or when, for example,

        (a)  the officer has knowledge of the juvenile's past delinquent or criminal history that demonstrates a pattern of disregard for the law, or

        (b)  when the circumstances of the offense, such as the time and location of the violation, provides reasonable suspicion of intent to commit additional delinquent or criminal acts.

    (6)  Officers may use their discretion concerning arrest upon any violation. In all cases, officers should clearly specify the basis for their arrest decision.

    (7)  When a juvenile is arrested, he shall be transported to the appropriate holding area where his parents or guardian will be contacted as soon as possible for pickup. Such detention shall conform with this department's policy on legal detention of juveniles in terms of length, location of detention and nature of security used. The parent or responsible adult shall be provided the same information and notice of violation as provided in item b (4) of this policy.

    (8)  If the juvenile's parents or guardian cannot be contacted within the prescribed period of time allowed for such detention, the youth shall be transported to this jurisdiction's juvenile care facility. The officer's report on the incident shall indicate the juvenile authority's final disposition of the case.

c.  Reporting and Follow-up Requirements. To adequately evaluate the effectiveness of the curfew ordinance and its impact on crime in this community and to provide information for the tracking of curfew violators, it is essential that the following reporting and follow-up activities be performed:

    (1)  All officers shall submit a report of a curfew violation in which a citation has been issued or a juvenile taken into custody. The report shall detail the name and place of residence of the violator, the time, place and circumstances surrounding the violation; actions taken by the officer with respect to the violator; any citations or warnings issued to the juvenile, parents or guardians; the final disposition of the incident; and any other pertinent information.

    (2)  Supervisors shall review all curfew reports for completeness and shall use this information as necessary to identify current or potential problem areas or individuals.

    (3)  The Chief of Police shall ensure that a notice of violation is forwarded via first class mail to any parent or guardian who was not personally served with such notice by the arresting or reporting officer. In addition, the Chief of Police shall

        (a)  use these reports as appropriate to identify current or potential juvenile problem areas such as common locations and/or establishments where violations are frequently taking place; and

        (b)  where identified, take such action necessary to fully inform proprietors or others of their responsibility to discourage and to report such violations.

    (4)  The administrative assistant shall be responsible for the proper filing of curfew violation reports and shall, at the direction of the chief executive officer or his designee, develop such statistical reports on enforcement actions or other matters as may be required.

## SECTION 61
## JUVENILE PROCEDURES

**POLICY:** The arrest or detention of juveniles will be in compliance with the orders and instructions of the Juvenile Court and the Juvenile Intake/Probation Officer within this County, and in accordance with applicable laws concerning arrest and incarceration of juvenile offenders.

**PURPOSE:** To provide guidelines for all employees to follow when processing a juvenile offender for various traffic or criminal violations.

**PROCEDURES:**

Subject to the approval of the juvenile authorities the following procedures will be used as a guideline for resolving incidents involving juveniles:

a.  Traffic violation by anyone not yet eighteen (18) years old:
    (1)  Issue Uniform Violations Notice.
    (2)  Summons to Municipal Court.
b.  Anyone reported as a runaway who is not yet eighteen (18) years old:
    (1) Confirm the runaway status through departmental reports, NCIC, etc.
    (2) If confirmed runaway, take into custody and transport to police headquarters. If no documentation exists, (no report or no NCIC hit) release the juvenile.
    (3) If transported, contact the Juvenile Intake/Probation officer for further direction such as incarceration or transport to a children's center.
    (4) Get all available information and, if entered by this agency, have the runaway deleted from ACIC/NCIC.
    (5) Complete an incident report.
    (6) Assist the Juvenile Intake Officer as needed.
    (7) Copy all documents concerning the juvenile contact and forward the same to the Juvenile Intake/Probation Officer.
    (8) If the juvenile had been entered into NCIC by some other police agency, contact that agency either by telephone or by terminal since the entering agency is required to delete the entry. The police agency in question can also provide other useful information concerning the juvenile, and make further contacts as needed.
    (9) Notify parents or guardian of the juvenile.
c.  Complaint or other incident where counseling or warning is administered to anyone not yet eighteen (18) years old:
    (1) Complete incident report.
    (2) Copy of incident report will be forwarded to Juvenile/Intake Probation Officer.
d.  Status Offenders:
    (1)  Juvenile in need of supervision:
        (a)  Place in custody.
        (b)  Notify Juvenile Intake/Probation Officer.
        (c)  Transfer custody to Juvenile Intake/Probation Officer.
        (d)  Complete incident report.
        (e)  Copy of incident report will be forwarded to Juvenile Intake/Probation Officer.
        (f)  Notify the parents or guardian of the juvenile.
    (2)  Dependent, Neglected, and Abused:
        (a)  Telephone Social Services immediately.
        (b)  Take into protective custody if necessary.
        (c)  If the juvenile is taken into protective custody:
            • Notify Juvenile Intake/Probation Officer.
            • Notify Social Services as soon as possible.
            • Photograph, transport for medical treatment/x-ray as needed.
            • Complete an incident report.
            • Copy of incident report will be forwarded to Juvenile Intake/Probation Officer and/or Social Services.

e.  Detention:
    (1)    When a juvenile must be detained in jail:
        (a)    Advise of rights if questioning.
        (b)    Notify Juvenile Intake/Probation Office.
        (c)    Notify parents or guardian of the juvenile.
    (2)    Detention not to exceed six (6) hours:
        (a)    For identification purposes.
        (b)    For determination of status.
        (c)    when arrested for being Intoxicated
        (d)    Notify the Juvenile Intake officer after the 6 hours for alternate placement.
        (e)    Notify parents or guardian of the juvenile.

f.  Criminal Violation by anyone not yet eighteen (18) years old:
    (1)    Local person, Non violent offense:
        (a) Advise the juvenile of his/her Miranda rights if questioning.
        (b)    Issue Juvenile Citation.
        (c)    Summons to Juvenile Court.
        (d)    If person is capable of caring for him/herself and the crime is not violent in nature:
            • Have the Juvenile sign the citation.
            • Release him/her.
            • Notify the parents or guardian of the juvenile.
        (e)    If the person is incapable of caring for him/herself or the crime is major or violent in nature:
            • Place the Juvenile in custody.
            • Advise of rights if questioning.
            • Notify Juvenile Intake/Probation Officer.
            • Notify parents of the juvenile or the guardian.
            • Issue Juvenile Citation.
            • Summons to Juvenile Court.
            • Transfer custody to Juvenile Intake/Probation Officer.
        (f)    Complete an incident report.
        (g)    Copy of incident report will be forwarded to Juvenile Intake/Probation Officer.
    (2)    Person from other than local area:
        (a)    Issue Juvenile Citation.
        (b)    Summons to Juvenile Court.
        (c)    Get assurance of court appearance.
            • Parent or guardian co-sign citation with offender.
            • Receive cash or commercial bond for violation.
        (d)    If violator is taken into custody:
            • Advise of rights if questioning.
            • Notify Juvenile Intake/Probation Officer.
            • Notify the parents or guardian of the juvenile.
            • Complete an incident report.
            • Copy of incident report will be forwarded to Juvenile Intake/Probation Officer.
    (3)    Juvenile arrested on warrant:
        (a)    Advise of rights if questioned.
        (b)    Immediately, or as soon as possible, take the Juvenile before the court that issued the warrant.
        (c)    If after regular court hours or on a weekend contact the juvenile intake officer concerning the arrest.
        (d)    Notify the parents of the juvenile or the guardian.
        (e)    If the arrest warrant was entered into ACIC/NCIC by this department, have the warrant deleted from the system.
        (f)    If the arrest warrant was entered into ACIC/NCIC by some other police agency, make contact with that agency, either by telephone or terminal, and advise of the arrest and any possible extradition proceedings.

# SECTION 62
# LEAVE

**POLICY:** It is the policy of this agency to encourage employees to take advantage of accrued vacation and compensatory time consistent with manpower requirements.

**PURPOSE:** To provide employees with information concerning annual leave, and guidelines to follow in applying for or otherwise utilizing this benefit.

**PROCEDURES:**

a.  Sick Leave and Vacation - Law Enforcement Officers:
    (1) Sick Leave:  Pursuant to ACA 14-52-107 all law enforcement officers employed by cities of the first or second class, or incorporated towns, shall accumulate sick leave at the rate of twenty (20) working days per year beginning one (1) year after the date of employment.
        (a) If unused, sick leave shall accumulate to a maximum of sixty (60) days unless the city, by Ordinance authorized the accumulation of a greater amount, in no event to exceed a maximum accumulation of ninety (90) days, except for the purpose of computing years of service for retirement purposes.
    (2) Vacation: Pursuant to ACA 14-52-106 the Chief of Police shall arrange that each employee of the police department shall be granted an annual vacation of not less than fifteen (15) working days with full pay.

b.  Sick Leave and Vacation - Non-Police Employees:
    (1) All full-time (non-police) employees with the city are eligible for sick leave with pay.  Sick leave will accumulate at the rate of one (1) day of sick leave for each calendar month of the employee's service with the city.
    (2) All full-time (non-police) employees who have been employed by the city continuously for a period of one 1) year or more will be allowed five (5) work days of vacation per year with pay beginning with the first year anniversary of the employee's date of hiring. This will accrue at a rate of five-twelfth (5/12) a day per month.
    (3) All full-time (non-police) employees who have been employed continuously for a period of five (5) years or more will be allowed ten (10) work days of vacation leave per year.  This will accrue at a rate of five-sixths (5/6) of a day per month beginning on the fifth year anniversary of the employee's date of hiring.
    (4) All full-time (non-police) employees who have been employed continuously for a period of fifteen (15) years will be allowed fifteen (15) work days of vacation leave per year. This will accrue at a rate of fifteen-twelfths (15/12) of a day per month beginning with the fifteenth year anniversary of an employee's date of hiring.

c.  Abuse of Sick Leave:
    (1) Sick leave is provided as a means whereby employees who are experiencing a medical problem can take a day or days off, and not lose their pay as a result of the illness.
    (2) Sick leave is not provided as a means whereby employees can take off work for reasons other than for an actual illness which renders him/her incapable of performing their duties.
    (3) Utilizing sick leave for any reason other than illness will be considered as abuse of sick leave and will not be tolerated by this department.
    (4) Any employee who is consistently using sick leave may be required to furnish an excuse from a licensed physician which states the nature of the illness, and the date of the visit.
    (5) Any supervisor who has reason to believe that an employee is abusing their sick leave may require that the employee in question provide a physician excuse for any use of sick time until further notice.
    (6) A supervisor initiating this procedure will be required to have documentation which shows a pattern of abuse, such as:
        a.  consistently taking off either the day before or the day after a regular day off.
        b.  consistently taking off on the day before or the day after a holiday for which the employee was also off.
        c.  consistently taking off on the same day of the week for numerous weeks.
        d.  Any other situation which would lead a reasonable and prudent person to believe that an employee is abusing their sick leave.
    (7) Should it be found that an employee is in fact abusing their sick leave, that employee will subject themselves to disciplinary action.

d.  FAMILY AND MEDICAL LEAVE ACT (FMLA) LEAVE POLICY

(1)  Purpose. The purpose of the Family and Medical Leave Act (FMLA) of 1993 is to balance the needs of families with demands of the workplace. It was designed to promote our country's interest in preserving family unity while accommodating the legitimate interests of employers.

(2)  Equality. The FMLA legislation seeks to minimize the potential for employment discrimination on the basis of gender consistent with the Equal Protection Clause of the Fourteenth Amendment by assuring that leave is available when necessary for both men and women.

(3)  Twelve weeks unpaid leave. This agency will grant up to twelve (12) weeks of unpaid leave per year to employees who need to care for family members.

(4)  Qualifying employees. An employee must have been employed for at least twelve (12) months and worked at least 1,250 hours during the previous twelve (12) months to qualify for FMLA leave.

(5)  Purposes for which leave can be taken. Employees are entitled to take up to twelve (12) weeks unpaid FMLA leave a year for:
(a)  The birth of the employee's child;
(b)  The placement of a child with the employee for adoption or foster care;
(c)  To care for the employee's spouse, child or parent who has a serious health condition;
(d)  A serious health condition rendering the employee unable to perform his or her job.

(6)  Intermittent leave. The employee may take leave intermittently or on a reduced work schedule when medically necessary due to the employee's or a family member's illness.

(7)  Notice Required. The employee is to provide at least thirty (30) days notice, if possible, of the intention to take leave.

(8)  Medical certification. This agency requires medical certification that the leave is needed due to the employee's own serious health condition or that of a family member. The agency may, at the agency expense, require a second medical opinion. If the first and second opinion differs, the agency may request a third opinion, at the agency's expense, which is then binding.

(9)  Continuation of benefits. The agency will continue the employee's health insurance under the same conditions as if the employee were working. Under this circumstance, the employee will still be required to pay his or her share of the premium if the agency's health insurance plan provides for such co-payments. Leave under this act is not a "qualifying" event under COBRA. If the employee does not return to the job, the employee shall be liable to the agency for repayment of the health insurance benefits paid by the agency during the employee's FMLA leave.

(10) Return to the job. Upon returning from leave, an employee is entitled to be restored to the same or equivalent position with equivalent pay, benefits, and other terms and conditions of employment.

62. 2

# SECTION 63
# MEDIA RELATIONS

**POLICY:** It is the policy of this law enforcement agency to cooperate fully and impartially with authorized news media representatives in their efforts to gather factual, public information pertaining to activities of the department, as long as these activities do not unduly interfere with departmental operation, infringe upon individual rights or violate the law. This policy shall be in compliance with the Arkansas Freedom of Information Act, (Arkansas Code 25-19-101 through 25-19-107). This department will not deny any news media, groups, organizations or individuals any information to which they are legally entitled.

**PURPOSE:** The purpose of this policy is to provide guidance for all employees concerning all interactions with the news media.

**PROCEDURES:**
a.  Authority of Departmental Personnel -
   (1)  The Chief of Police shall have the responsibility of disseminating all information to the news media.
      A.  The Chief of Police will delegate his/her authority to disseminate information to other employees within the department as listed within the procedures of this policy.
      B.  Even though this authority is delegated, the Chief of Police will be contacted at any time that a major event occurs within this jurisdiction. A major event, as pertaining to this policy, is any occurrence, such as a homicide or natural catastrophe or other major event, which is likely to create significant public interest and will require an extended presence of department personnel to keep the media properly informed.

b.  Duties of Department Personnel -
   (1)  Assist news personnel in covering routine news stories, and at the scenes of incidents; such as motor vehicle accidents or natural disasters
   (2)  Assist the news media on an on-call basis;
   (3)  Prepare and distribute news releases as authorized;
   (4)  Coordinate and authorize the release of information about victims, witnesses and suspects;
   (5)  Coordinate the release of authorized information concerning confidential agency investigations and operations.

c.  Cooperation with the Media -
   (1)  Authorized news media representatives shall have reasonable access to the Chief of Police, or his/her designee and operations of this department as governed by this policy.
   (2)  Public information shall be released to the media as promptly as circumstances allow, without partiality and in as objective a manner as possible.
   (3)  Public information may be provided to media representatives by telephone if the identity of the representative is known or can be authenticated. Information under these circumstances will be released by the person designated by the Chief of Police as a public information officer or by the senior officer on duty at the time of the request.
   (4)  Ranking officers at crime or incident scenes may release information of a factual nature to the media as governed by this policy or refer the inquiry to the Chief of Police. Where the officer is unsure of the facts or the propriety of releasing information, he shall refer the inquiry to the Chief of Police.
   (5)  Written press statements shall be released only following approval of the Chief of Police or his/her designee.

d.  Investigative Information –
   From the initial stage of a criminal investigation until the completion of trial, department personnel shall refer all requests for information to the Chief of Police or his/her designee.
   (1)  Information that may be released in connection with an investigation of an event or crime includes:
      (a)  The type or nature of an event or crime;
      (b)  The location, date and time, injuries sustained, damages and a general description of how the incident occurred;
      (c)  Type and quantity of property taken;
      (d)  The identity and approximate address of a victim with the exception of sex crime victims, and in other cases where reprisals or intimidation may be employed;
      (e)  Requests for aid in locating evidence, a complainant or a suspect;

    (f)   Numbers of officers or people involved in an event or investigation, the length of the investigation, and the different departments involved; and

    (g)   The name of the officer in charge of a case (exception: the name of any undercover officer will not be released).

    (h)   The name, address, and age of any adult individual(s) arrested for the crime or event.

    *NOTE: names of juveniles cannot be released unless the juvenile has been transferred from the authority of the juvenile court to a court of adult jurisdiction.*

(2)  Information that *may not be released* in connection with an investigation of a crime, unless authorized by the Chief of Police, include:

    (a)   The identity of a suspect prior to arrest unless such information would aid in apprehending the suspect or serve to warn the public of potential danger. In any event, this information should not be released unless probable cause has been established and a warrant of arrest has been obtained for the suspect;

    (b)   The identity of any victim of a sex crime or any related information which, if divulged, could lead to the victim's identity;

    (c)   The identity of victims or witnesses if such disclosure would prejudice an investigation to any significant degree, or if it would place the victim or witnesses in personal danger;

    (d)   The identity of any juvenile who is a suspect or defendant in a case subject to the jurisdiction of the juvenile court;

    (e)   The identity of any critically injured or deceased person prior to notification of next of kin;

    (f)   The results of any investigative procedure such as lineups, polygraph tests, fingerprint comparison, ballistics tests or other procedures (the fact that these tests have been performed may be revealed without further comment);

    (g)   Information, which, if prematurely released, may interfere with the investigation or apprehension of a suspect, such as the nature of leads, specifics of an "MO", details of the crime known only to the perpetrator and law enforcement personnel or information that may cause the suspect to flee or more effectively avoid apprehension;

    (h)   Information that may be of evidentiary value in criminal proceedings;

    (i)   Specific cause of death unless officially determined by the medical examiner; and

    (j)   The home address or telephone number of any department member.

    (k)   In the event a GAG ORDER is issued by any court of law, information concerning the crime or event in question will not be released until that order has been rescinded.

e.  Arrest Information -

  (1)  Following arrest, issuance of an arrest warrant or filing of an information or indictment, it is permissible to release:

    (a)   The accused name, age, residence, occupation and family status;

    (b)   The time and place of arrest, whether pursuit or resistance was encountered, whether weapons were used, charges placed against the suspect and description of contraband seized;

    (c)   The identity of the arresting officers and the duration of the investigation unless the officers are engaged in undercover operations, and

    (d)   The amount of bond, scheduled court dates and place of the suspect's detention.

  (2)  Following arrest and formal charging of a suspect, but prior to adjudication, the following types of information should not be released without the express permission of the Chief of Police:

    (a)   Prior criminal conviction record, character or reputation of a defendant;

        **NOTE**: A prior criminal record is subject to release in accordance with the Arkansas Freedom of Information act. It shall be the policy of this agency, however, not to cause this information to be released. This agency also will not restrict its lawful dissemination should it be requested by media representatives or any other citizen.

    (b)   Existence or contents of any confession, admission or statement of a defendant, or his failure or unwillingness to make a statement;

    (c)   Performance or results of any tests, or a defendant's refusal or failure to submit to tests such as a polygraph;

    (d)   Identity, statement or expected testimony of any witness or victim;

    (e)   Any opinion about the guilt or innocence of a defendant or the merits of the case; or

    (f)   Any opinion or knowledge of the potential for a plea bargain or other pretrial action.

f.  Special Considerations - Criminal Matters -

  (1)  Personnel of this department shall extend every reasonable courtesy to news media representatives at crime scenes. This may include closer access of media personnel and equipment than available to the general public to the degree that it does not interfere with the law enforcement mission or movement of traffic.

(2) The news media shall not be allowed access to any area or scene of an incident or crime where there is a possibility that evidence may be damaged, altered, destroyed or otherwise prejudiced by its existence being published or portrayed. Once evidence has been processed, removed and secured by the department, the media may be allowed to enter by permission of the senior officer at the scene.

    (a) On private property, photography, film or videotaping by the media requires the permission of the owner or the owners' representative.

    (b) Suspects or accused persons in custody shall not be posed or arrangements made for photographs, telecasts or interviews, nor shall department personnel pose with suspects or accused persons in custody. This does not prohibit, however, media representatives from taking photographs or video tape of suspects or departmental employees at a crime or incident scene.

    (c) When an individual is charged with a criminal offense and is sought by law enforcement authorities, photographs or mug shots may be released to the media to help locate the individual. No departmental photographs, mug shots, videotape, film or composites of subjects in custody shall be released unless authorized by the Chief of Police.

g. Special Considerations - Noncriminal matters -

    (1) News media representatives should not be prevented from access to any area solely because of the possibility of their injury or death. If this is the only consideration, the media representative should be advised of the danger and allowed to make the decision to enter on his own volition.

    (2) The officer in charge of a crime or incident scene should consider allowing access to the news media by means of an officer escorting the media personnel through the area. This will allow for media coverage without disturbing any of the physical evidence present. Exercising this procedure of course will depend on circumstances which exist at each scene and the use of discretion by the officer in charge.

    (3) Daily administrative reports of criminal activity will be made available on a routine basis to media representatives within this jurisdiction, or to representatives outside the jurisdiction which request the information.

    (4) All employees of this department will at all times be courteous and cooperative when dealing with members of the news media as well as with all other individuals or groups requesting information.

# SECTION 64
## MEMBERSHIP IN ORGANIZATIONS

**POLICY:** Employees are encouraged to participate in community, social, and service clubs, also in professional organizations. Employees shall not have a membership in or participate in the activities of any organization, association, society, or other group, the purpose or activities of which is subversive or which in any way may adversely influence or control the work or services of the employee in their official capacity.

**PURPOSE:** The purpose of this policy is to promote employee activity in certain organizations and also to provide employees with information concerning the types of organizations which are considered to be subversive, (anti government), and therefore against departmental policy for employees to belong.

a.    Examples of social and service clubs include, but are not limited to, the following:
      (1)  Lions Club          (5)  VFW Club
      (2)  Rotary Club      (6)  American Legion
      (3)  Masonic Organizations      (7)  Optimist Club
      (4)  Church Organizations (8)  Boy Scout/Girl Scout Leadership Programs

b.    Examples of professional organizations include, but are not limited to the following:
      (1)  Arkansas Municipal Police Association
      (2)  Arkansas Law Enforcement Officers Association
      (3)  Fraternal Order of Police
      (4)  Arkansas Sheriffs' Association
      (5)  FBI National Academy Associates
      (6)  Any other similar law enforcement programs or organizations

c.    Examples of Subversive groups include, but are not limited to, the following:
      (1)  KKK   (Ku-Klux-Klan)
      (2)  Skinhead groups
      (3)  neo-Nazi groups
      (4)  C S A   (Covenant, Sword and Arm of the Lord)
      (5)  Aryan Resistance groups
      (6)  Militia Groups
      (7)  The Church of the Creator, (COTC)
      (8)  Any other similar group or organization whose basic purpose is to disregard governmental directives, or resort to violence in situations where confronted by authority.

d.  Any employee found to be a member of any organization or belonging to any group as listed in subsection "c" of this policy will subject themselves to disciplinary action up to and including dismissal.

64.1

# SECTION 65
# MOBILE VIDEO/AUDIO RECORDING EQUIPMENT

**POLICY:**    Mobile video/audio recording (MVR) equipment has been demonstrated to be of value in the prosecution of traffic violations and related offenses, in evaluation of officer performance as well as in training.  In order to maximize the utility of this equipment in these and related areas, officers shall follow the procedures for MVR equipment use as set forth in this policy.

**PROCEDURES:**
a.   Program Objectives - This agency has adopted the use of in-car video/audio recording systems in order to accomplish several objectives, including:
   (1)   Accurate documentation of events, actions, conditions and statements made during arrests and critical incidents, so as to enhance officer reports, collection of evidence and testimony in court; and
   (2)   The enhancement of this agency's ability to review probable cause for arrest, arrest procedures, officer and suspect interaction, and evidence for investigative purposes, as well as for officer evaluation and training.
b.   Operating Procedures - Officers shall adhere to the following procedures when utilizing MVR equipment.
   (1)   MVR equipment installed in vehicles is the responsibility of the officer assigned to that vehicle and will be maintained according to manufacturer's recommendations.
   (2)   Prior to each shift, officers shall determine whether their MVR equipment is working satisfactorily and  shall bring any problems at this or other times to the attention of their immediate supervisor as soon as possible.
   (3)   MVR equipment will automatically activate when the vehicle's emergency warning devices are in operation. The equipment may be manually deactivated during non-enforcement activities such as when protecting accident scenes from other vehicular traffic.
      (a)   Whenever equipment is manually deactivated, officers shall properly document the reasons  for this action.
   (4)   Whenever possible, officers should ensure that MVR equipment is operating in order to record traffic stops or other enforcement actions.  In so doing they will ensure that:
      (a)   The video recorder is positioned and adjusted to record events;
      (b)   The MVR is not deactivated until the enforcement action is completed; and
      (c)   Their wireless microphone is activated in order to provide narration with the video recording to explain the reason for their current or planned enforcement action.
   (5)   Where possible, officers shall also use their MVR equipment to record
      a.   The actions of suspects during interviews, when undergoing sobriety checks or when placed in custody if the recording would prove useful in later judicial proceedings; and
      b.   the circumstances at crime and accident scenes or other events such as the documentation of evidence or contraband.
   (6)   Officers shall not erase, reuse or in any manner alter MVR data.
   (7)   Officers shall ensure that they are equipped with an adequate supply of data storage devices to complete their tour of duty.
   (8)   All completed data devices shall be properly labeled and identified prior to being submitted with related documentation at the end of the officers' tour of duty.
   (9)   Officers are encouraged to inform their supervisor of any incidents sequences that may be of value for training purposes.
   (10)  Officers will note in incident, arrest and related reports when video/audio recordings were made during the incident in question.
   (11)  Officers will use data storage devices as issued and approved by this agency.
c.   Data Storage Devices Control and Management
   (1)   MVR data devices containing information that may be of value for case prosecution or in any criminal or civil adversarial proceeding shall be safeguarded as other forms of evidence.  As such, these videotapes will:
      (a)   be subject to the same security restrictions and chain of evidence safeguards as any other evidence;
      (b)   not be released to another criminal justice agency for trial or other reasons without having a duplicate copy made and returned to safe storage; and
      (c)   will not be released to other than bona fide criminal justice agencies without prior approval of the Chief of Police.
   (3)   Recordings not scheduled for court proceedings or other adversarial or department uses shall be maintained for a minimum period authorized by law.  All recordings shall be maintained in a manner  that allows efficient identification and retrieval.
   (4)   No recordings shall be reissued for operational use unless completely erased by designated Personnel in this agency.

# SECTION 66
# OFF-DUTY EMPLOYMENT

**POLICY:** The policy of this department is to provide guidelines to law enforcement employees to inform them of the types of off-duty employment which are appropriate; and to establish procedures to maintain accountability for the welfare of the department. These requirements are essential for the efficient operation of the department and for the protection of the community.

**PROCEDURES:**

There are two types of off-duty employment in which an employee may engage:

a. *Regular Off-Duty Employment.* Employees may engage in off-duty employment that meets the following criteria:

    (1) Employment of a non-law enforcement nature in which vested police powers are not a condition of employment; the work provides no real or implied law enforcement service to the employer and is not performed during assigned hours of duty.

    (2) Employment that presents no potential conflict of interest between their duties as a law enforcement officer and their duties for their secondary employers. Some examples of employment representing a conflict of interest are:

        (a) As a process server, repossessor, bill collector, towing of vehicles, or in any other employment in which law enforcement authority might tend to be used to collect money or merchandise for private purposes.

        (b) Personnel investigations for the private sector or any employment which might require the law enforcement officer to have access to law enforcement information, files, records or services as a condition of employment.

        (c) In a law enforcement uniform in the performance of tasks other than that of a police nature.

        (d) Which assists (in any manner) the case preparation for the defense in any criminal or civil action or proceeding.

        (e) For a business or labor group that is on strike.

        (f) In occupations that are regulated by, or must be licensed through the law enforcement agency or its civilian board.

    (3) Employment that does not constitute a threat to the status or dignity of law enforcement as a professional occupation. Examples of employment representing a threat to the status or dignity of the law enforcement profession are:

        (a) Establishments which sell pornographic books, magazines, sexual devices, or videos, or that otherwise provide entertainment or services of a sexual nature.

        (b) Any employment involving the sale, manufacture or transport of alcoholic beverages as the principal business.

        (c) Any gambling establishment not exempted by law.

b. *Extra-Duty Employment.* Law enforcement officers may engage in extra-duty employment as follows:

    (1) Where a government, profit-making or not-for-profit entity has a contract agreement with the law enforcement agency for law enforcement officers in uniform who are able to exercise their police duties.

    (2) Types of extra-duty services which may be considered for contracting are:

        (a) Traffic control and pedestrian safety.

        (b) Crowd control.

        (c) Routine law enforcement for public authorities.

        (d) Plainclothes assignments.

c. *Limitations on regular off-duty employment and extra-duty employment are as follows:*

    (1) In order to be eligible for off-duty employment, a law enforcement employee must be in good standing with the department. Continued departmental approval of a law enforcement employee's off-duty employment is contingent on such good standing.

    (2) Those officers who have not completed their probationary period, or who are on medical or other leave due to sickness, temporary disability or an on-duty injury shall not be eligible to engage in regular or extra-duty employment.

    (3) Prior to obtaining off-duty employment, a law enforcement employee shall comply with departmental procedures for granting approval of such employment, or registration for extra-duty employment.

    (4) A law enforcement officer may work a maximum of 24 hours of off-duty-regular employment, or total 1 of 64 hours in combination with regular duty in each calendar week.

    (5) Work hours for all off-duty employment must be scheduled in a manner that does not conflict or interfere with the law enforcement officer's performance of duty.

    (6) A law enforcement officer engaged in any off-duty employment is subject to call-out in case of emergency, and may be expected to leave his off-duty or extra-duty employment in such situations.

    (7) Permission for a law enforcement employee to engage in outside employment may be revoked where it is determined pursuant to departmental procedure that such outside employment is not in the best interests of the department.

d. Any employee considering *off-duty* or *extra duty* employment must request permission in writing to the Chief of Police, stating the working hours and duties of such employment. Such requests must be approved prior to the commencement of outside employment.

# SECTION 67
# OFF DUTY: POLICE ACTIVITY, NEGHBORHOOD DISPUTES

**POLICY:**    Due to the nature of law enforcement activities, it is necessary for employees to be subject to call out at all times. It is the policy of this department to allow the highest ranking supervisor or senior officer on duty, at the time a situation occurs, to evaluate the circumstances and determine what additional resources, (personnel, equipment, etc.), if any, are needed.

**PURPOSE:**    The purpose of this policy is to establish guidelines for all employees to follow concerning call out procedures, and actions to be taken by off duty officers in certain situations.

**DEFINITIONS:**
*Conflict of Interest:*
A conflict of interest, concerning police activities within this agency, occurs when an employee of this department becomes involved in a situation, (acts or intervenes in a case), for which the employee has a particular interest in the outcome.

**PROCEDURES:**
a.   It shall be the responsibility of the highest ranking supervisor/officer on duty to notify the Chief of Police in the event that a call out is being contemplated. An exception to this rule will apply in situations such as a minor felony offense, (battery, burglary, theft, etc.), for which an investigating officer is needed to perform a follow up investigation. The Chief of Police will always be notified concerning any major crime, event, or catastrophe.
b.   All employees of this agency will be considered as being "off duty" at any time other than during regularly scheduled working hours.
    All employees of this agency will be subject to call during their "off-duty" time.
c.   Employees shall be subject to emergency stand-by as deemed necessary by the Chief of Police or his/her designee.
e.   Law Enforcement Action While Off-Duty:
    1.   An officer shall act in his official capacity, whether on or off-duty, if he observes an incident requiring law enforcement action in which time is of the essence, or if his action will safeguard life or property or prevent escape of a criminal.
    2.   An officer shall not take action, other than to safeguard life and property, in any situation for which he/she would be considered to have a conflict of interest.
    3.   An off duty officer in plain clothes will not place themselves in a situation, because of their appearance, which would create a substantial risk of injury to the officer or others. Intervening in a domestic dispute for which no physical altercation is occurring is an example of this type situation. An officer should, however, contact the department for deployment of uniform personnel.
    4.   An off duty officer will carry his/her official police department identification when armed with his/her duty weapon at all times when off duty and away from home.
c.   Neighborhood Disputes:
    (1)   Officers shall not intentionally become involved in or attempt to intervene in neighborhood quarrels or disputes involving their neighbors. These disputes shall be handled by disinterested persons, and the officer assigned to patrol the area shall be called when necessary.
    (2)   Officers shall not make arrests in their personal quarrels or those of their family or neighbors unless such action is warranted by the immediate threat of serious bodily harm or property damage.
d.   In any situation requiring the utilization of additional resources, the Chief of Police will have the responsibility of contacting the mayor/city manager as soon as it is reasonably possible.
e.   Call out in all situations involving off duty personnel will require the use of discretion by the supervisor/highest ranking officer in charge and will depend on the circumstances associated with each incident.

67.1

# SECTION 68
# OUT-OF-TOWN HOME CHECKS

**POLICY:** It shall be the policy of this department to provide a service of making periodic checks of a residence while the owner(s)/occupant(s) are out of town. This is a service that citizens of this community deserve and will use because it makes them feel more comfortable about leaving their homes unattended. While it is understood that the mere visual and physical checking of homes may not prevent a burglary, or some other incident, it increases the opportunity of finding it once it has occurred.

**PURPOSE:** To provide guidelines for all departmental employees to follow concerning scheduling out-of-town home checks and in the field performing the checks.

**PROCEDURES:**

a.   Normally citizen requests for home checks come in during the daylight hours for which the calls are received by the Day Shift telecommunications/dispatch personnel or the officer in charge of the desk area. When this happens, a Citizen out-of-town Check List form (Appendix A) will be completed by the individual receiving the request.

b.   Any employee completing the Citizen out-of-town Check List will obtain necessary information from the citizen to complete the form. In "Additional Information", provide information as to lights left on, who will be checking the house or taking in mail, vehicles which will be parked at the residence, or any other relevant information. Advise the citizen the house check will be canceled on the date they give as their return date. If they realize they won't be back by that date, please call and extend the request. Also if they return before the date indicated, be sure to call and cancel the house check.

c.   Upon completing the request form, the following procedures will apply:

    1.   The employee receiving the information will record the request in a master log book.

    2.   The log book will have a space to write a house check number. A number will be assigned to each house check.

    3.   The house check number will then be written in the upper right hand corner of the request form.

    4.   After logging the information, the request form will then be separated and distributed as follows:

        a.   The bottom copy will be alternately assigned to the daytime and evening shift officers who are patrolling the particular area of each house check.

        b.   The top portion of the Check List will always be placed in the master log book by the employee receiving the information.

d.   One copy of the Citizen out-of-town Check List will be prepared for each trip that the citizen will be out-of-town.

e.   The patrol officer making the house check should try to make a check of the house at least once daily and have the dispatcher record the check by the assigned number. Name or address of the homeowner/occupant, who is out-of-town, will not be broadcast.

f.   When the citizen returns and notifies this agency, the entry in the master log book will be canceled by writing "RETURNED" in red letters across the form.

g.   The day shift desk officer will monitor all house check request forms for expected citizen return dates. If no call is received from the citizen on the morning of the documented return date, the desk officer will telephone the resident in question to determine if the citizen has in fact returned. If it is confirmed that the citizen has returned, the desk officer will then notify the patrol officer to cease the home checks. Phone calls to citizens should not be made prior to 7:00 AM. If there is no answer at the residence in question, the desk officer will notify the patrol officer in that area and have the patrol officer to check the residence and ascertain if the owner/occupant has or has not returned.

h.   Extended House Checks: There are occasions where citizens may be gone for extended periods of time and wish to make the agency aware of their absence. A real estate company may also periodically request a house watch for a vacant house. Normally, anything over a 30 day period will be considered an extended house check. When such a request is received, the person receiving the request will complete a house check form as in paragraph a through c above. A notation will be made on the form that this is an EXTENDED HOUSE CHECK. The completed request will be distributed the same as in paragraph c. Houses on the extended check list normally will receive the same service as a regular house check. Officers will remain aware of the house and provide periodic checks of the home.

68.1

**APPENDIX A**
**CITIZEN OUT-OF-TOWN CHECK LIST**

DATE _____

HOUSE CHECK NUMBER _____

THE CITIZEN LISTED BELOW WILL BE OUT-OF-TOWN AND REQUESTS THAT HIS/HER HOME
 BE CHECKED PERIODICALLY FROM _____ TO _____.

_____    _____    _____
       (NAME)                (ADDRESS)       (PHONE)

IF RURAL, DIRECTIONS TO HOME: _____

_____

ADDITIONAL INFORMATION: _____

_____

INFORMATION TAKEN BY: _____    _____
                           (NAME)                 (TITLE)

**Master Log Book Copy**

---

**CITIZEN OUT-OF-TOWN CHECK LIST**

DATE _____

HOUSE CHECK NUMBER _____

THE CITIZEN LISTED BELOW WILL BE OUT-OF-TOWN AND REQUESTS THAT HIS HOME BE

CHECKED PERIODICALLY FROM _____ TO _____.

_____    _____    _____
       (NAME)                (ADDRESS)       (PHONE)

IF RURAL, DIRECTIONS TO HOME: _____

_____

ADDITIONAL INFORMATION: _____

_____

INFORMATION TAKEN BY: _____    _____
                           (NAME)                 (TITLE)

**Patrol Officer Copy**

68.2

# SECTION 69
# PATROL FUNCTIONS

**POLICY:** The patrol function is a primary law enforcement function and embraces much more than the act of patrolling. It is a generalized function in which officers engage in a wide variety of activities to include, but not limited to; enforcing traffic/criminal laws, answering complaints, conducting follow-up investigations, community relations, transporting prisoners, crime prevention activities, etc.

**PROCEDURES:**

a.   Communications/coordination/cooperation between components:
All patrol officers must cooperate and exchange information with criminal investigators and personnel of other functional areas of the department. This cooperation and exchange is accomplished by, but not limited to:

    (1) Attendance of all personnel at staff meetings, where matters of departmental interest are discussed and ideas are exchanged.

    (2) Review daily by all patrol and investigative personnel of offense/incident reports and miscellaneous information made available by utilization of the daily reading file. This review should trigger the sharing of information and assistance.

    (3) Review of and input from all personnel in development of new policies and/or procedures.

b.   Patrol Coverage

    (1) This law enforcement agency operates 24 hours a day, around the clock, seven days a week, to provide the citizens with law enforcement services. The department will provide, generally, the same services at all hours of the day or night in relation to answering calls for service, emergency, preventive patrol, traffic enforcement, etc.

    (2) Assignment of Officers to Patrol Areas:  The assignment of officers to particular areas will be the responsibility of the Chief of Police based on the following criteria:

        (a) Number of calls for service

        (b) Number of offenses/incidents

        (c) Number of businesses

        (d) Available manpower

        (e) other specific needs

    (3) Area Rotation Frequency:

        (a) Normally, an officer will be assigned to the same area on a permanent basis. This is a preferred practice for the following reasons:

            *   Officer is able to become better acquainted with persons, businesses, organizations, and hazards in his area.

            *   Helps place responsibility and accountability for events occurring in a certain area on a specific officer.

        (b) Rotation of area assignment, of necessity, must occur during the days-off of the officer normally assigned.

        (c) Partial rotation may also be necessary when a particular officer is required to perform a specific type of assignment in another part of this jurisdiction.

        (d) The Chief of Police will rotate area assignments as frequently as believed necessary to maintain a high level of officer interest and responsiveness to the law enforcement needs of the district.

    (4) Sharing Significant Law Enforcement Information:  Officers assigned to areas are encouraged to share significant law enforcement information concerning their area with other officers. Such information may be placed on an Information Memo or passed on personally.

c.   Supervision/scheduling:
Supervisor scheduling responsibilities include:

    (1) Ensuring sufficient personnel are available for daily assignment to meet prescribed minimum staffing levels.

    (2) Anticipating pre-planned major events and ensuring availability of personnel as required.

    (3) Monitoring accrual of/and mandatory pay back requirements for compensatory time.

    (4) Monitoring of leave time accrual in order to ensure that no individual leave is lost due to excess accrual at year-end (December 31).

    (5) Coordinating officer attendance at required and optional training, range firing, physical fitness evaluation, etc.

    (6) Within staffing guidelines encouraging officer participation in college courses.

    (7) Requesting Auxiliary officer assistance in meeting emergency or other planned law enforcement activities.

    (8) Briefing officers with information regarding daily patrol activity, with particular attention given to unusual situations, directed patrol activity, and changes in the status of wanted persons, the stolen property list and major investigations.

    (9) Notifying officer of schedules and assignments or changes therein.

    (10) Informing officers of new directives or changes in directives.

d.   Prisoner Transport Vehicles:
The department does not have officers or vehicles that are designated exclusively for prisoner transport

purposes. Any officer while performing his regular duties may be utilized to transport prisoners as the need arise. See **SECTION 106, TRANSPORTING ARRESTED PERSONS.**

e.  Patrol Activities
    (1)  Response to certain incidents. Response to some calls may require several officers to deal effectively and safely with the problem. The types of situations requiring the response of at least two officers are:
        (a)  Potential or actual assault on an officer
        (b)  Possibility of or actual on-scene arrest for a felony or violent misdemeanor
        (c)  Potential or actual resistance to arrest
        (d)  Possibility of or actual use of force
        (e)  Crime in progress
        (f)  Fleeing suspect
        (g)  Domestic Abuse Incidents
    (2)  Dispatchers will ensure the dispatch of two officers to calls listed above. An officer finding the circumstances listed above will request back-up assistance. Two officers assigned to such a call will coordinate their simultaneous arrival, where possible.

f.  Incidents Requiring Presence of Chief of Police:
Chief of Police will be notified and determine whether to proceed to and assume command of the following types of incidents:
    (1)  Serious injury to a police officer
    (2)  Accident involving a police vehicle especially if an officer is injured, other persons are injured, or major damage is involved
    (3)  Major crimes to include murder, bank robbery, jail break, heinous crime, and assault where death may occur
    (4)  Barricade/hostage situation
    (5)  Disasters, catastrophes, or severe weather producing emergency conditions
    (6)  Serious complaint or incident involving a law enforcement officer
    (7)  serious accident, injury, or incident involving agency personnel or property
    (8)  Any other incident where he/she is requested

g.  Public Hazards/Potential Hazards
    (1)  A wide variety of hazardous situations in this jurisdiction such as bad road/weather conditions, unsafe structures, potentially dangerous calls for service, etc., will normally be identified by the patrol officers on the street or called into communications by citizens or announced by local media. Information as to any of these hazardous or potentially hazardous situations should be reported, shared among officers and other agencies that ought to know, and passed on to subsequent shifts.
    (2)  Information concerning hazardous/potentially hazardous situations that is received by the dispatcher should be passed on to all personnel during shift change in order to prepare and plan for the situations.

h.  Special Notifications:
    (1)  Emergency/Next-of-Kin Messages
        (a)  Subject to the availability of personnel, emergency messages of any legitimate type, as defined by the person receiving the message here in the department may be delivered. Any message pertaining to a death, serious injury or serious illness will be delivered.
        (b)  Notifying next-of-kin in a case where there is a death, serious injury, and/or serious illness, can place the officer in a delicate and uncomfortable situation. The following procedures should be utilized whenever possible and practical:
            *  Notification should be made as promptly as possible
            *  The presence of a minister or relative/close friend (if known) should be obtained whenever possible prior to notification.
            *  If notification has to be made alone, the officer should offer assistance to the next-of-kin in contacting a relative, close friend, and/or minister.
            *  The person receiving notification should be advised of the means used in transmitting the notification to the department, i.e., teletype or call from another law enforcement agency, unverified telephone call to the department, etc.
        (c)  When requested by another agency to make notification of next-of-kin, the dispatcher and/or officer should attempt to obtain whatever pertinent information about the situation is available in order to assist the relative receiving the message here.
    (2)  Coroner: The Coroner will be notified in all situations where an officer responds to a location where a death has occurred. Notification will normally be made by the dispatcher on request from the responding officer. The name of the victim, location, telephone number and any preliminary facts pertaining to the death will be given to the Coroner.

    (3)   Street/Highway/Public Utility Personnel:  At anytime when a situation exists that creates a hazard or potential hazard, the officer identifying the situation will request that the dispatcher make proper notification in order that the situation may be corrected in as short a time as possible. Typical situations and timing of notification are as follows:

        (a)   Immediate notification to proper agency
*    Essential traffic light in need of repair
*    Large holes in road
*    Electrical power lines down
*    Large debris etc., in roadway
*    Breaks in water, gas, or other utility
*    Snow/ice, etc. on roads
*    Fire hazards needing immediate attention

        (b)   Notification at beginning of next business day
*    Non-essential traffic lights in need of repair
*    Small (non-hazardous) holes in road
*    Street lights in need of repair
*    Telephone/video cables down but not creating hazard
*    Dead animals in road
*    Potential fire hazards not requiring immediate attention
*    Excessive growth of weeds, grass, etc.

        (c)   Some hazardous situations may demand immediate notification of the local radio station(s) in order to request immediate public service announcements.  Normally, the Chief of Police will advise dispatchers to notify the stations when such a hazard exists.

i.  Preliminary Court Appearances Not Required: Court appearance by the law enforcement officer is not required in the following types of cases:

    (1)   Any initial appearance which requires appointment of counsel to the defendant

    (2)   Any initial appearance of a driving under the influence charge unless requested by the court

    (3)   Any prepaid traffic infraction

    (4)   Any other cases when officer is notified by the court/Prosecuting Attorney that his presence is not required.

# SECTION 70
# PERFORMANCE EVALUATION

**POLICY:** The purpose of the evaluation system is to standardize the nature of the personnel decision making process; ensure the public that our department personnel are qualified to carry out their assigned duties; and to provide job incumbents with necessary behavior modification information to allow them to maintain behaviors that are appropriate from the department's standpoint and to eliminate inappropriate behavior. It shall be the policy of this department to complete performance evaluations on each employee on an annual basis or as outlined within the following procedures.

**OBJECTIVE:**
It is significant that the purpose of our evaluating system be communicated to all employees so they understand that our objective is to ensure all personnel receive a fair and timely evaluation of their efforts and potential toward growth and development.

Since the employee evaluation plays an important role in the promotional system, it is equally important for raters to understand our basic personnel evaluation objectives.
1.    Standardized rating procedures will become a continuing process that will not set a trend for continued performance, either positive or negative, without continued supervisor involvement.
   a.    Counseling, Reprimand, punitive action, etc. for negative performance.
   b.    Praise, Recognition, Merit award, etc. for positive performance.
2.    Employees will realize that the rating system is not self-executing and that raters' and rates' must be able to properly distinguish and document expectations, goals, and achievements.
3.    A fair and impartial rating system that will provide job incumbents with the necessary behavior modification information to allow them to maintain behaviors that are consistent with department standards.
4.    Maintain and improve performance; provide a medium for personnel counseling; facilitate proper decisions regarding probationary employees; and provide an objective and fair means for measurement and recognition of individual performance.

**RESPONSIBILITY:**
The Chief of Police retains ultimate authority for the implementation of the performance evaluation system.  The Chief of Police will ensure that the system is administered in a manner that demonstrates a fair and equal assessment of an employee's performance and potential for increased responsibility. An Assistant to the Chief of Police, as assigned, will be designated as the performance evaluation monitor and is tasked with the following duties:
1.    Make sure that a current file is maintained on all department employees that will contain all information necessary to coordinate the timely execution of personnel evaluations.
2.    Make sure that a suspense file is maintained on all evaluations in progress.
3.    Coordinate with the Chief of Police on any problems of non-compliance with system requirements.

**DEFINITION OF TERMS:**
1.    RATEE:    The employee whose performance is evaluated by the rater.
2.    RATER:    The supervisor who evaluates the performance of a subordinate employee.
3.    RATING:  The estimate of a value, worth, strength, capacity, etc., of appraisal.  As used: an indication of the quality of performance or attributes.
4.    REVIEWING OFFICIAL:   The person, normally the rater's supervisor, who is responsible for ensuring the completeness of the evaluation report and the fairness, objectivity, and lack of bias on the part of the rater in measuring performance of the employee.

**RATING INSTRUMENTS:**
There are two (2) basic rating instruments, which will be used by this agency. The Employee Performance Evaluation (EPE) and the Letter of Evaluation (LOE).
1.    Employee Performance Evaluation (EPE):
   a.    The Employee Performance Evaluation (EPE) is a formal written evaluation that is used as a source document to evaluate an employee's past performance and potential for growth and development.
   b.    The employee is rated for performance in the position held during a 365-day rating period in relation to the tasks set forth in the employee's job description.  Evaluations will be based only on performance

during this 365-day rating period. Additional duties performed may also be evaluated but will be used only in support of the total evaluation.

c.    The results of an employee's evaluation report will be used by this department to provide documented information concerning:

(1)    Suitability for assignment
(2)    Identification of training needs
(3)    Ability to assume increased responsibility
(4)    Effectiveness in assigned position
(5)    Guidance for career development
(6)    Identify strengths
(7)    Identify weaknesses and provide guidance aimed at improving

d.    All Employee Performance Evaluations (EPE) are due on an employee's anniversary date. Newly hired employees who have not completed one (1) year of employment will receive an Employee Performance Evaluation at the end of six (6) months and then on their anniversary date.

2.    Letter of Evaluation (LOE):

a.    The Letter of Evaluation or LOE is also a valuable management tool that is used to document an employee's performance and potential for growth and development. This type of evaluation will be used when a reporting official (rater) does not have an opportunity to fully observe a subordinate's performance and personal qualities during an entire reporting period. For example; there may be a change in rating officials and there has not been sufficient time since the close out date of the last Employee Performance Evaluation (EPE) to require submission of an Employee Performance Evaluation. Another example would be when the ratee performs duties under the supervision of someone other than the assigned rater for part of the reporting period.

b.    The Letter of Evaluation (LOE), although an official evaluation, will be written on the designated form with specific emphasis placed on the ratees' performance as related to the reason why the employee is receiving the Letter of Evaluation (LOE). There are no numerical values assigned to a Letter of Evaluation (LOE), as it is simply a management tool used by the official rater to document specific actions taken or observed during a specific time period where the ratee is in transition, or under close supervision.

(1)    Employees placed on probation for disciplinary reasons will receive a Letter of Evaluation (LOE) after the completion of each 30-day period of probation. The time periods authorized for probation is 30 or 60 days. No probationary period action will exceed this time period without written approval from the Chief of Police. No Employee Performance Evaluation (EPE) will be written on any employee while in probationary status as a result of the disciplinary process. If an Employee Performance Evaluation (EPE) is due during this period, the suspense date will be changed to be effective 30 days   after completion of the probationary period. (If remedial training is required or completed, this will be documented on the Letter of Evaluation).

(2)    A ratee will receive a Letter of Evaluation (LOE) at the end of a special assignment, such as temporary duty from the Patrol Division to the Investigation Division. This Letter of the rater supervising the ratee during the special will write evaluation (LOE) assignment and filed with the employee's official rater.

1.    The close out date for Employee Performance Evaluations (EPE) will not be affected by an employee's absence due to holidays, vacations, or any other employee initiated absence. The Employee Performance Evaluation (EPE) will be completed and filed; however, the employee will be afforded the opportunity to review and/or challenge the Employee Performance Evaluation (EPE) after returning to duty.

2.    Completion of the Letter of Evaluation:

There are instances when a reporting official (rater) does not have an opportunity to fully observe an employee's performance and personal qualities during an entire reporting period. For example, there may be a change in rating officials and there has not been sufficient time since the close out date of the last Employee Performance Evaluation (EPE) to justify a formal evaluation. Another example would be when the ratee performs duties under the supervision of someone other than the rating official for part of the reporting period. In such cases, the rating official would request a Letter of Evaluation (LOE) from the official most familiar with the ratees' performance during that period.

The Letter of Evaluation (LOE), although an official evaluation, will be written on department form with specific emphasis placed on the ratees' performance as related to the reason why the employee is receiving the Letter of Evaluation (LOE). There will be no numerical value assigned to a Letter of Evaluation

(LOE), as it is simply a management tool used by the official rater, to document specific actions taken or observed during a period where the ratee is in transition, or under close supervision.

    a.    The date for the Letter of Evaluation (LOE) should correspond to the date the Letter of Evaluation was written. This will be exact, as the date will be officially recorded to establish consistent rating periods.

    b.    The name of the rater may not be the same as the one officially assigned since the employee may be performing duties outside the supervision of the official rater.

    c.    The ratees' status will be entered as PROBATION, SPECIAL ASSIGNMENT, etc.

    d.    The comments and recommendations will be specific and contained to the reason for the Letter of Evaluation (LOE). Example: If an employee is on special assignment, then the comments and recommendations will reflect that assignment. If an employee is on probation due to disciplinary action, then the comments and recommendations would be confined to those corrective actions taken or recommended. Letter of Evaluations written on officers who have been promoted should reflect the employee's acceptance and performance at this new level of responsibility.

## APPEALS:

All employees have the right to appeal any Letter of Evaluation (LOE) or Employee Performance Evaluation (EPE). This appeal will be submitted within five (5) working days after the close out date of the Letter of Evaluation (LOE) or Employee Performance Evaluation (EPE). (Employees on leave, holiday, etc., will be authorized to appeal any Letter of Evaluation (LOE) or Employee Performance Evaluation (EPE) written during their absence. The appeal date will be extended to five (5) working days after their date of return). The appeal must be in writing and must state the specific reason why the employee believes the evaluation to be invalid.

In all cases, an employee has the right to continue an appeal through all levels of supervision until it has reached the Office of the Chief of Police. If the conflict cannot be settled at this point, then the employee has the option of appealing directly to the City Council.

All appeals will be filed with the original document that generated the appeal, unless the employee executes a written request to withdraw the appeal.

## PERFORMANCE COUNSELING:

1.    <u>Rating Period</u> - Each employee will be formally counseled by the rating official at the beginning of the rating period. Counseling will include, at a minimum, the following expectations:

    a.    Requirements of the position occupied and any additional duties required.

    b.    Level of performance expected

    c.    Evaluation rating criteria

    d.    Appeal procedures

    e.    Probation/Suspension

2.    <u>Notification of Poor Performance</u> - Employees who are performing in less than a satisfactory manner during the rating period must be counseled 60 days PRIOR to the submission of an Employee Performance Evaluation (EPE) that rates the employee unsatisfactory. If the "less than satisfactory" performance occurs within 60 days of the submission date of the Employee Performance Evaluation, the counseling should take place as soon thereafter as is reasonable. This counseling should be in writing and the supervisor must define the actions needed to correct the performance. If unsatisfactory performance continues, this information should be included in the evaluation report at the end of the rating period. Employees must be provided with a copy of the counseling report.

3.    <u>Rater and employee review of Letter of Evaluations and Employee Performance Evaluations</u> - A review of all completed Letter of Evaluations and Employee Performance Evaluations will be conducted between the supervisor and employee in a private location, At a minimum, the following will be discussed:

    a.    Explanation of the rating of each area

    b.    Justification, low and high scores, through the use of previous counseling letters, Letter of Evaluations, etc.

    c.    Explanation of the appeals procedure

    e.    Disposition of all evaluations, to include providing a copy for the ratee.

    f.    Actions the employee can take to improve performance, (even if performance is satisfactory or above average).

70.3

4.   Retention of Letter of Evaluation/Employee Performance Evaluation - All evaluations will be placed in the employee's official personnel file. Retention of these evaluations will be in accordance with City Policy concerning the retention of such documents.

5.   Access to Letter of Evaluation/Employee Performance Evaluation  No employee will be granted access to any other employee's personnel file without first establishing the need and right to access as determined by the Chief of Police.  An employee may have access to his or her own personnel file during daytime business hours, (0900-1700 hours), by requesting access through the Chief of Police.  No records shall be removed from the official file without the approval of the Chief of Police.

6.   Rater Training - Each employee assigned duties, as a rater will receive training as directed by the Chief of Police on the following:
     a.    Performance measurement definitions
     b.    Procedures for use of forms
     c.    Rater Responsibilities
     d.    Counseling requirements
     e.    Suspense date processing
     f.    Appeals processing
     g.    Performance factors to consider; Factors include, but are not limited to, the following:
     Punctuality, Attendance, Application to duties, Interest, Initiative, Appearance, Ability to learn and follow directions, Completion of assignments, Supervision required, Quality of work, Goals, Organizational skills, Job knowledge, Working relationships, Acceptance of criticism.

7.   Supervisor Review - All Letter of Evaluations and Employee Performance Evaluations will be reviewed by the rater's reporting official (immediate supervisor). The reviewing official must concur or non-concur with all evaluations.  In each case of non-concurrence with any portion of the evaluation, the reviewing official must justify such action in writing.
     a.    Employee Performance Evaluation (EPE) - Reviewing officials can change individual ratings. These changes must be justified in writing and a copy provided to the rater and the ratee.
     b.    Letter of Evaluation - Reviewing officials cannot change the word content of any Letter of Evaluation (LOE); however, a statement of non-concurrence can be attached.  A copy of the non-concurrence will be provided to the rater and the ratee.

8.   Rater Evaluation - Reviewing officials will place a continued emphasis regarding the quality of ratings given by their employees.  Reviewing officials will reflect in all evaluations of rater's their ability to administer an evaluation process regarding the fairness and impartiality of ratings assigned, their participation in employee counseling, their ability to carry out the rater's role in the performance evaluation system, and their ability to apply ratings uniformly.

9.   Review of Evaluation System - The Chief of Police will conduct an annual review of the Performance Evaluation System.  Emphasis will be placed on the extremes of the ratings given, number of appeals filed including the reason and disposition, and recommendations for improvement.  This review will be conducted jointly with the Division Heads who will, 30 days prior to the review, solicit input from all employees within their respective divisions.
     Critical factors to be considered during this review are:
     a.    Stability of assignments
     b.    Training needs
     c.    Assumption of responsibility
     d.    Effectiveness in position

## SECTION 71
## PERSONAL PROPERTY AND EQUIPMENT

**POLICY:**  Employees are authorized to use personal property and equipment in the performance of the official duties for the department.  Most items of personal property and equipment used must first be approved in writing by the Chief of Police, who shall also require that the property be maintained in the same manner as departmental property.

**PURPOSE:**  To provide guidance for all employees concerning the use of personal property in the performance of official duties.

a.  Any employee desiring to use personal property in the performance of official duties shall submit a written request to the Chief of Police citing the reason and justification for the use of such property. The decision of the Chief of Police shall be final. An exception to this rule will apply for the use of certain property items, such as the following examples:
  1. Calculator
  2. Typewriter
  3. Slide rule
  4. Cellular phone
  5. Beeper
  As a general rule, if there is any doubt as to whether or not a particular piece of equipment should be authorized for use, the employee desiring to use the equipment shall be responsible for obtaining the authorization.

b.  Personal property items which require authorization for official duty use include, but are not limited to, the following examples:
  1. Handgun
  2. Shotgun
  3. Rifle
  4. Any other type of firearm
  5. Police Baton or similar device
  6. Pepper Spray or Mace
  7. Any other type of chemical
  8. Stun Gun of any type
  9. Bullet Proof Vests'
  10. Flashlight
  11. Handcuffs
  12. Vehicle
  As a general rule, if there is any doubt as to whether or not a particular piece of equipment is authorized for official use, the employee desiring to use the equipment shall be responsible for making that determination through the authorization process.

c.  No personal vehicle may be used as a police unit. An exception to this rule is possible upon written notice to the Chief of Police indicating the purpose, duration, etc. for the vehicle use. Personal vehicle use is possible in situations such as the following examples:
  1. Surveillance
  2. Undercover Operation
  The use of a personal vehicle in these types of situations will depend upon approval by the Chief of Police. There will be no justification, however, for an officer to use a personal vehicle as a police emergency response unit.

d.  Under certain circumstances and with the approval of the Chief of Police, employees may be authorized to use their personal vehicle when on official city business.
  ***EXAMPLE:*** *Travel to and from a conference, training course, etc.  Amount of reimbursement for personal vehicle use will be authorized by the Chief of Police or pursuant to city travel policy.*

# SECTION 72
## POLICE OFFENSES: DISCIPLINARY

**POLICY:** Employees of this department are expected to abide by all policies, procedures, rules, and regulations as established by this agency. Employees are also expected to abide by all laws, whether local, state, or federal and to always maintain a lifestyle which adheres to the moralistic values of society. Employees must be forever mindful that as a city representative, you are a public servant, (customer service representative), and as a public servant you are expected to be at all times helpful and courteous to the public for which we serve.

**PURPOSE:**  To provide guidelines for all employees to follow concerning behavior that is considered by this department to be undesirable and which will subject an employee to disciplinary action.

**DEFINITIONS:**

A.  Immoral conduct:  Any type of behavior which is contrary to established moral principles.

B.  Employees of this department who violate any of the following offenses may be subject to disciplinary action. These offenses may or may not be identified in other sections of this manual.

a.    Drinking any type of intoxicating beverage while on duty, except in the performance of assigned duties.
b.    Intoxication off-duty which affects the department.
c.    Any conduct unbecoming an employee of the department.
d.    Immoral conduct.
e.    Neglect of duty.
f.    Violation of any statute, law, or ordinance.
g.    Sleeping while on duty.
h.    Inattention to duty.
i.    Disobedience to a lawful order.
j.    Using threatening or profane language toward a supervisor or other employee of this department.
k.    Receiving a bribe, gratuity, money, or any other thing of value related to job performance.
l.    Insubordination.
m.    The mistreatment of any person in the performance of duty, (in person or on the phone).
n.    The unlawful or unauthorized use of any person in the performance of duty.
o.    Making a false report.
p.    The unauthorized release of any information concerning cases, incident records, or other items of interest to the department.
q.    Failure to wear prescribed uniform while performing a law enforcement function.
r.    Refusing to provide name and badge number when requested.
s.    Absence from duty without approved leave.
t.    Failure to immediately turn in property recovered or taken from persons arrested.
u.    Failure to appear in court on proper day and time.
v.    Failure to report any employee of the department suspected or known to have violated any rule, regulation, policy, or procedure of the department.
w.    Failure to give statements or testimony concerning the true facts in any case or by changing statements or testimony to avoid the truth or facts.
x.    Failure to properly care for and use departmental equipment.
y.    Faking illness or injury to avoid duty.
z.    Recommending the names of attorneys, bondsmen, wreckers, or physicians to any person arrested or in police custody.  Exception: Members of officer or employees family.

# SECTION 75
# POLICE VEHICLE: MAINTENANCE

**POLICY:** It shall be the policy of this department that all police vehicles will be properly maintained, cleaned, and serviced regularly.

**PURPOSE:** To provide guidelines for all employees to follow concerning proper maintenance and care of departmental vehicles.

**PROCEDURES:**

a.  It shall be the responsibility of the highest ranking supervisor or senior officer on each shift to ensure that all police vehicles used on the shift are properly maintained. Any problem(s) associated with any of the vehicles will be documented on the vehicle (unit) check sheet form, (appendix), and forwarded to the attention of the day shift supervisor/senior officer in charge.

b.  A vehicle (unit) check sheet form will be distributed by the officer in charge of each shift to all subordinates who will be operating a police vehicle during the tour of duty.

c.  This vehicle (unit) check sheet form will be completed by the employee operating the vehicle and will be completed at the beginning of the shift or as soon as possible thereafter.

d.  The vehicle (unit) check sheet form will document information pertaining to the condition of the vehicle at the beginning of the shift and will include other useful information.

e.  Information on the form will include the following:

   1.  Mileage
   2.  Condition of Tires
   3.  Condition of vehicle exterior, (dirty, damaged, etc.)
   4.  Condition of vehicle interior, (dirty, damaged, etc.)
   5.  Gas in vehicle
   6.  Oil in vehicle
   7.  Battery cables checked
   8.  Battery water checked
   9.  Exterior lights checked, (headlights, taillights, blinkers, parking lights).
   10. Horn checked
   11. Emergency equipment checked, (emergency lights, siren, overhead speaker).
   12. Spotlights checked
   13. Spare tire checked
   14. Communications equipment, (police radio), checked
   15. Fire extinguisher checked
   16. Prisoner passenger area checked
   17. Any property, (contraband or other), located in the vehicle, if so where in the vehicle was item(s) located and a brief summary of property disposition---placed in evidence---secured by senior officer, etc..
   18. A comments section on the form is for the purpose of explaining any problems associated with the vehicle such as mechanical or other.

f.  Following inspection, any defects, including body or interior damage, will be properly documented and reported immediately to the supervisor prior to beginning the tour of duty.

g.  Each officer shall search the vehicle he/she is operating, not only prior to the start of a shift but also after any person is placed in or transported in the vehicle.

h.  The day shift supervisor/senior officer will be responsible for assuring that all police vehicles are washed and cleaned regularly. This shouldn't be necessary every day, but the vehicles should always be neat in appearance.

i.  The driver of a police vehicle on the day shift will be responsible for notifying the supervisor/senior officer in charge when a vehicle is in need of cleaning and will also be responsible for keeping the interior of the unit clean and free from dirt, trash, and objects on the floor and under the seats.

j.  The day shift supervisor/senior officer in charge will be responsible for assuring that all preventive maintenance, oil change, brakes repaired, etc. is accomplished on any police vehicle that is in need of such service.

k.  The day shift supervisor/senior officer will be made aware of any problems with police vehicles by reviewing the entire vehicle check sheet forms which will be forwarded to his/her attention.

l.   The supervisor/senior officer on each shift will be responsible for making sure any police vehicle is decontaminated, (properly cleaned with necessary bio-hazard chemicals), after any incident in which the police vehicle becomes contaminated. NOTE: A vehicle will become contaminated at any time that an individual, prisoner or non-prisoner, releases bodily fluid, (blood, urine, vomit, feces, etc.), into the vehicles interior.

m.  The supervisor/senior officer in charge will assure that OSHA, (Occupational Safety and Health Administration), guidelines are followed when a contaminated vehicle is cleaned.

n.  The following procedures will be followed when cleaning a contaminated vehicle:
Proper protective equipment will be provided to the person(s) involved in the cleaning task. Equipment will always include a pair of disposable gloves and depending on the circumstances will sometimes require the use of a gown, a mask, and protective eyewear.

    1.  An anti bacterial soap will be provided for handwashing purposes and any individual involved in the cleaning effort will be instructed to use the soap when the cleaning is finished.

    2.  All disposable material as a result of the cleaning effort will be disposed of in accordance with OSHA regulations which stipulate the use of containers displaying warning labels indicating "biohazard". The purpose of the container is to warn employees or any other person(s) of the potential danger associated with the waste, and that the container should be handled with care.

# APPENDIX

**Vehicle (Unit) Check Sheet**

Unit # _____ Mileage _____

Condition of tires _____

Condition of unit exterior _____

Condition of unit interior _____

Gas in unit _____ Oil in unit _____

Battery cables checked _____ Battery water checked _____

Exterior lights checked _____ Horn checked _____

Emergency equipment checked:

Emergency lights _____ Siren _____ Overhead speaker(s) _____

Spotlights checked _____ Spare tire checked _____

Communications equipment checked_____

Fire extinguisher checked _____ Prisoner passenger area checked _____

List any property, (contraband or other), located inside the unit: _____

_____

_____

_____

Comments: _____

_____

_____

_____

Officer Signature: _____

# SECTION 76
# POLICE VEHICLE: OCCUPANTS

**POLICY:**   For the benefit of Law abiding citizens who have a desire to become more aware of law enforcement operations, it shall be the policy of this department to adopt a ride along program which will allow civilian passengers to ride in a police vehicle when it has been authorized by the Chief of Police or his/her designee. Passengers in a police vehicle, other than for official business or those who have been authorized, are prohibited with the exceptions as outlined herein.

PURPOSE: To reduce the possibility of liability resulting from the death or injury of an unauthorized person in a departmental vehicle and to provide the general public the opportunity to experience actual problems and complexities involved in providing law enforcement services.

PROCEDURES:

A.   The Chief of Police or his/her designee will be responsible for determining whether or not an individual, other than a prisoner, is authorized to be transported in a police vehicle.

B.   Law enforcement officers, because of the nature of the job, at times will have to use discretion in determining whether or not to allow an individual or group to be transported in a police vehicle. It is impossible to account for every situation that might arise during a tour of duty; however, as a general rule an officer may allow transport of passengers in the following situations:
   1.   A police cadet who has been previously processed and assigned to duty.
   2.   A police officer from another agency who is working in conjunction with this department.
   3.   Victims
   4.   Witnesses
  5.  In situations where transport is necessary to protect life or property.

B.   At any time an officer allows passenger transport in a police vehicle, other than that authorized by the Chief of Police or his/her designee, a report will be filed documenting the reason for the transport.

C.   A ride along program will be made available to the general public and will be administered in the following manner:
   1.   Any person or group wishing to participate in this program will be referred to the Chief of Police or his/her designee for processing of an application, (appendix 1).
   2.   The application will be processed and based on information developed the applicant will be notified as to whether or not he/she is qualified to ride.
   3.   In most situations a law abiding citizen wishing to ride and completing all necessary requirements will be granted that opportunity.
   4.   Any individual who is a convicted felon or is suspected to be involved in criminal activity will not be allowed to participate in this program.
   5.   Any applicant who qualifies to ride will be required to complete a release of liability form, (Appendix 2). Prior to riding in a police vehicle.
   6.   Any applicant qualifying to ride will only be allowed to participate in this program once a year.
   7.   Whenever a rider is participating in the program, he/she will not be allowed to exit the police vehicle at any time to assist an officer on a call.

D.   Employees who violate this policy will assume the responsibility and personal liability for their actions and results of their actions.

**(Appendix 1)**

**Ride Along Program Application**

Name _____

Address _____

_____

Date of birth _____, SS # _____

Place of employment _____

How long so employed _____

Previous employer _____

Previous address _____

Name of spouse _____

Maiden Name (if applicable) _____

Have you ever been arrested? _____, if so for what reason _____

_____

Nicknames used _____

Drivers License # _____, State _____

Note: At least two pieces of identification must be presented, (one with photo), before any person will be authorized to ride along.

**(Appendix 2)**

**Ride Along Program
Release Of Liability Form**


I, _____ ,

      First Name                      Middle Name                 Last Name


do hereby release _____ ,

                               Name of Police Agency

from any liability resulting from any injury I might receive as a result of riding with a police officer in a police

vehicle which is the property of the agency named above.


I have also been informed of the possible dangers associated with law enforcement work and understand completely

that there are dangers involved in riding in a police vehicle for which a police officer is on patrol, issuing traffic

citations, serving warrants' for arrest, responding to various types of crimes or calls for service, and making

physical arrests' when necessary.


I also agree to abide by all the rules associated with the ride along program. Rules include the following:

1. Riders will remain in the police vehicle at all times unless otherwise instructed by the officer with whom they are riding.
2. Riders will not be communicating with anyone who is the subject of a police investigation, who is being arrested, or who is otherwise involved in any police action.
3. Riders will not carry or attempt to use any type of weapon.
4. Riders will follow instructions of the officer with whom they are riding.


Signature of Rider_____


Signature of Officer arranging the ride along _____


Signature of Witness _____


Date _____, Time _____

# SECTION 79
## POLICE VICTIM ASSISTANCE

**POLICY:**   Law enforcement officers are often in a unique position to provide assistance to victims of crime and other traumatic incidents that may have both immediate and long-term impact on their emotional recovery.  Also, victims who feel that they were treated with understanding and concern for their hardship and suffering more frequently become enthusiastic about cooperating with the investigation and assisting in the prosecution.  Therefore, it is the policy of this department to enhance the treatment of victims and survivors of crime and noncriminal crisis situations by providing the assistance and services necessary to speed their physical and emotional recovery, and to support and aid them as they continue to interact with the criminal justice system.

a.  Safety and Security
   (1)  Officers are responsible for securing the crime or incident scene to protect lives and ensure safety.
   (2)  Officers shall render emergency aid to individuals who have suffered physical injuries, and shall, as soon as possible, summon any necessary medical assistance.
   (3)  Where physical injuries are not apparent, victims shall be asked if they are injured and whether medical attention is required.
   (4)  In order to reduce fright and promote victim communication, victims should be informed as soon as appropriate that they are no longer in immediate danger.
   (5)  Recognizing that victims often suffer physical and/or emotional shock, officers shall assist them in making decisions and keep them informed of law enforcement actions and requirements.
   (6)  Whenever possible, law enforcement officers should not leave a distraught victim alone.  Arrangements should be made to have a relative, friend, or family or departmental clergyman join the victim for emotional support and comfort, or arrange for transportation of the victim to a friend, family member or other appropriate service provider.
b.  Providing Emotional Support
   In order to calm and assist the victim in regaining composure, officers shall
   (1)  allow the victim a reasonable period of time in which to express feelings and emotions while describing what happened during the incident;
   (2)  express empathy for the victim and recognition and understanding for emotional reactions;
   (3)  provide reassurance that the victim's feelings are normal and understandable;
   (4)  not be overtly judgmental of the victim's feelings and emotions or the apparent lack thereof, or of victim judgments or actions related to the incident;
   (5)  help redirect any self-blame and responsibility for the criminal act from the victim to the perpetrator; and
   (6)  emphasize your commitment and that of the department to assist and work with the victim.
c.  Information and Referral
   Before leaving the scene, it is important that officers take the steps necessary to meet victims' needs for support and information.  These include
   (1)  providing a brief overview of what actions will be taken shortly thereafter, and answering such questions as, "Will a criminal investigator contact the victim?,"  "Will evidence technicians be used at the scene?," "Will lineups or showups be held?,"  and "What other law enforcement actions will be taken?";
   (2)  providing information on victim service agencies available in the community; and
   (3)  leaving names and telephone numbers where the victim can reach the officer or the criminal investigator at the department, and encouraging the victim to use the number to report additional information about the incident or to request information or assistance.
d.  Follow-up
   Lack of information about case status is one of the greatest sources of dissatisfaction among victims of crime and victims' survivors.  Therefore, officers assigned to criminal investigations shall make routine victim call-backs in order to determine whether the victim has new information concerning the case, to ascertain whether the victim is in need of assistance from outside sources or the department, and to relay information relating to such matters as
   (1)  the status of stolen, recovered or removed property;
   (2)  the arrest and detention of suspects, and their pretrial release status;
   (3)  the victim's possible eligibility for victim compensation;
   (4)  court restraining orders;
   (5)  court proceedings and schedules; and
   (6)  the operations of the department and the criminal justice system.

# SECTION 80
# POLITICAL ACTIVITY

**POLICY:**  All involvement in political activity shall be in compliance with existing Arkansas Codes.

**PROCEDURES:**

a.   In those departments organized under civil service procedures, no employee shall engage in the solicitation of any subscription funds or assessments, or contribute thereto, for any political party or purpose.

   (1)   An employee shall not be connected with any political campaign or political management except to cast his vote and to express his personal opinions privately.

   (2)   An employee shall not:

      (a)   Use their offices to influence elections or nominations or for other political purposes.
      (b)   Solicit or receive political contribution while on duty, while in uniform, or performing a function that is clearly related to city employment.
      (c)   Require or advise other employees to make political contributions.  Employees are encouraged to exercise their right as a citizen to vote and time off will be granted for this purpose.

b.   **In compliance with ACA 14-52-109,** Notwithstanding any law to the contrary law enforcement officers of cities and incorporated towns shall not be prohibited from engaging in political activities except when on duty, when in uniform, or when acting in an official capacity, nor shall they be denied the right to refrain from engaging in political activities.

   (1)   Employees shall not:

      (a)   Use their offices to influence elections or nominations or for other political purposes.
      (b)   Solicit or receive political contribution while on duty, while in uniform, or performing a function that is clearly related to city employment.
      (c)   Require or advise other employees to make political contributions.
      (d)   Employees are encouraged to exercise their right as a citizen to vote and time off will be granted for this purpose.

# SECTION 81
# PROBATION PERIOD

**POLICY:** Probationary periods are established primarily for the purpose of allowing an agency to monitor the abilities of new employees, employees who have been promoted into a position of higher authority, and employees who are placed on probation for some type of infraction. All employees of this agency, below the level of Department Head, appointed or promoted shall be required to complete a probationary period as set forth herein.

**PURPOSE:** To provide all employees with information concerning Probationary requirements as established by this department and by the Arkansas Commission on Law Enforcement Standards and Training.

**PROCEDURES:**

A.  Law Enforcement Personnel
   a.  The Arkansas Commission on Law Enforcement Standards and Training has established minimum probationary periods for law enforcement officers as stated in the rules and regulations manual of that agency, (CLEST Manual - Regulation 1003). The regulations include the following:

   1.  Every officer employed or appointed below the level of department head shall satisfactorily complete a probationary period of not less than twelve (12) months with the employing department.
   2.  A department head is not required to serve a probationary period.
   3.  Every officer who is promoted or appointed as an assistant department head, middle management or supervisory position shall satisfactorily complete a probationary period of not less than six (6) months.
   4.  No law enforcement officer who lacks the training qualification required by the Commission may have his temporary or probationary employment extended beyond one year by renewal of appointment or otherwise, unless extraordinary circumstances exist in the majority opinion of the Commission whereupon the Commission may approve an extension of probation for no more than an eight (8) month period of time.

B.  Civilian Personnel:
   a.  All civilian employees, (non-sworn personnel), shall satisfactorily complete a probationary period of not less than one (1) year.

   b.  Examples of civilian employees include, but are not limited to, the following:
   1.  Clerks
   2.  Telecommunications Personnel, (dispatchers)
   3.  Jailer/matron
   4.  Secretary

C.  Anytime during the probationary period that it is determined and documented that an employee is not capable of satisfactorily performing the job for which he/she was hired the supervisor in charge of the employee in question will:
   1.  Forward an agency memo to the Chief of Police briefly describing the employee situation.
   2.  Forward all documentation of training, counseling, or other actions taken concerning this employee to the Chief of Police.

D.  The Chief of Police will decide what action shall be taken concerning any probationary employee who is determined to be incapable of satisfactorily performing the job for which he/she was hired.

E.  Action taken in this type of situation will depend on all the circumstances associated with each occurrence.

F.  Performance evaluations will be performed on probationary employees as stated in the Performance Evaluation policy of this department.

# SECTION 82
# PROMOTIONAL PROCEDURES

**PURPOSE**: To establish standard criteria for the promotion of Police Officers.

**PROCEDURE**: An eligibility list for promotion to the rank of shall be established annually. All eligible candidates shall be included on a list in rank order according to the following point system:

1. **Job knowledge**: Total of 30 promotional points possible.
   (a.) Job knowledge shall be evaluated by a written examination. The examination shall be obtained from a reputable provider and consist of validated questions related to duties of a Law Enforcement Officer with this agency.
   (b.) A minimum passing score for each examination shall be established by the Chief of Police. Promotional points to be awarded in this category shall be proportional to the number of questions answered correctly beyond the number required for a minimum passing score so that no points are awarded for minimum passing and thirty points are awarded for a 100% score.

   > *EXAMPLE*:
   > If passing score is 70%:
   > 70% score = 0 promotional points
   > 71% score = 1 promotional point
   > 72% score = 2 promotional points
   > 73% score = 3 promotional points
   > 100% score = 30 promotional points

   (c.) The number of times an existing examination score may be used in lieu of taking another examination shall be established by the Chief of Police.
   (d.) A written examination shall be administered in March of each year.

2. **Experience**: Total of 30 promotional points possible.
   (a.) All promotional points earned in this area will be established as of January of each year. Points earned on the last day of December will be counted, and points earned on January 1 and thereafter, will not be counted until the following year.
   Although 50 points are possible in this category, only 30 will be allowed. Any combination of points shall be acceptable to permit officers to earn the most possible points with a limit of 30 promotional points. Promotional points may be earned in any combination of the following:

   1. **Seniority** - 10 points maximum.
   2. **Corporal Status** - 10 points maximum.
      (a) Each Corporal shall receive one promotional point for each twelve (12) months as a Certified Corporal.
   3. **Field Training Officer** - 10 points maximum.
      (a) Each Field Training Officer shall receive one half of one promotional point for each six (6) months in that assignment.
   4. **Attendance** - 5 points maximum.
      (a) Each officer shall receive one half of one promotional point for each calendar year in which he/she takes twenty (20) hours or less off due to personal or family illness or injury. Job related illness or injury shall not be cause for denial of any promotional points.
      (b) Each Officer shall receive 1/4 of one promotional point for each calendar year in which he/she takes more than twenty (20) hours but less than forty one (41) hours off due to personal or family illness or injury. Job related illness or injury shall not be cause for denial of any promotional points.
      (c) A calendar year shall be from January 1 through December 31 of each year (inclusive).
   5. **Safe Driving** - 5 points maximum.
      (a) Each Officer who routinely operates an emergency vehicle during their regular duty assignment shall receive 1/2 of one promotional point for each calendar year in that assignment without a preventable (avoidable) accident. A calendar year shall be from January 1 through December 31 of each year (inclusive).
   6. **Firearm Skills** - 5 points maximum.
      (a) Each Officer shall receive 1/2 of one promotional point for each firearm qualification score of 85% or more on a firearms training course up to two times in each calendar year. Failure to attain a qualifying score on any regularly scheduled fire-arms training or failure to qualify as required by the Police Department policies shall result in the denial of all promotional points for firearms skills for the year in the failure to qualify or violation of policy occurred. A calendar year shall be from January 1 to December 31 each year (inclusive). Two firearms training courses shall be scheduled by the Rangemaster during each calendar year.

7.  **Education**: 30 Promotional points possible.
   (a.) The equivalent of fifteen (15) semester units are required to be eligible for promotion. One promotional point will be awarded for each three (3) semester units earned in excess of the required fifteen.
   *EXAMPLE:*
   18 semester units - 1 promotional point
   21 semester units - 2 promotional points
   105 semester units - 30 promotional points
   (b.) Four quarter units shall be equivalent to three semester units.
   *EXAMPLE:*
   20 quarter units - 0 promotional points
   24 quarter units - 1 promotional point
   28 quarter units - 2 promotional points
   120 quarter units - 30 promotional points
   (c.) A maximum of 30 promotional points can be earned in this category. Units earned in excess of 105 semester units, or 120 quarter units, will not be converted to promotional points.
   (d.) Each Officer shall be responsible for submitting proof of college units earned to the Chief of Police prior to March 1 of each year. Total points in this category will include all units earned prior to March 1st of each year. Classes in progress on March 1st will not be counted when establishing eligibility for that year.

8.  **Performance Evaluations** - 30 points maximum.
   (a.) Each candidate may earn up to 30 promotional points on the basis of his/her last three (3) annual performance evaluations. The following areas of performance evaluations shall be considered:
      (1) Planning and organizing work;
      (2) Thoroughness;
      (3) Accuracy;
      (4) Neatness of work product;
      (5) Oral expression;
      (6) Written expression;
      (7) Amount of work performed;
      (8) Completion of work on schedule;
      (9) Observance of working hours;
      (10) Coordination with others;
      (11) Willingness to assume responsibility;
      (12) Initiative or self starting energy;
      (13) Meeting and handling the public;
      (14) Performance in new situations;
      (15) Performance under pressure.
   (b.) Levels of performance (1 through 5) are indicated on evaluations in each of these listed areas. Points shall be awarded for levels of performance in each of the 15 areas in the following manner:
      Level 1      -      0 points
      Level 2      -      0 points
      Level 3      -      1/2 point
      Level 4      -      1 point
      Level 5      -      2 points
   (c.) If no performance level is indicated on a rating, one half (1/2) point will be awarded in the performance area that is left blank.
   (d.) The total points earned in the last three annual evaluations will be divided by three to determine the total promotional points to be awarded in this category.
   (e.) After the promotional points of all candidates in all categories have been determined, an eligibility list shall be established. The candidate with the most points will be listed first; the candidate with the second most points shall be listed second, and so on. Each candidate shall be advised of his/her standing on the list.
   (f.) The eligibility list to be used for promotion shall be the list that is in effect at the time that a vacancy occurs.
   (g.) Vacancies will be filled as soon as they occur by promoting candidates from the eligibility list in descending order. The Chief of Police may pass over a candidate for promotion and promote the next eligible person on the list providing that he first notifies the passed-over individual, in writing, of the reasons therefore. In the event of a tie, the Chief of Police may select any of the tied candidates on the basis of whatever criteria he shall establish.

# SECTION 83
# PROPERTY: DEPARTMENTAL

**POLICY:** Employees of this department will be issued departmental property according to each job description. It shall be the policy of this department to hold each employee responsible for the property assigned to them for use.

**PURPOSE:** To provide guidelines for all employees to follow in issuing or receiving departmental property, taking care of departmental property, reporting departmental property as lost or stolen, and in replacing equipment which has ceased to function properly.

**PROCEDURES:**

A.  Property assigned:

1.  Property will be assigned to all employees as needed and will be disseminated by the Chief of Police or his/her designee.
2.  Any time property is issued to an employee for exclusive use by that employee, a Property Assignment Form, (Appendix 1), will be completed and signed by the employee issuing the property and signed by the employee receiving the property. General office supplies, such as paper, ink pens, batteries, etc. are excluded from this requirement.
3.  Any time property is returned by an employee, who has had exclusive use of the item, a Returned Property Assignment Form, (Appendix 2), will be completed and signed by the employee receiving the property and signed by the employee returning the property.
4.  Records of property assignments and property returns will be maintained in the employees personnel file.

B.  Care of Property:

1.  It shall be the responsibility of each employee receiving departmental property to take proper care of the property. Proper care of property, for purposes of this policy, is defined as using the property in the manner it is supposed to be used, keeping the property item clean and functional, and never misusing a property item.
2.  Officers receiving department issued handguns will be trained on proper cleaning and care of this property item and will be required to make sure the handguns are clean and functional at all times. Officers authorized to carry personally owned handguns will also be required to make sure the handguns are clean and functional at all times.
3.  To insure compliance with this provision, a firearms instructor, as directed by the Chief of Police, will conduct inspections of handguns on an irregular basis. **NOTE:** Inspections will also include handguns which are the property of individual officers, since it is imperative that handguns are properly maintained. Handguns will be checked for cleanliness and proper functioning.
4.  Any misuse of departmental property, either intentional or due to negligence, will result in the employee who is assigned responsibility for the property being required to pay for the item(s) in question and also being subject to disciplinary action.
5.  Any employee who is aware of another employee misusing departmental property will report the misuse to the Chief of Police or the appropriate supervisor.
6.  Any supervisor who receives information of departmental property misuse will take immediate action by inspecting the property in question and taking further employee action as necessary.
7.  Any supervisor who personally observes employee misuse of property will take immediate action by suspending the employee in question from duty assignment and scheduling the employee to meet with the Chief of Police at a time the Chief will be available.
8.  All alleged acts of departmental property misuse will be properly documented in the form of a departmental memo. The memo will be prepared by the supervisor in charge and will be directed to the attention of the Chief of Police. The memo will include the following information:
    a.  Date of misuse
    b.  Time of misuse
    c.  Name of employee(s) involved
    d.  Names of any possible witness
    e.  Detailed narrative
    f.  Signature and printed name of supervisor

C.  **Lost or Stolen Property:**

    1.  Any employee who accidentally loses a departmental property item will report the loss to the Chief of Police or the supervisor in charge at the time the loss is discovered.

    2.  Any employee who discovers that a departmental property item has been stolen, either while at work, at the employees home, or any other time and location will immediately report the theft to the Chief of Police or the supervisor in charge at the time the theft is discovered.

    3.  Any employee who either loses departmental property or discovers that a property item has been stolen will properly document the circumstances by preparing the appropriate report, offense for the theft and incident for the lost property. **(Refer to Section 92 of the Policy Manual titled REPORT: OFFENSE/INCIDENT).**

D.  **Dysfunctional Departmental Property**:

    1.  Any employee who is issued departmental property that ceases to function properly, such as flashlight, handcuffs, computer, etc. will report the problem to the Chief of Police or the supervisor in charge at the time the problem is discovered.

    2.  The Chief of Police or supervisor in charge will replace any dysfunctional departmental property as quickly as possible after the problem is discovered.

    3.  Any time that a piece of departmental property is determined to be dysfunctional and is subsequently transferred to surplus or disposed of according to city policy, the supervisor in charge of the transfer or disposal will be responsible for documenting this information for inventory purposes.

    4.  Documentation of transferred or disposed property, other than forms required by the city administrative office, will consist of a departmental memo directed to the Chief of Police. The memo will include the following information:

        a.  Property item

        b.  Date and time the property item is discovered to be dysfunctional.

        c.  Name of employee who was assigned the property or if not specifically assigned, who discovered the problem.

        d.  Model/serial number or any other identification number assigned to the property in question.

        e.  Describe the problem with the property in question.

        f.  Signature and printed name of supervisor.

    5.  A record, for inventory purposes, will be kept of all disposed or transferred property. These records will be filed as directed by the Chief of Police.

E.  The Chief of Police will be responsible for the strict enforcement of this section.

# APPENDIX 1
## Property Assignment Form

On _____ at _____ I _____ ,
     Date         Time                        Name

did receive the following property:  (Describe property and record any identification numbers)

_____

_____

_____

_____

_____

The property is being issued by _____
                                               Printed Name

## Acknowledgment

I understand that the property described above belongs to _____ .
                                                Name of Department
I also understand that in receiving this property its care becomes my responsibility, and I will report to my

supervisor should the property cease to function properly or if it is lost or stolen.

_____
Signature of employee **RECEIVING** property

_____
Signature of employee **ISSUING** property

83.3

**APPENDIX 2**
**Returned Property Assignment Form**

I _____ did receive the
   Printed name of employee **RECEIVING** property

following property from _____

_____
                    Name of employee **RETURNING** property

on _____ at _____.
       Date            Time

          Describe the property below and record any identification numbers

_____

_____

_____

_____

_____

_____

_____

The property described above is being returned for the following reason:

_____

_____

Condition of Property: _____

_____

_____

_____
                    Signature of employee **RETURNING** property

_____
                    Signature of employee **RECEIVING** property

# SECTION 84
## PROPERTY: DISPOSITION

**POLICY:**  Property that has been held by this department must be disposed of in a manner authorized by law, and will be disposed of in a systematic manner in order to avoid an overwhelming accumulation of property items. The Chief of Police, or his/her designee, will seek applicable court orders as needed to accomplish such final disposition of property. Under no circumstances will an employee convert any property of this type to his/her personal use.

**PURPOSE:**  To provide guidelines for all employees to follow in handling, storing, and disposing of property items which are being held by this department.

**PROCEDURES:**

A.  Property Classifications:  Items coming into the possession of this department will be classified in one of the following categories:
1.  Evidence
2.  Recovered Property
3.  Seized Property
4.  Found Property
5.  Stored Property
6.  Personal Belongings

B.  Definitions:
1.  Evidence:   This property includes items which may be used in conjunction with criminal proceedings. Stolen property, as an example, is evidence whether or not a suspect has been arrested in a case.
2.  Found Property:   Items of property which come into the possession of this department and for which the owner of the property is unknown. Property found by a citizen, for example, and turned in to the police department.
3.  Recovered Property:   Property that has been recovered as the result of an investigation, however the property owner is unknown. Property believed to be stolen, but this fact cannot be established, is an example of this property classification.
4.  Seized Property:   Property or contraband that has been seized during the execution of a lawful act by an officer of this agency. This includes articles for which the owner may or may not be known.
5.  Stored Property:  Property for which the identity of the owner is known, however, the owner has failed to claim.
6.  Personal Belongings:   Property which is the personal belongings of persons taken into custody which will be returned to the person upon release or transfer to another facility.

C.  Disposition of Property: Destruction, retention or sale of property which comes into the possession of this department shall be governed by state law, **(AR CODE 5-5-101 or 5-5-201— 5-5-204)**. The city attorney is to be contacted if any questions arise concerning the legality of the disposal process.

   ➢  **NOTE:**  In accordance with AR CODE 5-5-101, all unclaimed property items or contraband shall be transferred to the sheriff of the county in which the seizure took place and either destroyed or sold at public auction,  depending on the property type and its usefulness. The sheriff is to hold the auction and all proceeds from the  sale of the property, less the cost of sale and storage charges, shall be paid into the general fund of the county.

   ➢  **NOTE:**  In accordance with AR CODE 5-5-201 --- 5-5-204, all conveyances, including aircraft, motor vehicles, and vessels, which are seized by this department as a result of being used to promote a criminal  enterprise shall be subject to forfeiture. Any officer involved in seizing property of this type will notify the prosecuting attorneys' office and request that a petition to seize the property item be filed in circuit court. The officer involved will further assist the prosecuting attorney in completing the petition process. The officer will also submit an incident report, forwarded to the Chief of Police through the chain of command, explaining the  seizure and the final disposition of the property.

   ➢  **Note:**  All property items as listed below which are subject to being returned to the property owner will be  returned or documentation of at least two attempts to return the property will be filed in the property folder. Otherwise property disposition will proceed in the following manner:

84.1

1. Evidence:   All evidence stored by this department will be held until it has been used in court and all appeals pertaining to the evidence have been exhausted, or a decision has been made that it will not be used in court. When evidence is to be disposed of, it shall either be destroyed or transferred to the county Sheriffs' Department to be sold at public auction, depending on the type of property. This procedure will always be accomplished in accordance with state law.

2. Found Property:   Property will be held for a period of time as applicable by state law. It shall be disposed of by either being destroyed or transferred to the county Sheriffs' Department to be sold at public auction, depending on the property type. Property destruction or transfer will be accomplished in accordance with applicable law.

3. Recovered Property:   Property will be held for a period of time as applicable by state law. It shall be disposed of by either being destroyed or transferred to the county Sheriffs' Department to be sold at public auction, depending on the property type, and will be disposed of in accordance with state law.

4. Seized Property:   Property will be held for a period of time as applicable by state law. It shall be disposed of by either being destroyed or transferred to the county Sheriffs' Department to be sold at public auction, depending on the property type, and will be disposed of in accordance with state law.

5. Stored Property:   Property will be held for a period of time as applicable by state law. It shall be disposed of by either being destroyed or transferred to the county Sheriffs' Department to be sold at public auction, depending on the property type, and will be disposed of in accordance with state law. NOTE: Documentation must exist showing that the owner of the property was contacted and given an opportunity to recover the property in question.

6. Personal Belongings:   Property of this type will not be kept, except under the following circumstances:
   a. Prisoner refuses to accept the property upon release from agency custody.
   b. Prisoner dies while in agency custody.
   If a prisoner refuses to accept their personal belongings, the property will be reclassified as STORED PROPERTY and will be subject to the stored property provision. If a prisoner dies while in custody and has personal belongings in the property storage area, notification will be made to the deceased next of kin who will be given the opportunity to recover the property in question. If not released, the property will be classified as STORED PROPERTY and will be subject to the stored property provision.

D. Receipt and Storage of Property:
   1. The following procedures shall govern the receipt and storage of property which comes into the possession of this department:
      a. All items will be placed into a secured storage area as quickly as possible after possession is acquired.
      b. If an item is too large for storage in the designated storage area, it may be stored elsewhere under the direction of the Chief of Police or the supervisor/senior officer in charge at the time of storage.
      c. An officer placing any item, regardless of the classification, into storage shall complete a Property Inventory Form (PIF), (APPENDIX 1).
      d. A copy of this form will be attached to each reporting document, (arrest report, offense report, incident report, accident report, etc.).
      e. The original Property Inventory Form will remain with the stored item(s).
      f. Any officer receiving or removing personal property from a prisoner will provide the prisoner with a copy of the Property Inventory Form.
      g. Upon release, a prisoner will be required to sign the original Property Inventory Form before his/her personal property can be released.
      h. Should a situation occur which would render a prisoner incapable of signing the Property Inventory Form, a family member can sign the form for release of property upon approval by the Chief of Police.
      i. The following information will be included on the Property Inventory Form:
         1. Date, time and location where property came into possession of this department.
         2. Officer(s) taking possession of the property, (printed name and signature).
         3. Description of property
         4. Classification of property
         5. Offense number
         6. Bin number where property is stored in the storage area
         7. Suspects (names, addresses, descriptive information, additional information)
         8. Owner of property (names, addresses, phone numbers)
         9. Signature spaces for owners of property to sign upon release of property items.

84.2

       10.  Disposition of property item----destroyed, transferred, etc.
       11.  Date and time of destruction, transfer, etc.
       12.  Signature of department employee(s) having the property destroyed, transferred, etc.
       13.  Signature of witness present when the property is destroyed or transferred.

E.   Transfer of property for departmental or other use:
    1.  When property is ready for disposition, the owner of the property is unknown, and it is determined that the property item in question can be used by the department, the following procedure will apply: The Chief of Police, or his/her designee, may petition the court of jurisdiction to transfer the property item to the police department in accordance with applicable laws.
    2.  When the normal method of disposition would work an irrevocable harm or needless waste of a valuable article, the Chief of Police, or his/her designee, may petition the court for an alternate method of disposition.

F.   Alive or Perishable Property:
    1.  For property which is alive or perishable, the officer seizing or otherwise receiving the property shall immediately petition the court of jurisdiction for disposition or storage instructions. The court orders will be followed and these instructions will be documented on the Property Inventory Form.

G.  Inventory and records of property destruction:
    1.  An annual inventory of property will be conducted by the Chief of Police, or his/her designee, to determine what property should be disposed of.
    2.  Prior to disposing of any property, the Chief of Police will assign a department employee to complete a list describing the property to be destroyed. The list will include case numbers, property classifications, and any other pertinent information concerning each item.
    3.  A copy of the property list will be forwarded to the Chief of Police and to the prosecuting attorneys' office for review and concurrence.
    4.  Once concurrence for the property list is received, the employee who prepared the list will secure the necessary court orders for final disposition.
    5.  Complete records will be kept, in an area designated by the chief of police, of all property dispositions. These records will include the following information: NOTE: A copy of the P.I.F. should have the necessary information for records purposes.
       a.  Date and time of disposition
       b.  Method of disposition
       c.  Court order number
       d.  Agency case number
       e.  Agency employee in charge of destruction, transfer, etc.
       f.  Witness to the disposition
       g.  Any other pertinent details

# Property Inventory Form

Police Department Case Number: _____

Date: _____ Time: _____ Where, why, and how did this property come into the possession of this

agency, (explain): _____

_____

_____

_____

_____

_____

Describe property: For multiple items see supplement.        (Property stored in Bin # _____)

Item _____ Classification _____

_____

Owner of property, address, phone number and any other pertinent information: _____

_____

_____

Suspect(s): _____

_____

Printed name of employee taking possession of property: _____

Signature of employee taking possession of property: _____

Disposition of Property:
1.  Released:    Date: _____    Time: _____
2.  Destroyed:  Date: _____    Time: _____    Method _____
3.  Transferred: Date: _____   Time: _____    Location _____

Property released to (Signature): _____

If Destroyed or Transferred, Court Order # _____

Signature of employee making final disposition: _____

Signature of Witnesses: _____

_____

84.4

## Property Inventory Form Supplement

Item # 2: _____ Classification _____

_____

Item # 3: _____ Classification _____

_____

Item # 4: _____ Classification _____

_____

Item # 5: _____ Classification _____

Additional Items: _____

_____

_____

Additional Information about the property listed: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Signature of employee: _____

84.5

## SECTION 85
## PSYCHOLOGICAL AND PHYSICAL EXAMINATION

**POLICY:** It shall be the policy of this department to, at any time, require an employee to undergo a physical or psychological examination, or both, for investigative purposes or for cause due to mental or physical concerns brought to the attention of the Chief of Police. The cost of an examination, under these circumstances, will be the responsibility of the department.

**PURPOSE:** To provide guidelines for all employees to follow concerning the physical and psychological examination requirements of this department.

**PROCEDURES:**
A. Police Officer Applicants:
   1. The State of Arkansas, through its Executive Commission on Law Enforcement Standards and Training, establishes Minimum Standards for employment of law enforcement officers which includes a physical and psychological examination.
   2. Every applicant for police officer, prior to being employed by this department, must be examined for emotional stability and physical condition by an individual licensed and qualified to perform the examinations. The examiners shall make a recommendation to the employing agency concerning the applicant's suitability for employment.
   3. Specifications S-5 and S-7 of the Commission on Law Enforcement Standards and Training Manual of Rules and Regulations will be used as a guideline for physical and emotional requirements for police officer applicants.
   4. If a physician or mental health professional indicates the presence of a condition that could limit an officer's physical or emotional ability to cope with the stress of law enforcement duties, he/she will not be eligible for certification as a law enforcement officer with this department.
B. Certified law enforcement personnel:
   1. After employment, the department reserves the right to have a police officer reexamined at anytime to determine his/her continued fitness for duty.
   2. The department will only request that an officer be reexamined under the following conditions:
      a. For purposes of a criminal or internal investigation
      b. For suspicions of emotional or physical problems due to documented accounts of an officer's psychological behavior or decline in physical health.
   3. If a qualified physician or mental health professional indicates the presence of a condition that could limit an officer's physical or emotional ability to perform his/her duties, the officer in question will be placed on sick leave in accordance with departmental policy.
   4. Any officer placed on sick leave, due to circumstances listed in provision 3 above, will not be allowed to return to work until being released from care and a letter is submitted from the health care professional indicating that the officer in question is physically or emotionally fit for duty.
C. Civilian Personnel:
   1. Civilian employees are not required to undergo a physical or psychological examination prior to employment, however, the department will have the right to have a civilian employee examined at any time after employment to determine his/her fitness to perform their duties.
   2. The department will only request that an employee be examined under the following circumstances:
      a. For purposes of a criminal or internal investigation.
      b. For suspicions of physical or emotional problems due to documented accounts of an employees' psychological behavior or decline in physical health.
   3. If a qualified physician or mental health professional indicates the presence of a condition that will adversely affect or prevent the employee from performing their duties, the employee in question will be placed on sick leave in accordance with departmental policy.
   4. Any employee placed on sick leave, due to circumstances listed in provision 3 above, will not be allowed to return to work until being released from care and a letter is submitted from the health care professional indicating that the employee in question is physically or emotionally fit for duty.
D. Responsibility:
   1. It shall be the responsibility of the Chief of Police to enforce this policy. The Chief will, however, expect any employee to report any suspicious behavior or suspected decline in health of any other employee.
   2. It is the responsibility of each employee to abide by the procedures as outlined. Any employee refusing to submit to a physical or psychological examination after a request is made by the Chief of Police will be subject to dismissal.

## SECTION 88
## RADIO PROCEDURES

**POLICY:**    Law Enforcement Radio Stations are licensed by the Federal Communications Commission (FCC) and are required to follow the regulations of the FCC.  All employees shall limit their use of the law enforcement radio to messages that pertain to the conducting of official law enforcement business.

**PURPOSE:**  To provide guidelines for all employees to follow in the use of the police radio equipment for the purpose of communicating law enforcement information.

**DEFINITIONS:**  Communications is vital in the law enforcement profession because of the dangers involved in the work and also because officers are often counted on in emergency's to save or protect the lives of citizens within the community. For purposes of this policy Communications will be defined as: *The transfer of an idea from the mind of one to the mind of another with understanding.* The key word in this definition is understanding, because without understanding there is no communicating.

**PROCEDURES:**
a.    Instructions for Transmitting:
      (1)    Pronounce words slowly and distinctly.
      (2)    Whenever transmitting a message to an officer, refer to the officer by call number.
      (3)    An officer in the field will use his/her call number prior to transmitting any information.
      (4)    Always try to compose yourself and speak with as little emotion as possible.
      (5)    Do not transmit until message is clearly in mind, but don't hesitate in emergency situations.
      (6)    If necessary to transmit a lengthy message and time permits, write it down in logical order before transmitting.
      (7)    BREAK a lengthy message periodically, (especially a message having more than one part).
      (8)    Keep mouth close to microphone and speak as if you were using a telephone, (do not shout).
      (9)    Use the minimum number of words necessary to convey the message.
      (10)    In describing persons, give information in the following order:

| | |
|---|---|
| (a) Name | (h) Color of Hair |
| (b) Alias | (i) Color of Eyes |
| (c) Race | (j) Complexion |
| (d) Sex | (k) Scars or Tattoos |
| (e) Age, (DOB) | (l) Clothing description |
| (f) Height | (m) Home Address |
| (g) Weight | (n) Felony-misdemeanor or reason for Broadcast. |

      (11)    Names of persons should be spelled and their initials coded (A-Adam; B-Boy; C-Charles, etc.)  Unusual words will be spelled.
      (12)    When transmitting numbers, group them in groups of three.
      (13)    When an emergency exists, the officer with the emergency and the dispatcher WILL have first priority use of the radio until emergency traffic is concluded.
      (14)    Officers not involved in the emergency shall not call with requests for information.  By listening, officers can get the available information and if their assistance is needed, it will be requested.
      (15)    When stopping a vehicle for any reason, the following procedure should be followed for the personal safety of the officer:
          (a)  Traffic Stop:  When a decision has been made to stop a vehicle for a traffic violation, the officer shall notify the communications center of the:
               (1)  intent to stop a vehicle;
               (2)  location where vehicle is stopped;
               (3)  complete description of the vehicle;
               (4)  number and description of occupants;
               (5)  need for back-up;
           (b)  Felony Stop:
               (1)    When a vehicle is observed that is thought to be occupied by felons or suspected felons, officers shall notify the communication center and provide the location of the vehicle if stationary, or the location and direction of the travel if moving;
               (2)    Officers should keep the vehicle in sight, notify the communications center and request sufficient back-up to have manpower superiority;

b.  Instructions for Receiving:
  (1)  Keep radio on at all times when in or out of the unit.
  (2)  If equipped with a portable radio, always make sure this equipment is on and operational when out and away from the unit.
  (3)  Keep radio volume control on all equipment loud enough to easily be heard.
  (4)  Have notebook and pencil so messages may be written.
  (5)  Do not acknowledge receipt of message until the complete text is accurately known.

c.  Alphabetical Word Code:  Employees shall use this word code when transmitting:

| | | |
|---|---|---|
| 1. A – Adam | 10. J – John | 19. S – Sam |
| 2. B – Boy | 11. K – King | 20. T – Tom |
| 3. C – Charles | 12. L – Lincoln | 21. U – Union |
| 4. D – David | 13. M – Mary | 22. V – Victor |
| 5. E – Edward | 14. N – Nora | 23. W – William |
| 6. F – Frank | 15. O – Ocean | 24. X – X-Ray |
| 7. G – George | 16. P – Paul | 25. Y – Young |
| 8. H – Henry | 17. Q – Queen | 26. Z – Zebra |
| 9. I – Ida | 18. R – Robert | |

d.  Courtesy Messages:
  (1)  Law enforcement radio facilities may be used to locate persons for emergency purposes whenever public service facilities have failed, are inadequate, non-existent, or whenever a person sought is en-route to destination when emergency arises.
  (2)  Courtesy messages should be carefully considered before acceptance.  Communications which are not urgent should not be transmitted.
  (3)  In handling or delivery of a courtesy message, no employee shall convey the text of the message or the nature of the emergency.  Employees shall inform the person that an emergency exists and the name and telephone number of the person who is trying to reach them.
  (4)  The law enforcement radio system is for official law enforcement messages only and shall not be used as a paging system for any private individual or organization.

e.  Checking in and out of Service:
  (1)  Officers shall check "10-10" or "10-7" each time he/she is out of service, giving the dispatcher the location and telephone number if possible.
  (2)  Officers shall promptly check "10-8" each time they return to service.

f.  Reporting Disasters and Other Serious Incidents:
  (1)  Any employee learning of any crime, civil disorder or disaster such as an explosion, tornado, etc., shall immediately give the description of what happened to the dispatcher by radio or any other available source of communication.
  (2)  The Dispatcher will immediately contact and dispatch a supervisor.
  (3)  The employee reporting the incident as described in # 1 above shall further evaluate the situation and provide further communication concerning the event, including resources needed immediately, request back up, street needs closing, re-route traffic, etc..

g.  Hit and Run Reports:  Officers reporting hit-and-run cases shall transmit the information in the following manner:
  (1)  location of hit-and-run accident.
  (2)  was personal injury involved?
  (3)  date and time of the accident.
  (4)  the color, year, make, body style, accessories, and license information of vehicle that left the scene.
  (5)  identifying features of damages to the vehicle that left the scene.
  (6)  description of driver and passengers, if known, occupying suspect vehicle.
  (7)  direction of travel of hit-and-run vehicle when last seen.

h.  Car-to-Car Transmissions:
  (1)  Employees using the law enforcement communications system are prohibited from using slang expressions, joking, making humorous remarks, using profanity or keying the microphone to music, internal or external noises, etc.
  (2)  All communication will be in the performance of official law enforcement business, using as few words as possible to complete transmissions.

# SECTION 89
# RECOMMENDATION OF SERVICES

**POLICY:**   Employees shall not recommend to any person the services of an attorney, bondsman, wrecker service, physician, dentist or any other professional service.  If a person requests services and specifies any individual or business, employees will attempt to comply with the request.

**PURPOSE:**   To provide guidelines for all employees to follow in communicating with individuals or groups about professional services for which an employee might be perceived to have a personal bias.

**PROCEDURES:**
A.  As an employee of a law enforcement agency you will be confronted periodically with questions from prisoner's, family of prisoner's and the general public concerning their need of professional services. Questions frequently asked include, but are not limited to, the following:
   1.   What bonding company or bondsman should I call?
   2.   What wrecker service do you recommend?
   3.   Do you know a good attorney or which attorney do you recommend?
   4.   What doctor should I call?
   5.   What dentist should I call?

B.  In response to these types of questions, an employee will respond in the following manner:
   1.   Indicate no personal preference.
   2.   Advise that these services are listed in the local phone book which can be provided for reference purposes.

C.  In situations where officers are attempting to remove a disabled vehicle from the street and it becomes apparent that a wrecker must be summoned, the officer will ask the motorist if they have a wrecker preference. The motorist in this situation will often ask "who do you recommend?". An officer in this situation, or a similar situation, will respond in the following manner:
   1.   Indicate no personal preference.
   2.   Explain departmental procedures in towing vehicles.
   3.   Ask the vehicle owner/driver if they wish to use the service provided by the department.
   4.   If so, advise communications to utilize the wrecker service which is next on the rotating list.

D.  If an employee is approached by a prisoner or the family of a prisoner who makes a request for medical services from a specific individual or business, the employee will:
   1.   Notify the Chief of Police or the supervisor in charge.
   2.   Advise the prisoner or family member(s) that a supervisor will speak to them as scheduled.
   3.   The Chief of Police or supervisor in charge will meet with the individual(s) in question as time allows, and depending on urgency.
   4.   The Chief or supervisor will explain that services provided to prisoner's are contracted, therefore, If services are desired from someone other than the contracted service, the prisoner or person(s) requesting the specific service will be responsible for the cost.
   5.   Should the prisoner or family member(s) still request the specific service, the employee assigned this duty will make the necessary arrangements.
   6.   The prisoner or a family member will be required to sign a form that he/she is responsible for the medical cost associated with any visits the prisoner makes to that location. These forms are provided by health care facilities.

E.  Employees will attempt to comply with any other request for specific service, such as requests for a specific wrecker or bail bond company.


F.  An exception to this policy will be made under the following circumstance:
   1.   The requesting person is a member of the employees' family.

## SECTION 92
## REPORT: OFFENSE/INCIDENT

**POLICY:** Having written reports and written documentation concerning law enforcement activities is essential in meeting the management, operational, and informational needs of this agency. All employees must be aware of and properly complete all required reports and paperwork as prescribed.

**PROCEDURES:**

a.  Reporting: Written reports, on appropriate forms, will be required in all of the following:
   (1)  Citizen Complaints
   (2)  Citizen reports of crime
   (3)  Follow-up investigations
   (4)  Incidents involving arrests, citations, or summons
   (5)  All situations where an officer is dispatched
   (6)  All situations where an officer is assigned to take action at a later time
   (7)  Criminal and noncriminal cases initiated by officers

b.  Radio Dispatch Logs:
   (1)  Normally radio dispatch log entry's will be made on all cases listed above and becomes the first, and in some cases, only record of law enforcement action taken.
   (2)  Requirements for Radio Dispatch Log Entry's include, at a minimum:
      (a)  Date and time of initial report of incident/activity
      (b)  Name/address/phone number of citizen requesting service, victim or complainant
      (c)  Nature of incident
      (d)  Nature, date, and time of action taken by officer

c.  Field Reports:
   (1)  This agency utilizes the following preprinted report formats for field operation reporting:
      (a)  Offense reports
      (b)  Incident reports
      (c)  Supplementary reports
      (d)  Traffic accident reports
      (e)  Arrest reports
      (f)  Arkansas Uniform Traffic Ticket and Complaint
      (g)  Property/evidence reports
      (h)  Felony case folders (See **SECTION 38, FOLDER, FELONY CASE**)

   (2)  Case Numbering
      (a)  All offense/incident reports initiated by this agency will be assigned a report number obtained by requesting the next available number from Dispatch. This number is obtained from the Master Offense Report Log. The offense report #95-06-117 would mean that the offense was reported in June 1995 and that it was the 117th offense of 1995.
      (b)  The report numbering system utilized by this agency ensures that no two cases will be assigned identical numbers.

   (3)  Review of Reports: The Chief of Police will review the report for accuracy, completeness, legibility, etc. and, after his review and approval, will sign off on the report in the designated area.

   (4)  All entries on the Offense Report, Incident Report, and the Supplementary Report forms, shall be legibly written. If printing is preferred, the reporting officer will use the block letter alphabet. This alphabet utilizes all capital letters, since the mixing of capital letters and small letters may result in mistaking one letter for another.

d.  Offense Report
    (1)  The Offense Report has been designed to accomplish the following:
        (a)  To provide a means whereby officers can conduct and record a preliminary investigation of a criminal offense.
        (b)  To provide complete and accurate information for follow-up investigation and prosecution.
        (c)  To provide the officer, supervisor and Chief of Police with certain decision-making points which will enable them to identify follow-up investigative needs.
        (d)  To improve control of the report flow process within the department thereby improving report access and statistical recording.
        (e)  To aid the Chief of Police in the collection of data relating to crime types, patterns, suspect information, etc.

    (2)  The Offense Report is a permanent and public record.  It will be scrutinized at times by law enforcement administrative personnel, attorneys, judges, the media, and may be used in court as evidence.  The following good habits should be developed.
        (a)  Take pride in writing good reports
        (b)  Survey the facts before you begin writing
        (c)  Be a stickler for accuracy and details
        (d)  Use the dictionary when you are not sure of the correct spelling of a word

    (3)  Guard against the following common errors in report writing:
        (a)  Incorrect spelling
        (b)  Bad grammar and punctuation
        (c)  Mistakes in addresses and telephone numbers
        (d)  Failure to identify the names of witnesses
        (e)  Exaggerated value of property
        (f)  Incorrect offense classification
        (g)  Incompleteness

e.  The Incident Report has been designed to accomplish the following:
    (1) To provide a means for recording non-criminal incidents to be brought to the attention of law enforcement personnel.
    (2) To provide a means of recording any information that an officer feels should be brought to the attention of any agency personnel.

f.  Supplementary Report
    (1)  The Supplementary Report has been designed to accomplish the following:
        (1)  To provide a means of adding investigative information to a preliminary report.
        (2)  To provide a means of recording follow-up investigative data in an on-going investigation.
        (3)  To record data concerning an offense incident not releasable to the news media.
    (2)  The last Supplementary Report filed on a case will be used to record the court disposition of a case and the disposition of any evidence.

g.  The original of all reports along with follow-up reports will be maintained in the Administrative Office.

# SECTION 93
# REPORT WRITING PROCEDURE

**POLICY:**   A report is any written communication on a departmental form or any written or typed document prepared by an employee about an incident of interest to the department.

a.  Note taking is the foundation for report writing.

    (1)  Officers of the department shall use the permanent notebook system.  The following procedures will be followed:

        (a)  Put your name and badge number on the notebook for verification that the book contains your original notes and if lost the book can be returned to you.

        (b)  The notes must be neat and accurate.  When introduced in court, sloppy notes can embarrass you, as well as cause a case to be dismissed.

        (c)  Keep the pages intact.  Pages in sequence of date and time with officer's daily activities give weight to original notes in court.

        (d)  Date the notebook, indicating the dates it covers.  EXAMPLE: From (date) To (date).  Keep your notebook for later use as a reference or for admission in court.

        (e)  Do not place information from one incident on the same page with information from another incident.

        (f)  Take complete notes at the time of the incident. Too much information is preferred to insufficient information.

b.  Reports prepared by employees of this department shall be:

    (1)  Accurate:
        (a)  Correct information based on accurate notes.

    (2)  Brief:
        (a)  Be explicit.
        (b)  Do not use unnecessary words.

    (3)  Complete:
        (a)  Include all relevant information available to you.
        (b)  Include all elements of the crime.

    (4)  Clear:
        (a)  Communicate your ideas to the reader in an understandable account of the incident.

    (5)  When did it occur?
        *EXAMPLE:*
Crime discovery report time, evidence located, witnesses and victims contacted, arrest made, etc. Be as specific as possible.

    (6)  Where did it happen?
The location should be as exact as possible.  If unable to obtain an address, record to the nearest intersection or permanent landmark.
        (a)  Describe the area.  EXAMPLE: Business, residential, open country, apartment complex, etc.

    (7)  Why did the incident occur?
        (a)  Revenge.
        (b)  Monetary or personal gain.
        (c)  Drug-related.
        (d)  Accidental.
        (e)  Other reasons.

    (8)  How did it happen?
        *EXAMPLE:*
        (a)  How was entry made?
        (b)  How was the property obtained?
        (c)  How did the suspect approach the victim?
        (d)  Inappropriate language for police reports shall not be used unless quoting a suspect, witness or victim.
            (1)  Slang: Inappropriate "street" language.
            *EXAMPLE:*

| Split | Left or ran |
| --- | --- |
| Bust | Arrest |
| Rap Sheet | Arrest record |

| | |
|---|---|
| Freeze | Stop |
| Narc | Undercover officer |
| Piece | Service Weapon |
| Take him out | Stop or kill a person |
| Snitch | Confidential informant |
| Smoke him | Fire your service weapon |

(2)  Jargon:  Defined by Webster as "unintelligible talk ... A specialized vocabulary of those in the same way of life or work."

    (a)  In report narratives you shall not use radio codes, numerical designations or other terms peculiar to Law Enforcement.

(3)  Legible:

    (a)  Neat

    (b)  Readable.

(4)  Objective:

    (a)  Record all information, positive and negative.

    (b)  The report will be free from bias and unsubstantiated opinion.

(5)  Grammatically Correct.

(6)  Words correctly spelled.

(e)  All reports submitted shall contain the answers to:

(1)  Who was involved?

    (a)  The persons involved shall be identified by their role, as suspects, victims, witnesses, etc.

    (b)  Always obtain the full first, middle, and last names of persons involved. Be accurate in spelling.  EXAMPLE:  SMITH, SMYTH, SCHMIDT, SCHMID, ROBINSON, ROBERTSON, ROBERSON, ROBESEN, ROBERSEN, etc.

    (c)  Obtain alias if one is used.

    (d)  Home and work address and telephone numbers.

    (e)  Confirm ages with date of birth.

    (f)  Attempt to confirm race or ethnic background of suspects.

(2)  What (happened)?

    (a)  What type of offense was committed?  Was it a burglary from a commercial building or from an automobile?  Was it strong-armed robbery, purse-snatching?

    (b)  What type of property was stolen, received, lost or found?  Accurately describe items associated with this crime and their value.

    (c)  What means of transportation was used?  Describe vehicles involved in accordance with Auto Theft Section (a) of this manual.

    (d)  What statements were made by the victims, witnesses, suspects?  Note accents, unusual phrases or speech peculiarities.

(3)  Non-standard abbreviations:  Defined as abbreviations not readily understood by persons outside law enforcement.

*EXAMPLE:*

Poor:  We ID'd the S from recent APB.

Better:  We identified James Robert Smith from recent all points bulletins.

c.  All police reports will be prepared in the first person writing style.

(1)  The benefits of using first person is the language will be more natural, direct, and specific, and will be less confusing.

*EXAMPLES:*

Poor:  This officer verbally advised R.L. to give this officer the   irons belonging to this officer.

Worse:  R.O. verbally advised R.L. to give this officer back R.O.'s leg irons.

Best:  I told Officer Robert Lewis to return my Peerless ankle restraints.

(2)  Placement of events in chronological order.

    (a)  Every report narrative, regardless of format must at some point establish an order in which events occurred.

    (b)  Write your report identifying what occurred, and the order in which it occurred from the time of your arrival until the time of your departure.

## SECTION 95
## RESPONSE OUTSIDE OF JURISDICTION

**POLICY:** Officers of this department are not authorized to respond to calls for law enforcement service outside this area of jurisdiction. Exceptions to this policy include statutory, mutual assistance agreements and assisting adjoining jurisdictions requesting back - up units.

**PURPOSE:** To provide guidelines for law enforcement officers of this department to follow in responding to calls for service or otherwise performing law enforcement functions outside of this jurisdiction.

**PROCEDURES:**

A.  Statutory Guidelines:
    1.  An officer may serve a warrant of arrest in any county in the state,
        (ACA 16-81-105, 16-81-109)
    2.  Intrastate Fresh Pursuit:  (ACA 16-81-303).  The term "fresh pursuit" as used in this Act (16-81-301, 16-81-305) shall include fresh pursuit as defined by the common law and also the pursuit of a person who has committed a felony or is reasonably suspected of having committed a felony in this state or who has committed or attempted to commit any criminal offense in this state in the presence of the arresting officer referred to in Section 1 (ACA 16-81-301) of this Act or for whom such officer holds a warrant of arrest for a criminal offense.  It shall also include the pursuit of a person suspected of having committed a felony in this state, although no felony has actually been committed, if there is reasonable ground for so believing. Fresh pursuit as used herein shall not necessarily imply instant pursuit, but pursuit without unreasonable delay.  (Acts 1941, No. 19, Sec. 3, p. 46.)
    3.  Interstate Fresh Pursuit:  A similar law applies to "fresh pursuit" across state lines.  (ACA 16-81-401, 16-81- 407)
    4.  Drug Enforcement:  ACA 5-64-705 provides: "Upon receiving permission from the proper County Chief of Police, any law enforcement officer, acting within the official scope of his duty, may investigate and arrest any person violating any provision of the Uniform Controlled Substances Act, as amended, in any county contiguous to the county in which he is employed."
    5.  Law enforcement officers may transport prisoners outside the boundaries of this jurisdiction and if prisoners escape while being transported, officers may pursue escapees.

B.  Mutual Assistance Agreements:
    1.  This agency prescribes to a policy of Mutual Assistance Agreements which allows officers of this agency response authorization to other jurisdictions in emergency situations as directed by the Chief of Police or his/ her designee.
    2.  The Mutual Assistance Agreement will also allow officers of this agency, as assigned by the Chief of Police or his/her designee, to conduct various types of investigations within other jurisdictions in conjunction with officers from the jurisdiction in question. Criminal type investigations that will be conducted as a joint or multiple force effort include, but are not limited to, the following:
        a.  Narcotics Investigations
        b.  Sting Operations (recovery of stolen property)
        c.  Acquiring Intelligence Information

C.  Assisting Adjoining Jurisdictions Requesting Back - Up Units:
    1.  In the event an adjoining jurisdiction makes a request for back - up assistance due to an officer in need of help, or similar situation, the supervisor or senior officer on duty is authorized to dispatch assistance. The following procedures will apply:
        a.  Officers responding from this agency will assist as needed and follow the lawful orders of the supervisor in charge of the agency where response is made.
        b.  Officers responding from this agency will adhere to agency policies and procedures and use only those weapons and tactics with which they have qualified.
        c.  Officers responding from this agency will maintain contact with the communications center concerning the status of the call.
        d.  Officers responding from this agency may take only those law enforcement actions permitted under state law for emergency allocation outside this jurisdiction.

# SECTION 96
# ROBBERY: BANK/SAVINGS AND LOAN, HOLDUP, ALARM PROCEDURES

**POLICY:** With robberies of banks and related financial institutions at a record high, it is essential that all law enforcement officers understand their role and responsibilities when responding to these offenses and the inherent dangers involved. Therefore, when responding to robbery alarms at these establishments, officers shall follow the procedures set forth in this policy in order to enhance arrest possibilities of suspects and observe proper precautions for the safety of officers, employees and bystanders.

**PROCEDURES:**

## BANK ALARM PROCEDURE DURING NORMAL HOURS OF OPERATION

a.  WHEN AN ALARM FROM A BANK OR ALARM COMPANY IS RECEIVED:
    1. The employee receiving the alarm will notify on-duty officers of the situation.
    2. A telecommunications employee will telephone the bank, on recorded line if possible.
    3. Identify yourself and your agency and determine if there is a problem.
b.  IF THERE IS NO PROBLEM THEIR RESPONSE WILL BE:
    1. They will state their name, the name of the bank, and the telephone number.
    2. They will then give an explanation regarding why the alarm was activated or refer the call to a supervisor or Security Officer.
    ***EXAMPLE:*** This is Jane Doe at Hometown Bank, 268-1234. I'm sorry, one of the employee's accidentally set off our alarm, there is no problem.
    3. If this procedure is followed, no placard will be placed in the assigned area.
    4. A law enforcement officer will not enter the bank unless requested.
c.  IF A ROBBERY OCCURS THE RESPONSE WILL BE:
    1. Any variation from the procedure listed in Section B.
    2. Should the telecommunications employee establish communication by telephone, the bank employee will be told to stay on the phone if possible "DO NOT HANG UP".
    3. Responding officers will respond in an emergency mode, however, will use the following procedures:
        a. If close to the location of the alarm when the call is received, do not activate a siren.
        b. Deactivate the patrol unit blue light prior to coming within sight of the location.
        c. If response is from a long distance, activate both the siren and blue light, however, deactivate both before coming within sight or sound of the response location.
    4. Upon arrival to a robbery location, an officer may enter the building if there is a placard visible from the entrance indicating that the suspect(s) has left the scene.
    5. If no placard is visible an officer will not enter the building until instructed to do so by a bank employee or the telecommunications personnel who are communicating with bank employees.
    6. The first officer arriving at the bank will be responsible for securing the crime scene, identifying witnesses, and obtaining additional information from witnesses. This officer will maintain the security of the crime scene until relieved.
d.  KEEP OFFICERS INFORMED AS INFORMATION BECOMES KNOWN
e.  **NOTE: AS ALREADY STATED ABOVE, OFFICERS WILL NOT ENTER THE BANK UNTIL THE PLACARD IS PLACED IN THE ASSIGNED AREA OR THEY'RE REQUESTED TO DO SO BY A BANK EMPLOYEE OR A TELECOMMUNICATIONS OPERATOR.**

### BANK ALARM PLACARD POSITION

Bank of         ................. In west side window
               ................. West side lobby door
               ................. North side teller window

**NOTE: SAFETY OF THE EMPLOYEE'S IS THE MAIN CONCERN. NOTHING WILL BE DONE TO PLACE THEM IN JEOPARDY.**

f.  Most bank/savings and loan and pharmacy robberies last less than five (5) minutes.
g.  Should the suspects leave the facility after your arrival, do not attempt any arrest until they have left the building. Also remember the suspects may have received a tear-gas or dye device.

h.  Bank, savings and loan and pharmacy employees will, after the suspect(s) have left the premises, display the green card with the day-glow orange plus (+) on it so that it can be easily seen from the entrance by the responding officer, to signal an "ALL CLEAR."

i.  Responding officers should remember that it is possible that the suspect(s) have left the scene, and prior to leaving may have locked customers and employees in a room. BEFORE YOU ENTER THE FACILITY, BE CERTAIN THAT ALL SUSPECTS HAVE LEFT THE SCENE.

j.  In addition to securing the crime scene and identifying and briefly interviewing witnesses, the first officer on the scene shall immediately determine if the suspect(s) left in a vehicle or on foot. If a vehicle was used the officer will obtain a description, direction of travel and occupant information. This information shall be given to the dispatcher for immediate broadcast.

k.  All officers will personally observe every facility that has a holdup alarm wired direct into the department and locate an area where they can observe the building without being seen.

l.  The preceding procedure shall be followed by the law enforcement officers and the personnel of alarmed facilities, even though the dispatcher has advised that the call is a FALSE ALARM.

m.  An incident report will be prepared on all calls made to any facility having a holdup alarm wired direct into the department. This will enable the department to have a record of these types of calls for law enforcement service.

## INFORMATION FROM DEPARTMENT TO ALL FINANCIAL INSTITUTIONS

## BANK ALARM PROCEDURE DURING NORMAL HOURS OF OPERATION

When an alarm from your bank is activated at the Police Department, a radio dispatcher will telephone the bank and relay the following message: "This is the Police Department, your alarm has been activated, is there a problem?"

a.  **If there is no problem the department should obtain:**
    1.  the name of the bank employee on the phone,
    2.  the telephone number from which the bank employee is talking,
    3.  an explanation regarding the alarm, and
    4.  the name of the bank employee activating the alarm.
*EXAMPLE:*  This is Jane Doe at Hometown Bank, 268-1234. This is an accidental alarm set off by an employee named Sally Doe when she opened the door before turning the alarm system off. There is no need for police response to this facility.
    5.  If this procedure is followed, it will not be necessary to place the placard in the assigned area.
    6.  A Law Enforcement Officer will not enter the bank unless requested.

b.  **Employee's response if there is a robbery in progress.**
    1.  Anything other than the procedure described in Section (a)

c.  **If a robbery occurs:**
    1.  After the suspect leaves call the Police Department.
    2.  Stay on the line with police telecommunications personnel, DO NOT HANG UP.
    3.  You will be asked several questions and told what to do.
    4.  Have someone place the placard in the assigned area.
    5.  Do not touch anything or walk into the area the suspect occupied unless absolutely necessary. Valuable evidence could be destroyed.
    6.  Do not discuss the incident with other employee's until you are interviewed by law enforcement officers. You may want to write down what you saw or heard while it's fresh in your mind. It could be hours before you are interviewed.
    7.  Officers will not enter the building until the placard is in its assigned area. If for some reason the placard can't be placed, then call the department and request the officer to enter.
    8.  Do not use the alarm for a quick law enforcement response on matters other than a robbery.

# SECTION 97
# SEARCH: MOTOR VEHICLES

**POLICY:**   It is the policy of this department to conduct motor vehicle searches that are both legal and thorough.  Such searches are to be conducted in strict observance of the constitutional rights of the owner and occupants of the motor vehicle being searched, and with due regard for the safety of all officers, other persons and property involved.

**PURPOSE:**  To provide guidelines for officers of this department to follow in conducting motor vehicle searches in the performance of duties as a law enforcement officer.

**PROCEDURES:**

    a. Whenever feasible, a warrant will be obtained for the search of a motor vehicle.  Warrantless searches are to be conducted only when lack of time or other exigencies make it impractical for officers to obtain a warrant.  When a vehicle has broken down, or there is otherwise no significant chance the vehicle will be driven away or that evidence contained within it will be removed or destroyed, the vehicle should be searched only after a warrant has been obtained. In other cases, vehicles may be searched:

      (1)   When Reasonable cause to search the vehicle exists;
      (2)   With consent of the owner or operator;
      (3)   Incidental to an arrest of the occupants of the vehicle;
      (4)   When necessary to examine the vehicle identification number or to determine the ownership of the vehicle;
      (5)   In situations where evidence of criminal activity or contraband is in Plain View;
      (6)   For Investigatory purposes to ensure the safety of officers;
      (7)   For inventory purposes pursuant to departmental policy; or. . .
      (8)   Under emergency circumstances not stated above.

    b. Scope of Vehicle Searches

      (1)   *Searches with a warrant.*  When searching under a warrant, officers may search all areas of the vehicle unless the warrant states otherwise.

    **GENERAL RULE:**  If police conduct a vehicle search pursuant to a search warrant, the warrant must be supported by probable cause, specifically describe the vehicle to be searched and the objects to be seized, and otherwise comply with the technical requirements of the rules of criminal procedure. (Arkansas Rules of Criminal Procedure, Rule 13)

      (2)   Reaso*nable cause searches.*  Reasonable cause searches may extend to all areas of the motor vehicle, unless the reasonable cause is limited to a specific area of the vehicle.

    **GENERAL RULE:** If police have reasonable cause to search a vehicle or a container within the vehicle, a warrantless search may be made of the vehicle and any containers contained therein likely to conceal the object of the search. (Arkansas Rules of Criminal Procedure, Rule 14).

      (3)   *Consent searches.*  The extent of the consent search depends upon the terms of the consent itself.  If the consent is limited to specific areas of the vehicle, officers may search only portions of the vehicle covered by the consent.  Written consent should be obtained whenever possible before conducting these searches. **(See Appendix for Consent Search Form).**

    **SPECIAL NOTE:   If a seizure is made pursuant to a consent search, a RECEIPT, describing the items seized shall be delivered to the person consenting to the search.**

    **GENERAL RULE:** Police may conduct a warrantless search without probable cause if an authorized person or a person with apparent authority has consented to the search. A person granting consent to search may limit the scope of the consent or later withdraw the consent. (Arkansas Rules of Criminal Procedure, Rule 11)

    (4) *Searches incident to arrest.*  An officer who is making a lawful arrest may, without a search warrant, conduct a search of a vehicle occupied by the accused for the following purposes: (1) to protect the officer, the accused, or others, (2) to prevent the escape of the accused, (3) to furnish appropriate custodial care if the accused is jailed, (4) to obtain evidence of the commission of the offense for which the accused has been arrested or to seize contraband, the fruits of crime, or other things criminally possessed or used in conjunction with the offense.

**GENERAL RULE:**  If, at the time of arrest, the accused is in a vehicle or in the immediate vicinity of a vehicle of which he or she is in apparent control, and if the circumstances of the arrest justify a reasonable belief on the part of the arresting officer that the vehicle contains things which are connected with the offense for which the arrest is made, the arresting officer may search the vehicle for such things and seize any things subject to seizure and discovered in the course of the search. The search of a vehicle pursuant to this rule shall only be made contemporaneously with the arrest or as soon thereafter as is reasonably practicable.  (Rules of Criminal Procedure, Rule 12)

(5)  *Entries to examine vehicle identification number or determine ownership of the vehicle.* Entries made to examine the vehicle identification number or to determine the ownership of the vehicle must be limited to actions reasonably necessary to accomplish these goals.

(6)  *Emergencies.*  Search of a motor vehicle under emergency circumstances not otherwise listed above must be co-extensive with the nature of the emergency.  The proper extent of the search must therefore be determined by search personnel in each specific situation, but in no event will the extent of the search exceed that necessary to respond properly to the emergency.  *Note: Where the initial search discloses probable cause to believe that other portions of the vehicle may contain fruits, instrumentalities or evidence of a crime or contraband, any additional portions of the vehicle may be searched that could reasonably contain the items being sought.*

**GENERAL RULE:**  An officer who has **reasonable cause** to believe that a moving or readily movable vehicle is or contains things subject to seizure may, without a search warrant, stop, detain, and search the vehicle and may seize things subject to seizure discovered in the course of the search where the vehicle is: (1) on a public way or waters or other area open to the public, (2) in a private area unlawfully entered by the vehicle, or (3) in a private area lawfully entered by the vehicle, provided that exigent circumstances require immediate detention, search, and seizure to prevent destruction or removal of the things subject to seizure.  (Rules of Criminal Procedure, Rule 14)  NOTE:  Occupants of a vehicle may also be searched if the officer has reason to believe that one or more of the occupants may be concealing things subject to seizure.  This rule does not apply to individuals traveling as passengers in a vehicle operating as a common carrier.

(7)  Plain View.  A police officer who is lawfully in a position from which he/she can view a particular area of a vehicle and observes an item that is evidence of criminality, contraband or otherwise seizable, may seize the item in question. An officer may then, depending on the item seized and other circumstances surrounding the incident, conduct a warrantless search of the entire vehicle, or portions of the vehicle, based on probable cause, consent, search incident to arrest, etc.

**GENERAL RULE:**  If police are lawfully in a position to observe an object in "plain view", and they have probable cause to believe that the object is contraband or evidence of criminality, they may seize it without warrant.

(8)  Investigatory.  An Investigatory search allows police officers to conduct a protective sweep of the vehicle passenger compartment for weapons if there is reasonable suspicion that a person may be armed.

**GENERAL RULE:**  If during a valid vehicle stop police have reasonable suspicion that a person may be armed, they may conduct a protective sweep for weapons of the vehicle's passenger compartment.

(9)  Inventory.  This search will be completed at any time a vehicle is taken into custody or control by a law enforcement officer of this agency. The inventory search shall include all spaces within the vehicle and the trunk or bed of the vehicle and shall include an inventory of all containers therein, including those that are closed or locked. **(SEE SECTION 50 OF THE POLICY MANUAL, INVENTORY - MOTOR VEHICLES).**

**GENERAL RULE:**  A vehicle impounded in consequence of an arrest, or retained in official custody for other good cause, may be searched at such times and to such extent as is reasonably necessary for safekeeping of the vehicle and its contents.

c. Search of Containers Found in a Vehicle.  In no instance, other than for inventory purposes, shall a container in a motor vehicle be searched unless it could contain the item(s) being sought.  In addition:

(1)  Unlocked containers found in motor vehicles are governed by the nature of the search, as follows:

    (a)  In a probable cause search, containers such as paper bags, cardboard boxes, wrapped packages. etc., wherever found in the vehicle, may be opened.

    (b)  When the passenger compartment of a vehicle is being searched incident to an arrest, such containers found within the passenger compartment may be opened.

    (c)  Containers discovered during a consent search of the vehicle may be opened provided that the terms of the consent expressly permit or reasonably imply that the particular container may be opened.

    (d)  Containers found in or discarded from a vehicle under circumstances that do not justify their search under probable cause rules or in connection with a search incident to arrest should be secured but not searched until a warrant is obtained to search them.

(2)  Locked containers such as attaché cases, suitcases and footlockers found during a vehicle search should be opened only if:

    (a)  The search is being conducted under a warrant; or

    (b)  A valid consent to open the locked container is first obtained.  Where these conditions are not met, locked containers should be secured by search personnel and opened only after a warrant has been obtained. **EXCEPTION:** Inventory Search, unless the inventory results in locating evidence of criminaliality before the containers are opened. If evidence of criminality is discovered as a result of the inventory, discontinue and obtain a search warrant.

d.  Whenever possible, search of a motor vehicle, and of containers found therein should be conducted at the location where the vehicle was discovered or detained.  Under exigent circumstances, search of the vehicle or container may be delayed and/or conducted after the vehicle or container has been moved to another location.  However, in all instances searches shall be conducted as soon as reasonably possible; that is, as soon as adequate personnel are available to conduct a thorough search with due regard for the safety of all officers, citizens and property concerned.

e.  Motor vehicle searches shall be conducted in a manner that minimizes the intrusiveness of the search and the inconvenience caused to vehicle owners, occupants and other persons involved.  Where possible, damage to the vehicle or to other property in the course of the search should be avoided.  Where unavoidable, such damage should be confined to that reasonably necessary to carry out a safe and thorough search.

f.  Regardless of the circumstances involved in any vehicle search, consent to search should always be requested and a consent to search form completed if the consent is given. Even in circumstances where probable cause for a search exists, or there is evidence in plain view, or it is a search incidental to arrest, it doesn't damage anything to ask for consent and might actually strengthen some cases.

## CONSENT TO SEARCH FORM

I, _____
                              **Print Name**

do hereby authorize the following officer(s): _____

_____, _____

_____, _____

who have identified themselves as being employed by the _____
                                                              **Name of Department**

to conduct a search of the following described vehicle: _____,
                                          **Year      Make      Model      Body style      Color**

Additional descriptive information:_____

_____,

Registered owner of vehicle: _____
**Name of Registered Owner**
I have also been advised that it is my right to not allow a search of the vehicle described above and that I may also withdraw

the consent given at any time during the search procedure. I have been asked by the above named law enforcement officers to

allow a search of the above described vehicle. There have been no threats or promises made to me and no pressure or coercion

of any kind has been used against me. I make this decision rationally and of my own free will.


Signature of vehicle owner/operator: _____

Date: _____, Time: _____, Location: _____

Comments, (list any items seized, attach additional sheet if necessary): _____

_____

_____

Signature of officer(s): _____

_____, _____

Signature of Witnesses: _____

_____, _____

# SECTION 98
## SEARCH: EXECUTION OF WARRANT

**POLICY:** It is the policy of this law enforcement agency to (1) provide techniques to accomplish a thorough and legal search; (2) observe the constitutional rights of the person(s) the warrant is being served upon; (3) minimize the level of intrusion experienced by those who are having their premises searched; (4) provide for the highest degree of safety for all persons concerned; and (5) establish a record of the entire execution process.

**PROCEDURES:**

a.  Uniform and Equipment Requirements
 (1) The search team shall at all times include at least one uniformed officer.  All non-uniformed officers shall be clearly identified as law enforcement officers by wearing a distinctive armband, jacket or some other indicator of office.
 (2) All members of the search team should be equipped with body armor and a safety holster.
b.  Time Limitations on Search Warrant Execution
 (1) A search warrant shall be executed as soon as possible within the conditions as stated in the warrant. Circumstances that may necessitate a delay in executing a search warrant include, but are not limited to:
  (a)  The need to have many searches occur at the same time, which requires coordination and mobilization of law enforcement resources.
  (b)  The seizable items have not arrived at the search site.
  (c)  The probability that substantial resistance will be encountered.
  (d)  A particular person(s) is absent from the search site and it is determined that the search would best be conducted if that person were present.
 (2) Absent court approval, necessity or authorization by law, a search should be conducted during daylight hours.
c.  Preparation for Execution of Warrant
 (1) Prior to entering the premises, the supervisory officer shall conduct a pre-entry briefing of the execution process with all search team personnel.  The briefing shall include a review of the actual order of operations and procedures the search personnel will follow, a simulation of the conditions of the search (using maps, charts and diagrams, when appropriate) and tactics and equipment to be used in the event of forced entry.
 (2) The supervisory officer shall attempt to determine if any circumstances have changed that make executing the search warrant at that time undesirable.
 (3) The supervisory officer shall ensure that the entire search warrant execution process is documented, from beginning to end, and continued until the search team leaves the premises.  A written record shall be supported by photographs, and, if practical, a videotaping of the entire search site from start to finish.
d.  Entry Procedures
 (1) The approach to the scene shall be executed without sirens.  If a pre-execution surveillance team is on the scene, radio contact shall be made to ensure that it is an appropriate time to serve the search warrant.
 (2) The supervisory officer shall be responsible for ensuring that the search warrant is valid and that the property about to be searched is the property listed on the warrant.
 (3) The supervisory officer shall ensure that the entry is tape recorded.
 (4) The search personnel shall position themselves in the following manner:
  (a)  Exits from the premises will be covered.
  (b)  Uniformed officers shall be the most visible members of the search team, and shall conduct the entry.
  (c)  Non-uniformed officers shall be the last members to enter the search site.
 (5)  Notification
  (a)  The supervisory officer, or a uniformed officer, shall notify persons inside the search site, in a voice loud enough to be heard inside the premises, that he/she is a police officer and has a warrant to search the premises and that he/she demands entry to the premises at once.
  (b)  No-knock entries will be used only as a last resort and executed under the personal supervision of the supervisory officer.
e.  On Premises Activities
 (1) The supervisory officer shall ensure that a member of the search team conducts a security sweep of the search site.
 (2) After the search site has been secured, search personnel shall develop a prioritized strategy that details the likely whereabouts of the items to be seized and an order of operation for conducting the search.
 (3) One person shall be designated as responsible for collecting, preserving and documenting all items seized until possession is transferred to the evidence custodian.
 (4) If damage occurs during an entry to premises that will be left vacant, and the damage may leave the premises vulnerable to security problems, arrangements shall be made to guard the premises until it can be secured.
 (5)  If damage occurs, a special report shall be prepared on the actions that caused the damage and a detailed description of the nature and extent of the damage.
 (6)  See Rule 13, Arkansas Rules of Criminal Procedure, for correct procedures to follow in preparing, executing, and finalizing (Returning) the search warrant.

# SECTION 99
# SEARCH: PERSON

**POLICY:** It is the policy of this agency that searches of detainees shall be conducted no more than is reasonably necessary, and with proper regard for the dignity of the detainee and personal safety of the searching officer, in accordance with law.

**PURPOSE:** To provide guidelines for officers of this agency to follow in conducting Investigatory stops, limited searches and complete searches of persons during the performance of official duties.

**DEFINITIONS:**
(1) For purposes of this policy **REASONABLE SUSPICION** will be defined as:  The level of suspicion that must exist before a stop and frisk, (Investigatory stop), may be conducted. This standard involves a level of belief which is something less than the probable cause standard needed to support an arrest. The officer must be able to articulate, based on experience and the totality of the circumstances, that he/she reasonably inferred, (believed), that the individual he/she was confronting was involved in criminal activity or was armed with a weapon. The facts establishing the reasonable suspicion, for either the stop or the frisk, must be objectively realistic and not grounded in speculation, subjective feelings or intuition.

**PROCEDURES:**
a.   Stop and Frisk , (Investigatory stop),  **Rule 8.1, Federal Rules of Criminal Procedure**

   (1)  An officer of this agency who observes an individual or group of individuals engaged in unusual conduct which leads the officer to conclude that criminal activity may be occurring or may be forthcoming is authorized to stop and detain the individual(s) in question.
   (2)  An officer of this agency involved in this type of detention who has reason to believe that he/she is dealing with an armed and dangerous individual, regardless of whether there is probable cause for arrest, may conduct a limited search, "protective frisk", which involves the pat down of the outer clothing of the individual being detained. This is not a search for the purpose of discovering evidence, but to allow an officer to pursue his/her investigation without fear of violence.
   (3)  If during this pat down search of the outer clothing of a suspect an officer discovers a weapon, contraband or evidence of criminal activity, the officer will search the individual completely as probable cause for arrest or a continued search at this point in the investigation has been established.

b.   **Rule 12.1 and Rule 12.2, Arkansas Rules of Criminal Procedure** provide the guidelines for Search and Seizure Incidental to Arrest.
   (1)  Permissible purposes - An officer who is making a **lawful** arrest may, without a **search warrant**, conduct a **search** of the person or property of the accused for the following purposes only:
      (a)   To protect the officer, the accused, or others;
      (b)   To prevent the escape of the accused;
      (c)   To furnish appropriate custodial care if the accused is jailed; or
      (d)   To obtain evidence of the commission of the offense for which the accused has been arrested or to seize contraband, the fruits of the crime, or other things criminally possessed or used in conjunction with the offense.
   (2) Permissible Scope - An officer making an arrest and the authorized officials at the police station or other place of detention to which the accused is brought may conduct a search of the individuals' garments and personal effects, the surface of his body and the area within his immediate control.

c. Search Procedure for Routine Search Incidental to Arrest
   (1)  Place the individual with hands high on the wall or patrol vehicle and extended approximately three feet apart.  Do not allow the individual to place his palms flat.  Make the individual extend on his fingers.  The feet should be positioned where they are separated in a wide manner, and far enough away from the wall or patrol vehicle so that the individual would not have balance enough to push away from the wall or patrol vehicle with any force.  The back should be in a straight line with the legs and not be arched.  When searching the individual's left side, the officer's left leg should be placed in such a manner that the officer could dislodge the individual if he should make a sudden move.  The right hand should be placed in the middle of the back.  With this manner of search, only one hand is used to search.
   (2)  Search the following:
      (a)   Hair
      (b)   Open Mouth
      (c)   Collar
      (d)   Back of neck

   (e)   Both arms
   (f)   Armpits
   (g)   Chest
   (h)   Back
   (i)   Waistline (feel inside pants)
   (j)   Inside belt
   (k)   Crotch
   (l)   Down both legs
   (m)   Cuffs
   (n)   Socks
   (o)   Inside shoes
   (p)   Inside pockets of all clothing items

d.   Field Strip Search - Field strip searches of detainees shall be conducted only in the rarest of circumstances under exigent circumstances where the life of officers or others may be placed at risk, and only with the explicit approval of a supervisory officer.

e.   Other Strip Search - Where articulable, reasonable suspicion exists to conduct a strip search, the arresting officer shall make a written request for such action to the detention supervisor or other designated authority that clearly defines the basis for suspicion. When authorized by the supervising authority, strip searches may be conducted only

   (1)   by specially trained and designated personnel;
   (2)   in conformance with approved hygienic procedures and professional practices;
   (3)   in a room specifically authorized for this purpose;
   (4)   by the least number of personnel necessary and only by those of the same sex; and
   (5)   under conditions that provide privacy from all but those authorized to conduct the search.

f.   Body Cavity Searches - Pursuant to **Rule 12.3, Arkansas Rules of Criminal Procedure**, the search of an individuals' blood stream, body cavities, and subcutaneous tissues conducted incidental to arrest may be made without a search warrant only:

   (1) if there is a strong probability that it will disclose things subject to seizure and related to the offense for which the individual was arrested; **and**
   (2) if it reasonably appears that delay consequent upon procurement of a search warrant would probably result in the disappearance or destruction of the objects of the search; **and**
   (3) if it appears that the search if otherwise reasonable under the circumstances of the case, including the seriousness of the offense and the nature of the invasion of the individual's person.
   (4) Any search pursuant to this rule shall be conducted by a **physician** or a **licensed nurse.**

g.   Should visual examination of a suspect during a search incident to arrest, a strip search and/or other information lead an officer to believe that the suspect is concealing a weapon, evidence or contraband within a body cavity, the following procedures shall be followed:

   (1) The officer shall consult with his immediate supervisor to determine whether probable cause exists to seek a search warrant for a body cavity search. The decision to seek a search warrant shall recognize that a body cavity search is highly invasive of personal privacy and is reasonable only where the suspected offense is of a serious nature and/or poses a threat to the safety of the officer or others, and/or the security of the department's detention operations.
   (2) If probable cause exists for a body cavity search, an affidavit for search warrant shall be prepared that clearly defines the nature of the alleged offense and the basis for the officer's probable cause.
   (3) On the basis of a search warrant, a body cavity search shall be performed only by an authorized **physician or licensed nurse.**
   (4) For safety and security reasons, the search shall be conducted at the department's detention facility or other authorized facility and in the room designated for this purpose.
   (5) Body cavity searches shall be performed with due recognition of privacy and hygienic concerns previously addressed in this policy.
   (6) The authorized individual conducting the search shall file a report with the requesting law enforcement agency. The witnessing law enforcement officer will cosign that report.

# SECTION 100
# VEHICLE SAFETY CHECKPOINT

**POLICY:** This agency has a primary mission of creating a safer environment for the citizens within this community. In furtherance of this mission, this agency shall periodically conduct a vehicle safety checkpoint as directed by the Chief or his or her designee. All vehicle safety checkpoint operations shall be closely supervised as assigned by the Chief or his or her designee. The directives, as stated within this policy, shall be applied as a standard operating procedure in providing guidance to agency personnel in conducting all vehicle safety checkpoints. This policy applies only to vehicle safety checkpoints. It does not apply to sobriety checkpoints, drug interdiction checkpoints, or roadblocks for other purposes.

**PURPOSE:** To increase the effectiveness of this agency in checking for unsafe vehicles traveling upon the roadways. Vehicle safety checkpoints will also allow this agency the opportunity to periodically concentrate its efforts in checking for violations of Arkansas traffic and regulatory laws that will ultimately increase the safety of the citizens within the community.

**PROCEDURES:**

a.  A decision to implement a vehicle safety checkpoint operation must be approved either by the Chief or his or her designee.
b.  The maximum duration of any vehicle safety checkpoint operation shall be four hours unless otherwise directed by the Chief or his or her designee.
c.  A safety checkpoint operation shall only be conducted by utilizing the proper equipment. The following shall be considered as being proper equipment:
    1.  At least three marked patrol units equipped with emergency lights, siren and communications devices. One of these marked units shall be positioned at the checkpoint central location and shall have emergency lights operational during the checkpoint operation. The other two patrol units shall be positioned at each end of the checkpoint area. Other patrol units, for prisoner transport, shall be called to the checkpoint area if necessary.
    2.  At least one portable sign (when traffic is only stopped one way) to be placed alongside the roadway approximately 300 feet from the checkpoint area. The letters on the sign shall be large enough so that passing motorists are able to read it easily. The sign shall display the following messages:
        a.  *__NOTICE__*------ You are now entering a vehicle safety checkpoint under the direction of the _____ Police Department.
        b.  Be prepared to stop.
    3.  When traffic is being stopped from both directions a second sign shall be utilized and displayed as stated above.
d.  A vehicle safety checkpoint operation shall only be conducted by assigning the appropriate number of personnel. The following shall be considered an appropriate number of personnel:
    1.  At least two or three officers (depending on the time of day and the traffic flow) conducting the checkpoint in full departmental uniform or in clothing, as approved by an immediate supervisor, that identifies him or her as a law enforcement officer. Two officers shall be utilized to approach the vehicles stopped and one officer will be utilized to take any enforcement action as necessary.
    2.  At least one officer or a properly trained K-9 and K-9 handler occupying the other marked units. These officers shall be in full departmental uniform or in clothing, as approved by an immediate supervisor that identifies him or her as a law enforcement officer.
    3.  A supervisor as assigned by the Chief or his or her designee.
e.  Law Enforcement officers of this agency participating in a vehicle safety checkpoint operation shall:
    1.  Establish a checkpoint only in an area where there is complete visibility for a minimum of 500 feet from both directions of oncoming traffic to the checkpoint area.
    2.  Establish a checkpoint whereby all vehicles or a designated number, every third vehicle for instance, is stopped. The Chief of Police or other supervisor assigned to the operation shall make a decision as to how the checkpoint will be conducted at the scene.

3. Cautiously approach all vehicles and be particularly alert to suspicious movements or actions of the vehicle occupants.
4. Allow the driver and occupants to remain inside their vehicle unless their removal from the vehicle is necessary due to facts leading the officer to reasonably suspect that:
   a. A crime has been or is being committed;
   b. The vehicle occupant(s) presents some danger to the officer or others; or
   c. The person is armed and presently dangerous.
5. Courteously advise the driver of the vehicle the following: This is a vehicle safety checkpoint being conducted by the _____ Police Department. We are checking vehicles for the safety of all motorists within the city of _____ and the state of _____.
6. Advise the operator of the vehicle to provide a driver's license, vehicle registration, and proof of vehicle insurance. Also advise the vehicle operator that a brief vehicle safety inspection, checking the general condition of the motor vehicle will be completed.
7. Complete the vehicle/document inspection and take any enforcement action deemed necessary or appropriate. Drivers of vehicles for which enforcement action is necessary will be directed to a "pull off area" that has been established prior to the beginning of the checkpoint operation. A pull off area is defined as a location such as the following:
   1. The shoulder of the roadway that is wide enough that three or more vehicles can be parked in a safe manner.
   2. A parking area that can be utilized either by permission of the owner or a business parking lot for which the business is closed.
   The pull off area is necessary to avoid any lane blockage for prolonged periods and to provide for motorists and officer safety.
8. After completing the document/vehicle inspection or taking enforcement action and no arrests are made, law enforcement officers shall:
   a. Thank the vehicle operator/occupants for the cooperation extended.
   b. Promptly release the vehicle and occupants.
9. The additional patrol unit(s), positioned at each end of the checkpoint area, shall provide back-up for the officers conducting the checkpoint and shall conduct traffic stops in a situation where a vehicle, after observing the portable signs, takes evasive action to avoid entering the checkpoint area.

f. Upon completion of a vehicle safety checkpoint operation, all signs will be removed from alongside the roadway and returned to agency storage.
g. Agency personnel assigned to a vehicle safety checkpoint operation must first attend a briefing for which a supervisor or designee will further familiarize personnel with agency operational procedures discuss the location of the checkpoint and emphasize officer safety.
h. Information about any vehicle safety checkpoint operation, or subsequent arrests or seizures as a result of the operation, will be released to the news media in accordance with departmental policy concerning Freedom of Information.
i. At the conclusion of a vehicle safety checkpoint operation, the Chief or supervising officer in charge will assign one of the officers involved in the checkpoint to complete a full report outlining the details associated with the operation. The report shall include the date, time, and location of the checkpoint; personnel assigned including the use of a K-9 and in what capacity each individual was utilized; results of the operation such as, arrests made, searches conducted and items seized subsequent to the search; and any other information specific to the particular event.
j. A completed report shall be forwarded to the supervising officer making the assignment. The supervising officer shall forward a copy to the Criminal Investigation Division for investigative purposes if necessary. The original report shall be filed within the Police Department in accordance with departmental filing procedures.
k. Law enforcement officers of this agency may conduct a Vehicle Checkpoint operation in conjunction with other law enforcement agencies within the City only if the cooperating agency will agree to comply with the specific requirements set forth within this policy.

100.2

# SECTION 101
# SOBRIETY CHECKPOINT (ROADBLOCK)

**POLICY:** The United States Supreme Court has upheld that **systematic** vehicle stops based upon no suspicion whatsoever are authorized if the need is substantial and outweighs the intrusion to motorists. It is the policy of this agency to conduct sobriety checkpoints, roadblocks and other types of checkpoints when a significant problem has been identified and a need for the checkpoint has been determined to outweigh the subsequent intrusion to motorists.

**PURPOSE:** To provide guidelines for all law enforcement officers of this agency to follow in establishing and conducting any type of roadblock or checkpoint.

**PROCEDURES:**

a.  General Rule as stated within the Arkansas Rules of Criminal Procedure, Rule 9. Police may generally not make spot checks of vehicles without reasonable suspicion. However, where police are conducting a systematic checkpoint or roadblock, no degree of suspicion is necessary if the need for stopping vehicles is substantial and outweighs the intrusion to motorists.

b.  Roadblocks will only be conducted by this agency when directed by the Chief of Police or the supervisor in charge at the time the need for a roadblock arises.

c.  Roadblocks will be established in cases of compelling law enforcement and public concern (e.g., prison or jail escape where escapees' have been determined to be a risk to society, serious felony offense having just occurred, or in any case for which the need for stopping vehicles is substantial and outweighs the intrusion to motorists.

d.  Sobriety checkpoints are deemed constitutionally reasonable only when a balancing test is employed, considering:
   (1) the gravity of public concerns served by the checkpoint (state's interest in reducing drunk driving versus large number of alcohol related vehicle accidents in vicinity of where checkpoint is to be conducted);
   (2) the degree to which the roadblock advances public interest (arrest adequately demonstrates the checkpoint was a reasonable law enforcement effort to combat a serious public danger); and
   (3) the severity of the interference with individual liberty.
      a.  duration of the seizure and intensity of the investigation.
      b.  potential to generate fear and surprise in a motorist.

e.  Sobriety checkpoints will be conducted only after there is a demonstrated compelling need for reducing a severe drunk driving problem in the vicinity of the sobriety checkpoint. Drinking in public and possession of alcohol concerns will not be considered.

f.  When research shows that a sobriety checkpoint will be the most effective law enforcement response to a serious alcohol/drug related problem, the Chief of Police or his/her designee will take the following steps prior to conducting the operation:
   (1) Written guidelines will be prepared for conducting the checkpoint.
   (2) Establish and document that the drunk driving problem is severe enough to qualify for a sobriety checkpoint.
   (3) Establish the goals and specific objectives for the checkpoint. Goals and objectives will include:
      a.  Rules governing the who, when, where, and how for organizing and operating the sobriety checkpoint.
      b.  Taking steps, such as issuing directives that minimize officer discretion and establish the specifics of the checkpoint.

g.  The public must be given notice by means of signs, etc., placed on the street that a sobriety checkpoint, or any other type of checkpoint is being conducted on the roadway ahead. The signs are to be placed at a location near enough to the checkpoint that officers in patrol units can intercept those vehicles whose drivers are attempting to leave the scene.

h.  Records of sobriety checkpoints or any other type of checkpoint, conducted by this agency will be maintained by the Chief of Police or his/her designee.

i.  There are other types of checkpoints that are typically used by law enforcement agencies and are governed by the same law and procedural rules as are the sobriety checkpoint. The checkpoints that are typically used include, but are not limited to, the following:
   1.  Check drivers' license
   2.  Check all motorists' paper work, including drivers' license, vehicle registration, insurance documentation, etc.

j.  As a final note, all officers of this agency should realize the following:
   1.  Roadblocks or checkpoints are authorized only in situations where a specific need for that operation has been identified.
   2.  In conducting a roadblock/checkpoint, officers may systematically stop vehicles, such as: every vehicle, every other vehicle, or every tenth vehicle. It only requires that some system is used in stopping the vehicles.
   3.  The roadblock/checkpoint may not be multi- purpose for which the law enforcement agency conducting the operation is actually "fishing" for evidence of illegal activity instead of concentrating on the specific purpose of the operation.

# SECTION 102
## SMOKING AND USE OF TOBACCO

**POLICY:**   In the past few years a substantial amount of controversy has surrounded the subject of smoking in public buildings or in areas frequented by the general public. Many people are allergic to tobacco smoke, some find it offensive, and others may have a respiratory illness, which could be aggravated by cigarette, cigar, or pipe smoke. It shall be the policy of this agency to restrict smoking or the use of tobacco by employees at agency headquarters to a designated area, and to restrict smoking or the use of tobacco while on patrol, in performance of an official investigation, or while off duty in uniform as a representative of this agency.

**PURPOSE:**   To provide guidelines for all departmental employees to follow in the use of tobacco products while on duty or off duty and in uniform.

**PROCEDURES:**

Use of tobacco products on police department property

a.   There will be no smoking or use of other tobacco products allowed inside the police department building.
b.   The prohibited use of tobacco products inside the police department building will apply to all employees as well as the general public.
c.   A sign posted by all entry doors will indicate the police department building to be a smoke free structure.
d.   Any employee observing a non employee using a tobacco product inside the building will inform the individual that tobacco use is not allowed inside the building.
e.   A designated area for the use of tobacco products will be located outside the building in a location as specified by the Chief of Police.
f.   Employees will be allowed to smoke or use tobacco products in the designated area and will be permitted to do so to the extent that it does not interfere with assigned duties.
g.   All employees using the designated area for tobacco use at the police department will be required to use the appropriate containers at the location for disposal of the used tobacco product.
h.   The Chief of Police or designated supervisor's will monitor employees to assure that this privilege is not abused.

Use of tobacco products by employees in the field:

a.   No employee shall smoke or use any tobacco product while making personal contacts with citizens in the course of their official duties.
b.   No employees shall smoke or use any tobacco product while in the view of the public, such as working traffic, investigating accidents, or any on-the-scene criminal investigations.
c.   Any officer answering a call for police service, whether on patrol or in an investigative capacity, will discard any tobacco product he/she might be using before exiting the police vehicle.
d.   All employees using tobacco products will be required to use the product in a manner which will keep their assigned vehicles clean.

General guidelines:
a.   Any employee using tobacco products such as chewing tobacco or snuff will be allowed to use the product in accordance with the guidelines of this policy. It should be noted, however, that use of this type product will be closely scrutinized and any individual using the product in an unclean or unsanitary manner will be subject to restrictions as deemed necessary by the Chief of Police or departmental supervisors.
b.   Police officers who are off duty but in a departmental uniform shall be required to abide by the procedures as set forth within this policy.
c.   This policy will be strictly enforced. Any employee who fails to follow procedures as outlined will be subject to disciplinary action.

# SECTION 103
# EMPLOYEE - DRUG TESTING

**POLICY:** It is the policy of this department that the critical mission of law enforcement services justifies maintenance of a drug-free work environment through the use of a reasonable employee drug-testing program. The law enforcement profession has several uniquely compelling interests that justify the use of employee drug-testing. The public has a right to expect that those who are employed as a public servant, either sworn or in a civilian capacity, are at all times both physically and mentally prepared to assume these duties. There is sufficient evidence to conclude that the use of controlled substances and other forms of drug abuse will seriously impair an employee's physical and mental health, and thus, their job performance. Where law enforcement officers participate in illegal drug use and drug activity, the integrity of the law enforcement profession, and public confidence in it are destroyed. This confidence is further eroded by the potential for corruption created by drug use. Therefore, in order to ensure the integrity of the department, and to preserve public trust and confidence in a fit and drug-free law enforcement profession, this department shall implement a drug-testing program to detect prohibited drug use by all employees.

**PURPOSE:** To provide guidelines for all employees to follow concerning the use or possession of drugs and the procedures involved in employee drug testing.

**PROCEDURES/RULES**

a.  *Prohibited Activity:*
    The following rules shall apply to all civilian employees, applicants, and probationary and sworn employees, while on and off duty:
    (1) No employee shall illegally possess any controlled substance.
    (2) No employee shall ingest any controlled or other dangerous substance, unless as prescribed by a licensed medical practitioner.
        (a) Employees shall notify their immediate supervisor when required to use prescription medicine which they have been informed has the potential to impair job performance. The employee shall advise the supervisor of the known side effects of such medication, and the prescribed period of use.
        (b) Supervisors shall document this information through the use of an internal memorandum and maintain this memorandum in a secured file.
        (c) The employee may be temporarily reassigned to other duties, where appropriate.
    (3) No employee shall ingest any prescribed or over-the-counter medication in amounts beyond the recommended dosage.
    (4) Any employee who unintentionally ingests, or is made to ingest a controlled substance shall immediately report the incident to their supervisor so that appropriate medical steps may be taken to ensure the officer's health and safety.
    (5) Any employee having a reasonable basis to believe that another employee is illegally using, or in possession of any controlled substance shall immediately report the facts and circumstances to their supervisor.
    (6) Discipline of employees for violation of this policy shall be in accordance with the due process rights provided in the departments' grievance and discipline procedures found in **SECTION 42, GRIEVANCE & DISCIPLINARY PROCEDURES.**

b.  *Applicant Drug-Testing:*
    (1) All applicants, either sworn or civilian, shall be required to complete a drug screen as a condition of employment during a pre-employment medical examination.
    (2) Applicants shall be disqualified from further consideration for employment under the following circumstances:
        (a) Refusal to submit to a required drug-test; or
        (b) A confirmed positive drug-test indicating drug use prohibited by this policy.

c.  *Probationary Employee Drug-Testing:*
    (1) All probationary employees, sworn or civilian, shall be required as a condition of employment to participate in any unannounced mandatory drug tests scheduled for the probationary period. The frequency and timing of such tests shall be determined by the Chief of Police.
    (2) In addition, where the probationary employee has a past history of drug use, he/she shall be required to submit to random testing until the probationary period is successfully completed. The frequency and timing of such testing shall be determined by the Chief of Police.

d. *Employee Drug Testing:*
   All employees will be required to take drug tests as a condition of continued employment in order to
   ascertain prohibited drug use, as provided below:
   (1) A supervisor may order an employee to take a drug test upon documented reasonable suspicion that the
       employee is or has been using drugs. A summary of the facts supporting the order shall be made available to
       the employee prior to the actual test.
   (2) A drug test will be administered as part of any regular physical examination required by this department.
   (3) All employees shall be uniformly tested during any unannounced mandatory testing required by the
       department. The Chief of Police shall determine the frequency and timing of such tests.
   (4) Any situation where employee drug screening is required, the employee to be tested will sign a consent form
       (appendix) indicating willingness or refusal to submit to drug testing. The form will list any medication
       currently being taken by the employee or any incidental contact or on duty exposure to controlled substances
       which might affect the outcome of the screening. This form will be completed before interviewing or testing
       by personnel authorized to complete the process.
   (5) It is to the employee's benefit to complete the consent form by filling in all spaces, even placing N/A on
       lines which are not applicable to the employee completing the form. Failure to list prescribed drugs or over
       the counter medication recently taken, or document incidental/on-duty contact with controlled substances
       could result in a positive screening and subject an employee to disciplinary action.
   (6) A copy of the consent form will be provided to the employee being tested to keep for personal record and the
       original will be placed in the employee personnel file.

e. *Drug-Testing Procedures:*
   (1) The testing procedures and safeguards provided in this policy to ensure the integrity of department drug-
       testing shall be adhered to by any personnel administering drug tests.
   (2) Personnel authorized to administer drug tests shall require positive identification from each employee to be
       tested before they enter the testing area.
   (3) A pre-test interview shall be conducted by testing personnel with each employee in order to ascertain and
       document the recent use of any prescription or non-prescription drugs, or any indirect exposure to drugs that
       may result in a false positive test result. **NOTE:** Employee's may use their copy of the consent form for this
       purpose.
   (4) The bathroom facility of the testing area shall be private and secure.
       (a) Authorized testing personnel shall search the facility before an employee enters it to produce
           a urine sample and document that it is free of any foreign substances.
       (b) The employee to be tested shall disrobe before entering the bathroom facility, and be provided a light
           robe.
       (c) Testing personnel of the same sex as the employee shall observe production of the urine sample.
   (5) Where the employee appears unable, or unwilling to give a specimen at the time of the test, testing
       personnel shall document the circumstances on the drug-test report form. The employee shall be permitted
       no more than eight hours to give a sample, during which time he/she shall remain in the testing area, under
       observation. Reasonable amounts of water may be given to the employee to encourage urination. Failure to
       submit a sample shall be considered a refusal to submit to a drug-test.
   (6) Employees shall have the right to request that their urine sample be split and stored in case of legal
       disputes. The urine samples must be provided at the same time, and marked and placed in identical
       specimen containers by authorized testing personnel. One sample shall be submitted for immediate drug-
       testing. The other sample shall remain at the facility in frozen storage. This sample shall be made available
       to the employee or his attorney should the original sample result in a legal dispute or the chain of custody be
       broken.
   (7) Specimen samples shall be sealed, labeled and checked against the identity of the employee to ensure the
       results match the tested specimen. Samples shall be stored in a secured and refrigerated atmosphere until
       tested or delivered to the testing lab representative.
   (8) Whenever there is a reason to believe that the employee may have altered or substituted the specimen to be
       provided, a second specimen shall be obtained immediately, under direct supervision of the testing
       personnel.

f. *Drug-Testing Methodology:*
   (1) The testing or processing phase shall consist of a two-step procedure:
       (a) Initial screening test, and
       (b) Confirmation test.

(2) The urine sample is first tested using the initial drug screening procedure. An initial positive test result will not be considered conclusive; rather it will be classified as "confirmation pending." Notification of test results to the supervisor shall be held until the confirmation test results are obtained.

(3) A specimen testing positive will undergo an additional confirmatory test. The confirmation procedure shall be technologically different and more sensitive than the initial screening test.

(4) A positive result of a screening procedure shall be defined as testing positive for drugs on both the initial screening and the confirmation screening. If the two screenings do not match the result of the screening will not be positive.

(5) The drug screening tests selected shall be capable of identifying marijuana, cocaine, and every major drug of abuse including heroin, amphetamine and barbiturates. Personnel utilized for testing will be certified as qualified to collect urine samples or adequately trained in collection procedures.

(6) Concentrations of a drug at or above the following levels shall be considered a positive test result when using the initial immunoassay drug screening test:

*Initial Test Level (ng/ml)*

| | |
|---|---|
| Marijuana metabolite | 100 |
| Cocaine metabolite | 300 |
| Opiate metabolites | 300* |
| Phencyclidine | 25 |
| Amphetamines | 1000 |

\* 25ng/ml if immunoassay specific for free morphine

Concentrations of a drug at or above the following levels shall be considered a positive test result when performing a confirmatory GC/MS test on a urine specimen that tested positive using a technologically different initial screening method:

*Confirmatory Test Level (ng/ml)*

| | |
|---|---|
| Marijuana metabolite | 15(1) |
| Cocaine metabolite | 150(2) |

Opiates:

| | |
|---|---|
| Morphine | 300 |
| Codeine | 300 |
| Phencyclidine | 25 |

Amphetamines:

| | |
|---|---|
| Amphetamine | 500 |
| Methamphetamine | 500 |

(1) Delta-9-tetrahydrocannabinol-9-carboxylic acid
(2) Benzoylecgonine

(7) The laboratory selected to conduct the analysis shall be experienced and capable of quality control, documentation, chain-of-custody, technical expertise, and demonstrated proficiency in urinalysis.

(8) Employees having negative drug tests results shall receive a memorandum stating that no illegal drugs were found. If the employee requests such, a copy of the memorandum will be placed in the employee's personnel file.

(9) Any employee who breaches the confidentiality of testing information shall be subject to discipline.

g. ***Chain of Evidence-Storage:***

(1) Each step in the collecting and processing of the urine specimens shall be documented to establish procedural integrity and the chain of custody.

(2) Where a positive test result is confirmed, urine specimens shall be maintained in secured, refrigerated storage for an indefinite period.

h. ***Drug-Test Results:***

(1) All records pertaining to department required drug tests shall remain confidential, and shall not be provided to other employees or agencies without the written permission of the person whose records are sought.

(2) Drug test results and records shall be stored and **securely** retained for an indefinite period in an employee personnel file that is not subject to public information.

**EMPLOYEE DRUG SCREENING**
**CONSENT FORM**

I, _____ on this date _____ do    do not
        (name)                                                              (date)            (circle one)

consent to provide a sample specimen, (urine), for drug testing.

I am currently using the following medication:

| Type drug/brand name/dosage | Last taken | Indicate physician prescribing drug or over the counter medication: |

---------------------------------------------------------------------------------------------------

---------------------------------------------------------------------------------------------------

---------------------------------------------------------------------------------------------------

---------------------------------------------------------------------------------------------------

List any incidental or on duty exposure to controlled substances which might affect this test. Include basic details surrounding the exposure. Attach additional page(s) if necessary:

I understand that refusal to submit to a drug screen may be grounds for disciplinary action up to and including dismissal from this department. I further understand that a confirmed positive test result without satisfactory justification may be grounds for disciplinary action up to and including dismissal from this department.

Employee signature: _____ Date _____

Supervisor signature: _____ Date _____

# SECTION 104
# TRAINING

**POLICY:** Training has often been cited as one of the most important responsibilities in any law enforcement agency. Training serves three broad purposes; First, well trained officers are generally better prepared to act decisively and correctly in a broad spectrum of situations. Second, training results in greater productivity and effectiveness. Third, it fosters cooperation and unity of purpose. Furthermore, agencies are now being held legally accountable for the actions of their personnel and for failing to provide initial or remedial training. This agency recognizes the importance of training and is committed to providing the best training available to all personnel.

**PURPOSE:** To provide information to all departmental employees concerning the goals of the training program and the responsibilities of the officer in charge of this function.

**PROCEDURES:**

a. Goals: The goals of this agency's training program include:
    (1) Meet mandatory and in-service training requirements;
    (2) Provide better educated, more professional personnel;
    (3) Provide for a more efficient and effective accomplishment of departmental objectives;
    (4) Improve law enforcement/community relations;
    (5) Provide career development opportunities within the department;
    (6) Provide training in specialized areas of law enforcement;
    (7) Provide consistency in training with department law enforcement responsibilities; and
    (8) Develop officer skills in working with the law abiding citizens within this community on issues of problem solving and in detecting, preventing and reducing crime.

b. Responsibilities: While training is a continual, never-ending process involving all members of this agency, the overall training function is a primary responsibility of the Chief of Police, or his/her designee. This responsibility will include at a minimum:
    (1) Providing or coordinating training for both sworn and civilian personnel;
    (2) Planning and developing training programs;
    (3) Notifying personnel in writing of required training, such as mandatory firearms training, and all other training that is available to departmental personnel;
    (4) Notification will be posted on a bulletin board in the squad room/officer meeting area;
    (5) Assuring that training programs are attended;
    (6) Maintaining liaison with the Arkansas Law Enforcement Training Academy, Criminal Justice Institute, and other sources of education and training;
    (7) Overseeing the department's field training program;
    (8) Maintain accurate and up to date training files on all departmental employees.
    (9) Scheduling and making arrangements for employees to attend training classes.
    (10) Complete all forms that are required by the Executive Commission on Law Enforcement Standards and Training and submit the forms on a timely basis.
    (11) Keep certifications on all personnel up to date. Certifications such as:
        a. Radar Operator Certification
        b. Instructor Certification
        c. Firearms Instructor Certification
        d. Terminal Operator

    (12) Implement disciplinary action, pursuant to disciplinary procedures, against any employee who fails to attend training that is mandatory.

# SECTION 105
# TRAINING REQUIREMENTS

**POLICY:** The training policy of this agency shall be commensurate with minimum requirements as established by the Executive Commission on Law Enforcement Standards and Training and the Arkansas Crime Information Center. The Chief of Police shall establish requirements for employee training that will be above the standards established by the commission or any other standards established by law.

**PURPOSE:** To establish guidelines for all personnel of this agency to follow concerning training/education requirements.

Sworn Personnel:

A.  Every officer employed by this department must satisfactorily complete the Basic Police Training Course of twelve (12) weeks, (480 hours), within twelve (12) months from the date of appointment.

B.  If an officer has had previous certified law enforcement training, (military or otherwise), consisting of 480 or more hours he/she shall supply documentation of training to the Chief of Police, or his/her designee. The following procedures will then apply:
    1.  The Chief of Police, or his/her designee, will complete an F-10 form and submit it along with copies of the training documentation to the Commission on Law Enforcement Standards and Training for review.
    2.  The Commission will review the training documentation and make a decision after which this agency will be notified in writing. The Commission will make one of the following decisions:
        a.  Training will be accepted in lieu of a basic course; applicant is not required to attend the basic course.
        b.  Training will not be accepted and the applicant will be required to complete the entire Basic course.
        c.  Training will be accepted, however, applicant will be required to finish a refresher course consisting of one (1) week and presented by the Arkansas Law Enforcement Training Academy (ALETA).

C.  The Chief of Police, or his/her designee, will be responsible for completing all required forms pertaining to basic training and will schedule officer's for training according to the requirements of each individual.

D.  Should an officer be unable to satisfactorily complete the basic training requirements within the twelve (12) month limitation, the Chief of Police, or his/her designee, will, if it is desirable to do so, submit a letter of request to the Commission on Law Enforcement Standards and Training requesting an extension for up to eight (8) months.

E.  Any officer who fails to complete the basic training requirements within the twelve (12) months or with a Commission approved extension of eight (8) months will not be eligible for training nor certification for twenty-four (24) months following the date of failure of the training course or the date of expiration of the probation period.

F.  Reappointment or reemployment of an officer who fails to satisfactorily complete training as required will be considered only after the person has been separated from law enforcement for at least twenty-four (24) months.

G.  Should an officer be re-appointed or re-employed, as stated in paragraph (F) above, he/she will be eligible to begin a new twelve (12) month probationary period, unless specific waivers are granted by the Commission on Law Enforcement Standards and Training.

H.  Should an officer fail to meet the minimum training requirements for a second time, he or she will not be eligible for certification as a law enforcement officer in the State of Arkansas.

I.  All officers of this department will be required to attend firearms training, on a semi-annual basis, as outlined in the policy and procedures manual, (SECTION 37, FIREARMS: TRAINING AND QUALIFICATIONS).

I.  Any officer of this agency who needs to be certified as an ACIC/NCIC terminal operator will be required to attend a basic terminal operators class (level I) presented by ACIC for certification purposes.

K.  It shall be the responsibility of each individual officer to attend all mandatory training classes designated for all personnel or all sworn personnel.

Non-Sworn Personnel:

A.  Each telecommunications operator, (dispatcher), of this agency will be required to complete the ACIC basic terminal operators class (level I) for initial ACIC/NCIC terminal operator certification.

B.  Each telecommunications operator of this agency will also be required to attend all advanced levels of training classes offered by ACIC for purposes of acquiring an advanced level of certification.

C.  All non-sworn personnel will be required to attend training classes occasionally, therefore, it will be each employee's responsibility to attend all mandatory training classes as scheduled.

*GENERAL INFORMATION:*

A.  All notices of training will be posted in the squad room within one (1) week, or as soon as possible, before the date the class is scheduled.  NOTE:  It is to each employee's benefit to check the bulletin board in the squad room periodically for class schedules.

B.  The Chief of Police, or his/her designee, will notify all supervisors' of scheduled training for which the supervisor's personnel will be affected. This will be accomplished in the following manner and for the following purpose:
    1.  Supervisor's affected by the training will be forwarded a copy of the training notice.
    2.  The purpose of the notice is to allow the supervisor time to adjust personnel scheduling if necessary.

C.  The Chief of Police, or his/her designee, will be responsible for completing all required forms pertaining to employee training and submitting the forms to the Commission on Law Enforcement Standards and Training, the Arkansas Law Enforcement Training Academy, or any other agency as required.

D.  The Chief of Police, or his/her designee, will be responsible for maintaining accurate and up to date training files on all employees.

E.  Training files will be kept in a secured area as designated by the Chief of Police.

105.2

# SECTION 106
# TRANSPORTING ARRESTED PERSONS

**POLICY:** Persons in police custody are usually transported initially to a detention facility and afterward are often transported to other locations as the need for transport arises. It shall be the policy of this law enforcement agency to take the precautions necessary while transporting prisoners to protect the lives and promote the safety of the officers, the public, and the person in custody.

**PURPOSE:** To provide guidelines for all officers to follow when a person in police custody is transported by an employee of this department.

**PROCEDURES:**

A. Vehicle inspection
(1) At the beginning and end of each tour of duty, all vehicles regularly used for prisoner transport shall be inspected for readiness as follows:
   a. The officer assigned to operate a department vehicle will be responsible for making an inspection of that vehicle and will complete the inspection in the following manner:
      1. The safety screen shall be securely in place and undamaged;
      2. All windows shall be intact and outer door latches in proper working order;
      3. Rear seat door handles and window controls should be deactivated;
      4. The interior shall be thoroughly searched to ensure that no weapons or contraband have been left or hidden within the vehicle.
      5. Special emphasis shall be placed on inspecting under the rear seat and floorboard area.
      6. Should any problems with the vehicle be discovered or any contraband or property of any kind be located inside the vehicle, the information shall be documented on the Vehicle (Unit) check sheet as outlined in the departmental policy manual, SECTION # 75, POLICE VEHICLE MAINTENANCE.
(2) After each prisoner transport, the vehicle shall be searched again after the prisoner has been delivered to the detention facility or other destination.
B. Handcuffing
   (1) Officers shall handcuff (double locked) all prisoners with their hands behind their back and palms facing outward.
   (2) The officer may handcuff the prisoner with his/her hands in front, or utilize other appropriate restraining devices where the prisoner:
      (a) Is in an obvious state of pregnancy;
      (b) Has a physical handicap; or
      (c) Has injuries that could be aggravated by standard handcuffing procedures.
   (3) Prisoners shall not be handcuffed to any part of the vehicle during transport.
   (4) Additional approved restraint devices may be used to secure a prisoner who violently resists arrest or who manifests mental disorders such that he poses a threat to himself, the transporting officer(s) or the public.
C. Transport
   (1) Prior to transport, all prisoners shall be thoroughly searched for any weapons or tools of escape.
      (a) If practical, the protective search should be conducted by an officer of the same sex of the prisoner.
      (b) The transporting officer should search the prisoner, unless a search was conducted in his presence.
   (2) When transporting prisoners, the officer shall provide the dispatcher with the following information when possible:
      (a) Identity of the prisoner, (this information, along with a DOB, should be given so a warrants check can be completed);
      (b) Arrest location and destination of transport; and
      (c) Time and mileage readings before and after transport.
   (3) The officer should use care when assisting a prisoner into the vehicle for transport.
   (4) Prisoners shall be transported in the following manner:
      (a) Where the vehicle has a security screen but only one transporting officer, the prisoner shall be placed in the back seat on the right hand side of the vehicle. When the vehicle is not equipped with a security screen and has only one transporting officer, the prisoner shall be placed in the right front seat.
      (b) When a prisoner is being transported in a two-officer vehicle without a security screen, the prisoner shall be placed in the right rear seat. The second officer shall sit in the left rear seat behind the driver. An officer occupying the rear seat shall take extra precautions in securing a duty weapon.
      (c) Leg restraints shall be used when a prisoner is exhibiting violent behavior or an officer believes the prisoner has a potential for violent behavior.
      (d) One transporting officer shall not attempt to transport more than one prisoner in a vehicle without a security barrier.

    (e)  All prisoners shall be secured in the vehicle by proper use of a seatbelt except in situations where circumstances exist, such as violent behavior or unconscious/intoxicated person that would otherwise present more danger to the officer or the person being transported.

(5)  Any wheelchairs, crutches, prosthetic devices, and medication should be transported with, but not in the possession of, the prisoner.

(6)  Transport of prisoner's, for any reason after incarceration, will be accomplished by a sworn officer.

(7)  Prisoners shall not be left unattended during transport.

(8)  In the event of a prisoner escape all information shall be immediately reported to the communications **center** by means of the police radio if possible.

# SECTION 107
# UNIFORMS/GROOMING

**POLICY:** Employees of this agency are customer service representatives of this city and in that capacity it is very important that all employees, both sworn and non-sworn, present a professional image to the public. It shall be the policy of this agency that all employees will consistently maintain a neat and clean appearance at all times during the performance of official duties or at any time that he/she is representing this agency in any manner.

**PURPOSE:** The purpose of this policy is to provide all employees with guidelines concerning proper clothing, uniform and grooming requirements when on duty or when representing this agency in any manner.

**PROCEDURES:**

a. Grooming:
   (1) Employees will keep their persons clean and sanitary by practicing the following:
       (a) Bathing daily and practicing good hygiene.
       (b) Wearing clean clothes that are free from unpleasant odors.
   (2) Mustache:
       (a) The face shall be clean shaven, with the exception that the wearing of a neatly trimmed mustache is permitted. The lowest point of the mustache will be no lower than the lowest point of the bottom lip.
   (3) Hairstyle:
       (a) Hair will be neat and clean in appearance at all times.
       (b) While on duty, and in uniform, male officers will keep their hair trimmed according to the following guidelines:
           1. The back will be neatly tapered, rounded or squared and may extend down to the top of the collar.
           2. The length of the hair in front will not fall lower than one-half inch above the tops of the eyebrows.
           3. The length of the bulk of the hair on the sides will not extend lower than half way down the ear.
           4. Sideburns may extend downward to the bottom of the lowest part of the ear, but not below.
           5. Sideburns will not be flared or any wider at the bottom than their natural width at the top.
       (c) While on duty, and in uniform, female officers' hairstyle shall be worn according to the following guidelines:
           1. Hair will not extend below the bottom of the collar.
           2. Hair will be styled in a fashion that will allow the cap to be worn over the hair.
           3. Conspicuous pins, barrettes, and combs are not authorized.
       (d) Female officers working in non-uniform positions may wear their hair in a style that is not as restrictive however, the hair should be relatively short and in a style and color that is non offensive to the general public.
       (e) Civilians' hair will be neatly styled, trimmed and well kept. It will not be of a style, length or artificial color which is offensive to the general public.
       (f) Any employee whose current assignment may require any deviation from the above procedures, such as plain clothes undercover work, may make a request to the Chief of Police for approval of an exception. The said approval will automatically expire upon completion of the assignment.

b. Uniforms and equipment:
   (1) All personnel will be held personally accountable for the return of all department issued uniform items. No issued item is to become the property of any individual, all remain the property of the department. **NOTE: REFER TO POLICY MANUAL, SECTION 83, "PROPERTY: DEPARTMENTAL" FOR PROPER PROCEDURES IN ISSUING OR COLLECTING DEPARTMENTAL PROPERTY.**
   (2) Items lost or damaged during law enforcement activities will be reported to the Chief of Police as soon as possible by means of the appropriate report. **(REFER TO POLICY MANUAL, SECTION 83, PROPERTY: DEPARTMENTAL FOR INFORMATION ON APPROPRIATE REPORTS)**
   (3) Replacement of items of personal purchase which are lost or damaged in law enforcement activities will be determined on a case-by-case basis.

    (4)    Property lost or damaged as a result of law enforcement activities in connection with the arrest of an individual will be promptly reported, replacement costs determined and the officer involved will include, during prosecution of the individual, a request to the courts that any sentence include reimbursement of costs to the department.

    (5)    All officers will be issued a body armor vest and carrier for use. Wear will be required for all personnel participating in raids, any barricade or hostage situation, or in any situation deemed appropriate by the Chief of Police. Wear at other times is encouraged.

c.  Uniform Requirements:
1. All uniform clothing items will be clean and pressed
2. All uniform clothing items will not be torn, frayed or patched.
3. All leather items, belt, holster, handcuff case, etc. will be the appropriate color and style as determined by the Chief of Police.
4. All silver or brass items will be clean and properly polished.
5. When in uniform, all pieces of the uniform and all uniform equipment will be worn.
6. Shoes or boots will be the appropriate color and styles as determined by the Chief of Police, and will be shined/polished appropriately on a regular basis.
7. Socks that are exposed will be an appropriate color that matches the uniform.
8. Caps are required on certain assignments which are non-violent or of a non-emergency nature, and require an officer to be in the public view, such as traffic control, foot patrol, etc.
9. Caps are optional when responding to an urgent call, such as a fight or other type of disturbance. Caps are also optional in weather conditions, such as extreme heat, which cause discomfort when being worn.

d.  Court Appearances:
1. The police uniform is authorized dress for any court appearance.
2. Male officers may substitute a suit for the uniform when appearing in court. Minimum requirements for non-uniform court attire include:
    a.  Dress slacks
    b.  Dress shirt
    c.  Tie
    d.  Suit jacket or sports jacket
    e.  Dress shoes
3. Female officers may substitute conservative business suits or ensembles for the uniform when appearing in court.

e.  Non-uniform appearance:
1. Any female officer authorized to dress in plain clothes shall wear conservative business suits or ensembles when on duty. Clothing such as warm up suits, blue jeans, stretch pants or shorts is not appropriate attire when on duty.
2. Male officers authorized to dress in plain clothes will wear a suit or sports jacket with dress shirt, slacks and necktie. The jacket will be worn at any time the officer is out in the public view.
3. Whether on or off duty, an officer of this agency will not wear a firearm or a police badge in view of the public while not in uniform. An exception to this will be made in specific situations such as executing a search warrant/raid or at the scene of a similar type incident where the identity of plain clothes officers will need to be established.

f.  Non-sworn personnel:
1. All non-sworn female personnel whose duties require that they interact with the public will wear conservative type business suits or ensembles.
2. All non-sworn male personnel whose duties require that they interact with the public will wear slacks, dress or sport shirts and dress shoes. NOTE: Necktie is optional.
3. All non-sworn employees who do not interact with the public in the performance of their duties will dress casually, as directed by the Chief of Police and depending on the type of work performed.
4. Any non-sworn employee subpoenaed to appear in a court of law shall dress appropriately as outlined in section (d) above.

# SECTION 108
# USE OF FORCE

**POLICY:** This department recognizes and respects the value and special integrity of each human life. In vesting law enforcement officers with the lawful authority to use force to protect the public welfare, a careful balancing of all human interests is required. Therefore, it is the policy of this agency that law enforcement officers shall use only that force that is reasonably necessary to effectively bring an incident under control, while protecting the lives of the officer or another.

**PURPOSE:** To provide guidelines for law enforcement officers of this agency to follow in the use of force, either deadly or non-deadly, to bring an incident under control.

**DEFINITIONS:**

A. *Deadly force:*  Any use of force that is likely to cause death or serious bodily harm. For purposes of  this policy deadly force will mean the discharging of a firearm toward a person. No other type of deadly force is authorized

B. *Non-deadly force:*  Any use of force other than that which is considered deadly force.

**PROCEDURES:**

A.  Parameters for use of deadly force:
    (1)  Law enforcement officers are authorized to fire their weapons in order to:
        (a)  Protect the law enforcement officer or others from what is reasonably believed to be an immediate threat of death or serious bodily harm; or
        (b)  Prevent the escape of a fleeing felon whom the officer has probable cause to believe will pose a significant threat to human life should escape occur.
    (2)  Before using a firearm, law enforcement officers shall identify themselves and state their intent to shoot, where feasible.
    (3)  A law enforcement officer may also discharge a weapon under the following circumstances:
        (a)  During range practice or competitive sporting events.
        (b)  To destroy an animal that represents a threat to public safety, or as a humanitarian measure where the animal is seriously injured.
    (4)  Law enforcement officers shall adhere to the following restrictions when their weapon is  exhibited:
        (a)  Except for maintenance or during training, law enforcement officers shall not draw or exhibit their firearm unless circumstances create reasonable cause to believe that it may be necessary to use the weapon in conformance to this policy.
        (b)  Warning shots are prohibited.
        (c)  Law enforcement officers shall not fire their weapons at or from a moving vehicle. An exception to this provision will be justified under circumstances where an officer is in immediate danger of being subjected to deadly force. Example: A suspect in a moving vehicle discharges or is attempting to discharge a weapon directed at a vehicle occupied by a law enforcement officer.
        (d)  Firearms shall not be discharged when it appears likely that an innocent person may be injured.

B.  Parameters for use of non-deadly force:
    (1)  Where deadly force is not authorized, officers should assess the incident, if possible, in order to determine which non-deadly technique or weapon will best bring the incident under control in a safe manner.
    (2)  Law enforcement officers are authorized to use non-deadly force techniques and issued equipment for resolution of incidents, as follows:
        (a)  To protect themselves or another from physical harm; or
        (b)  To restrain or subdue a resistant individual; or
        (c)  To bring an unlawful situation safely and effectively under control.

C.  Training and qualifications:
    (1)  Deadly weapons:
        (a)  While on-and off-duty, law enforcement officers shall carry only weapons and ammunition

authorized by and registered with this agency.
- (b) Authorized weapons are those with which the law enforcement officer has qualified and received departmental training on proper and safe usage, and that are registered and comply with departmental specifications.
- (c) This agency shall schedule regular training and qualification sessions for duty, off-duty and specialized weapons, which will be graded on a pass/fail basis.
- (d) Law enforcement officers who fail to receive a passing score with their duty weapon(s) in accordance with department testing procedures shall be relieved of their police powers and immediately reassigned to non-enforcement duties.
- (e) A law enforcement officer shall not be permitted to carry any weapon with which he has not been able to qualify during the most recent qualification period.
- (f) A law enforcement officer who has taken extended leave or suffered an illness or injury that could affect his use of firearms ability will be required to re-qualify before returning to enforcement duties.

(2) Non-deadly force weapons and methods:
- (a) A law enforcement officer is not permitted to use a non-deadly weapon unless qualified in its proficient use as determined by training procedures.
- (b) The following non-deadly weapons are authorized:
  - (1) Police Baton - A police baton may be used when considerable force is necessary. The baton will permit an officer to defend himself or others in situations where the use of firearms may not be necessary or justified. Officers must use discretion in determining whether or not to use this equipment. Generally, if verbal persuasion and other means of force have failed to effectively control an individual and backup is not readily available the use of the baton is justified to gain control.
  - (2) Side Handle Baton - Officers who have not completed the certified training are not authorized to carry the side handle baton. The same rules apply to this piece of equipment as the regular baton listed above.
  - (3) Flashlights - In the event it becomes necessary to use a flashlight as a defensive weapon, officers will use it in the same manner as the baton.
    * Note: In use of the above non-lethal weapons, suspects should not be struck in the head, neck, groin area, joints or kidneys.
  - (4) OC Pepper Mace - Generally OC Pepper Mace spray will only be used when a danger of physical injury to the officer or other person(s) is reasonably apparent and the officer is unable to verbally control an offender.
    - Note: In use of OC Pepper Mace, officers must successfully complete a training course approved by the department on the use of OC Pepper Mace prior to carrying or deploying the agent. This course must include the officer being exposed to the effects of the OC agents, and guidelines for proper cleanup/treatment of persons exposed, including bystanders, officers and suspects.
  - (5) Weaponless Defense/Arrest Tactics - Officers may use defense tactics in which departmental training has been given to control or arrest uncooperative suspects.
  - (6) Canine - The use of a police canine to search for or apprehend suspects will be considered a use of force under this policy when the canine inflicts injury.

D. Escalating levels of force:   For the purposes of this policy use of force, if possible, will begin and escalate to different levels in the following sequence:
1. (Level 1): Verbal Persuasion
2. (Level 2): Minor physical force (taking a suspect/prisoner by the arm as a physical type of persuasion)
3. (Level 3): OC Pepper Spray (use ONLY if resistance is encountered in step 2 above)
4. (Level 4): Defensive tactics (use of defensive tactics at this point will often result in the suspect/prisoner being subdued, and will include placing hands behind the back for handcuffing)
5. (Level 5): Use of baton, PR-24, kubaton or flashlight.
6. (Level 6): Deadly force; Deadly force as used in this policy shall mean the discharging of a firearm toward a person. Justification for the use of deadly physical force by an officer is restricted to the following:
   a. When necessary to defend the officer or another person from death or serious bodily injury, and all other means of defense have failed or would be inadequate under the circumstances.
   b. To effect the arrest of a person attempting to escape from a violent felony, and then ONLY if the officer reasonably believes the fleeing felon poses a significant threat to human life should escape occur.

E.  It is impossible to control at which level of force any particular use of force incident will begin or how quickly and in what steps it might escalate. An incident might begin at "level # 4" for instance instead of level #1. As another example, a use of force incident might begin at level # 1, verbal persuasion, and escalate immediately to level # 6, deadly force.

F.  The most important thing to remember concerning the use of force is that an officer must use judgment each time a use of force incident occurs and an officer must base this judgment on training along with the circumstances associated with the incident to make a decision on what type of force to use. An officer must always remember that whatever the circumstances are, only the minimum amount of force necessary will be used to preserve the peace, prevent the commission of offenses, effect lawful arrests' or defend persons or property.

G.  Reporting uses of force:
   (1)  A written "INCIDENT" report prepared according to departmental procedures will be required in the following situations:
      (a)  When a firearm is discharged outside the firing range.
      (b)  When a use of force results in death or injury.
      (c)  When a non-lethal weapon is used against a person.
      (d)  Anytime physical force is used against a person to affect an arrest.
      NOTE:  The use of handcuffs, although considered to be a use of force, will be excluded from the report requirement.
   (2)  A use of force report will outline the circumstances surrounding the use of force, the specific degree, amount and type of force employed and the results of the use of force. (who, what, when, where, why and how)
   (3)  A supervisor will be immediately summoned to the scene and will comply with investigative procedures as required by the department in the following situations:
      (a)  When a firearm is discharged outside of the firing range.
      (b)  When a use of force results in death or serious injury.
      (c)  When a subject complains that an injury has been inflicted.

H.  Agency response:
   (1)  Deadly force incident
      (a)  Where a law enforcement officer's use of force causes death, the officer shall be placed on administrative leave and arrangements made with a mental health agency for counseling purposes.
      (b)  The purpose of the counseling is to help the officer cope with the stress and reactions to the use of deadly force.
      (c)  An officer will be allowed to return to duty only after all investigative requirements are complete and it is determined by a mental health professional that the officer is ready to return to duty.
      (d)  This agency will conduct both administrative and criminal investigations as a result of any incident involving the use of deadly force. Refer to policy manual section 53 Criminal Investigation and section 54 Internal Affairs Investigation for proper investigative procedures.
   (2)  Administrative review of critical incidents:
      (a)  All reported uses of force will be reviewed by the appropriate departmental authority to determine whether:
         (1)  Departmental rules, policy or procedure were violated;
         (2)  The relevant policy was clearly understandable and effective to cover the situation; and
         (3)  Department training is currently adequate.
      (b)  All findings of policy violations or training inadequacies shall be reported to the Chief of Police for resolution and/or discipline.
      (c)  All use of force incident reports shall be retained indefinitely.

# SECTION 109
# HOSTAGE/BARRICADED SUBJECT SITUATIONS

**POLICY:**   In hostage/barricaded subject situations it shall be the policy of this law enforcement agency to consider the lives of the hostages, civilians and officers involved to be of the utmost importance; whenever possible, to enhance the prospects of peacefully resolving the incident through communication with the suspect; whenever possible, to develop and maintain the ability to use alternative approaches to resolve the incident should communications fail; and in hostage situations, to make every reasonable effort to effect the safe release of the hostages.

## DEFINITIONS:

a.   Barricaded Subject:  Any individual who is reasonably believed to be a threat to commit serious bodily injury or death to hostages, officers or others in the community and who is in a stronghold position.
b.   Hostage:  Any person held by another against his will by force or threat of force, expressed or implied.

## PROCEDURES

a.   Patrol Officers.  Patrol officers confronting hostage/barricaded subject incidents shall not initiate tactical actions other than those necessary to protect the lives and safety of themselves or others consistent with this department's use of force policy.  Officers shall then:
   (1)   notify dispatch of the situation and request other on-duty patrol units' assistance at the scene, including any state police and highway police units on patrol in the jurisdiction.
   (2)   direct dispatch to notify the Chief of Police immediately of the situation.  The Chief of Police will make the decision to call out additional support.
   (3)   contain and isolate the incident scene, establishing an inner containment perimeter to provide a reasonable degree of safety while maintaining contact with the incident scene and as time and resources permit establish an outer containment perimeter to control pedestrian and vehicular traffic into the area;
   (4)   whenever possible, evacuate occupants of affected residences and businesses to a point beyond the perimeter; and
   (5)   attempt to make contact with the subject to calm, distract and to gain information, while you
      (a)   avoid soliciting demands;
      (b)   listen carefully for clues regarding the subject's emotional state;
      (c)   avoid bargaining or making concessions;
      (d)   reassure subject that police will not storm the building;
      (e)   do not offer subject's anything;
      (f)   minimize seriousness of subject's crimes
      (g)   do not refer to people being held as "hostages";
      (h)   avoid tricks and try to be honest;
      (i)   never say "No" to a demand (you do not have to say "Yes", either);
      (j)   do not make suggestions; and
      (k)   do not use "outsiders" to talk to subjects.

b.   Officer in Command (OIC).  The ranking officer at the scene shall be in command until specifically relieved by a superior.  The OIC shall
   (1)   inform the Chief of Police about the nature and circumstances surrounding the incident;
   (2)   delegate the tactical mission to the OIC of the tactical response team;
   (3)   ensure development of a communications/negotiations process and an emergency response team reaction;
   (4)   ensure establishment of an inner and outer perimeter, command post, tactical operations center, negotiations center and a staging area for officers and others arriving for assignment;
   (5)   assign a press center and an officer for press liaison;

(6)  ensure that responsibility for traffic and crowd control is established, and that routes for emergency vehicles have been designated;

(7)  make provisions for recording personnel assignments and developing a chronological record of events at the command center and tactical operations center;

(8)  ensure that necessary equipment from the fire department is made available at the staging area together with any other units or equipment such as canine teams; and

(9)  ensure that emergency medical services are available at the site.

c.  Tactical Response Team Commander.  The commander of the tactical response team shall

(1)  assist the OIC in assessing the situation and formulate and provide the OIC with recommended tactical alternatives should communications with the subject fail to resolve the incident;

(2)  determine equipment needs and assign personnel to control and contain the inner perimeter

(3)  designate marksmen and entry teams as necessary;

(4)  ensure that personnel manning the inner perimeter maintain firearms discipline and are provided with periodic relief by appropriate tactical response team members;

(5)  prepare appropriate logistical plans to include diagrams of the location in question;

(6)  ensure the establishment of a tactical operations center if necessary; and

(7)  maintain contact with and keep the command post informed of all developments and operations.

d.  Hostage Communications Team.  The individual in charge of communicating with the subject shall

(1)  provide any requested assistance to the OIC;

(2)  provide trained primary and secondary negotiators and, as available and necessary, a negotiations investigator

(3)  obtain all pertinent information about the hostage taker, the hostages, hostage site and other barricaded subjects;

(4)  designate a location to interview witnesses, released hostages and others; and

(5)  debrief hostages following the incident.

# SECTION 110
## TOWING/WRECKER SERVICE

**POLICY:** On many occasions during normal operations of this agency it becomes necessary to authorize the services of private wrecker companies without the knowledge or express consent of the vehicle owners. This department must maintain fairness, equality and insure the protection of vehicle owners from unethical or unfair business practices on the part of the private wrecker companies whose services are authorized, and Officers of this agency must know when the towing of certain vehicles is authorized. Whenever possible, owners or operators of vehicles for which towing is required will be encouraged to specify a towing service of their own choice. When required, the officer will summons needed tow trucks on a rotation basis, unless a specific request for a particular tow service has been made by the owner or operator of the vehicle to be towed. A Tow Book will be maintained by this agency to insure tow trucks are called on a rotation basis.

**PURPOSE:** To provide guidelines for all department employees to follow in towing of vehicles by this agency, and in documentation requirements subsequent to each towing incident.

**PROCEDURES:**
a. Towing Situations:
  (1) Accident: Any vehicle involved in an accident shall be removed to the shoulder of the road or elsewhere as soon as possible after necessary accident investigation information has been obtained. Vehicles shall be removed from the shoulder without unnecessary delay.
    (a) Vehicles may be pushed at no expense to owner to the shoulder of the road or other legal parking spot which does not obstruct or impede vehicle travel on the roadway.
    (b) If this is not possible, and a traffic hazard is potentially created, towing of the vehicle at the expense of the owner, may be ordered by the investigating officer.
  (2) Emergency Situation: Any vehicle found illegally parked, in the vicinity of a fire, traffic or airplane accident or area of emergency, which creates a traffic hazard or interferes with the necessary work of law enforcement, fire, or other rescue workers may be ordered towed, at the expense of the owner, by a law enforcement officer.
  (3) Impeding/Danger to Traffic: No vehicle shall be stopped in such a manner as to impede or render dangerous the a traffic hazard the law enforcement officer may order the vehicle towed at the expense of the owner.
  (4) Blocking Driveway or Parking Area: Any law enforcement officer discovering or having report of any motor
  (5) Unattended Traffic Hazard/Violation of Law: Officers may tow any motor vehicle found on the public street or
  (6) Unattended Vehicle: Whenever any motor vehicle is left unattended for more than 10 days upon any public or
  (7) Abandoned Vehicle: Whenever any motor vehicle is abandoned upon public or privately owned property, without the permission of the owner, lease, or occupant thereof, a law enforcement officer may order it towed at the expense of the owner of the vehicle. A vehicle may be presumed to be abandoned if:
    (a) it is inoperable and left unattended on public property for more than 48 hours;
    (b) has remained illegally on public property for more than 48 hours; or
    (c) has remained, without consent on private property, including, but not limited to any commercial parking space, motor vehicle storage facility or establishment for the service, repair, maintenance or sale of motor vehicle, whether or not such vehicle was brought onto or left at such property with or without the consent of the owner or person in control of the property, for more than 48 hours.
    (d) it has been parked in a specific location, upon a public right-of-way for ten or more days without being moved.
  (8) Removal from Private Property:
    (a) Property owners, etc., may act immediately to have vehicles towed which are occupying lot, area, space, building or part thereof without their permission.
    (b) Evidence/Crime Involvement: Vehicles that must be processed for evidence or as evidence, having been involved in the commission of a crime, will normally be towed at the request of the officer to the department. When all evidentiary processing has been completed, vehicles may be released to owners upon presentation of proof of payment of the tow bill.
    (c) Anytime a warrant exists for seizing the vehicle or the vehicle meets the normal requirements for warrantless seizure from private property.
    (d) Officers of this agency are not authorized to order a vehicle towed from private property except in circumstances as listed in # 7 (c) and # 8 (b) and (c) above.
    (e) Officers of this agency will advise private property owners that vehicles cannot be removed from their property by this agency except in circumstances as listed above.
    (f) Officers will not recommend any particular wrecker service to private property owners, however, may provide information as to the various towing services available if the information is requested by the property owner.
  (9) Arrested persons: Following the arrest of a driver of a motor vehicle such as a DWI suspect or a person wanted pursuant to a warrant, and the vehicle is not subject to seizure, the following procedures will be followed:

(a)  A vehicle that is legally and safely parked shall be locked and left at the arrest location if the suspect consents.

(b)  The suspect may turn the keys over to a friend or relative who will become responsible for the vehicle.

(c)  If the vehicle is on private property at the time of arrest and the vehicle owner requests that the vehicle be left parked on the private property, the vehicle may be left if the property owner is present and gives permission. If the owner of the property is not present or does not give permission for the vehicle to be left parked on the property, the vehicle will be towed.

(d)  The suspect may request the vehicle be towed by a particular towing service. If so, and the request is reasonable, dispatch will be instructed to notify the towing service as requested.

(e)  If the suspect does not consent to locking and leaving a legally and safely parked vehicle, or refuses to allow a friend or relative to move the vehicle, or does not request a particular tow service to move the vehicle, the law enforcement officer may order it towed for safekeeping at the owner's expense.

(f)  If the  vehicle is left parked or released to another individual, the officer will provide the disposition of the vehicle to dispatch personnel. Dispatch personnel will document this information in the comments section of the tow log.

b.  Towing Procedure

(1)  The law enforcement officer should know under which provision of departmental policy the vehicle will be towed.

(2)  It is always preferred to have the vehicle owner/operator name the towing company to be used.

(3)  If the owner/operator does not wish to specify a towing firm or is not available to make a choice, the officer will ask the dispatcher to send the next wrecker from the wrecker rotation list.

(4)  In an emergency situation involving major traffic congestion and tie up, the officer will so notify the dispatcher and will request the closest/most readily accessible wrecker.

(5)  If the vehicles involved are larger than normal passenger vehicle or pickup size, the officer should so advise the dispatcher who has a separate list of specially equipped wrecker services.

(6)  When a vehicle owner/operator requests that a specific wrecker be called, the Dispatcher will make an entry of such on the Citizen Wrecker Request Log sheet, showing the service called, date, time, arrival time at the scene, any comments, and requesting officer's and dispatcher's signal numbers.

(7)  When the wrecker arrives on the scene, the officer will advise the dispatcher of the time of arrival and any other subsequent problems.

(8)  Dispatchers will be notified of all vehicles being towed by officers or owners of private property and will record the information on the tow log.

(a)  Officer requests will be recorded on the Wrecker Rotation List,  with vehicle description and reason for towing recorded in the "Comment" column.

(b)  Private property owners must advise the name of the wrecker service summoned, description of the vehicle to be towed, where the vehicle is being towed from and to, and their name and the reason for towing.

(9)  Unless directed otherwise by the owner, a towed vehicle will normally be towed to and stored at the wrecker company towing the vehicle.  It is then the responsibility of the wrecker company to collect the tow bill. On occasions where a vehicle is towed to the department for processing, the owner of the vehicle will have to present a paid tow bill before the vehicle is released to the owner.  A copy of this paid tow bill should be forwarded to the Chief's Office.

(10)  In accordance with **Arkansas Code 27-50-1208, ACT 1000 of 1993**, any officer of this agency who causes an abandoned or unattended vehicle to be towed will, within 24 hours of the tow, provide the following information, at no cost, to the wrecker service towing the vehicle:

a.  Information received from the records of motor vehicles or through ACIC which will include:

1.  Name and address of last registered owner;

2.  The name and address of the holder of any recorded lien on the vehicle;

3.  The VIN (Serial) number of the vehicle

(11)  Towed vehicles will normally not have a "hold" placed on them by a law enforcement officer for reasons of defective equipment, altered equipment, etc., and will be released to the owner following payment of the tow bill.

c.  Vehicle Holds:

1.  Any officer of this department placing a hold on a vehicle will advise dispatch personnel who will document the "hold" status on the tow log.

2.  The officer placing a hold on a vehicle will document the reason for the hold on an inventory (Tow) report.

3.  The officer placing a hold on a vehicle shall indicate on the tow report what steps should be completed to release the hold. EXAMPLE: If a vehicle involved in an accident is towed because the driver abandoned the vehicle and fled

110.2

the scene, the tow report should reflect that once the driver responds to the department, receives a citation and provides other necessary information the vehicle hold may be released.

4. In cases of investigative holds placed on vehicles by C.I.D. the tow log will indicate a hold by C.I.D. and the owner or driver referred to C.I.D. to clear the hold. C.I.D. is responsible for maintaining a storage log for vehicles with an investigative hold, so that on duty detectives can process a vehicle for evidence, clear the hold and release the vehicle to the owner.

5. Any officer, uniform or detective, placing a hold on a vehicle will be responsible for completing an investigation, contacting or attempting to contact the vehicle owner and releasing the vehicle to the owner as quickly as possible.

6. Although some major cases will require longer vehicle holds while evidence is processed, the majority of holds placed on vehicles can be easily resolved quickly by the on-duty patrol or C.I.D. shift.

7. Any contact or attempted contact with a vehicle owner whose vehicle has been the subject of a police hold shall be documented either on the tow report or a supplement to the tow report.

d. Inventory

   (1) Vehicles that are towed at the request of the owner/operator or vehicles that are left legally parked will not be inventoried, officers are reminded of the "plain view doctrine" and the limitations upon the authority to search incidental to a lawful arrest. (Reference **SECTION 50, INVENTORY - MOTOR VEHICLE**).

   (2) A vehicle inventory tow-in report will be completed when an officer assumes responsibility for towing a vehicle.

   (3) The vehicle inventory tow-in report will contain at a minimum the following information:

      a. The registered owner of the vehicle along with address and telephone number if available.
      b. Vehicle information: make model, LPN, VIN, color and any other identifying information.
      c. Valuables located on or inside the vehicle.
      d. Condition of the vehicle: operable/inoperable, etc.
      e. Damage to the vehicle, interior or exterior.
      f. Inventory of the vehicle.
      g. Any known liens against the vehicle
      h. Location from which the vehicle was towed to where the vehicle is stored.
      i. Reason for tow
      j. Date and time of tow

   (4) Prior to the vehicle being removed, officers will obtain the signature of the tow truck driver on the inventory report and provide the tow driver a duplicate copy of the report.

   (5) Officer will turn in original copy of inventory report to dispatcher, who will in turn file the report in the Towed Vehicle File.

   (6) At the beginning of each month, inventory reports filed during the previous month will be transferred to Records and retained for a period of three years.

e. Wrecker Rotation List

   (1) All wrecker services wishing to be called by this agency must meet the following criteria:

      (a) Each towing and recovery company must submit a written request to the Chief of Police requesting to be placed on the department rotation list. The Chief shall have the authority to accept or reject such requests.

      (b) Each requesting company must provide twenty-four (24) hour continuous service for both the acceptance and release of vehicles and for requests for service.

      (c) Each requesting company must provide tow vehicles that are in good mechanically safe conditions and must display a current commercial vehicle license as required by state law. The towing and recovery company must also possess a license and decal issued by the Arkansas Towing and Recovery Board, which will be provided to the Chief of Police for departmental records.

      (d) Each requesting company must maintain a minimum of two (2) wreckers equipped with the following:

         \* At least one (1) ton vehicle
         \* Equipped with a wheel lift
         \* One (1) fire extinguisher (ABC type, not less than 10 lb.) per wrecker.
         \* Shovel
         \* Broom
         \* Scotches -- minimum of one (1) set.
         \* Dollies -- minimum of one (1) set.
         \* Bar lights, amber in color (meets requirements of **ACA 27-36-305** and **ACA 27-37-302**).
         \* Brake Lock System
         \* Sand or Oil Dry (for minor oil or fuel leaks).
         \* Radio equipped with the department radio frequency for communication between the department and the wrecker driver.

(e) All wreckers used to tow on behalf of this agency must be properly permitted by the Arkansas Towing and Recovery Board. All wrecker operations must meet the minimum insurance requirements set forth by the Arkansas Towing and Recovery Board, including on-hook cargo insurance.

(f) The owner of the towing company shall provide the names and driver's license number of all employees that will operate and store towed vehicles.

(g) Must have trained operators and use proper towing methods.

(h) Maximum 20 minute response time from time dispatcher logs call until time the law enforcement officer reports arrival at scene.

(i) Each towing and storage facility must maintain a lighted area surrounded by adequate fencing to prevent entrance by unauthorized persons and must hold itself responsible for any theft or vandalism of stored property.

(j) The towing service shall provide the Chief of Police with a maximum of three (3) local telephone numbers where the service can be reached. At least one number shall be listed in the name of the business. Pager numbers shall not be accepted by this agency. If for some reason the dispatcher cannot make contact with the phone numbers provided, the dispatcher will use the radio. If no contact is made, the towing company will lose its turn for that call.

(k) No towing company shall proceed to any scene being investigated by this agency unless requested by this agency or the owner or person in control of the vehicle. Should a towing company or any of its employees receive notification that a tow truck is needed from a source other than a law enforcement agency of the owner or person in control of the vehicle, the towing company should immediately notify this department. Upon arrival at a scene the tow operator shall not take any action until directed by the law enforcement officer in charge.

(l) All tow operators must obey all Arkansas Vehicle and Traffic Laws.

(m) Rates charged will be "reasonable, necessary costs".

(n) Wrecker services failing to meet the above criteria will be so advised in writing and warned only once. Any further discrepancies will result in the wrecker service listing being deleted from the wrecker rotation list and being advised in writing accordingly.

f.  Use of Wrecker Rotation List:

   (1) Officer requests next wrecker and advises if special equipment needed.

   (2) Dispatcher, using correct wrecker list, calls wrecker service whose turn is next.

      (a) If phone is busy and dispatcher cannot reach tow service by radio, place "B" on list and call next wrecker.

      (b) If phone and radio is not answered or wrecker is not available, place "NA" on list and call next wrecker.

      (c) On completed call, note time and service called on Wrecker Log. When officer calls in wrecker arrival time, note this on Wrecker Log. If more than 20 minutes or if officer identifies other problems, dispatcher should leave note for Chief of Police.

      (d) If a wrecker is called to a scene, and for any reason the tow is canceled, this will not count as a turn on the rotation list, unless the wrecker driver receives payment for services rendered. Dispatchers will note that the call was "canceled," and when another wrecker is again required will call that wrecker company again.

   (3) At least monthly, the Chief of Police will check the wrecker rotation list, slow arrival notes, and officer comments and take appropriate action regarding warning and/or disqualifying wrecker services.

   (4) Officer Feedback: To insure efficient tow service is being rendered, officers comments are strongly encouraged.

g.  Complaints. Any complaints against the department or towing service that the owner or person in charge of any vehicle that this agency has caused to be towed wishes to make should be in written form to the Chief of Police. he Chief of Police shall make a determination of the merit of such complaint and take such actions as necessary to correct the matter if the complaint is validated.

h.  Hearing Process: **Arkansas Code 27-50-1208** provides that should the owner of a towed vehicle consider that the original taking of his/her vehicle was improper or not legally justified, he/she has a right to contest the towing process in a court of competent jurisdiction. Should this situation occur, refer the vehicle owner to the Chief of Police for complaint processing.

# SECTION  112
## EQUAL EMPLOYMENT OPPORTUNITY

**POLICY**:  This agency will be committed to complying with all laws, both state and federal, pertaining to equal employment opportunity, affirmative action, and discrimination or harassment of any type in the workplace.

**PURPOSE**:  To establish and define the policy for this agency concerning fair employment practices and to ensure equal employment opportunities, free from harassment or discrimination, to all employees and applicants for employment.

**POLICY STATEMENT/PROCEDUREDS**:

A. It shall be the policy of this Department to base all employment decisions on principles of equal opportunity. This agency will not discriminate against any employee or applicant for employment on the basis of the following:
1. Race
2. Color
3. Religion
4. Sex
5. National Origin
6. Disability
7. Age
8. Veteran status
9. handicap
10. Sexual Orientation
11. Marital Status

B. Employment opportunities will not be distinguished on the basis of age, national origin, or disability/handicap except for the position of police officer as defined by **ACT 452 of 1975, (codified as Arkansas Code 12-9-101 through 12-9-109)**, the establishment of the State of Arkansas Executive Commission on Law Enforcement Standards and Training.  The said ACT establishes the following minimum requirements:
1. Requires that an individual be at least 21 years of age before being eligible for the position of police officer.
2. Requires that an individual, to be eligible for the position of police officer, must be a citizen of the United States.   **NOTE:**  This law would not be applicable to an individual who has obtained citizenship by means of other than national origin.
3. Requires that an individual be physically and mentally capable of performing the duties of a police officer. An applicant must successfully complete physical and mental examinations performed by qualified professionals licensed to practice in each respective field.

C. This department fully supports the Americans with Disabilities Act, (ADA), and will respond to reasonable requests for job accommodations.

D. The administration of this Department will take affirmative action to recruit, hire, reassign, compensate, train, demote, and to advance in employment: minorities, women, qualified individuals with disabilities and veterans. This agency is committed to making sustained, diligent efforts to identify and consider such individuals for employment and for opportunities arising during employment.

E. Harassment, in any form, against any employee of this agency or applicant for employment is unacceptable and will not be tolerated.

F. All employees must respect civil rights laws and refrain from discriminatory actions. It is everyone's responsibility to perform official duties in a way that maintains and fosters a non-hostile work environment free from discrimination.

G. Discriminatory actions or conduct may include remarks and jokes regarding race, color, religion, sex, national origin, age, physical/mental ability, marital status, sexual orientation, etc.

H. This agency prohibits any retaliatory action against an employee for opposing a practice which he/she believes to be discriminatory. This includes the filing of an internal complaint or the filing of a complaint with a state or federal civil rights enforcement agency.

I. The Chief of Police, or his/her designee, will be responsible for educating employees on equal employment opportunity, affirmative action and discrimination/harassment issues. He will also be responsible for ensuring that staff members at all levels carry out the intent of this equal employment/affirmative action policy and take appropriate measures to correct any discrimination which might occur.

J. All employees are expected to abide by the procedures as outlined within this policy. Violation of this policy will subject an employee to disciplinary action, up to and including dismissal.

112.1

# SECTION 113
# SPIKED BARRIER SYSTEM

**POLICY:** A method commonly used by law enforcement agencies to stop a vehicle involved in a pursuit situation is to deploy a device designed to deflate a vehicle's tires at a controlled rate. A Spiked Barrier System is a device designed for that purpose, resulting in a reasonably safe and effective immobilization of the pursued vehicle. It shall be the policy of this agency to utilize a Spiked Barrier System in pursuit situations for which there is a potential risk of injury to any person.

**PURPOSE:** To provide guidelines for all law enforcement officers of this agency to follow in the proper use and care of the Spiked Barrier System.

**DEFINITIONS:**

1. **Spiked Barrier System:** A tire deflation device for law enforcement use. The device is used in stopping vehicles involved in pursuits with law enforcement officers. The Spiked system is designed to stop a vehicle by deflating its tires at a controlled rate, resulting in a reasonably safe and effective immobilization of the vehicle.
2. **Vehicle pursuit:** A law enforcement phrase which describes the situation of a police officer, in a police vehicle with emergency lights and siren activated, pursuing an individual who is fleeing in a vehicle at various speeds, (low, moderate or high), and refuses to stop.

**PROCEDURES:**

A. **UTILIZATION OF THE SPIKED BARRIER SYSTEM:**
   1. The Spiked Barrier System will be used in vehicle pursuit situations for which there is a potential for injury to any person. The following guidelines will be followed before utilizing the system at any time:
      a. The Chief of Police, or highest ranking officer on duty when a pursuit begins, will make a decision, based on all the circumstances involved in each situation, whether to terminate the pursuit or to utilize the Spiked Barrier System.
   2. The Spiked Barrier System may be used when the following circumstances are present:
      a. A law enforcement officer of this agency initiates a traffic stop using emergency lights however, the suspect operating the vehicle in question refuses to stop and instead continues to drive, at various speeds, causing the officer to initiate a pursuit situation for which emergency lights and siren are used. **(NOTE: EMERGENCY LIGHTS AND SIREN WILL ALWAYS BE UTILIZED BEFORE USING THE SPIKED BARRIER SYSTEM SO THERE IS NO QUESTION THAT THE OPERATOR OF THE SUSPECT VEHICLE KNEW HE/SHE WAS GIVEN A COMMAND TO STOP BY A LAW ENFORCEMENT OFFICER.)**
      b. When a law enforcement officer of another agency is involved in a vehicle pursuit situation which has entered the corporate limits of this city and the pursuing agency is requesting assistance.
      c. To assist another agency outside the corporate limits of this city, but only upon request of the agency. **NOTE:** In this type of situation an officer from this agency will deploy the device for the requesting agency and will deploy the device in accordance with guidelines of this policy. Under no circumstances will an officer of this agency loan the Spiked Barrier System to another agency.
      d. When the risk of allowing a pursuit to continue outweighs the risk of making a forcible traffic stop.
   3. The Spiked Barrier System shall not be used in stopping the following vehicle types:
      a. Motorcycle
      b. Moped
      c. Any other two wheeled vehicle
      d. Vehicles (cycles) commonly referred to as three wheelers or four wheelers
   4. The Spiked Barrier System will not be used in stopping the following vehicles: (except under circumstances where if not used the threat to public safety is likely to be greater.):
      a. Any vehicle transporting hazardous materials
      b. Any passenger bus transporting passengers
      c. Any school bus transporting students
      d. Any vehicle that would pose an unusual hazard to innocent persons

B. **TRAINING REQUIREMENTS:**
   1. Before using the Spiked Barrier System in an actual vehicle stop, a law enforcement officer of this agency must first complete a training class, taught by a certified law enforcement instructor, which includes the following criteria:

      a.  **DESCRIPTION** and OPERATION of the System.
      b.  **SAFETY** precautions in handling or deploying the System.
      c.  Methods and proper procedures of DEPLOYMENT.
      d.  Methods and proper procedures of RECOVERY after using the System.
      e.  Proper procedures involved in SPIKE **REPLACEMENT**. (**NOTE:** Any officer deploying the Spike System will be responsible for replacing the spikes after its use.)
      f.  Proper STORAGE of the System. (**NOTE:** Any officer deploying the Spike System will be responsible for properly packaging and storing the device after its use.)

2.  One officer within the department, appointed by the Chief of Police, will be trained to inspect the Spike System and accomplish any repair that might be needed. The System will be inspected after each use to assure that:
      a.  The device is stored properly.
      b.  There are no missing or loose screws, (if so, tighten or replace).
      c.  The Spikes have been properly replaced.
      d.  The device is operational and ready for use.

## C.  DEPLOYMENT:

1.  The Spiked Barrier System will be deployed in a manner as recommended by the manufacturer and in accordance with departmental policy, procedure and training.  **NOTE:**  Safety precautions of wearing departmental specified gloves and eye protection equipment are mandatory during deployment.

2.  The Spike System will be carried in the trunk of a squad car operated by an on-duty officer as assigned by the highest ranking officer on each shift.

3.  When a decision has been made by the appropriate authority, (highest ranking officer on duty), to utilize the Spike System, the authority will coordinate and direct the officer in possession of the device to a location for deployment.

4.  The officer in possession of the Spike System will notify telecommunications personnel and the pursuing officer(s) when he/she has arrived at the deployment location and is in position to deploy the device.

5.  A deployment location should provide a good line of sight to enable the deploying officer to observe the suspect vehicle and the pursuing police unit(s) as these vehicle's approach. Deployment should not take place within a curve, on a hill or any other area where the deploying officer cannot observe the approaching vehicles. If at all possible, a level section of the roadway that provides the deploying officer some type of safety barrier, such as guardrails, abutments, bridges, overpasses and etc., should be selected as a favorable location for deployment.

6.  The deploying officer will maintain communications with the officer(s) in pursuit and deploy the Spike System in accordance with the manufacturer's recommendation in conjunction with the following circumstances:
      a.  upon sight of the suspect vehicle by pushing or throwing. **NOTE:** This does not require the deploying officer to cross the lanes of traffic.
      b.  At a time when the deploying officer is certain that no other passing motorists will travel over the device prior to the arrival of the suspect vehicle, deployment can be accomplished by throwing, pushing or by use of the rope. The rope, however, requires that the deploying officer cross the lanes of traffic.
      **NOTE:** In any deployment situation, **DO NOT** hold the rope as the suspect vehicle passes.
      c.  At any time prior to suspect vehicle arrival if the Spiked Barrier System is equipped with remote controlled retractable spikes.

7.  The officer deploying the Spike System will notify the pursuing officer(s) when the device has been deployed.

8.  The pursuing officer(s), upon approaching the deployment location, will allow enough distance between the police vehicle and the suspect vehicle that the deploying officer can remove (RECOVER) the Spike System from the roadway after the suspect vehicle has engaged the device and before engagement is possible by the police vehicle. (**NOTE:** This will require that pursuing officer(s) drastically decrease the speed of their vehicle upon approach of the deployment location; however continue to pursue at a decreased speed with emergency lights and siren in use.)

9.  Deployment of the Spiked Barrier System will not be attempted unless there is sufficient time to complete the task in a safe, organized and efficient manner.

10.  On each occasion that the Spike System is deployed and recovered from the roadway, it will be necessary to prepare it for use before it is deployed again.

D.  **RECOVERY/STORAGE:**
1.  Each officer will be trained on how to properly RECOVER the Spiked Barrier System as quickly and efficiently as possible. After the device is removed from the roadway, the officer recovering it will make sure that:
    a.  Other vehicular traffic that might be on the roadway is either stopped briefly or detoured around the scene of deployment until the area has been searched for spikes or other debris which might be present.
    b.  Any rocks, grass or other debris which might be attached to the device is removed.
    c.  The spikes are replaced on the device.
    d.  Any visual signs of damage to the device is noted, (listed on the report).
    e.  Any loose screws are tightened and any missing screws are replaced.
    f.  The device is properly packaged in its case, (unless damage prohibits this), and stored in an assigned patrol vehicle.

E.  **REPORTING/ADMINISTRATIVE REQUIREMENTS:**
1.  Any officer who deploys the Spiked Barrier System, other than for training exercises, will be required to complete a detailed report concerning use of the equipment. Information on the report will include, but not be limited to, the following:
    a.  Pursuing officer(s)
    b.  Location where the pursuit began and location of the Spike System deployment
    c.  Time pursuit began and concluded. Include time elapsed prior to deployment of the Spike System.
    d.  Date of pursuit
    e.  Suspect(s) information
    f.  Suspect vehicle description
    g.  Name of officer ordering the deployment
    h.  Actions of vehicle and occupant(s) before and after contact with the Spike System
    i.  Weather conditions
    j.  Road surface and condition
    k.  Suspect vehicle direction of travel when contact made with the Spike System
    l.  Condition of the Spiked Barrier System before and after deployment
    m.  Any other information pertinent to the vehicle pursuit/Spike System deployment, such as suspect vehicle evasive actions, speed, etc. during the pursuit.
    n.  Signature of officer completing the report
2.  The initial pursuing officer will also be required to complete a detailed report which will explain how the pursuit began, the route of the pursuit, actions of the fleeing vehicle and why a decision was made to deploy the Spiked Barrier System.
3.  The highest ranking officer on duty at any time the Spiked Barrier System is deployed will collect all data pertaining to the pursuit and the Spike System deployment and organize a file which will be routed to the Chief of Police for review and for filing. Data pertaining to the pursuit will include, but not be limited to, the following:
    a.  Reports
    b.  Dispatch logs
    c.  Witness statements
    d.  Documentation of any possible evidence

# SECTION 114
# TASER HANDLING AND DEPLOYMENT

1. **POLICY:** This section sets forth the Alexander Police Department's policy regarding the training, handling and deployment of the M/X26 TASER.

2. **PURPOSE:**
   A.    To inform and direct those officers who are authorized operators of the M/X26 TASER, in a uniform and professional manner, in the proper tactics and procedures in deploying the TASER.
   B.    To provide written guidelines for officers to follow when deploying the TASER, as well as documentation required for a TASER deployment.

3. **INFORMATION:**
   A.    The TASER is an additional police tool and is not intended to replace verbal problem solving skills, self-defense techniques, or firearms. The TASER shall be deployed only in circumstances where it is deemed reasonably necessary to control a dangerous or violent subject. The TASER shall be deployed when deadly force does not appear to be justified and/or necessary, and attempts to subdue the subject by other conventional tactics have been, or will likely be, ineffective in the situation at hand; or there is a reasonable expectation that it will be unsafe for officers to approach within contact range of the subject. The deployment of a TASER is considered a use of force one level greater than physical strength and skill and is on the same use of force level as pepper spray (Oleoresin Capsicum or Mace).

   B.    Only properly functioning and charged TASER'S will be issued for field use. The battery charge shall be checked prior to removing the TASER from storage. The battery charge shall only be checked when there is no air cartridge loaded in the TASER. The TASER should be pointed in a safe direction with no air cartridge loaded in the unit front, the "test spark", performed when checking the TASER out is to test the battery charge.

   C.    Any TASER or component thereof found to be defective or damaged shall be turned in to the Chief of Police, or other designated person, as soon as possible. The defective TASER or component will then be returned to the appropriate TASER Company for replacement or repair. Repairs will not be attempted by anyone other than an appropriate TASER company technician, or someone authorized by the appropriate TASER company.

   D.    All TASER'S and associated equipment shall be properly secured when not in use. When carried in the field, the TASER should be carried in an authorized TASER holster. When carried by an officer, the TASER holster should be carried opposite of the officer's service firearm.

   E.    *Only officers that have been trained by a TASER certified instructor are authorized to carry and/or deploy a TASER.*

4. **DEPLOYMENT:**
   A.  Each deployment of a TASER shall be investigated and documented utilizing an Incident Report and/or Use of Force report. This includes a contact deployment (Drive Stun), as well as the firing of an air cartridge or other deployment resulting in a subject or animal receiving an electrical charge from the TASER, or when the TASER is activated (sparked) and the subject is subdued/controlled without actually receiving an electrical charge from the TASER.

   B.  An officer shall not brandish, display, or threaten the use of the TASER unless the officer can reasonably conclude that its use may become, or is likely to become justified. Officers shall ensure that the TASER is deployed or discharged only in the manner in which they were trained; the TASER shall only be utilized by trained/certified personnel. The cycles should not exceed two (2) five second cycles except under extreme circumstances.

114.1

C. Prior to deployment or discharge of the TASER, officers shall ensure that there are no **FLAMMABLES** present.

D. **UNDER NO CIRCUMSTANCES SHALL AN OFFICER INTENTIONALLY DEPLOY OR DISCHARGE THE TASER AT THE NECK, HEAD OR FACIAL AREAS** of the target subject. All deployment or discharges will be targeted to the chest, back, arms, and/or legs.

E. Officers shall not deploy the TASER on a **FEMALE WHO IS OBVIOUSLY PREGNANT.**

F. Officers shall not deploy the TASER on children under the age of twelve (12) or elderly unless the actions of the subject present an immediate threat of death, great bodily harm, or substantial physical struggle that could result in injury to themselves or any other person including the deploying officer.

G. Officers shall exercise extreme caution when deploying the TASER on people that is positioned on an elevated platform, or who are at a greater risk of sustaining substantial injury or death from a fall.

H. The Chief of Police or his designee shall be notified of TASER usage in any situation. The Chief of Police, or his designee, shall be notified as soon as possible after the incident, within reason, and a full, detailed report will be submitted as soon as reasonably possible.

I. The TASER shall under no circumstance be used punitively or for the purpose of coercion.

J. When an officer deploys the TASER and immediately prior to using the TASER, the TASER officer should notify any and all other officers on the scene that he is going to utilize the TASER by announcing **"TASER".**

K. Only medical personnel may remove, or direct the removal, of TASER probes that are embedded in soft tissue areas such as the neck, face or groin or the breast of a female. Removal from other areas will be at the discretion of the supervisor at the scene or the medical personnel. It is recommended, but not mandatory, that medical personnel (EMT, Paramedic, etc...) remove the TASER probes if they are imbedded in the skin. It is recommended that prior to removal of the probes; the officer should take photographs of the probes and the location of the probes on the subject.

L. After an officer utilizes the TASER, the officer will submit a detailed report, along with a TASER Use Report, and mark the location of the impact of the TASER probes on the diagram of page two of the TASER Use Report.

M. When an officer deploys and utilized the TASER, and after the subject is subdued and taken into custody, the officer will secure the spent cartridge, complete with the wires, and probes and place them into evidence. The TASER control officer should download the deployment data on the computer and obtain a printed report. A copy of the printed deployment report shall include the date prior to the deployment, the date of the deployment on the subject, and the day after if available. This deployment printed report will be maintained with the original incident/arrest report for court purposes.

**5. GUIDELINES FOR POLICE OFFICER REMOVAL OF TASER PROBES FROM SUBJECT:**

A. Supplies:
    a. Medical type gloves, antiseptic/alcohol wipes, band-aid, biohazard stickers.
B. Subject Safety:
    a. DO NOT attempt removal if subject is combative.
    b. DO NOT attempt removal if location of the probe is in;
       Face, Neck, Ear, Breast, Groin, or Deeply Implanted.

(Probes that are superficially in the skin may be removed by an officer who is trained to do so and under the supervision of another officer if possible.)

C. Procedure:
    a. Officers will put on medical type gloves.

    b. Place the spent TASER cartridge on the ground or other flat surface with holes up.

    c. Firmly grasp the probe and with one pull remove probe from the subject and check to see that the barb is still on the probe then place the probe point down in the spent cartridge. DO NOT HOLD THE CARTRIDGE WHILE PLACING USED PROBE INTO THE CARTRIDGE; INSTEAD KEEP IT ON THE GROUND OR OTHER FLAT SURFACE.

    d. With an antiseptic wipe, clean the skin in a circular motion moving from puncture wound out, dirty skin will need more than one cleaning. Use a new antiseptic wipe for each cleaning. DO NOT GO BACK AND FORTH ACROSS THE PUNCTURE WOUND, START IN THE CENTER AND MOVE OUTWARD IN A CIRCULAR MOTION (this is to prevent infection of the puncture site).

    e. After air drying, if needed apply clean dry Band-Aid.

    f. If needed, follow same procedure for removal of second Taser probe.

    g. Each fired probe shall be treated as a biohazard whether it is in the skin or not at the time of Post-deployment evaluation.

    h. Secure the holes of spent Taser cartridge with both latex type gloves and apply biohazard label.

    i. Handle, store, and dispose of the cartridge in the same manner as biohazard waste. The used cartridge is to be turned in as evidence.

    j. Asses subject for any injury or condition that may need medical attention and seek appropriate level of service for the subject

    k. Clean hands with waterless hand sanitizer or wash with soap and water.

    l. You may provide the subject or caretaker with a copy of the TASER Aftercare Sheet

Updated 8/2008

114.3

## TASER AFTERCARE

The Taser M/ X26 sends a low dose of electrical current for up to five (5) seconds to temporarily stun or immobilize. The manufacturer reports that it may cause temporary involuntary skeletal muscle contraction and a feeling of dizziness. It does not interfere with the heart muscle contraction or pacemakers and does not cause long term after effects, nerves, or body functions.

What to expect:

It is normal to experience redness, numbness, and tingling in the effected area for a few hours afterwards. If the skin was punctured by the Taser probe, the probe has been removed, the skin cleaned with an antiseptic and a bandage applied.

Recommendations:

Keep bandage clean and dry to reduce the possibility of infection. Watch for and seek medical care if signs such as persistent redness and swelling or fever occur. If it has been ten or more years since your last Tetanus shot see your doctor for a Tetanus booster.

This information provided for your safety by the Alexander Police Department.


DATE:

BY:

114.4

# SECTION 115
## DEATH/SERIOUS INJURY NOTIFICATION

POLICY: It is the policy of this agency that all officers become familiar with procedures to be used to provide next of kin and other family members with adequate information and support when notifying them of the death or serious injury of a family member. Death or serious injury notification will be accomplished in a manner consistent with professionally accepted crisis intervention techniques.

PROCEDURES:

a.   Gathering of Information and Preparing for Notification Assignment
    (1) All death and serious injury notifications made by this agency will be made in person, with the exception of a serious injury notification where the delay in notification might prevent the family from arriving at the hospital before the injured person's death.
    (2) Officers shall be prepared to spend as much time as necessary with survivors to provide assistance.
    (3) Prior to contacting next of kin, notification officers shall gather and become familiar with essential details concerning the deceased or seriously injured person, to include full name, age, race and home address. The notification officers shall be well informed as to the details of the death or serious injury, location of the body/personal effects and any other pertinent information.
    (4) Notification officers shall establish the identity of the next of kin of the deceased or seriously injured person for purposes of notification. The order of priority for notification will be the spouse, followed by parents, brothers or sisters, then any children. Where time permits parents should be notified after notification of spouse.
        (a)   Only where substantial delays would be required to make contact with next of kin should other family members are contacted.
        (b)   Notification officers should contact the Chief of Police for guidance when in doubt concerning next of kin or any delay in notification.
    (5) When another agency must be contacted to notify the next of kin, officers should
        (a)   request that the notification be made in person, and
        (b)   request immediate verification when notification has been accomplished.
    (6) Notification officers should gather available information concerning the survivors that may aid in notification. This information would include whether survivors are elderly, disabled, visually or hearing impaired, have medical problems or may not speak English. If possible, obtain the names of the survivor's closest relative, friend, family doctor and clergyman.
    (7) Officers will not use the name of the deceased or seriously injured person over the radio and will not release name to news media until assured that next of kin notification has been made.
    (8) Where possible, two officers (preferably a male and female team) should be assigned to a death or serious injury notification.
    (9) Notification officers should request the assistance of a local minister, preferably the survivor's minister, where feasible.
    (10) Personal effects of the deceased will not be delivered to survivors at the time of death notification.

b.   Making Notification
    (1) Upon arrival at the residence or place of business, the notification officers will:
        (a)   check the accuracy of the location;
        (b)   request to speak to the next of kin;
        (c)   identify themselves by name and agency;
        (d)   verify the relationship of the next of kin to the deceased or seriously injured person; and
        (e)   ask permission to enter the residence or (in the case of a business or other location) move to a place of privacy.
    (2) Every reasonable effort shall be made to make the death or serious injury notification in the privacy of the next of kin's home or in another location away from public scrutiny.
    (3) Prior to making notification, officers should, where possible, bring members of the family together if they are immediately available.

(4) Notification officers should address the next of kin in a straight-forward manner and use easy to understand language to briefly explain the circumstances of the incident and the fact that the individual is seriously injured or dead.
    (a)   Officers should not use words such as "passed on" or "no longer with us" in order to avoid using the term "dead" as those words may create confusion or false hope.
    (b)   Officers should avoid graphic aspects of the incident and the use of law enforcement jargon.
    (c)   Officers should refer to the deceased or seriously injured person using his/her first name or in terms reflecting the deceased's or seriously injured person's relationship to the next of kin (i.e., husband, wife, son, daughter, etc.).
(5) Officers should be prepared for unexpected responses from survivors to include hysteria and possible verbal or physical attack.
(6) Officers should provide survivors with sufficient time to regain composure before proceeding. Avoid attempts in the interim to provide comfort by using such phrases as "I know how you feel" or "I know how hard this is for you."

c.   Providing Assistance and Referral
(1) Notification officers shall not leave upon completion of the notification until reasonable assured that the next of kin has adequate personal control and/or family or close friend(s) readily available to provide support. In gauging the need for assistance, notification officers shall also consider the following:
    (a)   the emotional reaction and the physical condition of the next of kin;
    (b)   the availability of other adults in the home;
    (c)   responsibility for infants or small children;
    (d)   home environment (e.g., evidence of excessive alcohol use or drug use, lack of means of financial support, shortage of food, problem with shelter, etc.); and
    (e)   availability of a support system (e.g., including friends, family, close neighbors, access to clergy, means of transportation, etc.)
(2) Officers should provide any additional information of a fatal incident requested by survivors. While graphic details may not be necessary, officers should provide information if asked specifically concerning the cause of death, condition of the body or other details of the fatality.
(3) Officers should remain alert to the possible need for medical assistance. When officers are aware of serious medical conditions in advance of notification, they should place a local medical response unit on alert.
(4) Officers should be aware of confusion on the part of survivors; speak slowly and deliberately, and write down any pertinent information that the survivor may need. This includes such matters as the following:
    (a)   disposition of the body;
    (b)   location of personal effects;
    (c)   identification requirements/procedures; and
    (d)   notification officers' names, agency and telephone numbers.
(5) Officers should assess the physical and emotional well-being of the survivor before departing. Officers should be reasonably assured that survivors can take care of themselves and those for whom they may be responsible.
(6) Notification officers should not leave a lone survivor unattended until all reasonable efforts have been made to obtain first-hand support from the survivor's family, friends, co-workers, neighbors, family clergy or counselors.
(7) Notification officers should conduct a follow-up within 24 hours with any survivor when there is a concern for the survivor's well-being.

# SECTION 116
# LINE OF DUTY DEATHS

**POLICY:** The policy of this agency is to immediately respond to an employee's death by not only conducting a thorough investigation into the circumstances, but also by providing comprehensive support to next-of-kin.

*IMPLEMENTATION*

a.  In the event of a felonious or an accidental line of duty death of an employee of this agency, all assigned personnel not involved in an emergency situation will prepare to respond as directed.
  (1) First officer on the scene will call for the nearest available back-up officer immediately upon determining that an employee's death has occurred. The duty of the back-up officer will be to make notification to next-of-kin as quickly as possible after being briefed on circumstances of death. The only circumstance when the back-up officer would not proceed to make notification would be that the officer's presence at the scene is tactically required. In that case, the back-up officer will provide assistance until the scene is secure, then proceed with notification.
  (2) First officer on scene will notify dispatcher by radio that an employee death has occurred, and whether the death is accidental or felonious. DO NOT USE NAMES ON RADIO.
  (3) Upon notification that an employee's death has occurred, the dispatcher will immediately notify the Chief of Police. If radio is used for means of communication, DO NOT USE NAMES ON RADIO.
  (4) First officer on the scene will be responsible for complete and detailed written report. First officer on scene will not leave scene until investigation of scene is complete or relieved by the Chief of Police.

b.  Notification of Next-of-Kin
  (1) The back-up officer will contact the dispatcher to determine the most senior officer available to accompany him to notify next-of-kin. In addition to these two officers, the agency chaplain or a member of the clergy may be dispatched if available to respond quickly. If another person is not readily accessible, and there is an opportunity to get the family to the hospital prior to the demise of the employee, the back-up officer should not wait for the appropriate delegation to gather.
  (2) If the family wants to go to the hospital, they should be transported via police vehicle. Should there be serious resistance and the family insists on driving, an officer should ride with them.
  (3) Make arrangements for any young children.
  (4) Surviving parents will be notified in the same manner as spouses if they live within the county. If they live elsewhere, a request will be made to the appropriate agency to make notification.
  (5) If the tactical situation permits, the Chief of Police will accompany the back-up officer and will be the primary notification officer.

c.  Assisting the Family at the Hospital.
  (1) A member of this agency will be present the entire time the family is at the hospital and will arrange whatever assistance the family needs. (The crew who made the initial notification should be at the hospital).
  (2) Arrangements will be made for transportation of the family back to their residence.
  (3) Arrangements will be made for all medical bills relating to the services rendered to the deceased employee to be sent to this agency. The family should NOT receive any of these bills at their residence address.

d.  Family Support
  (1) A Department Officer will immediately be appointed to the critical assignment of liaison officer. This position will not be a decision making position, but in the role of "facilitator" between the family and this agency. The liaison officer will:
    (a) insure the needs of the family come before the wishes of the department;
    (b) meet with the family and tell them what his responsibilities will be during this time;
    (c) meet with the family regarding funeral arrangements. The liaison officer should make the family aware of what the department can offer in the way of assistance if the family decides to have a "law enforcement funeral";
    (d) know all the information concerning the death and the continuing investigation to answer family questions;

(e)  provide as much assistance as possible, oversee arrangements for travel and lodging for out-of-town family members;

(f)  be constantly available to the family;

(g)  see that the surviving parents are afforded recognition and will have proper placement arranged for them during the funeral and funeral procession;

(h)  see that the family is briefed on the funeral procedure (i.e., 21-gun salute, presentation of flag, playing of taps, pallbearers, funeral procession, etc.);

(i)  see that a "family support group" (officer's wives and others) are assigned the responsibility of seeing that the home is prepared for the influx of visitors and that ample food is available. Baby sitting needs for all family members should be met.  Have someone screen phone calls. Make sure someone is <u>always</u> at the residence;

(j)  coordinate pallbearers, ushers, and 21-gun salute manpower requirements with other law enforcement agencies if the family desires a "law enforcement funeral";

(k)  make available department patrol vehicles to the family if they desire transportation to and from the funeral home; and

(l)  provide information and assistance to obtain benefits to the surviving family.

(1) The same person appointed as liaison officer for family support will be appointed as a "benefits coordinator" after the funeral to gather information on all benefits/funeral payments available to the family.  This officer will be completely responsible for filing appropriate paperwork and following through with the family to ensure that these benefits are being received.

(2) The benefits coordinator will visit the family a few days following the funeral and give them a list of the benefits due, who to contact at the various benefits offices, and when they can expect payment of the benefits.  Benefits will differ with each individual, and depending on whether death was felonious or accidental, but all the following benefit sources should be explored:

*  workers compensation;
*  social security;
*  federal public safety officer death benefit, 42 USC 3796 (currently $119,894.00);
*  state public safety officer death benefit, ACA 21-5-705 (currently $100,000.00 if a felonious act, plus $25,000.00 if wearing a bullet proof vest, or $25,000.00 for accidental death);
*  National Chief of Police's Association ($2,500.00);
*  personal life insurance;
*  educational benefits for dependent children;
*  Veterans Administration; and
*  health benefits will continue for six months after death upon payment of premium.